and had received inadequate assistance. Another problem was the absence of on-line confirmations via Echo. Bill Olsen installed an Echo upgrade while on site and provided some remedial training. Colonial acknowledge a system wide problem in processing Echo confirmations and advised that a correction would be in place by approx. 31 July. In the meantime, Colonial had instituted fax confirmations. Olsen also advised that the site contact him if they were not receiving satisfactory assitance from the Echo Choice help desk.

10. In terms of JIT orders, WP identified four areas of dissatisfaction - having to initiate contact with Colonial for determination of reason for cancellations, being advised to order as EDOs items that they feel should be available within the JIT timeframe, not receiving confirmation within 2 hours, and receiving cancellations on items that were specifically ordered based on apparent availabilty as indicated by Colonial stock status reports. Colonial's failure to adhere to the required confirmation timeframe appears to be due to their manual review of orders in an attempt to maximize fill. WP requested, and DPSC concurred, that Colonial should allow its automated order processing system to operate without intervention. The cancellations were predicated on either the absence of usage data or consistent ordering - there was no specific allusion to manufacturer backorders (eg., Baxter).

11. When specifically questioned on the following issues, WP could not identify any existing deficiencies or problems: contract terms and conditions, shipment discrepancies, credits, customer rep visits. While there initial problems experienced with the splitting of EDO shipments, Colonial had apparently taken corrective action. WP would like to see expanded DAPA coverage, but conceded that in term of where they were now in the program, this was not an inhibiting factor. Mike O'Connor confirmed continued interest in providing additional coverage under a Colonial DAPA, but advised of their intention to wait until the application procedures were automated.

12. DPSC asked what additional opportunities existed for increasing contract utilization. This lead to a discussion of procedural packs. Colonial was currently working with WP on providing Sterile Design prepacks via non-DAPA purchases. DPSC again reiterated it's intention of adding prepacks under DAPAs and requested that WP provide usage and component data. Msgt Dildy indicated that he was working on the component data and would provide it to DPSC when completed. The Colonial sales rep., Craig Madding, had a copy of a "Custom Product Purchase Contract" in hand (see MFR dtd 2 Jul). This was returned to him without discussion. In Mr. Madding's opinion, the configuration of prepacks changed too frequently to be effectively accommodated by the DAPA process. WP did not concur.

CONCLUSIONS - WRIGHT PATTERSON

1. WP regretted not starting the implementation process earlier, and believed that in consideration of the level of effort required, more guidance and assistance should have been provided. Msgt Dildy indicated that it wasn't until the visit of 30 Apr that the basic program requirements and processes began to become clear to him.

2. WP has not been able to make substantive independent progress in adequately identifying and defining requirements. Colonial and WP committed the time and resources to address this deficiency. WP declined DPSC assistance at this time

3. Colonial needs, in addition to reliable requirement forecasts, consistency in order patterns and levels. WP, on the other hand, doesn't believe Colonial performance to date supports a level of confidence that would justify attempting anything systemically to equalize order intervals and quantities. Although not an ideal solution, Colonial agreed to provide a weekly stock status report to assist the site in determining supply availability.

4. Colonial acknowledged the need to evaluate and, if required, correct the following performance deficiencies reported by WP: Echo access, on-line confirmations, provision of monthly fill rate report, delivery of EDOs within prescribed timeframe, availability and quality of help desk support on the part of Colonial and Choice Medical Systems, proactive response in providing information on rejected line items.

5. Because WP intends to use both the PVI and Echo, additional OES training is required. The Colonial sales rep., Mr. Madding, would not be the most suitable Colonial resource to effect the type of comprehensive training needed by WP. WP also has an obligation to ensure that the training provided is reinforced by routine and consistent use of the system.

6. WP believes that the estimates of potential sales volume are realistic, but full blown implementation will not be acheived until Jan 97.

FOLLOW-ON ACTIONS:

1. Monitor status of WP and Colonial efforts in converting item equivalents identified by DPSC in Apr. 96. (MSACA)

2. Obtain WP requirement data for Sterile Design prepacks. (MSACA)

3. Coordinate with EDS on questions regarding PVI reports. (MSACA - information provided to Sgt Scrivens 7/30/96. Absence of reason codes on cancellation rpt to be researched by Mark Grzebien, EDS)

4. Provide formal notification of findings to Colonial. (MSAA)

GREAT LAKES NTC DISCUSSION:

1. DPSC expectations were that by mid May GLs should have been in positon to convert and order approx 400 line items from the PV. This was based on the development of a preliminary ISR by 8 Mar and installation of the Echo OES in mid march. Primary cause for the initial delay was the absence of Colonial catalog numbers in the DAPA database. It wasn't until GL could rerun an ISR that incorporated the Colonial numbers (May 96), that usable usage data could be readily provided.

2. GLs had submitted 126 calls to date. The JITO/EDO ratio is approx. 60/40. GLs estimated that it had converted only 10% of the 550 warehouse stocked line items over to the PV. Although there were review procedures in place that would divert local purchases to PV if a DAPA equivalent was evident, there had been no concerted effort to expand the PV item population. As was the case at WP, GLs did not believe that Colonial performance to date warranted large scale conversion. GLs statistics suggested a fill rate in the range of 60%, with approx. 10% of the orders having been killed. An additional 10% of the orders (EDOs) were recorded as being overdue. Like WP, GLs was not receiving the required monthly fill rate report. GLs had also experienced at least two instances of split shipments.

3. As with WP, the central issue became that of the PV trying to reconcile its commercial stockage practices with the ability of the customer to commit to a consistent requirement pattern. Being a naval facility, GLs has even less capacity in its various legacy systems to forecast or regulate orders. In contrast to the 55 line items that GLs claimed it had converted over to the PV SOS, Colonial maintained that it was currently stocking 207 line items specifically for GLs. Again, Colonial agreed to provide a weekly updated stock status report as a means of improving the coordination between the distribution center and GLs. John Ballengee, GLs materiel management, advised that they had just moved $100K worth of stock back into warehouse inventory (ordered from DPSC) because of repeated kills on the part of Colonial. DPSC reiterated its current stock reduction policy so that GLs would have no expectation of continued support from the depot on DAPA equivalent items.

4. Ballengee advised that the PPC was the primary source for item data and that the Echo on-line catalog was seldom used. Other than the recent failure in on-line confirmations, he had no complaints about Echo access or operations. Ballengee indicated that Colonial had been providing fax confirmations in the interim. There were no problems evident in Colonial meeting the required timeframes for JITO or EDO confirmations, or JITO delivery.

5. Other than apparent fill rates, the most egregious deficiency in Colonial performance is in EDO delivery. GLs could document open EDOs that were approaching 30 days. Colonial has also failed to adequately communicate to the customer the reasons for order cancellation. A final issue of serious concern is the inordinately high denial rate of the Colonial distribution center. By GLs estimate, 20% of the calls have line items confirmed, that are not shipped.

6. GLs praised the efforts of the Colonial customer support personnel, but believes that staffing is inadequate to the demands being placed on it. An example of this was an emergency order initiated by John Ballengee. Because the order was placed during non-business hours, it was left on a voicemail system and no confirmation was returned. The shipment was at the hospital within two hours, but in the absence of a confirmation, the GLs materiel management division could not verify that it's call was being processed or the product shipped.

7. Because of GLs internal accounting requirements, materiel management is attempting to track cost center expenditures via memo data entered onto the Echo order screen (MILSTRIP doc num., J.O.N., and UIC). This memo data is not captured or retained by Colonial and therefore doesn't appear on the confirmations or packing lists. Bill Olsen, Colonial, believes that this information could be preserved, and agreed to attempt to accommodate GLs needs. DPSC cautioned GLs that Colonial was under no obligation to effect this change, and had no authorization to request consideration as a result of its efforts.

8. The issue of GLs directing non-DAPA purchases to Colonial was discussed (see MFR dtd 2 Jul). Lt. Ellis explained the requirement to compete all non-PV purchases over $2.5K and indicated that there were other goals and priorities (ie. socioeconomic) to be considered. Mike O'Connor asserted that both GLs' and Colonial's socioeconomic obligations would be served by utilizing his firm. The DPSC position was that it was natural that Colonial would pursue this business opportunity, but it was entirely up to the ordering site to determine how and where it was going to procure non-DAPA supplies.

CONCLUSIONS - GREAT LAKES NTC

1. GLs was further advanced than WP in the item conversion process, but was reluctant to accelerate the process until Colonial could demonstrate significantly improved support capabilities.

2. Colonial acknowledged the need to evaluate and, if required, correct the following performance deficiencies: on-line confirmations, EDO deliveries, fill rates and reports, high denial rate ( discrepancies btw confirmation and shipment), communications on killed orders, and customer support resources.

3. GLs would not commit to a specific sales target. John Ballengee suggested that full implementation would take another 6-8 months. At a debrief btw DPSC, LtCdr Ziemke, and Lt. Ellis, the latter advised that he would support a critical re-evaluation of the continuation of the contract if the program was not running full blown by Nov.

FOLLOW-ON ACTIONS:

1. Provide LtCdr Ziemke replacement COR designation letter. (MSACA)

2. Provide formal notification of findings to Colonial. (MSAA)

GENERAL CONCLUSIONS:

1. Customers rarely exibit either the capacity or intensity of intent to independently implement the Med/Surg PV program at the pace anticipated by DPSC or the PV. The demands and priorities placed upon local operational resources may preclude greater committment.

2. There is little evidence of direct assistance or support being offered by the service field offices. Conversely, the ordering sites do not appear to have actively solicited aid from those sources.

3. The PV account representatives servicing this region could best be characterized as "salesmen", well versed in the industry and commodity, but not necessarily inclined to do the full range of grunt work required to bring DOD customers up to speed.

4. The PV's corporate leadership either did not entirely comprehend its contractual obligations, or failed to adequately communicate those obligations to the staff responsible for implementation.

5. There remains a fundamental gulf between how commercial PVs and DOD customers manage requirements and inventory. PVs are not going to radically change their inventory control practices to accommodate the relative inability of military customers to accurately forecast materiel requirements or equalize ordering patterns. The unsatisfactory fill rates that result further erode customer confidence and argue against taking any preemptive measures to adjust leadtimes, procurement cycles, stockage levels, etc.

6. Customers are not discernably anxious about the future of the Med/Surg PV program or the potential repercussions of its failure. Alternate means of obtaining supplies (Impact cards, DBPAs) afford a degree of equanimity that is obviously not in the best interest of DPSC.

Greg Wentzel
MSACA
EXT: 7124

CF: M.Rees, M.Schmitt, L.Flatley, D.Kennedy, M.Boggs, D.Stewart, B.Carson (Case Mgrs)

# Memo For Record

SUBJECT: Justification for Including Approximate Yearly Maximums

"Approximate yearly maximums" have been included in the MED/SURG Prime Vendor requirements contracts as the sales are historically difficult to estimate with accuracy.

The annual estimates were developed by the ordering facilities in conjunction with their military Service representatives. These estimates were as accurate as possible at the time of development but as additional classes of items are added to the Distribution and Pricing Agreement (DAPA) database, the potential for increased sales rises.

It is in the best interest of the Government to ensure continuity of contract in each region. As each ordering facility has adjusted to using its Prime Vendor, day-to-day stock levels have dropped and reliance on 24 hour delivery of product has risen. The annual estimate reflects our best prediction as to the sales per year in a region. This is the estimate our offerors use to develop their pricing proposal.

Without the "approximate yearly maximum," it would be likely that some regions, which have exceeded our expectations for sales, would have "purchased" themselves out of their contract parameters. These facilities would have little stock on hand and would be ill-prepared to await the award of a new contract.

It is the intent of the "approximate yearly maximum" to keep all offerors on equal footing by clearly explaining that yearly sales up to that dollar value in a region will not result in a resolicitation.

L. Flatley 12-11-95

L. FLATLEY
Chief, MED/SURG Prime Vendor Section
Devices CBU
Directorate of Medical Materiel