Christopher J. Moser
Quilling, Selander, Cummiskey
& Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)

Attorneys for Debtor

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| UNITED MEDICAL SUPPLY CO., INC., | § | CASE NO. 01-41911-BJH-11 |
| | § | (Chapter 11) |
| DEBTOR | § | |

# FIRST AMENDED DISCLOSURE STATEMENT

## I. INTRODUCTION

United Medical Supply Co., Inc. ("Debtor"), the debtor-in-possession in this case and UM Acquisition Company, LLC ("UMAC") submit this First Amended Disclosure Statement ("Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code regarding the First Amended Plan of Reorganization ("Plan") proposed by the Debtor and UMAC. This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan of Reorganization proposed by the Debtor and UMAC and filed on November 12, 2001 as it may be amended from time to time (the "Plan"). A copy of the Plan is attached hereto as **Exhibit "A"**. Unless otherwise defined herein, terms used herein have the meaning ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions").

## II. NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable creditors of the Debtor to make an informed decision in voting to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

On __________, 2001, the Bankruptcy Court entered an order pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving this Disclosure Statement as

maturity or payment in full in cash. **ALL CLASSES OF CLAIMS ARE IMPAIRED AND ARE ENTITLED TO VOTE ON THE PLAN IN THIS CASE.**

The Bankruptcy Court may also confirm a plan of reorganization despite its rejection by a class of impaired claims or interests, if the proponents of the plan show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

The Debtor believes that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims, and can therefore be confirmed, if necessary, over the objection of any Classes of Claims. The Debtor reserves the right to request Confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

## IV. HISTORY AND BUSINESS OF THE DEBTOR

### A. Company Profile.

The Debtor, United Medical Supply Co., Inc., is a Texas corporation which is engaged in the business of distributing medical supplies to hospitals, clinics, doctors and home health patients. The Debtor is a closely held corporation whose stock is held 100% by United Ventex, Inc.

### B. Events Leading to Bankruptcy.

Prior to filing bankruptcy, the Debtor had focused its efforts on providing medical supplies to major hospitals and medical clinics on a high volume, low margin basis. This business plan would have been profitable had the hospitals and clinics who received the medical supplies paid the Debtor on a timely basis. The slow payments and/or delayed payments by large hospitals and divisions of the federal government caused a shrinkage of eligible receivables that the Debtor could borrow against in its asset based lending arrangement with CIT. As eligible receivables shrunk, the Debtor's borrowing availability constricted causing cash flow problems. As a result of inadequate cash flow, caused in part by a large reduction of sales, the Debtor fell behind on its trade debt obligations while at the same time rapidly repaying CIT. The Debtor collected ineligible receivables prior to bankruptcy; however, these collections were not replaced with new receivables which resulted in limited borrowing availability and severe cash flow problems. Within the nine months prior to bankruptcy, CIT's secured debt was reduced by approximately $7 million at the expense of the trade creditors whose debt soared to approximately $8 million. During this time period, the trade creditors were financing the Debtor's operations due to the unworkable financial arrangement between the Debtor and CIT.

In March 16, 2001, the Debtor filed Chapter 11 bankruptcy in an effort to save its business, pay trade creditors and to restructure its lending arrangement with CIT.

### C. The Debtor's Management and Governance.

Brown and CIT on the Closing Date. The Loan and Security Agreement will enable UMAC to borrow from CIT through a revolving loan. The assets of the Debtor, other than the DOD Claim, shall be transferred to UMAC on the closing date subject to CIT's liens. Following the execution of a Loan and Security Agreement by UMAC, CIT will release the Debtor from any liability on the Loan and Security Agreement except that CIT shall retain its lien on sixty percent (60%) of the Net Proceeds of the DOD Claim which shall continue to secure CIT.

CIT shall finance the loan of UMAC to effectuate the sale of assets contemplated in this Plan.

Class 4: (Allowed Secured Claim of Ford Motor Credit). The Allowed Secured Claim of Ford Motor Credit shall be paid by UMAC pursuant to the terms of its note. Ford Motor Credit shall retain its liens securing its claim.

Class 5: (Allowed Secured Claim of General Motors Acceptance Corporation). The Allowed Secured Claim of General Motors Acceptance Corporation be paid by UMAC pursuant to the terms of its note. General Motors Acceptance Corporation shall retain its lien securing its claim.

Class 6: (Allowed Secured Claim of Frank Broyles and Goins, Underkofler, Crawford and Langdon). The Allowed Secured Claim of Frank Broyles and Goins, Underkofler, Crawford and Langdon shall be paid in accordance with the Agreed Order on Motion to Compel Debtor to Assume or Reject Contingency Fee Agreement and Authorizing Debtor to Assume Such Agreement, as Modified ("Agreed Order") entered by the Court on August 22, 2001. Claimant shall retain its presently existing lien until it is paid pursuant to the terms of the Agreed Order. Claimant is not subject to the deadlines listed herein for filing fee claims or notices of fee claims.

Class 7: Allowed Unsecured Claims. The Class 7 Allowed Unsecured Claims shall be paid 16% of their Allowed Claim by UMAC over a five (5) year time period as follows:

a. On the Closing Date - 2%
b. One year after the Closing Date - 2.25%
c. Two years after the Closing Date - 2.25%
d. Three years after the Closing Date - 3%
e. Four years after the Closing Date -3%
f. Five years after the Closing Date - 3.5%

In addition to the payments referenced above, the Debtor will pay 40% of the Net Recovery from the DOD Claim to Allowed Unsecured Creditors. The remaining 60% of the Net Recovery from the DOD Claim shall vest in UMAC subject to CIT's lien.

The Reorganized Debtor reserves the sole right to settle its claim against the Department of Defense and neither court, Committee, creditor or creditor's trust approval is required, subject to Section 9.09 of the Plan. However, prior to settling the claim, the Debtor shall provide the Unsecured Creditors' Committee, CIT and their counsel written notice of intent to settle the claim. The Unsecured Creditors' Committee and CIT shall have ten (10) days to provide the Reorganized Debtor with written notice of any objection to the proposed settlement. If neither the Unsecured

As to the other alternatives, the Debtor is unable to predict whether or not it would be given additional time to formulate a different plan of reorganization under chapter 11. In all likelihood, the chapter 11 would continue for an additional period of time, during which any party in interest would be allowed to propose a plan and the Debtor could propose an alternative plan. If the Plan is rejected and not confirmed, the Debtor would most likely cease operations and file a liquidating plan. In this event, CIT would not consent to the use of cash collateral and would pursue its lift stay motion.

The third alternative is the liquidation of the Debtor's estate. A liquidation or straight bankruptcy proceeding, known as a Chapter 7 proceeding, is a liquidation of the Debtor by an impartial trustee with no effort to rehabilitate the Debtor's business. By contrast, a chapter 11 proceeding, in which the Debtor is currently engaged, is designed to permit the Debtor time to formulate a plan for the rehabilitation of the Debtor or the sale of the assets of the Debtor as a going concern under the supervision and protection of the Court.

**1. General Concept of a Chapter 7 Liquidation.**

In a chapter 7 bankruptcy proceeding, the amount to be received by Unsecured Creditors would depend upon the net estate available after all assets of the Debtor have been reduced to cash, and all Secured Creditors have been paid in full. Furthermore, whether a bankruptcy is a Chapter 7 or a Chapter 11 proceeding, administrative and Priority Claims are entitled to be paid in cash and in full before Unsecured Creditors receive any funds.

Should this case be converted to Chapter 7 liquidation, a Secured Creditor would be entitled to full payment of its allowed claim from the proceeds of sale of its collateral. Following payment of Secured Creditors, the funds remaining in the estate after administrative claims are paid in full would be paid to Unsecured Creditors. Based solely upon the Debtor's liquidation estimates, Unsecured Creditors would most likely not receive a distribution if the case were converted to Chapter 7.

The Chapter 7 Trustee would be entitled to receive compensation under §326 of the Bankruptcy Code. Such a fee would not exceed twenty-five percent (25%) on the first $5,000.00 or less, ten percent (10%) on any amount in excess of $5,000.00, but not in excess of $50,000.00, and five percent (5%) on any amount in excess of $50,000.00 but not in excess of $1,000,000.00 and reasonable compensation not to exceed 3% of such monies in excess of $1,000,000.00 upon all monies disbursed or turned over in the case by the trustee to parties in interest, excluding the Debtor but including holders of Secured Claims. The trustee's fees would be paid as a cost of administration and would be paid in full prior to the costs and expenses incurred in the chapter 11 case and prior to any payment of Unsecured Creditors.

**(A) Chapter 7 Liquidation Applied to the Facts of this Case.**

The Debtor has analyzed whether a chapter 7 liquidation of the assets of the Debtor would be in the best interest of holders of Claims. The analysis reflects that a liquidation value is materially lower than the value that may be realized through the Plan. The Debtor further believes that, given CIT's lien position, a liquidation in chapter 7 would result in substantial diminution in value to be

realized by holders of Claims because of (i) additional administrative expenses involved in the appointment of a chapter 7 trustee, attorneys, accountants and other professionals to assist the trustee in the case of a chapter 7 proceeding; (ii) the substantial time which would elapse before creditors would receive any distribution in respect to their Claims and (iii) substantially all recoveries would benefit only CIT and not unsecured creditors as a class. Consequently, the Debtor believes that the Plan provides a substantially greater return to holders of Claims than would a chapter 7 liquidation.

In a chapter 7 liquidation, CIT would most likely attempt to sell its collateral through a foreclosure scenario. Nearly all of the Debtor's property is encumbered by a lien in favor of CIT. Additionally, various other creditors assert liens against the Debtor's property. The chapter 7 trustee would likely be given some period of time to sell the encumbered property for an amount in excess of the lien amount. If the trustee were successful, all proceeds in excess of the secured creditor's liens would be paid first to pay costs of administration and then be available for distribution pursuant to the terms of the Bankruptcy Code. In a liquidation scenario, it is likely that general unsecured creditors would receive a nominal distribution through the liquidation of the Debtor. Consequently, the Debtor believes that the Plan provides a substantially greater return to holders of Claims than would a chapter 7 liquidation.

The Debtor estimates that in the event this case were converted to Chapter 7, as of this date, the following amounts would be received by a Chapter 7 Trustee from liquidating the assets:

**ASSETS:**

| | Assets | Chapter 11 Going Concern Value | Chapter 7 Liquidation Value |
|---|---|---|---|
| a. | Accounts Receivable | $1,200,000.00 | $ 700,000.00 |
| b. | Inventory | $1,700,000.00 | $1,400,000.00 |
| c. | FF&E | $ 35,000.00 | $ 35,000.00 |
| d. | Real Estate | $1,375,000.00 | $1,375,000.00 |
| e. | Cash | $ 25,000.00 | $ 25,000.00 |
| f. | Rebates | $ 125,000.00 | $ 75,000.00 |
| g. | Shipped not Billed | $ 48,000.00 | $ 40,000.00 |
| h. | Prepaid Inventory | $ 200,000.00 | $ 150,000.00 |
| i. | Automobiles | $ 5,000.00 | $ 2,000.00 |
| j. | DOD Claim | $ 250,000.00 | $ 200,000.00 |
| k. | Ad Valorem Tax Escrow | $ 160,000.00 | $ 160,000.00 |
| l. | Preference Recoveries | $ 200,000.00 | $ 200,000.00 |
| m. | Professional Escrow | $ 50,000.00 | $ 50,000.00 |
| | **Total** | **$5,373,000.00** | **$3,087,000.00** |

**ASSET VALUE IN CHAPTER 11 AS A GOING CONCERN: $5,373,000.00**
**ASSET VALUE IN CHAPTER 7 LIQUIDATION: $3,087,000.00**

**LIABILITIES:**

a. **Less Secured Debt:**

| | |
|---|---|
| 1) CIT | $3,450,000.00* |
| 2) Bexar County Assessor | $ 74,000.00 |
| 3) Sugarland City | $ 10,200.00 |
| 4) Eagle Mountain ISD | $ 130,000.00 |
| 5) Ft. Bend County | $ 13,500.00 |
| 6) Ft. Bend County Assessor | $ 16,500.00 |
| 7) Ft. Bend ISD | $ 50,200.00 |
| 8) Judson ISD | $ 100,000.00 |
| 9) Lubbock CAD | $ 3,500.00 |
| **Total Secured Debt:** | **$3,847,000.00** |

***Estimated amount, may be less.**

b. **Less Chapter 7 Administrative Expenses: $ 300,000.00**

c. **Less Chapter 11 Administrative Expenses: $ 250,000.00**

d. **Less Unsecured Priority Claims: $ 10,000.00**

**TOTAL LIABILITIES: $4,407,000.00**

**NET FUNDS AVAILABLE TO PAY APPROXIMATELY $9,000,000.00 OF UNSECURED CREDITORS IN A CHAPTER 7 LIQUIDATION: $0.00**

As the liquidation analysis confirms, Debtor believes that creditors will receive a significantly greater amount of money under its proposed Plan of Reorganization under Chapter 11 than under a Chapter 7 liquidation by a Trustee. CIT believes that liquidation might yield significantly less than the above estimates, and would result in no distribution at all for Unsecured Creditors.

## XIV. CONCLUSION

The Debtor and UMAC urge holders of Claims to vote to **ACCEPT** the Plan and to evidence such acceptances by returning their ballots so that they will be received on or before 4:00 p.m., Central Standard Time, on ____________, 2001.

Submitted on this 12th day of November, 2001.

UNITED MEDICAL SUPPLY COMPANY , INC.

UNITED MEDICAL SUPPLY COMPANY, INC.

By: ______________________
William P. Bandy, President

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

By: ______________________
Christopher J. Moser, Attorneys for Debtor

UNITED MEDICAL SUPPLY COMPANY, INC.

By:____________________
William P. Bandy, President

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

By:____________________
Christopher J. Moser, Attorneys for Debtor

UM ACQUISITION COMPANY, LLC

By:____________________
Frank Brown, President



LR:N:\CJMtemp\CJM\UnitedMedical2125.00\DisclosureStatement1.wpd