IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff v. THE UNITED STATES, Defendant** | **CASE NO: 03-CV-289**<br>**Judge Allegra** |

**AFFIDAVIT OF WILLIAM BANDY**

1. My name is William Bandy. I am over the age of 21 years and fully competent to make this affidavit. Unless otherwise stated, all statements made herein are based on my personal knowledge. The statements of fact based on my personal knowledge are true and the opinion statements are my opinions.

2. Attached to this affidavit as Exhibit A is a genuine copy of my resume. The statements made in that resume are true.

3. In 1980 I co-founded United Medical Supply Company Joint Venture as a predecessor to United Medical Supply Company, Inc, which was formed in 1987 as a Texas corporation. Its primary business purpose was to engage in the distribution of medical supplies, an industry with which I was very familiar. I served as president of United Medical Supply Company, Inc. during the period from the time it was incorporated in 1987 until late 2001, at which time Frank Brown became president. I have remained in a consulting capacity to United Medical since that time.

4. In my capacity as president and as a consultant I have acted as a custodian of certain business records of United Medical and all purported business records attached to this affidavit are genuine copies of records from files maintained by me.

5. The reference in this affidavit to United Medical refers to United Medical Supply Company, Inc., the plaintiff in this case.

6. In 1997, the United States contracted with United Medical under a “Prime Vendor” requirements contract to purchase medical supplies for a period of one year, with the Government having a unilateral right to renew annually for four additional “option” years. References in this affidavit to the Contract refer to Contract Number SP0200-97-D-7133. References to the Solicitation are to Solicitation DLA120-93-R-0587. The Contract was terminated by agreement of the Parties 47 months after the effective date.

7. United Medical agreed to the Contract and calculated its proposed distribution fee of 6.4% based on the Solicitation representations by the United States its estimates of its requirements during the proposed five year Contract period and on the representations

of the United States that it would pay promptly in accordance with the "15 day" Contract terms.

8. The United States represented in its Solicitation that its estimated requirements were estimates of requirements of supplies then in the DAPA database, but that its requirements could increase as items were added to the DAPA database and that the Contract would be subject to rebidding if the requirements reached the stated maximum numbers.

9. During the Contract term I had numerous conversations with United States personnel about the fact that purchases by the various military medical treatment facilities ("MTFs") were purchasing only a small fraction of their estimated purchases. These conversations were with United States personnel at both the MTFs and DSCP, the administrator of the program. Mr. Michael Schmitt, then Program Manager of the Med/Surg Prime Vendor Program at DSCP, told me that the primary reason for the failure of the United States to purchase its requirements in accordance with the Contract was that the MTFs were using government issued credit cards to purchase most of their requirements from manufacturers and other distributors. Mr. Schmitt told me that the problem was widespread throughout the military and that DSCP was trying to stop the practice, but that it had little authority to do so. Mr. Anthony Amendolia, the DSCP Case Manager for the Lone Star Region, who acted as a principal liason between United Medical and DSCP, advised me on several occasions that DSCP was diligently trying to solve the problem of diverted orders and that it anticipated purchases would catch up to estimates. This was confirmed to me by other military personnel.

10. During the Contract period I invited the various logistics officers from the MTFs and the Contract Officers to visit United Medical's headquarters in Fort Worth Texas so that they could see how the ordering, shipping and invoicing systems actually operated with respect to the Contract. This, I believed, was critical to understanding and resolving problems under the Contract since it appeared to me that DSCP was not being provided accurate information by the MTFs with respect to how the process was actually functioning. Notwithstanding my repeated requests, only Colonel James Riley, the logistics officer for William Beaumont, made such a visit, and he made two visits. His first visit was unannounced. He appeared quite interested in the entire process and spent several hours asking me questions, touring the facility and reviewing the systems United Medical had in place to ensure its compliance with the Contract terms. He told me following the visit that his conclusion was the Government caused the Contract problems William Beaumont was having and not by United Medical and that he hoped he could help solve them. He also told me that the primary reason that William Beaumont was diverting orders from United Medical to manufacturers was because there were 187 different people with ordering and government credit card authority. He told me that most credit card holders had authority to charge $2,500 per order on their credit cards, but that some had $25,000 per order charging authority.

11. Throughout the Contract term, United Medical regularly experienced problems obtaining timely payment from the United States. These payment problems ranged

from no payment, to short pays, to substantial delays in payment. In 1999 the payment problems reached a crisis level. The United States became very delinquent in payments that approached one million dollars. Although United Medical submitted all invoices as required by the Contract, and resubmitted them when requested by DSCP, DSCP kept advising me that the problem must be with United Medical's invoicing system. I did not know until documents were obtained through discovery in this case that DSCP had a major failure in its invoice process system and that payment delays to United Medical were caused by that failure. The MTFs kept ordering medical supplies, and United Medical kept purchasing and shipping medical supplies to the MTFs using United Medical's lines of credit with its institutional lender and suppliers, until its lines of credit were exhausted. It then went into default on its CIT loan and was forced into a Chapter 11 bankruptcy on March 16, 2001.

12. On April 4, 2001, shortly after United Medical filed its Chapter 11 proceedings, its business records reflected past due receivables of approximately $275,000.00. A claim for payment of outstanding invoices was made to the Contracting Officer, Ms. Linda Flatley, who denied the claim in its entirety.

13. Attached as Exhibit B to this affidavit are genuine copies of business records of United Medical or by Advanced Medical Supply Company, Inc., a sister company of United Medical, acting on behalf of United Medical. During the time I was president of United Medical I monitored receivables from the United States on a daily basis. The attached records are from data stored on a computer and based on my recollection accurately reflect the data stored. The data was input at or near the date of the invoice and payments against the invoice, if any. The data was input by a person with personal knowledge of the invoice or payment amounts and the basis for those amounts, or from information transmitted by persons with such personal knowledge. The data was kept in the regular course of business of United Medical and it was the regular practice of United Medical to make reports and data compilations in the form shown on Exhibit B. Based on Exhibit B, it is my opinion that the total amounts owed by the United States for outstanding invoices under the Contract is $180,156.90 plus contractual interest.

14. During late 1998 and early 1999 United Medical engaged in negotiations with Henry Schein Inc., a well known publicly traded company that focused on medical supply to physicians and other medical providers other than acute care hospitals, for the purchase by Schein of certain assets of United Medical, as described in the next paragraph. On January 25, 1999, Schein made a proposal to United Medical for the purchase of essentially all of United Medical's assets. The purchase price as stated in the proposal was to be the assumption of all of United Medical's outstanding bank debt owed to CIT of approximately $9 million and its outstanding payables in the amount of approximately $7,000,000 plus an upfront payment of $10.5 million plus some other bonus payments. It is my opinion that fair market value of the assets to be purchased by Schein, other than goodwill, did not exceed the book value of those assets as reflected in regularly kept monthly financials of United Medical. The book value of those assets in January 1999 as shown on Exhibit C was approximately $17,000,000. The additional $10 million plus bonuses Schein proposed to pay was for

goodwill of United Medical. It is my opinion that the reputation of United Medical in the medical distribution industry in January 1999 justified a goodwill value of at least $10 million. My opinion is based on general knowledge in the industry, an intimate knowledge of United Medical's business and its reputation and the importance of reputation in the industry, the independently evaluated reputation of United Medical described in the paragraph below, and the fact that Schein had special and well known expertise in valuing potential acquisitions. Indeed, the proposal submitted to United Medical by Schein was made by Schein's Vice-President of Acquisitions, Mark Mlotek.

15. United Medical had worked hard to build a good reputation in the industry. *Repertoire,* a specialty medical distribution publication recognized in the medical supply industry as a leading and reliable publication, annually published survey results provided by H.R. Chally (a nationally recognized independent survey company for many types of industries), which survey results evaluated medical distribution companies throughout the nation. In its September 2000 edition, *Repertoire,* published the results of its previously performed national survey of approximately 600 medical supply distributors. The publication showed United Medical was ranked as the best regional distributor in the United States and 4th best distributor overall.

16. Prior to the Effective Date of the Contract, United Medical had obtained authorization to sell almost all DAPA items. I estimate that the dollar volume of DAPA items that United Medical was not authorized to sell was less than 1% of the total requirements of the MTFs subject to the Contract. United did not obtain authority to sell these DAPA items because the suppliers could not, or would not, provide evidence of adequate liability insurance, which is critical in the medical supply business where product liability lawsuits are common. Moreover, these items generally could be supplied by United Medical from another source that had its own DAPA.

17. Shortly before the effective date of the Contract, the United States represented that the DAPA database consisted of approximately 130,000 items. When United Medical loaded the DAPA database with products it was authorized to sell, it loaded approximately 197,000 items. At that time, DSCP advised United Medical that it was the only prime vendor that correctly had loaded the entire DAPA database. United Medical regularly advised DSCP that the DAPA database was too large and even if most of the database were eliminated, virtually all the day-to-day supply requirements of the MTFs could be met.

18. During the 47-month Contract period, I was never advised by the Government nor anybody else that any material downward adjustments were being made to the estimates of Contract value as represented in the Solicitation or Award. Indeed, DSCP advised me during the Contract period that sales would catch up to DSCP estimates.

19. Prior to the Contract Award to United Medical, I was never advised by DSCP that DSCP had concerns that the MTFs would not honor the contract.

20. The MTFs attempted to order only a small fraction of their estimated requirements from United Medical.

21. Mr. Michael Schmitt, then Program Manager of the Med/Surg Prime Vendor Program at DSCP, told me that the use of government credit cards remained the primary method used by MTFs to purchase their requirements and until DSCP could end that practice actual sales under the Contract would be a small fraction of estimates.

22. I now have learned that Mr. Greg Wentzel at DSCP had concluded prior to the Award by DSCP to United Medical that the MTFs rarely exhibit either the capacity or intensity of intent to independently implement the med/surg PV program at the pace anticipated by DPSC or the Prime Vendor and that the demands and priorities placed upon local operational resources may preclude greater commitment. That information was never disclosed to me during the Solicitation or Contract period. At all times, DSCP represented to me that its estimates of requirements were its best estimates of requirements of the existing DAPA items based on historical purchases.

23. Subsequent to the filing of this lawsuit I have seen some internal emails of DSCP executive personnel that are shocking to me. In one, a May 1999 email, Greg Wentzel emailed Bud Wellens advising him that, "based on historical sales data, the interruption in the 810 processing routine since 17 May had already delayed payments to United [Medical] in the magnitude of $375,000. This firm, a small business, cannot absorb even a temporary loss of this magnitude without serious risk to its financial viability." Shortly thereafter, on July 1, 1999, Sara Bird wrote an email to John Boyle, "Jack, We certainly appreciate the extraordinary efforts Bud Wellens and your office have made to shore up our failing electronic invoicing system. Perhaps after today, we will get the attention from the IT folks that we all have been demanding. As you personally may not be aware, United Medical is a small, minority owned distributor. We can't afford the adverse publicity nor the deterioration of service to our Texas customers if they are unable to pay their bills and are cut off from their suppliers. Their cash flow is very tight. If you can help get them the money they are owed, we'd be grateful…. We have established a reputation for reliability in paying our bills. Our low distribution fees are for the most part dependent on cash management. These problems have set us back with the industry. I suppose we can call it the first casualty of Y2K." This accurately describes exactly what happened to United Medical. United Medical was cut off from its suppliers and, as a consequence, went out of business.

24. The United States' stated Contract award in January 1997 was $272,268,214.00. Its actual purchases were less than $32,000,000.00. United Medical maintained books and records reflecting sales to individual MTFs and summaries of such sales. A genuine copy of the summary maintained by United Medical of total sales under the Contract is attached as Exhibit D. Excluded from that summary are sales of $17,767.06 to AFMLO/OL-2. One of the Contract provisions contained in the bid submitted by United Medical was an agreement that the United States would negotiate an adjustment to the Contract price if the United States failed to purchase at least 90% of its estimates. The United States failed to purchase that amount. A claim for the

adjustment was submitted to the Contract Officer along with a request for mediation. These requests were denied in total.

25. During the Solicitation United Medical provided its confidential financial information to the United States. That information disclosed that United Medical was a small company and did not have existing capital resources to fund sales to the United States without prompt payment. Prior to the Award, United Medical's institutional lender, CIT, even notified me that it was going to require the United States to wire transfer payments directly to CIT since those payments secured CIT's loan to United Medical. The United States in fact did agree to the direct transfer of payments to CIT and made those direct transfers as requested by CIT.

26. During the last 9 months of 1999 United Medical experienced substantial problems getting its invoices paid by the United States. United Medical began an almost daily communication with DSCP since the delay in payments was threatening United Medical's existence. United Medical was being advised by DSCP that the problem must be with United Medical's system. Based on internal emails obtained from the United States in this case, it is obvious to me that it knew the problem was with its systems. It is my opinion that a problem of that magnitude should have been disclosed so that United Medical could have attempted to take protective steps to protect its financial viability. The United States never made that disclosure except during discovery in this case.

27. United Medical relied on the Solicitation in preparing its offer, especially the Solicitation representations concerning estimated requirements and fifteen day prompt payment. It was ready willing and able to comply with its obligations under the Contract. In my opinion, its business failure was a direct and clearly foreseeable consequence of the failure of the United States to pay in accordance with Contract terms.

[signature]
William Bandy, Affiant

On this day as dated below personally appeared Mr. William Bandy and, after being identified to me by government issued photo identification, on his oath swore that he is the person described in the affidavit and that the alleged statements of fact made therein are true and that the opinions provided are his opinions.

Dated: August 08th 2003.

[signature: Shara A. Gebhardt]

Notary Public for the State of Texas

SHARA A. GEBHARDT
Notary Public, State of Texas
My Comm. Expires 06-14-2005

[seal]