# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC.,<br>Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | CASE NO: 03-CV-289<br><br>Judge Allegra |

## **PLAINTIFF'S FIRST AMENDED MOTION FOR SUMMARY JUDGMENT UNDER RULE 56**

TO THE HONORABLE COURT:

United Medical Supply Company, Inc., Plaintiff, pursuant to Rule 56 moves this Court for judgment against Defendant the United States for breach of contract, Contract Number SP0200-97-D-7133, and would show the Court as follows:

1. The United States and Plaintiff entered into a "requirements" contract which provided that the United States would purchase all of its requirements for certain types of medical supplies from Plaintiff.
2. The United States, in breach of the requirements contract, purchased the majority of its "requirements" from third parties.
3. These diverted purchases caused damages to Plaintiff.
4. The Government purchased and obtained supplies from Plaintiff for which it has not paid.
5. Demand has been made on the United States for payment, but payment has not been made.

6. The Government also breached the contract by failing to timely pay Plaintiff for goods it ordered and received, ultimately resulting in Plaintiff's failure as a going concern, and, under the circumstances of this case, the Government is liable for Plaintiff's lost goodwill and reputation.
7. The elements of Plaintiff's breach of contract claim are: (1) breach by the Government; (2) performance by Plaintiff with the material terms of the contract or excuse of such performance; (3) resulting damages to Plaintiff.
8. As shown in the brief filed with this Motion, there are no genuine issues of material fact with respect to each of the breach of contract elements and the minumum damages suffered by Plaintiff.
9. To the extent that Plaintiff believes a portion of its damages cannot be established with summary judgment proof, it waives those portions for purposes of this motion only, and only in the event that this Court grants this Motion and that the judgment eventually becomes a final judgment against the United States not subject to further appeal.
10. The granting of this motion would be dispositive of all issues in the lawsuit and the judgment would be a final order.

Accordingly, Plaintiff requests that the Court enter final judgment in favor of Plaintiff United Medical Supply Company, Inc. against the United States in accordance with Plaintiff's brief filed in support of this motion.

Signed August 15, 2003.

Respectfully submitted,

/s/ Frank L. Broyles

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

On August 15, 2003 the foregoing motion for extension was served on the persons shown below by the method shown below in accordance with rule 5.1.

/s/ Frank L. Broyles

**PERSONS SERVED:**

Ms. E. Kathleen Shahan
Civil Division
U.S. Department of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875

Method Served: email for motion and brief; Appendices served by mailing copy of CD Rom.

ALAN J. LO RE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530

Method Served: email for motion and brief; Appendices served by mailing copy of CD Rom.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

UNITED MEDICAL SUPPLY COMPANY, INC.,
Plaintiff

v.

THE UNITED STATES, Defendant

CASE NO: 03-CV-289

Judge Allegra

PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

SUBMITTED BY:

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff United Medical Supply Company, Inc.

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ... i

TABLE OF AUTHORITIES ... ii

TABLE OF APPENDICES ... v

ISSUES PRESENTED ... vii

INTRODUCTION ... 1

HISTORY OF THIS CASE ... 5

PLAINTIFF'S SUMMARY JUDGMENT PROOF ... 5

ARGUMENT ON LIABILITY ISSUES ... 7

Issue 1 Restated – The Government is liable to Plaintiff because it diverted orders from the Plaintiff to third parties in breach of the Contract ... 7

Sub-issue 1 Restated– The Government contracted with Plaintiff For the purchase of medical supplies under a "requirements" contract ... 8

Sub-issue 2 Restated – The "Requirements" subject to the Contract were all The Government's requirements for "day-to-day brand name specific and generic medical supplies" for the identified medical treatment facilities ("MTFs") if those medical supplies were subject to: (1) a Government "Distribution and Pricing Agreement" ("DAPA"), and (2) an agreement between the supplier (typically a manufacturer) and Plaintiff authorizing Plaintiff to sell the supply or supplies ... 10

a) Virtually all medical supplies used by the MTFs on a day-to-day basis were Requirements because they were subject to both DAPAs with the Government and sales agreements with United Medical ... 11

b) Plaintiff was an authorized distributor for essentially all DAPA items ... 13

Sub-issue 3 Restated – Based on Government records, its requirements for medical supplies subject to the Contract during the 47-month ordering period can reasonably be estimated at not less than $208,000,000 ... 13

Sub-issue 4 Restated – The MTFs subject to the Contract ordered most of their Requirements from third parties without first submitting those orders to Plaintiff ........ 14

a) The Department of Defense admitted to United Medical that orders were being diverted........ 15

b) DSCP, as administrator, had on-going concerns about the widespread use of Impact cards and other alternative purchasing methods use by MTFs to purchase requirements in violation of Prime Vendor contracts ........ 15

Issue 2 Restated – The Government is liable to Plaintiff for its failures to promptly pay for the supplies it ordered and received........ 16

Sub-issue 1 – The Government breached the Contract because it did not timely pay for the medical supplies it ordered and received........ 17

Sub-issue 2 – The Government, under these circumstances, is liable for damage to Plaintiff's reputation and goodwill caused by its breach of payment terms........ 18

Issue 3 Restated – Alternatively, the Government is liable to Plaintiff because the Government's purchases under the Contract did not equal or exceed 90 percent of estimated purchases, and the Contract provided for a price adjustment under these circumstances ........ 22

ARGUMENT ON QUANTUM ISSUES ........ 23

Issue 4 Restated – Plaintiff is entitled to recover lost profits of not less than $10,929,000 ........ 23

Issue 5 Restated – Plaintiff is entitled to recover not less than $10,000,000 for the value of its goodwill and reputation lost as a result of payment delays by the Government ........ 25

Issue 6 Restated – Plaintiff is entitled to recover $180,156.90 for outstanding invoices for supplies ordered and received by the Government........ 27

LIMITED WAIVER AND RESERVATION OF RIGHTS ........ 28

CONCLUSION AND SUMMARY OF RELIEF REQUESTED ........ 28

CERTIFICATE OF SERVICE ....................................................................................................33

# TABLE OF AUTHORITIES

**CASES** **Page**

*Energy Capital Corp. v. United States,* 302 F.3d 1314 (Fed. Cir. 2002)......................................23

*Energy Capital Corp. v. United States,* 47 Fed. Cl. 382, 396 (2000), *affirmed in part and reversed in part on other grounds,* 302 Fed. 3d 1314 (Fed. Cir. 2003)........................................24

*Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed. Cir. 1987) .....................29

*Olin Jones Sand Co. v. U.S.,* 225 Ct. Cl. 741 (1980)................................................................4,18

*Rumsfeld v. Applied Companies, Inc.,* 325 F.3d 1328, 1339 (Fed. Cir. 2003, *pet. for cert. filed*)..........................................................................................7,23

*S.P.L. Spare Parts Logistics, Inc,* 2002 WL 31053809 (A.S.B.C.A.), 02-2 BCA P31,982, ASBCA No. 51,118, ASBCA No. 51,384 (2002)........................................23

*T&M Distributors, Inc.,* 2001 WL 638522 (A.S.B.C.A.), 01-2 BCA P 31,442, ASBCA No. 51,279 (2001)...................................................................................2,7,23

*Torncello v. U.S.,* 681 F.2d 756 (Ct. Cl. 1982)..................................................................13

**STATUTES AND RULES** **Page**

FAR 9.103.....................................................................................................................2

FAR 9.104.....................................................................................................................2

FAR 9.105-2 ..........................................................................................................1,2,19

FAR 52.216-21 ...........................................................................................................11

FAR 52.235-25 ...........................................................................................................17

TABLE OF CONTENTS FOR APPENDICES

(A hard copy of appendices will be submitted to chambers when Plaintiff files its reply brief)


| APPENDIX # | DESCRIPTION | SIZE (pages) | PAGE REFERENCES |
|---|---|---|---|
| | | | |
| 1 | 1993 Original Solicitation, pp 1 – 15 | 15 | 10 |
| 2 | | | |
| 3 | June 30, 1999 email from Sara Bird to various DSCP personnel | 1 | 21 |
| 4A | Solicitation Amendment 008 and Plaintiff's Offer, pp. 1- 25 of 96 | 25 | 4,9,10,11,13,17 22 |
| 4B | Solicitation Amendment 008 and Plaintiff's Offer, pp. 26-50 of 96 | 25 | 9,11,17 |
| 4C | Solicitation Amendment 008 and Plaintiff's Offer, pp. 51-75 | 25 | n/a |
| 4D | Solicitation Amendment 008 and Plaintiff's Offer, pp. 76-96 | 21 | 10 |
| 6 | July 10, 1997 Schmitt memo to DAPA Holders | 6 | 12 |
| 7 | Solicitation Amendment 012 and Plaintiff's Offer | 42 | 4,10,13,22 |
| 8 | Contract Award | 10 | 8,9,10,23 |
| 9 | Contract Modification 5 Adopting ADR procedures | 2 | 23 |
| 10 | Contract Modification 6 Adding Additional MTF | 2 | 23 |
| 11 | Contract Modification 20 authorizing lump sum interest on past due invoices | 9 | 17 |
| 12 | Contract Modification 10, exercising option year 1 | 1 | n/a |
| 13 | Contract Modification 16, exercising option year 2 | 1 | 2,20 |
| 14 | May 11, 1999 Findings of Contract Officer Jennings with Respect to Option Year 2 | 4 | 2,14,19 |
| 15 | May 11, 1999 Request by L. Flatley for Approval to Exercise Option Year 2 | 2 | 2,14,20 |
| 16 | May 2000 Contract Modification 21, exercising option year 3 signed by Kennedy, Flatley & Gushue | 1 | 2,14 |
| 17 | May 22, 2000 Findings by Contracting Officer Kennedy with Respect to Option Year 3 | 4 | 2,9,14,19 |
| 18 | | | |
| 19 | March 13, 2001 Contract Modification 26, signed by Contracting Officer Jennings terminating obligation to purchase after April 30, 2001 | 3 | 2 |
| 20 | Internal correspondence of DoD, Bates numbers DSCP-UMS-392-93, 405408, 496, 591, 624-626, 631-633, 639-642, DSCP-PV-5131-35, 5140-41. | 26 | 3,4,5,17,18,19, 20,21,22 |
| 21 | Feb. 14, 2001 Hasting Memo re: payment issue with United Medical | 1 | 27 |

| | | | |
|---|---|---|---|
| 22 | Documents created and maintained by the Department of Defense, Bates Numbers DSCP-PV-1238, 1353-59, 1369-76, 5026 | | 11,16 |
| 23 | Documents created and maintained by the Department of Defense, Bates Numbers DSCP-PV-1470-71, 4522-23, DSCP-UMS-2136, 2137, 2140-41, 2762. | 9 | 16 |
| 24 | June 18, 1999 Greg Wentzel letter re: size of DAPA database | 3 | 12 |
| 25 | Oct. 10, 2000 Memo re: 3 month extension of Contract | 8 | 2 |
| 26 | Certain Interrogatory Responses of United States | | 2,13,14,29 |
| 27 | Affidavit of William Bandy with Exhibits | | 11,12,13,14,15, 17,18,19,20,22, 23,26,27 |
| 28 | Affidavit of Robert Imel with Exhibits | 10 | 14,20,25,26 |
| 29 | Affidavit of Frank Brown with Exhibits | | 27 |
| 30 | February 26, 2001 letter from John Cuorato to United Medical committing to pay outstanding invoices | 1 | 27 |
| 31 | Selected pages from First Amended Disclosure Statement filed in Plaintiff's bankruptcy case | 8 | 26 |
| 32 | Selected Pages from the DoD's GEN II Prime Vendor Program Information | 8 | 4 |

# ISSUES PRESENTED

ISSUE 1

Is the Government liable to Plaintiff for breach of a requirements contract by diversion of orders?

Sub-issue 1

Was there a requirements contract between the parties?

Sub-issue 2

What comprised the "requirements?"

Sub-issue 3

What were the requirements of the Government, in dollars?

Sub-issue 4

What requirements were diverted?

ISSUE 2

Is the Government liable to Plaintiff for breach of contract for failure to pay in accordance with the contract terms?

Sub-issue 1

Did the Government fail to pay in accordance with the Contract terms?

Sub-issue 2

Under the circumstances, is the Government liable for any damage to Plaintiff's goodwill and reputation caused by any breach of payment terms?

ISSUE 3

In the alternative to breach of contract, is the Government liable to Plaintiff for failure to purchase 90% of estimated purchases when the Contract contains such a term?

ISSUE 4

What were Plaintiff's lost profits caused by any breach of contract by the Government?

ISSUE 5

What was the value of any lost goodwill and damage to reputation caused by the Government's breach of payment terms?

ISSUE 6

What is the amount of outstanding invoices for supplies ordered and received by the Government?

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff | CASE NO: 03-CV-289 |
| v. | Judge Allegra |
| THE UNITED STATES, Defendant | |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In 1997, the Defendant, through the Department of Defense ("DoD"), and more particularly, the Defense Supply Center Philadelphia ("DSCP") (typically referenced in this brief as "the Government" or "the United States") contracted with Plaintiff -- a small Fort Worth, Texas based medical supply distributor -- under a "Prime Vendor" requirements contract ("the Contract") to purchase all of its "Lone Star Region" requirements for certain medical supplies ("Requirements") for a period of one year, with the Government having a unilateral right to renew the Contract annually for four additional "option" years.

The Government exercised three of the four option years. By regulation, FAR 9.105-2, each time the Government renewed the Contract, the Contracting Officer was required to evaluate and determine that Plaintiff was responsible with respect to the Contract. In May 2000, for example, Contracting Officer Donna M. Kennedy, made the following findings and determinations in connection with the exercise of Option Year 3 [Contract Year 4]:

> "United Medical Supply has demonstrated a full understanding of the Government requirements and has performed all the required tasks and functions cited in the [Contract]. The firm is a

> commercially recognized large volume distributor of medical/surgical products. It has been determined that United Medical Supply, from a critical review of its commercial operations, can handle the financial and logistical obligations of this contract without difficulty. In accordance with the provisions of FAR 9.105-2, I hereby determine that United Medical Supply is considered to be responsible within the meaning of FAR 9.103 and 9.104." (APPDX-17, pp. 3-4).[1]

Ms. Kennedy's recommendation was reviewed and approved by several Department of Defense personnel, including Ms. Linda Flatley, the Contracting Officer who ultimately denied Plaintiff's claim. (APPDX-16, p.1).

The Government's obligations to order its Requirements terminated by agreement of the Parties 47 months after the effective date of June 1, 1997. (APPDX-19, pp. 1-3).

Based on Government records and admissions, the Requirements during the 47-month ordering period were $208,000,000. The Government's orders submitted to Plaintiff during that period were less than 1/5th of its Requirements. The remaining orders were diverted by the Government to the manufacturers and other distributors, primarily through the use of Government credit cards, also known as Impact cards. Plaintiff, therefore, is entitled to and seeks an equitable adjustment to the Contract Price for the diversion of orders. *T&M Distributors, Inc.,* 2001 WL 638522 (A.S.B.C.A.), 01-2 BCA P 31,442, ASBCA No. 51,279 (2001).

---

[1] Appendix 17 was a document produced by the Government in response to a request for production requesting documents evidencing any failure of Plaintiff to perform its contractual obligations. (Request and Response No. 8, APPDX-26, p.10). Also produced were similar documents prepared by DSCP personnel Jennings and Flatley in connection with the 1999 exercise of Option Year 2. (APPDX-13,14,15). Finally, in October 2000, the Government attempted to solicit a three-month extension of the Contract. In connection with that, Contract Officers Jennings and Flatley certified to similar findings. (APPDX-25, p.4, para #6; pp.5-6).

In addition to the diversion of orders, Plaintiff suffered two types of material payment breaches for supplies the Government actually ordered and received. First, the Government did not pay -- and still has not paid -- $180,000 for supplies it ordered and received. Second, during at least a nine-month period, electronic invoices and supporting documentation submitted to the Government apparently were electronically destroyed by the Government's computer system and the Government was unable to process them in accordance with the Contract terms.

Notwithstanding its inability to process payments, the Government continued to order roughly $45,000 per day of supplies without disclosing its payment processing problems to Plaintiff. The combined effect of these two payment problems was the total destruction of United Medical as an on-going business, which was accurately predicted by the Department of Defense in an internal email from Greg Wentzel to Bud Wellens, in which Mr. Wentzel stated:

> "This is to confirm our fonecon of this AM. Using historical data as a basis, the interruption in the 810 processing routine since 17 May [1999] has already delayed payments to United [Medical] on the order of $375,000. This firm (a small business) cannot absorb even a temporary loss of this magnitude without serious risk to its financial viability. In the event that the systems issues are not resolved by 1 June, we have no option but to initiate request for manual payments by DFAS. We understand that this is inefficient, resource intensive, and costly, but we cannot be put in a position of contributing to the failure of United Medical due to issues that currently appear to rest solely with the government." (APPDX-20, p. 18).

Colonel James Riley, Logistics Officer at William Beaumont Army Medical Center in El Paso, one of the largest volume ordering facilities under the Contract, summarized the problem concisely in an internal report to DSCP in which he stated,

> "Bottom Line, THE U.S. Government IS NOT HONORING THE CONTRACT." [Emphasis his]. (APPDX-20, p.5).

As shown by the above request from Mr. Wentzel, a request he repeated on July 1, 1999, (APPDX-20, p. 10), and Colonel Riley's report, there were concerned DoD personnel who desired to mitigate the damage being done to United Medical by the failure of DSCP's payment processing systems. That desire, however, was not universally shared. Mr. Wellens, for example, was too busy to focus on the problems of United Medical, (APPDX-20, p.10), while Mr. Steve McManus (in connection with the DoD's transition to the GEN II PV Program, *see*APPDX-32) desired to use United Medical's cash flow crises to extract a contract modification from United Medical that United was not obligated to give. (APPDX-20, p.2, APPDX-2).[2]

As Mr. Wentzel anticipated, the Government's failures to timely pay caused Plaintiff to suffer a cash flow disaster, subsequently causing Plaintiff to lose of its lines of credit, its ability to pay vendors and employees, and ultimately file bankruptcy and liquidate. Plaintiff, therefore, is entitled to and seeks payment for its outstanding invoices and an equitable adjustment to the Contract Price for loss of reputation and goodwill that were a natural and probable consequence of the United States' failures to pay invoices. *Olin Jones Sand Co. v. U.S.,* 225 Ct. Cl. 741 (1980).

Plaintiff, alternatively, is entitled to and seeks an equitable adjustment to the Contract Price because the Government did not purchase at least 90 percent of its estimated purchases. The Contract specifically provided for such an adjustment (APPDX-4A, p.6 and APPDX-7, p. 6), but the Government's purchases were only about 15% of its estimate.

---

[2] On January 18, 2001, while the Government was seeking a Contract modification, Mr. McManus, whose position with DSCP is unknown, wrote, "Anything you can tell me about United Medical bill paying?…I think in the end we will have to give [United] the money, but I

## HISTORY OF THIS CASE

This dispute originated as a June 28, 2002 claim filed with the Contracting Officer, Linda Flatley, along with a request for mediation, both of which were denied on August 22, 2002. On September 13, 2002, Plaintiff filed its appeal of that decision as an adversary proceeding in the United States Bankruptcy Court for the Northern District of Texas. Defendant filed a response to the adversary complaint on or about October 17, 2002, requesting that the case be transferred to this Court. Pending a ruling on the Motion to Transfer and subsequent docketing by this Court, the parties continued to engage in discovery, including requests for production of documents and interrogatories. The bankruptcy court entered an order transferring this case to the Court of Federal Claims and was docketed on February 10, 2003.

Plaintiff filed its Amended Complaint in this Court on March 24, 2003.

Defendant filed its answer on June 23, 2003, and filed an amended answer on July 21, 2003.

The only affirmative defense asserted by the Government was accord and satisfaction. The Government has not asserted any other affirmative defense or otherwise requested any relief.

## PLAINTIFF'S SUMMARY JUDGMENT PROOF

The internal documents of the Government and its responses to interrogatories eliminate any good faith defense with respect to liability. The Government can hardly deny that: (1) a requirements contract existed between it and Plaintiff; (2) it did not order or attempt to order all

---

would like to make sure we get our money's worth." (APPDX-20, p.2). Of course, the United States had long ago already received its money's worth in delivered medical supplies.

of its Requirements from Plaintiff; (3) it did not timely pay Plaintiff for many of the supplies it ordered and received; (4) it still has not paid Plaintiff for some of the supplies it ordered and received; (5) total purchases under the Contract were substantially less than 90% of estimate; (6) Plaintiff was damaged as a result; and (7) it denied Plaintiff's claims and refused Plaintiff's request to use ADR to resolve any disagreements.

In support of its motion for summary judgment, Plaintiff relies on the following summary judgment evidence:

a. The Appendices referenced in and filed with this Brief, including the affidavits of William Bandy, Frank Brown, and Robert Imel, and referenced exhibits.

b. Any admissions made by Defendant in Plaintiff's Amended Complaint and its response to Plaintiff's Motion for Summary Judgment.

c. Any other summary judgment proof offered by Plaintiff that the Court admits into the summary judgment record.

References to certain people in this brief and appendices refer to the following:

| | | |
|---|---|---|
| Anthony | Amendolia | DSCP employee assigned to the Contract as the case manager for the Lone Star Region |
| Rose Marie | Badame | DSCP personnel. Position unknown |
| William | Bandy | President of United Medical throughout the Contract Period |
| Sara ("Sally") | Bird | Deputy Director of DSCP |
| Maherlia | Bynum-Tillman | Invoice Facilitator at DSCP |
| John | Cuorato | Chief, Medical Surgical Products Group, Directorate of Medical Materiel, DSCP |

| | | |
|---|---|---|
| Megan | Edmonds | V.P. and Director of Credit and Collections for Plaintiff |
| Linda | Flatley | One of the Lone Star Contract Officers at DSCP who also acted from time to time as a superior to other Contract Officers |
| Florence | Gunn | DSCP New Branch Section Chief, DSCP |
| Steve | Hasting | System Facilitator who worked with DSCP, but was assigned to Fort Detrick |
| James | Jennings | One of the Lone Star Contract Officers at DSCP |
| Donna | Kennedy | One of the Lone Star Contract Officers at DSCP |
| Nancy | Martin | Contract Specialist at DSCP |
| Stephen | McManus | DSCP personnel. Position unknown. |
| Maggie | Rees | Mr. Schmitt's supervisor at DSCP |
| Colonel James | Riley | Logistics Officer at Fort Bliss, William Beaumont AMC |
| Michael | Schmitt | Program Manager of the Med/Surg Prime Vendor Program at DSCP |
| Bud | Wellens | Information Systems supervisor at DSCP |
| Greg | Wentzel | Med/Surg PV Customer Support Representative, Med/Surg Products CBU, Directorate of Medical Materiel, DSCP |

## ARGUMENT ON LIABILITY ISSUES

### A. [Issue 1 Restated] The Government is liable to Plaintiff because it diverted orders from the Plaintiff to third parties in breach of the Contract.

The law is well established. If the Government orders its requirements from a third party that, under the terms of a "requirements" contract, it should have ordered from a contractor, the Government is liable to the contractor for diversion of purchases. *Rumsfeld v. Applied Companies, Inc.,* 325 F.3d 1328, 1339 (Fed. Cir. 2003, *pet. for cert. filed); T&M Distributors, Inc.,* 2001 WL 638522 (A.S.B.C.A.), 01-2 BCA P 31,442, ASBCA No. 51,279 (2001). To prove Government liability for breach of contract by diversion, Plaintiff must prove the existence of a

requirements contract, diversion of purchases by the Government, and damages resulting from the diversion. Plaintiff's summary judgment proof establishes each of these elements. The first element, the existence of a requirements contract is readily established. The last element, damages, is discussed in the damages argument section. The focus here is the proof that there was diversion.

**1. The Government contracted with Plaintiff for the purchase of medical supplies under a "requirements" contract.**

Although the Government, in its Amended Answer, would not unequivocally admit that the Contract was a requirements contact, it clearly was.[3] On January 30, 1997 Plaintiff was awarded Prime Vendor contract number SP0200-97-D-7133, effective June 1, 1997. (APPDX-8). The Award, signed by Linda Flatley as the Contracting Officer, assigned an Estimated Dollar Value for the Base Year of $30,177,346.00 and an Estimated Total Contract Value of $272,268,314, which Contract values were consistent with the estimates provided throughout the Solicitation, number DLA120-93-R-0587.

The Award also incorporated the Solicitation and Plaintiff's offer into the Contract terms and specifically identified the 32 ordering (i.e., purchasing) governmental units that were participating in the Lone Star Region's Prime Vendor Program. Block 18 of the Award incorporated the terms of the UMS offer as follows:

> "*Your offer on Solicitation Number DLA120-93-R-0587, including the additions or changes made by you which additions or changes are set forth in full above is hereby accepted as to the items listed above and on any continuation sheets. This award consummates*

[3] *See,* Response of Government to Plaintiff's Amended Complaint allegation #23.

> *the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary."* (*APPDX-8, p.1).*

Appendix 8 sets forth in full the ten-page Award confirming the Contract, Contract terms and military ordering facilities subject to the Contract. Appendix 10 adds an ordering facility with an estimated impact on the Contract of $400,000 per year, or $1.8 million over the anticipated 60-month anticipated term of the Contract.

The Contract contained the following language, "(a) This is a requirements contract…. (c) Except as this Contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the schedule that are required to be purchased by the Government activity or activities in the Schedule." (APPDX-4B, p. 46 of 96).

The Government consistently referred to the Contract as a requirements contract and made that representation. For example, in Solicitation Amendment 008, the Government stated, "A requirements contract is contemplated…." (APPDX-4A, p. 4, para 4). When the United States exercised its renewal options, it referenced the Contract as a requirements contract. (*e.g.,*APPDX-17, p.3, para #3).

**2. The "Requirements" subject to the Contract were all of the Government's requirements for "day-to-day brand name specific and generic medical supplies" for the identified medical treatment facilities ("MTFs") if those medical supplies were subject to: (1) a Government "Distribution and Pricing Agreement" ("DAPA"), and (2) an agreement between the supplier (typically a manufacturer) and Plaintiff authorizing Plaintiff to sell the supply or supplies.**

In its original solicitation numbered DLA120-93-R-0587 and dated 11 Aug. 1993, (APPDX-1) the Government represented through the DSCP[4] that the prime vendors in each of the 22 regions would be responsible for supplying all of the medical items that are listed on Distribution and Pricing Agreements ("DAPAs"). The Government provided further clarification when it represented that the prime vendors would be responsible for providing to the participating hospitals the majority of their "day-to-day requirements for brand name specific and generic medical supplies." (APPDX-1, p. 3). That representation was later amended to change the number of prime vendor regions from 22 to 21 and to change "hospitals" to "participating ordering facilities." (Solicitation Amendment 008, APPDX-4A, p. 4). In Amendments to the Solicitation numbers 008 and 012 and in the Award the Government designated the participating ordering facilities that would order under the Contract. These facilities were commonly called medical treatment facilities, or "MTFs." (Solicitation Amendment 008, APPDX-4D, pp. 90-96 of 96, Solicitation Amendment 012, APPDX-7, Amendment pp. 40-47 of 47, pp. 35-42 of Appendix 7)[5]. The ordering facilities were also identified in the Award. (APPDX-8, pp. 3-10).

---

[4] The name was changed during the Contract term from Defense Personnel Support Center ("DPSC") to Defense Supply Center Philadelphia ("DSCP"). For clarity, this brief uniformly uses "DSCP."

[5] Certain pages concerning the stockless option were deleted from Appendix 7 to reduce the electronic file size. The stockless option was never exercised and is not relevant to this lawsuit.

FAR clause 52.216-21 was incorporated into the Contract and included the following language, "(c) Except as this Contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the schedule that are required to be purchased by the Government activity or activities in the Schedule." (Solicitation Amendment 008, APPDX-4B, p.41 of 96).

Solicitation Amendment 008, at page 4, stated, "Each Prime Vendor will be responsible for supplying all of the medical items that are listed on Distribution and Pricing Agreements…" Then, on page 13, it stated, "The contractor (Prime Vendor) shall provide all medical/surgical products for which the Prime Vendor has been authorized as a distributor under [DSCP] Medical's Distribution and Pricing Agreements (DAPAs)…." (APPDX-4A, pp. 4 and 13).

**a) Virtually all medical supplies used by the MTFs on a day-to-day basis were Requirements because they were subject to both DAPAs with the Government and sales agreements with United Medical.**

The supplies that MTFs were required to order from prime vendors were those supplies that were subject to distribution and pricing agreements ("DAPAs") between suppliers or manufacturers on one hand and the Government on the other hand and sales agreements between those manufactures or suppliers and Plaintiff. The estimates of requirements the Government provided during the solicitation process were estimates of day-to-day requirements for items that were then subject to DAPAs. DSCP believed and represented to Plaintiff that additional items would be added to the DAPA database and, as they were added, the value of the Contract would increase above the estimate. (APPDX-22, p.17; APPDX-27, para #8).

In actuality, however, the DAPA database as it existed on the effective date of the Contract was so large that it included almost every item that could be needed by an MTF on a day-to-day basis. The few items occasionally needed by an MTF that were not subject to

DAPAs would not have materially increased the Contract value or potential if they had been part of the DAPA database. (APPDX-27, para #17). Indeed, the Government later concluded that most of its DAPA database items were medical supplies that MTFs rarely, if ever, used, and the DAPA database should be cleaned up to reduce expense. (APPDX-24, p.2). This was consistent with Plaintiff's observations and suggestions to the Government. (Bandy Affidavit, APPDX-27, para #17)

Shortly before the effective date of the Contract, the DAPA database consisted of approximately 130,000 items. (APPDX-6, p.5). When UMS loaded the DAPA database, it loaded the entire DAPA database, then consisting of approximately 197,000 items. (Bandy Affidavit, APPDX-27, para #17). At that time, DSCP advised Plaintiff that Plaintiff was the only prime vendor that correctly had loaded the entire DAPA database. (Bandy Affidavit, APPDX-27, para #17). Plaintiff, an experienced medical supply prime vendor to private hospitals, regularly advised DSCP that the DAPA database was too large and even if most of the database were eliminated, virtually all the day-to-day supply requirements of the MTFs could be met. (Bandy affidavit, APPDX-27, para #27). A couple of years after the effective date of the Contract, DSCP came to the same conclusion. On June 18, 1999, Mr. Greg Wentzel of DSCP concluded that the number of DAPA items actually being purchased by the MTFs from the DAPA database was approximately 12% of the total items available. Specifically, Mr. Wentzel stated,

> "DSCP has recently embarked on an intensive review of historical sales data pertaining to the Medical Surgical DAPA database. In spite of the continuing increase in prime vendor sales and the number of items available through DAPA, only 12% of the items marketed under this program garner sales. An increasing amount of time and effort in DAPA maintenance is expended for no discernible gain to either the vendor or customers." (APPDX-24, p.2).

**b) Plaintiff was an authorized distributor for essentially all DAPA items.**

Plaintiff was a long time distributor of medical supplies as of the effective date of the Contract. (Bandy Affidavit, APPDX-27, Exhibit A). Consequently, Plaintiff had obtained either written or verbal distribution authority from the bulk of DAPA holders who were manufacturers of DAPA items, and promptly obtained authority from any other holders of DAPAs if they were manufacturers. Plaintiff did not obtain distribution authority with a few small DAPA holders who were not manufacturers, but were upstream distributors between the manufacture and Plaintiff. Plaintiff did not obtain distribution agreements with these entities because: (1) they could not provide proof of required insurance, which is critical in an industry subject to product liability claims; (2) the potential volume of supplies from these distributors was insignificant; and (3) Plaintiff had distribution agreements with manufacturers and other upstream distributors for the same products at lower prices. MTFs generally were willing to order using such alternative DAPAs. (Bandy Affidavit, APPDX-27, para #16).

**3. Based on Government records, its requirements for medical supplies subject to the Contract during the 47-month ordering period can reasonably be estimated at not less than $208,000,000.**

The cornerstone for determining the Government's requirements is its pre-award estimates. Those are presumed to have been made in good faith (*Torncello v. U.S.,* 681 F.2d 756 (Ct. Cl. 1982)) and, according to the Government, were based on historical requirements. (APPDX-4A, p. 12; APPDX-7, p. 5). In other words, the estimates, according to the Government, were not proforma speculations of requirements.

First, the Government does not contend that its actual Requirements were less than the estimates. (Response to Interrogatory No. 17, APPDX-26, p.8). The Government further admits

that it never determined that its original estimates were greater than its Requirements. (Response to Interrogatory No. 9, APPDX-26, p. 4-5).

Second, during the 47-month ordering period, the Government, on at least two occasions (May 1999 and May 2000), re-evaluated its estimates of future purchases under the Contract and confirmed the validity of the original estimates. (APPDX-14, pp. 1 & 3; APPDX-15, p. 1; APPDX-16, p. 1; APPDX-17, pp.1 & 3; APPDX-16, p.1).

Third, the Government never, at any time during the 47-month ordering period, advised Plaintiff that its original estimates were inaccurate or inflated. (APPDX-27, para #18). Indeed, when questioned by United Medical about why actual purchases were so low, DoD personnel advised United Medical that the MTFs were using credit cards to purchase their requirements directly from manufacturers and other distributors, but that DSCP was trying to get control of that and orders would catch up to estimates. (APPDX-27, paras ## 9, 10, 18, 20, 21).

**4. The MTFs subject to the Contract ordered most of their Requirements from third parties without first submitting those orders to Plaintiff.**

The Government's documents and admissions show Requirements were approximately $5 million per month. Orders were far short of that number (APPDX-27, para #20) and actual purchases averaged less than $1 million per month. The fill rates establish that the Government never attempted to order from United Medical much more than its purchases. (APPDX-28, para #7a). If the Government had attempted to order all of its requirements, the calculated fill rates, based on existing sales, would have been about twenty percent. The math alone establishes the breach by diversion. (APPDX-26, Government interrogatory response #5). But the evidence does not end there.

**a) The Department of Defense admitted to United Medical that orders were being diverted.**

Throughout the Contract period, Mr. William Bandy, Plaintiff's president and CEO, inquired of various Department of Defense personnel why the orders were such a small percentage of the estimates provided in the Solicitation and Award. Mr. Bandy was repeatedly advised in response that the MTFs Requirements were being purchased through use of Government credit cards, or IMPACT cards. (APPDX-27, paras 9, 10, 21). In particular, Mr. Michael Schmitt, then Program Manager of the Med/Surg Prime Vendor Program at DSCP, told Mr. Bandy that the use of government credit cards remained the primary method used by MTFs to purchase their Requirements and until DSCP could end that practice, realized sales under the Contract would be a small fraction of DSCP estimates. (APPDX-27, paras 9, 21).

Late in the 47-month ordering period, Colonel James Riley, a logistics officer at Fort Bliss, the location of William Beaumont Army Medical Facility, advised Mr. Bandy that there were 187 IMPACT cards at William Beaumont and that many of these had been, and were being, used to divert orders from Plaintiff, a violation of the prime vendor Contract. (APPDX-27, para 10).

**b) DSCP, as administrator, had on-going concerns about the widespread use of Impact cards and other alternative purchasing methods used by MTFs to purchase requirements in violation of Prime Vendor contracts.**

DSCP, the Prime Vendor program administrator, had significant concerns why actual sales in various prime vendor regions were small fractions of estimated sales. In response to this concern, DSCP conducted several on-site investigations. Each investigation uncovered that medical treatment facilities were routinely using alternative purchasing options to the prime vendor program. The reasons for this varied, but they included reasons such as the software is

not user friendly (APPDX-22, p. 1, para 2); lack of personnel at the MTF (APPDX-22, p. 1, para 3, APPDX.23, p. 6), no established procedures to restrict use of alternative purchasing options (APPDX-22, p.1, paras 2, 5; APPDX-23, p. 8); availability of alternative purchasing procedures such as IMPACT cards (APPDX-22, p. 15); and a perception that the DSCP administrative fee was too expensive (APPDX-23, p. 3).

This was summarized in an internal Department of Defense memo written by Greg Wentzel in July 1996, in which he stated in paragraphs numbers 1 and 6,

> "Customers [MTFs] rarely exhibit either the capacity or intensity of intent to independently implement the med/surg P[rime] V[endor] program at the pace anticipated by DPSC or the P[rime V[endor]. The demands and priorities placed upon local operational resources may preclude greater commitment."… Customers are not discernibly anxious about the future of the Med/Surg PV program or the potential repercussion of its failure. Alternate means of obtaining supplies (Impact cards, DBPAs ) afford a degree of equanimity that is obvious not in the best interest of [DSCP]." (APPDX-22, p.15).

In March 1997 the Chief of the Logistics Division at Fort Campbell in the Illinois/Kentucky/Missouri Region wrote DPSC and advised it that, "In the month of Jan 97, our P[rime] V[endor] was only able to obtain 33% of our business. We continue to do more than half our business with DPSC and credit cards. (APPDX-23, p.2).

In 1998, Linda Flatley, one of the contracting officers assigned by DSCP to the Contract, concluded that Ft. Sill and Ft. Sheppard (Lone Star MTFs) were breaching the contract by purchasing McGaw IV solutions directly from the manufacturer. (APPDX-23, p.9).

**B. [Issue 2 Restated] The Government is liable to Plaintiff for its failures to promptly pay for the supplies it ordered and received.**

FAR 52.232-25, as amended by the Contract, required the Government to pay by electronic funds transfer within 15 days after receipt of both the invoice and supplies covered by the invoice. (APPDX-4B, p. 40 of 96). This requirement was incorporated into the Statement of Work, which contained the following language,

> "Payment will be made 15 days after receipt of a valid invoice or supplies, whichever is later. Payment will be made via electronic funds transfer (EFT) to the contractor's financial institution." (APPDX-4A, p.20).

**1. The Government breached the Contract because it did not timely pay for the medical supplies it ordered and received.**

The Government routinely failed to pay within the fifteen-day payment period. (APPDX-27, para 11; Contract Modification 20 (authorizing a lump sum interest payment for late payments), APPDX-11). It provided a variety of reasons for this. The most egregious breach, however, and the one for which an adjustment to the Contract Price is sought, are the delayed payments during at least a 9-month period when failures in the Government's computer system prevented processing of Plaintiff's invoices for a sustained period. Many internal Government emails evidence the breach and its consequences. (APPDX-20). Two of them are summarized below.

In May 1999, Greg Wentzel emailed Bud Wellens advising him that,

> "based on historical sales data, the interruption in the 810 processing routine since 17 May had already delayed payments to United [Medical] in the magnitude of $375,000. This firm, a small business, cannot absorb even a temporary loss of this magnitude without serious risk to its financial viability." (APPDX-20, p.18).

Shortly thereafter, on July 1, 1999, Sara ("Sally") Bird wrote John Boyle,

> "Jack, We certainly appreciate the extraordinary efforts Bud Wellens and your office have made to shore up our failing electronic invoicing system. Perhaps after today, we will get the attention from the IT folks that we all have been demanding. As you personally may not be aware, United Medical is a small, minority owned distributor. We can't afford the adverse publicity nor the deterioration of service to our Texas customers if they are unable to pay their bills and are cut off from their suppliers. Their cash flow is very tight. If you can help get them the money they are owed, we'd be grateful…. We have established a reputation for reliability in paying our bills. Our low distribution fees are for the most part dependent on cash management. These problems have set us back with the industry. I suppose we can call it the first casualty of Y2K." (APPDX-20, p.10).

Obviously, the Government is obligated to pay for the materials it ordered, received and used. That outstanding amount for such supplies based on the books and records of United Medical is $180,156.90. (APPDX-27, para 13). Plaintiff submitted its invoices to the Government in the form required by the Contract, and, at the Government's request, resubmitted its invoices. (APPDX-27, para 11). A more serious issue is presented, however. That is the liability of the Government for its role in the business failure of United Medical.

**2. The Government, under these circumstances, is liable for damage to the Plaintiff's reputation and goodwill caused by its breach of payment terms.**

For the breaches of contract by the government, United Medical is also entitled to recover damages to reputation and loss of goodwill if these damages were foreseeable, natural and probable at time parties contracted. *Olin Jones Sand Co. v. U.S.,* 225 Ct. Cl. 741 (1980). The damages issue in *Olin Jones* was whether the Government contractor could recover damages to reputation resulting from failures to timely pay by the Government. The *Olin Jones* Court held that if the contractor could prove that its reputation damages resulting from inability to pay its employees and suppliers were a direct and foreseeable consequence of the Government's delay in making payments, then the contractor could recover for lost reputation.

Plaintiff was a small business. Its largest annual revenues during its existence were approximately $72,000,000. (APPDX-27, Exhibit A). The projected annual revenues from the Contract approached $60,000,000. Prior to the Award, Plaintiff's institutional lender took a security interest in the Government receivables and obtained an agreement from the Government to pay it directly. (APPDX-27, para #25). As part of the bid process Plaintiff submitted its financial information to the Government. (APPDX-27, para #25). And the Government was required to evaluate the financial ability of United Medical to perform the Contract. (FAR 9.105-2; *see,* APPDX-14 and APPDX-17).

The Government recognized that the small distribution fee it was paying resulted from its prompt payment promise and that cash flow for a company the size of United Medical was vital. Ms. Sally Bird, Deputy Director of DSCP, clearly stated that in a May 1999 internal memo where she was expressing her exasperation with the inability of DSCP to make timely payments to United Medical and others. Her statement clearly expressed recognition for the basis of the low distribution fee being paid by the Government to United Medical and other prime vendors,

> "We really must get a handle on these invoices and the translator problems. I fear our frustrations will engender a lot of additional ill will with our prime vendors. We can't just keep pointing fingers or giving an exasperated shrug. No one in the Medical Directorate really knows what to tell these vendors. They must be losing confidence that our once reliable pay system is going into a tailspin and it's not even 1 January 2000. *Our very favorable distribution fees are in large measure a result of our 15 day payments of invoices*." Emphasis added. (APPDX-20, p. 23).

The relative size of the Contract compared to the size of United Medical, all known to the Government at the time of the Award, coupled with the Government's recognition that the basis

for the low distribution fees was quick payment to the Contractor, is adequate summary judgment evidence of foreseeability. (APPDX-28, para 11).

The actions of the Government, however, became quite egregious. Not later than March 1999, as shown by the series of emails below, the Government knew that it had a terrible payment mess, and it foresaw the demise of United Medical. But, not only did it not disclose this to United Medical, it exercised its unilateral option to renew the Contract for another year on May 11, 1999, with the option year to begin June 1, 1999. (APPDX-27, para 26; APPDX-13; APPDX-15). The exercise of the option permitted the Government to continue ordering supplies from United Medical at a time when the Government knew it probably was not going to pay for those products in accordance with the Contract.

Throughout the 1999 payment crisis, however, the Government internally expressed its recognition of potential problems associated with delayed payment, especially with United Medical, which had one of the largest sales volumes under the Prime Vendor program. The picture painted is so clear that these emails are set forth below in considerable detail. Each of the identified senders and receivers of the emails are Government representatives.

1. On March 19, 1999 Bud Wellens emailed Rose Marie Badame the following, "On 17, 18, 19 March 1999 it appears (sic) that all E[lectronic] I[invoices] received since 1 February 1999 have recycled into C&T and Medical SAMMS. This has resulted in over 70 FEET on paper being printed. Addionally, (sic) it is virtually impossible to identify the good invoices from the bad ones. At this time I beleive (sic) that we have lost a large measure of control. Furhter (sic), DFAS is also getting their copies of this paper, and are quite upset because like us, they cannot identify the good invoices from the bad. PLEASE, PLEASE do whatever is necessary to get this resolved. PLEASE." (APPDX-20, p.24-25).
2. Wellens wrote again on March 22, 1999, "Rose, it has happened again today on 22 March 1999. It is getting bigger each day. This problem has resulted in a complete loss of control over Medical Prime Vendor invoices. PLEASE advise when this problem will be resolved." (APPDX-20, p. 24).

3. The problem had not been resolved by the end of May 1999. On May 26, 1999 Ms. Sara (Sally) Bird, Deputy Director of DSCP Medical, insisted, "We really must get a handle on these invoices and the translator problems. I fear our frustrations will engender a lot of additional ill will with our prime vendors. We can't just keep pointing fingers or giving an exasperated shrug. No one in the Medical Directorate really knows what to tell these vendors. They must be losing confidence that our once reliable pay system is going into a tailspin and it's not even 1 January 2000. Our very favorable distribution fees are in large measure a result of our 15 day payments of invoices." (APPDX-20, p.23).

4. The next day, DSCP's George Allen responded, "I'm going to make one last try at this because I really think it is important. This conversion will not be done on time. We will lose some of our large electronic vendors. …We have contracts that require electronic means that we are not honoring our end (electronic orders) and the vendor can't do his end…. We are in such a rush to make this date that we are making mistakes and not reaching important vendors…." (APPDX-20, p.22).

5. Shortly thereafter Greg Wentzel emailed Bud Wellens advising him that, "based on historical sales data, the interruption in the 810 processing routine since 17 May had already delayed payments to United [Medical] in the magnitude of $375,000. This firm, a small business, cannot absorb even a temporary loss of this magnitude without serious risk to its financial viability." (APPDX-20, p. 18).

6. On June 15, 1999, Maggie Rees responded to a Steve Hasting June 14, 1999 email as follows, "we are actively working this issue. results from a move to a new translator and has screwed up subsistence, medical and c&t invoicing. we think we are coming out of it now. Mr. Bandy [at United Medical] is one of our priorities…." (APPDX-20, p. 13-14).

7. On June 16, 1999 Greg Wentzel wrote Bud Wellens to advise him that he [Wentzel] does not believe "all the evidence supports the contention that the issue [payment of outstanding United invoices] is resolved. Wentzel then states that the customers [*i.e.*, the MTFs] have submitted over 300 payments for which invoices do not appear to have been received from Plaintiff. Wentzel's conclusion is that the invoices were submitted by Plaintiff, but lost somewhere in the process. Wellens response is that the translator blew out on May 12, 13, and 14, 1999 and that the United invoices might have been in the system at the time of the blow out. (APPDX-20, p.12-13).

8. On June 30, 1999 Sara Bird wrote George Allen and others re "Translator Impact on EDI Process" stating, "I don't want to throw gasoline on what is already the most vexing problem to strike our prime vendor, ECAT and EDI programs but Ted's memo below is just the tip of an iceberg. We are not paying our vendors and it has affected some small businesses and 8a contractors. If we have been minimizing this issue with HQS, DLA, now is the time to 'fess up and cry for help.' Carla VonBerniwitz and ADM Chamberlin need to know how much trouble we're in. ….Can we explore paying the invoices by credit card." (APPDX-3).

9. On July 1, 1999 Bud Wellens wrote to Sara Bird, "Sally: It is getting worse. There are now 1734 interest bearing invoices valued at $9 Million…." (APPDX-20, p. 9).

10. Bird responded, "Guys, We have a terrible problem where we don't have the invoices because the translator 'ate' them, but we have these invoices for $9M and we can't seem to get them processed?!…. Please tell me what is going on…." (APPDX-20, p.9).

11. On July 2, 1999, Tom McCarthy wrote to Maggie Rees and others, "We are aware that nothing has processed due to Mercator FTP failures all week. They are not lost but queued. We can't even hand jam them over the mainframe because the FTP just hangs….This is our number one priority to fix." (APPDX-20, p. 8).

12. Maggie Rees responded on July 2, 1999, "for anyone who has been following this mess, the new translator failed again." (APPDX-20, p. 7-8).

13. On December 6, 1999, Bud Wellens again emailed Ms. Bird on the issue, "Sally, Things are not getting better…." (APPDX-20, p.26).

14. On January 19, 2001, Donna Galligan emailed John Charalabidis, "We currently have invoices worth $284,000 in-house that we owe payments to United [Medical] ($111,000 beyond 15 days)." (APPDX-20, p. 2).

And, not surprisingly, United Medical, as a direct result of the delayed payments, lost its reputation and goodwill with its vendors, it lenders, its employees, and had to file bankruptcy. (APPDX-27, para #10).

**C. [Issue 3 Restated] Alternatively, the Government is liable to Plaintiff because the Government's purchases under the Contract did not equal or exceed 90 Percent of estimated purchases, and the Contract provided for a price adjustment under these circumstances.**

On page 6 of Amendment 0008 to the Solicitation, (APPDX-4A), the Government stated, "The offeror is to insert in the spaces provided below its proposed distribution fees …These fees will cover all of the medical facilities on the attached list …." Plaintiff inserted into each space under the "JITO/EDO OPTION" column, "6.4%*" and then below the column it inserted, "* SUBJECT TO NEGOTIATION IF VOLUME DOES NOT REACH 90% OF THE STATED CONTRACT AWARD." Plaintiff inserted the same statement into its offer submitted under Amendment 012, p. 6 of 47. (APPDX-7).

On page 1 of the Award signed January 30, 1997, (APPDX-8), the Government accepted Plaintiff's offer and stated, "This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary." (underline added).

The Government's stated contract award value was, $272,268,214. (APPDX-8, p.1). That was adjusted upward $1.8 million. (APPDX-10). The Government's actual purchases were less than $32,000,000.00. (APPDX-27, para #24). Plaintiff submitted a claim to the contracting officer for an adjustment based on the Government's breaches of contract or alternatively its failure to order 90 percent of the stated contract award. That claim was denied. Plaintiff requested the Government to mediate this dispute in accordance with Contract Modification 5. (APPDX-9). That request also was denied. (APPDX-27, para #24).

## ARGUMENT ON QUANTUM ISSUES

### D. [Issue 4 Restated] Plaintiff is entitled to recover lost profits of not less than $10,929,000 for the Government's diversion of orders.

Where the Government, under a requirements contract, diverts orders to a third party, it is liable to the contractor for the contractor for damages including lost profits on the orders diverted. *Rumsfeld v. Applied Companies, Inc.,* 325 F.3d 1328, 1339 (Fed. Cir. 2003, *pet. for cert. filed); T&M Distributors, Inc.,* 2001 WL 638522 (A.S.B.C.A.), 01-2 BCA P 31,442, ASBCA No. 51,279 (2001); *S.P.L. Spare Parts Logistics, Inc.,* 2002 WL 31053809 (A.S.B.C.A.), 02-2 BCA P 31,982, ASBCA No. 51,118, ASBCA No. 51,384 (2002).

The proof required for recovery of lost profits is set forth in *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed. Cir. 2002). Plaintiff must prove that the Government's

breach caused the lost profits, that the lost profits were foreseeable, and the lost profits can be estimated with reasonable certainty. Under the terms of the Contract, the first two elements cannot be disputed. Plaintiff's role was to purchase medical supplies and to resell them to the Government at DAPA cost plus 6.4%. For the most part, the items being purchased by the Government were routine, low tech, medical supplies. Obviously, the parties contemplated that Plaintiff would make a profit since there would have been no other reason for Plaintiff to participate in this Contract.

"Lost Profits" are calculated by subtracting expenses from revenue. *Energy Capital Corp. v. United States,* 47 Fed. Cl. 382, 396 (2000), *affirmed in part and reversed in part on other grounds,* 302 Fed. 3d 1314 (Fed. Cir. 2003). In *Energy Capital* the Court of Federal Claims examined in detail the Plaintiff's model for calculating lost profits. In that calculation, the expenses subtracted from revenue were those direct expenses incurred in originating loans, which were subtracted from the loan and fee revenue. The issue in that case was simply the reasonableness of the loan volume as estimated by Plaintiff. In affirming the Court of Federal Claims, the Federal Circuit Court of Appeals found the opinion of the Court of Federal Claims "thorough and well reasoned," 302 F.3d at 1317, and stated the well settled rule of law that lost profits can be recovered by a plaintiff who proves: (1) the loss was a proximate result of the breach; (2) the loss of profits in the event of breach was within the contemplation of the contracting parties because the loss was foreseeable; and (3) a sufficient basis exists for estimating the amount of profits lost with reasonable certainty. 302 F.3d at 1324-1325.

It cannot be argued, under this type of contract, that it was not foreseeable that the failure of the Government to order would result in lost profits. The Contract was a distribution contract with a fixed percentage distribution fee. There would have been no other motive for United

Medical to engage in this activity but to make a profit, which was directly tied to sales volume. Similarly, since profits were tied to sales volume, the breach was the cause of lost profits.

The affidavit of Robert Imel, Plaintiff's designated expert, details the method for calculating the lost profits and establishes that a basis exists for estimating the lost profits with reasonable certainty. (APPDX-28). Mr. Imel's methodology establishes a range of lost profits and he opines that the $10,929,000 amount sought in connection with the summary judgment is based on conservative assumptions favorable to the Government.

The overall methodology is not complicated. The actual sales are known. Since there were orders that did not result in sales, Mr. Imel applied a minimum fill rate factor to estimate total orders. Then, Mr. Imel estimated the MFTs total Requirements based on the Solicitation and Contract estimates. He then was able to determine the volume of Requirements the MTFs had not attempted to order. Although United Medical will contend at any trial that a more reasonable fill rate would be 95%, Imel used a conservative fill rate factor of 85% to estimate the actual orders that United Medical would have filled if the orders had been placed.

Once he determined the volume of orders that United Medical would have filled based on the Requirements for the 47-month ordering period, Mr. Imel assumed the Government would pay invoices within the 15-day contract terms and prepared proforma income statements using, where appropriate, historical expense numbers. He then compared the proforma income statements to United Medical's actual income statements to estimate lost profits. That figure, as reasonably estimated by Mr. Imel is $10,929,000. (APPDX-28).

**E. [Issue 5 restated] Plaintiff damages for lost reputation and goodwill resulting from payment delays are not less than $10,000,000.**

Both Mr. Imel and Mr. William Bandy, Plaintiff's former president and CEO, opine that Plaintiff had an established goodwill in January 1999 of not less than $10,000,000. (APPDX-27, para #14; APPDX-28, para #12). These numbers are supported by an asset purchase proposal from Henry Schein, a large publicly traded medical supply distributor, made in January 1999 in which Schein offered to purchase the assets of Plaintiff for assumption of liabilities in an amount approximately equal to the book value of the hard assets plus a cash payment of $10,500,000.00. (APPDX-27, Exhibit C).

The goodwill value is reasonable. Prior to its bankruptcy in 2001 and subsequent liquidation, Plaintiff, a company that had been in the medical supply business for over ten years, had a reputation as one of the best distributors of medical supplies in the United States. *Repertoire,* a specialty medical distribution publication recognized in the medical supply industry as leading and reliable, annually published survey results provided by H.R. Chally (a nationally recognized independent survey company for many types of industries), which survey results compared medical distribution companies throughout the U.S. In its September 2000 edition, *Repertoire* published the results of its previously performed national survey of approximately 600 medical supply distributors. The survey showed United Medical was ranked as the best regional distributor in the United States and the 4th best overall distributor of medical supplies in the United States. (APPDX-27, para #15).

In March 2001, United filed a Chapter 11 proceeding and ended up losing all goodwill. It anticipated being able to pay unsecured creditors less than 20 cents on the dollar in a Chapter 11 proceeding, and nothing in a Chapter 7. (APPDX-31).

**F. [Issue 6 Restated] Plaintiff's outstanding invoices for supplies ordered by and delivered to the Government are $180,156.90.**

This is hardly a complex legal issue. The Government ordered the supplies, United Medical provided them, it properly invoiced, and re-invoiced, but the Government has not paid for all such supplies. The Government, on several occasions, admitted it had not paid its obligations. For example, Mr. Steve Hasting sent an internal email to Linda Flatley and John Cuorato on February 14, 2001, recognizing DSCP's continuing lack of payment and the consequences as follows,

> "[United] is averaging $43,000 per day in sales, but only $26,000 per day in payments. Obviously, [United] can't sustain that imbalance for very long without negatively impacting credit availability. And credit availability to support cash flow requirements is what keeps them afloat day-to-day.
>
> "I (sic) appears that lack of DSCP payment drives [United] into credit a hold status with banks and major manufactures…which reduces their purchasing power and drives down on-hand stock…which drives down the fill rate…which drives up customer credit card purchases…which drives up cost to the end user.…" (APPDX-21).

On February 26, 2001, Mr. John Cuorato, Chief, Med/Surg Products Group, Directorate of Medical Materiel at DSCP wrote United Medical and told it that, "DSCP is committed to paying your firm what it is due for materiel that was received by the MFTs under the contract. We will pursue this effort with reasonable resources due diligence to expeditiously settle the outstanding invoices." (APPDX-30). The amount outstanding on April 4, 2001 was approximately $300,000, but is currently $180,156.90. (APPDX-27, paras ## 11 and 13, Exhibit B; APPDX-29).

## LIMITED WAIVER AND RESERVATION OF RIGHTS

For purposes of Plaintiff's summary judgment motion only, since it is seeking a final order, Plaintiff is willing to waive certain aspects of its claim including unpaid interest and right to challenge the good faith of the Government in its estimates of its Requirements; and reduced its damage claims to an amount that it believes cannot be reasonably contested. In the event that Plaintiff obtains a final summary judgment in accordance with its request, those claims and damage amounts not asserted in connection with the motion are waived, however, in the event that Plaintiff does not prevail by final judgment on its motion and the case is tried, Plaintiff reserves the right to assert at trial its full damage claims and those additional claims for liability that Plaintiff is not asserting in its summary judgment motion. Plaintiff also is reserving its claims for attorneys fees and litigation costs under the Equal Access to Justice Act.

## CONCLUSION AND SUMMARY OF RELIEF REQUESTED

On May 11, 1999, DSCP's exercise of the Government's unilateral right to renew the Contract doomed Plaintiff. At that very moment, DSCP new that it had not been able to properly process payments for at least 8 weeks and that a solution had not been identified. The Government was in a pickle. Obviously it had a continuing need for medical supplies on a daily basis. But implementation of alternative payment procedures was too expensive, so the decision was made to let United take the hit, a decision that was expedient for the Government.

Not only did the Government not disclose its payment processing problems, but, in response to United's "where's our money" inquiries, it kept point the finger at United and its invoicing systems.

At least three different contracting officers made official findings that United Medical had performed its obligations under the Contract. (APPDX 14 & 17). The Government, during the course of Contract performance acknowledged that the MTFs were diverting orders. But after United submits a claim, the Government again refused to accept responsibility and pointed its finger at Plaintiff, and that is why Plaintiff is before this Court.

The Government's documents establish clear-cut liability. They show Contracting Officers annually reaffirming original estimates of Requirements, but only small fractions of those Requirements being submitted to United Medical. They show a system wide problem of purchases being diverted from the contractors to third parties through the use of alternative purchasing methods, primarily Impact cards.

Plaintiff is entitled to summary judgment on material facts where there are no genuine issues. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed. Cir. 1987). Based on the affidavits filed with this brief, the volume of admissions made by Defendant, and the discovery responses by Defendant that Defendant cannot produce records or make estimations with respect to significant issues in this case, (APPDX-26), Plaintiff moves for summary judgment on the grounds that there are no genuine issues with respect to the following:

(a) The Contract was a requirements contract;

(b) The ordering term of the contract was approximately 47-months;

(c) The Government diverted orders from Plaintiff to manufacturers and other suppliers during the ordering term by use of credit cards and other purchasing methods;

(d) A basis exists for estimating Plaintiff's lost profits with reasonable certainty;

(e) The Government's requirements during the ordering term can be reasonably estimated at $208,000,000.

(f) The Government's actual orders or attempted orders from Plaintiff during the ordering period can be established with reasonable certainty at not more than $35,000,000.

(g) Plaintiff's lost profits on the diverted orders can be estimated with reasonable certainty at not less than $10,929,000.

(h) It was reasonably foreseeable and in the contemplation of the parties at the time of the Contract Award and at the time of each annual Contract renewal that a diversion of orders by the Government would result in lost profits to Plaintiff.

(i) The Government's diversion of $173,000,000 was a breach of contract for which the Government is liable for Plaintiff's lost profits.

(j) The Government failed to pay Plaintiff in accordance with the prompt pay requirements of the Contract.

(k) A natural and probable consequence of the Government's failure to pay in accordance with the Contract in the magnitudes at issue was the loss of Plaintiff's goodwill and reputation to Plaintiff, and this was reasonably foreseeable to the Government at the time of the Contract Award and at each renewal.

(l) The Government's failures to pay in accordance with the Contract were a proximate cause of Plaintiff's lost goodwill and reputation.

(m) Plaintiff's lost reputation and goodwill proximately caused by the Government's failures to pay can be estimated with reasonable certainty at not less than $10,000,000.

(n) The Government ordered and received supplies under the Contract for which it has not paid.

(o) Plaintiff has properly invoiced the Government for the supplies ordered and received by the Government for which the Government has not paid.

(p) The amount currently owed by the Government for the supplies ordered and received by the Government for which the Government has not paid is $180,156,90.

(q) The Contract provided for an adjustment of Contract Price if the Government's purchases were less than 90% of estimates.

(r) The Government's total purchases were less than 90% of total estimates.

(s) The adjustment of Contract Price to which Plaintiff is entitled for the Government's failures to purchase 90% of estimates is not subject to summary judgment because there are genuine issues of material fact regarding the amount of the adjustment.

(t) Plaintiff submitted its claims to the Contracting Officer, and the Government totally denied all claims.

(u) Plaintiff requested mediation of its disputes but the Government refused to mediate.

(v) Plaintiff is entitled to summary judgment against the Government for breach of contact in the amount of $21,109,156.90 and requests that the Court enter a final judgment against the United States in that amount.

Signed March 5, 2003.

Respectfully submitted,

/s/ Frank L. Broyles

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

On August 15, 2003 the foregoing motion for extension was served on the persons shown below by the method shown below in accordance with rule 5.1.

/s/ Frank L. Broyles

**PERSONS SERVED:**

Ms. E. Kathleen Shahan
Civil Division
U.S. Department of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875

Method Served: email for motion and brief; Appendices served by mailing copy of CD Rom.