IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 03-289C (Judge Allegra) |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT APPLICABLE TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND TO DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56(h)(1) and (2) of the Court's Rules ("RCFC"), the United States respectfully submits that the following facts relevant to the parties' cross-motions are uncontested. In accordance with RCFC 56(h)(1), we respond to plaintiff's proposed findings of fact in a separate document.

THE SOLICITATION

1. On August 11, 1993, the Defense Personnel Support Center (now named Defense Supply Center Philadelphia ("DSCP")) issued Solicitation DLA120-93-R-0587 to establish a prime vendor contract to service military medical facilities (or "customers") located in the Lone Star Region of the Southern United States. Pl. App. tab 1, at 2.

2. At the time of the solicitation, DSCP anticipated the establishment of 22 prime vendor regions. Pl. App. tab 1, at 2. The Lone Star Region was one of the first regions established. Def. App. 2 ¶ 10 (Flatley Aff.).

3. Under the program, one prime vendor would be responsible for establishing an ordering, distribution, and warehousing system to meet the medical/surgical supply requirements of the customers. The prime was required to provide all medical/surgical products for which it was an authorized distributor under DSCP's Distribution and Pricing Agreements ("DAPAs") or Indefinite Delivery-Type Contracts ("IDTCs"). Each holder of a DAPA consents to allow prime vendors selected by DSCP to distribute its products to participating hospitals and agrees to charge the prime no more than the prices set forth in the DAPA. Pl. App. tab 1, at 2.

4. A number of manufacturers offered medical facilities served by DSCP volume discounts in the form of "charge-backs." The prime was responsible for establishing charge-back arrangements with DAPA holders and ensuring that charge-backs were passed through to customers. Id.

5. Plaintiff, United Medical Supply Company, Inc. ("United Medical"), submitted an offer on or about September 14, 1993, but was not initially awarded the contract. Pl. App. tab 1. Instead, the contract was awarded to Owens & Minor in December 1994. Def. App. 2 ¶ 11 (Flatley Aff.).

6. A General Accounting Office protest resulted from the award. Id. ¶ 12. To resolve the protest, DSCP decided not to invoke the option under Owens & Minor's contract, but to continue

negotiations and award a new contract at the expiration of the base year. Id. ¶ 13.

7. During the second negotiation period, DSCP made a number of changes to its prime vendor program. Id. ¶ 14. In order to standardize the program throughout all the regions, bilateral Amendment 0008 was issued in December 1995, incorporating the changes that had been made to the program. Id. ¶ 15. The Amendment replaced pages 1-88 of the original solicitation and Amendments 1-7. Pl. App. tab 4.

8. One significant change made by Amendment 0008 was the inclusion of a stockless option. Def. App. 2 ¶ 16 (Flatley Aff.); Pl. App. tab 4, at 8-11. If that option was exercised, the prime would work with customers to develop both a standard list of items that each hospital used on a recurring basis and a per- item usage quantity. To the extent any of those items were unavailable through a DAPA or IDTC, the prime was required to assist the customer to find DAPA substitutes. The vendor would then maintain the stock level of the listed items without the customer's having to place orders. Def. App. 2-3 ¶ 17; Pl. App. tab 4, at 9.

CONTRACT TYPE

9. A one-year, firm-fixed price, requirements type contract was contemplated, with an option to extend the contract for four additional one-year periods. Pl. App. tab 4, at 5. The

solicitation and resultant contract included Federal Acquisition Regulation ("FAR") clause 52.216-21, "Requirements (Apr 1986)." That clause provided, in pertinent part:

> (a) This is a requirements contract for the supplies or services specified . . . . The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, <u>if the Government's requirements do not result in orders in the quantities described as "estimate" . . ., that fact shall not constitute the basis of an equitable price adjustment.</u>

Pl. App. tab 4, at 46 (emphasis added).

10. The annual estimate set forth in Amendment 0008 was $57,665,500 for those types of medical/surgical products covered by the contract. Bidders were advised there was no guarantee this amount would be purchased. They were cautioned that during the first year of the contract, each facility would begin to reduce its inventory of medical/surgical products, which could reduce the volume of orders placed during that period. Pl. App. tab 4, at 12.

11. Bilateral Amendment 0012 was issued on February 7, 1996 to include information inadvertently omitted from Amendment 0008 and to update the statement of work and various contract clauses. The estimated annual requirements value was increased slightly, to $57,965,500. Pl. App. tab 7, at 5.

12. Thereafter, in March 1996, bilateral Amendment 0014 was issued. Among other things, it changed the yearly estimate to $56,715,500. Amendment 0014 stated that:

> The potential dollar value for the stockless portion of this contract in the base year is $23,500,000.00. The remaining $4,857,750.00 is the potential dollar value for the base year for facilities using the JITO/EDO portion of the contract only. For Option years 1-4, the potential dollar value for the stockless portion is $47,000,000.00 and the remaining $9,715,500.00 is the potential dollar value for facilities using the JITO/EDO portion of the contract only.

Def. App. 8 (emphasis added).

13. The estimated annual requirements listed in the solicitation were based upon figures provided by the participating medical facilities, reflecting amounts the facilities spent locally in a 12-month period for all items covered by the solicitation. Pl. App. tab 4, at 12; Def. App. 3 ¶ 19 (Flatley Aff.), 261.

14. Estimates for each hospital were obtained through designated points of contact for the Army, Navy, and Air Force. See Def. App. 11-23. The estimate did not reflect the amounts customers had spent for DAPA items: Rather, it reflected what customers spent for all surgical/medical items, regardless of whether they were covered by a DAPA. Def. App. 3 ¶ 19 (Flatley Aff.), 261; see also Def. App. 7 (estimate is "for those types of medical/surgical products covered by the proposed contract").

15. Customers were required to order all DAPA items from the prime. A customer determined the specific source of supply (DAPA holder) for each ordered item. The prime was not permitted to substitute a product without customer authorization Pl. App. tab 4, at 4; Def. App. 3 ¶ 21 (Flatley Aff.).

16. Although customers had to purchase all items covered by a DAPA from the prime, customers were not obligated to purchase solely DAPA items. For example, if a customer used brand A bandages and only brands B-Z were available under DAPAs, the customer was not required to change brands, and could buy brand A outside the contract. Def. App. 3 ¶ 20 (Flatley Aff.).

17. Additionally, some customers might prefer one DAPA holder over another, based upon factors such as socioeconomic goals or price. In those cases, a customer did not have to order under the contract if United Medical did not have an agreement with the preferred DAPA holder. Id. ¶ 22.

18. However, the prime was allowed and encouraged to work with customers to find acceptable DAPA alternatives to customers' non-DAPA selections. (Under the stockless option, this would have been a contract requirement.) Id. ¶ 23.

UNITED MEDICAL'S OFFER

19. In response to Amendment 0008, United Medical submitted a new offer on or about January 15, 1996. Pl. App. tab 4. United Medical's offer included a business proposal and a technical proposal. Def. App. 4 ¶¶ 24-25 (Flatley Aff.).

20. Unbeknownst to the contracting officer, United Medical added a statement at the bottom of page 6 of the solicitation that its proposed distribution fee was "subject to negotiation if volume does not reach 90 percent of the stated contract award." Pl. App. tab 4, at 6; Def. App. 4 ¶¶ 26-31 (Flatley Aff.).

21. Prior to litigation, the latter language was never brought to the attention of the contracting officer. Def. App. 4 ¶ 29 (Flatley Aff.). It was never the subject of negotiations. Id. ¶ 30. The resultant contract was never modified to include the statement. Id. ¶ 31. Finally, United Medical never asked to renegotiate its distribution fee during performance. Id. ¶ 32; see also Def. App. 276 (Pl. Resp. Def. Interrog. 3).

THE CONTRACT

22. On January 30, 1997, United Medical was awarded two prime medical/surgical contracts. One contract, SPO200-97-D-7134, was for the stockless option. Def. App. 24-25. No orders were placed under this contract. The other contract, SPO200-97-D-7133, was for orders generated by ordering facilities. Pl. App. tab 8. The effective date of the award was June 1, 1997, which allowed United Medical time to implement the electronic

data requirements of the contract, enter into agreements with DAPA holders, and start stocking items. Pl. App. tab 8.

23. DSCP's and the customers' electronic data interchange ("EDI") used the American National Standards Institute ("ANSI") X12/UCS Standards. Pl. App. tab 4, at 31. United Medical was required to coordinate its computer system with the Government's. Id. at 19. Among other things, United Medical's system had to use ANSI X12 standards for Purchase Orders (document 850), Order Confirmation, (855) Sales Price Catalog (832), and Invoices (810). Id. at 19, 31.

24. A customer assigned a contract/delivery order number to each order when it was placed. The contract/delivery order number consisted of 17 characters, the first 13 of which reflected the contract number (SP0200-97-D-7134), which remained fixed throughout the contract period. The last four characters (commonly called the "call number") were a combination of letters and numbers. Each order received a unique call number. Pl. App. tab 4, at 20

25. The contract identified two types of routine orders: Just-In-Time ("JITOs") and Extended Delivery Orders ("EDOs"). United Medical was required to accept routine orders at all times between 8:00 a.m. and 5:00 p.m. local time of the ordering facility, Monday through Friday. Pl. App. tab 4, at 13.

26. JITO required delivery within 24 hours, unless an order was placed on a Friday, in which case it had to be delivered by Monday. Pl. App. tab 4, at 13, 16. EDOs required shipment within 10 calendar days, and all EDO items in one order had to be delivered at the same time. Pl. App. tab 16, at 2. JITO and EDO shipments could not be combined in a single order. Pl. App. tab 4, at 13.

27. JITO items were those whose usage was regular and predictable. Under the contract, the Government was to provide customer usage data for the JITO items within 10 days of contract award. Pl. App. tab 4, at 27. The contract anticipated that the majority of orders placed would be JITO. Every ordering facility had the right to identify any item it submitted usage data on as a JITO. Id. at 13.

28. In addition to the above routine orders, the solicitation allowed the ordering facilities to order items on an emergency basis. Emergency orders could be placed at any time. The time allowed for delivery of emergency orders varied between six to 12 hours, depending on the ordering facility. Each ordering facility was allowed two emergency orders per month free of shipping or handling charges. Id. at 16

29. Once an order was placed by a customer, United Medical was required to provide an order confirmation (document 855) to the ordering facility within two hours for JITO and emergency

orders, and within 24 hours for EDOs. Pl. App. tab 4, at 22; Def. App. 29.

30. If an order for an item could not be filled by the United Medical when ordered, the request for that particular item was automatically "killed" (cancelled) unless the ordering facility had previously approved delivery of a substitute. Pl. App. tab 4, at 14.

31. With each shipment, United Medical was required to enclose a packing slip showing the 17-character order number, date of order, list of supplies shipped, quantity, and price. After inspection and acceptance of the shipment, the customer would "pay" for the items by electronically obligating funds to DSCP. Pl. App. tab 4, at 26; Def. App. 198 ¶¶ 10-11 (Galligan Aff.).

32. DSCP's computer system identified the obligation by the four digit call number. Only one customer obligation could be made per call number. This is the reason the contract required United Medical to deliver each order in a single shipment. Def. App. 198 ¶¶ 13-14 (Galligan Aff.).

33. After shipment, United Medical was required to electronically submit an invoice for each delivery order to the payment office. Only one electronic invoice per delivery order was allowed, and each invoice had to include the correct call

number. Pl. App. tab 4, at 20; Def. App. 198 ¶¶ 16-18 (Galligan Aff.).

34. When the electronic invoice hit DSCP's system, the system would match the call number on the invoice to the call number identified in the customer's obligation. When the computer found a match, it would approve payment of the sum invoiced or the sum obligated (whichever was less) and transfer funds electronically to an account designated by United Medical. Def. App. 199 ¶¶ 19-20 (Galligan Aff.).

35. DSCP's computer system is designed to make only a single electronic payment for each call number. Any future invoice electronically submitted under a "used" call number is treated as an error and automatically disregarded. This is the reason the contract required United Medical to submit only one invoice per order. Id. ¶¶ 21-23.

UNITED MEDICAL'S PERFORMANCE PROBLEMS

36. Shortly after award, United Medical issued letters to each customer seeking verification of the usage data provided by the Government, together with a "commitment form" which purported to obligate customers to purchase all items stocked by United Medical for the contract. Def. App. 26-27.

37. The purpose of providing usage data to the prime vendor was to identify JITO items that required delivery in 24 hours. The contract allowed customers to designate any item, in any

quantity, as usage data without committing to its purchase. United Medical, however, refused to assume this business risk and refused to stock any JITO item, or quantity thereof, without an up-front commitment to purchase. This put the customer in the position of having to assume the business risk that DSCP was paying United Medical to assume. Def. App. 26-27.

38. Beginning in June 1997, the effective date of the contract, United Medical was supposed to be in a position to make deliveries in accordance with the contract requirements. United Medical was unable to do so, however. Therefore, with United Medical's knowledge and approval, DSCP allowed customers to order from Owens & Minor until November 30, 1997. Def. App. 28-29, 33.

39. During the initial performance period, there were numerous problems that resulted in low fill rates, untimely deliveries, failure to issue order confirmations, inability to invoice, failure to have refrigerated warehouses for IV solutions and other supplies at two sites, discrepancies between information on packing slips and information on confirmations, and lack of visits on the part of customer service representatives. Def. App. 34-40.

40. United Medical was made aware of these problems and advised to remedy them. Def. App. 36-38 (June 27, 1997 letter from prime vendor program manager to plaintiff's president).

41. Four months into the initial delivery period, fill rates were still low, Fort Bliss was still without a local warehouse in the El Paso area, deliveries for JITO and EDOs were still untimely, customer representatives were still not visiting on a regular basis, packing slips were not always included with every shipment and United Medical had not updated its DAPA catalog since April. Def. App. 41-43.

42. United Medical was made aware of these problems and advised to correct them. Def. App. 42.

43. In October 1997, DSCP became aware that United Medical was making deliveries in "split shipments." United Medical was reminded that this practice was not allowed under the contract. Def. App. 44.

44. United Medical continued the above practice throughout the base contract period and option years 1, 2, and 3. United Medical's continued use of split shipments created severe problems for DSCP's payment office. See Def. App. 201 ¶ 32 (Galligan Aff.). This is discussed in more detail below.

45. Six months into the first delivery period, more than half of the ordering facilities were experiencing fill rates below the contractually required 95 percent for JITO. Def. App. 49-50. Customers were also dissatisfied that United Medical had not entered into agreements with certain DAPA holders. Def. App. 45-46 (report of November 1997 In-Process Review).

46. At this time, United Medical still had not established DAPA agreements with 165 DAPA holders. Def. App. 51-55. With few exceptions, United Medical was contractually required to establish agreements with <u>all</u> DAPA holders before contract performance. <u>See</u> Def. App. 60. United Medical's failure to establish its <u>own</u> DAPA to provide ordered items was also a significant concern to customers. Def. App. 47.

47. In January 1998, fill rates still had not reached the required 95 percent. Def. App. 61. Customers were still complaining that United Medical had not established enough DAPA agreements. United Medical was advised that customers continued to be dissatisfied with the level of customer support from United Medical's representatives, unavailability of items, and lack of order confirmations. Def. App. 63-71.

48. Also, as of early 1998, United Medical had not updated its electronic catalog since the inception of the contract. This impeded customers' ability to place DAPA orders. Further, United Medical was misbilling DSCP for delivered items, causing DSCP to perform extensive manual research. Def. App. 67-70.

49. In February, March, and April 1998, United Medical's fill rates remained below 95 percent. Def. App. 72-77. By April 1998, there were still 127 DAPA holders with whom United Medical had not established agreements. Def. App. 79-83. Fill rates for May 1998 were below the required 95 percent. Def. App. 84-85.

Nonetheless, most customers did not want to invest the time and effort to switch prime vendors. Consequently, DSCP exercised option year 1. Def. App. 63.

50. The fill rates for the remainder of 1998 remained below the 95 percent minimum. Def. App. 86-99. By the end of 1998, the situation with product unavailability remained unchanged, as did problems with order confirmations, lack of DAPA agreements, and untimely deliveries. Def. App. 100-03.

51. Lack of customer service was a continuing problem. One ordering facility, WBAMC, reported that the time period between United Medical's service representative visits averaged three to four months. Def. App. 104-06

52. WBAMC was disappointed with the amount of time it was required to spend investigating United Medical’s allegations of nonpayment. According to WBAMC, for the most part, the alleged nonpayments arose from orders that were still open owing to nondelivery of items. Def. App. 105.

53. Fort Huachuca also voiced displeasure in 1998 with having to waste time researching alleged nonpayments, only to discover that the orders were unfilled. Def. App. 106.

54. Because fill rates do not reflect “killed” orders, fill rates do not accurately reflect the true level of United Medical's failure to perform. For instance, even though customers submitted usage data and commitment forms for certain

items, United Medical failed to keep those items in stock and thus failed to deliver (killed) them. Def. App. 111-22.

55. During 1999, United Medical's poor service got worse. When asked about the increasing unavailability of items, United Medical offered responses to the effect of, "The item is not available in Fort Worth," or, "You didn't order any of these [items] for two months, so it dropped out of our computer." Def. App. 123.

56. In one case, United Medical's response to a complaint from Fort Huachuca was, "Someone from your place called us last August and told us you weren't going to use these any more, so we discontinued them." But, when asked for a name, United Medical could not provide one. Def. App. 123.

57. Fill rates did not improve as United Medical reached the end of option year 1 in June 1999. Def. App. 124-29. Nor did the situation improve in the second half of 1999. Fill rates remained low and customers continued to complain. Def. App. 130-43. By December 1999, United Medical still had not established agreements with 118 DAPA holders. Def. App. 144-49.

58. During the first half of 2000, low fill rates continued, as did customer complaints about fill rates, late deliveries, and killed orders. Def. App. 150-78.

59. On July 31, 2000, United Medical closed its El Paso warehouse, creating further concerns among customers about United

Medical's ability to support them. Def. App. 179-80. Shortly after the closure, those concerns became reality when the already low fill rates for El Paso area customers plunged downward. Def. App. 183-92.

60. On November 6, 2000, Kirtland Air Force Base, a customer previously serviced by the El Paso warehouse, reported that United Medical had not filled any DAPA orders since October 31, 2000. Def. App. 193. Throughout the remainder of the United Medical's performance, low fill rates and frequent customer complaints persisted. Def. App. 194-96. One customer related, "Talking to United about this is like talking to a doorknob. Perhaps because of my constant complaining." Def. App. 196.

UNITED MEDICAL'S BILLING PROBLEMS

61. United Medical's failure to follow contractually required procedures resulted in numerous payment problems. The most common problem involved "short pays," meaning that only partial payment was made for an order. Def. App. 199 ¶ 25 (Galligan Aff.).

62. Many of United Medical's short pays are attributable to its practice of delivering orders in split shipments rather than in single shipments, as required by the contract. Id. Short pays result because the customer would typically obligate the money due on the first shipment. The customer, unaware that United Medical intended to ship the missing items at a later

date, determined the amount to be obligated from the price listed on United Medical's packing slip. Days or weeks later when additional items were delivered, the system would reject the customer's attempt to obligate further funds for that call number. Id. ¶¶ 12, 26.

63. It was not uncommon for United Medical to ship an order in three or more increments, over a period of 12 or more days. Id. ¶ 28.

64. Correction of a short pay resulting from a split shipment involved a great deal of effort on the part of the customer and DSCP. First, the customer had to manually research its records to determine the reason for the short pay. Once the customer determined that it resulted from a split shipment, the customer had to issue another call number to United Medical so United Medical could submit another invoice. Then, the entire electronic payment scenario described above had to be repeated. Id. ¶ 32.

65. Some short pays resulted from causes other than split shipments. Some resulted from United Medical's failure to adjust its records to account for cancellations, returns, or nonreceipt of items. Id. ¶ 34.

66. United Medical had a habit of killing orders then subsequently shipping the "killed" items. Because the customer

may have purchased the item elsewhere in the meantime, this could generate customer returns. See Def. App. 181-82.

67. As examples of the above, United Medical's claims of nonpayment for items under call numbers G900 and G901 were both found to be invalid. Government records confirm that the subject items were never delivered. Def. App. 202 ¶ 34 (Galligan Aff.).

68. In several instances, United Medical doubled-billed for items and the customer paid, but, because of United Medical's poor record keeping, United Medical continued to seek payment for the item. Id.

69. To resolve nonpayment claims arising from United Medical's failure to deliver, DSCP must contact the customer and the customer must manually research its records to determine if the entire order was delivered. If the customer cannot affirm that the order was completely shipped, DSCP must go back to United Medical for proof of delivery (i.e., packing slips). United Medical did not always respond to requests for packing slips and, consequently, payment problems remained unresolved. Id. ¶ 35; see Def. App. 239-45, 260.

70. Short pays also resulted from missing packing slips. United Medical's computer system could generate packing slips of only 10 lines or fewer. For shipments that included more than 10 line items, United Medical included multiple slips. Each of the

multiple slips would be confusingly numbered "1 of 1." Def. App. 203 ¶¶ 35-36 (Galligan Aff.); see Def. App. 246.

71. The amounts United Medical claimed in the past and that it currently claims are often overstated because United Medical frequently does not subtract DSCP's contractual distribution fee from the amount claimed. Def. App. 204-05 ¶ 37 (Galligan Aff.); see also Def. App. 260.

72. For example, United Medical is presently seeking a payment of $7.38 for invoice 500036 relative to call number R520. See Pl. App. tab 27, at 4 line 2. Government records show that United Medical correctly billed the customer, Cannon, $575.01, and that the customer transferred funds in that amount to DSCP. When invoiced, DSCP paid United Medical $567.63 on March 2, 2000. That amount represents the full payment that United Medical is entitled to. The difference of $7.38 represents DSCP's 1.3 percent surcharge, to which United Medical is not entitled. Def. App. 204-05 ¶ 37 (Galligan Aff.).

73. It is not uncommon to find that United Medical's allegations of nonpayment are totally unfounded and the sole result of United Medical's billing failures. In several instances, United Medical claimed nonpayment in situations where DSCP not only paid, but overpaid. Id. ¶ 38, see Def. App. 260.

74. In addition, United Medical has not fully cooperated with DSCP to resolve nonpayment claims. In order for DSCP and

its customers to search their records if a payment problem arises, United Medical must provide a correct call number. Def. App. 202 ¶ 34 (Galligan Aff.). Although United Medical seeks payment for hundreds of allegedly unpaid invoices, to date, it has not provided requested call numbers for approximately 250 of those invoices. Id. ¶ 39; see Def. App. 276 (Pl. Resp. Def. Interrog. 2).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kyle Chadwick
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

December 19, 2003

CERTIFICATE OF FILING

I certify that on December 19, 2003, the foregoing "Defendant's Proposed Findings Of Uncontroverted Fact, etc." was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Kyle Chadwick