AFFIDAVIT OF DONNA GALLIGAN

I, DONNA GALLIGAN, having been duly sworn, deposes and says as follows:

1. That I, DONNA GALLIGAN am over 21 years of age, of sound mind, capable of making this Affidavit, and personally acquitted with the facts herein stated.

2. That the Defense Logistics Agency is a component of the Department of Defense.

3. That the Defense Supply Center, Philadelphia, ["DSCP"] formerly known as the Defense Personnel Support Center[1] is a field activity of DLA and is located in Philadelphia Pennsylvania. DSCP is responsible for acquiring, and distributing a wide variety of items to the military services.

4. That I have been employed in the Directorate of Medical Material at DSCP since June 1977.

5. That I am currently a Prime Vendor Analyst (Team Leader) and have held this position since March 1999.

6. That as a Team Leader, I act as a liaison between the customers, vendors and DFAS on issues relating to prime vendor invoicing and customer payments. I oversee and provide guidance and assistance to my team members and others involved with invoicing procedures.

7. That I am familiar with the payment procedure utilized under the contract.

1 In January 1998, DPSC changed its name to Defense Supply Center Philadelphia.

8. That I am also familiar with many of the payment problems experienced by United Medical Supply ["UMS"].

9. That many of, if not all, the payments problems arose from UMS' failure to conform to the contract requirements.

10. That with the shipment of each order, UMS was contractually required to enclose a packing list/slip indicating the 17 character delivery order number, date of order, list of supplies shipped, quantity and price. The delivery order number always ended with the four digit call number assigned to the order by the customer. The four digit call number was unique for each order.

11. That after inspection and acceptance of the shipment, the customer would "pay" for the items by electronically obligating funds to DSCP. The obligation referenced the call number

12. That the customer determined the amount to be obligated from the price listed on UMS' packing slip.

13. That DSCP's system identified the obligation from a given customer by the four digit call number.

14. That once a customer obligation was made on a call number, additional obligations for that call number could not be made. The system would only accept one customer obligation per call number.

15. That this is the reason that the contract required UMS to deliver all items on an order in a single shipment.

16. That after shipment, UMS was required to electronically submit an invoice for each delivery order to the payment office.

17. That only one electronic invoice per delivery order was allowed.

18. That each invoice had to include the correct call number.

19. That when the electronic invoice hit DSCP's system, the system would match up the call number on the invoice to the call number identified in the customer's obligation.

20. That when the computer found a match, it would approve payment of the sum invoiced or the sum transferred (whichever was less) and electronically transfer the funds to the account designated by UMS.

21. That the system is designed to make only a single electronic payment to UMS for each call number.

22. That any future invoices electronically submitted under a "used" call number are treated as an error and automatically rejected.

23. That this is the reason that the contract required UMS to submit only one invoice per order.

24. That a correct and identical call number must appear on the packing slip for the order, the obligation for the order, and the invoice for the order. In order for DSCP and its customers to search any of its records, UMS must provide a correct call number.

25. That UMS' failure to follow the above procedures resulted in numerous problems. The most common problem involved "short pays", i.e. partial payment was made against the order rather than full payment.

26. That many short pays are attributable to UMS' practice of delivering orders in split shipments rather than in a single shipment as required by the

contract. Short pays result because the customer will typically obligate the money due on the first shipment. Days or weeks later when additional items are delivered, the system will reject any attempt on the customer's part to obligate further funds for the call number.

27. That Attachment 1 illustrates four of the many instances where split shipments caused short pays.

28. That pages 1-4 of Attachment 1 relate to a shot pay under call number GG76.[2] Page 2 of the attachment is a delivery record from UMS. The last line item on the delivery record shows that a portion of the order placed under call number GG76 was delivered on May 5, 1998. Page 3 of the attachment (next to the last line item) shows that another portion of order GG76 was delivered on May 7, 1998. Page 4 of the attachment (last line item) shows that still another portion of the order was delivered on May 19, 1998. In this instance the customer, (BAMC) had originally obligated $876.72, leaving unpaid these three later shipped items.

29. That pages 5-11 of Attachment 1 relate to a short pay under call number UF90. Page 6 is a packing slip showing that a portion of the order was shipped on March 16, 1998. Pages 7 and 8 show that another portion of the order was shipped on March 12, 1998 (probably in two separate trucks since there are two packing slips each for one line item). Page 9 shows that another part of the order was shipped on March 13, 1998. Page 10 shows that another line item of the order was shipped March 25, 1998. In this case, the customer,

---

[2] The first page references call number GJ23. However, this is not the call number that is subject to the short pay. Rather it is the call number assigned so that the balance due can be paid.

Beaumont, obligated $5,216.72 when the original shipment was made under the call number. When additional items started arriving on March 12–25, 1998, the system would not allow any further obligations on the call number.

30. That pages 12-15 of Attachment 1 relate to BAMC's order under call number GG55. Page 15 is the packing slip listing three items. Two items were delivered together with the packing slip. The circled item was not delivered with other two items for that call under. Instead that item was delivered in a different shipment along with items from orders placed under call numbers GG56, and GG57. Again the customer only obligated funds for the items received in the initial shipment, leaving a short paid on the third line item.

31. That pages 16-21of Attachment 1 relate to Bliss' order under call number PC75. Page 17 is a packing slip showing that two line items were shipped on February 27, 1998. Page 18 is a packing slip showing that one line item was shipped a month later March 26, 1998.

32. That the correction of a "short pay" due to a split shipment involved a great deal of effort on the part of the customer and DSCP. First, the customer had to manually research its records to determine the reason for the short pay. Once the customer determined that the short pay resulted from a split shipment, the customer had to issue another call number to UMS so that it could submit another invoice. At that point in time, the entire electronic payment scenario described above had to be repeated.

33. That none of the shorts in Attachment 1 would have occurred if UMS had complied with the contract requirements and shipped all line items in the order in a single shipment.

34. That short pays resulted from reasons other than split shipments. For instance, some short pays resulted from UMS' failure to adjust its records to account for customer cancellations, returns and nonreceipt of items. Attachment 2 illustrates a several instances where UMS alleged nonpayment for these returns and for items never received. Pages 1-5 is claim by UMS for payment of an item that was not received by the customer, Beaumont. Pages 6-7 is Fort Worth's response to UMS' allegations of nonpayment. The order under call number G900 was never shipped in full. One line item under call number G901 was returned. Pages 8-14 is Tinker's response to UMS' claim of unpaid invoices. Page 9 indicates that a wrong item was sent under call number K631, one line items was never received under call number K639, one line item was not received under call number K643 and UMS sent partial delivery of five other line items on that call. Page 10 indicates that Tinker only received a partial shipment under call number K647 and that UMS double billed for line items under call numbers K672 and K673. Page 11 indicates that two line items were never received under call number K679, a wrong item was sent under call number K699, and one line item was not received under call K729. Page 12 indicates that the order under call number K754 was cancelled and four items under call K788 were never received. Page 13 indicates that one or more items under call numbers K815, K817, K818 and K821 were never received. Page 14 indicates

that, the orders shipped under call numbers K835 and K853 were not complete, and, contrary to UMS' allegation, the order under call number K828 had been paid in full.

35. That to resolve nonpayment claims arising from UMS' failure to deliver, DSCP must contact the customer and the customer must manually research its records to determine if the entire order was delivered. If the customer cannot affirm that the order was completely shipped, DSCP must go back to UMS for its proof of delivery, i.e. packing list, delivery records. UMS did not always respond to these requests for proof and consequently, the payment problem remained unresolved.

36. That short pays also resulted from missing packing lists. UMS' system only had the capacity to generate a ten line item or less packing lists. For shipments that included more than ten line items, UMS included multiple lists. UMS' lists were all numbered 1 of 1. Attachment 3 is a packing list for GH28. The list is nine pages. However, each page states on the top right hand corner that it is page 1 of 1. Consequently, the customer could not readily determine whether all the pages of a multi-page packing list were included in the shipment. Sometimes, a list might have been overlooked by the customer and the wrong amount obligated. Sometimes, UMS failed to include all the lists.

37. That the amounts UMS claimed in the past and the amounts UMS currently claims are often overstated because UMS frequently does not back DSCP's surcharge from the amount claimed. For instance, UMS is presently seeking a payment of $7.38 for invoice 500036. See PA, tab 27, p. 4 line 2.

When I researched this invoice (under call number R520), I discovered that UMS billed the customer, Cannon, $575.01, the customer transferred funds in that amount to DSCP. DSCP paid UMS $567.63 on March 2, 2000. That amount represents the full payment that UMS is entitled to. The difference of $7.38 is DSCP's 1.3% surcharge[3].

38. That after extensive research, UMS' allegations of nonpayment have sometimes been found to totally unfounded and the sole result of UMS' failure to do the math and/or keep track of payments received. Attachment 4 is an e-mail response that Donna Kennedy submitted to UMS. The response illustrates six situations where UMS' allegations were totally unsupported. In one case, call number U116, UMS alleged DSCP owed $33.98, when in actually DSCP owed 2 cents. The remaining balance had been paid a year and a half before the response. In four instances, DSCP had overpaid UMS in varying amounts from $0.28 to $111.51. Two of those overpayments were over one and half years old. In the last instance, call number U550, the bill had been paid in the full amount due.

39. That many of the invoices UMS claims are unpaid cannot be researched because UMS has not provided DSCP with a call number. To date, call numbers corresponding to the following invoices have not been provided:

<u>ALBUQUERQUE</u>
302839
<u>ALTUS</u>
100508
114527
115712
231018

[3] DSCP's surcharge fluctuated during the contract period. The surcharge is also referred to as DSCP's administrative fee or the cost recovery rate (CRR).

BEAUMONT
200710
200717
201138
223887
224471
225292
225403
226243
226446
226505
226972
227714
228193
228382
228726
228730
230517
230533
230548
230674
231373
232034
232723
232755
232835
301352
301383
301822
302571
302866
303798
306164
308195

BROOKE
700605
700821
701193
701465
705006
706966
708502
708503
708537
708737
708738
708784
709004
709265
709276
709277
709369
709370

709496
709522
709523
709660
709834
710228
710260
710493
710504
710722
710787
710789
711084
711103
711581
712172
712294
712529
712619
712620
713065
713353
714203
715038
715979
716296
716373
716560
716954
717006
717105
717106
717107
717108
717109
717110
717111
717112
717585
717972
719437
721676
725741
726179
727547
727563
728074
728288
728396
728846
728999
729123
729159
729287
729651
729708

729919
730322
730323
730462
730630
730718
732697
732877
734021
734180
734206
734286
735238
735239
735242
736692
737526
738272
738708
739213
739283
739375
739643
739925
740446
741776
741780
742083
742100
742248
743005
744089
744975

Cannon AFB
50002
500395
500561

CORPUS CHRISTI
701750
712428
714544
718563
722403
722910
724699
725864
727313
727879
727935
728383
729124
733948
734232

734566
734584
735046
735973
736179
736877
737107
737490
737897
738224
738619
739247
740233
741238
742113

GALVESTON
812576

HOLLOMAN
300813
300949
300979
302098

LAUGHLIN
700876
702793
708922
724797
725494
726222
728926
730471
730471
731761
734605
734621
807193

SHEPPARD
FM3
114573
140564
140979
141059
141388
145569
146535
150601
154263
154483
156488
165424

166398
187374
207867
231152

FM3020
100400
135271
136707
136837
141403
142999
145275
145680
147177
147987
149631
150270
155899
172808
173272
174923
174947
178206
178208
178214
178222
178242
178289
178300
179733
180130
180246
181015
182358
184721
187539
187540
187544
187552
188795
191358
191798
193455
193457
193462
194627
197828
198359
199000
207348
217067
225483
225593
227164

VANCE
109989
157688

Donna Galligan
DONNA GALLIGAN
Prime Vendor Analyst

Subscribed and Sworn to before me this 15th day of November 2003.

Virginia J. Nunes
Notary Public

Notarial Seal
Virginia J. Nunes, Notary Public
Philadelphia, Philadelphia County
My Commission Expires Mar. 16, 2004
Member, Pennsylvania Association of Notaries