IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff | CASE NO: 03-CV-289 |
| v. | Judge Allegra |
| THE UNITED STATES, Defendant | |

# PLAINTIFF'S ANSWERS AND RESPONSES TO DEFENDANT'S INTERROGATORIES AND REQUEST FOR PRODUCTION

Objections to Number of Interrogatories: Plaintiff objects that the Government's position that this is a new case and entitles it to "start-over" with interrogatories is incorrect. This case was transferred from the United States Bankruptcy Court. Plaintiff contends that interrogatories served and answered in that case may be used in this case and the number of interrogatories served counts as interrogatories served in this case in calculating the 25 interrogatories permitted by Rule 33(a). Subject to this objection, Plaintiff otherwise answers and responds as follows:

Specific objection to interrogatories 10 through 15: Plaintiff objects to these interrogatories as misleading to the extent that the interrogatories assume or imply that these contract issues were in any way material breaches by Plaintiff or not waived by the Government and Plaintiff's answers are subject to such objections.

**INTERROGATORY NO. 1:** Identify each specific item (including each specific brand of similar or identical products) that is alleged in paragraphs 23 and 24 of the amended complaint to be a DAPA item, and for which United Medical, at any time during contract performance, did not have an executed agreement with a DAPA holder authorizing United Medical to sell the item, and for each item identified, state the exact time period(s) during which no agreement was in effect.

**ANSWER:**

Plaintiff objects that this interrogatory is overlybroad and answering it would impose an undue burden on Plaintiff. Subject to objection, Plaintiff states that DAPA agreements were supplier specific, not DAPA item specific. To the extent United Medical can provide information with respect to each DAPA supplier, United Medical

will produce its DAPA contracts file, its supplier invoice files, and its AS 400 computer hard drive in response to this interrogatory pursuant to Rule 33(d).

<u>INTERROGATORY NO. 2:</u> Provide the MTF call number for each invoice below.

<u>Albuquerque</u>
302839

<u>Altus</u>

100508
114527
115712
231018

<u>Beaumont</u>

200710
200717
201138
223887
224471
225292
225403
226243
226446
226505
226972
227714
228193
228382
228726
228730
230517
230533
230548
230674
231373
232034
232723
232755

232835
301352
301383
301822
302571
302866
303798
306164
308195

Brooke

700605
700821
701193
701465
705006
706966
708502
708503
708537
708737
708738
708784
709004
709265
709276
709277
709369
709370
709496
709522
709523
709660
709834
710228
710260
710493
710504
710722
710787
710789
711084

711103
711581
712172
712294
712529
712619
712620
713065
713353
714203
715038
715979
716296
716373
716560
716954
717006
717105
717106
717107
717108
717109
717110
717111
717112
717585
717972
719437
721676
725741
726179
727547
727563
728074
728288
728396
728846
728999
729123
729159
729287
729651
729708

729919
730322
730323
730462
730630
730718
732697
732877
734021
734180
734206
734286
735238
735239
735242
736692
737526
738272
738708
739213
739823
739375
739643
739925
740446
741776
741780
742083
742100
742248
743005
744089
744975

Canon AFB

50002
500395
500561

Corpus Christi

701750
712428
714544
718563
722403
722910
724699
725864
727313
727879
727935
728383
729124
733948
734232
734566
734584
735046
735973
736179
736877
737107
737490
737897
738224
738619
739247
740233
741238
742113

<u>Galveston</u>

812576

<u>Holloman</u>

300813
300949
300979
300098

Laughlin

700876
702793
708922
724797
725494
726222
728926
730471
730471
731761
734605
734621
807193

Sheppard
FM3

114573
140564
140979
141059
141388
145569
146535
150601
154263
154483
156488
165424
166398
187374
207867
231152

FM3020

100400

135271
136707
136837
141403
142999
145275
145680
147177
147987
149631
150270
155899
172808
173272
174923
174947
178206
178208
178214
178222
178242
178289
178300
179733
180130
180246
181015
182358
184721
187539
187540
187544
187552
188795
191358
191798
193455
193457
193762
194627
197828
198359
199000

207348
217067
225483
225593
227164

Vance

109989
157688

**ANSWER:**

The information necessary to match United's invoice numbers with the DSCP call numbers, on several occasions, has previously been provided to DSCP by spreadsheet and the burden to obtain the requested information from the spreadsheet is no greater on the United States than United Medical. Pursuant to Rule 33(d) United Medical will make the spreadsheet information available for inspection and copying in accordance with Rule 33(d). United Medical also believes that the correspondence file of Megan Edmonds may assist the Government in determining this information, and that correspondence file will be made available.

**INTERROGATORY NO. 3:** Identify and describe in full each of the 'informal inquiries" about renegotiating United Medical's distribution fee that are alleged in plaintiff's January 8, 2003 response to defendant's interrogatory number 6 in United Medical's bankruptcy proceeding, identifying without limitation the date of each alleged inquiry; the form of each inquiry (e.g., oral, letter, electronic mail); all documents that contain, record, or otherwise reflect any inquiry; and everyone who allegedly made and received each inquiry.

**ANSWER:**

Mr. Bandy specifically recalls one discussion with Mr. Anthony Amendolia in which Mr. Amendolia stated that the MTFs would catch up when their credit card usage was stopped. United Medical requested in its claim submitted to the Contracting Officer that the fee be renegotiated. See also the discussion with Mr. Hasting described in the next interrogatory response.

**INTERROGATORY NO. 4:** Identify and describe in full each time, other than the claim now in litigation, that United Medical raised with the Government the issue of orders from the MTFs falling below the estimated amounts, identifying without

limitation the date of each alleged communication; the form of each communication (e.g., oral, letter, electronic mail); all documents that contain, record, or otherwise reflect each communication; and everyone who allegedly made and received each communication concerning underrunning the estimates.

**ANSWER:** Mr. Bill Bandy had numerous discussions with DSCP and DoD personnel on this issue. Early in the contract period, Mr. Bandy had several discussions with Mr. Michael Schmitt. Mr. Schmitt advised Mr. Bandy that the primary reason the orders were below estimates was that the MTFs continued to use government credit cards to make many of their purchases of DAPA items and that DSCP would eliminate the practice.

Mr. Bandy also discussed the issue with Mr. John Cuorato, Mr. Greg Wentzel, Mr. Steve Hasting, Mr. Anthony Amendolia and Ms. Maggie Rees. Mr. Amendolia, with whom Mr. Bandy discussed the issue 6 or 7 times, advised Mr. Bandy that DSCP did not have the authority to make the MTFs comply with the contract. Mr. Bandy ask Mr. Amendolia who did, and Mr. Amendolia was not able to provide an answer.

One of the discussions Mr. Bandy recalls with Ms. Maggie Rees prior to the effective date of the Contract concerned accuracy of usage figures. Ms. Rees told Mr. Bandy that they expected purchases within six weeks to be $250,000.00 per month. Mr. Bandy replied that that was good news and bad news. The good news was that the MTF usage would be increasing to $250,000 per month in the near term, but that the bad news was that this was way below estimates. Ms. Rees reply was that this was just the start up month and that purchases would escalate to the Contract estimates.

Mr. Bandy recalls a discussion with Mr. Hasting about the MTFs not purchasing 90% of estimates. Mr. Hasting was sympathetic but that he had no authority in that area.

Mr. Bandy recalls a discussion with Col. James Riley over pizza in which he expressed concern that the orders were far lower than estimates. Colonel Riley expressed recognition of the problem and admitted that the Government was not complying with the contract terms.

Never did any DSCP or MTF personnel tell Mr. Bandy that the estimates were too large.

**INTERROGATORY NO. 5:** Fully describe all of United Medical's reasons for not accepting the offer from Henry Schein described on page 26 of your summary judgment brief and identify all documents that record or otherwise reflect those reasons.

**ANSWER:**

Schein made two offers. The first offer was not accepted because it was too low. While United Medical was reviewing the second offer, Henry Schein advised United Medical that its stock price had plummeted and that it would have to postpone any purchase of United Medical's for financing reasons. Shortly thereafter, United Medical's financial condition became too dire to wait on Schein. United Medical's bankruptcy eliminated any reasonable possibility of completing the transaction with Schein.

**INTERROGATORY NO. 6:** Identify and describe in full any offers to purchase all or part of United Medical's business or assets made by anyone other than Henry Schein since June 1996, including without limitation the identity of any offeror or offerors, all documents constituting or relating to each offer, the amount of each offer, all of United Medical's reasons for not accepting each offer, and all documents that record or otherwise reflect those reasons.

**ANSWER:**

None, other than the offer by Advanced Medical, which United Medical accepted as part of its plan of reorganization. The terms of that offer and acceptance are document in the confirmed plan and confirmed disclosure statement. United Medical elects to answer this interrogatory by providing for copying and acceptance these two documents and the order confirming the plan.

**INTERROGATORY NO. 7:** For each claim for money, other than this action, filed or prosecuted by or upon behalf of United Medical against any party in any judicial or administrative forum since June 1996, identify the forum, case number, opposing party, opposing counsel (if any), nature of claims, amount sought, and amount recovered or awarded.

**ANSWER:**

Pursuant to its confirmed Plan of Reorganization, United Medical's liquidation included assignment to Advanced Medical of all claims against third parties except claims under Chapter 5 of the Bankruptcy Code (preference and fraudulent transfer claims) and claims against the United States. To the extent that claims other than these have been pursued in the name of United Medical, United Medical is not the real party in interest.

United Medical has pursued many claims, primarily claims for 11 U.S.C. 547 preference payments pursuant to its plan of reorganization. These preference claims and the payments received are of public record in the United Bankruptcy. Pursuant to Rule 33(d), United Medical elects to provide the information pertinent to these claims by directing the United States to the Bankruptcy Docket and documents (all documents of

public record) filed under the general docket label of Motions to compromise. The docket and the motions can be reviewed online.

United Medical, from time to time, has pursued claims against its customers who failed to pay. United Medical does not have records on these, but may be able to locate the name of the attorneys who handled any such claims if desired by the United States.

United Medical also filed a proof of claim in the Allied Physicians bankruptcy in the Northern District of Texas. CASE NO. 397-31267-HCA-11; IN RE: ALLIED PHYSICIANS GROUP, P.A. AND ALLIED PHYSICIANS OF DFW, INC. That proof of claim may be inspected at the bankruptcy clerk's office during normal business hours, and United Medical elects its Rule 33(d) election with respect to that claim. United also believes that the proof of claim can be viewed online through the PACER website.

**INTERROGATORY NO. 8:** If you contend for purposes of your summary judgment motion that the Government's estimates of its annual purchases under the contract were negligently prepared, describe all facts and identify all documents that you allege support that contention.

**ANSWER:**

Plaintiff objects to this interrogatory on the grounds that it is overlybroad and purports to require United Medical to marshal all of its evidence on the issue. Subject to this objection Plaintiff's evidence on the issue is generally as follows:

1. The actual orders from United Medical were only 15% or so of estimated orders;
2. The representation by the DoD was that the estimates were based on historical purchases. The United States has not been able to produce any records to support any claim that the estimates were based on historical purchases;
3. The written requests from DSCP, and notes of requests made by DSCP, produced by DSCP did not evidence any request to the MTFs to base their estimates on historical purchases.
4. Documents produced by the DoD did not evidence any consistent methodology for making the estimates and many of the documents in the files of DSCP evidenced simply "off the cuff" estimates.
5. The United States has been unable to back up its estimates.
6. The United States post-contract-completion estimates of its actual requirements vary widely.
7. Substantial internal correspondence of DSCP produced in this case admit that the estimates were not realistic. DSCP's disclosed in discovery in this case that it used 1995 estimates. Those estimates, based on disclosures made in this case by DSCP, included estimated purchases for William Beaumont Army Medical Center of $18,000,000 per year and for Fort Hood of $4,000,000 per year.

However, in 1996, DSCP concluded that a more realistic estimate for Fort Hood was $1.7 million and that William Beaumont's purchases were below the $1.5 million per year number. (Reference documents Bates Numbers "DSCP-UMS-2136-2140"). This was never disclosed to Plaintiff prior to the filing of this lawsuit.

8. Not one single region's actual PV sales came close to the DSCP estimate, based on documents produced by DSCP.
9. The United States, prior to contracting with UMS, knew the ramp up was more difficult and slower than represented. See for example, Bates DSCP-PV-1238.

INTERROGATORY NO. 9: For each contract year for which you seek recovery in your summary judgment motion, state as precisely as you can the total value of the DAPA items that you allege the ordering facilities purchased from parties other than United Medical in that year, but should have purchased from United Medical (i.e., "diverted" purchases), and fully explain how you derive that dollar figure.

ANSWER:

Plaintiff elects to answer by directing the Government to the calculations of Robert Imel pursuant to Rule 33(d). To assist the Government in analyzing this information, but without waiving its rights to make a Rule 33(d) election, Plaintiff supplements as follows:

| Contract Yr. | Contract Estimates (million $) | x 85%[1] | Equals (amount Gov't should have purchased) (million $) | Less Actual Purchases (estimated from attached chart) (million $) | Equals Shortage (million $) |
|---|---|---|---|---|---|
| 1 | 30.4 | | 25.8 | 5.9 | 19.9 |
| 2 | 61.05 | | 51.9 | 8.0 | 43.9 |
| 3 | 61.05 | | 51.9 | 10.7 | 41.2 |
| 4 | 56.0 | | 47.6 | 7.4 | 40.2 |
| Total | 208.5 | | 177.2 | 32.0 | 145.2 |

Calculation Methodology used to determine the above figures was a three-step process:

[1] Mr. Imel used 85% as a conservative number in favor of the Government. Actual fill rates suggest that this number is too low by at least 5%.

Step 1: Calculation of the Government's requirements for each of the 4 contract years.

The documents produced by the Government evidence a range of actual requirements from a high of the actual estimates to a low of 222% of actual purchases from prime vendors. Based on the substantial documents produced by the Government in this case that support actual requirements equal to the contract estimates and actual diversion of purchases, United Medical calculated the Governments' requirements each year based on the estimates.

Step 2: Calculation of the orders that would have been filled by United Medical had the Government ordered and paid in accordance with the Contract Terms.

United Medical calculated this number using a 85% fill rate, although United Medical believes it would have exceeded this minimum number. The 85% number was used to be conservative and to provide "cushion" in the event that the treatment of the Government's estimates did not properly reflect the DSCP service fee.

Step 3: Subtract actual orders.

The Government apparently has information that it has not provided to United Medical even though requested by a proper request for production. For example, the internal emails provided by the Government in this case reference a 122-page computer printout prepared by Fort Hood and given to Anthony Amendolia for his use in determining what DAPA items were being purchased by credit card. Neither the 122-page Fort Hood computer printout nor the Amendolia analysis has been provided to United Medical.

**INTERROGATORY NO. 10:** If you contend that United Medical provided 24-hour electronic confirmation of all Extended Delivery Orders, identify all documents and specify all facts that allegedly support that contention.

**ANSWER:**

No such contention is made.

**INTERROGATORY NO. 11:** If you contend that United Medical attained a 95 percent fill rate specifically for Just-in-Time Orders, identify all documents and specify all facts that allegedly support that contention.

**ANSWER:**

No such contention is made.

**INTERROGATORY NO. 12:** If you contend that United Medical attained a 95 percent fill rate specifically for Extended Delivery Orders, identify all documents and specify all facts that allegedly support that contention.

**ANSWER:**

No such contention is made.

**INTERROGATORY NO. 13:** If you contend that United Medical attained a 100 percent fill rate specifically for emergency orders, identify all documents and specify all facts that allegedly support that contention.

**ANSWER:**

No such contention is made.

**INTERROGATORY NO. 14:** If you contend that United Medical provided 10-calendar day delivery of all Extended Delivery Orders, identify all documents and specify all facts that allegedly support that contention.

**ANSWER:**

No such contention is made.

**INTERROGATORY NO. 15:** If you contend that United Medical always made one shipment to fill each delivery order, identify all documents and specify all facts that allegedly support that contention.

**ANSWER:**

No such contention is made.

**INTERROGATORY NO. 16:** Explain in detail whether and how United Medical concluded, before or upon submitting its bid for the contract, that it would earn a profit on the contract, including without limitation who made that determination, when it was made, and the expected profitability level; and identify all documents that record, reflect, or support the conclusion reached by plaintiff at that time as to profitability.

**ANSWER:**

Plaintiff objects to the extent that this interrogatory requires Plaintiff to identify, as defined, documents as imposing an undue burden and expense on Plaintiff. The documents responsive include all of Plaintiffs' financial information, sales information to third parties, especially if such sales were made under a prime vendor contract, and and pricing discount information with the various DAPA holders.

The profit information was determined by Mr. William Bandy (UMS CEO), Joe Smith (UMS EVP at the time) and Gloria Salgado. The proforma determinations were made throughout the solicitation and bid process as additional information was provided. United Medical reviewed its financial statements and its pricing agreements with various DAPA holders and then calculated its bid price needed to make a minimum 4% net profit on average for sales under the Contract. The calculations were later confirmed by Don Condor, a CFO for Plaintiff.

United Medical also compared its proposals to known prime vendor contracts with the DoD to assure itself that its bid was reasonable to both itself and the Government.

United Medical had substantial experience as a prime vendor to hospitals and was quite familiar with the pricing it needed to make a minimum 3% net profit. It expected to make at least a 4% net profit on the DoD contract.

Plaintiff further directs the United States to the affidavit of Robert Imel filed in support of Plaintiff's pending motion for summary judgment and the Claim submitted to the Contracting Officer.

To the extent that documents exist and are in the custody and control of United Medical they will be produced.

**INTERROGATORY NO. 17:** Supplement or amend any of United Medical's responses to the Government's interrogatories in the bankruptcy proceeding to the extent you would be obligated to supplement or amend those responses, pursuant to RCFC 26 (e), had those interrogatory responses been provided in this action.

**ANSWER:**

Plaintiff objects on the grounds that this interrogatory is overlybroad and assumes that this action is different than the bankruptcy court case that was transferred to this Court. Plaintiff will comply with its obligations to supplement and this response is subject to all previously served objections.

**REQUEST NO. 1:** All documents not previously produced to the Government that are responsive to the Government's document requests in United Medical's bankruptcy proceeding.

**RESPONSE:**

Subject to previously served objections, to the extent that these documents are in the custody or control of United Medical, Plaintiff will produce either at the offices of Plaintiff's counsel or the United Medical storage facility during normal business hours upon reasonable notice.

**REQUEST NO. 2:** Packing slips for all invoices alleged to be outstanding.

**RESPONSE:**

To the extent that these documents are in the custody or control of United Medical, Plaintiff will produce either at the offices of Plaintiff's counsel or the United Medical storage facility during normal business hours upon reasonable notice.

**REQUEST NO. 3:** All documents not previously produced that are identified in your responses to defendant's interrogatories above.

**RESPONSE:**

To the extent that these documents are in the custody or control of United Medical, Plaintiff will produce either at the offices of Plaintiff's counsel or the United Medical storage facility during normal business hours upon reasonable notice.

**REQUEST NO. 4:** All documents relating in any way to United Medical or this case, including without limitation proposals, statements of work, bills, and substantive materials, including financial data, draft reports, and comments on drafts, communicated at any time between United Medical (including counsel) and Robert Imel, plaintiff's designated expert.

**RESPONSE:**

Plaintiff will produce at the offices of Plaintiff's counsel during normal business hours upon reasonable notice.

Signed November 10th, 2003

______________________________
William Bandy
Former President and CEO of Plaintiff

**Verification**

On November 10 th 2003 personally appeared Mr. William Bandy and verified that the answers to the foregoing answers to interrogatories 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, and 16 are true, correct, and complete based on his recollection of events and diligent review of Plaintiff's relevant records.

Notary Public for the State of Texas

[seal]

SHANTA K. YADAV
Notary Public, State of Texas
My Comm. Expires Jan. 16, 2005

Respectfully submitted,

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

On November 13, 2003 the foregoing was served on the persons shown below by the method shown below in accordance with rule 5.1.

Frank L. Broyles

**PERSONS SERVED:**

Kyle Chadwick
Department of Justice
1100 L Street
Washington, D.C. 20530

Method Served: first class mail, certified return receipt requested