**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | CASE NO: 03-CV-289<br><br>Judge Allegra |

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND ITS RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S COUNTERMOTION FOR SUMMARY JUDGMENT

SUBMITTED BY:

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff
UNITED MEDICAL SUPPLY COMPANY, INC.

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

SUPPLEMENTAL TABLE OF APPENDICES ..... iii

SUMMARY ..... 1

OBJECTIONS TO GOVERNMENT'S SUMMARY JUDGMENT EVIDENCE ..... 3

ARGUMENT

A. The bankruptcy Court did not dismiss this case for want of jurisdiction ..... 4

B. Plaintiff's summary judgment evidence in support of liability for diversion is uncontroverted and plaintiff is entitled to summary judgment on this issue. ..... 5

C. Plaintiff's summary judgment evidence in support of damage quantum For diversion is uncontroverted and plaintiff is entitled to summary judgment on its damage claim ..... 7

D. Plaintiff's summary judgment evidence in support of liability for outstanding invoices is uncontroverted and plaintiff is entitled to summary judgment on this issue. ..... 16

E. An alternative remedy to Plaintiff is an adjustment in contract price for failure of the government to purchase the contractually agreed minimum of 90% of estimates. ..... 17

F. Plaintiff's summary judgment evidence in support of liability and damage quantum for lost goodwill and reputation is uncontroverted and plaintiff is entitled to summary judgment on this issue with respect to both liability and quantum. ..... 19

G. Plaintiff performed its obligations under the Contract, or they were legally excused. ..... 22

CONCLUSION AND REQUEST FOR RELIEF ..... 26

# TABLE OF AUTHORITIES

**CASES** **Page**

*A.R. Sales Co, Inc. v. United States,* 51 Fed. Cl. 370, 374 (2002). ....24

*Becho Inc. v. United States,* 47 Fed. Cl. 595, 604 (2000). ....3

*Biener v. United States,* 17 Cl. Ct. 802 (1989) ....18

*DeVito v. United States,* 413 F.2d 1147, 1154 (Ct. Cl. 1969) ....24

*Hughes v. United States,* 58 Fed. Cl. 291, 297 (2003). ....3

*Olin Jones Sand Co. v. United States,* 225 Ct. Cl. 741 (1980) ....22,27

*Quiman, S.A. v. United States,* 39 Fed. Cl. 171, 183 (1997). ....20

*Ramsey v. United States,* 121 Ct. Cl. 426, 101 F. Supp. 353, 357 (1951) ....22

*San Carlos Irrigation and Drainage Dist. v. United States,* 111 F.3d 1557, 1563 (Fed. Cir. 1997). ....20

**STATUTES AND RULES** **Page**

FAR 9.103 ....24

FAR 9.104 ....24

FAR 9.105-2 ....23,24

FAR 17.207 ....23

F.R.C.P. 9(c) and Fed. Ct. Cl. Rule 9(c) ....22,25

F.R.C.P. 56 and Fed. Ct. Cl. Rule 56 ....2

F.R.C.P. 56(e) and Fed. Ct. Cl. Rule 56(e) ....3,4

SUPPLEMENTAL TABLE OF CONTENTS FOR APPENDICES
(A hard copy of appendices will be submitted to chambers)

| APPENDIX # | DESCRIPTION | SIZE **(pages)** | REFERENCED IN PLAINTIFF'S BRIEF AT PAGE(S): | REFERENCED IN PLAINTIFF'S REPLY BRIEF AT PAGE(S): |
|---|---|---|---|---|
| | | | | |
| 1 | 1993 Original Solicitation, pp 1 – 15 | 15 | 10 | |
| 2 | | | | |
| 3 | June 30, 1999 email from Sara Bird to various DSCP personnel | 1 | 21 | |
| 4A | Solicitation Amendment 008 and Plaintiff's Offer, pp. 1- 25 of 96 | 25 | 4,9,10,11,13,17 22 | 4,10,12,13,18,19 |
| 4B | Solicitation Amendment 008 and Plaintiff's Offer, pp. 26-50 of 96 | 25 | 9,11,17 | |
| 4C | Solicitation Amendment 008 and Plaintiff's Offer, pp. 51-75 | 25 | n/a | |
| 4D | Solicitation Amendment 008 and Plaintiff's Offer, pp. 76-96 | 21 | 10 | |
| 6 | July 10, 1997 Schmitt memo to DAPA Holders | 6 | 12 | |
| 7 | Solicitation Amendment 012 and Plaintiff's Offer | 42 | 4,10,13,22 | 10,12,13,18,19 |
| 8 | Contract Award | 10 | 8,9,10,23 | 18 |
| 9 | Contract Modification 5 Adopting ADR procedures | 2 | 23 | |
| 10 | Contract Modification 6 Adding Additional MTF | 2 | 23 | |
| 11 | Contract Modification 20 authorizing lump sum interest on past due invoices | 9 | 17 | |
| 12 | Contract Modification 10, exercising option year 1 | 1 | n/a | 25 |
| 13 | Contract Modification 16, exercising option year 2 | 1 | 2,20 | 25 |

| APPENDIX # | DESCRIPTION | SIZE **(pages)** | REFERENCED IN PLAINTIFF'S BRIEF AT PAGE(S): | REFERENCED IN PLAINTIFF'S REPLY BRIEF AT PAGE(S): |
|---|---|---|---|---|
| 14 | May 11, 1999 Findings of Contract Officer Jennings with Respect to Option Year 2 | 4 | 2,14,19 | 11,23,24 |
| 15 | May 11, 1999 Request by L. Flatley for Approval to Exercise Option Year 2 | 2 | 2,14,20 | 11,24 |
| 16 | May 2000 Contract Modification 21, exercising option year 3 signed by Kennedy, Flatley & Gushue | 1 | 2,14 | 11,25 |
| 17 | May 22, 2000 Findings by Contracting Officer Kennedy with Respect to Option Year 3 | 4 | 2,9,14,19 | 11,23,24 |
| 18 | omitted | | | |
| 19 | March 13, 2001 Contract Modification 26, signed by Contracting Officer Jennings terminating obligation to purchase after April 30, 2001 | 3 | 2 | 11 |
| 20 | Internal correspondence of DoD, Bates numbers DSCP-UMS-392-93, 405408, 496, 591, 624-626, 631-633, 639-642, DSCP-PV-5131-35, 5140-41. | 26 | 3,4,5,17,18,19, 20,21,22 | 17 |
| 21 | Feb. 14, 2001 Hasting Memo re: payment issue with United Medical | 1 | 27 | |

| APPENDIX # | DESCRIPTION | SIZE **(pages)** | REFERENCED IN PLAINTIFF'S BRIEF AT PAGE(S): | REFERENCED IN PLAINTIFF'S REPLY BRIEF AT PAGE(S): |
|---|---|---|---|---|
| 22 | Documents created and maintained by the Department of Defense, Bates Numbers DSCP-PV-1238, 1353-59, 1369-76, 5026 | | 11,16 | 6,13 |
| 23 | Documents created and maintained by the Department of Defense, Bates Numbers DSCP-PV-1470-71, 4522-23, DSCP-UMS-2136, 2137, 2140-41, 2762. | 9 | 16 | 6 |
| 24 | June 18, 1999 Greg Wentzel letter re: size of DAPA database | 3 | 12 | 15 |
| 25 | Oct. 10, 2000 Memo re: 3 month extension of Contract | 8 | 2 | |
| 26 | Certain Interrogatory Responses of United States | | 2,13,14,29 | 6,8,10,25 |
| 27 | Affidavit of William Bandy with Exhibits | | 11,12,13,14,15, 17,18,19,20,22, 23,26,27 | 5,6,15,19 |
| 28 | Affidavit of Robert Imel with Exhibits | 10 | 14,20,25,26 | 8,9 |
| 29 | Affidavit of Frank Brown with Exhibits | | 27 | |
| 30 | February 26, 2001 letter from John Cuorato to United Medical committing to pay outstanding invoices | 1 | 27 | |
| 31 | Selected pages from First Amended Disclosure Statement filed in Plaintiff's bankruptcy case | 8 | 26 | |
| 32 | Selected Pages from the DoD's GEN II Prime Vendor Program Information | 8 | 4 | |
| 33 | Supplement Affidavit of Frank Brown | | | 16,17 |
| 34 | Contractor's refusal of Plaintiff's request to mediate disputes | | | 19 |
| 35 | Claim filed with Contract Officer | | | 35 |
| 36 | Bankruptcy Court Order Transferring Case and Bankruptcy Court's Docket Sheet | | | 5 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | CASE NO: 03-CV-289<br><br>Judge Allegra |

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND ITS RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S COUNTERMOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES COURT OF FEDERAL CLAIMS:

Plaintiff files this reply brief in support of its motion for summary judgment and its response to Defendant's Countermotion for Summary Judgment as follows:

## I. SUMMARY

This case arises out of a requirements contract between Plaintiff and the Government for the distribution of medical supplies to various military facilities in the states of Texas, New Mexico and Oklahoma ("the Lone Star Region"). The supplies to be distributed were those medical supplies for which the Government had entered into distribution and pricing agreements with third parties ("DAPAs") and for which Plaintiff was an authorized distributor. The contract provided two terms of primary relevance to this case: The military facilities in the Lone Star Region subject to the Contract were required to order all of their supplies subject to the Contract from Plaintiff and to pay for those

conforming supplies received within fifteen days from receipt of both invoice and the supplies.

Plaintiff contends that the Government breached the contract by: diverting orders to third parties without first attempting to order from Plaintiff; ordering supplies when it knew or reasonably believed that it could not timely pay because its electronic payment system had failed; and failing to pay for supplies it received and used.

The Government's general response is to assert several theories why Plaintiff should not be granted summary judgment. The Government, however, attempts to oppose Plaintiff's summary judgment motion and to obtain its own summary judgment by filing mostly inadmissible summary judgment evidence. Its only two affidavits, for example, do not even purport to be based on personal knowledge as required by Rule 56.

Additionally, the Government incorrectly restates several of Plaintiff's contentions and then argues why these incorrectly restated contentions should be denied. As shown by Plaintiff, the restated contentions have nothing to do with this case and the Government's argument is simply not responsive to the issues.

Plaintiff filed credible and admissible summary judgment evidence on each element of its claims, while the Government has wholly failed to file sufficient summary judgment evidence to create a genuine issue of material fact on any of them.

Similarly, although Plaintiff filed controverting summary judgment evidence, the Government's failure to file admissible summary judgment evidence in support of its countermotion prevents the Court from granting the Government relief on its countermotion without even addressing the controverting evidence.

## II. OBJECTIONS TO GOVERNMENT'S SUMMARY JUDGMENT EVIDENCE

Although the burden, at least with respect to claims made in Plaintiff's summary judgment motion, is on Plaintiff to establish that there is no genuine issue of any material fact, that burden may be discharged by showing that there is an absence of evidence to support the Government's case. *Hughes v. United States,* 58 Fed. Cl. 291, 297 (2003). In support of its summary judgment response and countermotion, the Government filed: (i) two affidavits that do not even purport to be based on personal knowledge, and (ii) numerous unauthenticated documents consisting primarily of what appears to be Government internal hearsay and multiple hearsay correspondence and memoranda.

With respect to the two Government affidavits, (Government Appdx pp. 1 and 197), Rule 56(e) requires that affidavits be based on personal knowledge, set forth specific facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify. An affiant must be willing to swear to personal knowledge for an affidavit to be considered. *Becho Inc. v. United States,* 47 Fed. Cl. 595, 604 (2000). The two affidavits offered by the Government are not

based on personal knowledge. The affiants claim they are personally acquainted with the facts. "Personal acquaintance" is not the "personal knowledge" required by Rule 56(e).[1] The affidavits are replete with opinions, speculation, conclusions, and hearsay. Specific objections to these two affidavits are made in Attachments A and B, which objections are incorporated herein by reference. Accordingly, Plaintiff requests the Court strike the affidavits from the summary judgment record for the reasons set forth herein and in Attachments A and B.

Most of the documents filed by the Government as summary judgment evidence are miscellaneous, unauthenticated, and unsworn documents that appear to have been created by Government employees. They all are hearsay, and many, if not most, are multiple hearsay. They contain conclusions and speculation not supported by any specific facts. Plaintiff specifically objects to these documents for the reasons set forth in Attachment C and requests that the Court strike the objectionable documents from the summary judgment record.

## III. ARGUMENT

### A. The Bankruptcy Court did not dismiss this case for want of jurisdiction.

The Government claims, incorrectly, that this case originally was dismissed by the Bankruptcy Court for want of jurisdiction. (Government Br. at 2). The Bankruptcy Court, in its discretion, abstained and transferred the case to

[1] It would be difficult to imagine a perjury prosecution based on an allegation that a person falsely swore that he or she was "personally acquainted" with facts.

this Court. Obviously, the Order speaks for itself, and it and the Bankruptcy Court's docket sheet are in this Court's record. For ease of reference, however, copies are included in Plaintiff's Supplemental Appendix at 36. To the extent that it is relevant how this Court received this case, the summary judgment record establishes that the Bankruptcy Court never dismissed the case, it simply chose to abstain.

**B. Plaintiff's summary judgment evidence in support of liability for diversion is uncontroverted and plaintiff is entitled to summary judgment on this issue.**

The Government contends that there are multiple fact questions on whether the Government improperly diverted orders. (Government Br. at 7). The primary focus of the Government's argument on this issue is quantum, not liability. The Government makes a general allegation that there is not summary judgment evidence on the issue of liability, but it does not offer any admissible summary judgment evidence that it did not divert orders while, in contrast, Plaintiff offered both direct admissions by the Government and substantial circumstantial evidence of improper diversion of orders.

Plaintiff's direct summary judgment evidence of diversion includes the admission by Colonel Riley that his medical treatment facility had diverted orders through the use of credit cards (Pl. Appdx. Tab 27, paras #9, 10 & 21); the admission by Michael Schmitt as the then director of the prime vendor program at DSCP that orders were being diverted (Pl. Appdx. Tab 27, para #9); the

admission by Anthony Amendolia that Medical Treatment Facilities ("MTFs") were diverting orders through the use of credit cards (Pl. Appdx. Tab 27, para #9); and the admission by Contract Officer Flatley that DAPA supplies being ordered directly from the manufacturer by Fort Sill and Fort Sheppard were violations of the Contract with United Medical. (Pl. Appdx. Tab 23, p. 9, bates 2762).

Plaintiff's circumstantial evidence is overwhelming that the Government diverted orders. First, the Government has not filed a single affidavit from a medical treatment facility ("MTF") representative claiming that the facility did not divert orders, or even that he or she had reason to believe the facility had not diverted orders. Second, Plaintiff on multiple occasions asked why the Government's orders were extremely low. The regular response was the credit cards were being used to purchase requirements. (Pl. Appdx. Tab 27, para 9).

Third, DSCP recognized that an audit process might need to be implemented to control diversions. (Pl. Appdx. Tab 22 – page 10, bates 1370, para #5). Fourth, DSCP advised United Medical during the Contract period that DSCP did not have any enforcement mechanism to prevent diversion of orders but that it was working on the issue. (Pl. Appdx. Tab 27, para 9). Fifth, in response to an interrogatory served by Plaintiff requesting the Government's estimate of diverted purchases by each MTF, the Government did not state "zero," but rather stated it had no basis for such an estimate. (Pl. Appdx. Tab 26, Interrogatory #20).

Sixth, The Government has not provided any credible explanation, other than improper diversion, why orders it submitted to United Medical under the Contract were approximately 15% of estimates. The Government made a specific representation that United Medical would furnish the MTFs with the majority of their day-to-day requirements for medical supplies. (Pl. Appdx 4, p. 4). The Government's orders from United Medical did not come close to being a "majority" of its requirements.

**C. Plaintiff's summary judgment evidence in support of damage quantum for diversion is uncontroverted and plaintiff is entitled to summary judgment on its damage claim.**

The fundamental problem with the Government's argument on quantum is that it is based on the incorrect contention that United Medical simply calculated diversions by subtracting sales from estimates. (Government Br. at 5). The Government then wastes considerable effort in its brief to show the Court how that calculation cannot reasonably estimate Plaintiff's diversion damages. The fact is that Plaintiff did not make such a contention.[2]

The diversion formula is not complicated. The Government's actual orders,[3] in dollars, submitted to Plaintiff are subtracted from the orders, in

---

[2] The Government also claims that Plaintiff presumed that all purchases made with Government credit cards were diverted orders. (Government Br. at 12). Plaintiff does not make such a presumption and never represented that it was making such a presumption.

[3] Actual orders are greater than actual purchases since not all orders were filled. The Government overlooks this fact also.

dollars, it was contractually required to give Plaintiff. *T&M Distributors, Inc.*, ASBCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442.[4] The orders it was required to give were orders for all DAPA items for which Plaintiff was an authorized distributor. While that is the dollar volume of diversion, it is only the starting point for calculating damages. Plaintiff, of course, must reduce its dollar damages by the volume of diverted orders that it would not have filled, had the orders been made. Although, Plaintiff made the appropriate reduction, this was totally ignored by the Government.

The Government, in response to Plaintiff's interrogatories, admits that actual orders can be reasonably estimated by taking total sales and dividing by the historical fill rate. (Pl. Appdx Tab 26, Interrogatory Response #5). Although Plaintiff's fill rate forms evidence an overall historic fill rate in excess of 90%, Plaintiff's damage expert Imel estimated actual orders and percentage fill of projected orders by using a more conservative 85% to give the Government the benefit of any doubts. (Pl. Appdx. Tab 28, para 7a and 7d).[5]

Plaintiff's diversion calculation in its summary judgment motion is estimated requirements minus estimated diverted orders (<u>not purchases</u>), <u>reduced</u> by 15% to account for orders by the Government that, for whatever

---

[4] In Plaintiff's Westlaw format, this appears on page 21 of 26.

[5] Plaintiff's fill rate percentage was dramatically reduced by the failure of the Government's electronic payment system, since it impacted Plaintiff's credit lines and its ability to purchase product.

reason irrespective of fault, would not be filled by Plaintiff. As explained in Plaintiff's summary judgment motion, the fifteen percent was a conservative number that was substantially larger than the percentage dollar volume of orders that historically had not been filled by Plaintiff. (Pl. Appdx. Tab 28, para 7a and 7d).

The potentially dramatic difference between the damage methodology the Government claims Plaintiff used and the damage methodology Plaintiff actually used can be illustrated by example. Assume that Plaintiff historically filled 50% of orders, and the total actual orders had been fifty percent of estimated requirements. Plaintiff's damage methodology would limit diversion damages based to the 25% of estimated requirements that were not ordered <u>but which would have been filled</u> if ordered. Plaintiff eliminated from its damage claim both historically unfilled orders and projected unfilled orders, <u>facts overlooked by the Government.</u> (See Pl. Appdx. Tab 28). The Government's claimed damage methodology, on the other hand, ignores the unfilled orders portion of the equation. As a result, under this example Plaintiff's damage calculation, according to the Government, would be the 75% difference between actual sales (being 25% of estimate) and the estimate and Plaintiff's actual diversion damages calculation would be 1/3rd of what it would be under the damages calculation the Government claims Plaintiff used.

The Government also claims that it was not reasonable for Plaintiff to use the Government's estimated requirements as a baseline to establish actual

requirements. (Government Br. at 13). The Government then, without summary judgment evidence, offers two theories to support this claim. First, it theorizes generally that its requirements could have been less than its estimates. Second, it claims that the estimates were not just the Government's estimated requirements for med/surg supplies subject to distribution and pricing agreements (DAPAs) as of the date the estimates were provided, but instead they were estimates of the Government's projected requirements for all of its med/surg supplies. (Government Br. at 10).[6]

The Government's first theory, that its "requirements" could have been significantly lower than its estimates, is contradicted by its responses to Plaintiff's interrogatories and its continued revaluation of the Contract each time it was renewed.

In response to interrogatories the Government represented that it had never determined that its estimates were greater than its requirements and that was not contending that there was a reduction in its requirements subsequent to the estimates. (Pl. Appdx. 26, pp. 4, 5 and 8, Government response to interrogatories 9 and 17). The Government also represented in its Solicitation that the estimates were based on actual historical purchases by the Government. (Pl. Appdx. 4 (Amend 008) and 7 (Amend 012), pages 12 - 13, and page 5,

---

[6] It is undisputed that the only supplies the Government was required to purchase under the Contract were med/surg supplies subject at the time of purchase to DAPAs. Indeed, the only sales that could be made under the Contract were sales of DAPA items.

respectively). Since the estimates were based on historical requirements and there was not any reduction in requirements subsequent to the estimates, the use of the estimates, absent better evidence of actual requirements, is intuitively reasonable, especially since Government does not offer any affidavit of any MTF representative that the MTF's actual requirements were significantly less than its estimates and each of the three times the Government renewed the Contract, it revisited its original estimates of requirements and made no changes. (Pl. Appdx 14, p. 1; Appdx 15, block 9a, p. 1; Appdx. 16, block 4, p. 1; Appdx 17, block 4, p. 1; Appdx 19, p. 1).

The Government's other theory why the use of estimates as a baseline for actual requirements was not reasonable is that the estimates, it claims, were estimates of its total med/surg supply requirements, not just med/surg requirements that were, at the date of the estimate, subject to existing DAPAs . (Government Br. at 10). There are at least six (6) reasons why this theory can be, and should be, rejected at the summary judgment level.

First, it is not what the Solicitation represents and the Solicitation language cannot reasonably be interpreted to support the Government's summary judgment position. The Solicitation included the following language:

> "*Estimated Annual Requirements: Based on a 12-month reporting period, the medical treatment facilities that will be covered by the contract locally spent an estimated $57,665,500 per year for those types of medical/surgical products covered by the proposed contract*."

> (Pl. Appdx. 4 (Amend 008) and 7 (Amend 012), page 12 and page 5, respectively).[7]
>
> "B. Only items appearing on a DPSC Medical DAPA or IDTC will be ordered and delivered under the Prime Vendor Contract. All items are brand name specific and generic commercial products which are identified by the manufacturer's item descriptions and part numbers and conform to the manufacturer's commercial specifications. Estimated requirements listed in Section B reflect annual estimated requirements based upon *usage figures* provided by the participating order facilities." Emphasis added. (Pl. Appdx. 4, p. 13).

Given the language in subparagraphs a and b above, it is virtually impossible to reconcile the Solicitation with the Government's summary judgment position that "those types of medical/surgical products covered by the proposed contract" means, "all medical/surgical products." Why would the Government not just use the word "all" if that is what was meant, instead of using the words "those types?"

The second reason to reject the Government's theory that the estimates were estimates of all med/surg items, is that there is not any summary judgment evidence to support this theory. There are not, for example, affidavits of any MTF representatives attesting that the estimates it provided were estimates of total med/surg sales.

A third reason to reject the Government's theory is that during the Solicitation period DSCP itself clearly took the position, internally, that the

[7] Note: the use of the word "spent." Also note the use of the word "covered" instead of "covered or that might become covered."

estimates being provided were not estimates of total med/surg purchases, but current DAPA purchases. Linda Flatley wrote in an internal DSCP memo,

> "The annual estimates were developed by the ordering facilities in conjunction with their Military Service Representatives. These estimates were as accurate as possible at the time of development, but as <u>additional classes of items are added</u> the Distribution and Pricing Agreement (DAPA) database, <u>the potential for increased sales rises.</u>" (Pl. Appdx. Tab 22, page 17, bates 5026).

This memo was written by Ms. Flatley to justify the contract insertion of maximums so that if DAPA items were added that increased sales, the Contract would not have to be resolicited. (Flatley memo, *supra*). Amendment 0012 contained a provision for yearly maximums, which were approximately 210% of the estimated yearly purchases. (Pl. Appdx. 7, P.5).

A fourth reason to reject the Government's theory is that the Government admits in its brief that, "the estimate was consistently described as the current requirements for the general 'type' of medical and surgical items covered by DAPAs." (Government Br. at 9). This is precisely Plaintiff's position -- the estimates were estimates of current requirements for medical/surgical items covered by DAPAs, <u>not</u> estimates of total medical/surgical requirements that included non-DAPA items.

A fifth reason to reject the Government's theory is that the Government represented that "the prime vendor chosen by DSCP will furnish the ordering facilities with the <u>majority</u> of their normal day-to-day brand name specific and generic medical supplies." (Pl. Appdx. 4, p. 4, 2nd paragraph). That statement,

with its reference to "majority" cannot be reconciled with the position that the estimates of requirements were estimates of all med/surg items.

A sixth reason to reject the Government's contention is that there is not any summary judgment evidence of a material difference between the total requirements and the requirements for supplies covered by then existing DAPAs. The Government's contention that the represented estimates were estimated requirements for all med/surg items instead of just estimates of its requirements for supplies then covered by a DAPA would be relevant only if the requirements for total med/surg items was significantly larger than the requirements for the DAPA items. There is no evidence of this, and certainly the Government is in a position to provide that evidence if it were true.

The Government then offers another theory why Plaintiff's damage model is not reasonable. It claims that there is inadequate summary judgment evidence that United Medical was an authorized distributor for essentially all DAPA items. Plaintiff provided specific and uncontroverted summary judgment evidence on the issue. Bill Bandy, who was president of United Medical during the Contract period and extremely experienced in the medical supply distribution industry, in his affidavit, stated that United Medical was an authorized distributor for an estimated 99% of all DAPA items.

The Government claims that there were numerous DAPA holders with whom Plaintiff did not have distribution agreements. But the Government does not tie this alleged piece of information into its contention. Both the

Government and Plaintiff agree that the bulk of med/surg supplies that were in the DAPA database were rarely, if ever, purchased by the MTFs. Indeed, the Government concluded following an intensive study of the DAPA database purchasing history, that only 12% of the DAPA items were actually being purchased in any significant quantities by the MTFs. (Pl Appdx 27, para #17; Pl. Appdx 24, page 2, para 1 of Part II). The Government does not provide any summary judgment evidence that it required any items from DAPA holders with whom Plaintiff did not have a distribution agreement.

Just as it did in *T&M Distributors, Inc.*, ASBCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442, the Government argues that Plaintiff cannot recover on its diversion claim because there is not sufficient documentation to support the claim and basis for damage methodology. The *T&M Distributors* Board, notwithstanding any shortage of documentation, imposed liability on the Government for diversion of orders through the use of Government credit card purchases. The Board found that the "missing" documentation was peculiarly within the knowledge of the Government, the Government's failure to come forward with facts raised an inference in favor of the contractor, and that the contractor's burden is simply to provide a basis for considering the damage projection sufficiently accurate.[8]

---

[8] This discussion is located on page 19 of 26 in the Westlaw printed format.

**D. Plaintiff's summary judgment evidence in support of liability for outstanding invoices is uncontroverted and plaintiff is entitled to summary judgment on this issue.**

The Government has pleaded the affirmative defense of accord and satisfaction. Instead of providing any evidence of an accord and satisfaction, The Government simply attacks Plaintiff's books and records without providing any foundation for such an attack. The Government's apparent position here is that it cannot determine how much, if any, it owes Plaintiff, but that this is Plaintiff's fault. Plaintiff's summary judgment evidence in support of both liability and quantum are its account receivable business records. The Government's controverting argument is that Plaintiff's books and records are not reliable.

Again, the Government does not provide any admissible summary judgment evidence to support its contention. The Government claims it has made a substantial effort to determine what it owes Plaintiff, but that Plaintiff has not been cooperative. (Government Br. at 14 and 15).

There is no identification of what effort was made and why such effort would have revealed anything of relevance. Plaintiff's summary judgment evidence is that it has been fully cooperative. It provided the Government with a 125-page list of Government purchase order numbers that Plaintiff's records show remain unpaid in full or in part. (Pl. Supp. Appdx. 33). The Government summary judgment response offers no explanation why it cannot respond from its records to each of these calls. Plaintiff invited the Government to inspect

Plaintiff's books and records, an invitation that was not accepted. (Pl. Supplemental Appdx. 33, para 4).

The Government admits that, as of January 19, 2001, it owed Plaintiff at least $284,000, of which $111,000 was past due. (Pl. Appdx. 20, p. 2, bates 0393). The customary, or at least expected, evidence to refute a claim such as the one being made by Plaintiff would be the regularly kept Government accounts payable records including evidence of payments to Plaintiff. The Government has not provided any of that information.

Absent any summary judgment evidence from the Government that controverts Plaintiff's claims on this issue, Plaintiff's summary judgment evidence establishes liability and quantum for Plaintiff's outstanding invoice claim.

**E. An alternative remedy to Plaintiff is an adjustment in contract price for failure of the government to purchase the contractually agreed minimum of 90% of estimates.**

As a possible alternative remedy to breach of contract remedies, Plaintiff is entitled to renegotiation of its contract fee for failure of the Government to purchase the agreed minimum 90% of estimates. The Government contends that this Contract provision is ineffective for three reasons: (1) it is inconsistent with a "requirements contract" and its inclusion would create a "patent ambiguity," (2) Plaintiff failed to specifically point out the provision to the Contract Officer, and (3) Plaintiff failed to timely request a renegotiation. (Government Br. at 15-17).

As a matter of law, the provision is not inconsistent with a "requirements" contract. Government "requirements" contracts can provide for an increase in contract price if a defined minimum purchases are not made. *Biener v. United States*, 17 Cl. Ct. 802 (1989). Since courts are required to construe a contract to avoid an ambiguity, *Biener* at 807, this Contract can be construed to be a case where the parties simply agreed to a requirements contract with adjustments if minimum purchases were not made. Like the Plaintiff in *Biener,* United Medical, as an alternative to its remedies for breach, is entitled to an equitable adjustment in contract price because the Government failed to purchase the agreed Contract minimum equal to 90% of the estimate.

When the Government awarded Plaintiff the Contract, the Government incorporated into the Contract the terms of Plaintiff's offer. (Pl. Appdx. 8, p. 1). The offer provided for a renegotiation of the fee (Pl. Appdx. 4, p. 6, Pl Appdx. 7 p. 6.). The parties do not disagree that the Contract was a requirements contract. The Government's obligation to order all of its requirements would not have been excused simply because the 90% threshold had been reached. The Contract, thus, could not have been an indefinite quantity contract.

Since there is not any patent ambiguity, no duty could be imposed on United Medical to bring the provision to the attention of the Contract Officer. Plaintiff notes that the provision was quite prominent. It appeared in Plaintiff's responses to both Solicitation Amendments 008 and 012, was in a different typeface from most of the document and appeared prominently at the bottom of

page 6 of each bid response. (Pl. Appdx 4 and 7). Moreover, there is not any competent summary judgment evidence that the Contract Officer was not aware of the provision. In fact, the provision is so prominent it would be almost impossible to overlook by someone reviewing Plaintiff's bid percentages.

With respect to the claim that Plaintiff failed to request renegotiation, Plaintiff on multiple occasions expressed concern about the low order volume, and was assured by DSCP that the ordering facilities would "catch up." (Pl. Appdx 27, para 9). Prior to filing its claim for an adjustment to the Contract Price, Plaintiff requested mediation of its disputes. (Pl. Supp. Appdx 34). This was refused. Plaintiff also requested mediation of its disputes in the claim itself, which included the claim relating to the price adjustment for failure of the Government to purchase 90% of the total estimates. (Pl. Supp. Appdx., 35 pp.17, 29,34,38). There would have been no basis for renegotiation until the ordering shortage, if any, could be determined. The ordering shortage could not be determined until the purchasing and delivery obligations of buyer and seller respectfully had ended. Plaintiff submitted its request for renegotiation shortly thereafter.

**F. Plaintiff's summary judgment evidence in support of liability and damage quantum for lost goodwill and reputation is uncontroverted and plaintiff is entitled to summary judgment on this issue with respect to both liability and quantum.**

The Government argues that Plaintiff's claims for damage to goodwill and reputation should be denied because the claim is based on lost profits associated

with other, unrelated contracts (Government Br. at 17). The Government's argument is not responsive to Plaintiff's claim. Plaintiff has not based its claims for lost goodwill and lost reputation on lost profits from other contracts.

During approximately a one-year period, described in particular in Plaintiff's summary judgment brief, the Government experienced catastrophic problems with its electronic payment system. It never disclosed this to Plaintiff during the contract period. It simply kept ordering medical supplies, while blaming its failures to pay on Plaintiff's invoicing system. At the time it ordered, the Government knew that it probably could not timely pay Plaintiff, but it needed the medical supplies. So it kept ordering with knowledge that it was putting Plaintiff a risk of a complete business failure.

The Government cites *San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) for the proposition that Plaintiff must prove the Government's breach was the sole cause of Plaintiff's loss. (Government's Br. at 17). The *San Carlos* Court simply held that a "but for" proximate cause test must be applied. It did not hold that the Government's breach must be the sole proximate cause. 111 F.3d at 1557. The issue facing that Court was whether damages resulting nine years after the Government's breach were recoverable. The Court held that the Plaintiff could not prove "but for" the Government's breach its damages would not have occurred.

Similarly, the Government's reliance on *Quiman, S.A. v. United States,* 39 Fed. Cl. 171, 183 (1997) is not helpful to the Government's case. (Government Br.

at 17). That Court simply stated that the breach must produce the damages inevitably and naturally.

Plaintiff's summary judgment evidence meets the *Quiman* test. The Government knew Plaintiff was a small business, that Plaintiff's asset based lender had taken a security interest in the Government's payments and that the Government's payments under the Contract were to be made directly to this lender. The internal documents produced by the Government during discovery in this case and filed as part of the summary judgment record establish that the Government knew that it would put Plaintiff out of business if it delayed payments over even a short period of time, if, during that same time, it kept ordering a substantial volume of supplies. The Government recognized that this situation would result in the loss of Plaintiff's credit lines.

The Government failed to timely pay over an extended period of time while, at the same time, it kept ordering supplies from Plaintiff without disclosing that its electronic payment system had failed. The result was the inevitable as predicted by the Government; Plaintiff became unable to pay its contractors, employees, lenders and vendors, with a natural loss of business reputation.

The Government has not pleaded intervening cause as an affirmative defense and there is no summary judgment evidence provided by the Government that the damages claimed by Plaintiff for lost goodwill and damage

to reputation were caused by anything other than the electronic payment system failure.

*Ramsey v. United States,* 121 Ct. Cl. 426, 101 F. Supp. 353, 357 (1951) and *Olin Jones Sand Co. v. United States,* 225 Ct. Cl. 741, 743-44 (1980) are cited by the Government to support its contention that Plaintiff may not recover lost profits unrelated to the Government contract at issue. (Government Br. at 18). Plaintiff's claims for lost goodwill and damage to reputation are not related to lost profits on other contracts. *Olin Jones* specifically held that a Plaintiff can recover for damage to reputation caused by the Government's failure to pay sufficiently impaired Plaintiff's financial condition to the extent that Plaintiff could not pay its vendors and employees.

Plaintiff has pleaded and proven with summary judgment evidence the elements required for recovery of lost goodwill, which are set forth in *Olin Jones.* The Government, on the other hand, has not filed any controverting summary judgment evidence on this issue.

**G. Plaintiff performed its obligations under the Contract, or they were legally excused.**

The Government alleges in its brief that Plaintiff's contract performance, or lack thereof, contributed to its damages. While this was not made a specific argument point by the Government, it is so pervasive that Plaintiff believes it requires some response. The Government has neither pleaded any failures of a condition precedent as required by Rule 9(c), nor offered any admissible

summary judgment evidence in support of this contention. Furthermore, the allegation is contradicted by the Government's own certifications of complete contractor performance made annually at time of Contract renewal.

The issue also is of questionable significance to this summary judgment proceeding. To the extent, if any, that Plaintiff's performance failures required to the Government to fill orders from third parties, that factor is accounted for in the fill rates and damage reductions based on fill rates. To the extent, if any, that Plaintiff did not comply with the Government's invoicing protocol, surely the Government cannot be claiming it is excused from paying for supplies it received and did not return.

Plaintiff's summary judgment evidence includes uncontroverted certifications by the various contract officers and his or her supervisors that Plaintiff fully performed all its obligations under the contract. (Pl. Appdx Tabs 14 and 17). The Contract was a requirements contract for one year, renewable, at the sole option of the Government, each year for four years. The Government exercised three of its four options. Each time the Government elected to renew the Contract, the Government's Contracting Officer was required by FAR 17.207 to make and document a determination that the exercise of the option was the most advantageous method of meeting the Government's need and that United Medical was a responsible contractor determined in accordance with FAR 9.105-

2. The summary judgment record evidences that each Contracting Officer, including the Government's Affiant Linda Flatley, concluded annually that,

> "United Medical Supply has demonstrated a full understanding of the Government requirements and has performed all the required tasks and functions cited in the aforementioned contract." The Contracting Officers further concluded, in accordance with FAR 9.105-2, that "[United Medical] is a commercially recognized large volume distributor of medical/surgical products. It has been determined that United Medical Supply, from a critical review of its commercial operations, can handle the financial and logistical obligations of this Contract without difficulty [and is] considered to be responsible within the meaning of FAR 9.103 and 9.104." (Pl. Appdx, Tabs 14 and 17). See also, Pl. Appdx. 15, box 12a, in which Ms. Flatley and Mr. Jennings claim, at the time the Government exercised its second option, that Plaintiff had met the required delivery dates.

The Government is now attempting to disavow these determinations by asserting, unsupported by any admissible summary judgment evidence that United Medical failed to perform "all the required tasks and functions."

The Government renewed the Contract three times. By renewing the Contract without requiring any corrective performance action on the part of United Medical, the Government waived its objections, if any, concerning United Medical's performance. The Government waives claims for non-performance if it fails to terminate within a reasonable time after the default under circumstances indicating forbearance, the contractor relies on the failure to terminate, and the contractor continues performance under the contract with the agency's knowledge and implied or express consent. *DeVito v. United States,* 413 F.2d 1147, 1154 (Ct. Cl. 1969), cited with approval by *A.R. Sales Co, Inc. v. United*

*States,* 51 Fed. Cl. 370, 374 (2002). When the Government renewed the contract, the renewals were not made subject to any corrective performance by Plaintiff. (Pl. Appdx. Tabs 12, 13, 16). Plaintiff's continued performance establishes reliance and the Government's claim that Plaintiff's performance was an issue "from day one" establishes the requisite Government knowledge.

Plaintiff must plead that it complied with conditions precedent under the Contract. It may plead generally. And it did so plead. (Plaintiff's amended complaint, para #108). The Government, on the other hand, must specifically plead facts to controvert Plaintiff's allegation. (Rule 9(c)). The Government did not so plead.[9] Indeed, the Government claims that it cannot make any estimate of the dollar impact of Plaintiff's alleged performance failures. (Pl. Appdx. 26, page 08, Government response to interrogatory 12 and pages 2 and 3, Government response to interrogatory 4).

The failure of the Government to specifically plead failures to perform in the face of Plaintiff's Complaint allegation that Plaintiff did perform, the annual certifications by the Government that Plaintiff performed, the unconditional annual Contract renewals by the Government, and the failure of the Government to file any admissible summary judgment evidence of any failure by Plaintiff to

---

[9]The Government's answer to the allegation was, "The allegations in paragraph 108 are legal conclusions and plaintiff's characterizations of its case, to which no response is required; to the extent they may be deemed allegations of fact, they are denied."

perform, eliminate any genuine dispute as to the issue, if relevant, of Plaintiff's performance under the Contract.

## IV. CONCLUSION AND REQUEST FOR RELIEF

The Government obviously has major problems with its summary judgment proof – mostly it does not have any. Summary judgment standards require the Government to come forth with credible controverting evidence; it cannot avoid summary judgment simply by advancing numerous theories why it may not be liable. There is an absence of evidence to support the Government's case.

As to quantum on the issue of diversion damages, the Government was in a position to come forth with evidence to support its contention that Plaintiff's expert's opinions and assumptions are baseless, as it alleges, but it did not do so. It claims to have performed an intensive review of DAPA purchases, but has not provided that review as part of the summary judgment record. It would be logical and legally appropriate to assume that this review, if it rebutted Plaintiff's claims, would have been offered.

On the issue of quantum for damage to reputation and lost goodwill, the Government's defense is that the damages Plaintiff seeks are future lost profits and Plaintiff is not entitled to future lost profits. Plaintiff never made a claim for future lost profits. Plaintiff provided uncontroverted summary judgment

evidence for each element of the factors recited in *Olin Jones* necessary to recover its damages to reputation and lost goodwill.

Finally, Plaintiff's summary judgment evidence on the issue of nonpayment is credible and unrebutted. Plaintiff's regularly kept books and records evidence amounts due and owing. Plaintiff has provided the Government with the 125 pages of Government purchase orders (calls) Plaintiff contends is unpaid. Plaintiff has invited inspection of its books and records. There is no summary judgment evidence before this Court that Plaintiff's books and records are not reliable or that the Government does not owe the money claimed for outstanding invoices.

For the reasons stated above, Plaintiff requests that its objections to the Government's summary judgment evidence be sustained, that its motion for summary judgment be granted, and that Defendant's countermotion for summary judgment be denied. Plaintiff further requests that the Court grant such further relief to which Plaintiff justly may be entitled.

Signed January 5, 2004.

Respectfully submitted,

/s/ Frank L. Broyles

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

## EXHIBIT A

## OBJECTIONS TO AFFIDAVIT OF LINDA FLATLEY

Plaintiff objects to the Affidavit of Linda Flatley (Defendant's Appendix pp 1 – 5) on the grounds that it is not based on personal knowledge as required by Rule 56.

Plaintiff also objects to the affidavit paragraph 6 since it does not identify the specific time periods for which Ms. Flatley was the contract officer for the applicable contract. Without this information it is impossible to discern the basis for her knowledge to the extent that a specific time period is at issue.

Plaintiff also objects to the affidavit paragraph 7 in that it is so general it cannot be determined what involvement Ms. Flatley had and what knowledge she obtained as a result.

Plaintiff objects to paragraphs 12 and 13 as hearsay.

Plaintiff objects to paragraph 15 on the grounds that Ms. Flatley does not appear competent to testify on the issue.

Plaintiff objects to paragraph 19 on the grounds that affiant is not competent to testify as to the meaning given to estimates by others, is conclusory and is not the best evidence of what the estimates meant since the estimates were included in the Contract and no ambiguity has been pleaded, nor is one apparent. This is a violation of the Parol

evidence rule. Further, this paragraph is not credible since it is contradicted by affiant's earlier "non-litigation" position as shown in Plaintiff's reply brief.

Plaintiff objects to paragraph 22 as a legal conclusion without foundation or relevance.

Plaintiff objects to paragraph 26 as hearsay with respect to other team members.

Plaintiff objects to paragraph 28 and speculation without foundation.

Plaintiff objects to paragraph 29 as ambiguous and misleading. The provision at issue was in the contract.

Plaintiff objects to paragraphs 30 and 31 as legal conclusions without foundation or relevance.

Plaintiff objects to paragraph 32 as a legal conclusion and not credible, and hearsay with respect to any other persons with whom United Medical raised the issue.

# EXHIBIT B

OBJECTIONS TO AFFIDAVIT OF DONNA GALLIGAN

Plaintiff objects to the affidavit of Donna Galligan (Defendant's Appendix pp 197-210) as follows:

It is not based on personal knowledge as required by Rule 56(e).

There is no foundation for Plaintiff's claim of familiarity in paragraph 7. The affidavit evidences her role as a team leader beginning in 1999, but her affidavit appears to concern prior periods without any basis for knowledge for such prior periods.

Paragraph 9 is a general conclusion and a legal conclusion without foundation.

Paragraph 10 is a legal conclusion without foundation or relevance.

Paragraphs 14 through 24 are legal conclusions without foundation and are speculation as to this affiant. Paragraph 24 is also hearsay with respect to "customers."

Paragraphs 25 through 39 are speculation and hearsay. Affiant is attempting to testify as to the meaning of unauthenticated documents that themselves are hearsay.

EXHIBIT C

Objections to documents filed by Defendant as "summary judgment" evidence.

| Apparent Document Description | Apparent Author | Defendant's Apdx Page # | Plaintiff's Objection |
|---|---|---|---|
| Affidavit | Linda Flatley | 1-5 | Affidavit is based on being personally "acquitted" (sic) with the facts and is not based on personal knowledge.<br>Paragraph 6 does not identify the time period when Flatley was the contract officer on the contract at issue and cannot support factual allegations that would require her to have been the contract officer at a given point in time.<br><br>Paragraph 17 is Ms. Flatley's interpretation of the contract and is irrelevant and is not the best evidence of the contract's meaning.<br><br>The last two sentences of Paragraph 19 are the affiant's assumptions and conclusions as to the meanings of statements by unidentified third parties and are irrelevant.<br><br>In paragraph 26 Affiant purports to have knowledge of the communications and thought processes of other persons and no foundation is shown for such knowledge.<br><br>Paragraph 29 is directly contradicted by pre-claim correspondence with affiant and is not credible.<br><br>Paragraphs 30 and 31 are the legal |

| Apparent Document Description | Apparent Author | Defendant's Apdx Page # | Plaintiff's Objection |
|---|---|---|---|
| | | | conclusions of affiant and are irrelevant.<br><br>Paragraph 32 is contradicted by preclaim correspondence with affiant and is not credible. |
| Government Letter Seeking Estimates | Marie Boggs | 11-13 | Unauthenticated and hearsay |
| Customer Response | Unknown | 14-23 | Unauthenticated and hearsay |
| Award Document | | 24-25 | Irrelevant. This is a different contract number, concerns the stockless option, which was never exercised by any of the ordering facilities. That is, no ordering facility elected to substitute the stockless option procedures under contract 7134 for the distribution procedures under contract 7133, and Defendant does not offer any evidence that any medical treatment facility elected to substitute the stockless option. The contract at issue in this case is 7133. |
| UMS letter forwarding commitment form | Nancy Martin | 26 - 27 | Unauthenticated and hearsay. Defendant purports to claim that it is a letter from Plaintiff, however, on its face the handwritten portion evidences it was a form and there is no competent evidence that any such letter was ever sent by Plaintiff or received by and medical treatment facility. |
| Amendments 16, 17 and 18 to Owens & Minor contract | Owens & Minor/Department of Defense | 28-33 | United Medical was not a party to this contract and these amendments are irrelevant, unauthenticated and are hearsay. |
| Emails | Nancy Martin, James Jennings, | 34-35 | Unauthenticated and hearsay. |

| Apparent Document Description | Apparent Author | Defendant's Apdx Page # | Plaintiff's Objection |
|---|---|---|---|
| | Kristina Fites | | |
| Government letter | Michael Schmitt | 36-38 | Unauthenticated, unsigned and no evidence the letter was sent, hearsay. |
| Government email | Anthony Amendolia | 39-40 | Unauthenticated, hearsay |
| Government email | Nancy Martin | 41 | Unauthenticated, hearsay |
| Government letters | Nancy Martin | 42-44 | Unauthenticated, hearsay |
| Government Memorandum | Anthony Amendolia | 45-48 | Unauthenticated, hearsay |
| Government letter | Linda Flatley | 63-66 | Unauthenticated, hearsay and multiple references to hearsay. Additionally paragraphs numbered 1 through 5 are the legal conclusions of the author. |
| Government letter | Nancy Martin | 67-71 | Unauthenticated and multiple hearsay |
| Government emails | Donna Kennedy/ Oscar Molinar | 100-103 | Unauthenticated and multiple hearsay |
| Internal Government Memorandum | Melvin Hicks | 104-106 | Unauthenticated and hearsay |
| Internal Government emails | Donna Kennedy/ Oscar Molinar | 111-113 | Unauthenticated and multiple hearsay |
| Internal Government worksheet | Unknown | 114-119 | Unauthenticated, hearsay |
| Internal Government email | Oscar Molinar | 120 | Unauthenticated, hearsay |
| Internal Government Memorandum | Melvin Hicks | 121-122 | Unauthenticated, hearsay |
| Internal Government email | Melvin Hicks | 123 | Unauthenticated, multiple hearsay |

| Apparent Document Description | Apparent Author | Defendant's Apdx Page # | Plaintiff's Objection |
|---|---|---|---|
| Internal Government emails | Anthony Amendolia/ Donna Kennedy/ Oscar Molinar | 170 | Unauthenticated, multiple hearsay, incomplete on its face. |
| Government emails | Various | 177-188 | Unauthenticated, multiple hearsay. |
| Internal Government memorandum | Melvin Hicks | 189 | Unauthenticated, multiple hearsay. |
| Internal Government Emails | Various | 190-196 | Unauthenticated, multiple hearsay. |
| Affidavit | Donna Galligan | 197-210 | Not based on personal knowledge. Many of the affiant's statements are simply legal conclusions about contract requirements, for example: numbered paragraphs 9, 10, 15, 16, 17, 18,23, 24, and 33. The affidavit references attachments by number, but the attachments do not contain reference numbers. (Plaintiff was not served with a hard copy of the affidavit and attachments. The electronic copy downloaded by Plaintiff does not identify where the alleged attachments end). The affidavit obviously is based on hearsay attachments and not on personal knowledge. |
| Plaintiff's letter with handwritten comments | June Lyon as to typewritten, unknown as to handwritten | 211 | The handwritten comments are unauthenticated and hearsay |
| Daily Delivery Records | Unknown | 212-214 | Unauthenticated, hearsay |
| Plaintiff's letter with handwritten comments | June Lyon as to typewritten, unknown as to handwritten | 215 | The handwritten comments are unauthenticated and hearsay |
| Delivery | Unknown | 221 | Unauthenticated, hearsay |

| Apparent Document Description | Apparent Author | Defendant's Apdx Page # | Plaintiff's Objection |
|---|---|---|---|
| Manifest | | | |
| Plaintiff's letter with handwritten comments | June Lyon as to typewritten, unknown as to handwritten | 222 | The handwritten comments are unauthenticated and hearsay |
| Daily Delivery Records | Unknown | 223 | Unauthenticated, hearsay |
| Plaintiff's letter with handwritten comments | June Lyon as to typewritten, unknown as to handwritten | 224-228 | The handwritten comments are unauthenticated and hearsay |
| Delivery Manifest | Unknown | 230 | Unauthenticated, hearsay |
| Contract Number Query | Unknown | 231 | Unauthenticated, hearsay |
| Plaintiff's letter with handwritten comments | June Lyon as to typewritten, unknown as to handwritten | 232 | The handwritten comments are unauthenticated and hearsay |
| Delivery Manifest | Unknown | 235-236 | Unauthenticated, hearsay |
| Government email | Donna Galligan/ Megan Edmonds | 237-238 | Unauthenticated, hearsay as to the Galligan portion |
| Government fax | Connie Lucash | 239-245 | Unauthenticated hearsay. |
| Plaintiff's letter with handwritten comments | June Lyon as to typewritten, unknown as to handwritten | 246 | The handwritten comments are unauthenticated and hearsay |
| Chart | Unknown | 257-259 | Unauthenticated, hearsay. |
| Government email | Donna Kennedy | 260 | Unauthenticated, hearsay. |
| Internal Government email | Anthony Amendolia | 261 | Unauthenticated, hearsay. |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | CASE NO: 03-CV-289<br><br>Judge Allegra |

**SUPPLEMENTAL AFFIDAVIT OF FRANK BROWN**

1. My name is Frank Brown. I am over the age of 21 years and fully competent to make this affidavit. Unless otherwise stated, all statements made herein are based on my personal knowledge. The statements of fact based on my personal knowledge are true and the opinion statements are my opinions.

2. Since Mr. William Bandy resigned as president of United Medical Supply Company, Inc., in December 2001, I have served as president of United Medical Supply Company, Inc. and its sister company, Advanced Medical Supply, Inc.

3. In those capacities I have acted as a custodian of certain business records of United Medical Supply and Advanced Medical Supply and all purported business records attached to this affidavit are genuine copies of records for which I served as a custodian.

4. I have been made aware that the Defense Supply Center Philadelphia (DSCP) claims it cannot match shipments to United Medical invoices. There are thousands of pages of documentation maintained by United Medical with respect to this issue and computer storage media. During this lawsuit, I, as president of plaintiff United Medical, have made those records and computer storage media available for copying and inspection by DSCP and the Government's attorneys. Although the records were offered many months ago, the Government has not reviewed any of them.

5. In response to the inquiries for information by the Government, United Medical sent DSCP 125 pages of documents listing the Government purchase orders by Government number ("calls") that United Medical's records show as unpaid in whole or in part. Included with each call was the amount of the call that is outstanding. Two pages of these documents, as an illustration, is attached to this affidavit. The call numbers shown in the example are calls G054, G900, G902, and G901.

Frank Brown, Affiant

On this day as dated below personally appeared Mr. Frank Brown and, after being identified to me by government issued photo identification, on his oath swore that he is the person described in the supplemental affidavit and that the alleged statements of fact made therein are true.

Dated: January 5 2004.

Marjorie A. Trimpe

Notary Public for the State of Texas

[seal]

MARJORIE ANN TRIMPE
Notary Public, State of Texas
My Commission Expires
August 23, 2006

30102-01 AFMLO; Fort Worth
FM9133

| 9/13/00 | **G054** | | |
|---|---|---|---|
| | 180615 | $ | 7.63 |
| **G054** | | $ | 7.63 |
| DSCP Paid | | $ | - |
| Amount Open | | **$** | **7.63** |

| 12/8/00 | **G900** | | |
|---|---|---|---|
| | 214201 | $ | 401.19 |
| | 214202 | $ | 36.69 |
| | 214204 | $ | 147.40 |
| | 215635 | $ | 38.92 |
| | 219837 | $ | 3,770.77 |
| | 219838 | $ | 1,300.00 |
| | 219839 | $ | 1,986.30 |
| | 224134 | $ | 282.83 |
| | 224135 | $ | 318.90 |
| | 226239 | $ | 213.72 |
| | 214198 | $ | 462.35 |
| | 214199 | $ | 267.35 |
| | 214200 | $ | 262.31 |
| **G900** | | $ | 9,488.73 |
| DSCP Paid 010201 | | $ | 1,257.31 |
| Amount Open | | **$** | **8,231.42** |

12/28/00 **G902**

| | | | |
|---|---|---|---|
| | 219834 | $ | 41.12 |
| | 224133 | $ | 857.40 |
| | 218780 | $ | 648.55 |
| | 218792 | $ | 407.88 |
| | 219833 | $ | 40.75 |
| **G902** | | $ | 1,995.70 |
| DSCP Paid 011801 | | $ | 1,024.22 |
| Amount Open | | **$** | **971.48** |

12/28/00 **G901**

| | | | |
|---|---|---|---|
| | 226268 | $ | 290.06 |
| | 226265 | $ | 875.40 |
| | 224138 | $ | 8,706.67 |
| | 224139 | $ | 59.00 |
| | 224140 | $ | 2,245.22 |
| | 218775 | $ | 1,131.00 |
| | 218776 | $ | 1,532.25 |
| | 218777 | $ | 2,389.60 |
| | 218778 | $ | 3,398.90 |
| | 218779 | $ | 1,180.72 |
| | 218795 | $ | 342.23 |
| | 219831 | $ | 1,249.35 |
| | 219832 | $ | 1,635.45 |
| | 219836 | $ | 2,138.85 |
| | 220702 | $ | 435.09 |
| **G901** | | $ | 27,609.79 |
| DSCP Paid 011601 | | $ | 15,191.81 |
| Amount Open | | **$** | **12,417.98** |

**DEFENSE LOGISTICS AGENCY**
DEFENSE SUPPLY CENTER PHILADELPHIA
700 ROBBINS AVENUE
PHILADELPHIA, PENNSYLVANIA 19111-5096

IN REPLY REFER TO
**MSA**

May 20, 2002

CERTIFIED MAIL- RETURN RECEIPT REQUESTED

Mr. William Bandy
President
United Medical Supply
5117 Northeast Parkway
Fort Worth, TX 76106

RE: In re: United Medical Supply Company, Inc.

Dear Mr. Bandy:

In response to your May 9, 2002 request for mediation relative to your pending claim under contract number SP0200-97-D-7133, please be advised that while we encourage Alternative Disputes Resolution procedures, we require the claim to be properly certified before proceeding.

Sincerely,

L. Flatley

L. FLATLEY
Chief, Medical Surgical Prime Vendor Sect.
Medical Surgical Products CBU
Directorate of Medical Materiel

LAW OFFICES
**GOINS, UNDERKOFLER, CRAWFORD & LANGDON**
A REGISTERED LIMITED LIABILITY PARTNERSHIP
RENAISSANCE TOWER
1201 ELM STREET, SUITE 4800
DALLAS, TEXAS 75270

**FRANK L. BROYLES**
BOARD CERTIFIED – BUSINESS BANKRUPTCY
TEXAS BOARD OF LEGAL SPECIALIZATION

(214) 969-5454
FAX (214) 969-5902
E-mail: frankb@gucl.com

May 9, 2002

Ms. E. Kathleen Shahan
Civil Division
U.S. Department of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875

Via Facsimile - (202) 307-0494

**RE: Case No. 01-41911-bjh-11; *In re: United Medical Supply Company, Inc.* Adversary No. 01-4124; *United Medical Supply Co., Inc.*, Petitioner**

Dear Ms. Shahan:

Please find attached amendment to contract number 5. United Medical is within ten days or so of having its claim ready to submit. Rather than simply submit the claim and proceed on different fronts with our FOIA actions and our pending petition to take Mr. Bandy's deposition. United Medical is prepare to submit the claim informally (i.e., unsigned) and mediate all issues. If the claim issue is not resolved at mediation, then we might be able to resolve the FOIA and the Bandy deposition issue.

United Medical's willingness to mediate would depend on the selection of an acceptable mediator, but mediation in Philadelphia would be fine.

This letter is being submitted to you, since we currently have a pending action and need to resolve that pretty quickly. Please let me know whether this approach is acceptable to you and the DSCP.

Very truly yours,

Frank L. Broyles

c:
Frank Rapaport, MCKENNA & CUNEO, L.L.P., via fax (610) 687-9755
Frank Brown via first class mail

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

| 1. CONTRACT ID CODE | PAGE 1 OF 2 PAGES |
|---|---|

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| P00005 | 06/18/97 | N/A | |

6. ISSUED BY CODE SP0200

DEFENSE PERSONNEL SUPPORT CENTER
2800 SOUTH 20TH STREET
PHILADELPHIA, PA 19145-5099
CONTRACT SPECIALIST: N. MARTIN
PHONE: 215-737-8422

7. ADMINISTERED BY *(If other than Item 6)* CODE SP0200

SAME AS BLOCK 6

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

UNITED MEDICAL SUPPLY
5117 NORTHEAST PARKWAY
FORT WORTH, TX 76106

CODE 5T804 FACILITY CODE

(X) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

10A. MODIFICATION OF CONTRACT/ORDER NO.

X SP0200-97-D-7133

10B. DATED *(SEE ITEM 13)*

01/30/97

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. Accounting and Appropriation Data *(If required)*

MEDICAL/SURGICAL PRIME VENDOR - LONE STAR REGION

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (X) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| X | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc).* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER *(Specify type of modification and authority)* |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

1. Reference: Clause 52.233-1 DISPUTES (MAR 1994)

   The attached Alternative Dispute Resolution Policy Statement is hereby incorporated into the above referenced contract.

2. All other terms and conditions of the contract remain the same.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
|---|---|---|---|
| | | L. FLATLEY | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY L. Flatley | 16C. DATE SIGNED |
| *(Signature of person authorized to sign)* | | *(Signature of Contracting Officer)* | 6/18/97 |

NSN 7540-01-152-9070
PREVIOUS EDITION UNUSABLE

Created using PerForm Pro software.

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

**Use of Alternative Dispute Resolution to Resolve Preaward and Postaward Disputes**

This Policy Statement reinforces DPSC's commitment to make maximum use of Alternative Dispute Resolution (ADR) in resolving preaward and postaward protests/ disputes when unassisted negotiations are unsuccessful. ADR refers to a variety of dispute resolution techniques, many of which involve the use of a neutral third party, that serve as alternates to litigation. Examples of ADR techniques include mediation and neutral fact finding. These techniques are typically cheaper and faster than litigation. They serve to maintain long-term working relationships between the parties, and are less disruptive to procurement cycles, contracts, and the parties themselves.

FAR 33.214 permits contracting officers to use ADR procedures to settle any contractual issue within their jurisdiction. ADR is purely voluntary and may be used at any stage of a contract dispute. Once the parties elect to use ADR, it can be an effective tool for dispute resolution.

Parties are encouraged to seek resolution of protests within the agency. Where appropriate, DPSC encourages the use of ADR techniques to resolve protests to the agency, including protests to the contracting officer, in accordance with FAR 33.103.

Questions concerning ADR options may be addressed to the contracting officer or to Mr. Thomas Dougherty, DPSC's ADR Specialist for Contracting, located in the Office of Counsel.

CLAIM

United Medical Supply Company, Inc., ("UMS") submits this claim for equitable adjustment and breach of contract to be made whole as a matter of right pursuant to the Contract Disputes Act of 1978.

This claim arises out of a 1997 requirements contract between claimant UMS and the Defense Personnel Support Center ("DPSC"), now known as the Defense Supply Center Philadelphia ("DSCP").[1] Subject to few exceptions, the contract provided that UMS would be the prime ("sole source") vendor for certain medical and surgical supplies to various Department of Defense medical facilities in the Lone Star Region, comprised of Texas, New Mexico and Oklahoma. In soliciting the contract, DSCP represented the estimated requirements, exclusive of any distribution fee to the Prime Vendor, at approximately $250 million over the base period and the four annual options.

Contrary to the terms of the requirements contract and the solicitation representations made by DSCP, the actual purchases under the contract by the facilities, including a 6.4% distribution fee, were only about $30 million, or approximately eleven percent of the DSCP estimate. As discussed in detail below, the evidence is overwhelming that the supplies and equipment that contractually were required to be purchased from UMS were actually purchased from other sources. These diverted purchases breached the UMS requirements contract and entitle UMS to the damages and contract adjustments set forth in this Claim.

The Lone Star Region requirements contract further provided that UMS would be paid within fifteen days from the date the government either received the invoice or the ordered supplies and equipment, whichever was later. DSCP routinely failed to make payments within the fifteen-day terms. Many payments were unjustifiably delayed for months.

UMS, at the time it entered into the Lone Star Region requirements contract with DSCP, was a small business located in Fort Worth Texas. As a result of the events described in this claim, UMS filed for Chapter 11 bankruptcy and is currently being liquidated pursuant to a confirmed Chapter 11 Plan.[2]

---

[1] For ease of reference, this agency is usually referenced by the single designation "DSCP," even though the reference may be to DPSC prior to the name change.

[2] Appendix II, Tab 14.

UMS submits this claim for $26,723,875.00. The components of the claim and calculation methodology are described below and in the referenced appendices. In summary, however, the claim components UMS is legally entitled to recover are lost profits of $13,919,817.00; unpurchased stock commitments of $120,540.00, damages to reputation of $11,000,000.00, and an equitable adjustment for early termination of the contract of $1,683,518.00.

## I. FACTUAL BACKGROUND

### A. PRIME VENDOR PROGRAM

Prior to 1990 and acquisition reform, DSCP had a monopoly on sales of medical and surgical supplies to DoD facilities. Acquisition reform changed that, and the DoD facilities were permitted to seek better service, better product or lower price from the vendors of their choice.[3] In response and in an effort to maintain its supply position, DSCP developed the Prime Vendor Program. (The program in which claimant UMS participated is usually referenced in this claim as the Prime Vendor Program.) In 2001, this program was replaced with the Prime Vendor II Program.[4] UMS did not participate in the Prime Vendor II Program.[5]

Under the medical and surgical Prime Vendor Program envisioned by DSCP, there were four types of participants in the program: (1) the DSCP customer or "end-user" medical treatment facilities ("MTFs"), *i.e.*, the DoD medical treatment facilities that purchased medical and surgical supplies and equipment, (2) DAPA-holders,[6] *i.e.,* medical and surgical product manufacturers or manufacturers' representatives, including minority manufacturers' representatives (3) regional sole source distributors, or Prime Vendors ("PVs"), and (4) DSCP as Prime Vendor Program administrator.

---

[3] Address by Colonel Joel Lamy, Director, Medical Material, DSCP, to the attendees of the PREPACs Conference held February 19, 1998 in Philadelphia, summarized on page 2 of the Memorandum of the meeting. Appendix II, Tab 1. PREPACs refers to "prepackaged medical procedural kits."

[4] Sometimes called by DSCP as "GEN II" or "Generation II."

[5] UMS submitted a proposal, but its proposal was rejected by DSCP.

[6] DAPAs, or Distribution and Pricing Agreements, are discussed in detail on the following page.

The purchasers of medical and surgical supplies were the participating DoD medical treatment facilities. DSCP administered the program for these facilities and charged an administrative fee to each facility of approximately 1.3% of the cost of the medical and surgical supplies purchased by that facility from the Prime Vendor. Almost all the medical treatment facilities in the Lone Star Region agreed to participate in the med/surg Prime Vendor Program.

One of the planned benefits of the program to the DoD was a ceiling on the cost that manufacturers of medical and surgical supplies and equipment could charge. This ceiling was the "rebated cost" of the supplies and equipment established by contracts between DSCP and the manufacturers, or manufacturers' representatives.[7] These contracts, known as DAPAs, an acronym for "distribution and pricing agreements," established the "after rebate" ceiling costs for each of the products to be distributed by the Prime Vendor. The DAPAs purportedly ensured that medical and surgical products could be purchased at or near the lowest price available. When the Lone Star Regional Prime Vendor contract was awarded, DSCP had over 120,000 DAPAs in effect.

Each regional Prime Vendor contractually agreed to accept orders from the facilities for all DAPA items and deliver the ordered items in accordance with the delivery terms, typically on a next business day basis, although the Prime Vendor contract provided for other shorter and longer delivery options.

The Prime Vendor was required to purchase and inventory the various DAPA items and maintain a 95% fill rate for orders submitted by the facilities. The Prime Vendor also was required to provide customer support to the facilities, including periodic visits to the ordering sites.

Upon receipt of an order the Prime Vendor would fill the order and include a packing slip invoice in the packing material. That packing slip included a 1.3% administrative fee charged by DSCP. The actual receivable maintained on the Prime Vendor's books excluded the DSCP administrative fee. DSCP was obligated to pay the Prime Vendor the actual receivable amount (*i.e.*, the packing slip invoice amount less the administrative fee) within fifteen days from date of the invoice or date product was received, whichever was later.

---

[7] The invoice cost to UMS often was more than the purchase price paid by DSCP. When the product or equipment was sold to the DoD facility, UMS would receive a manufacturer's rebate to reduce its cost to the DAPA amount. If the DoD did not promptly purchase and pay for the product or equipment, UMS could incur, and did incur, substantial costs associated with carrying either the unpurchased inventory or the delinquent account receivable.

The Prime Vendor, in exchange for the benefits of being a sole source, assumed the burden of inventory management. As noted by Michael Schmitt, then former Program Manager of the Med/Surg Prime Vendor Program at DSCP, this burden was not light. On July 10, 1997, Michael Schmitt sent a memo to all DAPA holders detailing the burden placed on Prime Vendors to ensure that the Prime Vendor stocked only products that would be purchased by the government. Specifically, the memo advised DAPA holders that the Prime Vendor was precluded from charging the government restocking charges and the Prime Vendor was obligated to accept returns from the government for any reason. To avoid the costs of stocking unneeded supplies and equipment and to provide the effective maintenance of an inventory of 120,000 plus (and growing) DAPA items, detailed product usage data was to be provided to the Prime Vendor by the participating medical treatment facilities. DSCP contractually agreed to provide that data as part of the transition and implementation period. This claim discusses the transition and implementation period in greater detail below.

## B. THE CONTRACT SOLICITATION AND AWARD

The key solicitation and contract documents are included and tabbed in Appendix I.

### 1. Solicitation Summary

In 1993 the Department of Defense, through the Defense Personnel Support Center, pursuant to Solicitation DLA120-93-R-0587, invited offers from private companies to become the Prime Vendor to the Department of Defense for various medical and surgical supplies and equipment in the Lone Star Region pursuant to a requirements contract. The Solicitation was amended several times, but the contract being solicited consistently remained a requirements contract. The primary amendments were the December 1995 Amendment 008 that replaced the Initial Solicitation and the first seven (7) amendments, and Amendment 012, which, among other things, contained a discussion of the SEED (Small Entrepreneurial Enhancement Development) program and added an annual maximum purchases notice that advised Prime Vendors that the contract would be cancelled and the program re-bid if purchases under the contract exceeded an annual maximum.

The Initial Solicitation, the Award, the Solicitation Amendments, and the Contract Modifications were clear with respect to the material terms of the contract being awarded. As discussed in detail below, these terms were:

(1) A representation that a Prime Vendor requirements contract under FAR clauses 52.216-1,[8] 52.216-9P06, and 52.216-21 was being awarded;

(2) Identification of the medical treatment facilities in the Lone Star Region that were participating in the Prime Vendor Program;

(3) Identification of the medical and surgical products and supplies that were included in the award;

(4) The estimated award value, calculated by DSCP in accordance with the solicitation formula;

(5) DSCP's payment for supplies and equipment sold would be made within 15 days of date the product and supplies were received by the ordering facility or date of invoice, whichever was later; and

(6) The contract term was a base year with four additional one-year options in favor of the government, pursuant to Clause 52.217-9P10.

## 2. Solicitation Discussion

### a) The 1993 Initial Solicitation[9]

The Initial Solicitation ("1993 Solicitation") represented that a Prime Vendor Program was being established and that the Prime Vendor contract would be a requirements contract, under which the Prime Vendor would be the sole source of specified classes of brand name specific and generic medical and surgical supplies and equipment.

The Initial Solicitation "cautioned" that, "a requirements type contract is contemplated with the option to extend the contract for four additional one year periods…. Offers on the options are mandatory. Failure to offer on all options will result in an offer being eliminated from further consideration…."[10]

The government disclosed that,

---

[8] Amend. 008, at 79.

[9] Appendix I, Tab 1.

[10] 1993 Solicitation at 4.

> *Based on a 12 month reporting period, the medical treatment facilities that will be covered by the contract locally spent an estimated $27,500,000.00 per year for those types of consumable and disposable medical/surgical products and hand-held surgical instruments covered by the proposed contract.*[11]

As described below, this estimate was substantially increased, and proposed Prime Vendors were directed to use the increased estimate to determine their offers.

The government further represented in the Initial Solicitation that it would evaluate price offers by:

"(1) Multiplying the annual estimated requirements for the base ordering period and each option period by the offeror's distribution fee for each period and then (2) adding the dollar figure for each year to arrive at the total cost for the distribution fee for the entire 5 years."[12]

The Statement of Work represented that the Prime Vendor would provide "all medical/surgical products for which the Prime Vendor has been authorized as a distributor under the [Distribution and Pricing Agreements]." The government also represented that it would provide all DAPAs to the Prime Vendor.[13]

The Statement of Work dealt with implementation and transition.[14] The transition schedule specifically identified the facilities that would be participating in the Prime Vendor Program and provided deadlines for implementation of the Prime Vendor Program for those facilities. The deadlines specified in Attachment V varied from 60 days following the Effective Date of the Contract to 180 days.[15]

DSCP made a material commitment to potential offerors when it represented that "Participating facilities must provide the contractor with usage information six (6) weeks prior to start-up…. Items ordered by a facility whose usage data has not been provided or product quantities of [sic] the most recent month in question

---

[11] 1993 Solicitation at 6.

[12] 1993 Solicitation at 6.

[13] 1993 Solicitation at 7.

[14] 1993 Solicitation, SOW, at 3 and 4.

[15] Prime Vendor Program Commencement Schedule, 1993 Solicitation at 75.

exceeding the prior 45 day usage will be exempt from the [fill rate] calculation."[16] This commitment was critical to effective inventory management for several reasons, the most important being that ordered medical supplies often could not be returned to the manufacturer, if they could be returned at all, without a substantial restocking charge. Since the restocking charge could not be passed on to DSCP, it was imperative that UMS minimize ordering DAPA supplies the government would not purchase. UMS's ability to minimize the ordering of supplies not needed by DSCP was dependent on receiving accurate product usage information as contractually promised by DSCP.

DSCP emphasized, "THE MINIMUM REQUIREMENTS DESCRIBED IN THE ABOVE CITED STATEMENT OF WORK REPRESENT THE <u>MINIMUM</u> NEEDS OF THE GOVERNMENT. … SELECTION OF THE PRIME VENDOR WILL BE MADE BASED ON THE OFFER WHICH DEMONSTRATES THE HIGHEST PROBABILITY OF SUCCESSFUL PERFORMANCE AT A REASONABLE, REALISTIC PRICE WHERE TECHNICAL QUALITY IS MORE IMPORTANT THAN PRICE…."[17]

The Solicitation incorporated FAR Requirements Clause 52.216-21(c), which stated the requirements and DSCP's obligation to purchase the participating medical treatment facilities requirements from UMS. It stated,

> *(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.*[18]

Proposed exceptions to DSCP's obligations to purchase all requirements from UMS were identified in the Solicitation at pages 21, 33 and 34. The Solicitation incorporated and quoted FAR clause 52.216-9P06 which excluded from the requirements clause orders of less than $50.00.[19]

Proposed exclusions under FAR clause 52.216-21(e) were orders for supplies "urgently required by the Government" before the date that the Prime Vendor was

---

[16] 1993 Solicitation at 8.

[17] 1993 Solicitation at 15.

[18] 1993 Solicitation at 34.

[19] 1993 Solicitation at 33.

required to make such delivery and the Prime Vendor refused the accelerated delivery.[20]

Proposed exclusions under FAR clause 52.216-9P13 were orders for supplies available from depot stock, routine orders which the Prime Vendor could not fill due to backorders from the manufacturer; emergency orders which could not be filled within two hours of order, and orders which were required to be filled from the Federal Prison System or certain other special programs.

The Solicitation documents also provided that DSCP would not have to use the Prime Vendor to fill orders of less than $50.[21]

Finally, the Solicitation also incorporated FAR's Prompt Payment clause and specifically amended the clause to provide for 15-day payment under FAR 52.235-25(a)(2)(i-ii).[22]

The Initial Solicitation addressed various other factors. It included socioeconomic provisions that UMS would be required to implement and stated that the government reserved the right to make an award for less than 100 percent of its estimated requirements.[23] The government did not exercise that right.

On September 14, 1993, United Medical submitted its initial proposal in response to the government's Initial Solicitation.[24] The initial prime vendor contract for the Lone Star Region, however, was awarded to Owens & Minor.

**b) The 1995 Amendment 008[25]**

On December 4, 1995, due to the failure of Owens & Minor to perform under the 1993 Solicitation, the government re-solicited offers by means of Amendment

---

[20] 1993 Solicitation at 34.

[21] 1993 Solicitation at 33.

[22] 1993 Solicitation at 28.

[23] 1993 Solicitation at 66.

[24] Appendix I, Tab 1.

[25] Appendix I, Tab 2.

008.[26] Amendment 008 provided that the government could accept offers in response to the Initial Solicitation and amendments 001 through 007 as an offer under Amendment 008.[27]

One important difference between the Initial Solicitation and Amendment 008 was the change in DSCP's representation regarding the estimated volume of medical and surgical supplies and equipment to be purchased. DSCP's representation in Amendment 008 was:

> _Estimated Annual Requirements:_
>
> *Based on a 12-month reporting period, the medical treatment facilities that will be covered by the contract locally spent an estimated* _$57,665,500_ *per year for those types of medical/surgical products covered by the proposed contract. No guarantee is given that this volume will be purchased. It should be noted that during the first year of the contact [sic] each facility will begin to reduce its existing inventory of medical/surgical products. Orders will be placed with the Prime Vendor as existing* inventories *are reduced to lower levels This may effect the volume of ordering during the base ordering period.*[28]

Amendment 008 incorporated FAR clauses 52.216-1 and 52.216-21 and continued the government's constant drumbeat that the contract was a requirements contract by specifically stating that the contract was a "Firm Fixed Price Requirements Contract."[29]

Amendment 008 further restricted the government's right to purchase from alternative sources by substituting FAR clause 52.216-9P06 for FAR clause 52.216-9P13, which limited the exceptions to the government's obligation to order from

---

[26] The performance failure of Owens & Minor is based statements made by DSCP personnel. UMS has no independent knowledge on this issue.

[27] Amend 008 at 3.

[28] Amend 008 at 12.

[29] Amendment 008, at 45, 46, and 79.

UMS to either orders for less than $50.00 or emergency orders that could not be promptly filled by UMS.[30]

Amendment 008 additionally incorporated FAR Clause 52.217-9p14(M), which adopted the same "Evaluation of Offers" language contained in the Initial Solicitation.[31] Amendment 008 gave the government the right to add or delete ordering facilities and to change the Contract Estimate based on such additions or deletions.[32] During the term of the contract DSCP added two major purchasing facilities, later deleted one of those facilities (Ft. Huachuca, AZ), and deleted one minor clinic.[33]

The implementation and transition plan was changed to provide that the contractor would be given 120 days following the acceptance by the government of the Prime Vendor's implementation plan. The implementation plan accepted by the government required it to provide United Medical with usage data.[34]

Amendment 008 contained the same 15-day payment terms included in the Initial Solicitation.[35]

**c) DSCP's Lone Star Region Recap**[36]

On January 17, 1996, shortly after issuing Amendment 008 to the Solicitation, DSCP provided United Medical with an 8-page written summary of the Lone Star Prime Vendor Program. Captioned, "Lone Star Region Recap," this document summarized DSCP's interpretation of the key program points. Some of the points made in the Recap relevant to this claim were:

---

[30] Amend 008 at 45, 46. Compare page 21 of the Initial Solicitation at 21 with Amendment 008 at 45.

[31] Amend. 008 at 12 and 89.

[32] Amend. 008 at 13.

[33] The largest added purchasing facility was AFMLO/OL-2, Ft. Worth, Texas, with estimated annual purchases of $400,000.00. Appendix I, Tabs 6 and 7.

[34] Amend. 008 at 27.

[35] Amend. 008 at 40.

[36] Appendix I, Tab 3.

*Estimated [Annual] Sales: $57,655,500.00*
*(Initial year may be lower due to Inventory reduction.)*

*Facility Cost: DAPA/IDTC Price*
*+ PV Fee (%)*
*+ 1.3% = DPSC Fee*

*Minimum Order: $50.00*

*Payment: 15 days Via Electronic Funds Transfer (EFT)*

*Commence performance not later than 120 days after approval of plan.*
*(If first PV award.)*

*Implementation time based on government providing usage data to PV within 10 days of award.*

*Facility will reduce on-hand stock during transition period.*

**d) The 1996 Amendment 0012**[37]

DSCP issued Amendment 0012 on February 7, 1996. UMS submitted its offer on the form and in accordance with the terms and requirements contained in Amendment 0012. The material terms on which UMS relied in making its offer were carried forward from Amendment 008. Amendment 0012 contained a provision for yearly maximums, which were approximately 210% of the estimated yearly purchases. The effect of the yearly maximums was to notify the Prime Vendor that if purchases under the contract exceeded any yearly maximum, the contract would be re-bid for the next year. P. 5.

Amendment 0012 incorporated and quoted in full the clause 52.217-9P10, "OPTION FOR REQUIREMENTS CONTRACT TERM EXTENSION (PRIME VENDOR)." The option was a one-way option solely in favor of DSCP.

Amendment 0012 reiterated that the annual purchase volumes were estimated to be $57,982,750.00 after the initial year and directed the offerors to rely on this estimate. Specifically, the government stated:

---

[37] Appendix I, Tab 4.

*Based on a 12-month reporting period, the ordering facilities that will be listed in Attachment III spent an estimated $57,965,500 per year for those types of medical/surgical products covered by the proposed contract. Based on this figure, the following is the Government's best estimate of yearly sales that the ordering facilities will experience over the five year period.*[38]

| | *Yearly Estimate* | *Approximately Yearly Maximum* |
|---|---|---|
| *First Year* | *$ 28,982,750.00* | *$ 72,456,875.00* |
| *Second Year* | *57,965,500.00* | *144,913,750.00* |
| *Third Year* | *57,965,500.00* | *144,913,750.00* |
| *Fourth Year* | *57,965,500.00* | *144,913,750.00* |
| *Fifth Year* | *57,965,500.00* | *144,913,750.00* |

Following the above table providing the purchase estimates, Amendment 0012 further emphasized that the offer should be based on these estimates and instructed offerors that, "*Your proposed distribution fee should be based on the Yearly Estimate….*"[39]

In Amendment 0012, DSCP provided a calculation example of how offers would be evaluated. That calculation again represented that the annual estimates did not include any distribution fee.[40]

---

[38] Amend. 0012 at 5.

[39] Amend. 0012 at 5.

[40] Amend. 0012 at 7 and 8.

## C. UNITED MEDICAL SUPPLY COMPANY, INC. AND ITS PROPOSAL

### 1. Background of United Medical Supply

United Medical Supply Company was established in Fort Worth, Texas in 1980 as a Texas corporation. It enjoyed a 21-year history as a reputable regional distributor of medical supplies to various governmental entities and private industry. It typically employed about 150 employees and numerous other independent contractors and small businesses. Its annual revenues, exclusive of the Lone Star Region Prime Vendor contract, grew to approximately $60 million.[41] In sum, UMS was a reputable and responsible corporate citizen in the Fort Worth community.

Throughout its 21-year history United Medical was a small business whose only business was distribution of medical supplies and equipment to hospitals, physicians and other medical providers on a regional basis. It enjoyed an excellent reputation. Its tenure in the business and the fact that it was selected to be the Lone Star Region's Prime Vendor is substantial evidence of that good reputation. Moreover, UMS's reputation, at one time, was one of the most outstanding in the industry. In September 2000, *Repertoire,* a national publication of Medical Distribution Solutions, Inc., published survey results from an earlier independent Physicians World Class Survey.[42] Respondents to that survey included physicians and various medical treatment facilities. Five classes of distributors were evaluated: national, regional, local, specialized and direct marketing. The evaluations were based on sixteen criteria. Based on those sixteen criteria, UMS was rated the best regional distributor in the United States and fourth highest overall distributor out of the 567 distributors evaluated. UMS's rating of 96.84 percent was higher than any national or other regional distributor. Only three local distributors had higher ratings.

As a result of the events described in this claim, UMS ran into severe credit problems in 2000 and ultimately filed for Chapter 11 bankruptcy protection in March 2001. Shortly before the time it initially encountered these credit problems, UMS had received buyout offers in the $10 million range, which are discussed in more detail below. Naturally, the Chapter 11 proceedings slammed shut the door of reasonable buyout possibilities. UMS currently is being liquidated pursuant to a confirmed Chapter 11 plan.

---

[41] Appendix III, Tabs 1 – 3.

[42] Appendix II, Tab 2.

## 2. UMS's Reliance on the Solicitation Documents and its Decision to Offer

UMS read carefully the Solicitation and amendments when received. Amendments 008 and 0012 contained the offer forms and terms on which UMS submitted its offer. They contained various material terms, including:

(1) "The prime vendor SEED concept [was] an attempt to ensure growth opportunities and participation of small business and small disadvantaged business concerns in the Prime Vendor Program."[43]

(2) "A requirements type contract [was] contemplated with the option to extend the effective period of the contract for four additional one year periods."[44]

(3) Estimated yearly requirements were based on previous usage as reported by the facilities. The estimates, exclusive of distribution fees, were for $28,982,750 in year one and $57,965,000 each year thereafter. UMS was instructed to propose a distribution fee based on these estimates.[45]

(4) The government's right to purchase supplies and equipment from third party sources, i.e., not UMS, was limited to orders under $50 and emergency orders UMS could not fill.[46]

(5) The DAPA listing of products included in the requirements contract was estimated to include an initial 122,000 medical and surgical items and to grow to 500,000 items.[47]

(6) Payment to UMS would be by EFT in 15 days from the later of the date the invoice was received or the date the goods were delivered.[48]

---

[43] Amend. 0012 at 3.

[44] Amend. 008 at 5; Amend. 0012 at 4.

[45] Amend. 0012 at 5.

[46] Amend. 0012 at 33.

[47] Amend. 0012 at 14. UMS actually loaded 190,000 DAPA items into its database.

As previously discussed in this claim, the potential sales volume and prompt payment terms were extremely appealing to and relied on by UMS both in making a decision to respond to the Solicitation and in calculating its proposed distribution fee. The importance of the contract size is evident. It would almost double the annual revenues of UMS. In responding to the Solicitation, United Medical spent hundreds of hours preparing its offer and amendments. It confirmed with both Michael Schmitt – then Program Manager, Med/Surg Prime Vendor, Directorate of Medical Materiel and Margaret Rees, his supervisor and then Chief of Medical/Surgical Products Group -- that the Lone Star Region would produce the volume of sales revenues estimated in the Solicitation and that that invoices submitted by United Medical would be paid within the 15 day contractual period. Shortly after the award, but before the effective date, UMS confirmed with Linda Flatley, then Chief, New Initiatives Section and the contracting officer, that UMS could rely on the requirements representations and terms of the solicitation and contract.

Prompt payment of invoices was essential to UMS. The Solicitation and contract represented that DSCP would pay each invoice within fifteen days of receipt of the invoice or, if later, delivery of the product. UMS relied on the accuracy of that representation in preparing its offer and calculating its projected cash flow and future cash needs. The projected profits estimated by UMS through the Prime Vendor Program were reasonable, but, like UMS's cash needs, they were very much tied to 15-day payment by DSCP.

The DSCP estimates could not be met by UMS without timely payment in accordance with the terms of the contract. UMS, as a small business, did not have the internal financial capability to fund the projected sales growth. It sought and obtained a substantial line of credit to be used on an emergency basis, but the primary source of funds necessary to sustain the projected sales was DSCP, and prompt payment was as necessary as the size of the payment.

Also critical to UMS was accurate and complete product usage data. As a small business, UMS could not risk inventorying products the ordering facilities seldom or never purchased, or inventorying too much of given products. The primary tool for avoiding these problems was accurate and complete product usage data that, pursuant to the contract, was to be supplied by DSCP or the medical treatment facilities.

---

[48] Amend. 008 at 40. UMS's practice was to electronically invoice DSCP when the order was shipped.

The Solicitation documents and repeated discussions with DSCP personnel assured UMS that it could rely on the Solicitation documents, especially in the volume, payment terms and product usage data representations of DSCP. If UMS had had any significant reservations in these areas, it would not have submitted an offer.

United Medical would not have submitted its offer but for the fact that the contract being awarded was a requirements contract for purchase volumes represented by DSCP been represented as substantial, that payment for the purchases would be made within fifteen days of invoice or product delivery, and that the DoD would provide accurate product usage data. The UMS decision to submit an offer and its proposed distribution fee were premised on these representations.

### 3. Distribution Fee Proposed

UMS, in total reliance on the material representations by DSCP, submitted its offer on February 26, 1996, and proposed a distribution fee of 6.4% of the DAPA cost of the supplies and equipment sold under the contract. UMS projected its profits and cash flows on the material representations and determined that a 6.4% distribution fee for the volume estimated by DSCP paid within fifteen days of invoice would yield a reasonable profit.

UMS took into account the risk that the requirements of the ordering medical treatment facilities might not reach the DSCP projections. UMS considered this unlikely because the estimated volumes were purportedly based on historical usage volumes and DSCP had represented that the DAPA product list was projected to grow from 122,000 items to 500,000. Nevertheless, because of the significant consequences to UMS if the estimated sales volume was not achieved, it protected itself against this contingency by including in its offer a contract condition requiring renegotiation of the distribution fee if the requirements did not reach at least 90 percent of the stated contract award.[49]

The offer proposal offered by UMS was accepted by DSCP as written, including the right to the renegotiated distribution fee described above.

---

[49] Response to Amend. 0012 at 2. Appendix I, Tab 4. This right to a renegotiation was carried forward from UMS's response to Amend. 008 at 6. Appendix I, Tab 2.

## D. THE CONTRACT AWARD AND MODIFICATIONS[50]

On January 30, 1997, and over the protest of two national distributors who had submitted competing offers, Claimant United Medical was awarded Prime Vendor contract number SP0200-97-D-7133 effective June 1, 1997, consistent with the solicitation. The Award, signed by Linda Flatley as the Contracting Officer, assigned an "Estimated Dollar Value for the Base Year of $30,177,346.00 and an Estimated Total Contract Value of $272,268,314.00.[51]

The award also incorporated the Solicitation Terms into the Contract and specifically identified the 32 ordering (i.e., purchasing) governmental units that were participating in the Lone Star Region's Prime Vendor Program. Block 18 of the Award incorporated the terms of the UMS offer as follows:

> *Your offer on Solicitation Number DLA120-93-R-0587, including the additions or changes made by you which additions or changes are set forth in full above is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation* ***and your offer****, and (b) this award/contract. No further contractual document is necessary.* Bolding added.

Under this term of the award, incorporated into the contract and accepted by DSCP was the right of UMS right to a renegotiated fee if DSCP's requirements did not equal at least 90% of the DSCP requirements estimate.

Shortly after the award, Brooke Army Medical Center, one of the participating facilities in the Lone Star Region Prime Vendor Program, raised an issue concerning its obligations to purchase DAPA products solely from UMS. UMS was concerned about making capital investments if the contract was not a requirements contract. It immediately requested confirmation for DSCP that the award was for a requirement contract and that the obligations were absolute. See footnote 52. On March 4, 1997, it received that confirmation from Linda Flatley, contract officer and then Chief, New Initiatives Section. She stated in response:

> ***United Medical should not be reluctant to invest in capital commitments, but should proceed with full implementation as quickly as possible. Colonel***

---

[50] Appendix I, Tabs 5 – 11.

[51] Award at 1.

> ***McNabb, as well as DPSC, will provide complete support during the transition period and beyond.***[52]

Following the award, there were several subsequent material modifications to the contract. Modification No. 5, effective June 18, 1997, committed DSCP to alternative dispute resolution at any stage of a dispute; Modification No. 6, effective June 30, 1997, added AFMLO/OL-2, Ft. Worth, TX, as a purchasing facility with estimated annual purchases of $400,000.00.[53]

Modification No. 10 signed by Linda Flatley for DSCP on May 27, 1998, effective June 1, 1998, exercised option year 1.[54]

Modification No. 16 signed by James Jenning for DSCP on May 11, 1999, effective June 1, 1999, exercised option year 2.[55]

Modification number 21 signed by Donna Kennedy for DSCP on May 22, 2000, effective June 1, 2000, exercised option year 3.[56]

Modification No. 26 terminated the contract effective April 30, 2001.[57] The ostensible reason given by DSCP for the termination was that it was implementing the Prime Vendor II Program.

## E. UMS POST AWARD PERFORMANCE

### 1. The Transition and Implementation Period

The contract discussed, in detail, transition and implementation. In summary, the transition and implementation period was a 120-day period beginning when the government approved the UMS implementation plan. Primary transition and implementation activities included: software installation, training on software use, evaluation of usage data to be provided by the government,

---

[52] Appendix II, Tab 3.

[53] Appendix I, Tabs 6 and 7.

[54] Appendix I, Tab 8.

[55] Appendix I, Tab 9.

[56] Appendix I, Tab 10.

[57] Appendix I, Tab 11.

attempted verification of usage data provided by the government, and data input for approximately 190,000 DAPA items.

From UMS's standpoint, the most important transition objective it needed accomplished was receipt of complete and accurate product usage data for the participating facilities, as promised in the Solicitation and Award. DSCP had ultimate responsibility for this obligation. As discussed elsewhere, DSCP did not faithfully discharge this obligation and UMS never obtained accurate and complete product usage data, although UMS devoted an inordinate amount of manpower attempting, unsuccessfully, to obtain this data from the participating medical treatment facilities and the former Prime Vendor, Owens & Minor.

**2. Post Transition Period**

**a) UMS Performance**

To ensure that adequate inventory could be housed and that deliveries would be timely, UMS added warehouse space -- including a new 32,000 square foot facility in El Paso Texas, a 16,000 square foot addition to the San Antonio warehouse, and special climate controlled warehouse sections in Fort Worth and El Paso. It purchased substantial computer hardware and software to handle the ordering and invoicing process demanded by the government. Its fill rates typically were in excess of the 95% contract specification. On occasion the lack of accurate and complete usage data and other problems at the ordering facility prevented a 95% fill rate.

When the government notified UMS of problems, either with an ordering facility or with DSCP, UMS responded promptly and professionally to resolve the problem.

Eventually DSCP terminated the contract early by means of modification 26, which terminated the contract in April 2001, just before the end of the third option year. The reason given by DSCP was that it was implementing Prime Vendor II. The contract was not terminated for any performance problems attributable to UMS; the government did not attempt to hold back any payments due UMS as damage offsets; and the government did not alleged that it suffered damages from any breach by UMS. To the contrary, as discussed below, the government periodically admitted that it failed to perform its obligations under the contract and told UMS that it was pleased with its performance as a Prime Vendor.

When UMS was awarded the contract, it prepared to supply the DoD approximately $300 million of medical and surgical products and supplies over a five-year period. The DoD estimate of product it would purchase, as modified by

Modification 006 to the award, was $274,268,214.00. DSCP actually purchased approximately $31,000,000 of products and supplies, or about eleven percent of the DSCP estimated contract volume.[58]

## F. DSCP CONDUCT AND BREACH

The Lone Star Region Prime Vendor contract was a disaster for United Medical Supply. The disaster began during the transition period when UMS was not able to get accurate and usable product usage data from the government. The disaster continued when the Government ordering facilities diverted most of their product and supply purchases from UMS to other sources and when the payments due UMS for product actually purchased often were delayed substantially beyond the 15 day period specified in the contract.

### 1. Breach by Diversion of Purchases

The government's diversion of purchases away from the UMS contract was the most egregious breach by the government. The evidence of diversion is undeniable and compensable. See, *T&M Distributors, Inc.*, ABSCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442.[59]

Standing alone, the dramatic disparity between the DSCP estimates and actual purchases provides compelling evidence that substantial diversion occurred. The government cannot argue in good faith that the actual purchases of a small fraction of the estimate were due to reduced requirements by the government. Such an argument would make a mockery of the estimates and the March 4, 1997 Flatley directive to UMS that UMS should not be reluctant to invest in capital commitments. This disparity is shown simply in the charts on the next page.

---

[58] UMS's records indicate that immediately prior to filing its Chapter 11 petition, the actual volume purchased from UMS by DSCP over the 47-month contract period was $31,869,516.19. Appendix III, Tab 5.

[59] *T&M Distributors* opinion attached at Appendix II, Tab 20. References to specific opinion pages refer to the page numbers of the format as printed in the Appendix.

**TABLE I**

**Comparison of Estimated Dollar Volume of Purchases with Actual Dollar Volume of Purchases (Millions of $$)**

| | **Base Year** | **Option Year 1** | **Option Year 2** | **Option Year 3** | **Option Year 4** | **Totals** |
|---|---|---|---|---|---|---|
| DSCP Estimated Purchases, (including facility added by Mod 006) (millions $) | 30.4 | 60.9 | 60.9 | 60.9 | 60.9 | 274.0 |
| Approximate Actual Purchases (millions $) | 6.4 | 8.4 | 10.6 | 6.5 | 0.0 | 31.9 |

**TABLE II**

**Percentage of Actual Dollar Volume of Purchases to Estimated Dollar Volume of Purchases**

| | **Base year** | **Option Yr. 1** | **Option Yr. 2** | **Option Yr. 3** | **Option Yr. 4** | **Total** |
|---|---|---|---|---|---|---|
| % Actual/ Estimated (*including* option yr. 4) | 21.0% | 13.8% | 17.4% | 10.7% | 0.0% | 11.6% |
| % Actual/ Estimated (*excluding* option yr. 4) | 21.0% | 13.8% | 17.4% | 10.7% | n/a | 15.0% |

Additionally, there are at least two documents in which DSCP or its representatives admit that diversions occurred. Both blame the problem on the use by the medical treatment facilities of government credit cards. The first is a 1999 predecessor to the DSCP 2000 Prime Vendor II Solicitation. In an Addendum to Solicitation SP0200-99-5003, DSCP recognized that its "sole source" obligations of Prime Vendor I (the UMS program) were not met. DSCP does not disclose in the SP0200-99-R-5003 Solicitation that the failure to meet these obligations was attributable to its own mismanagement. In the Solicitation SP0200-99-R-5003, DSCP summarized the history of the Prime Vendor Program in which UMS had participated and stated, "Currently DSCP's PV Med/Surg contract sales worldwide are averaging eight million four hundred thousand dollars per month. ***The MTF's [Medical Treatment Facilities] estimate the balance of Med/Surg items are purchased directly from manufacturers and dealers using government wide commercial purchase cards and/or local purchase methods. It can be assumed the percentage of DSCP Med/Surg PV sales to total Med/Surg sales is relatively consistent across regions***. DSCP PV Medical/Surgical sales **worldwide** were $69.3 million and $97.5 million for fiscal years 1997 and 1998 respectively."[60] Emphasis added.

Even after disclosure in the SP0200-99-R-5003 solicitation that purchasing organizations were not complying with the sole source requirement of the Prime Vendor Program, DSCP continued to emphasize that the Prime Vendor Program was a sole source program. On January 13, 2001, too late to help UMS, the government published a *Prime Vendor Program Overview* in *DEFENSE MEDICAL MATERIAL ONLINE*.[61] The *Overview* featured the benefits of the Prime Vendor Program, including "Best Overall Pricing in the Industry," "Lowest Delivered Cost of an Item," "Lower Inventory Requirements," "**True Partnership with Distributor,"** and "One Stop Shopping." The *Overview* then addressed several questions. One of particular importance to this claim is the question,

> **Can [a DoD facility] partially use the Prime Vendor Program?"** [DSCP ANSWER]: "No, because the Prime Vendor Program is based on a requirements contract. If [the facility] elect[s] to participate in the program, [it] must

---

[60] Addendum to Standard Form 1449 at 6. Appendix I, Tab 12. In other words, the world-wide sales by all Prime Vendors of medical and surgical products in 1997 was barely above the estimate given to UMS for sales in the three state Lone Star Region.

[61] Appendix II, Tab 4.

> buy all [its] recurring items for that commodity line from the Prime Vendor. For example, if [it signs]-up for the pharmaceutical program [it] must buy all [its] pharmaceuticals from the Prime Vendor.

UMS does not know if the Prime Vendor II contract as awarded was ever changed to a requirements contract. The solicitation, however, did not contemplate awarding a requirements contract, but rather, under FAR Clause 52.216-22, contemplated awarding two indefinite quantities contracts with guaranteed minimums.

These admissions by DSCP are further confirmed in an article co-authored by Mr. Michael Schmitt, the former Program Manager, Med/Surg Prime Vendor, Directorate of Medical Materiel with whom UMS dealt in the early stages of the solicitation and contract.[62] The article focused on the problem of improper diversions. Mr. Schmitt attributed the improper diversion to two factors. One was the use of government credit cards by DoD "physicians, nurse supervisors and clinical director types." His article includes a chart detailing credit card purchases during 1999. According to Mr. Schmitt, during 1999 each DoD Agency used credit cards over 90 percent of the time to pay for transactions involving less than $2,500.00.[63] The credit card transaction volume, according to Schmitt, exceeded 3 billion dollars.

Schmitt further attributed the failure of the program to meet expectations to the fact that logistics officials and officers at medical treatment facilities did not implement the program consistently, that shortcuts to implementation were numerous, and previous practices of acquiring needed supplies directly from vendors continued.

The evidence consistently and substantially points to the fact that orders were diverted from the Prime Vendor, UMS, in breach of the UMS requirements contract. Proof of bad faith is not required to recover for breach by diversion, only that the diversion occurred and caused damages. *T&M Distributors, Inc.*, ASBCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442, at 21.

---

[62] Schmitt, *Government Prime Vendor Programs, No Sure Thing, Repertoire*, May 2000, at 48. Appendix II, Tab 5.

[63] Based on information and belief, some officers at the ordering facilities had $25,000 daily credit card authority.

**2. Breach of Payment Obligations**

The contract provided that DSCP would pay UMS within fifteen days of invoice or product delivery, whichever was later. This routinely was not done. A common excuse used by DSCP for breach of its payment obligations was that it had not received payment from the appropriate medical treatment facility.[64] That excuse is not supported by the contract and is discussed in more detail under the Breach of Duty of Good Faith below.

On April 4, 2001, at the time UMS was forced to file for Chapter 11 bankruptcy protection, outstanding invoices to DSCP in the 30 to 120+ day category were $275,171.34.[65] Mr. John S. Cuorato, Chief, Med/Surg Products Group, previously assured UMS on February 26, 2001 that UMS would *eventually* get paid if it could prove delivery.[66] That assurance was too little, too late to aid UMS in its fight for survival.

The failure to timely pay caused UMS a variety of problems, ultimately leading to its bankruptcy. First, it drove up UMS's cost of goods. UMS needed DSCP funds to pay its bills. UMS's suppliers, including suppliers under DAPAs and others, often charged UMS increased unit prices if UMS did not pay according to terms, typically 30 days. Further, many suppliers charged additional interest and late fees. UMS's secured lender excluded many of the overdue invoices from UMS's borrowing base, reducing its ability to borrow to purchase supplies and equipment. The ultimate problem and result was UMS's inability to obtain a substantial portion of the needed supplies because suppliers quit shipping.

A typical example is illustrated by a September 18, 2000 letter and memo from Megan Edmunds, United Medical's Director of Credit, to Mr. Greg Wentzel at DSCP. In that memo she states,

> The enclosed material relates to the Holloman calls Q063 and Q158 that remain open from 1997. This matter has been passed on to many people over the almost three years that it has remained open on our accounts receivable.

---

[64] *See,* Appendix II, Tab 8.

[65] Appendix II, Tab 6.

[66] Appendix II, Tab 7.

> United Medical Supply was asked by Holloman Air Force Base to place a special surge order for their purchase of Dittmar item 410015, UMS0185580 on September 1997. These instruments were not for inventory but to be used in case of deployment. The items were to be place in containers on C-130s and C-5s for supplying the Stealth Fighters.
>
> Due to the unusual quantity and special nature of this item, Joe Velasques, former Director of Operations- United Medical Supply, El Paso, specifically asked SSt Gunterman when the requirement report was delivered if they would use the specified amount of this item. She confirmed that Holloman indeed would. Upon ordering, United's purchasing was informed by Dittmar that this product is a non-stock item and therefore would be non-returnable, and in addition to that, it would be four weeks until shipment, due to being a special order. Joe was notified by James Hagemier, United's Director of Purchasing , of this stipulation and James requested that he contact Holloman to be 100% positive that they would purchase this item. Joe then verified this order a second time with Airman Renee Barnett by telephone, and she confirmed.
>
> The above invoices remain open…leaving a balance due of $10,518.56.
>
> When the facility was contacted in regards to the past due invoices containing this item, no one was able to discuss the issue because of the 'file' being lost at Holloman. Also due to staff rotations there was no one remaining on the staff aware of the original order back in 1997.[67]

Sometimes, DSCP would not pay even though it had been funded by the ordering facility. On April 3, 2001, for example, UMS complained to Donna Galligan at DSCP about the handling of call [invoice] number WC27 sent in 1999 to William Beaumont Hospital, one the medical treatment facilities in the Lone Star

---

[67] Appendix II, Tab 9. See related correspondence, Appendix II, Tab 10.

Region.[68] The invoice total was $9323.93, and that is what William Beaumont Hospital paid in August 1999. DSCP, however, only paid UMS $92.31. That problem remained unresolved at the time UMS filed it Chapter 11 petition.

DSCP was obviously aware of the payments problem. On November 30, 2000 UMS pleaded for help in an email to Lt. Colonel James D. Riley, Chief Logistics Officer for William Beaumont Hospital in El Paso, Texas. Lt. Colonel Riley had indicated that he had done some investigation on the delinquent payment issue and concluded that the problem was one the DoD had created through red tape and disorganization. Lt. Colonel Riley attempted to provide help, but to little avail. In a January 22, 2001 email, Bill Bandy, then UMS president, expressed his appreciation to Colonel Riley for his efforts, but advised him,

> *…we are still being treated by a totally unwanted stepchild by DSCP and whatever entity shares the responsibility of paying for merchandise that we continue to ship to the facilities. Our receivables continue to grow and age with each passing day I am exploring alternatives to deal with a situation that literally threatens to put UMS and its people out of business.*[69]

In a February 14, 2001 DoD internal memo from Steve Hasting, a civilian facilitator employed by the DoD to help implement the prime vendor program, to Linda Flatley, contract officer and John S. Cuorato, Chief Medical/Surgical Products Group, Mr. Hasting provided DSCP with a thumbnail summary of the problem,

> *UMS is averaging $43,000 per day in sales, but only $26,000 per day in payments. Obviously, UMS can't sustain that imbalance for very long without negatively impacting credit availability. And credit availability to support cash flow requirements is what keeps them afloat day-to-day.*
>
> *I[t] appears that lack of DSCP payment drives UMS into credit [hold] status with banks and major manufacturers…which reduces their purchasing power and drives down on-hand stock…which drives down the fill rate…which drives up customer credit card purchases…which drives up cost to the end user. Mr. Bandy [UMS's president]*

---

[68] Appendix II, Tab 11.

[69] Appendix II, Tab 17.

> *tells me this situation is also affecting his commercial accounts!*[70]
>
> ….
>
> …*The bottom line is that UMS is on the verge of bankruptcy,….*[71]

Approximately one month after Mr. Hasting's memo, UMS was forced to file for Chapter 11 protection.

**3. Breach by Failure to Honor Stock Commitments**

To mitigate the problem caused by the refusal of DSCP and medical treatment facilities to provide accurate and complete product usage data, the parties developed a process known as "stock commitment." Under the process, the ordering facilities agreed to provide UMS with a list of their needs in the near future (30 days) by sending UMS a "Stock Commitment Form," or providing the information over the phone so UMS could complete the form. UMS received and/or completed thousands of these. UMS then would plan its product purchases so the committed stock could be timely delivered to the facility.

Virtually all of the medical treatment facilities failed on numerous instances to either purchase the supplies they previously had committed to purchase through the stock commitment processor timely notify UMS of a decision not to purchase. The result to UMS was that it got stuck with inventory it could not return or resell.

**4. Breach of Duty of Good Faith.**

Under a requirements contract, UMS only has to prove diversion; it is not required to prove bad faith. Nevertheless, the evidence is clear and convincing that DSCP repeatedly acted in bad faith and with a callous disregard toward UMS.

---

[70] Mr. Bandy meant that UMS was not able to deliver product to other customers because of the credit hold by manufacturers resulting from UMS's inability to pay for product sold to the medical treatment facilities under the DSCP contract.

[71] Appendix II, Tab 12

UMS received a $250 plus million-contract estimate from DSCP and was instructed to base its offer on that estimate. It based its offer on that estimate. The estimate by DSCP never disclosed that it included a substantial volume of credit card purchases that probably would not be made through the Prime Vendor. The estimates used by DSCP almost certainly were negligently developed and published. The gross disparity between actual results under the contract and estimates represented by DSCP evidence bad faith.

As discussed in more detail below, the manner in which DSCP exercised the annual options is extremely persuasive evidence that DSCP throughout the course of the contract acted in bad faith and with a callous disregard to the probable consequences to UMS. At the time it exercised the options, DSCP knew that the medical treatment facilities had diverted substantial purchases from the Prime Vendor contract, that its initial estimates were too high by orders of magnitude, and that the diversions were most likely going to continue. Nevertheless, DSCP exercised the options without offering any relief to UMS; and unfairly bound UMS to a contract being performed by DSCP in a completely different manner than the manner represented in the Solicitation and subsequent contract documents.

**a) DSCP knew of Diversions when it Exercised the Options**

Solicitation SP0200-99-R-5003 discloses substantial purchase diversions away from the Prime Vendor I contracts on a worldwide basis. That document was prepared by DSCP prior to February 24, 1999, and prior to the exercise of the second and third option years.

Each year, the purchases by the medical treatment facilities from UMS were a small fraction of the estimate for that year. UMS repeatedly expressed concern to DSCP about the low purchase volume. Several people at DSCP, including the UMS Case Manager, Anthony Amendolia, admitted that there were purchase diversions, but assured UMS that it was being resolved.

**b) DSCP Intentionally Misrepresented its Right to Withhold Payment based on the Facilities Failure to Pay DSCP.**

DSCP routinely advised UMS it was withholding payment of an invoice or call because it had not received payment from the medical treatment facilities for that invoice, and that it a contractual right to do so.

First, neither the award, as modified, nor the Solicitation as amended, provided any basis for DSCP's position on payment.

Second, DSCP did not really believe it had the right to withhold payments for this reason. DSCP, in its online publication, *dmmonline,* promoted the benefits of the prime vendor program to the DoD's medical treatment facilities. In its *Prime Vendor Program Overview,* DSCP represented (and still represents) to the facilities that,

> *Your facility places the order, receives it and lets DSCP Medical know the dollar amount of the order. The Prime Vendor electronically invoices DSCP Medical for the order and we pay the bill for you! DSCP Medical **then** gets reimbursed through inter-fund or direct billing to your agency.* ***Emphasis added***.[72]

### c) DSCP never offered UMS Relief

At the time DSCP exercised each of the options, it exercised them without changing the estimated purchase quantities for that year or without negotiating a change in the distribution fee, even though DSCP obviously knew that there had been and would continue to be substantial breaches of the contract by diversions and that the total purchases under the contract were going to fall far below the renegotiation trigger of 90% of the total estimated contract volume.

As DSCP knew, the exercise of the options required UMS to remain able to perform its delivery obligations based on the estimated volumes.

### d) The Continuing Conduct of DSCP Evidences its Bad Faith

On February 22, 2002, UMS submitted twelve FOIA requests to DSCP pertaining to this claim. These FOIA requests included request number 10 seeking copies of claims submitted by other med/surg prime vendors and requests numbers 3 through 5 seeking the records that DSCP used to determine the estimated annual purchase volumes represented by DSCP to UMS and other potential Lone Star Region bidders under the 1993 Solicitation and Amendments 008 and 012.[73] DSCP, recognizing that a claim was being prepared, and without any explanation to support the accusation, accused UMS of submitting multiple requests for the purpose of avoiding payment of FOIA fees. DSCP then refused to

---

[72] Appendix II, Tab 4.

[73] Appendix II, Tab 18.

provide any documents under any of the FOIA requests unless it received a prepayment from bankrupt UMS of $85,961.00.[74] When UMS attempted to obtain documents detailing the calculation of the $85,961.00 fee, the request was denied by Linda Flatley, the contracting officer, based on a claimed "deliberative process" exclusion.[75] The denial did not include any *Vaughn* index or other acceptable substitute normally required when a "deliberative process exclusion" is claimed.

UMS requested mediation of its claims without having to go through the time and expense of the formal claims process. DSCP refused that request, notwithstanding contract modification 5, which represented that DSCP was committed to alternative dispute resolution at **any** stage of the process.

### e) Conclusions Pertaining to the Lack of Good Faith

Based on the facts, UMS believes that the following conclusions are justified and will be supported by fact discovery in the course of any necessary litigation in this matter.

DSCP knew that the representation of the contract value in the solicitation documents was false because of the significant probability that a substantial portion of the requirements would continue to be made through the credit card program and DSCP would not enforce the terms of the contract.

When DSCP exercised its unilateral renewal options, it knew that it had not solved the diversion of purchases problem and that continued renewal of the contract would impose continued and unfair financial hardship on UMS through risks that were never disclosed to or accepted by UMS during the solicitation period. It simply decided to leave UMS in limbo.

DSCP withheld timely payments due UMS on the ground that DSCP had not been paid by the medical treatment facilities for the products. DSCP represented it had the contractual right to withhold these payments, when in fact it did not have that contract right and did not even believe it had that right when it made contrary representations to UMS.

DSCP has exhibited a callous disregard for the rights of UMS and the substantial risks to its survival as a small business.

---

[74] Appendix II, Tab 19.

[75] Appendix II, Tab 19.

## II. QUANTUM

UMS submits this Claim to the Contracting Officer to be made whole. UMS is made whole only by an award and payment of $26,723,875.00, as summarized in the chart below and explained in the following narrative.

| Element of Claim | Dollar Amount |
|---|---|
| Lost Profits | $13,919,817.00 |
| Damage to Reputation | $11,000,000.00 |
| Unpurchased Stock Commitments | $ 120,540.00 |
| Equitable Adjustment for Early Termination | $ 1,683,518.00 |
| **TOTAL CLAIM** | **$26,723,875.00** |

### 1. Lost Profits

*T&M Distributors, Inc.*, ASBCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442 is a case decided in favor of the contractor on similar facts. The Board, at page 22, held the government was both liable to the contractor for the improper diversions and that the measure of damages is the amount necessary to place the contractor as good a position as it would have been had the government fully performed. That amount includes lost profits.[76]

In *T&M Distributors,* the Army had a requirements contract with T&M Distributors, but, in breach of that contract, the Army had purchased a substantial percentage of its needs from sources other than T&M Distributors, primarily

---

[76] DSCP also should consider that even if lost profits cannot be proved, UMS could, under the circumstances present here, recover for unabsorbed overhead. A claim based on unabsorbed overhead would exceed $10 million. *Wheeler Bros., Inc.* 79-1 B.C.A. (CCH) ¶13,642 (ABSCA 1979); *James S. Lee & Co., Inc. v. U.S.,* 9 Ct. Cl. 322 (1986).

through the use of government credit cards. The Board distinguished a change in requirements from a change in the source of those requirements. *T&M Distributors* at 15.

Under FAR regulation 52.216-21(c) and the contract, the DoD was required to purchase all of the scheduled supplies from UMS. Failure of the DoD to do so was an improper diversion, for which UMS is entitled to be made whole. *T&M Distributors, Inc, supra.* As the *T&M* Board held, "the Government does not have an arbitrary right under a requirements contract to develop and use its potential [third party source] capabilities at the expense of a contractor."

UMS also is entitled to be made whole, including recovery of lost profits, for breach of duty of good faith. UMS, to recover for breach of duty of good faith, is required to show that the government engaged in knowing and intentional misconduct. *Schweiger Construction Co, Inc. v. U.S.,* 49 Fed. Cl. 188 (2001). It can recover lost profits if the breaches were a substantial factor in causing the injury, the loss was natural and inevitable upon the breaches so that the government may be presumed from all circumstances to have foreseen it, and the losses can be established with reasonable certainty. *Energy Capital Corp. v. U.S.,* 47 Fed. Cl. 382 (2000). These criteria are self-evident from the facts as set forth in this claim.

Calculation of lost profits is a reasonably straightforward calculation. UMS has substantial historical information on its costs. Included in Appendix III, Tabs 1 through 3, are historical financials for fiscal years ending January 31, 1996 through January 31, 2000, plus historical financials for the three-month period ending April 30, 2001.

UMS had an independent CPA prepare proforma financials showing what UMS would, in reasonable probability, have made in profits had DSCP purchased its requirements from UMS and paid in accordance with the contract. Then UMS subtracted from that profit number the actual financial results UMS realized during the period that the Lone Star Region Prime Vendor Contract was in effect.[77]

---

[77] Appendix III, Tab 4. UMS is entitled to reasonable extrapolations in estimating DSCP's purchase requirements since the records that detail the exact amount of the improper diversions are peculiarly within the knowledge of the government. *T&M Distributors* at 19 and 20. DSCP never reduced the estimated purchase volumes during the entire four years of the contract or otherwise advised UMS that DSCP's original estimates were inaccurate. UMS, therefore, used DSCP estimated purchase volume representations in calculating lost profits.

In calculating profits to be made on the Lone Star Region contract, UMS made appropriate adjustments for the additional costs it would have incurred in supplying the additional supplies and equipment.

The period for which lost profits was calculated was limited to the period of June 1, 1997 through April 30, 2001. That was the period the contract was effective. The estimated sales to DSCP for that period, assuming performance based on the estimates represented by DSCP, would have been approximately $219,658,378. UMS's proforma profit had that sales level been achieved and payments timely made is estimated at $6,364,458. UMS actually experienced a loss during that period of $7,555,359.

The difference, and the amount of the claim for lost profits is $13,919,817.00. The calculation supporting this amount is shown in Appendix III, Tab 4.

**2. Damage to Reputation**

For the breaches of contract by the government, UMS is also entitled to recover damages to reputation and loss of goodwill if these damages were foreseeable, natural and probable at time parties contracted. *Olin Jones Sand Co. v. U.S.*, 225 Ct. Cl. 741 (1980).[78]

Prior to the contract, the government required a substantial amount of business and financial information on UMS. Consequently, at the time the parties contracted, the government knew that:

UMS was a small business;

---

[78] The Court of Claims in *Olin Jones* stated, "…it is alleged that, because of the [United States'] delay in making these contract payments, plaintiff could not meet payments owed to its employees, subcontractors and suppliers, under the instant contract, and also because of payment delays lost standing in the business community which resulted in a direct impact on the performance of the present contract. [footnote omitted]. It is impossible to say that this class of injuries cannot be shown at trial to have been a direct and foreseeable consequence of a delay in contract payments. Plaintiff may recover them if it can show that the Government's failure to make timely progress payments under the contract proximately resulted in damage of this direct type affecting this particular contract."

UMS expected the bulk of UMS sales during the five-year contract period to come from sales to DSCP;

UMS submitted as part of its offer, a contract protection requiring renegotiation if DSCP failed to purchase 90 percent of the estimated volume;

Profit margins on medical and surgical supplies are small;

DSCP contract was going to provide the majority of UMS's annual revenues as long as the contract remained in force and UMS had to make substantial reliance commitments in order to be capable of performing its obligations over a period of five years; and

A substantial failure in purchase commitments would be a financial disaster to UMS, unless, possibly, UMS was excused from performance under DSCP contract.

The methodology used by UMS to seek to estimate its claim for damage to reputation is as follows:

First, UMS asserts that, at the time of the Prime Vendor Contract Award, UMS had a reputation, and a good one. Its tenure in the business and the fact that it was selected to be the Lone Star Region's Prime Vendor is substantial evidence of a good reputation. Moreover, UMS's reputation may have been the most outstanding in the industry. In September 2000, *Repertoire,* a national publication of Medical Distribution Solutions, Inc., published survey results from the Physicians World Class Survey.[79] Respondents to that survey included both physicians and medical treatment facilities. The respondents evaluated three classes of distributors: national, regional, local, specialized and direct marketing. UMS had the highest overall sales rating among regional and national distributors, with a 96.84 rating. UMS was rated the best regional distributor in the United States. Only three distributors in the United States had higher ratings. Each of these was classified as a "local distributor."

---

[79] Appendix II, Tab 2.

UMS now has no reputation. In March 2001, UMS filed Chapter 11 bankruptcy proceedings. It is now being liquidated pursuant to a confirmed liquidating Chapter 11 Plan.[80]

The evidence of monetary damages to UMS's reputation is the arms-length merger and acquisition offers it had prior to or early in the contract term. UMS had two offers, both from Henry Schein, Inc.[81] The first Schein offer was October 23, 1998. Schein offered to purchase the equity in the company for $10 million *plus*, with the *plus* being based on the sale of certain assets of little interest to Schein. The second offer was dated January 25, 1999. In that offer Schein increased the purchase price to $10.5 million *plus*.

UMS's claim for damage to its reputation is computed by taking the larger Schein offer and adding $500,000 for the *"plus"* portion of the offer.

For its damage to reputation claim, UMS seeks a claim in the amount of $11,000,000.00.

**3. Failure to Purchase Stock Commitments**

UMS and the government established a process similar to a purchase order process. This purpose of this was to benefit both parties and to mitigate the problems caused by lack of accurate historical product usage data. The ordering facility would issue stock commitments on "Stock Commitment Memos," advising UMS of what medical and surgical supplies the facility would purchase during the next 30-day period.[82] The title was descriptive of the intent of the process. It was a commitment by the ordering facility to purchase the supplies listed on the Stock Commitment Memo. Some of the facilities, however, failed to honor their commitments, leaving UMS with supplies it could not economically return to the manufacture or resell.

The Hasting memo of February 14, 2001 to Linda Flatley, contract officer, and John Cuorato Chief, Med/Surg Products Group describes the UMS problem with stock commitments. Mr. Hasting stated,

---

[80] Appendix II, Tab 14.

[81] Henry Schein, Inc. is a large publicly traded corporation. Appendix II, Tab 15.

[82] *See,* examples of these memos at Appendix II, Tab 13.

> *[UMS] can provide Stock Commitment Reports, a list of material purchased and stocked by UMS at the customer's request, but never ordered by the customer. UMS has tried their best to sell that inventory to other customers, DoD and commercial. But after all they've done, there remains a residual inventory that just can't be sold. And almost all of it is either non-returnable or there's a significant manufacturer restock fee attached. UMS does not want to get stuck with this unmovable inventory. Mr. Bandy understands that the customer obviously doesn't want the material, but in-as-much as he purchased it at their request, he feels they have an obligation to purchase that material….And, of course, there's the ongoing issue of overdue payments.*[83]

UMS maintained reports listing the cost to UMS of unpurchased stock commitments.[84] A summary of these forms and calculation of claim amount is shown in the following chart:

| **Facility** | **Unpurchased Stock Commitments** | **Report Date** |
|---|---|---|
| Sheppard Air Force Base | $ 9,182.87 | Jan. 12, 2001 |
| Reynolds Army Community Hospital | $ 10,676.08 | Jan. 17, 2001 |
| Tinker Air Force Base | $ 10,557.00 | Jan. 15, 2001 |
| Altus Air Force Base | $ 4,034.32 | Jan. 17, 2001 |
| Holloman Air Force Base | $ 15,094.86 | Jan. 15, 2001 |
| Ft. Huachuca | $ 4,962.22 | Jan. 29, 2001 |
| Laughlin Air Force Base | $ 491.20 | Jan. 17, 2001 |
| Goodfellow Air Force Base | $ 1,646.22 | Jan. 17, 2001 |
| Dyess Air Force Base | $ 3,418.40 | Jan. 17, 2001 |
| Darnall Army Community Hosp. | $ 17,758.02 | Jan. 15, 2001 |
| Naval Hospital, Corpus Christi | $ 4,039.82 | Jan. 12, 2001 |
| Kirtland Air Force Base | $ 6,696.27 | Jan. 15, 2001 |
| Brooks Air Force Base | $ 4,636.70 | Jan. 12, 2001 |
| BAMC | $ 3,514.96 | Jan. 12, 2001 |
| Randolph Air Force Base | $ 1,857.20 | Jan. 12, 2001 |

Table Continued on Next Page

83 Appendix II, Tab 12.

84 Appendix II, Tab 16.

| Facility | Unpurchased Stock Commitments | Report Date |
|---|---|---|
| William Beaumont Army | $ 135,370.49 | June, 15, 2001 |
| Estimated purchases of committed stock by DoD immediately prior to the UMS bankruptcy | ($ 100,000.00) | |
| SUB-TOTAL | $ 133,936.63 | |
| Salvage (10%) | ($ 13,396.00) | |
| **TOTAL** | **$ 120,540.00** | |

For unpurchased stock commitments, UMS seeks a payment of the purchase cost of these products less an estimated salvage of ten percent of the purchase price.

The claim for unpurchased stock commitments sought by UMS is $120,540.00.

**4. Equitable Adjustment for Early Termination**

The contract was terminated 13 months prior to the end of the fourth option year. The UMS offer required as a contract condition renegotiation of the distribution fee if the government failed to purchase 90 percent of its estimate. If the government had purchased the estimate through the 47th month of the contract, it would have purchased $219,658,378.00. The estimated sales for the total five-year period were $272,268,314.00. The $219 million number is 80.6 percent of the $272 million number. UMS would have been entitled to a renegotiated distribution fee under the terms of its offer. UMS seeks an equitable adjustment of 3.2% of the difference between the two numbers, which is $1,683,518.00 ($52,609,936.00 x 0.032). The 3.2 percent is the expected profit percentage for the 12 months ended January 31, 2001 as shown in Appendix III, Tab 4.

## III. RESERVATIONS FROM CLAIM

UMS reserves its rights to seek payments for attorneys' fees under the Equal Access to Justice Act and its rights to seek payment of outstanding accounts receivable, including interest on such accounts.

## IV. ADR REQUEST

UMS previously requested mediation of this dispute. DSCP denied this request. UMS reasserts the request.

## V. CERTIFICATION

**I, WILLIAM BANDY, AS AN AUTHORIZED AGENT FOR UNITED MEDICAL SUPPLY COMPANY, INC, CERTIFY THAT THE CLAIM IS MADE IN GOOD FAITH; THAT THE SUPPORTING DATA ARE ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF; THAT THE AMOUNT REQUESTED ACCURATELY REFLECTS THE CONTRACT ADJUSTMENT FOR WHICH THE UNITED MEDICAL SUPPLY COMPANY, INC. BELIEVES THE GOVERNMENT IS LIABLE; AND THAT I AM DULY AUTHORIZED TO CERTIFY THE CLAIM ON BEHALF OF UNITED MEDICAL SUPPLY COMPANY, INC.**

______________________________________ Date: __________________ 2002.
WILLIAM BANDY
Authorized Agent, United Medical Supply Company, Inc. ("Claimant").

U.S. BANKRUPTCY COURT NORTHERN DISTRICT OF TEXAS
ENTERED
DEC 11 2002
TAWANA C. MARSHALL, CLERK
By ______ Deputy

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **UNITED MEDICAL SUPPLY CO.** | § | **CASE NO. 01-41911-BJH-11** |
| | § | |
| | § | |
| **Debtor.** | § | |
| | § | |
| **UNITED MEDICAL SUPPLY CO.,** | § | |
| | § | |
| **Plaintiff,** | § | **ADV. PRO. 02-4230-BJH** |
| **- against -** | § | |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| **Defendant.** | § | |

**ORDER TRANSFERRING ADVERSARY PROCEEDING**

On September 13, 2002, United Medical Supply Company, Inc. ("UMS") filed the above-captioned adversary proceeding against the United States of America (the "Defendant"). The dispute arises from a 1997 contract between UMS and the Defense Personnel Support Center, now known as the Defense Supply Center Philadelphia ("DSCP"), a component of the United States Department of Defense. UMS contends that the government solicited bids from UMS and others to sell medical supplies and equipment to Department of Defense medical facilities. UMS was the successful bidder, but alleges that the government breached its obligations under the contract causing UMS substantial damages.

UMS asserts that it has exhausted its administrative remedies. It filed a claim with the Contracting Officer at DSCP which was denied, and it submitted written requests for resolution of the dispute by the government's alternative dispute resolution procedures which were also denied.

12

The UMS complaint in this adversary proceeding is essentially an appeal of the adverse decision by the DSCP Contracting Officer. It contains claims for breach of contract and breach of a duty of care in preparing bid documents, and seeks actual and special damages, including lost profits and damage to reputation, interest and attorneys' fees. UMS contends that under judicial interpretations of the Contract Disputes Act of 1978, *see* 41 U.S.C. § 601 et seq. (the "CDA"), bankruptcy courts have concurrent jurisdiction to hear appeals from decisions of contracting officers.

Before the Court is Defendant's Motion to Dismiss Adversary Proceeding Without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims (the "Motion"). The Defendant asserts that the CDA gives jurisdiction solely to agency boards of contract appeals or the United States Court of Federal Claims. The Defendant further argues that even if this Court has concurrent jurisdiction over this dispute and thus deferral to the United States Court of Federal Claims is not mandatory, it should exercise its discretion to defer to that tribunal.

The Court agrees with the Defendant. Even if this Court has concurrent jurisdiction over this dispute, compare *Gary Aircraft Corp. v. United States (In re Gary Aircraft Corp.)*, 698 F.2d 775 (5th Cir. 1983) (concluding, prior to the enactment of the CDA, that the bankruptcy court improperly exercised jurisdiction over the liquidation of government contract claims) with *Quality Tooling Inc. v. United States*, 47 F.3d 1569 (Fed. Cir. 1995) (concluding that bankruptcy courts have jurisdiction concurrent with the United States Court of Federal Claims under the CDA), it concludes that deferral to the United States Court of Federal Claims is appropriate. It is a specialized court "accustomed to the intricacies of government contracts." *Quality Tooling*, at 1580. Disputes involving government contracts can be time-consuming, "complex, technical, esoteric, important and monumental." *Gary Aircraft*, at 779. There is no evidence that the dispute cannot be timely adjudicated by the United States Court of Federal Claims, and no showing that a transfer to that

forum would "cause substantial losses to the creditors of the bankrupt estate." *Quality Tooling*, at 1580. While UMS argues that all of the witnesses are here in the Northern District of Texas, the Court of Federal Claims hears cases throughout the United States and the Defendant has indicated that it would not oppose trial here. For these reasons, the Court concludes that transfer of this adversary proceeding to the United States Court of Federal Claims is appropriate.[1] It is therefore

ORDERED that the Motion is granted in part, and the Court shall defer consideration of the issues raised by this adversary proceeding to the United States Court of Federal Claims. The adversary proceeding is hereby transferred to the United States Court of Federal Claims, and the clerk is directed to take all steps necessary to complete the transfer.

SIGNED: December 9, 2002

Barbara Houser

**Barbara J. Houser**
**United States Bankruptcy Judge**

[1] At the December 2, 2002 hearing on the Motion, counsel for UMS requested that if this Court concludes that the action should proceed before the United States Court of Federal Claims, that it simply be transferred to that forum, to obviate the need for another summons and complaint. The Defendant consented to that procedure.

Moreover, UMS's contention that the Defendant waived its rights to seek dismissal or deferral is unpersuasive. UMS argued that the Defendant waived its right to object (or is estopped) by failing to object to confirmation of UMS's plan of reorganization. According to UMS, because its disclosure statement advised creditors that it intended to bring suit against the Defendant here in the Bankruptcy Court, and the Defendant failed to object to that statement in the disclosure statement or to confirmation of the plan, the Defendant is bound by confirmation to a trial here. The Court disagrees. While UMS told creditors it intended to bring suit in the Bankruptcy Court, it has done so. And now, the Defendant properly seeks dismissal or deferral.

CLOSED, TRANSOUT

**U.S. Bankruptcy Court**
**Northern District of Texas (Ft. Worth)**
**Adversary Proceeding #: 02-04230-bjh**

*Assigned to:* Barbara J. Houser
*Related BK Case:* 01-41911
*Related BK Title:* United Medical Supply Company, Inc.
*Demand:* $26000
*Nature of Suit:* 454

*Date Filed:* 09/13/02
*Date Terminated:* 04/15/2003

**Plaintiff**
-----------------------

**United Medical Supply Company Inc** represented by **Franklin L. Broyles**
Goins, Underkofler, Crawford & Langdon
1201 Elm St., Suite 4800
Dallas, TX 75270
214-969-5454
Email: frankb@gucl.com
*LEAD ATTORNEY*

V.

**Defendant**
-----------------------

**United States of America Dept of Justice** represented by **United States of America Dept of Justice**
PRO SE

| Filing Date | Docket Text |
|---|---|
| 09/13/2002 | 1 Complaint (02-4230) United Medical Supply Company Inc vs. United States of America Dept of Justice. NOS 454 Recover Money/Property . Filing Fee Received: $ 50.00 Receipt # 40083572 |
| 09/13/2002 | 2 Summons Issued on United States of America Dept of Justice (Herring,L.) |
| 09/13/2002 | 3 Standing Scheduling Order Setting Deadlines. Discovery and all exhibits except impeachment documents: 30 days prior, Pre-Trial Order: 7 calendar days prior, Proposed Findings of Fact and Conclusions of Law: 3 days prior to first scheduled docket call. ; Trial Docket Call Set For 1:15 2/3/03 at Room 204, Ft. Worth ;Trial |

| | |
|---|---|
| | Hearing Scheduled For Week of 2/10/03 at Room 204, Ft. Worth (Herring,L.) |
| 09/18/2002 | 4 Summons Served 9/17/02 on United States of America Dept of Justice. (Hunsuckle,J.) |
| 10/17/2002 | 5 Motion By Defendant United States of America Dept of Justice To Dismiss Adversary Proceeding without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims with Certificate of Service. (Hunsuckle,J.) |
| 10/17/2002 | 6 Motion By Defendant United States of America Dept of Justice To Dismiss Adversary Proceeding Without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims with Certificate of Service. (Hunsuckle,J.) |
| 10/29/2002 | 7 Notice of Hearing with Certificate of Service RE: [5-1] Motion To Dismiss Adversary Proceeding without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims by United States of America Dept of Justice Scheduled to 9:00 12/2/02 at Office, Ft. Worth, [6-1] Motion To Dismiss Adversary Proceeding Without Prejudice to Allow Plaintiff File Complaint in the United States Court of Federal Claims by United States of America Dept of Justice Scheduled to 9:00 12/2/02 at Room 204, Ft. Worth (Hunsuckle,J.) |
| 10/29/2002 | 8 Objection By Plaintiff United Medical Supply Company Inc with Certificate of Service To [5-1] Motion To Dismiss Adversary Proceeding without Prejudice to Allow Plaintiff to File Complaint in the States Court of Federal Claims by United States of America Dept of Justice, [6-1] Motion To Dismiss Adversary Proceeding Without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims by United States of America Dept of Justice . (Hunsuckle,J.) |
| 10/29/2002 | 8 Brief By Franklin L. Broyles for Plaintiff United Medical Supply Company Inc In Support Of [8-1] Objection by United Medical Supply Company Inc . (Hunsuckle,J.) |
| 11/13/2002 | 9 Response in Opposition By Defendant United States of America Dept of Justice with Certificate of Service To [8-1] Objection to Motion to Dismiss Case by United Medical Supply Company Inc . (Hunsuckle,J.) |
| 12/02/2002 | 10 Hearing Held Re: [6-1] Motion To Dismiss Adversary Proceeding Without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims by United States of America Dept of Justice, [5-1] Motion To Dismiss Adversary Proceeding without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims by United States of America Dept of Justice. (Under Advisement) (Hunsuckle,J.) (Entered: 12/11/2002) |
| 12/10/2002 | 11 Post- Hearing Brief By Plaintiff United Medical Supply Company Inc In |

| | |
|---|---|
| | Support Of Abstention with Certificate of Service. (Hunsuckle,J.) (Entered: 12/11/2002) |
| 12/11/2002 | 12 Order to Transfer to United States Court of Federal Claims . . (Hunsuckle,J.) |
| 12/12/2002 | 13 Letter by Frank L. Broyles concerning Supplemental Brief on Abstention Issue (Hunsuckle,J.) |
| 12/17/2002 | 14 (Unopposed)Plaintiff United Medical Supply Company Inc Request for Additional Findings and Conclusions in Connection with Defendant's Motion to Dismiss with Certificate of Service (Hunsuckle,J.) |
| 12/17/2002 | Exhibits, Date of Hearing 12/2/02 Re: [6-1] Motion To Dismiss Adversary Proceeding Without Prejudice to Allow Plaintiff to File Complaint in the United States Court of Federal Claims . (Hunsuckle,J.) |
| 12/24/2002 | 15 Order Granting [14-1] Plaintiff's Request for Additional Findings and Conslusions in Connection with Defendant's Motion to Dismiss by United Medical Supply Company Inc . (Hunsuckle,J.) |
| 01/22/2003 | 16 Hearing Held Re: [12-1] Order to Transfer to United States Court of Federal Claims . .(Stipulation to be filed regarding no appeal of Order of transfer, Case will then be re-sent to Court of Federal Claims) (Hunsuckle,J.) (Entered: 01/23/2003) |
| 01/27/2003 | 17 Stipulation By and Between Plaintiff United Medical Supply Company Inc, Defendant United States of America Dept of Justice Regarding Transfer to Court of Federal Claims and Waiving Right to Appeal Order, and Order of the Court Accepting the Stipulation (Hunsuckle,J.) |
| 01/30/2003 | 18 Hearing Held Re: [1-1] Complaint NOS 454 Recover Money/Property . Case transferred to Court of Federal Claims (McCrory,J.) |
| 02/18/2003 | 19 Certificate of Service Certified Copy of Order of Transfer; Original Docket Sheet; Claims Register and all other Original Pleadings. (Hunsuckle, J) (Entered: 02/19/2003) |
| 04/15/2003 | Disposition of adversary 02-4230 (McCrory, J.) |
| 04/15/2003 | Adversary case 02-4230 closed (McCrory, J.) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 12/29/2003 19:41:21 | | | |
| **PACER Login:** | gu0017 | **Client Code:** | United Medical 006 |
| **Description:** | Docket Report | **Case Number:** | 02-04230-bjh |
| **Billable Pages:** | 2 | **Cost:** | 0.14 |

CERTIFICATE OF SERVICE

On January 5, 2004 a genuine copy of the foregoing was served on the persons shown below by the method shown below in accordance with rule 5.1.

/s/ Frank L. Broyles

**PERSONS SERVED:**

Ms. E. Kathleen Shahan
Civil Division
U.S. Department of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875

Method Served: email

Mr. Kyle Chadwick
Civil Division
Department of Justice
8th Floor, 1100 L Street
Washington, D.C. 20530

Method Served: email