CLAIM

United Medical Supply Company, Inc., ("UMS") submits this claim for equitable adjustment and breach of contract to be made whole as a matter of right pursuant to the Contract Disputes Act of 1978.

This claim arises out of a 1997 requirements contract between claimant UMS and the Defense Personnel Support Center ("DPSC"), now known as the Defense Supply Center Philadelphia ("DSCP").[1] Subject to few exceptions, the contract provided that UMS would be the prime ("sole source") vendor for certain medical and surgical supplies to various Department of Defense medical facilities in the Lone Star Region, comprised of Texas, New Mexico and Oklahoma. In soliciting the contract, DSCP represented the estimated requirements, exclusive of any distribution fee to the Prime Vendor, at approximately $250 million over the base period and the four annual options.

Contrary to the terms of the requirements contract and the solicitation representations made by DSCP, the actual purchases under the contract by the facilities, including a 6.4% distribution fee, were only about $30 million, or approximately eleven percent of the DSCP estimate. As discussed in detail below, the evidence is overwhelming that the supplies and equipment that contractually were required to be purchased from UMS were actually purchased from other sources. These diverted purchases breached the UMS requirements contract and entitle UMS to the damages and contract adjustments set forth in this Claim.

The Lone Star Region requirements contract further provided that UMS would be paid within fifteen days from the date the government either received the invoice or the ordered supplies and equipment, whichever was later. DSCP routinely failed to make payments within the fifteen-day terms. Many payments were unjustifiably delayed for months.

UMS, at the time it entered into the Lone Star Region requirements contract with DSCP, was a small business located in Fort Worth Texas. As a result of the events described in this claim, UMS filed for Chapter 11 bankruptcy and is currently being liquidated pursuant to a confirmed Chapter 11 Plan.[2]

---

[1] For ease of reference, this agency is usually referenced by the single designation "DSCP," even though the reference may be to DPSC prior to the name change.

[2] Appendix II, Tab 14.

UMS submits this claim for $26,723,875.00. The components of the claim and calculation methodology are described below and in the referenced appendices. In summary, however, the claim components UMS is legally entitled to recover are lost profits of $13,919,817.00; unpurchased stock commitments of $120,540.00, damages to reputation of $11,000,000.00, and an equitable adjustment for early termination of the contract of $1,683,518.00.

## I. FACTUAL BACKGROUND

### A. PRIME VENDOR PROGRAM

Prior to 1990 and acquisition reform, DSCP had a monopoly on sales of medical and surgical supplies to DoD facilities. Acquisition reform changed that, and the DoD facilities were permitted to seek better service, better product or lower price from the vendors of their choice.[3] In response and in an effort to maintain its supply position, DSCP developed the Prime Vendor Program. (The program in which claimant UMS participated is usually referenced in this claim as the Prime Vendor Program.) In 2001, this program was replaced with the Prime Vendor II Program.[4] UMS did not participate in the Prime Vendor II Program.[5]

Under the medical and surgical Prime Vendor Program envisioned by DSCP, there were four types of participants in the program: (1) the DSCP customer or "end-user" medical treatment facilities ("MTFs"), *i.e.*, the DoD medical treatment facilities that purchased medical and surgical supplies and equipment, (2) DAPA-holders,[6] *i.e.,* medical and surgical product manufacturers or manufacturers' representatives, including minority manufacturers' representatives (3) regional sole source distributors, or Prime Vendors ("PVs"), and (4) DSCP as Prime Vendor Program administrator.

---

[3] Address by Colonel Joel Lamy, Director, Medical Material, DSCP, to the attendees of the PREPACs Conference held February 19, 1998 in Philadelphia, summarized on page 2 of the Memorandum of the meeting. Appendix II, Tab 1. PREPACs refers to "prepackaged medical procedural kits."

[4] Sometimes called by DSCP as "GEN II" or "Generation II."

[5] UMS submitted a proposal, but its proposal was rejected by DSCP.

[6] DAPAs, or Distribution and Pricing Agreements, are discussed in detail on the following page.

The purchasers of medical and surgical supplies were the participating DoD medical treatment facilities. DSCP administered the program for these facilities and charged an administrative fee to each facility of approximately 1.3% of the cost of the medical and surgical supplies purchased by that facility from the Prime Vendor. Almost all the medical treatment facilities in the Lone Star Region agreed to participate in the med/surg Prime Vendor Program.

One of the planned benefits of the program to the DoD was a ceiling on the cost that manufacturers of medical and surgical supplies and equipment could charge. This ceiling was the "rebated cost" of the supplies and equipment established by contracts between DSCP and the manufacturers, or manufacturers' representatives.[7] These contracts, known as DAPAs, an acronym for "distribution and pricing agreements," established the "after rebate" ceiling costs for each of the products to be distributed by the Prime Vendor. The DAPAs purportedly ensured that medical and surgical products could be purchased at or near the lowest price available. When the Lone Star Regional Prime Vendor contract was awarded, DSCP had over 120,000 DAPAs in effect.

Each regional Prime Vendor contractually agreed to accept orders from the facilities for all DAPA items and deliver the ordered items in accordance with the delivery terms, typically on a next business day basis, although the Prime Vendor contract provided for other shorter and longer delivery options.

The Prime Vendor was required to purchase and inventory the various DAPA items and maintain a 95% fill rate for orders submitted by the facilities. The Prime Vendor also was required to provide customer support to the facilities, including periodic visits to the ordering sites.

Upon receipt of an order the Prime Vendor would fill the order and include a packing slip invoice in the packing material. That packing slip included a 1.3% administrative fee charged by DSCP. The actual receivable maintained on the Prime Vendor's books excluded the DSCP administrative fee. DSCP was obligated to pay the Prime Vendor the actual receivable amount (*i.e.*, the packing slip invoice amount less the administrative fee) within fifteen days from date of the invoice or date product was received, whichever was later.

---

[7] The invoice cost to UMS often was more than the purchase price paid by DSCP. When the product or equipment was sold to the DoD facility, UMS would receive a manufacturer's rebate to reduce its cost to the DAPA amount. If the DoD did not promptly purchase and pay for the product or equipment, UMS could incur, and did incur, substantial costs associated with carrying either the unpurchased inventory or the delinquent account receivable.

The Prime Vendor, in exchange for the benefits of being a sole source, assumed the burden of inventory management. As noted by Michael Schmitt, then former Program Manager of the Med/Surg Prime Vendor Program at DSCP, this burden was not light. On July 10, 1997, Michael Schmitt sent a memo to all DAPA holders detailing the burden placed on Prime Vendors to ensure that the Prime Vendor stocked only products that would be purchased by the government. Specifically, the memo advised DAPA holders that the Prime Vendor was precluded from charging the government restocking charges and the Prime Vendor was obligated to accept returns from the government for any reason. To avoid the costs of stocking unneeded supplies and equipment and to provide the effective maintenance of an inventory of 120,000 plus (and growing) DAPA items, detailed product usage data was to be provided to the Prime Vendor by the participating medical treatment facilities. DSCP contractually agreed to provide that data as part of the transition and implementation period. This claim discusses the transition and implementation period in greater detail below.

## B. THE CONTRACT SOLICITATION AND AWARD

The key solicitation and contract documents are included and tabbed in Appendix I.

### 1. Solicitation Summary

In 1993 the Department of Defense, through the Defense Personnel Support Center, pursuant to Solicitation DLA120-93-R-0587, invited offers from private companies to become the Prime Vendor to the Department of Defense for various medical and surgical supplies and equipment in the Lone Star Region pursuant to a requirements contract. The Solicitation was amended several times, but the contract being solicited consistently remained a requirements contract. The primary amendments were the December 1995 Amendment 008 that replaced the Initial Solicitation and the first seven (7) amendments, and Amendment 012, which, among other things, contained a discussion of the SEED (Small Entrepreneurial Enhancement Development) program and added an annual maximum purchases notice that advised Prime Vendors that the contract would be cancelled and the program re-bid if purchases under the contract exceeded an annual maximum.

The Initial Solicitation, the Award, the Solicitation Amendments, and the Contract Modifications were clear with respect to the material terms of the contract being awarded. As discussed in detail below, these terms were:

(1) A representation that a Prime Vendor requirements contract under FAR clauses 52.216-1,[8] 52.216-9P06, and 52.216-21 was being awarded;

(2) Identification of the medical treatment facilities in the Lone Star Region that were participating in the Prime Vendor Program;

(3) Identification of the medical and surgical products and supplies that were included in the award;

(4) The estimated award value, calculated by DSCP in accordance with the solicitation formula;

(5) DSCP's payment for supplies and equipment sold would be made within 15 days of date the product and supplies were received by the ordering facility or date of invoice, whichever was later; and

(6) The contract term was a base year with four additional one-year options in favor of the government, pursuant to Clause 52.217-9P10.

**2. Solicitation Discussion**

**a) The 1993 Initial Solicitation**[9]

The Initial Solicitation ("1993 Solicitation") represented that a Prime Vendor Program was being established and that the Prime Vendor contract would be a requirements contract, under which the Prime Vendor would be the sole source of specified classes of brand name specific and generic medical and surgical supplies and equipment.

The Initial Solicitation "cautioned" that, "a requirements type contract is contemplated with the option to extend the contract for four additional one year periods…. Offers on the options are mandatory. Failure to offer on all options will result in an offer being eliminated from further consideration…."[10]

The government disclosed that,

---

[8] Amend. 008, at 79.

[9] Appendix I, Tab 1.

[10] 1993 Solicitation at 4.

> *Based on a 12 month reporting period, the medical treatment facilities that will be covered by the contract locally spent an estimated $27,500,000.00 per year for those types of consumable and disposable medical/surgical products and hand-held surgical instruments covered by the proposed contract.*[11]

As described below, this estimate was substantially increased, and proposed Prime Vendors were directed to use the increased estimate to determine their offers.

The government further represented in the Initial Solicitation that it would evaluate price offers by:

"(1) Multiplying the annual estimated requirements for the base ordering period and each option period by the offeror's distribution fee for each period and then (2) adding the dollar figure for each year to arrive at the total cost for the distribution fee for the entire 5 years."[12]

The Statement of Work represented that the Prime Vendor would provide "all medical/surgical products for which the Prime Vendor has been authorized as a distributor under the [Distribution and Pricing Agreements]." The government also represented that it would provide all DAPAs to the Prime Vendor.[13]

The Statement of Work dealt with implementation and transition.[14] The transition schedule specifically identified the facilities that would be participating in the Prime Vendor Program and provided deadlines for implementation of the Prime Vendor Program for those facilities. The deadlines specified in Attachment V varied from 60 days following the Effective Date of the Contract to 180 days.[15]

DSCP made a material commitment to potential offerors when it represented that "Participating facilities must provide the contractor with usage information six (6) weeks prior to start-up…. Items ordered by a facility whose usage data has not been provided or product quantities of [sic] the most recent month in question

---

[11] 1993 Solicitation at 6.

[12] 1993 Solicitation at 6.

[13] 1993 Solicitation at 7.

[14] 1993 Solicitation, SOW, at 3 and 4.

[15] Prime Vendor Program Commencement Schedule, 1993 Solicitation at 75.

exceeding the prior 45 day usage will be exempt from the [fill rate] calculation."[16] This commitment was critical to effective inventory management for several reasons, the most important being that ordered medical supplies often could not be returned to the manufacturer, if they could be returned at all, without a substantial restocking charge. Since the restocking charge could not be passed on to DSCP, it was imperative that UMS minimize ordering DAPA supplies the government would not purchase. UMS's ability to minimize the ordering of supplies not needed by DSCP was dependent on receiving accurate product usage information as contractually promised by DSCP.

DSCP emphasized, "THE MINIMUM REQUIREMENTS DESCRIBED IN THE ABOVE CITED STATEMENT OF WORK REPRESENT THE <u>MINIMUM</u> NEEDS OF THE GOVERNMENT. … SELECTION OF THE PRIME VENDOR WILL BE MADE BASED ON THE OFFER WHICH DEMONSTRATES THE HIGHEST PROBABILITY OF SUCCESSFUL PERFORMANCE AT A REASONABLE, REALISTIC PRICE WHERE TECHNICAL QUALITY IS MORE IMPORTANT THAN PRICE…."[17]

The Solicitation incorporated FAR Requirements Clause 52.216-21(c), which stated the requirements and DSCP's obligation to purchase the participating medical treatment facilities requirements from UMS. It stated,

> *(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.*[18]

Proposed exceptions to DSCP's obligations to purchase all requirements from UMS were identified in the Solicitation at pages 21, 33 and 34. The Solicitation incorporated and quoted FAR clause 52.216-9P06 which excluded from the requirements clause orders of less than $50.00.[19]

Proposed exclusions under FAR clause 52.216-21(e) were orders for supplies "urgently required by the Government" before the date that the Prime Vendor was

---

[16] 1993 Solicitation at 8.

[17] 1993 Solicitation at 15.

[18] 1993 Solicitation at 34.

[19] 1993 Solicitation at 33.

required to make such delivery and the Prime Vendor refused the accelerated delivery.[20]

Proposed exclusions under FAR clause 52.216-9P13 were orders for supplies available from depot stock, routine orders which the Prime Vendor could not fill due to backorders from the manufacturer; emergency orders which could not be filled within two hours of order, and orders which were required to be filled from the Federal Prison System or certain other special programs.

The Solicitation documents also provided that DSCP would not have to use the Prime Vendor to fill orders of less than $50.[21]

Finally, the Solicitation also incorporated FAR's Prompt Payment clause and specifically amended the clause to provide for 15-day payment under FAR 52.235-25(a)(2)(i-ii).[22]

The Initial Solicitation addressed various other factors. It included socioeconomic provisions that UMS would be required to implement and stated that the government reserved the right to make an award for less than 100 percent of its estimated requirements.[23] The government did not exercise that right.

On September 14, 1993, United Medical submitted its initial proposal in response to the government's Initial Solicitation.[24] The initial prime vendor contract for the Lone Star Region, however, was awarded to Owens & Minor.

**b) The 1995 Amendment 008**[25]

On December 4, 1995, due to the failure of Owens & Minor to perform under the 1993 Solicitation, the government re-solicited offers by means of Amendment

---

[20] 1993 Solicitation at 34.

[21] 1993 Solicitation at 33.

[22] 1993 Solicitation at 28.

[23] 1993 Solicitation at 66.

[24] Appendix I, Tab 1.

[25] Appendix I, Tab 2.

008.[26] Amendment 008 provided that the government could accept offers in response to the Initial Solicitation and amendments 001 through 007 as an offer under Amendment 008.[27]

One important difference between the Initial Solicitation and Amendment 008 was the change in DSCP's representation regarding the estimated volume of medical and surgical supplies and equipment to be purchased. DSCP's representation in Amendment 008 was:

> Estimated Annual Requirements:
>
> *Based on a 12-month reporting period, the medical treatment facilities that will be covered by the contract locally spent an estimated $57,665,500 per year for those types of medical/surgical products covered by the proposed contract. No guarantee is given that this volume will be purchased. It should be noted that during the first year of the contact [sic] each facility will begin to reduce its existing inventory of medical/surgical products. Orders will be placed with the Prime Vendor as existing* inventories *are reduced to lower levels This may effect the volume of ordering during the base ordering period.*[28]

Amendment 008 incorporated FAR clauses 52.216-1 and 52.216-21 and continued the government's constant drumbeat that the contract was a requirements contract by specifically stating that the contract was a "Firm Fixed Price Requirements Contract."[29]

Amendment 008 further restricted the government's right to purchase from alternative sources by substituting FAR clause 52.216-9P06 for FAR clause 52.216-9P13, which limited the exceptions to the government's obligation to order from

---

[26] The performance failure of Owens & Minor is based statements made by DSCP personnel. UMS has no independent knowledge on this issue.

[27] Amend 008 at 3.

[28] Amend 008 at 12.

[29] Amendment 008, at 45, 46, and 79.

UMS to either orders for less than $50.00 or emergency orders that could not be promptly filled by UMS.[30]

Amendment 008 additionally incorporated FAR Clause 52.217-9p14(M), which adopted the same "Evaluation of Offers" language contained in the Initial Solicitation.[31] Amendment 008 gave the government the right to add or delete ordering facilities and to change the Contract Estimate based on such additions or deletions.[32] During the term of the contract DSCP added two major purchasing facilities, later deleted one of those facilities (Ft. Huachuca, AZ), and deleted one minor clinic.[33]

The implementation and transition plan was changed to provide that the contractor would be given 120 days following the acceptance by the government of the Prime Vendor's implementation plan. The implementation plan accepted by the government required it to provide United Medical with usage data.[34]

Amendment 008 contained the same 15-day payment terms included in the Initial Solicitation.[35]

**c) DSCP's Lone Star Region Recap**[36]

On January 17, 1996, shortly after issuing Amendment 008 to the Solicitation, DSCP provided United Medical with an 8-page written summary of the Lone Star Prime Vendor Program. Captioned, "Lone Star Region Recap," this document summarized DSCP's interpretation of the key program points. Some of the points made in the Recap relevant to this claim were:

---

[30] Amend 008 at 45, 46. Compare page 21 of the Initial Solicitation at 21 with Amendment 008 at 45.

[31] Amend. 008 at 12 and 89.

[32] Amend. 008 at 13.

[33] The largest added purchasing facility was AFMLO/OL-2, Ft. Worth, Texas, with estimated annual purchases of $400,000.00. Appendix I, Tabs 6 and 7.

[34] Amend. 008 at 27.

[35] Amend. 008 at 40.

[36] Appendix I, Tab 3.

*Estimated [Annual] Sales: $57,655,500.00*
*(Initial year may be lower due to Inventory reduction.)*

*Facility Cost:* *DAPA/IDTC Price*
+ *PV Fee (%)*
+ *1.3% = DPSC Fee*

*Minimum Order:* *$50.00*

*Payment: 15 days Via Electronic Funds Transfer (EFT)*

*Commence performance not later than 120 days after approval of plan.*
*(If first PV award.)*

*Implementation time based on government providing usage data to PV within 10 days of award.*

*Facility will reduce on-hand stock during transition period.*

**d) The 1996 Amendment 0012**[37]

DSCP issued Amendment 0012 on February 7, 1996. UMS submitted its offer on the form and in accordance with the terms and requirements contained in Amendment 0012. The material terms on which UMS relied in making its offer were carried forward from Amendment 008. Amendment 0012 contained a provision for yearly maximums, which were approximately 210% of the estimated yearly purchases. The effect of the yearly maximums was to notify the Prime Vendor that if purchases under the contract exceeded any yearly maximum, the contract would be re-bid for the next year. P. 5.

Amendment 0012 incorporated and quoted in full the clause 52.217-9P10, "OPTION FOR REQUIREMENTS CONTRACT TERM EXTENSION (PRIME VENDOR)." The option was a one-way option solely in favor of DSCP.

Amendment 0012 reiterated that the annual purchase volumes were estimated to be $57,982,750.00 after the initial year and directed the offerors to rely on this estimate. Specifically, the government stated:

---

[37] Appendix I, Tab 4.

*Based on a 12-month reporting period, the ordering facilities that will be listed in Attachment III spent an estimated $57,965,500 per year for those types of medical/surgical products covered by the proposed contract. Based on this figure, the following is the Government's best estimate of yearly sales that the ordering facilities will experience over the five year period.*[38]

| | *Yearly Estimate* | *Approximately Yearly Maximum* |
|---|---|---|
| *First Year* | *$ 28,982,750.00* | *$ 72,456,875.00* |
| *Second Year* | *57,965,500.00* | *144,913,750.00* |
| *Third Year* | *57,965,500.00* | *144,913,750.00* |
| *Fourth Year* | *57,965,500.00* | *144,913,750.00* |
| *Fifth Year* | *57,965,500.00* | *144,913,750.00* |

Following the above table providing the purchase estimates, Amendment 0012 further emphasized that the offer should be based on these estimates and instructed offerors that, "*Your proposed distribution fee should be based on the Yearly Estimate….*"[39]

In Amendment 0012, DSCP provided a calculation example of how offers would be evaluated. That calculation again represented that the annual estimates did not include any distribution fee.[40]

---

[38] Amend. 0012 at 5.

[39] Amend. 0012 at 5.

[40] Amend. 0012 at 7 and 8.

## C. UNITED MEDICAL SUPPLY COMPANY, INC. AND ITS PROPOSAL

### 1. Background of United Medical Supply

United Medical Supply Company was established in Fort Worth, Texas in 1980 as a Texas corporation. It enjoyed a 21-year history as a reputable regional distributor of medical supplies to various governmental entities and private industry. It typically employed about 150 employees and numerous other independent contractors and small businesses. Its annual revenues, exclusive of the Lone Star Region Prime Vendor contract, grew to approximately $60 million.[41] In sum, UMS was a reputable and responsible corporate citizen in the Fort Worth community.

Throughout its 21-year history United Medical was a small business whose only business was distribution of medical supplies and equipment to hospitals, physicians and other medical providers on a regional basis. It enjoyed an excellent reputation. Its tenure in the business and the fact that it was selected to be the Lone Star Region's Prime Vendor is substantial evidence of that good reputation. Moreover, UMS's reputation, at one time, was one of the most outstanding in the industry. In September 2000, *Repertoire,* a national publication of Medical Distribution Solutions, Inc., published survey results from an earlier independent Physicians World Class Survey.[42] Respondents to that survey included physicians and various medical treatment facilities. Five classes of distributors were evaluated: national, regional, local, specialized and direct marketing. The evaluations were based on sixteen criteria. Based on those sixteen criteria, UMS was rated the best regional distributor in the United States and fourth highest overall distributor out of the 567 distributors evaluated. UMS's rating of 96.84 percent was higher than any national or other regional distributor. Only three local distributors had higher ratings.

As a result of the events described in this claim, UMS ran into severe credit problems in 2000 and ultimately filed for Chapter 11 bankruptcy protection in March 2001. Shortly before the time it initially encountered these credit problems, UMS had received buyout offers in the $10 million range, which are discussed in more detail below. Naturally, the Chapter 11 proceedings slammed shut the door of reasonable buyout possibilities. UMS currently is being liquidated pursuant to a confirmed Chapter 11 plan.

---

[41] Appendix III, Tabs 1 – 3.

[42] Appendix II, Tab 2.

**2. UMS's Reliance on the Solicitation Documents and its Decision to Offer**

UMS read carefully the Solicitation and amendments when received. Amendments 008 and 0012 contained the offer forms and terms on which UMS submitted its offer. They contained various material terms, including:

(1) "The prime vendor SEED concept [was] an attempt to ensure growth opportunities and participation of small business and small disadvantaged business concerns in the Prime Vendor Program."[43]

(2) "A requirements type contract [was] contemplated with the option to extend the effective period of the contract for four additional one year periods."[44]

(3) Estimated yearly requirements were based on previous usage as reported by the facilities. The estimates, exclusive of distribution fees, were for $28,982,750 in year one and $57,965,000 each year thereafter. UMS was instructed to propose a distribution fee based on these estimates.[45]

(4) The government's right to purchase supplies and equipment from third party sources, i.e., not UMS, was limited to orders under $50 and emergency orders UMS could not fill.[46]

(5) The DAPA listing of products included in the requirements contract was estimated to include an initial 122,000 medical and surgical items and to grow to 500,000 items.[47]

(6) Payment to UMS would be by EFT in 15 days from the later of the date the invoice was received or the date the goods were delivered.[48]

---

[43] Amend. 0012 at 3.

[44] Amend. 008 at 5; Amend. 0012 at 4.

[45] Amend. 0012 at 5.

[46] Amend. 0012 at 33.

[47] Amend. 0012 at 14. UMS actually loaded 190,000 DAPA items into its database.

As previously discussed in this claim, the potential sales volume and prompt payment terms were extremely appealing to and relied on by UMS both in making a decision to respond to the Solicitation and in calculating its proposed distribution fee. The importance of the contract size is evident. It would almost double the annual revenues of UMS. In responding to the Solicitation, United Medical spent hundreds of hours preparing its offer and amendments. It confirmed with both Michael Schmitt – then Program Manager, Med/Surg Prime Vendor, Directorate of Medical Materiel and Margaret Rees, his supervisor and then Chief of Medical/Surgical Products Group -- that the Lone Star Region would produce the volume of sales revenues estimated in the Solicitation and that that invoices submitted by United Medical would be paid within the 15 day contractual period. Shortly after the award, but before the effective date, UMS confirmed with Linda Flatley, then Chief, New Initiatives Section and the contracting officer, that UMS could rely on the requirements representations and terms of the solicitation and contract.

Prompt payment of invoices was essential to UMS. The Solicitation and contract represented that DSCP would pay each invoice within fifteen days of receipt of the invoice or, if later, delivery of the product. UMS relied on the accuracy of that representation in preparing its offer and calculating its projected cash flow and future cash needs. The projected profits estimated by UMS through the Prime Vendor Program were reasonable, but, like UMS's cash needs, they were very much tied to 15-day payment by DSCP.

The DSCP estimates could not be met by UMS without timely payment in accordance with the terms of the contract. UMS, as a small business, did not have the internal financial capability to fund the projected sales growth. It sought and obtained a substantial line of credit to be used on an emergency basis, but the primary source of funds necessary to sustain the projected sales was DSCP, and prompt payment was as necessary as the size of the payment.

Also critical to UMS was accurate and complete product usage data. As a small business, UMS could not risk inventorying products the ordering facilities seldom or never purchased, or inventorying too much of given products. The primary tool for avoiding these problems was accurate and complete product usage data that, pursuant to the contract, was to be supplied by DSCP or the medical treatment facilities.

---

[48] Amend. 008 at 40. UMS's practice was to electronically invoice DSCP when the order was shipped.

The Solicitation documents and repeated discussions with DSCP personnel assured UMS that it could rely on the Solicitation documents, especially in the volume, payment terms and product usage data representations of DSCP. If UMS had had any significant reservations in these areas, it would not have submitted an offer.

United Medical would not have submitted its offer but for the fact that the contract being awarded was a requirements contract for purchase volumes represented by DSCP been represented as substantial, that payment for the purchases would be made within fifteen days of invoice or product delivery, and that the DoD would provide accurate product usage data. The UMS decision to submit an offer and its proposed distribution fee were premised on these representations.

### 3. Distribution Fee Proposed

UMS, in total reliance on the material representations by DSCP, submitted its offer on February 26, 1996, and proposed a distribution fee of 6.4% of the DAPA cost of the supplies and equipment sold under the contract. UMS projected its profits and cash flows on the material representations and determined that a 6.4% distribution fee for the volume estimated by DSCP paid within fifteen days of invoice would yield a reasonable profit.

UMS took into account the risk that the requirements of the ordering medical treatment facilities might not reach the DSCP projections. UMS considered this unlikely because the estimated volumes were purportedly based on historical usage volumes and DSCP had represented that the DAPA product list was projected to grow from 122,000 items to 500,000. Nevertheless, because of the significant consequences to UMS if the estimated sales volume was not achieved, it protected itself against this contingency by including in its offer a contract condition requiring renegotiation of the distribution fee if the requirements did not reach at least 90 percent of the stated contract award.[49]

The offer proposal offered by UMS was accepted by DSCP as written, including the right to the renegotiated distribution fee described above.

---

[49] Response to Amend. 0012 at 2. Appendix I, Tab 4. This right to a renegotiation was carried forward from UMS's response to Amend. 008 at 6. Appendix I, Tab 2.

## D. THE CONTRACT AWARD AND MODIFICATIONS[50]

On January 30, 1997, and over the protest of two national distributors who had submitted competing offers, Claimant United Medical was awarded Prime Vendor contract number SP0200-97-D-7133 effective June 1, 1997, consistent with the solicitation. The Award, signed by Linda Flatley as the Contracting Officer, assigned an "Estimated Dollar Value for the Base Year of $30,177,346.00 and an Estimated Total Contract Value of $272,268,314.00.[51]

The award also incorporated the Solicitation Terms into the Contract and specifically identified the 32 ordering (i.e., purchasing) governmental units that were participating in the Lone Star Region's Prime Vendor Program. Block 18 of the Award incorporated the terms of the UMS offer as follows:

> *Your offer on Solicitation Number DLA120-93-R-0587, including the additions or changes made by you which additions or changes are set forth in full above is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation* ***and your offer****, and (b) this award/contract. No further contractual document is necessary.* Bolding added.

Under this term of the award, incorporated into the contract and accepted by DSCP was the right of UMS right to a renegotiated fee if DSCP's requirements did not equal at least 90% of the DSCP requirements estimate.

Shortly after the award, Brooke Army Medical Center, one of the participating facilities in the Lone Star Region Prime Vendor Program, raised an issue concerning its obligations to purchase DAPA products solely from UMS. UMS was concerned about making capital investments if the contract was not a requirements contract. It immediately requested confirmation for DSCP that the award was for a requirement contract and that the obligations were absolute. See footnote 52. On March 4, 1997, it received that confirmation from Linda Flatley, contract officer and then Chief, New Initiatives Section. She stated in response:

> ***United Medical should not be reluctant to invest in capital commitments, but should proceed with full implementation as quickly as possible. Colonel***

---

[50] Appendix I, Tabs 5 – 11.

[51] Award at 1.

> ***McNabb, as well as DPSC, will provide complete support during the transition period and beyond.***[52]

Following the award, there were several subsequent material modifications to the contract. Modification No. 5, effective June 18, 1997, committed DSCP to alternative dispute resolution at any stage of a dispute; Modification No. 6, effective June 30, 1997, added AFMLO/OL-2, Ft. Worth, TX, as a purchasing facility with estimated annual purchases of $400,000.00.[53]

Modification No. 10 signed by Linda Flatley for DSCP on May 27, 1998, effective June 1, 1998, exercised option year 1.[54]

Modification No. 16 signed by James Jenning for DSCP on May 11, 1999, effective June 1, 1999, exercised option year 2.[55]

Modification number 21 signed by Donna Kennedy for DSCP on May 22, 2000, effective June 1, 2000, exercised option year 3.[56]

Modification No. 26 terminated the contract effective April 30, 2001.[57] The ostensible reason given by DSCP for the termination was that it was implementing the Prime Vendor II Program.

## E. UMS POST AWARD PERFORMANCE

### 1. The Transition and Implementation Period

The contract discussed, in detail, transition and implementation. In summary, the transition and implementation period was a 120-day period beginning when the government approved the UMS implementation plan. Primary transition and implementation activities included: software installation, training on software use, evaluation of usage data to be provided by the government,

---

[52] Appendix II, Tab 3.

[53] Appendix I, Tabs 6 and 7.

[54] Appendix I, Tab 8.

[55] Appendix I, Tab 9.

[56] Appendix I, Tab 10.

[57] Appendix I, Tab 11.

attempted verification of usage data provided by the government, and data input for approximately 190,000 DAPA items.

From UMS's standpoint, the most important transition objective it needed accomplished was receipt of complete and accurate product usage data for the participating facilities, as promised in the Solicitation and Award. DSCP had ultimate responsibility for this obligation. As discussed elsewhere, DSCP did not faithfully discharge this obligation and UMS never obtained accurate and complete product usage data, although UMS devoted an inordinate amount of manpower attempting, unsuccessfully, to obtain this data from the participating medical treatment facilities and the former Prime Vendor, Owens & Minor.

**2. Post Transition Period**

**a) UMS Performance**

To ensure that adequate inventory could be housed and that deliveries would be timely, UMS added warehouse space -- including a new 32,000 square foot facility in El Paso Texas, a 16,000 square foot addition to the San Antonio warehouse, and special climate controlled warehouse sections in Fort Worth and El Paso. It purchased substantial computer hardware and software to handle the ordering and invoicing process demanded by the government. Its fill rates typically were in excess of the 95% contract specification. On occasion the lack of accurate and complete usage data and other problems at the ordering facility prevented a 95% fill rate.

When the government notified UMS of problems, either with an ordering facility or with DSCP, UMS responded promptly and professionally to resolve the problem.

Eventually DSCP terminated the contract early by means of modification 26, which terminated the contract in April 2001, just before the end of the third option year. The reason given by DSCP was that it was implementing Prime Vendor II. The contract was not terminated for any performance problems attributable to UMS; the government did not attempt to hold back any payments due UMS as damage offsets; and the government did not alleged that it suffered damages from any breach by UMS. To the contrary, as discussed below, the government periodically admitted that it failed to perform its obligations under the contract and told UMS that it was pleased with its performance as a Prime Vendor.

When UMS was awarded the contract, it prepared to supply the DoD approximately $300 million of medical and surgical products and supplies over a five-year period. The DoD estimate of product it would purchase, as modified by

Modification 006 to the award, was $274,268,214.00. DSCP actually purchased approximately $31,000,000 of products and supplies, or about eleven percent of the DSCP estimated contract volume.[58]

## F. DSCP CONDUCT AND BREACH

The Lone Star Region Prime Vendor contract was a disaster for United Medical Supply. The disaster began during the transition period when UMS was not able to get accurate and usable product usage data from the government. The disaster continued when the Government ordering facilities diverted most of their product and supply purchases from UMS to other sources and when the payments due UMS for product actually purchased often were delayed substantially beyond the 15 day period specified in the contract.

### 1. Breach by Diversion of Purchases

The government's diversion of purchases away from the UMS contract was the most egregious breach by the government. The evidence of diversion is undeniable and compensable. See, *T&M Distributors, Inc.*, ABSCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442.[59]

Standing alone, the dramatic disparity between the DSCP estimates and actual purchases provides compelling evidence that substantial diversion occurred. The government cannot argue in good faith that the actual purchases of a small fraction of the estimate were due to reduced requirements by the government. Such an argument would make a mockery of the estimates and the March 4, 1997 Flatley directive to UMS that UMS should not be reluctant to invest in capital commitments. This disparity is shown simply in the charts on the next page.

---

[58] UMS's records indicate that immediately prior to filing its Chapter 11 petition, the actual volume purchased from UMS by DSCP over the 47-month contract period was $31,869,516.19. Appendix III, Tab 5.

[59] *T&M Distributors* opinion attached at Appendix II, Tab 20. References to specific opinion pages refer to the page numbers of the format as printed in the Appendix.

## TABLE I

**Comparison of Estimated Dollar Volume of Purchases with Actual Dollar Volume of Purchases (Millions of $$)**

| | Base Year | Option Year 1 | Option Year 2 | Option Year 3 | Option Year 4 | Totals |
|---|---|---|---|---|---|---|
| DSCP Estimated Purchases, (including facility added by Mod 006) (millions $) | 30.4 | 60.9 | 60.9 | 60.9 | 60.9 | 274.0 |
| Approximate Actual Purchases (millions $) | 6.4 | 8.4 | 10.6 | 6.5 | 0.0 | 31.9 |

## TABLE II

**Percentage of Actual Dollar Volume of Purchases to Estimated Dollar Volume of Purchases**

| | Base year | Option Yr. 1 | Option Yr. 2 | Option Yr. 3 | Option Yr. 4 | Total |
|---|---|---|---|---|---|---|
| % Actual/ Estimated (*including* option yr. 4) | 21.0% | 13.8% | 17.4% | 10.7% | 0.0% | 11.6% |
| % Actual/ Estimated (*excluding* option yr. 4) | 21.0% | 13.8% | 17.4% | 10.7% | n/a | 15.0% |

Additionally, there are at least two documents in which DSCP or its representatives admit that diversions occurred. Both blame the problem on the use by the medical treatment facilities of government credit cards. The first is a 1999 predecessor to the DSCP 2000 Prime Vendor II Solicitation. In an Addendum to Solicitation SP0200-99-5003, DSCP recognized that its "sole source" obligations of Prime Vendor I (the UMS program) were not met. DSCP does not disclose in the SP0200-99-R-5003 Solicitation that the failure to meet these obligations was attributable to its own mismanagement. In the Solicitation SP0200-99-R-5003, DSCP summarized the history of the Prime Vendor Program in which UMS had participated and stated, "Currently DSCP's PV Med/Surg contract sales worldwide are averaging eight million four hundred thousand dollars per month. ***The MTF's [Medical Treatment Facilities] estimate the balance of Med/Surg items are purchased directly from manufacturers and dealers using government wide commercial purchase cards and/or local purchase methods. It can be assumed the percentage of DSCP Med/Surg PV sales to total Med/Surg sales is relatively consistent across regions***. DSCP PV Medical/Surgical sales **worldwide** were $69.3 million and $97.5 million for fiscal years 1997 and 1998 respectively."[60] Emphasis added.

Even after disclosure in the SP0200-99-R-5003 solicitation that purchasing organizations were not complying with the sole source requirement of the Prime Vendor Program, DSCP continued to emphasize that the Prime Vendor Program was a sole source program. On January 13, 2001, too late to help UMS, the government published a *Prime Vendor Program Overview* in *DEFENSE MEDICAL MATERIAL ONLINE*.[61] The *Overview* featured the benefits of the Prime Vendor Program, including "Best Overall Pricing in the Industry," "Lowest Delivered Cost of an Item," "Lower Inventory Requirements," "**True Partnership with Distributor,"** and "One Stop Shopping." The *Overview* then addressed several questions. One of particular importance to this claim is the question,

> **Can [a DoD facility] partially use the Prime Vendor Program?"** [DSCP ANSWER]: "No, because the Prime Vendor Program is based on a requirements contract. If [the facility] elect[s] to participate in the program, [it] must

---

[60] Addendum to Standard Form 1449 at 6. Appendix I, Tab 12. In other words, the world-wide sales by all Prime Vendors of medical and surgical products in 1997 was barely above the estimate given to UMS for sales in the three state Lone Star Region.

[61] Appendix II, Tab 4.

> buy all [its] recurring items for that commodity line from the Prime Vendor. For example, if [it signs]-up for the pharmaceutical program [it] must buy all [its] pharmaceuticals from the Prime Vendor.

UMS does not know if the Prime Vendor II contract as awarded was ever changed to a requirements contract. The solicitation, however, did not contemplate awarding a requirements contract, but rather, under FAR Clause 52.216-22, contemplated awarding two indefinite quantities contracts with guaranteed minimums.

These admissions by DSCP are further confirmed in an article co-authored by Mr. Michael Schmitt, the former Program Manager, Med/Surg Prime Vendor, Directorate of Medical Materiel with whom UMS dealt in the early stages of the solicitation and contract.[62] The article focused on the problem of improper diversions. Mr. Schmitt attributed the improper diversion to two factors. One was the use of government credit cards by DoD "physicians, nurse supervisors and clinical director types." His article includes a chart detailing credit card purchases during 1999. According to Mr. Schmitt, during 1999 each DoD Agency used credit cards over 90 percent of the time to pay for transactions involving less than $2,500.00.[63] The credit card transaction volume, according to Schmitt, exceeded 3 billion dollars.

Schmitt further attributed the failure of the program to meet expectations to the fact that logistics officials and officers at medical treatment facilities did not implement the program consistently, that shortcuts to implementation were numerous, and previous practices of acquiring needed supplies directly from vendors continued.

The evidence consistently and substantially points to the fact that orders were diverted from the Prime Vendor, UMS, in breach of the UMS requirements contract. Proof of bad faith is not required to recover for breach by diversion, only that the diversion occurred and caused damages. *T&M Distributors, Inc.*, ASBCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442, at 21.

---

[62] Schmitt, *Government Prime Vendor Programs, No Sure Thing, Repertoire*, May 2000, at 48. Appendix II, Tab 5.

[63] Based on information and belief, some officers at the ordering facilities had $25,000 daily credit card authority.

## 2. Breach of Payment Obligations

The contract provided that DSCP would pay UMS within fifteen days of invoice or product delivery, whichever was later. This routinely was not done. A common excuse used by DSCP for breach of its payment obligations was that it had not received payment from the appropriate medical treatment facility.[64] That excuse is not supported by the contract and is discussed in more detail under the Breach of Duty of Good Faith below.

On April 4, 2001, at the time UMS was forced to file for Chapter 11 bankruptcy protection, outstanding invoices to DSCP in the 30 to 120+ day category were $275,171.34.[65] Mr. John S. Cuorato, Chief, Med/Surg Products Group, previously assured UMS on February 26, 2001 that UMS would *eventually* get paid if it could prove delivery.[66] That assurance was too little, too late to aid UMS in its fight for survival.

The failure to timely pay caused UMS a variety of problems, ultimately leading to its bankruptcy. First, it drove up UMS's cost of goods. UMS needed DSCP funds to pay its bills. UMS's suppliers, including suppliers under DAPAs and others, often charged UMS increased unit prices if UMS did not pay according to terms, typically 30 days. Further, many suppliers charged additional interest and late fees. UMS's secured lender excluded many of the overdue invoices from UMS's borrowing base, reducing its ability to borrow to purchase supplies and equipment. The ultimate problem and result was UMS's inability to obtain a substantial portion of the needed supplies because suppliers quit shipping.

A typical example is illustrated by a September 18, 2000 letter and memo from Megan Edmunds, United Medical's Director of Credit, to Mr. Greg Wentzel at DSCP. In that memo she states,

> The enclosed material relates to the Holloman calls Q063 and Q158 that remain open from 1997. This matter has been passed on to many people over the almost three years that it has remained open on our accounts receivable.

---

[64] *See,* Appendix II, Tab 8.

[65] Appendix II, Tab 6.

[66] Appendix II, Tab 7.

> United Medical Supply was asked by Holloman Air Force Base to place a special surge order for their purchase of Dittmar item 410015, UMS0185580 on September 1997. These instruments were not for inventory but to be used in case of deployment. The items were to be place in containers on C-130s and C-5s for supplying the Stealth Fighters.
>
> Due to the unusual quantity and special nature of this item, Joe Velasques, former Director of Operations- United Medical Supply, El Paso, specifically asked SSt Gunterman when the requirement report was delivered if they would use the specified amount of this item. She confirmed that Holloman indeed would. Upon ordering, United's purchasing was informed by Dittmar that this product is a non-stock item and therefore would be non-returnable, and in addition to that, it would be four weeks until shipment, due to being a special order. Joe was notified by James Hagemier, United's Director of Purchasing , of this stipulation and James requested that he contact Holloman to be 100% positive that they would purchase this item. Joe then verified this order a second time with Airman Renee Barnett by telephone, and she confirmed.
>
> The above invoices remain open…leaving a balance due of $10,518.56.
>
> When the facility was contacted in regards to the past due invoices containing this item, no one was able to discuss the issue because of the 'file' being lost at Holloman. Also due to staff rotations there was no one remaining on the staff aware of the original order back in 1997.[67]

Sometimes, DSCP would not pay even though it had been funded by the ordering facility. On April 3, 2001, for example, UMS complained to Donna Galligan at DSCP about the handling of call [invoice] number WC27 sent in 1999 to William Beaumont Hospital, one the medical treatment facilities in the Lone Star

---

[67] Appendix II, Tab 9. See related correspondence, Appendix II, Tab 10.

Region.[68] The invoice total was $9323.93, and that is what William Beaumont Hospital paid in August 1999. DSCP, however, only paid UMS $92.31. That problem remained unresolved at the time UMS filed it Chapter 11 petition.

DSCP was obviously aware of the payments problem. On November 30, 2000 UMS pleaded for help in an email to Lt. Colonel James D. Riley, Chief Logistics Officer for William Beaumont Hospital in El Paso, Texas. Lt. Colonel Riley had indicated that he had done some investigation on the delinquent payment issue and concluded that the problem was one the DoD had created through red tape and disorganization. Lt. Colonel Riley attempted to provide help, but to little avail. In a January 22, 2001 email, Bill Bandy, then UMS president, expressed his appreciation to Colonel Riley for his efforts, but advised him,

> *…we are still being treated by a totally unwanted stepchild by DSCP and whatever entity shares the responsibility of paying for merchandise that we continue to ship to the facilities. Our receivables continue to grow and age with each passing day I am exploring alternatives to deal with a situation that literally threatens to put UMS and its people out of business.*[69]

In a February 14, 2001 DoD internal memo from Steve Hasting, a civilian facilitator employed by the DoD to help implement the prime vendor program, to Linda Flatley, contract officer and John S. Cuorato, Chief Medical/Surgical Products Group, Mr. Hasting provided DSCP with a thumbnail summary of the problem,

> *UMS is averaging $43,000 per day in sales, but only $26,000 per day in payments. Obviously, UMS can't sustain that imbalance for very long without negatively impacting credit availability. And credit availability to support cash flow requirements is what keeps them afloat day-to-day.*
>
> *I[t] appears that lack of DSCP payment drives UMS into credit [hold] status with banks and major manufacturers…which reduces their purchasing power and drives down on-hand stock…which drives down the fill rate…which drives up customer credit card purchases…which drives up cost to the end user. Mr. Bandy [UMS's president]*

---

[68] Appendix II, Tab 11.

[69] Appendix II, Tab 17.

> *tells me this situation is also affecting his commercial accounts!*[70]
>
> ….
>
> …*The bottom line is that UMS is on the verge of bankruptcy,….*[71]

Approximately one month after Mr. Hasting's memo, UMS was forced to file for Chapter 11 protection.

**3. Breach by Failure to Honor Stock Commitments**

To mitigate the problem caused by the refusal of DSCP and medical treatment facilities to provide accurate and complete product usage data, the parties developed a process known as "stock commitment." Under the process, the ordering facilities agreed to provide UMS with a list of their needs in the near future (30 days) by sending UMS a "Stock Commitment Form," or providing the information over the phone so UMS could complete the form. UMS received and/or completed thousands of these. UMS then would plan its product purchases so the committed stock could be timely delivered to the facility.

Virtually all of the medical treatment facilities failed on numerous instances to either purchase the supplies they previously had committed to purchase through the stock commitment processor timely notify UMS of a decision not to purchase. The result to UMS was that it got stuck with inventory it could not return or resell.

**4. Breach of Duty of Good Faith.**

Under a requirements contract, UMS only has to prove diversion; it is not required to prove bad faith. Nevertheless, the evidence is clear and convincing that DSCP repeatedly acted in bad faith and with a callous disregard toward UMS.

---

[70] Mr. Bandy meant that UMS was not able to deliver product to other customers because of the credit hold by manufacturers resulting from UMS's inability to pay for product sold to the medical treatment facilities under the DSCP contract.

[71] Appendix II, Tab 12

UMS received a $250 plus million-contract estimate from DSCP and was instructed to base its offer on that estimate. It based its offer on that estimate. The estimate by DSCP never disclosed that it included a substantial volume of credit card purchases that probably would not be made through the Prime Vendor. The estimates used by DSCP almost certainly were negligently developed and published. The gross disparity between actual results under the contract and estimates represented by DSCP evidence bad faith.

As discussed in more detail below, the manner in which DSCP exercised the annual options is extremely persuasive evidence that DSCP throughout the course of the contract acted in bad faith and with a callous disregard to the probable consequences to UMS. At the time it exercised the options, DSCP knew that the medical treatment facilities had diverted substantial purchases from the Prime Vendor contract, that its initial estimates were too high by orders of magnitude, and that the diversions were most likely going to continue. Nevertheless, DSCP exercised the options without offering any relief to UMS; and unfairly bound UMS to a contract being performed by DSCP in a completely different manner than the manner represented in the Solicitation and subsequent contract documents.

**a) DSCP knew of Diversions when it Exercised the Options**

Solicitation SP0200-99-R-5003 discloses substantial purchase diversions away from the Prime Vendor I contracts on a worldwide basis. That document was prepared by DSCP prior to February 24, 1999, and prior to the exercise of the second and third option years.

Each year, the purchases by the medical treatment facilities from UMS were a small fraction of the estimate for that year. UMS repeatedly expressed concern to DSCP about the low purchase volume. Several people at DSCP, including the UMS Case Manager, Anthony Amendolia, admitted that there were purchase diversions, but assured UMS that it was being resolved.

**b) DSCP Intentionally Misrepresented its Right to Withhold Payment based on the Facilities Failure to Pay DSCP.**

DSCP routinely advised UMS it was withholding payment of an invoice or call because it had not received payment from the medical treatment facilities for that invoice, and that it a contractual right to do so.

First, neither the award, as modified, nor the Solicitation as amended, provided any basis for DSCP's position on payment.

Second, DSCP did not really believe it had the right to withhold payments for this reason. DSCP, in its online publication, *dmmonline,* promoted the benefits of the prime vendor program to the DoD's medical treatment facilities. In its *Prime Vendor Program Overview,* DSCP represented (and still represents) to the facilities that,

> *Your facility places the order, receives it and lets DSCP Medical know the dollar amount of the order. The Prime Vendor electronically invoices DSCP Medical for the order and we pay the bill for you! DSCP Medical* ***then*** *gets reimbursed through inter-fund or direct billing to your agency.* ***Emphasis added****.*[72]

### c) DSCP never offered UMS Relief

At the time DSCP exercised each of the options, it exercised them without changing the estimated purchase quantities for that year or without negotiating a change in the distribution fee, even though DSCP obviously knew that there had been and would continue to be substantial breaches of the contract by diversions and that the total purchases under the contract were going to fall far below the renegotiation trigger of 90% of the total estimated contract volume.

As DSCP knew, the exercise of the options required UMS to remain able to perform its delivery obligations based on the estimated volumes.

### d) The Continuing Conduct of DSCP Evidences its Bad Faith

On February 22, 2002, UMS submitted twelve FOIA requests to DSCP pertaining to this claim. These FOIA requests included request number 10 seeking copies of claims submitted by other med/surg prime vendors and requests numbers 3 through 5 seeking the records that DSCP used to determine the estimated annual purchase volumes represented by DSCP to UMS and other potential Lone Star Region bidders under the 1993 Solicitation and Amendments 008 and 012.[73] DSCP, recognizing that a claim was being prepared, and without any explanation to support the accusation, accused UMS of submitting multiple requests for the purpose of avoiding payment of FOIA fees. DSCP then refused to

---

[72] Appendix II, Tab 4.

[73] Appendix II, Tab 18.

provide any documents under any of the FOIA requests unless it received a prepayment from bankrupt UMS of $85,961.00.[74] When UMS attempted to obtain documents detailing the calculation of the $85,961.00 fee, the request was denied by Linda Flatley, the contracting officer, based on a claimed "deliberative process" exclusion.[75] The denial did not include any *Vaughn* index or other acceptable substitute normally required when a "deliberative process exclusion" is claimed.

UMS requested mediation of its claims without having to go through the time and expense of the formal claims process. DSCP refused that request, notwithstanding contract modification 5, which represented that DSCP was committed to alternative dispute resolution at **any** stage of the process.

**e) Conclusions Pertaining to the Lack of Good Faith**

Based on the facts, UMS believes that the following conclusions are justified and will be supported by fact discovery in the course of any necessary litigation in this matter.

DSCP knew that the representation of the contract value in the solicitation documents was false because of the significant probability that a substantial portion of the requirements would continue to be made through the credit card program and DSCP would not enforce the terms of the contract.

When DSCP exercised its unilateral renewal options, it knew that it had not solved the diversion of purchases problem and that continued renewal of the contract would impose continued and unfair financial hardship on UMS through risks that were never disclosed to or accepted by UMS during the solicitation period. It simply decided to leave UMS in limbo.

DSCP withheld timely payments due UMS on the ground that DSCP had not been paid by the medical treatment facilities for the products. DSCP represented it had the contractual right to withhold these payments, when in fact it did not have that contract right and did not even believe it had that right when it made contrary representations to UMS.

DSCP has exhibited a callous disregard for the rights of UMS and the substantial risks to its survival as a small business.

---

[74] Appendix II, Tab 19.

[75] Appendix II, Tab 19.

## II. QUANTUM

UMS submits this Claim to the Contracting Officer to be made whole. UMS is made whole only by an award and payment of $26,723,875.00, as summarized in the chart below and explained in the following narrative.

| Element of Claim | Dollar Amount |
|---|---|
| Lost Profits | $13,919,817.00 |
| Damage to Reputation | $11,000,000.00 |
| Unpurchased Stock Commitments | $ 120,540.00 |
| Equitable Adjustment for Early Termination | $ 1,683,518.00 |
| **TOTAL CLAIM** | **$26,723,875.00** |

### 1. Lost Profits

*T&M Distributors, Inc.*, ASBCA No. 51,279, 2001 WL 638522, 01-2 BCA ¶31,442 is a case decided in favor of the contractor on similar facts. The Board, at page 22, held the government was both liable to the contractor for the improper diversions and that the measure of damages is the amount necessary to place the contractor as good a position as it would have been had the government fully performed. That amount includes lost profits.[76]

In *T&M Distributors,* the Army had a requirements contract with T&M Distributors, but, in breach of that contract, the Army had purchased a substantial percentage of its needs from sources other than T&M Distributors, primarily

[76] DSCP also should consider that even if lost profits cannot be proved, UMS could, under the circumstances present here, recover for unabsorbed overhead. A claim based on unabsorbed overhead would exceed $10 million. *Wheeler Bros., Inc.* 79-1 B.C.A. (CCH) ¶13,642 (ABSCA 1979); *James S. Lee & Co., Inc. v. U.S.,* 9 Ct. Cl. 322 (1986).

through the use of government credit cards. The Board distinguished a change in requirements from a change in the source of those requirements. *T&M Distributors* at 15.

Under FAR regulation 52.216-21(c) and the contract, the DoD was required to purchase all of the scheduled supplies from UMS. Failure of the DoD to do so was an improper diversion, for which UMS is entitled to be made whole. *T&M Distributors, Inc, supra.* As the *T&M* Board held, "the Government does not have an arbitrary right under a requirements contract to develop and use its potential [third party source] capabilities at the expense of a contractor."

UMS also is entitled to be made whole, including recovery of lost profits, for breach of duty of good faith. UMS, to recover for breach of duty of good faith, is required to show that the government engaged in knowing and intentional misconduct. *Schweiger Construction Co, Inc. v. U.S.,* 49 Fed. Cl. 188 (2001). It can recover lost profits if the breaches were a substantial factor in causing the injury, the loss was natural and inevitable upon the breaches so that the government may be presumed from all circumstances to have foreseen it, and the losses can be established with reasonable certainty. *Energy Capital Corp. v. U.S.,* 47 Fed. Cl. 382 (2000). These criteria are self-evident from the facts as set forth in this claim.

Calculation of lost profits is a reasonably straightforward calculation. UMS has substantial historical information on its costs. Included in Appendix III, Tabs 1 through 3, are historical financials for fiscal years ending January 31, 1996 through January 31, 2000, plus historical financials for the three-month period ending April 30, 2001.

UMS had an independent CPA prepare proforma financials showing what UMS would, in reasonable probability, have made in profits had DSCP purchased its requirements from UMS and paid in accordance with the contract. Then UMS subtracted from that profit number the actual financial results UMS realized during the period that the Lone Star Region Prime Vendor Contract was in effect.[77]

---

[77] Appendix III, Tab 4. UMS is entitled to reasonable extrapolations in estimating DSCP's purchase requirements since the records that detail the exact amount of the improper diversions are peculiarly within the knowledge of the government. *T&M Distributors* at 19 and 20. DSCP never reduced the estimated purchase volumes during the entire four years of the contract or otherwise advised UMS that DSCP's original estimates were inaccurate. UMS, therefore, used DSCP estimated purchase volume representations in calculating lost profits.

In calculating profits to be made on the Lone Star Region contract, UMS made appropriate adjustments for the additional costs it would have incurred in supplying the additional supplies and equipment.

The period for which lost profits was calculated was limited to the period of June 1, 1997 through April 30, 2001. That was the period the contract was effective. The estimated sales to DSCP for that period, assuming performance based on the estimates represented by DSCP, would have been approximately $219,658,378. UMS's proforma profit had that sales level been achieved and payments timely made is estimated at $6,364,458. UMS actually experienced a loss during that period of $7,555,359.

The difference, and the amount of the claim for lost profits is $13,919,817.00. The calculation supporting this amount is shown in Appendix III, Tab 4.

**2. Damage to Reputation**

For the breaches of contract by the government, UMS is also entitled to recover damages to reputation and loss of goodwill if these damages were foreseeable, natural and probable at time parties contracted. *Olin Jones Sand Co. v. U.S.*, 225 Ct. Cl. 741 (1980).[78]

Prior to the contract, the government required a substantial amount of business and financial information on UMS. Consequently, at the time the parties contracted, the government knew that:

UMS was a small business;

[78] The Court of Claims in *Olin Jones* stated, "…it is alleged that, because of the [United States'] delay in making these contract payments, plaintiff could not meet payments owed to its employees, subcontractors and suppliers, under the instant contract, and also because of payment delays lost standing in the business community which resulted in a direct impact on the performance of the present contract. [footnote omitted]. It is impossible to say that this class of injuries cannot be shown at trial to have been a direct and foreseeable consequence of a delay in contract payments. Plaintiff may recover them if it can show that the Government's failure to make timely progress payments under the contract proximately resulted in damage of this direct type affecting this particular contract."

UMS expected the bulk of UMS sales during the five-year contract period to come from sales to DSCP;

UMS submitted as part of its offer, a contract protection requiring renegotiation if DSCP failed to purchase 90 percent of the estimated volume;

Profit margins on medical and surgical supplies are small;

DSCP contract was going to provide the majority of UMS's annual revenues as long as the contract remained in force and UMS had to make substantial reliance commitments in order to be capable of performing its obligations over a period of five years; and

A substantial failure in purchase commitments would be a financial disaster to UMS, unless, possibly, UMS was excused from performance under DSCP contract.

The methodology used by UMS to seek to estimate its claim for damage to reputation is as follows:

First, UMS asserts that, at the time of the Prime Vendor Contract Award, UMS had a reputation, and a good one. Its tenure in the business and the fact that it was selected to be the Lone Star Region's Prime Vendor is substantial evidence of a good reputation. Moreover, UMS's reputation may have been the most outstanding in the industry. In September 2000, *Repertoire,* a national publication of Medical Distribution Solutions, Inc., published survey results from the Physicians World Class Survey.[79] Respondents to that survey included both physicians and medical treatment facilities. The respondents evaluated three classes of distributors: national, regional, local, specialized and direct marketing. UMS had the highest overall sales rating among regional and national distributors, with a 96.84 rating. UMS was rated the best regional distributor in the United States. Only three distributors in the United States had higher ratings. Each of these was classified as a "local distributor."

---

[79] Appendix II, Tab 2.

UMS now has no reputation. In March 2001, UMS filed Chapter 11 bankruptcy proceedings. It is now being liquidated pursuant to a confirmed liquidating Chapter 11 Plan.[80]

The evidence of monetary damages to UMS's reputation is the arms-length merger and acquisition offers it had prior to or early in the contract term. UMS had two offers, both from Henry Schein, Inc.[81] The first Schein offer was October 23, 1998. Schein offered to purchase the equity in the company for $10 million *plus*, with the *plus* being based on the sale of certain assets of little interest to Schein. The second offer was dated January 25, 1999. In that offer Schein increased the purchase price to $10.5 million *plus*.

UMS's claim for damage to its reputation is computed by taking the larger Schein offer and adding $500,000 for the *"plus"* portion of the offer.

For its damage to reputation claim, UMS seeks a claim in the amount of $11,000,000.00.

**3. Failure to Purchase Stock Commitments**

UMS and the government established a process similar to a purchase order process. This purpose of this was to benefit both parties and to mitigate the problems caused by lack of accurate historical product usage data. The ordering facility would issue stock commitments on "Stock Commitment Memos," advising UMS of what medical and surgical supplies the facility would purchase during the next 30-day period.[82] The title was descriptive of the intent of the process. It was a commitment by the ordering facility to purchase the supplies listed on the Stock Commitment Memo. Some of the facilities, however, failed to honor their commitments, leaving UMS with supplies it could not economically return to the manufacture or resell.

The Hasting memo of February 14, 2001 to Linda Flatley, contract officer, and John Cuorato Chief, Med/Surg Products Group describes the UMS problem with stock commitments. Mr. Hasting stated,

---

[80] Appendix II, Tab 14.

[81] Henry Schein, Inc. is a large publicly traded corporation. Appendix II, Tab 15.

[82] *See,* examples of these memos at Appendix II, Tab 13.

> *[UMS] can provide Stock Commitment Reports, a list of material purchased and stocked by UMS at the customer's request, but never ordered by the customer. UMS has tried their best to sell that inventory to other customers, DoD and commercial. But after all they've done, there remains a residual inventory that just can't be sold. And almost all of it is either non-returnable or there's a significant manufacturer restock fee attached. UMS does not want to get stuck with this unmovable inventory. Mr. Bandy understands that the customer obviously doesn't want the material, but in-as-much as he purchased it at their request, he feels they have an obligation to purchase that material….And, of course, there's the ongoing issue of overdue payments.*[83]

UMS maintained reports listing the cost to UMS of unpurchased stock commitments.[84] A summary of these forms and calculation of claim amount is shown in the following chart:

| Facility | Unpurchased Stock Commitments | Report Date |
|---|---|---|
| Sheppard Air Force Base | $ 9,182.87 | Jan. 12, 2001 |
| Reynolds Army Community Hospital | $ 10,676.08 | Jan. 17, 2001 |
| Tinker Air Force Base | $ 10,557.00 | Jan. 15, 2001 |
| Altus Air Force Base | $ 4,034.32 | Jan. 17, 2001 |
| Holloman Air Force Base | $ 15,094.86 | Jan. 15, 2001 |
| Ft. Huachuca | $ 4,962.22 | Jan. 29, 2001 |
| Laughlin Air Force Base | $ 491.20 | Jan. 17, 2001 |
| Goodfellow Air Force Base | $ 1,646.22 | Jan. 17, 2001 |
| Dyess Air Force Base | $ 3,418.40 | Jan. 17, 2001 |
| Darnall Army Community Hosp. | $ 17,758.02 | Jan. 15, 2001 |
| Naval Hospital, Corpus Christi | $ 4,039.82 | Jan. 12, 2001 |
| Kirtland Air Force Base | $ 6,696.27 | Jan. 15, 2001 |
| Brooks Air Force Base | $ 4,636.70 | Jan. 12, 2001 |
| BAMC | $ 3,514.96 | Jan. 12, 2001 |
| Randolph Air Force Base | $ 1,857.20 | Jan. 12, 2001 |

Table Continued on Next Page

[83] Appendix II, Tab 12.

[84] Appendix II, Tab 16.

| Facility | Unpurchased Stock Commitments | Report Date |
|---|---|---|
| William Beaumont Army | $ 135,370.49 | June, 15, 2001 |
| Estimated purchases of committed stock by DoD immediately prior to the UMS bankruptcy | ($ 100,000.00) | |
| SUB-TOTAL | $ 133,936.63 | |
| Salvage (10%) | ($ 13,396.00) | |
| **TOTAL** | **$ 120,540.00** | |

For unpurchased stock commitments, UMS seeks a payment of the purchase cost of these products less an estimated salvage of ten percent of the purchase price.

The claim for unpurchased stock commitments sought by UMS is $120,540.00.

**4. Equitable Adjustment for Early Termination**

The contract was terminated 13 months prior to the end of the fourth option year. The UMS offer required as a contract condition renegotiation of the distribution fee if the government failed to purchase 90 percent of its estimate. If the government had purchased the estimate through the 47th month of the contract, it would have purchased $219,658,378.00. The estimated sales for the total five-year period were $272,268,314.00. The $219 million number is 80.6 percent of the $272 million number. UMS would have been entitled to a renegotiated distribution fee under the terms of its offer. UMS seeks an equitable adjustment of 3.2% of the difference between the two numbers, which is $1,683,518.00 ($52,609,936.00 x 0.032). The 3.2 percent is the expected profit percentage for the 12 months ended January 31, 2001 as shown in Appendix III, Tab 4.

## III. RESERVATIONS FROM CLAIM

UMS reserves its rights to seek payments for attorneys' fees under the Equal Access to Justice Act and its rights to seek payment of outstanding accounts receivable, including interest on such accounts.

## IV. ADR REQUEST

UMS previously requested mediation of this dispute. DSCP denied this request. UMS reasserts the request.

## V. CERTIFICATION

**I, WILLIAM BANDY, AS AN AUTHORIZED AGENT FOR UNITED MEDICAL SUPPLY COMPANY, INC, CERTIFY THAT THE CLAIM IS MADE IN GOOD FAITH; THAT THE SUPPORTING DATA ARE ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF; THAT THE AMOUNT REQUESTED ACCURATELY REFLECTS THE CONTRACT ADJUSTMENT FOR WHICH THE UNITED MEDICAL SUPPLY COMPANY, INC. BELIEVES THE GOVERNMENT IS LIABLE; AND THAT I AM DULY AUTHORIZED TO CERTIFY THE CLAIM ON BEHALF OF UNITED MEDICAL SUPPLY COMPANY, INC.**

________________________________________ Date: __________________ 2002.
WILLIAM BANDY
Authorized Agent, United Medical Supply Company, Inc. ("Claimant").