# In The United States Court of Federal Claims

No. 03-289C

(Filed: January 3, 2005)

__________

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., | * | Summary judgment; Government contract |
| | * | case; Requirements contract; Claimed |
| | * | diversions of sales to third parties and |
| Plaintiff, | * | underpayments for goods provided; Factual |
| | * | questions precluding grant of summary |
| v. | * | judgment; No recovery under "negotiation |
| | * | clause" incorporated into contract; Potential |
| THE UNITED STATES, | * | recovery for loss of goodwill and reputation |
| | * | impacting performance of the contract in |
| Defendant. | * | question; *Olin Jones* construed. |

__________

**OPINION**

__________

*Frank L. Broyles*, Goins, Underkofler, Crawford & Langdon, Dallas, Texas, for plaintiff.

*Kyle Chadwick*, United States Department of Justice, Washington, D.C., with whom was *Peter D. Keisler*, Assistant Attorney General, for defendant.

**ALLEGRA, Judge:**

This government contract action is before the court on the parties' cross-motions for summary judgment. For the reasons that follow, this court **DENIES** plaintiff's motion and **GRANTS, IN PART**, defendant's motion.

## I. BACKGROUND[1]

On August 11, 1993, the Defense Personnel Support Center ("DPSC") (later renamed the Defense Supply Center Philadelphia ("DSCP")), issued a solicitation to establish a "prime vendor" contract to supply military medical facilities in particular regions with brand name specific and generic medical and surgical supplies. One of these regions, the Lone Star Region of the Southern United States ("Lone Star"), covered all military medical treatment facilities in New Mexico, Texas and Oklahoma. On or about September 14, 1993, plaintiff, United Medical

---

[1] These facts shall be deemed established for purposes of future proceedings in this case. RCFC 56(d).

Supply Company, Inc. ("United Medical"), submitted an offer in response to this solicitation. It did not receive the contract. Nonetheless, the DPSC, as the result of a General Accounting Office protest, eventually decided to award a new contract. Toward that end, on December 4, 1995, it issued Amendment 0008 to the original solicitation, which incorporated a number of changes to the prime vendor program.

Because the language of this amended solicitation eventually was incorporated into the contract at issue, it bears discussion. First, the amended solicitation described the prime vendor program in the following terms:

> The Defense Personnel Support Center (DPSC), Directorate of Medical Materiel is establishing a "Prime Vendor" program for brand name specific and generic medical supplies. A "Prime Vendor" is a business concern that functions as a purchaser's primary source for specified classes of products. A prime vendor is responsible for the delivery of goods produced by various suppliers to the customer upon order.
>
> DPSC Medical is selecting regional prime vendors for brand name specific and generic medical supplies broadly covering medical/surgical and pharmaceutical products. Presently, these items are purchased locally by the military medical facilities. Each prime vendor will be the primary supplier of one of the designated product groupings for member hospitals in a given geographic region. Under this program, the prime vendors chosen by DPSC will furnish the participating ordering facilities with the majority of their normal day-to-day requirements for brand name specific and generic medical supplies.
>
> * * * * *
>
> As part of the program, we are establishing "Distribution and Pricing Agreements" (DAPA's) with medical/surgical and pharmaceutical product manufacturers. Under a DAPA, the agreement holder consents to allow prime vendors selected by DPSC Medical to distribute its products to participating ordering facilities and agrees that the prime vendor will be charged no more than the prices set forth in the agreement. Orders will not be directly placed against the DAPA's; they are being used only to establish pricing and to obtain the right for our prime vendors to distribute an agreement holder's products. The DAPA's will be used to facilitate "charge-back" arrangements between the agreement holders and DPSC Medical's prime vendors. It is the responsibility of the Prime Vendor to establish the necessary "charge-back" arrangements with the DAPA holders. DPSC may also issue Indefinite Delivery Type Contracts (IDTC's) for specific products to be distributed by the Prime Vendor. The Prime Vendor will be required to obtain these specific products from the listed sources. The price charged by the prime to the ordering activities will not exceed that cited in the IDTC plus the offeror's negotiated distribution fee.

Regarding the DAPAs, the amended solicitation further indicated that "[e]ach Prime Vendor will be responsible for supplying all the medical items that are listed on Distribution and Pricing Agreements . . . ordered by the participating ordering facilities in the specific region."[2]

Like the original solicitation, the amendment contained an estimate of the orders to be placed for the types of products covered by the contract, setting that figure at approximately $57,665,500 per year, but immediately cautioning that "[n]o guarantee is given that this volume will be purchased." The statement of work listed a number of other requirements that eventually found their way into the contract. For example, it indicated that "[t]he Prime Vendor must have Prime Vendor/DAPA Holder agreements in place, within 90 days of their award date, for a minimum of 95% of the DAPA items under agreement between the DAPA holders and DPSC." The amended solicitation distinguished between three categories of orders: just-in-time orders that had to be delivered within 24 hours, extended delivery orders that had to be delivered within seven days, and emergency orders that had to be delivered within six to twelve hours depending upon the customer's location. It required the prime vendor to "[m]aintain, at a minimum, a 95% monthly fill-rate for each ordering facility for Just-in-Time Orders and Extended Delivery Orders;" no fill-rate apparently was specified for emergency orders.[3]

Terms of payment were also specified in the amended solicitation and thereby incorporated into the contract *sub judice*. Under these provisions, a purchasing facility assigned a unique call number to each order it placed. With each shipment, the prime vendor was required to enclose a packing slip showing this number, the date of the order, a list of the supplies shipped, quantity and price. To allow the call number to be tracked, the prime vendor was required to send all items in a single order in a single shipment. After inspection and acceptance of the shipment, the facility was required to "pay" by electronically obligating funds to the DPSC computer system, which would identify the obligation using the call number. Since this system

---

[2] By way of further explanation, the amended solicitation's statement of work provided that "[o]nly items appearing on a DPSC Medical DAPA or IDTC will be ordered and delivered under the Prime Vendor contract." Further in this regard, the solicitation's schedule of supplies stated "[t]he offeror, if awarded this contract, shall be paid for each medical/surgical product ordered and delivered which appears on a DPSC Medical Distribution and Pricing Agreement (DAPA) or on an Indefinite Delivery-Type Contract (IDTC), plus the offeror's negotiated distribution fee." It emphasized – "[t]he prime vendor shall only accept orders for and shall only furnish, under the contract, products which are part of the DPSC Prime Vendor Program."

[3] Under the contract, each order placed either was to be filled or "killed." Regarding the latter requirement, the contract's statement of work explained –

> If an order for an item cannot be filled by the prime vendor when ordered the request for that particular item will be automatically "killed" unless the ordering facility has previously approved delivery of a substitute.

only accepted one customer obligation per call number, additional obligations for that call number would be rejected. After shipment, the prime vendor was required to submit electronically an invoice for each delivery order to the payment office. Only one electronic invoice per delivery order was allowed, and each invoice had to include the correct call number. The DPSC system attempted to match the invoice to the customer obligation and upon finding a match, would approve payment of the sum invoiced or the sum obligated (whichever was less) and transfer funds electronically. The DPSC was obligated to transfer electronically payment to the prime vendor within 15 days of the invoice or supplies being received, whichever was later.

On or about January 1, 1996, United Medical submitted an offer in response to the amended solicitation. In this offer, it proposed a 6.4 percent distribution fee for the contract at issue, to be added to the purchases made under the DAPA arrangement. Its offer also included language indicating that the proposed distribution fee was "SUBJECT TO NEGOTIATION IF VOLUME DOES NOT REACH 90% OF THE STATED CONTRACT AWARD." In February and March of 1996, the DPSC issued further amendments of the solicitation that changed the yearly estimate of the requirements value to $57,965,500 and $56,715,500, respectively; these amendments again emphasized that the estimates were not "guarantees." On January 30, 1997, plaintiff was awarded two prime medical/surgical contracts, one of which, SPO200-97-D-7133, is the contract at issue. The contract was for a one-year base period, plus four one-year options.

As a threshold matter, the award document indicated that it "consummates the contract which consists of the following documents: (a) the Government solicitation and your offer, and (b) this award/contract." Tracking the solicitation, the contract also incorporated a number of FAR clauses, one of which, FAR § 52.216-21 (48 C.F.R.), states, in relevant part:

> (a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis of an equitable price adjustment.
>
> * * * * *.
>
> (c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

This FAR clause further provided that "[i]f the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source."

In fact, the volume of orders placed by the Lone Star facilities under the contract never approached the estimates in the amended solicitation – for example, in the base year of the contract, the DSCP estimated purchases of $30.4 million, while actual purchases were only approximately $6.4 million. The parties disagree as to why this happened. United Medical asserts that the government diverted orders to third parties in breach of the contract. Repeatedly emphasizing that the actual orders placed under the contract were dwarfed by the estimates, it relies upon correspondence from DSCP officials to various facilities suggesting that credit cards were being used to purchase supplies from outside suppliers. Defendant counters that any purchases made from outside vendors were not in violation of the contract, but rather were with DAPA holders with which United Medical failed timely to obtain an agreement, or related to items that were not available from DAPA sources or that United Medical indicated that it could not provide on a timely basis. By way of further explanation of what occurred, defendant notes that the estimates in the contract were not guaranteed and that the magnitude of the orders placed outside the contract reflects plaintiff's poor performance in killing or cancelling orders or not timely making deliveries. The parties also radically disagree regarding whether and to what extent problems were encountered in processing payments under the contract. While United Medical claims that DSCP routinely failed to pay on-time and failed to make payments, at all, for some of the materials it ordered, received, and used, defendant asserts that any such payment problems were attributable to plaintiff's failure to comply with contract's delivery requirements. Indeed, defendant questions whether any amounts are still due and owing.

Whatever issues it may have had with plaintiff's performance, the DSCP exercised three of the four options under the contracts. The fourth option was not exercised and the parties apparently agreed to end their contractual relationship on April 30, 2001. On June 28, 2002, plaintiff submitted a claim for equitable adjustment and breach of contract pursuant to the Contract Disputes Act of 1978. In this claim, it sought, *inter alia*, lost profits of $13,919,817, damages to reputation of $11,000,000, and an equitable adjustment for early termination of the contract of $1,683,518.

This case was originally filed as an adversary proceeding in plaintiff's bankruptcy case before the United States Bankruptcy Court for the Northern District of Texas. On February 10, 2003, the bankruptcy court issued an order transferring the case to this court. Plaintiff filed an amended complaint in this court on March 24, 2003. That complaint seeks, *inter alia*, $10,929,000 in lost profits, $180,156.90 for outstanding payments, and $10,000,000 for the value of its goodwill and reputation lost as the result of payment delays. On August 21, 2003, plaintiff filed its first amended motion for summary judgment. On December 19, 2003, defendant filed its opposition to plaintiff's motion for summary judgment, and a cross-motion for partial summary judgment. Responses and replies were filed in due course. Oral argument on the parties' cross motions was heard on July 6, 2004.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho. Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000). When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). Rather, the court must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)).

In its motion for summary judgment, United Medical, employing a three-fold thrust, asseverates that the government: (i) diverted orders to third parties in breach of its contract; (ii) failed to pay for certain supplies that were ordered and received; and (iii) is liable to plaintiff because the Lone Star purchases under the contract did not equal or exceed 90 percent of the estimated purchases and thus triggered the "negotiation" clause that plaintiff inserted in its offer. Parrying, defendant asserts that there are genuine issues of material fact as to whether any orders were improperly diverted and whether United Medical has been fully paid for the items it delivered. In a riposte*,* defendant also has moved for partial summary judgment, claiming that United Medical can recover neither because the actual purchases under the contract were less than 90 percent of the estimates nor for the loss of its goodwill and reputation. The court will consider these issues *seriatim*.

As to plaintiff's first claim, it is undisputed that the contract in question is a requirements contract. A requirements contract "calls for the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price." *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992).[4] Although the hallmark of such contracts is flexibility in the quantity of items ordered, *see Technical Assistance Int'l v. United States*, 150 F.3d 1369, 1371-72 (Fed. Cir. 1998), there are

---

[4] A requirements contract differs from an indefinite-quantity contract in that the Government need not guarantee a minimum purchase amount, but must buy all of its specified requirements from the contractor. *Travel Centre v. Barram*, 236 F.3d 1316, 1318-19 (Fed. Cir. 2001); *Mason v. United States*, 615 F.2d 1343, 1349 (Ct. Cl. 1980), *cert. denied*, 499 U.S. 830 (1980). "[A] requirements contract necessarily obligates the Government to purchase exclusively from a single source." *Coyle's Pest Control Inc. v. Cuomo*, 154 F.3d 1302, 1305 (Fed. Cir. 1998).

some limitations. First, "there is an implied obligation upon the government to 'act in good faith and use reasonable care in computing its estimated needs.'" *Rumsfeld v. Applied Cos., Inc.*, 325 F.3d 1328, 1335 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 981 (2003) (quoting *Medart, Inc.*, 967 F.2d at 581. If the government fails to meet that obligation by, for example, negligently preparing a grossly inadequate estimate, a breach of contract results. *See Rumsfeld*, 325 F.3d at 1335; *Clearwater Forest Indus., Inc. v. United States*, 650 F.2d 233, 240 (Ct. Cl. 1981). Second, it is well accepted that "the government breaches a requirements contract when it has a requirements for contract items or services, but diverts business from the contractor and does not use the contractor to satisfy those requirements." *Rumsfeld*, 325 F.3d at 1339; *see also Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1331-32 (Fed. Cir. 2000); *Torncello v. United States*, 681 F.2d 756, 761 (Ct. Cl. 1982).

Plaintiff does not contend – nor does the evidence produced so far suggest – that the DSCP acted in bad faith in computing its estimated needs for the Lone Star Region. Rather, United Medical asserts that the DSCP, acting through its facilities, diverted business by purchasing medical supplies covered by the contract from third parties, particularly through the use of credit cards. In support of this claim, plaintiff attempts to link together several factual premises, *to wit*, that: (i) the amounts of actual purchases under the contract were well below the estimates; (ii) virtually all of the supplies required by the facilities were covered by a DAPA with respect to which plaintiff had entered into an agreement with the supplier; and (iii) various documents and e-mails in the record indicate that credit cards were being used by the facilities and that the DSCP was attempting to limit that usage. But, there are at least two problems with this syllogistic approach.

First, defendant has produced evidence that tends to controvert the individual premises in plaintiff's proof. In particular, an affidavit filed by a DSCP employee, who was one of the contracting officers on this procurement, avers, with details, that: (i) plaintiff did not obtain, in a timely fashion (and, in some cases, at all), agreements with the various DAPA holders, requiring the affected facilities to purchase a significant volume of supplies from outside vendors; (ii) the contract did not require these facilities to purchase only DAPA products and, in fact, various facilities preferred brands of products that were not offered by DAPA holders; and (iii) plaintiff regularly lacked stock, particularly after closing its warehouses in El Paso, Texas, and thus was unable to fill many orders on a timely basis, thereby requiring facilities to look elsewhere.[5] In

---

[5] Plaintiff claims that the affidavits and other evidence provided by defendant in support of its cross-motion do not meet the requirements of RCFC 56 and should be stricken. It focuses on that part of Rule 56(e), which states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Contrary to plaintiff's claim, the court believes that the affidavits supplied by defendant were "made on personal knowledge," which knowledge does not require that the affiant be personally involved in all of the matters at issue, but can include information obtained from a review of business records. *See Cuyahoga Met. Hous. Auth. v. United States*, 60 Fed. Cl. 481, 483 n.1 (2004) ("lay

short, this affidavit claims that the diversions that occurred here were authorized and thus did not constitute a breach of the agreement. *Cf. Rowe, Inc. v. Gen. Servs. Admin.*, 03-1 B.C.A. ¶ 32,162, 2003 WL 253606 (2002) (no improper diversion where purchases were outside the contract's scope); *Pegasus Aviation, Inc. v. Gen. Servs. Admin.*, 93-3 B.C.A. ¶ 25,944, 1993 WL 95860 (1993) (no improper diversion where outside purchases were within exceptions to requirements contract). In the court's view, this affidavit not only controverts the factual assertions made by plaintiff discussed above, but also the specific allegations of improper diversions made by William Bandy, plaintiff's president at the time of the contract.

Second, assuming *arguendo* plaintiff's factual premises are true, they do not amount to proof that there were actual improper diversions here, *i.e.*, that items that were purchased from third parties were covered by the contract. *See Anderson*, 477 U.S. at 254 (trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it). Among other things, plaintiff's factual argument overlooks the possibility that it "killed" or could not fill on a timely basis a number of the orders in question. Nor does it account for the possibility that the estimates of the magnitude of products to be ordered were grossly overstated, albeit not due to a lack of good faith or reasonable care. After all, the solicitation and the subsequent contract amendments stressed repeatedly that the estimates were not "guarantees," and that changes were anticipated that might reduce the facilities' dependency on DAPAs.[6] Indeed, contrary to plaintiff's claims, there is evidence that the estimates reflected all the supplies purchased by the affected facilities, including those that had not previously been covered by a DAPA, and thus incorporated some speculation as to which

---

witnesses may testify as to perceptions acquired by them through review of records . . . prepared in the ordinary course of business"); *see also Allied Sys., Ltd. v. Teamsters Auto. Transport Chauffeurs*, 304 F.3d 785, 792 (8th Cir. 2002), *cert. denied*, 538 U.S. 924 (2003). In the court's view, these affidavits, standing alone, are sufficient to create questions of fact on both the diversion issue and the underpayment issue discussed below, making it unnecessary for the court to consider plaintiff's objections to various of the documents offered by defendant. *See Becho, Inc. v. United States*, 47 Fed. Cl. 595, 604 n.11 (2000) (citing cases for the proposition that "affidavits need not be corroborated by other evidence in order to show a genuine issue of fact"). The court notes, however, that many of defendant's documents appear to be in the nature of business records and thus contain facts that seemingly would be admissible in evidence within the meaning of RCFC 56(e).

[6] The contract itself specifically warned bidders that the estimates were not a "guarantee" of actual orders. In explaining the import of such language, the Federal Circuit explained that –

> The express terms of this regulation make clear that the risks associated with variance between actual purchases and estimated quantities are allocated to the contractor. Accordingly, estimated quantities are 'not guarantees or warranties of quantity.'"

*Medart, Inc.*, 967 F.2d at 581 (internal citations omitted); *see also Educators Assoc, Inc. v. United States*, 41 Fed. Cl. 811, 815-16 (1998)

products would eventually be purchased under DAPAs. At best, the evidence provided by plaintiff is not just circumstantial, but itself speculative, and essentially represents a backhanded attempt to impose liability on defendant based upon the difference between the estimates and the amounts actually purchased under the contract. That this court will not do. Indeed, plaintiff has not provided evidence of a single specific transaction in which the product purchased from a third party was explicitly covered by a DAPA under which plaintiff had obtained an agreement with the supplier. *Cf. T & M Distrib., Inc.*, 01-2 B.C.A. ¶ 31,442, 2001 WL 638522 (2001) (recovery allowed were invoices were submitted showing credit purchases that were covered by the requirements contract).

In sum, then, it appears that numerous disputes as to material facts exist here, precluding the court from granting plaintiff summary judgment on the issue whether improper diversions occurred. Certainly, there is some evidence that diversions may have occurred here. But, it is inappropriate, at this juncture, for the court to weigh this evidence against the controverting evidence provided by defendant. *See Becho, Inc.*, 47 Fed. Cl. at 601. Accordingly, plaintiff's motion on this point must fail.

Unresolved factual issues also permeate plaintiff's claim that defendant has failed to pay for $180,156.90 in supplies it ordered and received. Under FAR § 52.232.25, as amended by the contract, the DSPC was required to pay within 15 days of receipt of valid invoices or supplies. Plaintiff relies on various e-mails in which government officials admit that they were late in making payment to United Medical, as well as a few e-mails in which officials indicate that moneys were owed United Medical on outstanding invoices. In addition, in his affidavit, Mr. Bandy avers that "the payment problems ranged from no payment, to short pays, to substantial delays in payment." He further explains that he was custodian of the business records and summarily concludes that those records reflect the total amounts owed by the United States as $180,156.90 for outstanding invoices.

In countering this evidence, defendant relies primarily on an affidavit of Donna Galligan, an employee of the DSCP. In her affidavit, she asserts that "many of, if not all, the payment problems [experienced by United Medical] arose from [its] failure to conform to the contract requirements." Specifically, she avers, with several supporting examples, that plaintiff failed to deliver all the items on an order in a single shipment, thereby causing a mismatching of obligations and invoices. Again citing several examples, Ms. Galligan further asserts that problems also occurred when United Medical failed to adjust its records to account for customer cancellations, returns and nonreceipt of items. Finally, she contends that some of the underpayments claimed by plaintiff either are totally unfounded or overstated, while asserting, contrary to plaintiff's representations, that United Medical's claims regarding hundreds of other invoices cannot be researched because plaintiff has not provided the DSCP with a call number.

To be sure, neither defendant nor any of its affiants flatly deny that the DSCP or one of the participating facilities failed to pay plaintiff for some supplies that were delivered. Nonetheless, in various ways, defendant casts doubt on the existence of such an underpayment. Plaintiff's evidence does not dispel these doubts for it fails adequately to resolve the factual

issues arising from the possible mismatching of obligations and invoices, let alone the possibility that invoiced items were never provided.[7] Even were this court to conclude that there were some unspecified level of underpayment, the evidence would not permit the court accurately to determine the amount of that underpayment or even the magnitude thereof – any ruling on liability, therefore, would have a decidedly hollow ring. And while it may be that the parties can stipulate that a sample of invoices could be used to project the amount of an underpayment, there is no basis for the court unilaterally to make such an extrapolation at this point, such as might be done, after trial, under the jury verdict method of establishing damages. *See generally, Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 770 & n. 93 (2004). Accordingly, this issue, like the question of diversions, awaits further clarification at trial.

The third issue raised by plaintiff is one on which the defendant has cross-moved for summary judgment – *to wit*, whether the government is required, in effect, to pay plaintiff a higher distribution fee because sales under the contract did not equal or exceed 90 percent of the estimated purchases. Recall that, in its offer, plaintiff inserted language – all in caps – indicating that its proposed distribution fee was "subject to negotiation if volume [did] not reach 90% of the stated contract award." In the court's view, plaintiff correctly argues that the incorporation clause in the award decision merged these terms in its offer into the contract. *See Appeal of F&F Labs., Inc*., 89-1 B.C.A. ¶ 21,207, 1988 WL 104191 (1988) (under similarly-worded clause in award decision, attachment to contractor's offer incorporated into contract); *Appeal of Barry L. Miller Eng., Inc.*, 75-2 B.C.A. ¶ 11,567, 1975 WL 1751 (1975) (under similarly-worded clause in award decision, letter from contractor incorporated into contract). While defendant asserts that the contracting officer did not focus on the negotiation clause, that does not control whether there was a "meeting of the minds" on the negotiation provision. To the contrary, in light of the language of the award decision, defendant is charged with the knowledge of what was contained in plaintiff's offer, and thus cannot avoid the inclusion of the negotiation clause into the contract by claiming ignorance thereof. "Both parties to a contract are charged with knowledge of its terms," the Federal Circuit has emphasized, and "[n]either the contractor nor the government can avoid its legal responsibilities by asserting ignorance." *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988); *see also* Rest. (Second) Contracts § 21 & cmt. b (1981) ("Neither real nor apparent intention that a promise be legally binding is essential to the formation of a contract").[8]

---

[7] Although United Medical blames many or most of the unpaid invoices upon a mid-1999 computer problem within DSCP, the alleged nonpayments appears to predate that problem. Moreover, while the computer problem caused invoices to be lost altogether, United Medical complains mainly of "short pays" – invoices that were paid only in part.

[8] The court notes that when the shoe has been on the other foot, defendant has not hesitated to assert that contractors are charged with knowledge of the contents of contract documents, whether or not it can be shown that they were read. *See, e.g., Comtrol, Inc. v. United States*, 294 F.3d 1357, 1365 (Fed. Cir. 2002); *R.P. Wallace, Inc. v. United States*, Slip Op. No. 96-222C (Fed. Cl. Dec. 17, 2004). Moreover, although not determinative, it is worth noting that, despite defendant's claims of ignorance, all of plaintiff's offers to the various versions of the solicitation in question contained the same negotiation clause.

That said, defendant is right that, at best, the negotiation clause means that plaintiff could have sought to renegotiate its distribution fee when the listed target was not met. Nothing in the clause ensured that plaintiff would receive a higher distribution fee if the target was not met. Indeed, the contract *sub judice* contained the standard FAR clause regarding requirements contracts, which provides that "[e]xcept as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as 'estimated' or 'maximum' in the Schedule, that fact shall not constitute the basis for an equitable price adjustment." While the court does not believe that the negotiation clause conflicts with this FAR provision, the existence of the latter further suggests that all the negotiation clause reserved was the opportunity to renegotiate the distribution fee. Plaintiff never invoked this clause during the pendency of the contract and it cannot do so now in a belated attempt to increase it fees under the contract. Accordingly, while the court believes that the negotiation clause became part of the contract, it concludes that the clause is ultimately unavailing to plaintiff and, specifically, does not entitle it to any additional income on the contract or damages in lieu thereof. Defendant's cross-motion on this issue, therefore, is granted.

Finally, defendant moves for summary judgment on the issue whether plaintiff is entitled to damages for goodwill and reputation lost as the result of alleged delays in payments being made under the contract. Defendant argues that what plaintiff asserts is lost goodwill and reputation is, in fact, lost profits, which it further contends is not recoverable as a matter of law. In the court's view, defendant's assertions somewhat overstate the law. Indeed, in *Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741 (Ct. Cl. 1980), the Court of Claims held that, in certain circumstances, a contractor could attempt to prove that the Government's delay in making payments due under a contract "damage[d] plaintiff's standing in the business community." *Id*. at 742. Rejecting the government's contention that such damages always were nonrecoverable as a matter of law, the court stated –

> With respect to the first category it is alleged that, because of the defendant's delay in making these contract payments, plaintiff could not meet payments owed to its employees, subcontractors and suppliers, under the instant contract, and also because of payment delays lost standing in the business community which resulted in a direct impact on the performance of the present contract. It is impossible to say that this class of injuries cannot be shown at trial to have been a direct and foreseeable consequence of a delay in contract payments. Plaintiff may recover them if it can show that the Government's failure to make timely progress payments under the contract proximately resulted in damage of this direct type affecting this particular contract. On this aspect there can be no decision as a matter of law.

*Id*. But, the court hastened to distinguish between losses springing directly from the performance of a government contract, as a result of the inability to pay suppliers or obtain credit, as opposed to claims that a contractor's ability to obtain other contracts was crippled by the delayed payment. *See Olin Jones*, 225 Ct. Cl. at 743-44; *Smokey Bear, Inc. v. United States*, 31 Fed. Cl. 805, 808-09 (1994). Consistent with this distinction, various cases have rejected claims that the

government's conduct under a contract allegedly led to the destruction of the contractor's business. *See, e.g., Ramsey v. United States*, 101 F. Supp. 353, 357-58 (Ct. Cl. 1951), *cert. denied*, 343 U.S. 977 (1952); *Industrial Indem. Co. v. United States*, 26 Cl. Ct. 443, 445-46 (1992); *David J. Tierney, Jr., Inc.*, 88-2 B.C.A. ¶ 20,806 (1988); *see also* John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 732-33 (3d ed. 1995).

Accordingly, while it may be true – indeed, likely – that significant portions of what plaintiff seeks fall into the category of nonrecoverable consequential damages, it is also conceivable that other, perhaps more limited, portions of what it claims under the rubric of damages to its goodwill and reputation may be recoverable.[9] *See Olin Jones Sand Co.*, 225 Ct. Cl. at 744. Accordingly, the court denies this portion of defendant's motion, subject to allowing this issue to be raised anew to the extent plaintiff's proof at trial suggests that it is seeking consequential damages to its overall business or lost profits on future contracts that were not obtained.

## III. CONCLUSION

This court need go no further. Based on the foregoing, plaintiff's motion for summary judgment is **DENIED**, and defendant's cross-motion for summary judgment is **GRANTED** as to the negotiation clause, but otherwise **DENIED**. On or before January 28, 2005, the parties shall file a joint status report indicating how this case should proceed, with an appropriate proposed schedule. The court expects that, prior to this filing, the parties will conduct additional settlement discussions.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge

---

[9] A hint that such damages eventually may be proven may be found in an e-mail from Steve Hasting, an Army official involved with the procurement, indicated his concerns regarding the delays in payments being experienced by plaintiff, which states:

> It appears that lack of DSCP payments drives [United Medical] into credit a [sic] hold status with banks and major manufacturers, which reduces their purchasing power and drives down on-hand stock, which drives down the fill rate, which drives up customer credit card purchases, which drives up costs to the end user.