**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., *Plaintiff*<br><br>v.<br><br>THE UNITED STATES, *Defendant* | CASE NO: 03-CV-289<br><br>Judge Allegra |

**BRIEF IN SUPPORT OF PLAINTIFF'S EXPEDITED MOTION TO COMPEL COMPLIANCE WITH COURT'S ORDER OF APRIL 26, 2006 AND FOR SANCTIONS**

# TABLE OF CONTENTS

**BRIEF TABLE OF CONTENTS**

**APPENDIX TABLE OF CONTENTS**

**CASES, STATUTES AND RULES CITED**

**BRIEF**

**I. QUESTIONS PRESENTED** 1

1. Has the Government complied with its discovery obligations in this case, including its duties to preserve potentially relevant evidence and the Court's order of April 26, 2006?

2. Should the Government be compelled to comply with the Court's order of April 26, 2006?

3. Should the Government be sanctioned for is conduct in connection with discovery and its obligations to preserve evidence?

**II. SUMMARY** 1

**III. STATEMENT OF FACTS WITH RESPECT TO DISCOVERY AND PRESERVATION OF EVIDENCE ISSUES** 3

1. In July 2000, the Government expected Plaintiff to file claims arising out of non-payment of invoices. 3
2. The Government had notice of all Plaintiff's contract claims in September 2001. 3
3. Plaintiff's CDA Claim and Bankruptcy Adversary Proceeding filed in 2002 detailed the types of evidence that should have been identified and preserved. 4
4. Plaintiff's deficiency letter to the Government on December 16, 2002 was further notice to identify and preserve evidence at the MTF level. 4
5. The deposition of Contracting Officer Jennings confirmed that the Government had not made reasonable inquiry in responding to Plaintiff's initial discovery and put the Government on notice that corrective action might be required. 5

6. In response to the Government's prolonged resistance to Plaintiff's discovery efforts, Plaintiff sought Court intervention in June 2005. 6

7. Even after the Court became involved, the Government's discovery abuse continued. 7

8. The Government continues to neglect its discovery and evidence preservation obligations. 10

9. The Government seeks to benefit from its spoliation. 13

10. The Government has refused to answer Interrogatory 5, notwithstanding the Court's order to do so. 15

**IV. APPLICABLE LAW** 16

1. Elements for Spoliation Sanctions 16

2. Sanctions for Discovery Abuse 18

**V. CONCLUSION AND REQUEST FOR RELIEF** 21

**CERTIFICATE OF SERVICE** 24

# APPENDIX

TAB DESCRIPTION

Appendix A - Summaries of Affidavits and OIG data
Appendix B - July 2000 Wentzel memo
Appendix C - Plaintiff's Rule 27 Petition to Perpetuate Testimony
Appendix D – Plaintiff's Initial FOIA Request
Appendix E – CO Flatley denial of FOIA Requests
Appendix F – Plaintiff's Adversary Proceeding asserting CDA claims in Bankruptcy Court
Appendix G – Government's 2002 Responses to Interrogatories
Appendix H – Three of Plaintiff's letters to Government identifying discovery deficiencies
Appendix I – Portions from transcript of deposition of CO Jennings
Appendix J – Defendants Amended Interrogatory Responses dated October 26, 2005
Appendix L – Defendants Amended Interrogatory Responses dated July 5, 2006
Appendix K – DoD Memo regarding OIG data (redacted)
Appendix M -

Ethicon Sales to Fort Sill during September 2000 (Appendix M-1)

OIG purchase Summary for Fort Sill during September 2000 (Appendix M-2)

Appendix N –

Plaintiff's Q 1 2000 3% data sample summary from documents produced by Fort Hood (Appendix N-1)

OIG data showing credit card purchases by for Fort Hood for same period (Appendix N-2).

Appendix O - General Medical document produced by Fort Hood.
Appendix P - Fort Hood Data Sheet

**CASES CITED**


| CASE | REFERENCE |
|---|---|
| *Broccoli v. Echostar Communications Corp.*, 229 F.R.D. 506, 512 (D. Md. 2005). | 18 |
| *Columbia First Bank, FSB v. U.S.*, 58 F. Cl. 54, 56 (2003). | 17 |
| *Dillion v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993). | 17 |
| *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986). | 17 |
| *Klump v. U.S.*, 54 F. Cl. 167, fn 13 (2002). | 17 |
| *Krumwiede v. Brighton Associates, LLC,* 2006 WL 1308629, (N.D. Ill. 2006)(not reported in F. Supp.2d). | 18 |
| *Marrocco v. General Motors Corp.*, 966 F.2d 220, 223 (7th Cir. 1992). | 17 |
| *Metropolitan Opera Ass'n v. Local 100, Hotel Employees*, 212 F.R.D. 178 (S.D.N.Y 2003). | 19,20,21 |
| *National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543 (N.D. Cal 1987). | 20 |
| *Precision Pine & Timber, Inc. v. U.S.*, 2001 WL 1819224 (Fed. Cl. 2001)(not reported in Fed. Cl.). | 19 |
| *Pueblo of Laguna v. United States*, 60 F. Cl. 133 (2004). | 17 |
| *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572-73 (Fed. Cir. 1996). | 17 |
| *Tarlton v. Cumberland County Correction Facility*, 192 F.R.D. 165 (D.N.J. 2000). | 20 |
| *Thorton-Trump v. United States*, 12 Cl. Ct. 127, 130 (1987). | 19 |
| *West v. Goodyear Tire & Rubber Company*, 167 F.3d 776, 779 (2nd Cir. 1999). | 16 |
| *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003). | 17,18 |


ADMINISTRATIVE DECISIONS


| | |
|---|---|
| *Appeals of Northrup Grumman Corporation,* ASBCA No. 52178, 2003 WL 21380406 (2003). | 16 |

RULES CITED

| | |
|---|---|
| Fed. R. Civ. Proc. 26(g) | 19,20 |
| RCFC 26(g) | 18 |
| RCFC 30(d) | 18 |
| RCFC 37 | 18 |
| RCFC 37(b)(2) | 21 |
| RCFC 45 | 18 |
| Bankr. R. Fed. Proc. 7033 | 5 |
| Bankr. R. Fed. Proc. 7034 | 5 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., *Plaintiff*<br><br>v.<br><br>THE UNITED STATES, *Defendant* | CASE NO: 03-CV-289<br><br>Judge Allegra |

**BRIEF IN SUPPORT OF PLAINTIFF'S EXPEDITED MOTION TO COMPEL COMPLIANCE WITH COURT'S ORDER OF APRIL 26, 2006 AND FOR SANCTIONS**

**TO THE HONORABLE UNITED STATES COURT OF FEDERAL CLAIMS:**

Pursuant to the Court's order of July 21, 2006, Plaintiff United Medical Supply Company, Inc. files this brief in support of its previously filed motion to compel compliance with Court's order of April 26, 2006 and for sanctions.

## I. QUESTIONS PRESENTED

1. Has the Government complied with its discovery obligations in this case, including its duties to preserve potentially relevant evidence and the Court's order of April 26, 2006?

2. Should the Government be compelled to comply with the Court's order of April 26, 2006?

3. Should the Government be sanctioned for is conduct in connection with discovery and its obligations to preserve evidence?

## II. SUMMARY

For the last four years, Plaintiff has attempted, without success, to obtain adequate discovery from the Government pertaining to Plaintiff's claims. Since the status conference in April 2006 the Government has filed numerous affidavits by the various medical treatment facilities and produced some credit data from the Department of Defense Office of Inspector General ("OIG").

The OIG data produced is a fraction of the data it could have produced but for document destruction. The OIG, like the MTFs, destroyed credit card data purportedly in accordance with its normal document retention policies. Apparently its first notice of United Medical's claim was in or close to January 2006.

The Government's recently filed affidavits, summarized at Appendix Tab A, confirm:

• massive quantities of relevant or potentially relevant documents have been destroyed subsequent to notice to the Government of Plaintiff's claims to the prejudice of Plaintiff;

• many relevant documents the Court ordered produced by July 5, 2006 have not been produced;

• the Government did not implement, or even attempt to implement, adequate procedures to prevent destruction of potentially relevant documents;

• the Government responses to Plaintiff's written discovery requests were not based on reasonable inquiry, but on convenience and advocacy;

• the Government has been less than candid with both the Court and Plaintiff's counsel about the status of its efforts to produce documents and to protect documents from destruction;

• the magnitude of the destruction of potentially relevant evidence is not known and in reasonable probability will never be known; and

• the Government has unjustifiably and prejudicially delayed the progress of this case.

Even in its July 2006 Notice of Filing of Affidavits, the Government misstates facts attempts to trivialize its document destruction and suggest that the missing documents are insignificant.

Accordingly, Plaintiff requests entry of an order: (1) deeming certain specified facts established, (2) compelling a prompt supplementation of the Affidavits to complete the detailed

descriptions required in the Court's order of April 26, 2006, and (3) imposing monetary sanctions as the Court deems appropriate.

## III. STATEMENT OF FACTS WITH RESPECT TO DISCOVERY AND PRESERVATION OF EVIDENCE ISSUES

**1. In July 2000, the Government expected Plaintiff to file claims arising out of non-payment of invoices.**

In a DSCP internal memo dated July 14, 2000 Greg Wentzel wrote to Linda Flatley, Anthony Amendolia, Donna Galligan and Roslyn Rogers about the problem with United Medical's accounts receivable. He wrote,

> Mr. Bandy will simply not be mounting his palomino and riding off into the sunset at the end of his contract. We better have a very clear and convincing accounting of the status of United's accounts receivable. [Appendix Tab B].[1]

The only reasonable inference, "United Medical is going to file a claim."[2]

**2. The Government had notice of all Plaintiff's contract claims in September 2001.**

Plaintiff's formal discovery efforts of Plaintiff's claims began on October 2001 with a Rule 27 petition in the bankruptcy court to perpetuate the testimony of Plaintiff's key employees before their memories and records became the victims of the bankruptcy process. [Appendix Tab C]. The Rule 27 Petition specifically indicated that United believed it had a breach of contract claim for a number of reasons, including diversion. The Government successfully opposed that evidence preservation effort based on its position that Plaintiff should first be required to file a CDA claim.

---

[1] The Government has not produced any accounting, notwithstanding Plaintiff's discovery efforts on that issue.

[2] The account receivable issue should have been resolved. The Government produced an internal DSCP email in which the Government admitted that it owed Plaintiff not less than $284,000 as of January 19, 2001. The Government refuses to provide Plaintiff an accounting of payments made against that

When Plaintiff's Rule 27 Petition was denied by the Bankruptcy Court, Plaintiff faced a chicken and egg problem. Plaintiff desired documents before filing its CDA claim, so it submitted a series of six FOIA requests to DSCP on November 27, 2001. [Appendix Tab D]. The FOIA requests focused on the Government's bases for its estimates of requirements made in the solicitation documents. The Government promptly denied virtually all of Plaintiff's FOIA requests. The reasons for such denials included an April 2002 determination by Contracting Officer Flatley that some of the documents requested were subject to litigation and deliberative process privileges. [Appendix Tab E].

**3. Plaintiff's CDA Claim and Bankruptcy Adversary Proceeding filed in 2002 detailed the types of evidence that should have been identified and preserved.**

When Plaintiff lost its FOIA appeal, it requested mediation of its claims pursuant to Award Modification 0005. Contracting Officer Flatley refused Plaintiff's request to mediate its claims. Accordingly, Plaintiff filed its CDA claim with her on July 3, 2002. The claim was promptly denied.

On September 13, 2002 Plaintiff filed its lawsuit against the Government as Bankruptcy Adversary Proceeding No. 02-4230. [Appendix Tab F]. In that lawsuit Plaintiff asserted various claims for contract breach. These included claims for breach of contract by diversion of purchases, negligent estimation of requirements, payment failures, and failures to provide usage data in accordance with the contract terms.

**4. Plaintiff's deficiency letter to the Government on December 16, 2002 was further notice to identify and preserve evidence at the MTF level.**

---

$284,000, apparently on the theory that it is Plaintiff's burden of proof and the Government does not have to prove Plaintiff's case.

Pursuant to Bankruptcy Rules of Procedure 7033 and 7034, incorporating F.R.C.P. Rules 33 and 34, Plaintiff served its initial interrogatories and requests for production on October 25, 2002. The Government's responses raised immediate concerns. [Appendix Tab G].

First, it was apparent that the various medical treatment facilities ("MTFs") had been excluded from the discovery process. Second, it appeared that a reasonable search of the document database had not been conducted and that some documents once available at the MTFs may have been destroyed.[3] Accordingly, on December 16, 2002, Plaintiff sent a four-page "deficiency" letter to Government counsel identifying specific deficiencies and corrective action desired. This was the first of a series of deficiencies letters. [Appendix Tab H].

In the December 16, 2002 deficiency letter, United Medical specifically notified Government counsel of Plaintiff's contention that its requests were Government-wide and that the MTFs as well as the Agency were required to participate in providing discovery responses and documents. The Government did not correct any of the deficiencies.

**5. The deposition of Contracting Officer Jennings confirmed that the Government had not made reasonable inquiry in responding to Plaintiff's initial discovery and put the Government on notice that corrective action might be required.**

Mr. Jennings had verified the Government's 2002 interrogatory responses with a "to the best of his knowledge" verification. Plaintiff took Mr. Jennings deposition to determine whether the "best of his knowledge" was based on reasonable inquiry or simply ignorance.

---

[3] In interrogatory 4, Plaintiff requested the Government to state the dollar amount of products covered by the contract ("Scheduled Medical Products and Supplies") each MTF purchased from United Medical and from third parties. The Government responded, in part, that it was attempting to determine what records are available and would supplement the response if relevant information or documents were located. In response to Request for Production #1, the Government stated the only existing document was attached to the Responses. In response to Request for Production 13 seeking correspondence concerning an MTFs estimated requirements, the Government replied that such records had not been maintained.

Mr. Jennings testimony revealed that his verification was based on ignorance and that no reasonable inquiry had been made.[4] He testified that his only involvement with the litigation was preparing for his deposition [Tr. p. 16, lines 1-8; p. 62, lines 9-13]. He specifically testified that he was not aware of any investigation that was done in connection with this litigation to determine if credit cards had been used to bypass the prime vendor program. [Tr. pp. 49 – 50]. He also testified that when he signed the interrogatory answer that the Government had no knowledge of diverted purchases, he meant he personally had no knowledge of diverted purchases, *i.e.*, he did not know if the Government had any knowledge or not. [Tr. p. 118, lines 8-22].[5]

**6. In response to the Government's prolonged resistance to Plaintiff's discovery efforts, Plaintiff sought Court intervention in June 2005.**

Counsel for Plaintiff and the Government had several exchanges regarding the Government's discovery obligations. The Government's position was that Plaintiff had the burden of proof and the Government did not have to prove Plaintiff's case. Plaintiff's position was that the Government had to make reasonable inquiry and respond accordingly, even if it proved Plaintiff's case. On June 21, 2005, Counsel for the Government sent Plaintiff's counsel an email advising Plaintiff's counsel that he was welcome to visit the MTFs to see responsive documents, but that it would be a waste of time since the Government believed no additional responsive documents existed that had not been produced.

---

[4] Based on Mr. Jennings answers, one could readily conclude that the verification was stuck before Mr. Jennings and he simply signed it without any review.

[5] The relevant portions of the Jennings deposition transcript are at Appendix Tab I.

It was apparent to Plaintiff's counsel that the Government had not made reasonable inquiry in responding to Plaintiff's discovery and did not intend to do so. Accordingly, in June 2005 Plaintiff filed two motions to compel.

**7. Even after the Court became involved, the Government's discovery abuse continued.**

Plaintiff's two motions to compel were temporarily resolved by the submission of a joint status report on July 14, 2005 dealing with Plaintiff's most significant complaints. In that JSR (para 1 a) the Government agreed it would promptly provide, for each MTF, its best estimate of diverted purchases or detail the investigation it made to determine the estimate and why the estimate could not be made. The Court then ordered another JSR to be filed by September 15, 2005 describing the progress under the July 14, 2005 agreements.

The Government did not comply with the agreements of the July 2005 JSR. Accordingly, on September 13, 2005, a joint status report was filed that described numerous deficiencies in the Government's obligations under the July 14, 2005 JSR. On September 20, 2005 the Court entered an order noting that "many of the objectives proposed in [the] July 14, 2005 joint status report remain[ed] incomplete." It ordered another JSR to be filed on or before October 17, 2005 and noted an expectation that significant progress would be made by the Government to produce the required documents.

October 17, 2005, another JSR was filed. The Government claimed it had searched but found "very few responsive documents." Plaintiff complained that the Government had not described the efforts made to locate additional documents and that Plaintiff was entitled to know the extent of the search efforts. The Court immediately ordered the Government to respond to Plaintiff's complaint.

On October 24, 2005, the Government responded by filing a somewhat unusual "Defendant's Status Report Regarding Discovery." It was unusual in several respects.

First, it included the affidavit of Peter Brown, but the affidavit was not signed by Brown. Instead it was signed by Mr. Chadwick on behalf of Mr. Brown. The Defendant's Status Report claimed that seven people at various MTFs had been contacted who were knowledgeable about all or virtually all of the MTFs at issue.[6] It then claimed that Colonel Michael Johnson contacted 10 MTFs in an "undefined" southwest region and that such contact did not result in discovery of any additional documents. Further, it was stated that MEDCOM had "in recent years" adopted a new electronic data storage system so no budgeting or spending data for the contract period resided in the new system.[7] The Government then disclosed that apparently a large volume of relevant documents had been destroyed. These last two statements resulted in the Court's entry of an order directing a status conference to be held on December 5, 2005 in Dallas, Texas.

A transcribed status conference was held in Dallas, Texas on December 5, 2005. The primary issue was the recent disclosure by the Government that relevant documents had been destroyed. At the beginning of the conference, the Court noted a particular interest in preventing further destruction. [Tr. pp 3 and 4]. Government counsel's immediate response was to advise the Court that all MTFs had been contacted and "as far as we know, we have nothing from the MTFs that we've located that remains to be produced." [Tr. p. 4, lines 12-20].

The Court then asked Government counsel, "What have you done since that happened to ensure that this doesn't happen any place else? [Tr. p. 7, lines 19 and 20]. Government

---

[6] There was a contradictory qualifier that indicated maybe just the "larger" MTFs had been contacted.

[7] The Court's order setting the December 5, 2005 status conference indicated that this was one of the bases for setting the conference. As discussed below, none of the affidavits filed in July 2006 address this evidence or destruction of it.

counsel's response was that the Government went out and got all of the documents it could, which was next to nothing. [Tr. p. 7, lines 21 – 24].

The Court then inquired of Government counsel what he thought should be done. Government counsel claimed not much more could be done because "we have now conducted what we believe to be our full scale search for these documents. We've not found any." [Tr. p. 15, lines 7 – 17].

The Court continued with a series of questions that it believed needed to be addressed in the future, but it began with a contempt of court admonishment if any further documents were destroyed. [Tr. p. 15]. The first question was whether or not Government counsel was satisfied that each MTF had made every conceivable attempt to find what they had. The second question was how the case should progress since it appeared that a document preservation order was moot. [Tr. p. 16].

Based on the discussions at the status conference, the Court strongly encouraged settlement and suggested possible approaches that might be considered. The parties began settlement discussions, including mediation, but those were discontinued when the Government determined that additional credit card data might exist within DFAS. Following notification to the Court of termination of settlement discussions, the Court ordered filing of a joint status report in April 2006.

On April 12, 2006, Plaintiff and Defendant each filed their own version of the status of the case. Plaintiff particularly complained about the Government's failure to comply with the July 2005 JSR discovery agreements and also noted that one of the Government's amended responses to an interrogatory requiring an estimate of diverted purchases contained the following:

> …one cannot determine the dollar value of purchases of DAPA items from parties other than United Medical without access to the detailed MTF purchasing records, including but not limited to credit card records. As discussed in Defendant's status report dated October 24, 2005, we believe those records do not exist for any MTF. Even assuming all the records still existed, moreover, it would be an enormous task and unduly burdensome on the Defendant, which does not bear the burden of proof, to comb through the records….[Appendix Tab J].

Plaintiff's complaint included the fact that the "undue burden" objection was a new objection and that the failure to timely assert it years ago meant it had been waived. The April 12, 2006 JSR resulted in an order for another status conference.

**8. The Government continues to neglect its discovery and evidence preservation obligations.**

On April 25, 2006 a telephonic status conference was held. The subsequent scheduling order reflects that Mr. Chadwick and Mr. Broyles were the participants. Plaintiff's counsel believes it worth noting that DSCP counsel Kathleen Hallum also was on the call, although she did not comment on any issues raised. Ms. Hallum apparently has had some responsibility for responding to Plaintiff's discovery requests, although the extent of that is not known.

One inquiry made by the Court was whether steps had been taken to ensure that no further destruction of evidence had been made. The Government responded that such steps had been taken and that all MTFs had been notified. Plaintiff took issue with this statement since the Government did not seem to know the number or identity of the MTFs.

The Court then issued an order for the filing of affidavits and production of documents that is the subject of this Motion.

The numbered paragraphs of the Court's order require disclosures pertaining to <u>all</u> potential evidence, not just credit card evidence. Instead of providing that information, the affiants limited their disclosures to purchases by credit card. Not discussed was evidence

relevant to issues of negligent estimation of requirements, accounts payable to United Medical, and failures to provide usage data. Instead they responded only with respect to diverted purchases, primarily diverted purchases by the use of credit cards.[8]

One of the objectives the Court hoped to accomplish with its order was to establish what evidence once existed that no longer existed. For that purpose, it ordered at Paragraph 6 disclosures of records that the MTF originally possessed potentially relevant to the case. The affidavits do not comply with this requirement. To the extent that any effort was made to comply, the disclosures generally were limited to "after notification," which is not a limitation permitted in the Court's order. In its scheduling order setting the December 5, 2006 status conference, it noted its concern about the destruction of budgeting and financial data. Not a single affidavit mentions those issues. Moreover, not a single affidavit gives any indication that any MTF has notice that it should preserve documents relevant to those issues.

When the Government filed its affidavits, Plaintiff notified Government counsel of two deficiencies that could have been readily cured. One was that one of the affidavits omitted a referenced attachment. The other was that the interrogatory answers provided by the Government were not verified. Rather than curing, the Government contended that the omitted attachment was a document that was already in Plaintiff's possession (which ignores the fact that the affidavits were for the Court's purposes, not just Plaintiff's) and that a verification would be meaningless.

At the time the Government filed its affidavits, it also filed a document it called, "Defendant's Notice of Filing of Affidavits." Paragraph 3 of that Notice describes email

---

[8] The logical explanation, and obvious one, is that the MTFs were not notified of Plaintiff's other claims. They may still be destroying potentially relevant documents.

communications by Anthony Amendolia to the MTFs. The Notice then continues to blame the document destruction on inadvertent errors, lapses of memory and the like. There, however, is no evidence in the Notice or the affidavits of any good faith effort to preserve the types of documents that would be potentially relevant evidence. Mr. Amendolia's email communications can hardly be considered the types of communications that should occur to institute a litigation hold on document destruction.

In paragraph 7, the Government states, "Affiants from most existing Air Force Base ordering facilities …state that at the time the facilities received notice of Plaintiff's claim in the second half of 2002…." The impression the Government is attempting to convey to the Court is that most of the Air Force facilities received notice in 2002. There was one Air Force base that indicated it received Amendolia's email in 2002. The remaining 11 indicated they did not receive any notice of Plaintiff's claims until May 2006. Amazingly, the Government references the Baca Affidavit as support for its position. Captain Baca claims he was unaware of Plaintiff's claims or lawsuit until May 2006. [See summary of affidavits at Appendix A].

But the Government's attempts to trivialize its discovery behavior do not end with paragraph 7. In paragraph 8, the Government states, "Finally, the Government is also apparently responsible for the destruction of a <u>relatively small amount</u> of credit card records at William Beaumont Army Medical Center….." (Emphasis added). WBAMC was the second largest user of supplies in the Lone Star Region. There is nothing in either of the two affidavits filed by WBAMC to suggest the destruction was "relatively small." Indeed, Oscar Molinar states in his affidavit at paragraph 9, "The following potentially relevant records are known to have been destroyed: All daily Prime Vendor orders, all other contract documents and all credit card purchase records."

**9. The Government seeks to benefit from its spoliation.**

It has become obvious that the dollar quantity of diversions must be estimated based on extrapolation from known data. The Government has provided its version of an extrapolation from data provided by the Department of Defense Office of Inspector General ("OIG").[9] According to the Government, extrapolation from that data evidences maximum potential diversions of $44,242,718.66. [Appendix Tab L].

Plaintiff contends that the sales data from the individual MTFs and the missing OIG data (data that was destroyed by the Government) would establish: (1) that the OIG database did not include all credit card purchases, and (2) that purchase methods used to make diverted purchases were not limited to credit cards but included, among others, purchases using Blanket Purchase Agreements.

During the course of this case, Plaintiff served a third-party subpoena on Ethicon, Inc. to compel production of its documents evidencing sales directly to the MTFs. Ethicon was a DAPA holder that sold suture and related medical supply products. It was one of Plaintiff's primary suppliers. Ethicon responded with approximately 100 pages of computer reports. Those reports evidenced suture sold directly to the MTFs during the contract period that were not included in the OIG data. The Ethicon reports establish beyond reasonable doubt that the OIG data did not include all potential diversions.

---

[9] Data the OIG apparently obtained from DoD's repository for credit card data, namely the Manpower Data Center in Seaside, CA. OIG apparently was not notified of Plaintiff's claims until approximately January 2006, <u>so it too admits it destroyed a large quantity of credit card records relevant to the lawsuit.</u> [See Appendix Tab K].

A compelling illustration can be shown by comparing the OIG September 2000 credit card purchases for Fort Sill with the September 2000 sales data for Fort Sill provided by Ethicon. There is nothing special about this month. Virtually any other month could have been used for the same purpose.

Ethicon data shows that it made 17 sales directly to Fort Sill during September 2000. The Government's OIG data for the same period does not show any purchases from Ethicon. The information provided by Ethicon evidenced sales to Fort Sill during the contract period of over $300,000 -- $300,000+ that is missing from the OIG data. [See, Appendix Tab M].

The Government's reliance on the OIG data is further unreasonable since Fort Hood credit card records for the same periods covered by the OIG data contradict the Government's claim.[10]

One of the Government's contentions in support of its maximum diversion of $44,242,718.66 argument is its unsupported contention that the MTFs did not use direct purchase agreements to bypass the prime vendor program. Again, the Fort Hood data contradicts that. Fort Hood produced documents evidencing Fort Hood's purchase of substantial quantities of DAPA items from General Medical Corporation during the contract period pursuant to contract number SP020097A9420.[11] [See, for example, Appendix Tab O].

There is additional evidence from the Fort Hood production that the OIG data does not represent the universe of potential diverted purchases. Fort Hood produced a document titled

---

[10] Appendix Tab N is Plaintiff's first quarter 2000 sample of the Fort Hood credit card data. This was approximately a 3% sample. Appendix N also includes the OIG data for the same period, organized by vendor. There are a number of medical supply purchases shown in the Fort Hood data that are not shown in the OIG data. For example, the OIG data does not evidence any credit card purchases from Krasity's Medical and Surgical during Q1 2000. In contrast, the Fort Hood credit card data evidences three credit card purchases by card holder Susheep Oden on March 15, 2000.

Regional Tri-Service Medical Logistics Data Collection document ("the Data Collection Report"). [Appendix Tab P].

The Data Collection Report covers the quantity of total medical supplies purchased by Fort Hood during the six-month period from October 1, 1999 through March 31, 2000. It records total purchases of medical supplies during that six-month period of $5.6 million (annualized, $11.2 million); total prime vendor purchases of approximately $600,000 (which is consistent with United Medical's records); total credit card purchases of $1.9 million (over two times the monthly average claimed by the Government based on the OIG data); total purchases *via* blanket purchase agreements of $1.6 million; and total purchases *via* local purchase methods of $0.6 million.

The Fort Hood and Ethicon document productions provide compelling justification for rejecting the Government's claim that the OIG records can be used to estimate the universe of potential diverted purchases. The purchase documents destroyed by the other MTFs, which would be the best evidence on the issue, are the documents the Government destroyed at a time when it was under a duty to preserve and had knowledge that these types of documents were potentially relevant.

**10. The Government has refused to answer Interrogatory 5, notwithstanding the Court's order to do so.**

In its 2002 responses to interrogatories, the Government claimed that the dollar amount of DAPA items that each MTF ordered from Plaintiff, but which was not supplied by United Medical could be calculated from the fill rate forms. An issue arose at the summary judgment hearing whether this calculation was possible. Accordingly, during the deposition of Mr. Jennings, Plaintiff inquired of Mr. Jennings if the calculation was possible and the methodology

---

[11] General Medical was a distributor that competed with Plaintiff.

to make it. Mr. Jennings confirmed the calculation was possible and explained the appropriate methodology.

In June 2005, based on Mr. Jennings' testimony and the Government's refusal to answer interrogatory 5, Plaintiff sought an order compelling the Government to perform the calculation. Pursuant to the July 15, 2005 JSR, the Government agreed to perform the calculation. Since that time, the Government still claims that the calculation cannot be made. In April 2006 the Court ordered the Government to answer the interrogatory. It simply refuses. The Government claims that Plaintiff cannot prove that it could have provided the supplies that the Government obtained by diversion. United Medical's historical record as evidenced by the fill rate calculations is relevant to this issue.

## IV. APPLICABLE LAW

The Government admits that potentially relevant documents were destroyed after the litigation commenced. Moreover, it cannot reasonably deny that many of its discovery responses were incomplete and were not formulated based on reasonable inquiry. Further, the Government cannot reasonably deny that its discovery conduct has not substantially delayed the progress of this case. Thus, the Court is presented with a sanctions request based on the interplay of discovery abuse and document destruction.

### 1. Elements for Spoliation Sanctions.

The Armed Services Board of Contract Appeals recently reviewed the elements relevant to a request for sanctions based on spoliation. *Appeals of Northrup Grumman Corporation,* ASBCA No. 52178, 2003 WL 21380406 (2003). It stated,

> Sanctions have been found appropriate 'if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party.' *West v. Goodyear Tire & Rubber Company*, 167 F.3d 776, 779 (2nd Cir. 1999). A discovery order need not be in place, as trial forums have the inherent power to control litigation, and the

> trial forum has broad discretion in imposing sanctions for spoliation. 'The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party' [citations omitted].' *Id.* However, before a sanction may be imposed for spoliation, there must be a finding that the destruction prejudiced the opposing party. *Dillion v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993).
>
> Where a party destroyed physical evidence at the heart of the parties' dispute after conducting its own tests, and the opposing party was thereby denied the opportunity to conduct its own tests on that physical evidence, prejudice has been found. 'Perhaps that [destroyed] evidence was an irreplaceable part of GM's defense . . . . Then again, perhaps not. But therein lies the prejudice-- GM was denied any opportunity to find out one way or the other.' *Marrocco v. General Motors Corp.*, 966 F.2d 220, 223 (7th Cir. 1992).

This Court has had occasion to consider spoliation issues. In a case the Court cited to the parties, *Pueblo of Laguna v. United States*, 60 F. Cl. 133 (2004), the Court concluded that its inherent powers include the power to issue document preservation orders. *Id* at 136. It further noted that spoliation sanctions typically have not been imposed by the Court of Federal Claims absent a finding of bad faith. *Id*, fn 11 at 139. *See, Columbia First Bank, FSB v. U.S.*, 58 F. Cl. 54, 56 (2003), holding that the bad faith requirement of *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986) is a controlling case. But, as this Court noted, there is considerable tension between the holding in *Eaton Corp*. and the holding in *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572-73 (Fed. Cir. 1996) in which the Federal Circuit held that no bad faith was required if the destruction resulted from a purposeful action. *Klump v. U.S.*, 54 F. Cl. 167, fn 13 (2002).

In *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) the District Court examined the duty to preserve evidence and the "culpable" state of mind that would warrant sanctions for breach of that duty. It held, "The scope of a party's preservation obligation can be described as follows: Once a party reasonably anticipates litigation, it must suspend its routine

document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Id.* at 218. The Court concluded that the requisite state of mind existed when employees ignored an attorneys preservation directive, even though they did not do so with an intent to harm the opposing party's case.[12]

Similarly, the District Court for the Northern District of Illinois held, "Once a party is on notice that files or documents in their possession are relevant to pending litigation, the failure to prevent the destruction of relevant documents crosses the line between negligence and bad faith, even where the documents are destroyed according to a routine document retention policy." *Krumwiede v. Brighton Associates, LLC*, 2006 WL 1308629, (N.D. Ill. 2006). It is evidence of bad faith if a defendant fails to suspend its document retention policies after notice of the plaintiff's claims. *Broccoli v. Echostar Communications Corp.*, 229 F.R.D. 506, 512 (D. Md. 2005).

**2. Sanctions for Discovery Abuse.**

The Government did not make reasonable inquiry in responding to Plaintiff's discovery requests and it has resisted for over a year Plaintiff's straight forward request to have the scope of the inquiry disclosed. In June 2005, Government counsel advised Plaintiff's counsel that it would be a waste of time to visit the various MTFs because the Government believed all relevant documents had been produced. To make matters worse, the Government misrepresented to the Court and to Plaintiff's counsel the scope of its inquiries. And, the Government did not comply with the Court's order to produce all remaining credit card data by July 5, 2006. It still has not complied.

Discovery sanctions are governed by RCFC Rules 26(g), 30(d), 37 and 45.

---

[12] Surely there was a directive from DOJ to DSCP regarding preservation of documents.

Rule 26(g) is patterned after the 1983 version of Rule 11. It requires the signer of discovery papers to make reasonable inquiry to ascertain the appropriateness of the discovery response. Reasonable inquiry requires that the attorney signing the discovery paper has made "a reasonable effort to assure that the client has provided all the information and documents available to [it] that are responsive to the discovery demand." *Fed. R. Civ. Proc. 26(g),* Advis. Comm. Note – 1983 Amend. If a discovery response is not the product of a reasonable inquiry, the Court must impose a sanction. *See, Precision Pine & Timber, Inc. v. U.S.,* 2001 WL 1819224 (Fed. Cl. 2001)(not reported in Fed. Cl.). But the sanction to be imposed under Rule 26(g) is within the discretion of the Court. *Thorton-Trump v. United States*, 12 Cl. Ct. 127, 130 (1987).

*Metropolitan Opera Ass'n v. Local 100, Hotel Employees,* 212 F.R.D. 178 (S.D.N.Y 2003), presented facts with some disturbing similarities to the facts in this case. There the District Court granted Plaintiff's motion for judgment as a sanction. In imposing the sanction of judgment the District Court identified a situation that parallels the situation in this case. He wrote,

> In my consideration of the Union's and its counsel's conduct in this case, two statements are particularly apt. In *National Association of Radiation Survivors v. Turnage,* 115 F.R.D. 543 (N.D. Cal 1987), now Chief Judge Patel wrote: 'The [defendant's] various discovery omissions are directly attributable to the failure of defendant and its counsel to establish a coherent and effective system to faithfully and effectively respond to discovery requests.... [T]he defendant employed an unconscionably careless procedure to handle discovery matters, suggesting a callous disregard for its obligations as a litigant.
> * * * * * *
> The court concludes that defendant and its counsel failed in a variety of instances to conduct any reasonable inquiry into the factual basis of its discovery responses.... Such an inquiry would have required, at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to account for the collection and subsequent production of the information to plaintiffs.' *Metropolitan Opera* at 221.

The *Metropolitan Opera* court continued, quoting from *Tarlton v. Cumberland County Correction Facility*, 192 F.R.D. 165 (D.N.J. 2000),

> ‘It is not an excuse that defense counsel did not know about the retention of the cover sheets. Counsel had a duty to explain to their client what types of information would be relevant and responsive to discovery requests and ask how and where relevant documents may be maintained. The client is charged with knowledge of what documents it possesses. *It was not their option to simply react to plaintiff's fortuitous discovery of the existence off relevant document by making disjointed searches, each time coming up with a few more documents, and each time representing that that was all they had. Under the federal rules, the burden does not fall on plaintiff to learn whether, how and where defendant keeps relevant documents.*‘ *Id* at 170 (emphasis added).
>
> ….
>
> As is apparent from the lengthy factual recitation above, (footnote omitted) Union counsel's participation in and supervision of discovery in this case was in no way ‘consistent with the spirit and purpose of Rules 26 through 37,’ and mandatory sanctions under Rule 26(g) must be imposed… Counsel had an affirmative duty under Rule 26(g) to make a reasonable inquiry into the basis of their discovery responses and to ‘stop and think about the legitimacy of [those responses].’ Instead, as is crystal clear in hindsight, counsel's response to the Met's discovery requests, in formal responses, in letters (footnote omitted) and to the Court-particularly counsel's repeated representations that all responsive documents had been produced- were made without any real reflection or concern for their obligations under the rules governing discovery and, in the absence of an adequate search for responsive documents, without reasonable basis. *Metropolitan Opera* at 221.

The *Metropolitan Opera* court found “especially troubling,”

> and of great weight in my decision to impose the most sever sanction, is that counsel's conduct was not merely negligent but was aggressively willful. Union counsel's repeated representations of full production were made in response to Met counsels' continued high—decibel allegations of failure to make adequate inquiry and repeated demonstrations of incomplete compliance and non-compliance with discovery requests. …Local 100's counsel continually (footnote omitted) professed full compliance-falsely and, as confirmed by compliance discovery, without making a reasonable inquiry – constitutes such gross negligence as to rise to intentional misconduct. *Metropolitan Opera* at 222-223.

Here we have Plaintiff's repeated complaints about failures to make adequate inquiry, refusals to describe the inquiry made, repeated misrepresentations to the Court that no more documents remained to be produced, that complete searches had been made, and that adequate document protection procedures had been implemented.

RCFC 37(b)(2) provides that if a party fails to obey a discovery order or scheduling order, sanctions may be imposed, which sanctions may include an order that designated facts shall be take to be established. Plaintiff argues for such a sanction.

## V. CONCLUSION AND REQUEST FOR RELIEF

The Government has no justifiable explanation for its conduct. The fact that over half of the MTFs were unaware of United Medical's claims until May 2006 coupled with repeated misrepresentations by the Government that it had taken the necessary steps to identify and preserve potentially relevant evidence is serious litigation misconduct. It neglected its duties to preserve potentially relevant evidence before Plaintiff even filed it lawsuit in 2002. It dug in its heels to avoid providing discovery, all the while misrepresenting to both Plaintiff's counsel and the Court the efforts made to identify and preserve potentially relevant evidence.

A fundamental issue is whether discovery should continue at all, and if so, at what level. With respect to much of the evidence additional discovery will not be productive, since it has been destroyed. The Government has had multiple opportunities to identify and produce documents. Only after the Court required the filing of affidavits by the various MTFs did an accurate picture of discovery abuse emerge. Should the Government be given "one more chance."

Plaintiff believes that continued discovery efforts from the Government, for the most part, will be fruitless. Too many documents have been destroyed. The Government should not

be given one more chance to provide discovery on the diversion issue. The Government's interrogatory responses to Interrogatory 4 admit prejudice to Plaintiff. The question has become whether the OIG data is a reliable basis on which to estimate diversion. There is substantial evidence that it is not, and that a much more reliable basis would be analysis of the documents destroyed. Plaintiff should not have to suffer the risk of error.

On the issues of usage data, negligent estimation, and accounts receivable, an evidentiary baseline needs to be established similar to the baseline on diversion established by the affidavits. Then a decision can be better made on what continued discovery should take place on those issues.

Plaintiff requests that the Court enter a sanctions order establishing as a controlling facts in this case that the Government's dollar requirements under the contract of medical supply items that should have and could have been purchased from Plaintiff during the term of the 47-months of the contract period were $199,500,000.00, which is 95% of the amount of the estimated requirements for the 47-month period. The Government had ample opportunity to answer interrogatory 5 concerning the historical percentage of orders filled by United Medical. It did not, notwithstanding Mr. Jennings testimony that the interrogatory could be answered, the Government's agreement to answer it, and the Court's order to answer it. It also had ample opportunity (as well as the obligation) to respond to Plaintiff's discovery requests pertaining to usage data and the quantity of diverted purchases. It did not. Plaintiff's requested sanctions are appropriate under the circumstances.

Plaintiff further seeks a monetary sanction. Plaintiff's counsel has been required to spend significant time and expense chasing this discovery and Plaintiff has experienced considerable

and unnecessary delay in the progress of the case, during which delay documents have been destroyed and witnesses disappeared or their memories faded.

Since none of the MTFs responded with information pertaining to Plaintiff's claims for breach of contract based on failure to provide usage data, negligent estimation of requirements, and failures to pay outstanding receivables, Plaintiff is not in a position to specifically identify what sanctions might be appropriate in connection with Defendant's conduct on these issues. Plaintiff suspects that data has been destroyed without timely, if any, notification to the MTFs to preserve this type of information. Plaintiff claims that various MTFs received goods from Plaintiff for which Plaintiff has not paid. The Government has refused to produce records with respect to the specific purchase orders ("calls") identified by Plaintiff as outstanding, even though DSCP documents reflect an outstanding balance owed to United in January 2001 of $284,000.[13] Obviously, many MTFs were not timely notified of this claim by Plaintiff. Plaintiff seeks supplementation of the affidavits to identify what records pertaining to the calls existed, what records pertaining to the calls remain, and when and how any destruction of records took place. Accordingly, Plaintiff requests that the MTFs be required to supplement their affidavits with information on these issues.

**Signed July 31, 2006.**

[13] The same document implied DSCP might withhold payment to extract other concessions from United Medical.

Respectfully submitted,

s/ Frank L. Broyles

Frank L. Broyles
Texas State Bar No. 03230500
GOINS, UNDERKOFLER, CRAWFORD
& LANGDON, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

A copy as filed will be served on Kyle Chadwick via the Clerk's electronic service and by email on July 31, 2006.

s/ Frank L. Broyles