Appendix F – Plaintiff's Adversary Proceeding asserting CDA claims in Bankruptcy Court

Frank L. Broyles
1201 Elm St.
Suite 4800
Dallas, TX 75270
214-969-5454
214-969-5902 Telecopy
frankb@gucl.com email
Special Counsel to Reorganized Debtor

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| In re: UNITED MEDICAL SUPPLY COMPANY, INC., Reorganized Debtor | CASE NO.01 - 41911-bjh-11<br><br>Chapter 11 |
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>v.<br><br>United States of America, Defendant | Adversary: 02-04230 |

**COMPLAINT**

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

Plaintiff, United Medical Supply Company, Inc. ("Plaintiff"), files this its Complaint against the United States of America ("the government") pursuant to the Contract Disputes Act, 41 U.S.C. §601 *et seq.*, and in support would show the Court as follows:

## I. JURISDICTION

1. This is a core proceeding under 28 U.S.C. §157(b)(2)(O) and a direct appeal of an adverse decision of a contracting officer pursuant Section 10(a)(1) of the Contract Disputes Act.



2

2. The Confirmed Plan of Reorganization provides for retention of jurisdiction in this court to resolve these claims.

3. This is an appeal of an adverse decision by a contracting officer of the Defense Supply Center Philadelphia, a component of the United States Department of Defense. Under judicial interpretations of the 1994 amendments to Section 10 of the Contract Disputes Act, bankruptcy courts have concurrent jurisdiction to hear appeals from decisions of contracting officers.

4. The government, in adversary proceeding number 01-4124, expressed its opinion that this court could hear this breach of contract case.

## II. THE PARTIES

5. Plaintiff, United Medical Supply Company, Inc., is a reorganized debtor operating under a confirmed Chapter 11 Plan. Its principal offices are in the Northern District of Texas.

6. Defendant is the United States of America. Service on Defendant is made pursuant to F.R.C.P 4(i) by serving the summons and complaint by **certified mail, addressed to the Civil Process Clerk, U.S. Attorney for the Northern District of Texas, 1100 Commerce Street, Suite 300, Dallas, Texas 75242-1699**, with a copy of the complaint and summons sent certified mail to the **Attorney General for the United States at: Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.**

## III. STANDARD OF REVIEW

7. Trial before this court is *de novo* and there is no presumptive validity to the decision of the Contracting Officer denying Plaintiff's claim. Contract Disputes Act, §§6(a) and 10(a)(3). *Assurance Co. v. U.S.*, 813 F.2d 1202 (Fed. Cir. 1987).

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Plaintiff has exhausted all required administrative remedies.

9. Prior to filing of this lawsuit, UMS submitted its claim with supporting documentation to the Contracting Officer at the Defense Supply Center Philadelphia. The claim, as filed, but without the appendices, is Appendix Exhibit A. The claim was promptly and completely denied by the government without any documents to support the alleged bases for the denial. Appendix Exhibit B.

10. Plaintiff, twice, submitted written requests for resolution of the dispute by ADR procedures.

11. Plaintiff's first ADR request was submitted prior to its submitting its claim to the contracting officer. Appendix Exhibit D.

12. The government denied the first ADR request on the grounds that a claim had not been submitted. Appendix Exhibit E.

13. The second ADR request was submitted at the time Plaintiff submitted its claim.

14. The government denied the second ADR request without the explanation required by law.

15. Plaintiff has submitted several FOIA requests pertaining to its claim and the bid representations made by the government. All FOIA requests were actually or constructively denied. One of the denials was made by the contracting officer, who had no authority to deny these requests. Appendix Exhibit F.

## V. BACKGROUND FACTS

16. This breach of contract lawsuit arises out of a 1997 requirements, or "sole source," contract between Plaintiff and the Defense Personnel Support Center ("DPSC"), now known as the Defense Supply Center Philadelphia ("DSCP"), a component of the United States Department of Defense.

17. Plaintiff's claims are not complicated or technical. This dispute is not unlike disputes often found in private industry and is not arcane.

18. The government solicited bids from Plaintiff and others to sell tens of thousands of types of medical supplies and equipment to Department of Defense medical facilities. Initially, all government medical facilities subject to the contract were located in a three (3) state area (Texas, Oklahoma and New Mexico) known as the Lone Star Region. Eventually, the government added one Arizona medical facility to the region. This addition was later deleted.

19. To induce companies to bid, the government represented, among other things, that (1) the successful bidder would have certain exclusive distribution and sales rights for the Lone Star Region; (2) the government's estimates of the amount that it would purchase over a five year period were based on historical figures; (3) The

government estimated its requirements for products under the contract over a five-year period would exceed $270 million; (4) payment for products purchased would be made in accordance with a fifteen day prompt payment provision of the contract; and (5) the government was committed to the use of ADR at any stage of a dispute with the contractor.

20. Plaintiff was the successful bidder for the Lone Star Region.

21. Plaintiff did not reap any rewards for being the successful bidder. The government substantially misrepresented its requirements, failed to meet its initial obligations to provide complete historical usage data, and failed to honor its "sole source" commitments to Plaintiff.

22. Indeed, the government materially breached or misrepresented every one of the five "inducements" described in paragraph 18. Possibly the most financially devastating breach resulted from the government's purchasing only 1/8th of its estimated purchases from Plaintiff.

23. As a result of the conduct by the government, Plaintiff has suffered substantial damages.

24. Plaintiff's damages include but are not limited to lost profits, damage to reputation, and attorneys' fees.

25. Applicable government contract law entitles Plaintiff to recover approximately $26 million in damages plus a portion of its attorneys' fees plus statutory interest.

## A. SUMMARY OF MATERIAL CONTRACT TERMS

26. Material terms of the contract relevant to this lawsuit include, among others:

- The government's agreement that all medical facilities in the Lone Star Region participating in the Prime Vendor Program, with a few inconsequential exceptions, would order all medical supplies and equipment described in the contract from Plaintiff during the term of the contract.

- The government's agreement that it would pay for products purchased under the contract within fifteen days of the later of receipt of the product by the medical facility or receipt of the invoice.

- The government's agreement that if its orders from Plaintiff under the contract did not equal or exceed 90 percent of the estimated $270,000,000, the government would negotiate an adjustment to the contract price.

- The government's agreement that each government medical facility covered by the contract would provide Plaintiff with complete historical product and equipment usage data within a 45 days of the inception of the contract.

- The government's agreement that it would provide Plaintiff with all Distribution and Pricing Agreements as part of contract implementation.

- The government's commitment to use ADR at any stage of a dispute.

- The initial contract term was for one year, beginning June 1, 1997.

- The government, at its sole option, could renew the contract annually, up to four annual renewal periods, for a total contract period of five years.

- The government exercised three of the annual option periods.

## B. HISTORY AND DEVELOPMENT OF THE PRIME VENDOR PROGRAM AND THE BID PROCESS

27. A brief history of the Prime Vendor Program and bid solicitation process is helpful in understanding Plaintiff's claims.

28. Prior to 1990 and acquisition reform, DSCP had a monopoly on sales of medical and surgical supplies to Department of Defense facilities. Acquisition reform legislation changed that, and the Department of Defense facilities were permitted to seek better service, better product or lower price from the vendors of their choice.[1] In response and in an effort to maintain its supply position, DSCP developed the Prime Vendor Program. (The program in which Plaintiff participated is usually referenced in this lawsuit as the Prime Vendor Program.) In 2001, this program was replaced with the Prime Vendor II Program. Plaintiff unsuccessfully bid, and did not otherwise participate in the Prime Vendor II Program.

29. Under the medical and surgical Prime Vendor Program envisioned by DSCP, there were four types of participants in the program: (1) the DSCP customer or "end-user" medical treatment facilities ("MTFs"), *i.e.*, the Department of Defense medical treatment facilities that purchased medical and surgical supplies and equipment, (2) DAPA-holders,[2] *i.e.*, medical and surgical product manufacturers or

---

[1] Address by Colonel Joel Lamy, Director, Medical Material, DSCP, to the attendees of the PREPACs Conference held February 19, 1998 in Philadelphia. PREPACs refers to "prepackaged medical procedural kits."

[2] DAPA is an acronym for "Distribution and Pricing Agreement."

manufacturers' representatives, (3) regional sole source distributors, or Prime Vendors ("PVs"), and (4) DSCP as Prime Vendor Program administrator.

30. The purchasers of medical and surgical supplies were going to be the participating Department of Defense medical treatment facilities.

31. The seller of products to the medical treatment facilities was going to be the Prime Vendor.

32. DSCP was going to administer the Prime Vendor Program for these facilities and charge an administrative fee to each facility.

33. The DSCP administrative fee averaged approximately 1.3% of the cost of the medical and surgical supplies purchased by that facility from the Prime Vendor.

34. Almost all Department of Defense medical treatment facilities in the Lone Star Region agreed to participate in the med/surg Prime Vendor Program.

35. The fourth type of participant was the DAPA holder. DAPA holders were either manufacturers, or some-type of middleman between the manufacturer and the Prime Vendor.

36. Table 1 below is a summary illustration of the relationships.

Table 1




37. Upon receipt of an order the Prime Vendor (i.e., Plaintiff) generally would fill the order and include a packing slip invoice in the packing material.

38. The filled order and invoice was then shipped, at Plaintiff's expense, to the ordering facility.

39. That packing slip invoice included a 1.3% administrative fee charged by DSCP. The actual receivable maintained on the Prime Vendor's books excluded the DSCP administrative fee.

40. The government was obligated to pay the Prime Vendor the actual receivable amount (*i.e.*, the packing slip invoice amount less the administrative fee) within fifteen days from date of the invoice or date product was received, whichever was later.

41. The Prime Vendor, in exchange for the benefits of being a sole source, assumed the burden of inventory management.

42. To avoid the costs of stocking unneeded supplies and equipment and to provide the effective maintenance of an inventory of 120,000 plus (and growing) DAPA items, detailed product usage data was to be provided to the Prime Vendor by the participating medical treatment facilities.

43. The government contractually agreed to provide all DAPAs and the above described usage data as part of the transition and implementation period.

**C. THE SOLICITATION PERIOD**

44. In 1993 the Department of Defense, through the DSCP, pursuant to Solicitation DLA120-93-R-0587, invited offers from private companies to become the Prime Vendor to the Department of Defense for various medical and surgical supplies and equipment in the Lone Star Region pursuant to a requirements contract.

45. The Solicitation was amended several times, but the contract being solicited consistently remained a requirements or "sole source" contract in accordance with terms set forth in Federal Acquisition Regulations ("FAR") clauses 52.216-1, 52.216-9P06, and 52.216-21.

46. The Initial Solicitation, the Award, the Solicitation Amendments, and the Contract Modifications were clear with respect to the certain material terms of the contract being awarded.

47. The Initial Solicitation ("1993 Solicitation") represented that a Prime Vendor Program was being established and that the Prime Vendor contract would be a requirements contract, under which the Prime Vendor would be the sole source of

specified classes of brand name and generic medical and surgical supplies and equipment.

48. The Initial Solicitation "cautioned" that,

> "a requirements type contract is contemplated with the option to extend the contract for four additional one year periods.... Offers on the options are mandatory. Failure to offer on all options will result in an offer being eliminated from further consideration...."[3]

49. The government initially claimed that,

> "...the medical treatment facilities that will be covered by the contract locally spent an estimated $27,500,000.00 per year for those types of consumable and disposable medical/surgical products and hand-held surgical instruments covered by the proposed contract."[4]

50. As described below, this $27,500,000.00 estimate was doubled, and proposed Prime Vendors were directed to use the increased estimate to determine their offers.

51. The government further represented in the Initial Solicitation that it would evaluate price offers by:

> *"(1) Multiplying the annual estimated requirements for the base ordering period and each option period by the offeror's distribution fee for each period and then (2) adding the dollar figure for each*

---

[3] 1993 Solicitation at 4.

[4] 1993 Solicitation at 6.

> *year to arrive at the total cost for the distribution fee for the entire 5 years."*[5]

52. The Statement of Work represented that the Prime Vendor would provide,

> "all medical/surgical products for which the Prime Vendor has been authorized as a distributor under the [Distribution and Pricing Agreements]."

53. The government also represented that it would provide all Distribution and Pricing Agreements to the Prime Vendor.

54. The Statement of Work ("SOW") dealt with implementation and transition.

55. The transition schedule specifically identified the medical facilities that would be participating in the Prime Vendor Program and provided deadlines for implementation of the Prime Vendor Program for each of these facilities.

56. The specified deadlines ranged from 60 days following the Effective Date of the Contract to 180 days.[6]

57. The government made a material commitment to potential offerors, including Plaintiff, when it represented that,

> "Participating facilities must provide the contractor with usage information six (6) weeks prior to start-up.... Items ordered by a facility whose usage data has not been provided or product quantities of [sic] the most recent

---

[5] 1993 Solicitation at 6.

[6] Prime Vendor Program Commencement Schedule, 1993 Solicitation at 75.

> month in question exceeding the prior 45 day usage will be exempt from the [fill rate] calculation."[7]

58. This commitment was critical to effective inventory management for several reasons, the most important being that ordered medical supplies often could not be returned to the manufacturer, if they could be returned at all, without a substantial restocking charge. Since the restocking charge could not be passed on to the government, it was imperative that Plaintiff minimize ordering DAPA supplies the government would not purchase. Plaintiff's ability to minimize the ordering of supplies not needed by the government was dependent on receiving accurate product usage information as contractually promised by the government.

59. The government emphasized,

> "THE MINIMUM REQUIREMENTS DESCRIBED IN THE ABOVE CITED STATEMENT OF WORK REPRESENT THE <u>MINIMUM</u> NEEDS OF THE GOVERNMENT. ... SELECTION OF THE PRIME VENDOR WILL BE MADE BASED ON THE OFFER WHICH DEMONSTRATES THE HIGHEST PROBABILITY OF SUCCESSFUL PERFORMANCE AT A REASONABLE, REALISTIC PRICE WHERE TECHNICAL QUALITY IS MORE IMPORTANT THAN PRICE...."[8]

60. The Solicitation incorporated FAR Requirements Clause 52.216-21(c), which stated the requirements and the government's obligation to purchase the participating medical treatment facilities' requirements from UMS. It stated,

---

[7] 1993 Solicitation at 8.

[8] 1993 Solicitation at 15.

> (c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.[9]

61. Proposed exceptions to the government's obligations to purchase all requirements from Plaintiff were identified in the Solicitation at pages 21, 33 and 34. The Solicitation incorporated and quoted FAR clause 52.216-9P06 which excluded from the requirements clause orders of less than $50.00.

62. Proposed exclusions under FAR clause 52.216-21(e) were orders for supplies "urgently required by the Government" before the date that the Prime Vendor was required to make such delivery and the Prime Vendor refused the accelerated delivery.

63. Proposed exclusions under FAR clause 52.216-9P13 were orders for supplies available from depot stock, routine orders which the Prime Vendor could not fill due to backorders from the manufacturer; emergency orders which could not be filled within two hours of order, and orders which were required to be filled from the Federal Prison System or certain other special programs.

64. The Solicitation documents also provided that the government would not have to use the Prime Vendor to fill orders of less than $50.

[9] 1993 Solicitation at 34.

65. The impact of all exclusions on the contract was negligible compared to the $270,000,000 estimated value of the contract.

66. The Solicitation also incorporated FAR's Prompt Payment clause and specifically amended the clause to provide for 15-day payment under FAR 52.235-25(a)(2)(i-ii).

67. On September 14, 1993, Plaintiff submitted its initial proposal in response to the government's Initial Solicitation. The initial prime vendor contract for the Lone Star Region, however, was awarded to Owens & Minor, not to Plaintiff.

68. On December 4, 1995, apparently in response to poor performance by Owen & Minor, the government re-solicited offers by means of Amendment 008.

69. Amendment 008 provided that the government could accept offers in response to the Initial Solicitation and amendments 001 through 007 as an offer under Amendment 008.

70. One important difference between the Initial Solicitation and Amendment 008 was the change in the government's representation regarding the estimated volume of medical and surgical supplies and equipment to be purchased. The government's representation in Amendment 008 was:

> Estimated Annual Requirements:
>
> *... the medical treatment facilities that will be covered by the contract locally spent an estimated $57,665,500 per year for those types of medical/surgical products covered by the proposed contract. No guarantee is given that this volume will be purchased. It should be noted that during the first year of the*

> *contact [sic] each facility will begin to reduce its existing inventory of medical/surgical products. Orders will be placed with the Prime Vendor as existing inventories are reduced to lower levels This may effect the volume of ordering during the base ordering period.*[10]

71. Amendment 008 incorporated FAR clauses 52.216-1 and 52.216-21 and continued the government's constant drumbeat that the contract was a requirements contract by specifically stating that the contract was a "Firm Fixed Price Requirements Contract."

**72. Amendment 008 further restricted the government's right to purchase from alternative sources by substituting FAR clause 52.216-9P06 for FAR clause 52.216-9P13, which limited the exceptions to the government's obligation to order from Plaintiff to either orders for less than $50.00 or emergency orders that could not be promptly filled by Plaintiff.**

73. Amendment 008 additionally incorporated FAR Clause 52.217-9p14(M), which adopted the same "Evaluation of Offers" language contained in the Initial Solicitation.

74. Amendment 008 gave the government the right to add or delete ordering facilities and to change the Contract Estimate based on such additions or deletions.

75. During the term of the contract, the government added two major purchasing facilities, later deleted one of those facilities (Ft. Huachuca, AZ), and deleted

---

[10] Amend 008 at 12.

one minor clinic. The largest added purchasing facility was AFMLO/OL-2, Ft. Worth, Texas, with estimated annual purchases of $400,000.00.

76. The implementation and transition plan was changed to provide that the contractor would be given 120 days following the acceptance by the government of the Prime Vendor's implementation plan.

77. The implementation plan accepted by the government required it to provide Plaintiff with complete product historical usage data.

78. Amendment 008 contained the same 15-day payment terms included in the Initial Solicitation.

79. On January 17, 1996, shortly after issuing Amendment 008 to the Solicitation, the government provided Plaintiff with an 8-page written summary of the Lone Star Prime Vendor Program. Captioned, "Lone Star Region Recap," this document summarized the government's interpretation of the key program points. Some of the points made in the Recap relevant to this claim were:

> *Estimated [Annual] Sales: $57,655,500.00*
> *(Initial year may be lower due to Inventory reduction.)*
> *Facility Cost: DAPA/IDTC Price*
> *+ PV Fee (%)*
> *+ 1.3% = DPSC Fee*
> *Minimum Order: $50.00*
> *Payment: 15 days Via Electronic Funds Transfer (EFT)*
> Commence performance not later than 120 days after approval of plan. (If first PV award.)

*Implementation time based on government providing usage data to PV within 10 days of award.*

*Facility will reduce on-hand stock during transition period.*

80. The government issued Amendment 0012 on February 7, 1996. Plaintiff submitted its offer on the form and in accordance with the terms and requirements contained in Amendment 0012. The material terms on which Plaintiff relied in making its offer were carried forward from Amendment 008.

81. Amendment 0012 incorporated and quoted in full the clause 52.217-9P10, "OPTION FOR REQUIREMENTS CONTRACT TERM EXTENSION (PRIME VENDOR)." The option was a one-way option solely in favor of the government.

82. Amendment 0012 reiterated that the annual purchase volumes were estimated to be $57,982,750.00 after the initial year and directed Plaintiff to rely on this estimate. Specifically, the government stated:

> *" the ordering facilities that will be listed in Attachment III spent an estimated $57,965,500 per year for those types of medical/surgical products covered by the proposed contract. Based on this figure, the following is the Government's best estimate of yearly sales that the ordering facilities will experience over the five year period.*[11]

| | *Yearly Estimate* | *Approximately Yearly Maximum* |
|---|---|---|
| *First Year* | *$ 28,982,750.00* | *$ 72,456,875.00* |
| *Second Year* | *57,965,500.00* | *144,913,750.00* |
| *Third Year* | *57,965,500.00* | *144,913,750.00* |
| *Fourth Year* | *57,965,500.00* | *144,913,750.00* |
| *Fifth Year* | *57,965,500.00* | *144,913,750.00* |

[11] Amend. 0012 at 5.

83. Following the above table providing the purchase estimates, Amendment 0012 further emphasized that the offer should be based on these estimates and instructed offerors that, "*Your proposed distribution fee should be based on the Yearly Estimate....*"[12]

84. In Amendment 0012, the government provided a calculation example of how offers would be evaluated. That calculation again represented that the annual estimates did not include any distribution fee.

**D. PLAINTIFF'S BID**

85. Plaintiff read carefully the Solicitation and amendments when received. Amendments 008 and 0012 contained the offer forms and terms on which Plaintiff submitted its offer. They contained various material terms, including:

- "A requirements type contract [was] contemplated with the option to extend the effective period of the contract for four additional one year periods."[13]
- Estimated yearly requirements were based on previous usage as reported by the facilities. The estimates, exclusive of distribution fees, were for $28,982,750 in year one and $57,965,000 each year thereafter for four years. Plaintiff was instructed to propose a distribution fee based on these estimates.[14]
- The government's right to purchase supplies and equipment from third party sources, i.e., not Plaintiff,

---

[12] Amend. 0012 at 5.

[13] Amend. 008 at 5; Amend. 0012 at 4.

[14] Amend. 0012 at 5.

was limited to orders under $50 and emergency orders Plaintiff could not fill.

- The DAPA listing of products included in the requirements contract was estimated to include an initial 122,000 medical and surgical items and to grow to 500,000 items.

- Payment to Plaintiff would be by electronic funds transfer in 15 days from the later of the date the invoice was received or the date the goods were delivered.

86. In responding to the Solicitation, Plaintiff spent hundreds of hours preparing its offer and amendments.

87. Plaintiff confirmed with both Michael Schmitt - then Program Manager, Med/Surg Prime Vendor, Directorate of Medical Materiel, and Margaret Rees, his supervisor and then Chief of Medical/Surgical Products Group -- that the Lone Star Region would produce the volume of sales revenues estimated in the Solicitation and that that invoices submitted by Plaintiff would be paid within the 15 day contractual period.

88. Shortly after the award, but before the effective date, Plaintiff confirmed with Linda Flatley, then Chief, New Initiatives Section and the contracting officer ("CO"), that Plaintiff could rely on the requirements representations and terms of the solicitation and contract.

89. The Solicitation and contract represented that the government would pay each invoice within fifteen days of receipt of the invoice or, if later, delivery of the product.

90. Plaintiff reasonably relied on the accuracy of that representation in preparing its offer and calculating its projected cash flow and future cash needs.

91. The projected profits estimated by Plaintiff through the Prime Vendor Program were reasonable, but, like Plaintiff's cash needs, they were very much tied to 15-day payment by the government.

92. Plaintiff could not meet the government estimates without timely payment by the government in accordance with the terms of the contract.

93. Plaintiff, as a small business, did not have the internal financial capability to fund the projected sales growth.

94. Critical to Plaintiff was accurate and complete product usage data.

95. As a small business, Plaintiff could not risk stocking products the ordering facilities seldom or never purchased, or stocking too much of given products. The government's obligation to help Plaintiff to reduce this risk was to provide Plaintiff with complete and accurate product usage data. This information was also essential to ensure that Plaintiff did stock products that would be needed and used.

96. The primary tool for avoiding these problems was accurate and complete product usage data that, pursuant to the contract, was to be supplied by DSCP or the medical treatment facilities.

97. The Solicitation documents and repeated discussions with DSCP personnel assured Plaintiff that it could rely on the Solicitation documents, especially in

the volume, payment terms and product usage data representations of the government. If Plaintiff had had any significant reservations in these areas, it would not have submitted an offer.

98. Plaintiff would not have submitted its offer but for the fact that the contract being awarded was a "requirements contract" for purchase volumes represented by the government as substantial, that payment for the purchases would be made within fifteen days of invoice or product delivery, and that the Department of Defense would promptly provide accurate product usage data.

99. Plaintiff's decision to submit an offer and its proposed distribution fee were premised on these representations.

100. Plaintiff, in total and reasonable reliance on the material representations by the government, submitted its offer on February 26, 1996, and proposed a distribution fee of 6.4% of the DAPA cost of the supplies and equipment sold under the contract.

101. Plaintiff projected its profits and cash flows on the government's material representations and determined that a 6.4% distribution fee for the volume estimated by the government, if paid within fifteen days of invoice, would yield a reasonable profit.

102. The proposal offered by Plaintiff was accepted by the government as written, including the right to the renegotiated distribution fee described above in the event that the government's purchases did not equal at least 90 percent of the estimated amount.

## E. THE CONTRACT AWARD AND MODIFICATIONS

103. On January 30, 1997, and over the protest of two national distributors who had submitted competing offers, Plaintiff was awarded Prime Vendor contract number SP0200-97-D-7133 effective June 1, 1997, consistent with the solicitation.

104. The Award, signed by Linda Flatley as the Contracting Officer, assigned an "Estimated Dollar Value for the Base Year of $30,177,346.00 and an Estimated Total Contract Value of $272,268,314.00.

105. The award also incorporated the Solicitation Terms into the Contract and specifically identified the 32 ordering (i.e., purchasing) governmental units that were participating in the Lone Star Region's Prime Vendor Program. Block 18 of the Award incorporated the terms of Plaintiff's offer as follows:

> *Your offer on Solicitation Number DLA120-93-R-0587, including the additions or changes made by you which additions or changes are set forth in full above is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation* ***and your offer****, and (b) this award/contract. No further contractual document is necessary.* **Bolding added.**

106. Under this term of the award, incorporated into the contract and accepted by the government was the right of Plaintiff to a renegotiated fee if the government's purchases under the contract did not equal at least 90% of the government's $270,000,000 requirements estimate.

107. Shortly after the award, Brooke Army Medical Center, one of the participating facilities in the Lone Star Region Prime Vendor Program, raised an issue

concerning its obligations to purchase DAPA products solely from Plaintiff. Plaintiff was concerned about making capital investments if the contract was not a requirements contract. It immediately requested confirmation from the government that the award was for a requirements contract and that the obligations were absolute. On March 4, 1997, it received that confirmation from Linda Flatley, contract officer and then Chief, New Initiatives Section. She stated in response:

> **United Medical should not be reluctant to invest in capital commitments, but should proceed with full implementation as quickly as possible. Colonel McNabb, as well as DPSC, will provide complete support during the transition period and beyond.**[15]

108. Following the award, there were several subsequent material modifications to the contract. Modification No. 5, effective June 18, 1997, committed the government to alternative dispute resolution at any stage of a dispute; Modification No. 6, effective June 30, 1997, added AFMLO/OL-2, Ft. Worth, TX, as a purchasing facility with estimated annual purchases of $400,000.00.

109. Modification No. 10 signed by Linda Flatley for the government on May 27, 1998, effective June 1, 1998, exercised option year 1.

110. Modification No. 16 signed by James Jenning for the government on May 11, 1999, effective June 1, 1999, exercised option year 2.

---

[15] Exhibit C, attached.

111. Modification number 21 signed by Donna Kennedy for the government on May 22, 2000, effective June 1, 2000, exercised option year 3.

112. Modification No. 26 terminated the contract effective April 30, 2001. The ostensible reason given by the government for the termination was that it was implementing the Prime Vendor II Program.

## F. PLAINTIFF'S POST AWARD PERFORMANCE

113. The contract discussed, in detail, transition and implementation. In summary, the transition and implementation period was a 120-day period beginning when the government approved Plaintiff's implementation plan. Primary transition and implementation activities included: software installation, training on software use, evaluation of usage data to be provided by the government, attempted verification of usage data provided by the government, and data input for approximately 190,000 DAPA items.

114. From Plaintiff's standpoint, the most important transition objective it needed accomplished was receipt of complete and accurate product usage data for the participating facilities, as promised in the Solicitation and Award.

115. The government had ultimate responsibility to supply accurate and complete usage data.

116. The government did not faithfully discharge this obligation and Plaintiff never obtained accurate and complete product usage data, although Plaintiff devoted an inordinate amount of manpower attempting, unsuccessfully, to obtain this data from

the participating medical treatment facilities and the former Prime Vendor, Owens & Minor.

117. To ensure that adequate inventory could be housed and that deliveries would be timely, Plaintiff added warehouse space -- including a new 32,000 square foot facility in El Paso Texas, a 16,000 square foot addition to the San Antonio warehouse, and special climate controlled warehouse sections in Fort Worth and El Paso.

118. Plaintiff purchased substantial computer hardware and software to handle the ordering and invoicing process demanded by the government.

119. Plaintiff's fill rates typically were in excess of the 95% contract specification, notwithstanding the government's failure to provide complete product usage data and all DAPAs.

120. On occasion the lack of accurate and complete usage data and other problems at the ordering facility prevented a 95% fill rate.

121. When the government notified Plaintiff of problems, either with an ordering facility or with DSCP, Plaintiff responded promptly and professionally to resolve the problem.

122. Eventually the government terminated the contract early by means of modification 26, which terminated the contract in April 2001, just before the end of the third option (fourth contract) year.

123. The reason given by the government was that it was implementing Prime Vendor II.

124. The contract was not terminated for any performance problems attributable to Plaintiff; the government did not attempt to hold back any payments due Plaintiff as damage offsets; and the government did not alleged that it suffered damages from any breach by Plaintiff.

125. To the contrary, the government periodically admitted that it failed to perform its obligations under the contract and told Plaintiff that it was pleased with its performance as a Prime Vendor.

## VI. CLAIMS AND CAUSES OF ACTION

### A. BREACH OF CONTRACT

126. Plaintiff and Defendant contracted as described in the allegations of fact set forth above.

127. Plaintiff performed all its material obligations under the contract, or such obligations were excused or waived.

128. Defendant breached several of its material obligations under the contract, including its duty of good faith.

129. These obligations were breached by, among other things, diversion of purchases of supplies and equipment covered by the contract from Plaintiff to other sellers, failure to pay for medical supplies and equipment purchased and received, failure to honor the prompt payment provisions of the contract, failure to honor stock

commitments, failure to participate in requested ADR in an attempt to resolve the dispute without forcing Plaintiff to incur litigation expenses, and failure to provide complete and accurate product usage data and DAPAs to Plaintiff as required by the contract.

130. Defendant further breached the contract by failing to renegotiate the contract price after it purchased approximately 10 percent of Defendant's estimated purchases instead of the 90 percent required to excuse it from renegotiation of the contract price.

131. Defendant further breached its duty of good faith under the contract by exercising three annual options with knowledge that its estimates of contract value provided to Plaintiff as a basis for Plaintiff's bid were grossly inaccurate.

132. Defendant breached its duty of care in failing to promptly and accurately advise Plaintiff of the government's performance problems under the contract.

133. As a result of the breaches of contract by Defendant, Plaintiff has been damaged, for which it now sues.

134. Damages for which Plaintiff sues include but are not limited to lost profits and damage to reputation.

135. Plaintiff's lost profits were natural and inevitable upon breach by Defendant.

136. Defendant's breach was a substantial factor contributing to Plaintiff's lost profits.

137. Lost profits for which plaintiff now sues were reasonably foreseeable at the time Plaintiff and Defendant entered into the contract.

138. Plaintiff also seeks recovery of damage to reputation.

139. Damage to Plaintiff's reputation was natural and inevitable upon breach by Defendant.

140. Defendant's breach was a substantial factor contributing to damage to Plaintiff's reputation.

141. Damage to Plaintiff's reputation for which plaintiff now sues were reasonably foreseeable at the time Plaintiff and Defendant entered into the contract.

**B. BREACH OF DUTY OF CARE IN PREPARING BID DOCUMENTS**

142. The government owed a duty to Plaintiff to use reasonable care in fashioning estimates of the value of the contract it was soliciting from Plaintiff and others.

143. The government knew and intended that Plaintiff rely on the representations being made by the government in the bid documents pertaining to the estimated value of the contract and the source of information.

144. Plaintiff did reasonably rely on the government's representations in the bid documents.

145. The government breached that duty of care owed Plaintiff by failing to exercise ordinary care in preparing the bid documents, or acting in bad faith, or both.

146. The government further breached the duty of care owed Plaintiff by failing to update bid documents to correct substantial inaccuracies known to the government or alternatively, failing to provide Plaintiff with appropriate cautionary notices regarding the potential inaccuracies of the bid documents.

147. The government's breach of duty of care included but is not limited to misrepresentations about the basis for calculating the estimated contract value and the estimates themselves.

148. The representations by the government which form the basis for Plaintiff's claim of breach of duty of care were representations for which the government had superior knowledge and Plaintiff did not have any reasonable method to confirm or disprove the government's representations.

149. As a result of the breach of duty of care in preparing bid documents Plaintiff suffered damages that were: (1) natural and inevitable, (2) a substantial factor contributing to Plaintiff's damages and (3) reasonably foreseeable at the time Defendant provided Plaintiff with the bid documents. Such damages include losses suffered by Plaintiff in performing under the contract, reliance damages in preparing to bid on the contract and in performing under the contract, and damages to reputation.

## C. ATTORNEY'S FEES UNDER EQUAL ACCESS TO JUSTICE ACT

150. Plaintiff reserves its rights to assert claims under the Equal Access to Justice Act in the event that it prevails in this adversary.

## D. APPENDIX FILED WITH COMPLAINT

151. Exhibit A is a copy of the claim submitted to the government. The appendices referenced in the claim are quite voluminous and are not attached.

152. Exhibit B is Linda Flatley's denial of that claim on behalf of the government.

153. Exhibit C is the letter from Linda Flatley advising Plaintiff that the contract was indeed a requirements contract and that Plaintiff should make the capital commitments necessary to perform.

154. Exhibit D is Plaintiff's initial request for ADR.

155. Exhibit E is Linda Flatley's denial of that request.

156. Exhibit F is Linda Flatley's denial of a Plaintiff's FOIA request.

157. Exhibit G is a tabulated summary of the government's estimated purchases compared to actual.

# VII. PRAYER

Plaintiff requests that after trial on the merits, and after any required election of remedies, Plaintiff be awarded judgment against the government for its actual and

special damages, including lost profits and damage to reputation, plus interest on its claim as allowed by law, plus all other relief to which it justly may be entitled.

Respectfully submitted,

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Thanksgiving Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff