# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC.,<br>Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | CASE NO: 03-CV-289<br><br>Judge Allegra |

# PLAINTIFF'S BRIEF IN REPLY TO DEFENDANT'S OPPOSITION TO DISCOVERY MOTION

SUBMITTED BY:

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff United Medical Supply Company, Inc.

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ........ iii

**I. SUMMARY** ........ 1

**II. PLAINTIFF'S RESPONSE TO THE GOVERNMENT'S DEFENSES AND JUSTIFICATIONS** ........ 3

**Government Defense/Justification 1:**
A DOJ paralegal, according to the Government, was responsible for the discovery misrepresentations, the implication being that this is a mitigating factor ........ 3

**Government Defense/Justification 2:**
Plaintiff, according to the Government, has unclean hands because, according to the Government, it sold its assets shortly after filing its CDA Claim without attempting to retain relevant documents ........ 4

**Government Defense/Justification 3:**
There is not, according to the Government, a Certified Claim, implying that Plaintiff's discovery issues are irrelevant ........ 7

**Government Defense/Justification 4:**
The Government's Affidavits, according to the Government, are Unreliable, implying that they are not evidence of sanctionable conduct ........ 10

**Government Defense/Justification 5:**
The Government did not seek information on alternative purchase methods outside of credit card purchases because credit cards were the focus of Plaintiff's discovery efforts, implying that the Government had a lesser duty with respect to methods, other than credit cards, used to purchase DAPA items ........ 12

**Government Defense/Justification 6:**
Plaintiff has not provided the Government with a methodology necessary to answer Interrogatory 5, implying that the Government needs input from Plaintiff in order to answer the interrogatory ........ 13

**Government Defense/Justification 7:**
Deeming facts established, according to the Government, is not an available sanction for spoliation ........ 14

**Government Defense/Justification 8:**
Plaintiff's request for monetary sanction, according to the Government, lacks required specificity ........ 18

**III. CONCLUSION** ........................................................................................................ 18

Certificate of Service ........................................................................................................ 20

**APPENDICES**

Q. Email of June 21, 2005.

R. Transcript excerpt from December 5, 2005 hearing.

S. Plaintiff's Response to Initial Gov't Interrogatories served in 2002.

T. Account Receivable submitted to contracting officer as part of CDA claim.

U. Plaintiff's Response to Interrogatory 9 per Court order.

V. Affidavit of Frank L. Broyles with July 2006 time records.

# TABLE OF AUTHORITIES

**CASES:**

*Commercial Ins. Co. v. Gonzalez,* 512 F.2d 1307 (1st cir. 1975)............................................ 15

*Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986)..................................... 14

*Kindergartners Count, Inc. v. DeMoulin*, 209 F.R.D. 466 (D. Kan. 2002).......................... 2,16,17

*S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R.*, 695 F.2d 253 (7th cir. 1982) .............. 15

**STATUTES AND RULES:**

CFCR 26(g)......................................................................................................................... 2,15

CFCR 33 ............................................................................................................................... 2

CFCR 34 ............................................................................................................................... 2

Bankr. R. 7026(g) ................................................................................................................ 2

F.R.C.P. 33(d) ...................................................................................................................... 6

**PUBLICATIONS:**

*Sanctions in Civil Litigation: A Review of Rules 11, 26(G), 30(D), and 37, § 1927, Inherent Power, Appellate Rule 38, and § 1912 and Pending Legislative Changes,* SL081 ALI-ABA 301, 389 (2006)........................................................................ 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., *Plaintiff* | CASE NO: 03-CV-289 |
| v. | Judge Allegra |
| THE UNITED STATES, *Defendant* | |

**PLAINTIFF'S BRIEF IN REPLY TO DEFENDANT'S OPPOSITION TO DISCOVERY MOTION**

**TO THE HONORABLE UNITED STATES COURT OF FEDERAL CLAIMS:**

Plaintiiff files this its Brief in Reply to Defendant's Opposition to Discovery Motion as follows:

## I. SUMMARY

The Government asserts a number of random defenses to Plaintiff's motion. It attaches no documentary support for its factual assertions, several of which are materially wrong, including its statement that Plaintiff sold its assets after filing the CDA claim. The Government's "evidence" for its factual assertions consists of nothing but statements of its counsel. Plaintiff responds to each of those defenses, but many of them are diversions that are not responsive to the issues at hand.

The Government admitted in June 2005 that it had repeatedly advised Plaintiff that all existing MTF documents responsive to Plaintiff's documents had been produced. It had no basis for making those statements. Plaintiff on several occasions complained that the Government had not met its discovery obligations to disclose to Plaintiff the extent of the Government's efforts to

locate responsive documents. The Government's June 21, 2005 response to Plaintiff's counsel was,

> Please save your rhetoric about document production for the court…As I have stated repeatedly, the govt. doesn't believe there are any responsive docs at any MTFs that are not being produced to you on CD (except duplicates of what you saw in 2002 at DSCP). So you will be wasting your time at the MTFs – as you now say you did in deposing Jennings, and you try to blame us for. But you are welcome to waste your time at your risk. …" [Appdx Q attached].

The Government is not in a good spot. The record evidences repeated violations of CFCR 26(g) and its bankruptcy companion, Rule 7026(g), repeated failures of the Government to answer interrogatories and provide documents as required under CFC Rules 33 and 34 and similar bankruptcy rules; and misrepresentations to Plaintiff's counsel and the Court regarding the scope of the Government's search for documents and its efforts made to prevent further destruction of documents. Undisputedly, the Government now has failed to comply with the Court's order of April 26, 2006 as amended. In its "Defendant's Opposition to Discovery Motion," no attempt is made to defend or justify its failure to comply with paragraph (i) of the Court's order requiring production of all remaining sales data on or before July 5, 2006.

In its Opposition the Government takes the position that Plaintiff's proposed sanction is both unjustified and not a remedy available to this Court. Four types of sanctions are typically imposed in spoliation situations: (1) discovery sanctions, (2) the adverse spoliation inference, (3) a tort claim against the offending party, and (4) a disciplinary proceeding against the offending lawyer. *See,* David F. Herr and Nicole Narotzky, *Sanctions in Civil Litigation: A Review of Rules 11, 26(G), 30(D), and 37, § 1927, Inherent Power, Appellate Rule 38, and § 1912 and Pending Legislative Changes*, SL081 ALI-ABA 301, 389 (2006). In *Kindergartners Count, Inc. v. DeMoulin,* 209 F.R.D. 466 (D. Kan. 2002) the Court found it appropriate to enter a

spoliations sanctions order deeming certain facts established. The *DeMoulin* case and its applicability are examined in detail below.

## II. PLAINTIFF'S RESPONSE TO THE GOVERNMENT'S DEFENSES AND JUSTIFICATIONS

### GOVERNMENT DEFENSE/JUSTIFICATION 1:

#### A DOJ PARALEGAL, ACCORDING TO THE GOVERNMENT, WAS RESPONSIBLE FOR THE DISCOVERY MISREPRESENTATIONS, THE IMPLICATION BEING THAT THIS IS A MITIGATING FACTOR.

The Government attempts to justify misrepresentations to the Court by claiming that a "senior professional" of the Department of Justice failed to perform his job and then misrepresented that he had performed his job. That person obviously is a gentleman named Brown, a DOJ paralegal. Those allegations against Brown are contradicted by the record.

Government counsel's contention that he issued instructions to Mr. Brown is quite a broad statement. It does not include any detailed description of the instructions given, when they were given, how they were given, or what follow-up was made. It does not include any affidavit by Brown admitting fault.

In October 2005 the Government filed Brown's declaration, signed by Mr. Chadwick instead of Brown. The Declaration clearly shows that Mr. Brown had not made, nor was he claiming to have made, any *de novo* search of all the Medical Treatment Facilities in the Lone Star Region ("MTFs"). Brown states he relied on some general statements made to him by Anthony Amendolia at Defense Supply Center Philadelphia (DSCP"). Plaintiff's counsel noted at the December 5, 2005 hearing that the Declaration showed that the search had been inadequate. [Tr. p. 22, line 14 through p. 23, line 14, Appdx R]. Brown may be faulted for an inadequate search, but not misrepresentation.

Another misrepresentation issue raised by Plaintiff's motion concerns the representation to the Court in April 2006 that all MTFs had been contacted following the Government's October 2005 disclosure that documents had been destroyed to ensure that no further document destruction had been made. The Government's response does not address this.

**GOVERNMENT DEFENSE/JUSTIFICATION 2:**

**PLAINTIFF, ACCORDING TO THE GOVERNMENT, HAS UNCLEAN HANDS BECAUSE, ACCORDING TO THE GOVERNMENT, IT SOLD ITS ASSETS SHORTLY AFTER FILING ITS CDA CLAIM WITHOUT ATTEMPTING TO RETAIN RELEVANT DOCUMENTS.**

The Government alleges in paragraph number 2 that Plaintiff sold its assets 3-months after it filed its CDA claim without making any attempt to retain documents in its possession relevant to the claim. Defendant does not offer any evidence to support such a statement. The statement is wrong on both counts.

United Medical sold substantially all of its assets about 6-months prior to filing its CDA claim. The sale was pursuant to the bankruptcy court's plan confirmation order on December 19, 2001, and was entered after hearing and prior notice to the Government's bankruptcy counsel.

United Medical was forced to sell substantially all of its assets because it did not have the financial ability to continue in business and preservation of any going concern value required a prompt asset sale. Moreover, the purchaser did not acquire all of United's books and records. It acquired operational documents concerning vendors and customers and other types of information needed to operate an on-going business. United retained many documents, including a segregated closet of documents concerning its claims against the United States. Plaintiff's counsel took possession of those documents prior to the sale. Additionally, the primary computer system that had been used by United Medical consisted of two-IBM AS 400 systems and related components. Most of those components were not needed long-term by the purchaser. Accordingly, as soon as reasonably possible and with the consent of the purchaser, Plaintiff's

counsel took possession of and sequestered all electronic media he could find, including components from two IBM AS 400 computer systems and backup tapes created by those systems.

On this issue the Government complains about a self-inflicted wound. Plaintiff's financial predicament and consequential transfer of business records was proximately caused by the Government's numerous Government payment failures. During the bankruptcy proceedings it became apparent that United Medical would liquidate, that key people had disappeared, and were going to continue disappearing. Accordingly, counsel for United Medical filed a Rule 27 petition to perpetuate testimony of three-persons, all of whom were or had been records custodians for Plaintiff. Counsel for Plaintiff wanted to establish a baseline with respect to the types of documents created and maintained by United Medical during the contract period. Specific testimony sought by Plaintiff's counsel in the Rule 27 petition was "testimony concerning records maintained by the Debtor which pertain to the DoD contracts, including how the records were created, how they were maintained, and their authenticity." The Government successfully opposed Plaintiff's efforts and no deposition was taken. In its opposition to Plaintiff's Rule 27 request, the Government wrote,

> …Debtor-Petitioner fails to make a 'narrowly-tailored showing of the substance of the testimony which Petitioner expects to elicit from each person to be deposed,' [citations omitted], or that each of these individuals have 'some unique knowledge' relevant to the Debtor's claim. [citations omitted]. Debtor-Petitioner simply alleges that it generally expects to elicit testimony regarding … <u>record maintenance</u> by the Debtor. [Emphasis added].

While the Government certainly had legal rights to oppose the preservation of evidence pertaining to the creation and maintenance of Debtor's records, it is not immune from the consequences of that opposition.

On November 25, 2002, the Government served its first sets of interrogatories and requests for production of documents on Plaintiff. It was apparent that a number of the interrogatories required research of the operational records that had been transferred approximately one-year earlier to a third party purchaser. Plaintiff's counsel immediately confirmed with the purchaser that the records were still intact and that they would be made available to counsel for the Government. Accordingly, Plaintiff made the following interrogatory response to the Government,

> **Explanation of Rule 33(d) Option to Produce Business Records Response.**
>
> Rule 33(d) provides that, "Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation, abstract or summary thereof, and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries. A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained."

Plaintiff then responded with identification of the files that would permit the Government to derive the answers to its interrogatories, and notified the Government that a substantial portion of the documents were located at the purchaser's offices, *i.e.,* the former offices of Plaintiff located in Fort Worth, Texas. [Plaintiff's response attached as Appendix S]. The Government, through its bankruptcy counsel, indicated it would set up a time to inspect the documents in Fort Worth, Texas, but it did not.

Based on information and belief, the purchaser failed as an on-going business in 2004 and all records it maintained were collected by CIT Group/Business Credit, Inc. (sometimes

referenced as "CIT"), its secured lender.[1] Plaintiff's counsel is not aware what happened to those records, but they were not produced by CIT in response to Plaintiff's subpoena.

**GOVERNMENT DEFENSE/JUSTIFICATION 3:**

**THERE IS NOT, ACCORDING TO THE GOVERNMENT, A CERTIFIED CLAIM, IMPLYING THAT PLAINTIFF'S DISCOVERY ISSUES ARE IRRELEVANT.**

The Government's contention here is cryptic and internally inconsistent, but also irrelevant to this discovery dispute. Plaintiff sought discovery with respect to the basis for the Government's Solicitation estimates, usage data and the amounts owed by the Government for unpaid invoices. The Government did not object to the discovery sought based on relevance. Its objections have been waived. Moreover, the Government itself has asserted failure of performance defenses against United Medical which make the types of information at issue relevant.

In its brief the Government took the liberty of substituting for Plaintiff's breach based on negligent estimates Plaintiff's *quantum* contention for damage to reputation. Plaintiff's certified claim contains a claim for negligent estimates. The contracting officer was advised in the claim,

> UMS received a $250 plus million-contract estimate from DSCP and was instructed to base its offer on that estimate. It based its offer on that estimate. The estimate by DSCP never disclosed that it included a substantial volume of credit card purchases that probably would not be made through the Prime Vendor. The estimates used by DSCP almost certainly were negligently developed and published. The gross disparity between actual results under the contract and estimates represented by DSCP evidence bad faith.
>
> …
>
> As discussed in more detail below, the manner in which DSCP exercised the annual options is extremely persuasive evidence that DSCP throughout the course of the contract acted in bad faith and with a callous disregard to the probable consequences to UMS. At the time it exercised the options, DSCP knew that the medical treatment facilities had diverted substantial purchases

[1] This lender was a different CIT affiliate than the CIT that was the Debtor's lender. That was CIT Credit Finance, Inc.

> from the Prime Vendor contract, that its initial estimates were too high by orders of magnitude, and that the diversions were most likely going to continue.

Plaintiff's live Complaint in this Court similarly alleges,

> Plaintiff seeks an equitable adjustment of the Contract Price based on the failure of the Government to use due care in preparing the Solicitation. In the Solicitation, the Government provided estimates of purchases it would make under the Contract and the bases for those estimates. The Government instructed bidders, including Plaintiff, to base their bids on the estimates. The Government knowingly misrepresented the bases for the estimates by stating that the estimates equaled historical purchases when in fact they did not. Indeed, the Government's historical purchase data evidence the Government's purchases of items that would be subject to the Contract were but a small fraction (less than 10 percent) of the Solicitation estimates.[2]

Similarly, Plaintiff's certified claim put the Government on notice that the Government had obligations with respect to potentially relevant evidence on the issue of the Government's failure to provide usage data. The claim contains, *inter alia,* the following relevant paragraphs:

> DSCP made a material commitment to potential offerors when it represented that "Participating facilities must provide the contractor with usage information six (6) weeks prior to start-up…. Items ordered by a facility whose usage data has not been provided or product quantities of [sic] the most recent month in question exceeding the prior 45 day usage will be exempt from the [fill rate] calculation."[3] This commitment was critical to effective inventory management for several reasons, the most important being that ordered medical supplies often could not be returned to the manufacturer, if they could be returned at all, without a substantial restocking charge. Since the restocking charge could not be passed on to DSCP, it was imperative that UMS minimize ordering DAPA supplies the government would not purchase. UMS's ability to minimize the ordering of supplies not needed by DSCP was dependent on receiving accurate product usage information as contractually promised by DSCP.

> From UMS's standpoint, the most important transition objective it needed to accomplished [*sic*] was receipt of complete and accurate product usage data for the

[2] The Government suggests that the Court's statement in its 2005 opinion that, "Plaintiff does not contend-nor does the evidence produced so far suggest-that the DSCP acted in bad faith in computing its estimated needs for the Lone Star Region," excused the Government from its obligation to preserve evidence on the issue of negligent estimation. The Court's statement does not indicate the document to which the Court was referring. What were before the Court were summary judgment motions that did not deal with the estimation issue. Obviously Plaintiff's pleading quoted above contains a contention that DSCP acted in bad faith. Importantly, the Court obviously anticipated development of evidence on the issue.

[3] 1993 Solicitation at 8.

> participating facilities, as promised in the Solicitation and Award. DSCP had ultimate responsibility for this obligation. As discussed elsewhere, DSCP did not faithfully discharge this obligation and UMS never obtained accurate and complete product usage data, although UMS devoted an inordinate amount of manpower attempting, unsuccessfully, to obtain this data from the participating medical treatment facilities and the former Prime Vendor, Owens & Minor.

The Government seeks to exclude from the Court's order potentially relevant evidence on the issue of whether it has paid Plaintiff all that it owes it for merchandise received. It does so based on a contention that there is not any CDA claim, and therefore such evidence is not relevant.

The Government's failure to pay its accounts receivable timely or otherwise caused Plaintiff substantial damages. The CDA claim certified to the Government put the Government on notice that account receivable documents were relevant. The claim included at Claim Appendix Volume II, tab 6, a list of the call numbers that remained unpaid as of April 2001 and summarized the total, which was $275,171.34. [Appendix T]. The body of the claim discussed specific examples of outstanding receivable issues, for example, the handling of call [purchase order] number WC27 sent in 1999 to William Beaumont Hospital, one the medical treatment facilities in the Lone Star Region. The invoice total was $9323.93, and that is what William Beaumont Hospital claims it paid in August 1999. DSCP, however, only paid UMS $92.31. Plaintiff's damages included a damage to reputation directly attributable to payment breaches by the Government.

The Government suggests to the Court that it limited its focus on credit cards because that was Plaintiff's sole focus, and did not seek information produce information on Decentralized Blanket Purchase Agreements, ("DBPAs" or "BPAs"). Plaintiff's initial discovery requests included at Request 4 all documents evidencing purchases of DAPA items from parties

other than United Medical. Nothing in that request suggested that the request was limited to credit card purchases. [See, Appendix G attached to Plaintiff's Brief filed July 31, 2006].

Plaintiff's Complaint stated that diversions were being made by use of credit cards and purchases directly from the manufacturer. In its summary judgment brief, Plaintiff provided summary judgment proof to the Court that DSCP was concerned about the use of blanket purchase agreements to bypass the prime vendor program.[4]

The Government contends that it should not have to go back to the MTFs to get affidavits on BPAs because they understood that the May 2006 request pertained to BPAs. In support of this general statement, the Government cites the responses of a few MTFs. There is not any attempt made to provide to the Court what notice or request was provided to the MTFs. Simply because a few understood that the Court's order applied to BPAs, does not mean that all understood it that way.

Again, Government counsel expects acceptance of his undocumented statement that BPA's were not used to make DAPA item purchases.

**GOVERNMENT DEFENSE/JUSTIFICATION 4:**

**THE GOVERNMENT'S AFFIDAVITS, ACCORDING TO THE GOVERNMENT, ARE UNRELIABLE, IMPLYING THAT THEY ARE NOT EVIDENCE OF SANCTIONABLE CONDUCT.**

The affidavits filed July 5, 2006 by the Government are condemning. Over half of the MTFs claim they had no notice of the lawsuit until after the hearing in April 2006. None claim they have actually seen either Plaintiff's Complaint or discovery requests. Many admit document destruction. In an attempt to avoid the serious implications of these facts, the

[4] An internal DSCP memo provided to the Court as part of Plaintiff's summary judgment proof contained the following statement, "Alternate means of obtaining supplies (Impact cards, DBPAs ) afford a degree of equanimity that is obvious not in the best interest of [DSCP]." That statement was quoted in the body of Plaintiff's summary judgment brief.

Government wants the Court to accept the emails of Anthony Amendolia and responses thereto as evidence the Government discharged its discovery and document preservation obligations. Mr. Amendolia's emails and responses do not support the Government's position, they actually evidence failure.

First, Paragraph 7 of Mr. Amendolia's affidavit states that all facilities were asked if they had any responsive documents, <u>but only a few did so.</u> Mr. Amendolia's affidavit is misleading. His emails did not seek a response only if the MTFs had documents, it sought responses either way, responses he did not get. Follow-up was required, but there is no evidence of follow-up.

Second, the broadcast emails also were sent to contacts of Mr. Amendolia. The emails do not provide an instruction about the scope or thoroughness of the search that should be conducted. There is not any basis in the Amendolia affidavit for the Court to conclude that the recipient of the emails was a person qualified to take appropriate action.

Third, Plaintiff's document requests clearly included requests for information dealing with the Solicitation estimates.[5] There is no indication that any request was ever made to any MTF for documents pertaining to estimates or the other types of documents sought by Plaintiff.

Fourth, there is not any indication that the MTFs were requested to provide input to responses to Plaintiff's interrogatories, interrogatories that clearly required MTF input. Plaintiff's discovery deficiency letter sent to the Government in 2002 complained about this failure, and there is not any evidence that the Government ever attempted to have MTF input in responding to the interrogatories. [See Appendix H attached to Plaintiff's Brief filed July 31, 2006].

---

[5] For example, Plaintiff requested, "All correspondence between the Supply Center and any Participating MTF pertaining to the estimate of annual volume of Scheduled Medical Equipment and Supplies for that MTF. This request seeks documents created before and after the Award."

Fifth, none of the documents from MTFs that responded with a "yes we have documents" were produced to Plaintiff until May 2005, over two and one-half years after Plaintiffs request, and then only from Fort Hood.

Sixth, the affidavits of the MTFs do not reflect any instruction to preserve documents following DOJ's discovery in 2005 that responsive documents had been destroyed, contrary to the April 2006 representations made to the Court. Mr. Amendolia's emails do not contend otherwise.

Seventh, Mr. Amendolia's emails do not evidence any timely attempt made to obtain documents from the central credit card records depository or OIG, logical sources of documents known throughout this lawsuit to the Government, but not to Plaintiff until 2006. As it turns out, relevant documents were also destroyed by the depository. [See Appendix K attached to Plaintiff's Brief filed July 31, 2006].

**GOVERNMENT DEFENSE/JUSTIFICATION 5:**

**THE GOVERNMENT DID NOT SEEK INFORMATION ON ALTERNATIVE PURCHASE METHODS OUTSIDE OF CREDIT CARD PURCHASES BECAUSE CREDIT CARDS WERE THE FOCUS OF PLAINTIFF'S DISCOVERY EFFORTS, IMPLYING THAT THE GOVERNMENT HAD A LESSER DUTY WITH RESPECT TO METHODS, OTHER THAN CREDIT CARDS, USED TO PURCHASE DAPA ITEMS.**

Plaintiff's initial discovery requests included at Request 4 all documents evidencing purchases of DAPA items from parties other than United Medical. [See, Appendix G attached to Plaintiff's Brief filed July 31, 2006]. Nothing in that request suggested that the request was limited to credit card purchases and the Government did not lodge an objection to this request. See discussion to Government Defense/Justification 3 above.

**GOVERNMENT DEFENSE/JUSTIFICATION 6:**

**PLAINTIFF HAS NOT PROVIDED THE GOVERNMENT WITH A METHODOLOGY NECESSARY TO ANSWER INTERROGATORY 5, IMPLYING THAT THE GOVERNMENT NEEDS INPUT FROM PLAINTIFF IN ORDER TO ANSWER THE INTERROGATORY.**

Interrogatory 5 requests the Government to estimate what percentage of orders it placed with United Medical that was not filled by United Medical.

Both parties recognize that not every DAPA item that should have been ordered from United Medical would have been filled by United Medical., even if the order was properly made and even if accurate usage data had been provided. The Contract did not contemplate a 100% fill rate. Thus, in estimating the Government's liability for diversion, some estimate must be made of what percentage of orders, if placed with United Medical, would not have been filled.

Plaintiff's contention is that the best estimate of the total dollar volume of orders that would not have been filled is to look at Plaintiff's performance during the time period when it was not in financial distress. The performance is evidenced by the fill rate reports, *i.e.*, what percentage of items ordered was filled and what percentage was not.

In its original response to this interrogatory 5, the Government stated the estimate could be derived from the fill rates, but it did not answer the interrogatory. One of the related questions is whether fill rates, which were based on lines filled, partially filled, or completely unfilled, could be reasonably equated to dollars. For example, if 90% of items ordered were filled, could it be assumed that 90% of the dollar quantity ordered was filled. Plaintiff took the deposition of James Jennings, the contracting officer who verified interrogatory 5. His testimony was that the two correlated and the dollar quantity of orders not filled could be reasonably estimated using line item fill rates.

When the Government would not answer the interrogatory, Plaintiff filed a motion to compel the Government to answer. During the 2005 hearing on Plaintiff's motion to compel and as part of the agreements in the joint status report filed in July 2005, the Government agreed to perform the calculation. The Government then breached that agreement and refused to answer on the grounds that the fill rate calculations would be misleading because fill rates did not account for killed items. The Government's excuse is not justified. All reasons for a line item not being filled were part of the calculation formula, including kills. The Solicitation provided that the fill rate was calculated using three factors: The total of all items ordered measured in lines, the quantity of lines unfilled, in whole or in part, and the quantity of lines not filled, in whole or in part due solely to the inability of the manufacturer to provide the prime vendor with product. "Killed" line items were not excluded from the calculation.

The Government claims it does not understand a methodology for making the calculation or the relevance of it. Mr. Jennings provided the methodology in his deposition, and the relevance is clear from Plaintiff's summary judgment motion. It is exactly as described above.

**GOVERNMENT DEFENSE/JUSTIFICATION 7:**

**DEEMING FACTS ESTABLISHED, ACCORDING TO THE GOVERNMENT, IS NOT AN AVAILABLE SANCTION FOR SPOLIATION.**

Deeming the volume of diversion as an established fact is a very appropriate sanction in this case.

The Government relies on *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986) to support its position that document destruction must be done in bad faith before sanctions can be imposed. The Government then summarily concludes that bad faith does not exist in this case.

The *Eaton* Court's holding was limited. It held when a party produces evidence which is later destroyed, it cannot be inferred from the act of destruction that it was done in bad faith. The *Eaton* Court quoted a 7th circuit opinion, *S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R.*, 695 F.2d 253 (7th cir. 1982). There the *S.C. Johnson & Son* Court held,

> It is elementary that if a party has evidence ··· in its control and fails to produce it, an inference may be warranted that the document would have been unfavorable. However ··· it must appear that the party had some reason to suppose that non-production would justify the inference ··· the totality of the circumstances must bring home to the non-producing party notice that the inference may be drawn. *Id* at 258-259.

The *S.C. Johnson & Son* Court held a negative inference was not justified because it appeared that destroyed handwritten notes had been fully incorporated into a typewritten memorandum that was produced – a no harm, no foul conclusion. But, the analysis cannot end with the *S.C. Johnson & Son* case since the *S.C. Johnson & Son* Court relied on the First Circuit Court of Appeals opinion in *Commercial Ins. Co. v. Gonzalez,* 512 F.2d 1307 (1st cir. 1975).

In *Commercial Insurance,* the issue was whether a contract modification existed at all. Apparently both sides had possession of either the original or a copy of the original contract, but neither side had a claimed modification. The court concluded that the document was not destroyed, it simply never existed.

It is important that in the *Eaton* line of cases, discovery misconduct apart from the alleged spoliation was not material in the respective courts' opinions. Moreover, as universally noted, the totality of circumstances must be evaluated. In this case, we have exceptional circmstances. There not only has been massive document destruction after the filing of the lawsuit, there has been protracted and repeated refusals by the Government to search for documents, repeated misrepresentations that exhaustive searches had been completed, repeated violations of CFCR 26(g) regarding reasonable inquiry, repeated failure to answer interrogatories

and produce documents, and now, clear and unexplained failure to comply with the Court's order of April 26, 2006 as amended.

Moreover, the Government was ordered to provide its estimate of diverted purchases to Plaintiff's counsel on or before July 5, 2006. The $44.2 million estimate it provided was based solely on the OIG credit card data. At the time it made its estimate the Government could have based it on an analysis of all the purchase data it had located. It did not do so. It based its estimate only on the OIG data.

The Government also was ordered to produce to Plaintiff all of its remaining purchase data on or before July 5, 2006. It did not come close. It waited until August 2006 to begin producing any data from the MTFs. Plaintiff was under an order directing it to produce to the Government its estimate of diverted purchases on or before August 4, 2006. Plaintiff and its CPA expert calculated that estimate as ordered based on the data available and timely provided it to the Government. The Government now complains that Plaintiff's estimate is not based on the all available data and that it should include the late and on-going data being provided by the Government, data ignored by the Government in making its estimate even though it had access to such data.

In *Kindergartners Count, Inc. v. DeMoulin,* 209 F.R.D. 466 (D. Kan. 2002), the Federal District Court for Kansas considered a case in which the spoliation occurred after a discovery request. It found that the failure of the spoliator to comply with the discovery request was a cause of the spoliation, that is, had the spoliator timely complied with its discovery obligations, the spoliation would not have occurred. It began with a review of the facts and the purposes of sanctions. It held that,

> In determining the appropriate sanction to be imposed for discovery violation, the court must consider the purposes to be served by the imposition of sanctions

> including: (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management. *Id.* at 468.

The missing documents were telephone records which purportedly would assist in confirmation of defamation claims. The sanctions hearing was held by a U.S. Magistrate and affirmed by the District Court. In its sanctions motion, the victim moved for default. The Magistrate, however, considered such a sanction too severe and focused on curing the harm imposed on the victim. In affirming the Magistrate, the District Court found that the harm was cured and the purposes of the discovery rules satisfied by deeming as established fact that the victim had been defamed and that the sanction was the least severe to accomplish these goals. *Id.*

Not only have documents been destroyed, but the discovery conduct by the Government has delayed production of the non-destroyed documents by years. The Government admits, in attempting to convince the Court to overlook critical statements in the affidavits, that memories fade, one of the irreparable consequences resulting from the Government's discovery abuse.

The destruction of documents has forced both litigants to make estimates from a significantly reduced database. The Government, even though it had access to a much larger database than Plaintiff, and even though it was under a Court order to provide its best estimate of diverted purchases, chose to limit the basis for its estimate solely to the spotty OIG data. Plaintiff, on the other hand, relied primarily on the Fort Hood data and the admissions of the Government with respect to the OIG data. Plaintiff did not have access to the Government's MTF data because the Government did not timely provide it as required by the Court's order or in time for Plaintiff to incorporate it into its estimate. The Government's $44.2 million estimate of maximum diversions is based solely on the OIG data, data that clearly is incomplete.

Plaintiff's estimate of diversions based on the data available to it on August 4, 2006 ranges from a low of $104.9 million to a high of $251.5 million. It explained its methodology in detail as requested in the Government's interrogatory. [Attached Appendix U].

**GOVERNMENT DEFENSE/JUSTIFICATION 8:**

**PLAINTIFF'S REQUEST FOR MONETARY SANCTION, ACCORDING TO THE GOVERNMENT, LACKS REQUIRED SPECIFICITY.**

A monetary sanction should be imposed. The Government contends that Plaintiff's failure to identify a specific number is justification for not imposing any monetary sanction. The Court is in a much better position to determine the specific dollar amount of such a sanction. When Plaintiff filed its brief on July 31, 2006, counsel's time and billing records for July 2006 were not available. Those are attached along with counsel's supporting affidavit at Appendix V. But an attorney's fee only monetary sanction would not act as a deterent to the Government. It has an entrenched and abusive discovery position, notwithstanding the Court's prior admonitions, even those suggesting to the Government that sanctions could include contempt.

## III. CONCLUSION

Severe sanctions are justified in this case. The spoliation resulted from indifference by the Government to its discovery obligations. The spoliation damage was aggravated by numerous misrepresentations concerning document status and the extensiveness of Government's search for them.

Government counsel's June 21, 2005, "save your rhetoric for the Court" email to Plaintiff's counsel is indicative of the Government's attitude. The Government was unwilling to consider Plaintiff's discovery objections. Instead, it decided to resolutely stand on its "not our burden of proof" position.

In fashioning a sanction, the Court should consider the totality of circumstances. The Government's conduct following the Court's May 5, 2005 hearing and its April 26, 2006 order, and the Government's "no big deal" approach to the discovery situation it created supports severe sanctions. Plaintiff has been injured, not only by destroyed documents, but, by increased costs and, as the Government admits, faded memories.

If the Court requires the affidavits to be supplemented as requested by Plaintiff, almost certainly the Court will find that MTFs were never provided a comprehensive list of the types of documents that should be saved, or even a list of Plaintiff's claims. The Government's position in its Opposition that Plaintiff's CDA claim did not contain a claim for negligent estimates and therefore documents evidencing negligent estimates are not relevant, suggests that Government counsel knows that no reasonable inquiry was made to locate documents on this issue. The seriousness of the Government's situation is compounded by its Opposition in which it recharacterized Plaintiff's CDA claim to include four types of breaches, but substituted a type of damage (damage to reputation) for Plaintiff's breach based on negligent estimates.

**Signed August 16, 2006.**

Respectfully submitted,

s/ Frank L. Broyles
Frank L. Broyles
Texas State Bar No. 03230500
GOINS, UNDERKOFLER, CRAWFORD
& LANGDON, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

A copy of the foregoing brief, including referenced Appendices, as filed will be served on Kyle Chadwick via first class mail on August 16, 2006 in addition to the Clerk's electronic service.

s/ Frank L. Broyles