**Appendix U – Plaintiff's Response to Interrogatory 9 per Court order.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | CASE NO: 03-CV-289<br><br>Judge Allegra |

**PLAINTIFF'S SUPPLEMENTAL ANSWERS AND RESPONSES TO DEFENDANT'S INTERROGATORIES AND REQUEST FOR PRODUCTION**

**INTERROGATORY NO. 9:** For each contract year for which you seek recovery in your summary judgment motion, state as precisely as you can the total value of the DAPA items that you allege the ordering facilities purchased from parties other than United Medical in that year, but should have purchased from United Medical (i.e., "diverted" purchases), and fully explain how you derive that dollar figure.

**SUPPLEMENTAL ANSWER:** The total value of the DAPA items ordering facilities purchased from parties other than United Medical for a given year, which should have been purchased from United Medical must be estimated based on reasonable extrapolation from known data. The following constitute the primary data points used by United Medical in performing the extrapolation. In the event that the Court enters an order pursuant to United's sanctions request establishing as fact greater estimates, United will amend accordingly.

Primary Data points:

1. The estimates provided in the Solicitation by DSCP. These were represented to be based on historical purchases and were also represented to be the minimum requirements.
2. The credit card data produced by OIG.
3. The credit card and other purchase data produced by Fort Hood.
4. The Fort Hood logistics data study produced by the Government showing the quantities of supplies purchased during a six month period and the methods by which those supplies were purchased.
5. United Medical's historical fill rates as evidenced by the fill rate reports and summaries of those fill rates.
6. The various reasons that United Medical was unable to obtain a higher fill rate, as described in United's original answer to the Government's interrogatories.

7. The GEN II statements provided by DSCP with respect to historical purchases of medical supplies and the percentages typically purchased from the prime vendor.
8. Sales data provided to United Medical pursuant to third party subpoenaes served on Ethicon, Inc. and Roche.

Based on the claim by the Government that the OIG data represented 100% of possible diversions, United reassessed its data to determine if there was evidence of diverted sales that was not reflected in the OIG data.

The Ethicon documents and the credit card and other purchase data provided by Fort Hood established that the OIG data did not reflect all sales. It appears that one reason for that is that the SIC limitation used by OIG to extract sales information excluded applicable purchases. United was able to confirm this because it had made a small number of credit card sales to Fort Hood that did not appear on the OIG data. United typically did not code its sales under a 5047 SIC code. Another reason is that the Government assumed zero diverted purchases for certain years at certain facilities, see Government's response to Interrogatory 6.

United then took the OIG data as a baseline and estimated percentages of total supply purchases by each MTF using the ratio of total supplies purchased by Fort Hood, extrapolated from the Fort Hood data sheet to the claimed diversions shown by the Government in its amended response to Interrogatory 6.

The Fort Hood Regional Tri-Service Medical Logistics Data Collection report claims that Fort Hood purchased a total of $5,614,554 of medical and surgical supplies during the six-month period beginning October 1, 1999, or $935,759 per month. Based on the GEN II Solicitation statements made by DSCP and similar statements made in the GEN I Solicitation, the Government expected (and actually experienced in the National Capitol Region) not less than 45% of total medical supplies would be DAPA purchases under the GEN I prime vendor program. Applying the 45% estimate to Fort Hood's total purchases, the amount that should have been purchased under the prime vendor program was not less than $421,091 per month.

Fort Hood actually experienced, based on the Data Collection Report, purchases under the prime vendor program of $582,372, or $97,062 per month, which is consistent with United Medical's sales data for that period. The diverted purchases for that period of time were estimated by subtracting $97,062 from $421,091, or $324,029 per month.

Interrogatory 6, in contrast, estimates maximum diverted purchases at Fort Hood during 2000 to be $1,758,836, or $146,569 per month. It estimates maximum diverted purchases at Fort Hood over the 47 months of the contact period at $61,737 per month. The ratio of the diverted purchases estimated from the Fort Hood Data Collection

Report to the Government's estimate of maximum diverted purchases, using the 2000 figure, is 324,029/146,569 = 2.21. Use of the 2000 Fort Hood OIG data yields a result most beneficial to the Government. Any smaller number would increase the 2.21 ratio. Use of the 47 month average yields a ratio of 324,029/61,737 = 5.25.

Based on the Fort Hood Data Collection Report, Fort Hood total supply purchases during 1999 were 83% of 2000. Taking into account the missing 1999 data from the OIG report, the 83% number appears reasonable.

The Government's response to Interrogatory 6 indicates OIG data was available for all MTFs only in 2000. The Government estimated maximum diversions for calendar years 1998 through 2000 (the only three full contract years) at $37.62 million, but it omitted from its estimated diversions at diversions at 2 MTFs during 1999, including Fort Hood. It completely omitted from its maximum diversion estimate, diversions by AFMLO and NHS.[1]

Plaintiff had to make some assumptions to gross up the Government's diversion number for the missing data. It assumed that, had the Government made an estimate for the missing data, it would have increased the Government's estimate of maximum diversions for those 36-months by $2 MM. Thus, the Government would have estimated maximum diversions for those 3 years at $39.62 million, or $1.1 million per month (39.62/36).

Plaintiff then estimated the range of error made by the Government. The low range was $1.1 million per month x 2.21 ($2.43 million per month). The high range was $1.1 million per month x 5.25 ($5.78 million per month).

For the six months of 1997, Plaintiff estimated monthly diversions at 50% of average The contract was effective for 7-months during 1997.

| Contract Year | 1997 (7 months) | 1998 | 1999 | 2000 | 2001 (4 months) |
|---|---|---|---|---|---|
| **Low Range Estimated $ of Diversions (millions)** | 8.5 | 29.2 | 29.2 | 29.2 | 8.8 |
| **High Range Estimated $ of Diversions (millions)** | 20.2 | 69.4 | 69.4 | 69.44 | 23.1 |

Total Estimated Diversions: Low Range: $104.9 million. High Range: $251.5 million.

[1] The Government also omitted from its maximum diversion estimate, diversions by 9 MTFs in 1997 and 2 MTFs in 2001, as well as AFMLO and NHS diversions.

The Fort Hood Data indicates a reasonable mid-range factor is 3.12. It was calculated by taking the maximum OIG estimate at Fort Hood of $103,607 and dividing it into $324,607. 324,607/103,607 = 3.12. The diversion factor is $1.1 million x 3.12 = $3.43 million per month. The Mid Range table is presented below.

| Contract Year | 1997 (7 months) | 1998 | 1999 | 2000 | 2001 (4 months) |
|---|---|---|---|---|---|
| **Mid-Range Estimated $ of Diversions (millions)** | 12.0 | 41.2 | 41.2 | 41.2 | 13.7 |

Mid-Range Total Estimated Diversions: $149.3 million.

Plaintiff points out that the methodology incorporates a significant factor for reductions that the Government claims must be included in an estimate. It is also unclear from the GEN II data point whether the PV purchases include the full PV distribution fee, a partial PV distribution fee, or no PV distribution fee. Accordingly, Plaintiff assumed the case most beneficial to the Government, that the full PV distribution fee is included and did not gross up the estimated diversions by a distribution fee.

Plaintiff reserves the right to amend or supplement this interrogatory as needed based on additional data.

Signed August 7th 2006.

William Bandy

William Bandy
Former President and CEO of Plaintiff

**Verification**

On ~~November~~ August 07th 2006 personally appeared Mr. William Bandy and being first duly sworn declared and verified that the answer to the interrogatory 9 represents reasonable estimates of diverted purchases based on his review of the data produced in this case and his experience as former president of United Medical Supply Company, Inc.

Shara A. Gebhardt

Notary Public for the State of Texas

[seal] SHARA A GEBHARDT My Commission Expires May 14, 2009

Respectfully submitted,

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

Corrected AK

CERTIFICATE OF SERVICE AK

w/o verification

On August 5 4, 2006 the foregoing was served on the persons shown below by the method shown below in accordance with rule 5.1.

AK

______________________

Frank L. Broyles

**PERSONS SERVED:**

Kyle Chadwick
Department of Justice
1100 L Street
Washington, D.C. 20530

Method Served: first class mail, certified return receipt requested and telecopy