RECEIVED
MAR 2 4 2003
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | CASE NO: 03-CV-289<br><br>Judge Allegra |

## AMENDED COMPLAINT

TO THE HONORABLE COURT:

Plaintiff, United Medical Supply Company, Inc., files this its Amended Complaint pursuant to this Court's Rule 3.1(a)(2) against the United States (generally referenced as "Government"). Plaintiff seeks a judgment awarding it an equitable adjustment to the price of Contract Number SP0200-97-D-7133 (referenced in this Complaint as "the Contract" or "Contract") for: (1) the Government's various breaches of the Contract; (2) the Government's breaches of duty of care in preparing the bid Solicitation documents, Solicitation Number DLA120-93-R-0587 (generally referenced as "the Solicitation" or "Solicitation"); and (3) the Government's failure to purchase items maintained in stock by Plaintiff pursuant to Government issued stock commitments.

## JURISDICTION

1. This Court has jurisdiction of this case as a direct appeal of an adverse decision of a contracting officer pursuant Section 10(a)(1) of the Contract Disputes Act.

in breach of the Contract, it often either diverted its orders of DAPA items to third parties without making any attempt to order from Plaintiff, or it attempted to order from Plaintiff on a just-in-time ("JIT") basis without first providing Plaintiff with Usage Data as required by the Contract, thus preventing Plaintiff from filling the JIT order. Then, when Plaintiff did not fill the JIT order, the Government often diverted the order to third parties. For this breach, Plaintiff seeks an equitable adjustment.

18. Four. Plaintiff seeks an equitable adjustment of the Contract Price based on the failure of the Government to use due care in preparing the Solicitation. In the Solicitation, the Government provided estimates of purchases it would make under the Contract and the bases for those estimates. The Government instructed bidders, including Plaintiff, to base their bids on the estimates. The Government knowingly misrepresented the bases for the estimates by stating that the estimates equaled historical purchases when in fact they did not. Indeed, the Government's historical purchase data evidence the Government's purchases of items that would be subject to the Contract were but a small fraction (less than 10 percent) of the Solicitation estimates.

19. Five. Plaintiff, under the terms of the Contract, was permitted to return unpurchased DAPA items to the manufacturer even when the ordering facility had provided Usage Data for those items if the facility had not completed the purchase within the time period provided by the Contract, a time period tied to the date the Usage Data had been provided. This created a problem for the

Star region since December 2, 1994 were 95% caused by the Government's failure to act, provide information, or the MTF's failure to embrace the Prime Vendor concept." But, Mr. Schmitt opposed the Contract modification for Plaintiff proposed by Mr. Chenoweth because "there is nothing founded in any type of Government contracting law that requires 'the interest of fair treatment of all parties concerned.'" Plaintiff did not receive the Contract modification requested by Mr. Chenoweth.

63. On August 6, 1997 Brooke Army Medical Center, one of the ordering facilities in the Lone Star Region, concluded that bad Usage Data was severely impacting fill rates and that the Usage Data was "broken" and needed a manual fix.

64. Ms. Linda Flatley warned DPSC personnel that it was subject to a claim if complete and accurate Usage Data was not provided because the prime vendors did not bid expecting to have to work with piecemeal data.

65. Much of Plaintiff's efforts throughout the period beginning January 30, 1997 through March 2001 were spent trying to create reliable usage information for the ordering facilities in the Lone Star Region, efforts that increased the cost of performance and efforts that Plaintiff had planned on using to otherwise perform its Contract obligations.

**D. Sales Volume Deficiencies**

66. The Government made Solicitation representations to potential bidders, including Plaintiff, of its estimated Contract purchases over a five-year period.

67. The actual annual sales volumes that were achieved in the Lone Star Region by Plaintiff were approximately fifteen percent of the Government estimates.

68. There were two primary reasons for the sales deficiencies: the ordering facilities purchased many of their DAPA items from sources other than Plaintiff in violation of the Contract (diverted purchases) and the methodology used to make the estimates was so flawed that the estimates were materially inflated and unrealistic.

***Breach of Duty of Care in Preparing Bid Documents***

69. The Government, through the Defense Logistic Agency's Defense Personnel Support Center ("DPSC"), later changed to Defense Supply Center Philadelphia ("DSCP"), solicited offers for Prime Vendors in 22 different regions. Beginning in 1993, the Lone Star Region was solicited by the Solicitation. Plaintiff's bids were in response to the Solicitation.

70. With respect to the Government's volume estimates for projected sales by the Lone Star Prime Vendor, the Government, in the Solicitation, made the following representation to Plaintiff and other Lone Star potential bidders:

> "Based on a 12-month reporting period, the ordering facilities that will be listed in Attachment III spent an estimated $57,965,500 per year for those types of medical/surgical products covered by the proposed contract. Based on this figure, the following is the Government's best estimate of yearly sales that the ordering facilities will experience over the five-year period.

| | Yearly Estimate | Approximately Yearly Maximum |
|---|---|---|
| First Year | $ 28,982,750.00 | $ 72,456,875.00 |
| Second Year | 57,965,500.00 | 144,913,750.00 |

| | | |
|---|---|---|
| Third Year | 57,965,500.00 | 144,913,750.00 |
| Fourth Year | 57,965,500.00 | 144,913,750.00 |
| Fifth Year | 57,965,500.00 | 144,913,750.00 |

71. Following the above table providing the purchase estimates, the Government further emphasized that the offer should be based on these estimates and instructed offerors that, "*Your proposed distribution fee should be based on the Yearly Estimate....*""

72. Discovery obtained in this case evidences a failure of care in making the estimates for the following reasons:

73. First, there was no structured methodology for obtaining the estimates. The process appears to have had little more structure than a casual discussion about upcoming weather, a what is your "best guess?"

74. Based on discovery obtained in this case the entire representation that the estimates were supported by purchase histories was false:

a. The estimates were not based on a 12 month reporting period;

b. The ordering facilities never represented to DSCP that they had previously made purchases in the volumes estimated; and

c. The ordering facilities never represented to DSCP that the estimates were limited to the types of medical/surgical products covered by the Contract.

75. The Government knew that the estimates were unrealistic.

76. A comparison of actual sales during the Contract period to estimated sales for that same period is overwhelming evidence of the negligence of the Government

in providing estimates. Not a single Gen I Prime Vendor Region ever purchased the estimated annual quantity stated in its respective Solicitation.

77. The Government prepared a spreadsheet for six of the Prime Vendor regions comparing estimates against actual purchases. The only complete year shown on the spreadsheet was for the "base" or first year. First year actual sales for these six regions were 37% of estimated in the Cascades Region, 15% in the Illinois/Kentucky/Missouri Region, 36% in the Florida/Georgia Region, 13% in the Panhandle Region, 9% in the Ohio/Illinois Region, and approximately 33% in the Carolinas Region.

78. Plaintiff was awarded the Prime Vendor Contract on January 30, 1997. At the end of December 1996, the Government had access to the confidential and proprietary information for purchases by Lone Star ordering facilities from the first Lone Star Prime Vendor (Owens & Minor) for at least the 9 months ending December 31, 1996. The Government produced at least some of this information in response to Plaintiff's discovery requests in this case.

79. A comparison of the estimated monthly sales represented in the Solicitation to historic monthly purchases from the previous Prime Vendor is dramatic. The most cursory due diligence would have raised serious questions about the validity of the estimates provided in the Solicitation.

80. Table: "Estimated average monthly purchase volumes used in the Solicitation compared to confidential DSCP records of actual average monthly DAPA purchases from the previous Prime Vendor (Owens & Minor) (both rounded to

the nearest thousand dollars) for the period shown, taken from DSCP records produced in this lawsuit"

| *Ordering Facility* | *Estimated PV Purchases ($/mo) used in Solicitation* | *Actual PV Purchases ($/mo )for 9 mo. Period ending 12/31/96* |
|---|---|---|
| Fort Sam Houston | $1,750,000 | $332,000 |
| Fort Hood | $ 333,000 | $ 73,000 |
| Fort Bliss | $1,500,000 | $130,000 |
| Fort Sill | $ 333,000 | $ 46,000 |
| Corpus Christi Naval H | $ 25,000 | $ 15,000 |
| Kelly AFB | $ 29,000 | $ 2,000 |
| Randolph AFB | $ 9,000 | $ 4,000 |
| Sheppard AFB | $ 208,000 | $ 14,000 |
| Altus AFB | $ 167,000 | $ 4,000 |
| Tinker AFB | $ 35,000 | $ 38,000 |
| Reese AFB | $ 5,000 | $ 400 |
| Dyess AFB | $ 124,000 | $ 2000 |
| Holloman AFB | $ 33,000 | $ 8,000 |
| Cannon AFB | $ 42,000 | $ 7,000 |

81. A "do the math" exercise based on the Government's records does not support the estimates.

82. DSCP periodically requested ordering facilities to estimate their monthly prime vendor purchases compared to total purchases. The specific question asked of each ordering facility was, "What percentage of your medical/surgical supplies do you buy from your prime vendor?"

83. Dividing the sales from the prime vendor by the response to the question should equal that facility's total medical/surgical purchases for the period covered, which was usually six months. For example, if the prime vendor sold $1,000,000 of supplies to the facility during the reporting period, and the facility reported

that it purchased 20 percent of its supplies from the prime vendor, then its total purchases for medical surgical supplies during the period should be about $5,000,000.

84. If the estimates provided to bidders were reasonably accurate, the total purchases calculation described in the above paragraph, except in unusual circumstances, should exceed the estimated purchases, since not all purchases of medical/surgical supplies were subject to the prime vendor Contract. The fact is that the total purchase calculation consistently yields numbers far short of the estimates provided by DSCP in the Solicitations.

85. The only reasonable conclusion is that the Government did not exercise due care in preparing the Solicitation estimates of purchase volumes, estimates on which bidders – including Plaintiff - were instructed to rely.

**E. Diverted Purchases**

86. The Government would have the Court believe that the difference between the estimated purchases and actual purchases resulted from performance failures by the Government's prime vendors. In other words, "everybody is out of step but us."

87. Overwhelming evidence is that the MTFs purchased DAPA items from sources other than Plaintiff in violation of the "requirements" Contract.

88. There is the huge discrepancy between estimated and actual purchases throughout the prime vendor system, and the Lone Star Region is no exception.