IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNITED MEDICAL SUPPLY COMPANY, INC., )
Plaintiff )
vs. ) CASE NO. 03-CV-289
) Judge Allegra
THE UNITED STATES, )
Defendant )

---

ORAL DEPOSITION
PETER BROWN
May 31, 2007

---

ORAL DEPOSITION OF PETER BROWN, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 31st day of May, 2007, from 11:26 a.m. to 2:58 p.m., before Kim D. Carrell, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Goins, Underkofler, Crawford & Langdon, LLP, 1201 Elm Street, Suite 4800, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES

FOR THE PLAINTIFF:
Mr. Frank L. Broyles
GOINS UNDERKOFLER CRAWFORD & LANGDON, LLP
1201 Elm Street
Suite 4800
Dallas, Texas 75270
Telephone: 214.969.5454 - Fax: 214.969.5902
E-mail: fbroyles@gucl.com

FOR THE DEFENDANT:
Ms. Cathy J. Burdette
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue
LST 10064
Washington, D.C. 20004
Telephone: 202.616.2316 - Fax: 202-514-9163
E-mail: Cathy.Burdette@usdoj.gov

FOR THE WITNESS:
Mr. Patrick J. Hoover
PATRICK J. HOOVER LAW OFFICES
600 Jefferson Plaza
Suite 308
Rockville, Maryland 20852
Telephone: 301.424.5777 - Fax: 301.217.9297
E-mail: phoover@hooverlaw.com



INDEX


| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulations | -- |
| PETER BROWN | |
| Examination by Mr. Broyles | 5 |


EXHIBITS


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Declaration of Kyle Chadwick | 6 |
| 2 | Declaration of Peter Brown | 33 |
| 3 | Declaration of Peter Brown | 46 |
| 4 | List of people that have filed affidavits in this case | 53 |
| 5 | Transcription of Proceedings, 12-5-05 | 75 |
| 6 | Exhibit A to Joint Status Report of July 18, 2005 Pertaining to Plaintiff's First Set of Discovery Requests: Interrogatories 4, 6, 7, 19 and 20 | 75 |
| 7 | Plaintiff's Request for Production of Documents | 78 |
| 8 | Defendant's Status Report Regarding Discovery | 84 |





| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 9 | List of Bases and Contact Information | 89 |
| 10 | Order of the Court | 97 |

Page 5

PETER BROWN,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. BROYLES:
Q. Sir, what is your name?
**A. Peter Brown.**
Q. Mr. Brown, where are you employed?
**A. U.S. Department of Justice.**
Q. How long you have been with the Department of Justice?
**A. Twenty years.**
Q. What's your current position?
**A. Paralegal specialist.**
Q. Have you always been a paralegal specialist for the Department of Justice?
**A. Most of the time, yeah.**
Q. Now, I understand you have a law degree; is that correct?
**A. Yes, sir.**
Q. Where did you get a law degree?
**A. Antioch University.**
Q. When did you get that?
**A. 1982.**
Q. Are you licensed to practice law anywhere?
**A. No.**

Page 6

Q. Mr. Brown, my name is Frank Broyles. I'm an attorney that represents the Plaintiff, United Medical Supply, in this case. And I understand you are here today and you are individually represented by Counsel, correct?
A. Yes.
**(Deposition Exhibit No. ^1 marked.)**
Q. I'm going to show you what the court reporter has marked as Deposition Exhibit 1 --
MR. BROYLES: Cathy, I'll just kind of slide that down there.
Q. -- and ask you, have you seen that declaration of Mr. Chadwick before?
**A. Yes, I've seen the document.**
Q. Now, you understand that the reason -- and if I say something you disagree with, just let me know. The reason you are here is that Mr. Chadwick made some representations to the -- to Judge Allegra in the Court of Federal Claims that turned out to be false. And we're trying to figure out why the representations were made that were false.
And it appears that Mr. Chadwick relied on you and you relied on Anthony Amendolia to some extent. And we want to find out, you know, why you relied on Mr. Amendolia, if you did, and to the extent you relied

Page 7

on Mr. Amendolia. Have you ever met Anthony Amendolia?
**A. No, I haven't.**
Q. How many times have you talked to Anthony Amendolia?
**A. I don't know how many times. Many times.**
Q. Many times?
**A. Many.**
Q. Have you talked to Mr. Amendolia with respect to matters other than this case? In other words, have you talked to Mr. Amendolia on other cases?
**A. No.**
Q. When was the last time you talked to Mr. Amendolia?
**A. In 2005.**
MR. BROYLES: I turned down the temperature a little bit.
MR. HOOVER: Thank you.
Q. When you say you talked to Mr. Amendolia many times, would it be more than ten?
**A. Yes.**
Q. Was it always by telephone?
**A. Yes.**
Q. Did you talk with anybody else at DSCP about this case other than Anthony Amendolia?
**A. Yes, I did.**

Page 8

Q. Who did you talk with?
**A. Ms. Hallam. And I talked to other DSC -- I talked to other DLA people, but I don't know if they were DSC people.**
Q. What other DLA people did you talk to that you can recall?
**A. I think that some of the people that I talked to that were at other bases were DLA people, but I'm not sure which ones.**
Q. Did you ever go to DSCP?
**A. No.**
Q. What other bases -- when you say other bases, are you talking about that had the military treatment facilities?
**A. Yes.**
Q. What bases did you physically visit?
**A. Physically visited two in Texas and two in Oklahoma.**
Q. Did -- now, one of the -- we've received documents from you from Fort Carson in Colorado. Did you go to Fort Carson?
**A. No, I didn't.**
Q. Do you know how you got those documents from Fort Carson?
**A. Yes.**

Page 9

Q. How did you get those?
**A. By requesting them by telephone.**
Q. From Fort Carson?
**A. Yes.**
Q. Okay. And why were you requesting documents from Fort Carson in connection with this case?
**A. Because that was my assignment.**
Q. Who gave you that assignment?
**A. Kyle Chadwick.**
Q. And did he tell you to contact Fort Carson?
**A. Not specifically.**
Q. What did he tell you that caused you to contact Fort Carson?
**A. He -- when I first met with him in March of 2005, he asked me to -- specifically to try to find credit card records that showed what items the MTFs purchased by credit card.**
Q. And what caused you then to go to Fort Carson?
**A. I didn't go to Fort Carson.**
Q. Contact Fort Carson?
MR. HOOVER: Well, try again.
**A. Would you repeat the question?**
Q. What caused you to contact Fort Carson?
**A. I had reason to believe that they had some of the documents I was seeking.**

Page 10

Q. And what -- why did you have reason to believe that?
MR. HOOVER: If you recall. I don't recall exactly where I got the -- got the lead from that Fort Carson might have some. I don't recall.
Q. Was it from a person or from review of documents? Do you recall that?
**A. It could have been either. Either one. I'm not sure.**
Q. Now, when you talked -- when you first talked to Mr. Amendolia, did you call him or did he call you?
**A. I called him.**
Q. And when did -- did you get an inkling from him that documents had been destroyed?
**A. I don't think -- I don't think he ever said to me that documents had been destroyed.**
Q. Did he ever tell you that documents no longer existed?
**A. I don't remember if he said that. It was certainly part of our discussions as to whether -- as to whether or not the documents existed. And you know, I -- I'm not quite sure whether he -- what his opinion was on it.**
Q. Well, did -- I've seen the use of the phrase "They're all gone."

Page 11

**A. Um-hum.**
Q. Was that your words or his words?
**A. That was primarily my words of the -- of the people at the different MTFs, not Amendolia's.**
Q. Now, at some point in time, you formed an opinion that some MTFs had documents and some MTFs did not have documents, correct?
**A. Correct.**
Q. And as I understand it, you contacted only those MTFs that you believed had documents, correct?
**A. No.**
Q. Now, how -- you didn't contact all of the MTFs, correct?
**A. Correct. I didn't contact all of the nineteen.**
Q. You contacted four of the nineteen?
**A. I contacted many more than four.**
Q. How did you determine which ones to contact and which ones not to contact?
**A. I was given a list of nineteen.**
Q. By Mr. Amendolia?
**A. No. By Kyle Chadwick.**
Q. Okay.
**A. And immediately, we were able to eliminate some of them because of the fact that they had been closed due to the base realignment and closure process that was going on at that time in the Department of Defense.**

Page 12

Q. When you say "We were able to eliminate", who is "we"?
**A. I'd have to say that -- I think that was Mr. Amendolia, that he and I were in contact several times regarding which MTFs, you know, might have documents that we were interested in.**
Q. Getting back to the MTFs that had been closed, was Mr. Amendolia the one that determined what -- or advised you what MTFs had been closed?
**A. I think so, yeah. I think that was definitely part of our conversations. I'm not sure if I later -- you know, a lot of the information that I got from the MTFs was later confirmed by Amendolia, and some of the stuff that he originally told me was either confirmed or changed, but as the result of talking to people at the MTFs.**
Q. So with respect to the bases that had been closed, you originally got an impression from Mr. Amendolia which bases had been closed, correct?
**A. Yes.**
Q. And you later confirmed that either that was true or not true?

**A. Yes.**
Q. And did you determine that some of the bases that Mr. Amendolia said were closed were, in fact, not closed?
**A. Would you repeat that question?**
Q. Did you later determine, after you talked to Mr. Amendolia, that some of the bases that he told you were closed were, in fact, not closed?
**A. I don't remember. That's not the way I remember our discussions.**
Q. How do you remember the discussions with Mr. Amendolia on that issue?
**A. With what issue, sir?**
Q. What bases had been closed.
MR. HOOVER: If you remember it.
**A. I think he said to me some had been closed; others, you know, will be a more fruitful source of document search. And our focus was on the ones that would be a fruitful document search.**
**And I think in, you know -- he just, you know, mentioned in a summary fashion the ones that he thought would be, you know, the ones that were either closed or for other reasons were -- that he thought would be unfruitful.**
Q. Now, when you say for other reasons, he



thought would be unfruitful, what other reasons did he give to you that they would be -- that it would be unfruitful to contact them?
**A. That some of them did very little business with United Medical.**
Q. And when you said some of them did very little business with United Medical, how many of the nineteen MTFs did he say did very little business with United Medical?
**A. I don't remember.**
Q. Do you have an estimate?
**A. An estimate? I think -- I would estimate about ten of the nineteen did very little.**
Q. And based -- and based on his statement to you that ten of the nineteen did very little business with United Medical, you decided not to contact those ten MTFs at those ten bases?
**A. That wasn't his statement.**
Q. What was his statement?
**A. That's my estimate. You asked me how many I would think.**
Q. Okay.
**A. That wasn't his statement.**
Q. What was his statement?
**A. I don't remember.**



Q. What makes you think that ten of the nineteen did very little business with United Medical?
**A. That's my estimate. It's my best recollection.**
Q. And based on your belief that ten or whatever estimate you made did very little business with United Medical, you decided not to contact those -- those -- the MTFs at those military bases; is that correct?
**A. No, sir.**
Q. What process did you use to decide which MTFs you were going to contact and which MTFs you were not going to contact?
**A. I -- I believe I contacted them all except for the ones that either were closed or were -- or for some reason -- I think I contacted all of them except the ones that I could not contact.**
MR. HOOVER: Yeah. But the question was -- if you'll permit me, Mr. Broyles -- what process took place prior to your contacting any or all of the MTFs, so...
THE WITNESS: Prior to?
MR. HOOVER: Yeah. I think he's asking you to go back in time and tell us the process.
**A. Okay. And I think that's just what we just did. I -- in a previous question. You know, I talked to**



**Kyle Chadwick. He told me to contact Anthony Amendolia. I contacted Anthony Amendolia. He gave me some names and numbers. I talked to those people, and they gave me further names and numbers. And that's how I decided who to call.**
Q. Well, so people giving you names and numbers. But did you contact all of the names and all of the numbers that you were given?
**A. Yes.**
Q. And after you had contacted all of the names and numbers that you were given, did you recognize you had not contacted all of the MTFs?
**A. Yes.**
Q. And --
**A. Actually, I recognized that prior to, but...**
Q. So you recognized that the names and numbers you were given did not include all of the MTFs?
**A. Yes.**
Q. And did you -- what decision process did you use to decide that because you didn't have a name and number, you were not going to contact the MTFs?
**A. That wasn't my -- that wasn't my decision process.**
MR. HOOVER: Did you understand the question?

THE WITNESS: I'd like to have it repeated.
Q. What I'm trying to find out is you made a decision not to contact certain MTFs, correct?
**A. Yes, with regard to the ones that had been closed. I wouldn't contact them.**
Q. Did you make a decision not to contact any of the MTFs that were not closed?
**A. No.**
Q. So is it your testimony as you sit here today that you contacted all of the MTFs except for the ones that were closed?
**A. No.**
Q. Why did you not contact MTFs that were not closed?
**A. I can't remember with regard to each one. You'll have to give me a specific --**
Q. Well, can you give me --
**A. Which one you're referring to.**
Q. Can you give me reasons why you would not contact an MTF that was not closed?
**A. I think that there might be one or two -- two or three maybe that -- where I was not able to find out who an appropriate point of contact was.**
Q. So one or two or maybe three, you couldn't



find out an appropriate contact?
**A. Yes.**
MR. HOOVER: Could I just ask, what period of time are you referring to? The entire -- what was it? Six months that Mr. Brown was on this file?
THE WITNESS: Eight months.
MR. HOOVER: Eight months?
MR. BROYLES: Correct.
MR. HOOVER: Maybe if we can get a little more specificity as to what the question refers to. Initially? In the middle? At the end?
**A. Actually, I had been on this case longer than eight months, but I was working on actually contacting MTFs for about eight months or so.**
Q. And that period began and ended when?
**A. Began in -- I think it began in late March and went on through October 2005.**
Q. So unless I say differently, I'm referring to that period of time, that late March through October 2005.
So returning to my question, that you made a decision not to contact one or two or maybe three MTFs during that eight month period because you couldn't find an appropriate contact, is that an accurate statement?
**A. Yes.**



Q. Now, were there any other reasons you decided not to contact MTFs that had not closed?
**A. No.**
Q. So as you sit here today, your best recollection is that with respect to those MTFs that you did not contact, the reason you did not contact them was because they were either closed or you couldn't find an appropriate contact?
**A. The only exception I would make to that is that in every case, I went as far as to simply con -- if I couldn't find any other information from the -- from DLA or from other people in the field at the MTMs -- MTFs themselves -- MTFs -- then I would simply call directory assistance, and I would say I understand that there's a facility in such and such a town, and I'm trying to find out -- trying to get a telephone number for a facility that might handle records there.**
**You know, sometimes they would give me a phone number and sometimes they would say there is no such -- no such facility, you know, in the federal government. And sometimes I got a number. Sometimes I actually, you know, was able to find somebody in records management at one of the MTFs that way.**
Q. Did you ever call Mr. Amendolia back and say I can't find a contact at such and such an MTF?



**A. Yes.**
Q. And was Mr. Amendolia helpful in finding a particular contact at a particular MTF?
**A. Mr. Amendolia was not, no.**
Q. What did he tell you when you asked for a contact?
**A. He would say there's a better person who can give you that information, and he would give me the name of someone else.**
Q. Did he ever tell you to go to a -- to call a directory?
**A. What directory are you referring to, sir?**
Q. The one that you said you contacted to --
**A. I'm talking about 411, directory assistance.**
Q. Did Mr. Amendolia ever tell you to call 411?
**A. No.**
Q. What other person did Mr. Amendolia tell you to contact?
**A. He had given me a list of people that worked at various MTFs. When I first contacted him, those were the people that he thought would be most helpful to me in finding the information.**
Q. Are you saying he gave you a list? Was that a written list?
**A. I don't recall whether he gave it to me in

Page 21

**writing or not.**
Q. Did you ever receive any e-mails from Mr. Amendolia?
**A. Yes.**
Q. Did you ever send any e-mails to Mr. Amendolia?
**A. Yes, I think I did.**
Q. Now, have --
**A. Not frequently. Maybe one or two.**
Q. Do those e-mails still exist?
**A. I don't remember. I don't remember what they --**
MR. HOOVER: If you know even.
**A. I don't know.**
Q. Do you know if you produced those e-mails in this case?
**A. No, I don't. I don't know.**
Q. Have you been asked to produce those e-mails in this case?
**A. I don't -- I don't know. I can't remember if -- if I was asked to produce them or not.**
Q. So getting back to the MTFs that you contacted, you were originally given a list of nineteen MTFs. Of those nineteen MTFs, it's my understanding that you estimate that you did not contact ten of the

Page 22

nineteen. Now, is that correct, that you believe you didn't contact ten of the nineteen?
**A. That's not correct.**
Q. How many of the nineteen do you believe you contacted?
**A. I'd have to estimate because I don't know which specific ones you're referring to. I think that -- it's speculation unless I can --**
Q. Now, Mr. Chadwick indicated to the Court and to me that you volunteered for this particular assignment; is that true?
**A. I volunteered after it was made known to me that he had a need and that he was looking for one of the paralegals on the staff, yeah.**
Q. And he indicated that you have experience in discovering complex cases. Had you had experience in discovering complex cases?
**A. I have experience working in cases that are in the discovery phase.**
Q. Do you have any sort of understanding as to what might be a complex case versus a case that's not complex?
**A. Not really, no, sir.**
Q. Now, when you initially contacted Anthony Amendolia, that was in March of 2005?

Page 23

**A. I need to clarify something with regard to the last question, if I may.**
Q. Okay.
**A. You mentioned my experience as a paralegal, and I wanted to point out that in some of the pleadings, I've been referred to as a senior paralegal, and that's incorrect. My job description is paralegal specialist. My supervisor at the Department of Justice, her job title is senior paralegal. I'm not a senior paralegal. And so to the extent that I'm referred to in any pleadings or in this proceeding as a senior paralegal, that would be incorrect.**
Q. Returning to your initial contact with Anthony Amendolia, that was in March of 2005; is that correct?
**A. Yes.**
Q. And at that point in time, did you ask him whether any of the medical treatment facilities had documents relevant to the lawsuit?
**A. Would you repeat the question? I'm sorry.**
Q. At that point in time, did you ask Mr. Amendolia if he had any documents -- if any of the MTFs had any documents relevant to the lawsuit?
**A. Yes.**
Q. And what did he tell you?
**A. He told me that they had been in contact with**

Page 24

**the MTFs to determine that and that he thought that there were some documents related to the lawsuit.**
Q. And now, how did you -- did you -- at the time you called Mr. Amendolia, had you read anything about the case?
**A. I had read a little bit. I had read the case transfer memo that Mr. Chadwick received when he -- when the case was transferred to him. And another -- something else that was -- I think a pleading or a court order. I can't remember which one it was. I think it was a court order.**
Q. Did you read any of any discovery requests that the Plaintiff had served in the case?
MR. HOOVER: This is the time before he spoke with Amendolia?
MR. BROYLES: Yes.
MR. HOOVER: If you recall.
THE WITNESS: Yeah. When exactly is the time?
MR. HOOVER: March '05.
THE WITNESS: March '05?
MR. BROYLES: Right.
MR. HOOVER: After you talked to Chadwick.
**A. Yes. I think I read at least one document**

Page 25

**request prior to the time I spoke to Anthony Amendolia, yeah.**
Q. Now, did you -- during the eight month time period, did you become aware that there was a discovery dispute between the Plaintiff and the Defendant over the efforts made to locate documents?
**A. Yes.**
Q. How did you become aware of that?
**A. From Mr. Chadwick.**
Q. By telephone call? E-mail? Letter?
MR. HOOVER: In person?
**A. In person and by e-mail.**
Q. And when -- when did you learn that there was a discovery dispute between the Plaintiff and the Defendant?
**A. I don't recall when I first learned it.**
Q. Do you have an estimate?
**A. I'm not sure what you mean by a discovery dispute.**
Q. Well, what is -- you learned that there was some sort of discovery dispute, correct?
**A. I don't know what you mean by a discovery dispute.**
Q. Well, I'm asking for your understanding of what you learned about a discovery dispute. Did you --

Page 26

**A. A lawsuit is a dispute.**
Q. I'm sorry?
**A. A lawsuit is a dispute.**
Q. And did you learn that the Plaintiff was complaining about the investigation that the Defendant had made to locate documents?
**A. I think that was one of the first things that Kyle ever said to me.**
Q. So at the point that you became involved, you were aware that the Plaintiff was complaining about the Defendant's effort to locate documents?
**A. No. I wouldn't agree with that statement.**
Q. Did you ever learn that the Plaintiff was complaining about the investigation --
**A. Yes.**
Q. Let me finish my question there because the court reporter needs --
**A. Okay.**
Q. Did you ever learn that the Plaintiff was complaining about the efforts that Defendant had made to locate documents?
**A. Yes.**
Q. When do you recall you learned that?
**A. It was a topic that came up from time to time.**
Q. Did it come up early in the eight month time

Page 27

period you were involved?
**A. It came up much, much more after July of 2005. June or July.**
MR. HOOVER: Can we take a break real quick? I want to have two seconds with my client.
MR. BROYLES: Sure.
(Discussion off the record)
MR. HOOVER: Thank you. Can you repeat that question?
BY THE REPORTER:
QUESTION: Did you ever learn that the Plaintiff was complaining about the efforts that Defendant had made to locate documents?
ANSWER: Yes.
QUESTION: When do you recall you learned that?
ANSWER: It was a topic that came up from time to time.
QUESTION: Did it come up early in the eight month time period you were involved?
ANSWER: It came up much, much more after July of 2005. June or July.
Q. Do you want to change that answer?
**A. Yes. To clarify it, as I said earlier, one of the first things he ever said to me, that we had a**

Page 28

**problem with the locating of discovery documents in this case.**
**When I met with him the first time -- the first time I ever actually met Kyle Chadwick -- I had never met him in person before -- was in March of '05. He asked for help with this case, and I volunteered to help. And I went to his office, and the guy as anxious. It seems to me he even had sweat on his brow. He was so worried about the fact that -- as I understood it, that he felt like we had a strong case on the merits in this case.**
MS. BURDETTE: Objection. I'm going to object to anything that relates to the merits of the case. I'd like you to restrict your answer, if you could, please, just to the document production.
**A. But he didn't have the documents he needed -- that the government needed and that discovery -- document discovery had -- we only had six months left in the discovery period in the case, that discovery was going to end -- all discovery was going end in July of 2005, and that we had a very urgent need.**
**And he seemed to think that it was almost an insurmountable need to find -- specifically, what he wanted me to do was to find records of credit card purchases, whether statements or credit card invoices,**

**that would help us to prove that --**
MS. BURDETTE: Objection. Just the document, please, based on privilege.
MR. HOOVER: Don't answer any further unless Mr. Broyles has something to say.
MR. BROYLES: I might.
MR. HOOVER: Objection is made on the record.
MS. BURDETTE: Right.
Q. So Mr. Chadwick indicated that there was a very -- what you described as an almost insurmountable hurdle in locating documents. But at that point in time, did he indicate to you that the Plaintiff had voiced an objection, either in writing or informally, that documents were not being produced that Plaintiff thought should have been produced?
**A. That was not the thrust of his -- of his concern at the time. The thrust of his concern at the time was that we had not located the credit card record files, statements, and invoices that we needed in the case.**
Q. And did --
**A. He also said at that time that a secondary reason for our search was to fulfill --**
MS. BURDETTE: Objection.



**A. -- requests for documents --**
MS. BURDETTE: I object to you stating any reasons for Mr. Chadwick's request. You can only relate what he told you to do to discover documents. His reasoning and his motives and telling about proof is privileged.
MR. BROYLES: Well, I'm not convinced of that one, but we'll have to take that one up with the Court.
Q. Anyway, so Mr. Chadwick told you that he wanted you to discover credit card records?
**A. He said he wanted me to find credit card records and -- that's correct. That was my task.**
Q. So did Mr. Chadwick indicate to you that he wanted you to search for any records other than credit card records?
**A. The focus of my task was credit card records.**
Q. And when you say the focus of your task, is this a focus that you created or that Mr. Chadwick created?
**A. This is specifically what he asked me to find. This was the -- what he said to me was we only have two months left in discovery, and we need credit card records from the MTFs in order --**
MR. HOOVER: No. Sorry.



MS. BURDETTE: Objection.
**A. We need --**
MR. HOOVER: Just what he said, not why he said it. That's the objection. I mean, that's not for me to make actually. It's for the government. I'm here for you, Mr. Brown, so let me withdraw my objection. Sorry.
MS. BURDETTE: I'll voice an objection. It's only important what he asked you to look for.
Q. The question I asked was whether the focus on credit card records was a focus you created or that Mr. Chadwick created.
MR. HOOVER: And he answered that.
Q. And I believe you did answer that, and I think your answer was Mr. Chadwick created that focus.
**A. Correct.**
Q. Did Mr. Chadwick instruct you to look for any other kinds of records?
**A. Yes.**
Q. What other kinds of records did he tell you to look for?
MR. HOOVER: What period of time are you talking about? That initial conversation that you related or at any time in the eight months or what?
MR. BROYLES: This initial conversation.



MR. HOOVER: Okay.
**A. Any other document that was related to the -- to the narrow issue of the use of credit cards.**
Q. Did you and Mr. Chadwick have any discussions at all about the manner in which the government had prepared the bid documents?
**A. No.**
Q. Did -- as you sit here today, are you aware that that is one of the issues in the case?
**A. No.**
Q. So would it be a fair statement to say that in your search for records, you did not search for documents dealing with the manner in which the government prepared bid documents?
MR. HOOVER: Could you restate that? Do you want it restated?
THE WITNESS: Yeah. If you'd restate it.
MR. BROYLES: Kim, can you read it back? And then if you still don't understand it, I'll rephrase it.
MR. HOOVER: I think it's a double negative, and it might have been a little confusing. Why don't you --
MR. BROYLES: I can't imagine such a thing.

BY THE REPORTER:
QUESTION: So would it be a fair statement to say that in your search for records, you did not search for documents dealing with the manner in which the government prepared bid documents?
MR. HOOVER: You just said that --
**A. Yeah. That's a fair statement.**
**(Deposition Exhibit No. ^2 marked)**
Q. Okay. Now, the -- I'm going to hand you what the court reporter has marked as Exhibit 2. And actually, I thought I had three of each, but I don't. If you'll share that with your Counsel?
MR. HOOVER: What is it actually? I've got my table of contents here.
THE WITNESS: My first --
MR. HOOVER: Oh, your declaration? Okay. Um-hum.
Q. Do you recognize that document?
**A. Yes.**
Q. Did you prepare that document?
**A. Yes.**
Q. Now, Mr. Chadwick signed that document on your behalf. Did you authorize him to sign that document on your behalf?



**A. I don't remember how that happened.**
Q. Do you have any doubt that you authorized him to sign that on your behalf?
**A. No.**
Q. And there's the -- is there anything in that document that is inaccurate?
**A. No.**
Q. So let's -- let's -- starting with paragraph number 2 on page 1 of Exhibit 2, you state, "Anthony Amendolia supplied the names and telephone numbers of eight supply officers at eight MTFs that might currently possess such documents."
Do you see that?
**A. Yes.**
Q. And the "such documents" above, that you indicate were relevant, those were documents relevant to the lawsuit, correct?
**A. Yes.**
Q. And how did -- what kind of discussions did you and Mr. Amendolia have to determine what kinds of documents might be relevant to the lawsuit?
**A. I don't remember specifically.**
Q. Well, did you have in front of you at that time Plaintiff's -- any of Plaintiff's document requests?
**A. I don't remember whether I did.**



Q. Is it your testimony that you asked Mr. Amendolia what MTFs had documents relevant to the lawsuit?
**A. Yes.**
Q. And it wasn't focused on just credit card records?
**A. That's correct.**
Q. And did you and Mr. Amendolia have any discussion then about what kinds of documents might be relevant to the lawsuit?
**A. Yes.**
Q. Did you and Mr. Amendolia have any discussion about the bid documents? Documents that would be relevant to any issue of whether the bid documents had been properly prepared?
**A. We didn't have that discussion.**
Q. Now, it says he supplied the names and telephone numbers of eight supply officers that might currently possess such documents.
"He said that no other MTFs had any documents relevant to this lawsuit."
Did he make that statement to you?
MR. HOOVER: If you recall two years later.
**A. I don't recall at this time whether -- whether**



**he actually did.**
Q. So as you sit here today, you don't know whether that statement, "He said that no other MTFs had any documents relevant to this lawsuit", is a correct statement or not?
**A. I can't verify it from my memory at this time.**
Q. And the -- now, you prepared this document on October 24th or somewhere close to October 24th of 2005, correct?
**A. Correct.**
Q. And at that point in time, did you -- do you recall that you had a specific recollection regarding that statement?
**A. Yes, I did.**
Q. And that you believed at that time that that is exactly what Mr. Amendolia said? That no other MTFs had any documents relevant to this lawsuit?
**A. Correct.**
Q. And did you ask him why the other MTFs did not have any documents relevant to this lawsuit?
**A. I don't remember.**
Q. Did you ever tell Mr. Chadwick that you had made multiple visits to all of the MTFs?
**A. No.**
Q. Did Mr. Chadwick -- did you turn into

Page 37

Mr. Chadwick expense accounts for approval or anything like that?
A. **No.**
Q. So he -- in terms of your travels, he didn't see any documentation as to where you traveled. He just relied on what you told him, correct?
A. **Correct. Actually, I don't know what he -- I can't say how he arrived at his opinion about those things. I know what I said to him, and I know what the nature of our discussions were on it. He may have -- in fact, I feel certain that he -- you know, that he spoke to Anthony Amendolia, Kathryn Hallam, many other people about the efforts I was making. So he -- I feel certain that he heard from them what progress we were making.**
Q. Now, with respect to this statement by Amendolia that you -- that he said that no other MTFs had any documents relevant to this lawsuit, at that point in time then, did you just accept that on face value or did you go behind Mr. Amendolia's statement?
MR. HOOVER: Let's take a second here.
(Discussion off the record)
MS. BURDETTE: I want to note on the record that I'm representing the United States.
MR. HOOVER: Thank you for that.
A. **I'd like to clarify my last answer.**

Page 38

Q. Based on advice of Counsel?
A. **Yes.**
Q. And how do you want to clarify your last answer?
A. **The statement in paragraph 2, "He said that no other MTFs had any documents relevant to this lawsuit," isn't a verbatim quote from Mr. Amendolia. I'm not quoting his -- him verbatim. I'm summarizing the result of a long conversation -- in fact, more than one conversation that I had with him and summarizing the fact that as the result of discussions of specific MTFs and with regard to specific individuals at those MTFs that we had, that he thought we had discussed all of the MTFs that might have documents that were relevant.**
Q. Now, so what you're saying, as I understand it, is that in mid March, you contacted Anthony Amendolia to inquire whether any medical treatment facilities named by Plaintiff currently possessed any documents that were relevant to the lawsuit. You did that?
A. **It was a process that went on -- started in mid March and went on for months.**
Q. But you did do that in mid March?
A. **Yes.**
Q. And then as I understand what your testimony is today, that over a period of time, he supplied the

Page 39

names and telephone numbers of eight supply officers, or did he do that in March?
MR. HOOVER: If you recall.
A. **I recall that over a period of time, he did.**
Q. What would that period of time be; do you recall?
A. **Not exactly. It was primarily in March, but might have continued for another month or so. A little more maybe.**
Q. Now, you've listed in Paragraph 3 supply officers whose names were supplied by Mr. Amendolia, correct?
A. **Yes.**
Q. Now, where did you get these names to put into your affidavit or your declaration?
MR. HOOVER: Objection. You said yourself the names were provided by Mr. Amendolia. So you are asking where did he get the names. He got the names from Mr. Amendolia, I gather, is what you're -- I'm a little confused by your question, Counsel.
Q. Let me rephrase here. You've identified very specifically names and addresses. You didn't do that from memory, did you?
A. **No.**
Q. Where did you get that information that you

Page 40

used to put this information in your declaration?
A. **I don't remember.**
MR. HOOVER: I think -- was this -- all of this information provided to you by Amendolia in March when you first spoke with him, or was it also -- like your last sentence in paragraph 2, was it also information that you gathered over a period of months from speaking with him?
A. **Yes. It was -- it was the result of our discussions over --**
Q. Did you make this affidavit or this declaration from written notes?
A. **Yes. And other -- other materials.**
Q. What other materials?
A. **It would have been e-mail messages and might have been -- I seem to remember that there were other documents. I don't remember if they were court orders or pleadings or what the nature of those documents were.**
Q. Somewhere, you dug up the names and addresses at the time that you made this declaration?
A. **Yeah, yeah. With regard to the -- I had to verify that some way. They came, you know, from some other source, where I could be sure they were accurate. So I imagine that was -- yeah, from someone in DLA.**
Q. Prior to October of 2005, you and Mr. Chadwick

Page 41

had discussions regarding your efforts to locate documents; did you not?
A. Yes.
Q. You told Mr. Chadwick that you had contacted all of the medical treatment facilities; did you not?
MR. HOOVER: If you recall.
A. What time period are we referring to?
Q. Prior to October of 2005.
A. He'd ask me, "Who have you contacted?" And I would give him specific answers to that question.
Q. So you identified -- you identified the medical treatment facilities listed in Exhibit 2?
A. Yes.
Q. And did he ask you if you had contacted any other MTFs?
A. Yes.
Q. And what did you tell him?
A. I told him yes.
Q. So you told him -- in addition to the medical treatment facilities you've listed in Exhibit 2, you told Mr. Chadwick that you had contacted other MTFs?
A. Yes.
Q. And did he ask you which ones?
A. He didn't ask me -- he asked me about -- I

Page 42

remember him specifically asking me about Corpus Christi. But no, he never -- he never asked me to give him a list of the MTFs I had contacted, no.
Q. Did you tell him you had contacted all of the MTFs that Plaintiff had listed in its lawsuit?
A. No. He asked me. I remember him asking me, "Have you contacted all of the MTFs?"
Q. And he emphasized "all" like you just did?
A. I didn't emphasize "all".
Q. Did he emphasize "all"?
A. No. It was a sentence. He just -- you know, I don't remember him emphasizing any word more than another.
"Have you contacted all of the MTFs?"
Q. And you told him yes, or what did you tell him?
A. What I told him was that -- yeah, I said yes, in the affirmative. Usually, it wouldn't just be a "yes" or "no" answer. It would come in the context of what I was doing. He wanted to know specifically. He didn't just want a "yes" or "no" answer. He wanted to know not only what I had done, but how effective it was, how fruitful it was. He wanted -- and he was more interested in the results rather than just a "yes" or "no" answer.
Q. Did you ever talk to Oscar Molinar?

Page 43

A. Yes.
Q. Did you ever talk to Debra Thompson?
A. Yes.
Q. Did you ever talk to Sharlotte Terry?
A. That name, I don't remember.
Q. Did you ever talk to William Marchand?
MR. HOOVER: If you recall.
A. At this time, I don't recall that name.
Q. Did you ever talk to Terry Steele?
A. At this moment, I don't recall that name.
Q. How about Bruce Christie? Do you recall --
A. Yes.
Q. You talked to Bruce Christie?
A. Yes.
Q. Did you ever talk to Lynn Nelson?
A. I don't recall that name.
Q. Did you ever talk to Cliff Songer?
A. Sanger.
Q. S-O-N-G-E-R, however you pronounce it.
A. It's S-A-N-G-E-R.
Q. Did you ever talk to Judy Tyler?
A. Cliff Sanger. You know, I know that name so well because I tried multiple times to actually talk to that guy. And you know, I don't know if I ever actually did talk to him because I kept getting information that

Page 44

was obsolete. And --
Q. What do you mean, information that was obsolete? What do you mean by that?
A. Telephone numbers that -- where he no longer worked.
Q. And who was giving you this information?
A. I think it was Christie that gave me those. Mr. Christie.
Q. Bruce Christie?
A. Um-hum.
Q. Did you ever talk to Judy Tyler?
A. I don't recall that name.
MR. HOOVER: If you recall.
Q. Did you ever talk to Maria Trevino?
A. Yes.
Q. Did you ever talk to Jennifer Crosby?
A. I don't recall that name.
Q. Did you ever talk to Kenneth Chapman?
A. I don't recall.
Q. Did you ever talk to Jesse Schrunk?
A. I don't recall.
Q. Angela Yuhas, Y-U-H-A-S?
A. I don't recall.
MR. HOOVER: Where are you getting these names? Can we ask?

MR. BROYLES: You've got that document. It's part of a --
MR. HOOVER: Spreadsheet you developed?
MR. BROYLES: -- joint status report that was filed.
MR. HOOVER: Thank you.
Q. Did you ever talk to Mark Sabroski, S-A-B-R-O-S-K-I?
**A. I don't recall.**
Q. John Terra? J-O-H-N, T-E-R-R-A?
**A. Last name is T-E-R-R-A?**
Q. Yes.
**A. I don't recall.**
Q. Julia Hatch?
**A. I don't recall.**
Q. Winston Massey?
**A. I don't recall.**
MR. BROYLES: Did you find it?
MR. HOOVER: Huh-uh. May I have -- thank you.
Q. Dwayne Baca? D-W-A-Y-N-E, B-A-C-A?
**A. I don't recall that name.**
Q. Mark Green?
MR. HOOVER: You're under another sheet?
MR. BROYLES: I'm on the last page, I



think. Yeah, the last page.
MR. HOOVER: Yeah, sorry. Thank you.
Q. Mark Green. Does that ring a bell?
**A. I don't recall that name.**
Q. How about Mark Tawil, T-A-W-I-L?
**A. No, I don't recall that name.**
Q. Now, did you and Mr. Chadwick have any discussion about documents not being generally produced by Air Force MTFs?
**A. No.**
Q. Did you indicate to Mr. Chadwick that generally, Air Force MTFs no longer had documents?
**A. I don't recall making that statement.**
Q. Did you indicate to Mr. Chadwick that you had contacted any of the Air Force MTFs?
**A. Yes, I think I told him that I had.**
Q. Did you tell him specifically which Air Force MTFs you had contacted?
**A. No.**
**(Deposition Exhibit No. ^3 marked)**
Q. I'm going to hand you what the court reporter has marked as -- well, let's start with -- just to keep them in order, Exhibit 3. Do you recognize Exhibit 3?
**A. Yes.**
Q. Is that your signature on Exhibit 3?



**A. Yes.**
Q. Did you prepare Exhibit 3?
**A. Yes.**
Q. Okay. Now, with respect to Exhibit 3, in paragraph 2, it says that you met with Mr. Chadwick to -- who told you of a need for a paralegal to contact all Department of Defense medical treatment facilities to ascertain whether they currently possessed any document in paper or electronic form relevant to this matter.
How did you determine what was relevant to the lawsuit?
MR. HOOVER: You're assuming he did make that determination. I think you should ask the question in the first place, and then ask him how he determined it if it's yes, if it's affirmative.
Q. Did you understand the question your Counsel asked there?
**A. Yes. I understood what my Counsel asked.**
Q. Okay. So the question is, did you make a determination of what documents were relevant to the lawsuit.
**A. No.**
Q. How did you know what to look for, if you didn't know -- if you hadn't made a determination of what was relevant to the lawsuit?



**A. Other -- Mr. Chadwick and the lawyers at the Justice Department were the ones that made the determination about what was relevant to the lawsuit, not me.**
MR. HOOVER: It's really kind of been asked and answered because he specifically told you that he was tasked with looking for certain documents originally from Mr. Chadwick, credit card records.
Q. When you say "lawyers at the Justice Department", are you referring to lawyers other than Mr. Chadwick?
**A. Yeah. Lawyers -- but I don't know in specific which ones were involved in that decision.**
Q. So in terms of what was relevant or not relevant, you relied on Mr. Chadwick?
**A. Yes.**
Q. Now, Mr. Chadwick indicated that he was looking for a paralegal to help on this case that needed to work independently of him. Did Mr. Chadwick make you aware of the fact that he wanted you to work independently of him?
**A. No.**
Q. So now, in Paragraph 3, you make the statement that in June 2005, you met with Mr. Chadwick. Do you know when in June 2005 you met with Mr. Chadwick?

MR. HOOVER: Or how many times in June of 2005 you met with Chadwick?
**A. I don't know how many times.**
Q. Well, you make the statement, "At that time, Mr. Chadwick asked whether I had contacted all of the MTFs."
Do you recall when, in June 2005, Mr. Chadwick asked you that question?
**A. No, I don't.**
Q. Do you recall whether it was early June or late June?
**A. No, I don't.**
Q. Now, you make the statement that in June of 2005, you believed only eight or fewer MTFs possessed any responsive documents based on information provided by the Defense Logistic Agency headquarters personnel and confirmed by your inquiries.
Now, what DLA headquarters personnel are you referring to?
**A. I'm not sure what paragraph you're quoting.**
Q. I'm looking at Paragraph 3, page 2.
**A. Okay.**
MR. HOOVER: Take a second. Reread it.
MR. BROYLES: Let's go off the record a second.



(Recess taken)
Q. Okay, Mr. Brown. I had asked you with respect to Paragraph 3, based -- where you make the statement, "Based on information provided by Defense Logistics Agency headquarters personnel."
And my question was, prior to the time you and your attorney broke for a break here, what headquarters personnel at DLA are you referring to?
**A. Mr. Amendolia.**
Q. Any others?
**A. He's primarily the one. He referred me to other people that -- the other people that were listed in my other affidavit, and I think some of them may have been DLA, but they weren't headquarters people.**
Q. So when you say, "Based upon information provided by Defense Logistics Agency headquarters personnel," you are referring to solely Mr. Amendolia?
**A. No, sir.**
Q. Who else are you referring to?
MR. HOOVER: If you recall.
**A. I don't recall.**
MR. BROYLES: Okay. I'm going to object to Counsel instructing the witness. If he doesn't recall, he can state he doesn't recall.
MR. HOOVER: Then why don't you tell him



that in your question? You posed the question as if he must give you the answer. And of course, there's a legitimate answer, which is "I don't recall." I'm simply reminding him of that.
MR. BROYLES: Right. You're instructing the witness. You're instructing the witness. He knows -- if he came --
THE WITNESS: You're leading the witness, Mr. Broyles.
MR. BROYLES: Well, I've got a right to lead the witness.
MR. HOOVER: And I've got a right to counsel my client and tell him that there are parameters which he's available -- which are available to him such as I don't recall, I don't know the answer to that question, I don't understand the question.
MR. BROYLES: And you didn't prepare your witness prior to this deposition with respect to those parameters?
MR. HOOVER: I guess not well enough.
Q. What other -- so your testimony today then is the only Defense Logistics Agency headquarters personnel that you recall is Anthony Amendolia?
MR. HOOVER: Objection. That's incorrect. He already answered that question. Asked



and answered. He said he couldn't recall the names of other people besides -- I'm sorry. Amendolia. Strike that objection. I'm sorry.
Q. And your answer is?
MR. HOOVER: Can you answer it? Do you even know what the question is at this point?
**A. Yes, I know what the question is.**
MR. HOOVER: Go ahead.
**A. And Mr. Amendolia gave me the names of other people, and I contacted those people as well.**
Q. But they weren't headquarters personnel?
**A. I think most of them were at the MTFs.**
Q. Were any of them at the headquarters?
**A. I don't recall.**
Q. Now, it says "And confirmed by my inquiries." What inquiries did you make?
**A. Telephone calls and I -- when I talked to one person, that person would give me a name or a suggestion. And I would follow-up that name or suggestion.**
Q. Can you tell me the names of the people that you talked to that indicated that certain MTFs did no longer -- did not have any responsive documents?
**A. No. I can't give you the names of all of the people.**
Q. Can you give me the name of anybody?

**A. Anthony Amendolia.**
Q. So can you give me the name of anybody else?
**A. I think everyone that I spoke to discussed the fact that some of them were no longer in -- no longer in operation. Some had been closed due to the base realignment and closure activities that were going on in the Department of Defense.**
Q. So when you talked to Oscar Molinar, he indicated to you that there were military bases that had been closed?
**A. I don't recall any conversation with him regarding that specifically.**
Q. Did you talk to any supply personnel that indicated that their particular military treatment facility no longer had relevant documents?
**A. Could you repeat the question?**
Q. Did you talk to any supply personnel that indicated at their particular medical treatment facility, they no longer had relevant documents?
**A. Yes.**
Q. Who?
**A. If I were given -- if I were given the names, I might be able to remember who they were.**
**(Deposition Exhibit No. ^4 marked)**
MR. BROYLES: I'm going to hand you what



the court reporter has marked as Exhibit 4. And you'll notice in the second column, there's a list of people that have filed affidavits in this case. Look at that list and tell me if any of those people told you that their MTF no longer had relevant documents.
**A. Yeah. Mr. Molinar told me that. But as I recall, he recently moved from the -- from the facility that he was at during the -- during the time when United Medical was under contract. And I don't recall which facility it was he was referring to or whether it was both the one he was currently at or the one he was at at the relevant time period. But yeah, he told me that his facility didn't have any.**
Q. Didn't have any relevant documents, correct? Or did you guys just discuss credit card documents?
**A. Primarily, credit card documents. But I would start out more generally and ask -- my -- initially, when I contacted them, I would refer to them -- refer to United Medical as the supplier of surgical supplies, and I would say, "Do you recall them as a supplier?"**
**They would say yes or no or they're not sure.**
**And then I would say, "Do you have records, documents, or files that relate to that?"**
**And they would say yes or no or I'm not sure**



**or whatever -- whatever their response would be.**
**And I would go from there, and I would try to narrow it down because what it was seeking primarily were credit card records.**
Q. When you say you were seeking primarily credit card records, what other kinds of records were you seeking?
**A. I would ask them, "Do you have any records relating to supplies that were purchased or ordered or were, you know, within the contract of United Medical suppliers?"**
Q. Now, you've been a paralegal a long time, and you understand the phrase "relevant to the lawsuit" with respect to discovery, do you not?
**A. I don't understand your question.**
Q. With respect to locating documents that are relevant to a lawsuit, you understand what "relevant to the lawsuit" means, do you not?
**A. I'm not sure how you're using it, sir. I am familiar with the term "relevant". I'm familiar with the term "lawsuit". You know, I -- relevancy is not -- relevancy is not generally a determination that I make as a paralegal. It's generally what the attorneys tell me.**
Q. So when you say, in paragraph 2 of Exhibit 3, that you called or that Kyle Chadwick said he's looking



for documents in paper or electronic form relevant to the matter, that he's the one that described to you what kinds of documents that you were to try to locate?
**A. You said Exhibit 2?**
MR. HOOVER: Right here.
MR. BROYLES: Exhibit 3.
**A. Exhibit 3?**
MR. HOOVER: The one that starts, "In mid March 2005".
MR. BROYLES: It starts, "I, Peter Brown".
MR. HOOVER: I'm sorry. Paragraph 2.
MR. BROYLES: Yeah.
MR. HOOVER: Do you have it? Yes. Read that.
MR. BROYLES: I think they both start that way.
MS. BURDETTE: The third paragraph is what you need to look at to distinguish them.
MR. HOOVER: I'm sorry.
Q. The one I'm looking at in Paragraph 3 is, "In June 2005". Do you have that in front of you?
MR. HOOVER: Yes, he does. This is Exhibit 3.
**A. Paragraph 3, okay.**

Q. So your testimony is that Mr. Chadwick described to you the kinds of documents that he believed were relevant to the lawsuit and that you were to go and try and find?
**A. Correct.**
Q. Now, in paragraph 2 of Exhibit 2, you say you contacted Anthony Amendolia and asked him about MTFs that currently possessed any documents in paper or electronic form relevant to this matter. Did you use the words with Amendolia "relevant to this matter"?
**A. I don't recall.**
Q. Well, how did -- how did you believe Mr. Amendolia would know what kinds of documents you were looking for?
**A. I was told that he would.**
Q. By Mr. Chadwick?
**A. Yes.**
Q. At some point in time, did you become aware that there was an issue regarding destruction of documents by the MTFs?
**A. Yes.**
Q. How did you become aware of that?
**A. I spoke to some personnel at MTFs -- and I don't -- and Mr. Molinar was one of them who told me that the documents that I was asking about -- the kinds**



**of documents that I was asking about in some cases he thought had been destroyed.**
Q. And that was prior to June of 2005?
**A. I don't recall when I had that particular discussion with him, but -- so I don't know if it was before June or after.**
Q. Do you recall if it was in the first discussion you had with Mr. Molinar?
**A. No, I don't.**
Q. How many discussions did you have with Mr. Molinar?
**A. I don't recall.**
Q. Was it more than one?
**A. I don't recall.**
Q. And so when Mr. Molinar told you that he thought documents had been destroyed, what did you do?
**A. I said -- I asked him to continue to inquire as to whether there were any still existing.**
Q. Did you immediately notify Mr. Chadwick that Mr. Molinar had indicated to you that documents had been destroyed?
**A. Not immediately.**
Q. Eventually?
**A. I didn't have a specific -- I don't recall a specific discussion with Mr. Chadwick about what**



**Mr. Molinar said.**
Q. Now, when Mr. Molinar told you that he thought documents had been destroyed, did that give you any concern that evidence had been destroyed relevant to the case?
**A. I'm not sure what you mean by concern.**
Q. Do you get concerned about life?
**A. I'm not sure what you mean, sir.**
Q. Are you concerned about this deposition?
MR. HOOVER: Objection.
Q. Are you concerned about this deposition?
**A. I'm not sure what you mean, sir.**
Q. Are you concerned that the Court is concerned about false statements that have been made to it?
THE WITNESS: I'd like to talk with my Counsel.
(Discussion off the record.)
MS. BURDETTE: Let's take a little break.
MR. BROYLES: Let's go back on the record. Kim, can you repeat the last question? I think we have a pending question.
BY THE REPORTER:
QUESTION: Are you concerned about this deposition?
ANSWER: I'm not sure what you mean,



sir.
QUESTION: Are you concerned that the Court is concerned about false statements that have been made to it?
MR. HOOVER: I object to that question because it's not a fact that I know of, and you ask it as if it's a fact that Mr. Brown is aware of. I think the question is, are you aware that the Court is concerned with false statements.
Q. You can answer the question.
**A. I haven't been present at any proceedings in this case and in the courtroom because I'm a paralegal and I don't represent the government. The Court has never made -- I've never heard any representations of the Court in person. I don't read all of the pleadings. I don't -- I'm not aware of what the Court has said to lawyers, what the Court may have said to you. And so I'm not -- I'm not sure what opinions or concerns the Court may have.**
Q. So would it be a fair statement then that you have not read any of the transcripts of proceedings in this case?
**A. I can't remember if I've read any of them or which one I had read.**
Q. Do you believe you've read transcripts of

proceedings in this case?
**A. It's possible.**
Q. But you don't have any specific recollection?
**A. That's correct.**
Q. Now, the question I originally posed to you was when you were advised that documents had been destroyed, did that give you any concern that relevant evidence had been destroyed.
MR. HOOVER: Objection. When was he advised that documents had been destroyed? Were you advised that documents had been destroyed, Mr. Brown?
MS. BURDETTE: Asked and answered. It's already on the record.
Q. You can answer the -- you can answer my question.
**A. It was -- it was a fact that was a legitimate answer to my question to Mr. Molinar and to everyone else that I -- you know, it was a possible answer to every -- to the questions that I was asking the people at every MTF that I contacted, so... I don't know. I hesitate to characterize my response at the time. I don't remember how I responded --**
Q. Did you --
**A. -- other than to make note of it.**
Q. Did you form an opinion that there was an



issue regarding document destruction in this case during any of your discussions with Mr. Molinar?
**A. Yes.**
Q. And what opinion did you form?
**A. I -- my opinion was that it was -- it was possible that what he said was true, what he indicated to me, that some of them may have been destroyed. My primary reaction was not to take that statement on face value, but to inquire further and to not be -- not be satisfied with that answer from him, that they had been destroyed. I didn't -- I didn't believe that they had all been destroyed because they had been instructed not to destroy those -- those very documents.**
Q. By whom?
**A. And if they -- because they had been instructed by other people at DLA.**
Q. How do you know that?
**A. Because Mr. Amendolia told me.**
Q. That he had instructed them not to destroy documents?
**A. Yes.**
Q. Did you ever tell them not to destroy documents?
**A. No.**
Q. When you say you didn't take Mr. Molinar's



statement that documents had been destroyed at face value, but that you wanted to inquire further, what further inquiry did you make?
**A. I asked him about specific types of documents.**
Q. That had been destroyed?
**A. No, that I was seeking.**
Q. Did you talk with him about documents that had been destroyed? Types of documents that had been destroyed?
**A. Not about specific documents. I -- I simply didn't accept that his indication that he thought documents in general relating to United Medical Supply had been destroyed. I didn't ask him specifically what items -- what kinds of documents he was referring to because I asked him, rather, whether he thought certain kinds of documents still existed, not whether they had been destroyed.**
Q. And so as I understand it, he's indicated to you that documents related to United Medical had been destroyed, correct?
**A. That's what he thought, yeah.**
Q. And how long after he indicated that to you did you advise Mr. Chadwick that Mr. Molinar thought documents might have been destroyed related to United Medical?



**A. Shortly.**
Q. And was -- was this a conversation you had with Mr. Molinar on the phone or in person?
**A. On the phone.**
Q. Did you ever meet Mr. Molinar in person?
**A. No.**
Q. Now, you indicated that when Mr. Molinar said documents related to United Medical had been destroyed, you then asked him about specific types of documents, if they were in existence, correct?
**A. Would you repeat the question?**
Q. Well, you indicated that when Mr. Molinar generally said documents had been destroyed, you asked him about specific types of documents as to whether they existed or not?
**A. Yes.**
Q. And what types of documents did you ask him about?
**A. Credit card statements and credit card invoices.**
Q. Anything else?
**A. Yes. There were others.**
Q. What?
**A. I don't recall.**
Q. And did Mr. Molinar tell you that those

documents had been destroyed, the credit card statements and the credit card invoices?
A. **He told me he would make further inquiry to see if he could locate any.**
Q. And then did he get back to you on that?
A. **No, he didn't.**
Q. Did you get back to him?
A. **Yes.**
Q. What did he say?
A. **I don't recall.**
Q. Did he say --
A. **And I don't recall whether I actually had a conversation with him about it.**
Q. Well, when you say you got back to him, how do you recall getting back to him?
A. **I recall dialing his number and leaving messages with him frequently, more than once. Definitely, more than once.**
Q. And to the best of your recollection, he didn't return your phone calls?
A. **I don't recall whether he did or not. I just recall there was not another -- there was one main discussion about that conversation about that. And I persisted, but it didn't result in any further information from him.**



Q. Now, you had a discussion with Mr. Chadwick about how you decided which MTFs to contact and which MTFs not to contact, correct?
A. **No. I don't recall having a discussion like that. I'm not -- in terms of which MTFs to contact, he originally asked me to contact them all.**
Q. But when he found out you didn't contact them all, he asked you how you determined which ones to contact and which ones not to contact, correct?
A. **No.**
Q. He never asked you that?
A. **What he said was, "What have you done," not specifically which ones you've contacted.**
Q. So he didn't ask you about the decision making process you went through in determining which ones to contact and which ones not to contact?
A. **Correct.**
Q. Now, you've got in front of you Exhibit 1. I believe it's a declaration of Kyle Chadwick.
A. **Yes.**
Q. Now, Mr. Chadwick makes a statement in paragraph 3, that he has learned that you possess a law degree. And we've determined indeed you do have that, correct?
A. **Yes.**



Q. And that you have worked on complex litigation for more than a decade. Is that an accurate statement?
A. **I'm not sure what he means by complex litigation.**
Q. Do you have an opinion as to what complex litigation means?
A. **I don't have an opinion about what he -- what he's referring to there.**
Q. No. I'm not asking you that. I'm asking you if you have an opinion about what complex litigation means.
A. **No. And I would like to clarify that -- that the law degree that I got was attained from Antioch University. Antioch had a program in the '70s where if you enrolled there, you would -- what they did was I enrolled there, and then I would work as a paralegal in various law offices and clinics during the day. And then at nighttime, I would take law courses in order to eventually receive a degree. But I never intended to be a lawyer. I never intended to practice law or to -- to be Matlock or Perry Mason. I wanted to obtain basically skills as a paralegal, so that I could earn money, so that I could continue writing novels in my spare time, which I've continued to do. And so it was a program whereby you would actually work as a paralegal and get**



**credit for that as well as paid for that. And so at the end of a three year period, I had experience as a paralegal, and I also obtained a degree from that program, but it wasn't in order to take the Bar and then practice law. And that was twenty years ago.**
MR. HOOVER: Excuse me a second.
(Discussion off the record)
A. **It was not accredited. It might have been when I started, and then -- when I finished it was definitely not accredited by the ABA.**
Q. Did you and Mr. Chadwick have any discussions about document retention policies at any of the MTFs?
A. **Yes.**
Q. What discussions did you have?
A. **We had general discussions about my success and my lack of success in obtaining documents. And one of the reasons was for, you know, my success or lack of success was that they either retained or didn't retain the documents.**
Q. Did you advise -- did you discuss with any MTF their document retention policy?
A. **No.**
Q. Did you ever form an opinion that the MTFs kept their documents for three years and then destroyed them?

**A. I didn't -- that wasn't my opinion, no.**
Q. So when Mr. Chadwick advised the Court that the document retention policies at the MTFs were three years, that was not based to the best of your knowledge on anything you told him?
**A. I don't know what he based it on.**
Q. But nothing you told him. You didn't ever tell him that?
**A. I don't know what he based his -- I --**
MR. HOOVER: Specifically, did you tell him three years and they're destroyed, if you recall.
THE WITNESS: I did not tell him that.
MR. HOOVER: Okay.
**A. That's my opinion.**
Q. Well, did you tell him that as anybody else's opinion?
**A. I may have quoted somebody else saying that because it's possible somebody said that to me. I don't recall it specifically.**
Q. Does it ring a bell?
**A. Yes, it does. But I don't know if it rings a bell because of the documents I've read in preparation for this deposition or if it comes from back during the relevant time.**
Q. Now, Mr. Chadwick makes a statement in



paragraph 10 of Exhibit 1, that you told him the MTFs destroyed them. "They're all gone," discussing the documents. Do you recall making that kind of statement to Mr. Chadwick?
**A. That kind of statement, yeah. I mean, I -- I don't remember that specific quote. I don't know why that's in quotes, because I don't remember specifically, you know, stating it that way. But I -- I definitely had discussions with him about the retention policy and about the fact that I had been told that some had been destroyed.**
Q. Well, in fact, what he's referring to here is that you've indicated that all of the documents you hadn't located had been destroyed. Did you ever tell him that? That what you hadn't located -- that you had located everything locatable, and everything else had been destroyed?
**A. No.**
Q. Now, at some point in time, you formed an opinion that you had copied all relevant discovery documents. When did you form that opinion?
**A. I don't recall having that opinion.**
Q. Do you have that opinion?
THE WITNESS: Would you read the -- would you read your question back again -- or would you repeat



it?
BY THE REPORTER:
QUESTION: Now, at some point in time, you formed an opinion that you had copied all relevant discovery documents. When did you form that opinion?
ANSWER: I don't recall having that opinion.
QUESTION: Do you have that opinion?
**A. I copied them all? I don't remember having that opinion, that I had copied them all.**
Q. Did you have an opinion that you found them all?
**A. I found them all? No.**
Q. Do you -- now, looking at paragraph 12 of Exhibit 1, Mr. Chadwick said he sent you an e-mail alerting you to the fact that Air Force MTFs had responsive documents that they had not been -- that had not been turned over for production. And your response was, "My bad."
Do you recall that -- making that kind of response?
**A. Yes.**
Q. And why did you make that response?
**A. Because I realized at the time that there**



**had been a misunderstanding, that I had misunderstood some things that he had asked me. And I believed at the time that -- that over a period of time, his interests in obtaining specifically the credit card records may have changed in that he had his -- his desire had changed over the time to the point that where, when he wanted to obtain -- wanted to obtain through discovery processes a much broader scope of documents and materials -- not only documents, but all kinds of things in discovery that was much broader than he had communicated to me for months. And that when he -- when he had said -- when he said have you contacted all of the MTFs and have you found all of the documents that are relevant to this case, that over time, his -- his scope had broadened tremendously from the very, very limited, very, very narrow scope of documents that he had asked me to find.**
Q. And how did -- how did you come to the conclusion that his scope of discovery had broadened?
**A. I came to that discussion when he -- I came to that conclusion when he -- he made it clear to me that, you know, that he was -- he was specifically looking -- well, not specifically, but in general, he, you know, was looking for, you know, documents that -- certain kinds of documents that he had not asked for specifically before.**

Page 73

Q. Such as?
**A. Documents that -- such as correspondence, such as contract administration documents, such as even -- even communications between the Justice Department and the MTFs.**
Q. And the -- when did he have that discussion with you about communications between the Justice Department and MTFs?
**A. I don't recall the exact date.**
Q. Now, did you ask Mr. Chadwick to -- first of all, do you know Kathryn Bleecker?
**A. Yes.**
Q. Who is Kathryn Bleecker?
**A. She's an attorney at the Justice Department.**
Q. And did you ask Mr. Chadwick to notify Kathryn Bleecker that the workload in the case was going to increase dramatically?
**A. No, I didn't.**
Q. Did you have a case with Kathryn Bleecker at the time? "The time" being --
**A. I didn't have a case with her, no.**
Q. Do you know why Mr. Chadwick would be notifying Kathryn Bleecker that the workload in this case was going to increase dramatically?
**A. No.**

Page 74

Q. Do you know Brooke Mabry?
**A. Yes.**
Q. Who is Brooke Mabry?
**A. Senior paralegal.**
Q. Is she your supervisor or was your supervisor?
**A. Is and was. That's why I pointed out that I'm not a senior paralegal. I'm just --**
Q. Did you ask Mr. Chadwick to know --
MR. HOOVER: Can he finish, sir?
MR. BROYLES: He's going off on some other tangent.
Q. Did you ask Mr. Chadwick to notify Brooke Mabry that the workload was going to increase dramatically and that you would be expected to provide additional information and documents and round up witnesses from nineteen military treatment facilities across the Southwest U.S.?
**A. No.**
Q. Now, did you and Mr. Chadwick ever have a discussion, that there had been a priority of discovery for the different MTFs?
**A. I'm not sure what you mean.**
Q. I'm going to hand you what the court reporter has marked as -- first, I'll just -- for the record, I'm going to hand you what the court reporter has marked as

Page 75

Exhibit 5.
(Deposition Exhibit No. ^5 marked.)
Q. I'm not going to ask you any questions about that right now. I'm going to hand you what the court reporter has marked as Exhibit 6.
(Deposition Exhibit No. ^6 marked.)
Q. Have you ever seen this document before?
**A. Yes.**
Q. When did you first see that document; do you recall?
**A. No, I don't recall. But it was -- it was one of the first -- it was appended to one of the first documents that I reviewed.**
Q. This was filed with the Court in July of 2005. Did you do anything with this document when you saw it
**A. Other than read it?**
Q. Correct.
**A. I used it in reference to my search for documents.**
Q. After you got Exhibit 6, did you contact all of the facilities listed there with Numbers 1 through 10?
**A. Not as the result of receiving Exhibit 6, no.**
Q. Did you ever tell Mr. Chadwick that you were unable to contact any of the facilities numbered 1 through 10?

Page 76

**A. I never said that.**
Q. Now, Mr. Chadwick indicates in Exhibit 1 that he provided you with copies of the complaint. Do you recall getting that?
**A. I don't doubt it. I don't recall specifically what documents it was that you are referring to.**
Q. I'm going to hand you a copy of the amended complaint and ask you if that refreshes your memory in any way as to whether you've seen --
**A. No, it doesn't.**
Q. So just as a blush glance, looking at the first page, your testimony is it doesn't refresh your memory?
MR. HOOVER: It's 36 pages. Do you want him to scan it all, Mr. Broyles?
MR. BROYLES: I'm wondering if that refreshes his memory as to whether he's seen it or not. If it does, it does. If it doesn't, it doesn't.
**A. I don't know when I've seen it or if I've seen it.**
Q. Okay. I'm going to hand you what was the Government's Responses to Plaintiff's First Set of Discovery Requests while this case was still pending in the bankruptcy court and ask you if you can recall seeing that.

Page 77

**A. I don't recall.**
Q. And that's based on your looking at the first page of the document?
**A. Correct.**
Q. Do you recall having seen this letter dated December 16, 2002, from me to Ms. Kathy Shahan?
**A. I don't recall this, no, whether I -- I don't recall whether I've ever seen it or not.**
Q. I'm going to hand you a copy of an e-mail from me to Kyle Chadwick dated November 20, 2003, time-stamped 2:56 a.m., copied to Kathy Shahan. Do you recall ever seeing that document?
**A. I don't recall it, no.**
Q. I'm going to hand you a letter from me to Mr. Chadwick dated June 9th, 2005, and ask you if you recall ever having seen this document.
**A. I don't recall, no.**
Q. Did Mr. Chadwick ever provide to you any motions by Plaintiff to compel discovery in this case; Do you know?
**A. No, he didn't.**
Q. Did -- now, do you have access to Pacer? Do you ever use Pacer?
**A. I'm familiar with it. I have used it, yes.**
Q. Did you do any Pacer research in connection

Page 78

with this case?
**A. No.**
MR. BROYLES: I'm going to hand you the -- in fact, I want to mark this.
(Deposition Exhibit No. ^7 marked.)
Q. I'm going to hand you what the court reporter has marked as Exhibit 7, which is a request for production of documents served on the United States by the Plaintiff on June 22nd of 2005 and ask you if you have ever seen that document?
**A. I don't recall whether I've seen this.**
Q. Now, the Request Number 1 asks for pro forma budgets. Did you ever make any search for pro forma budgets at any of the MTFs?
**A. I never made a specific search for that, no.**
Q. Did you make a general search for that?
**A. I've never asked anyone for anything called a pro forma budget.**
Q. Have you asked anyone for any kind of budget -- did you ask any of the MTFs for any kind of budget?
**A. Not specifically.**
Q. Generally?
**A. I think that, you know, to me, a budget might or might not fall within the group of documents that we**

Page 79

**were searching for, but I don't --**
Q. You never used the word "budget" to the best of your knowledge?
**A. No, no.**
Q. How about -- Item Number 2 asks for financial reports. Did you ever ask for financial reports?
**A. Not specifically.**
Q. And by "not specifically", you mean you didn't use the word "financial reports" at all?
**A. That's correct. It could be one of the types of documents that we were looking for and fell within the more general description that we were using, which was, you know, documents that described or mentioned United Medical.**
Q. Are you familiar with the phrase, DAPA, D-A-P-A, items?
**A. No.**
Q. Now, during your eight month involvement in this case, did Mr. Chadwick ever show you any joint status reports that had been filed with the Court?
**A. I don't remember, no.**
Q. I'm going to hand you the joint status report that was filed with the Court on or about July 15th of 2005 and ask if you recall seeing that.
**A. I don't recall seeing this specifically.**

Page 80

Q. Now, the --
MR. BROYLES: What is this exhibit number?
MR. HOOVER: Exhibit 6.
Q. Now, Exhibit 6 -- I believe your testimony was that Exhibit 6, when you saw it, it was attached to another document, correct?
**A. Yes.**
Q. And could that document it was attached to have been the joint status report of July 15th, 2005?
**A. No, because, I mean, it -- I don't recall whether I ever saw the joint status report.**
Q. In paragraph 1 of the 2000 -- July 15th, 2005 joint status report, paragraph number 1 being the introductory paragraph, it says, "The parties have resolved at least temporarily their outstanding discovery disputes."
Did you and Mr. Chadwick have any discussion about discovery disputes?
**A. Yes.**
Q. Between the Plaintiff and the Defendant?
**A. Yes.**
Q. And what discussions did you have?
**A. Many, many and various discussions.**
Q. Do you recall any?

**A. I don't know which -- at what time period you're referring to, and I don't know what kind of disputes you're referring to.**
Q. Well, you indicated that you had many discussions with Mr. Chadwick regarding discovery disputes, and I'm asking if you can recall any of those discussions that you just referred to.
**A. I can recall some of them.**
Q. Tell me which ones you recall.
**A. I met with him -- the first time I met with him in the middle of March 2005, he said that there had been disputes regarding discovery, that there had been discussions about the -- the fact that there -- that very few credit card records and statements and invoices had been found, that it was a source of concern for him as well as for Plaintiff.**
Q. Did he indicate that it was a source of concern to the Court?
**A. No, he didn't.**
Q. Did you believe it was a source of concern to the Court?
**A. I didn't have an opinion on that.**
Q. I'll show you the joint status -- do you recall any other discussions with Mr. Chadwick about discovery disputes?



**A. Not specifically.**
Q. Generally?
**A. Generally, I -- I recall having discussions with him about -- about issues relating to discovery.**
Q. Do you recall having discussions with him about issues relating to disputes between the Plaintiff and the Defendant regarding discovery?
**A. Only in a general sense. Only that there were ongoing arguments regarding -- regarding that subject.**
Q. And you were aware of that basically from day one, when you got involved?
**A. Yes.**
Q. I'm going to show you what's filed as a status report of September 15th of '05 and ask you if you have seen that before.
**A. No. I don't recall seeing it. I'm not sure whether I did.**
Q. How about the October 17th, 2005 joint status report? Do you recall having seen that before?
**A. No, I don't recall seeing that before.**
Q. Did Mr. Chadwick show you any orders of the Court in connection with this case?
**A. Yes.**
Q. What orders did he show you that you recall?
**A. I don't recall what specific ones, but one**



**of the earliest documents he showed me was a court order. And it -- it was a lengthy court order that had attachments to it.**
Q. Was that the summary judgment opinion of the Court?
**A. I don't recall what it was.**
Q. Do you recall if it had anything to do with discovery?
**A. I don't recall. I really don't recall what the order -- whether it had anything to do with discovery or not because he was giving it to me -- I think it was our very first meeting. He gave me some documents that he thought would help me get up to speed on the case, and it was one of them. But honestly, I don't remember the caption at all.**
Q. Did Mr. Chadwick ever advise you to notify the MTFs not to destroy documents?
**A. No, he didn't give me that as -- you know, as my task.**
Q. So your testimony today is that never in that eight month period did Mr. Chadwick instruct you to notify MTFs not to destroy documents?
**A. That's correct.**
Q. Have you seen this order of the Court dated October 17th, 2005 before?



**A. I can't recall whether I've seen that before or not.**
Q. Have you seen this order of the Court dated September 20th, 2005 before?
**A. I can't recall.**
MS. BURDETTE: Was that September 30th?
MR. BROYLES: September 20th, 2005.
MS. BURDETTE: Okay.
(Deposition Exhibit No. ^8 marked.)
Q. I'm going to show you what the court reporter has marked as Deposition Exhibit 8, and it's entitled Defendant's Status Report Regarding Discovery, dated October 24th, 2005. Have you seen that document before?
**A. I don't recall whether I've seen it.**
MR. HOOVER: Can he have a moment to review it?
MR. BROYLES: Sure.
MR. HOOVER: Thanks.
MR. BROYLES: In fact, this is a good chance to break.
MR. HOOVER: Yes, I think so, too.
MR. BROYLES: Off the record.
(Recess taken)
Q. Mr. Brown, we're back on the record and you've had a chance then to review what is the Defendant's

status report regarding discovery filed October 24th, 2005. Have you seen that document before?
A. **Yes. In fact, it's the one I referred to earlier that incorrectly refers to me as a senior Department of Justice paralegal. I'm not a senior paralegal. I'm a paralegal specialist. So I'm a GS level below the senior paralegal level.**
Q. Now, did you see this document before it was filed?
A. **I don't recall.**
Q. Do you recall if you had any part in drafting this document?
A. **I don't recall. In fact, I don't -- I didn't have any part in drafting any document other than my declarations.**
Q. Defendant makes a statement, beginning at the bottom of the first page and continuing on to the second page, "Mr. Brown requested records in accordance with the Parties' joint status report dated July 15th, 2005."
Do you recall specifically requesting records in accordance with that joint status report?
A. **No, I don't.**
Q. Now, this -- do you recall making a specific effort after July 15th, 2005, to locate records?
A. **I'm not sure what specific records you're**



**referring to. I was looking for records after that, yeah. Documents, records, files.**
Q. The statement is made, "The Government provided United Medical electronic copies of all of these responsive MTF documents in July and August of 2005."
And what I'm asking you is do you recall a meeting with Mr. Chadwick or conducting any specific activity in July and August of 2005 in accordance with a joint status report?
A. **Not specifically for the purpose of a joint status report.**
Q. Now, you had been searching for documents prior to July 15th, 2005, correct?
A. **Correct.**
Q. Do you recall something changing around July 15th, 2005, to cause you to renew your interest, do something different than you've been doing before? Is that --
A. **I recall July 15th -- not specifically the 15th, but July as the cut-off for discovery.**
**One of the reasons why he was so -- why Mr. Chadwick had been so urgent in asking me to find the credit card records was because of the lack of time that we had, and discovery was going to close in July of 2005.**



**And so later on, when he became, you know -- so in June and May of 2005 -- well, not May, but later on in this June and July context.**
**Then later in the summer, on into fall, he -- now that I look back in hindsight, I can see that his meaning changed over the time -- over that time; that he became more general and began to be interested in a wider variety of documents other than just credit card reports. And I couldn't understand that. It didn't make any sense to me because of the fact that discovery -- because we didn't have time to go to a whole broader level of discovery due to the fact that -- about July, the discovery was going to end. It didn't make sense to me that he would want to suddenly make a -- you know, a really broad search for anything and everything that could be found.**
Q. Did -- did you ever express to Mr. Chadwick that you had concerns about the timing or the process that was being used to discover documents?
A. **I'm not sure what you mean by the timing and process.**
Q. Well, did you ever complain to Mr. Chadwick that something was wrong?
A. **No, I didn't.**
Q. Now, looking at the Defendant's status



report -- the Defendant's status report regarding discovery of October 24th, look at the last three pages of that document and tell me if you recognize any of those three pages.
A. **That would be --**
MR. HOOVER: All the way to the end.
A. **Oh, of the attachments? I recognize the e-mails on the last -- for the last page.**
Q. Were you copied on those e-mails at all?
A. **No. But I notice that in the subject line where Kyle Chadwick is writing to Debbie Thompson, the subject line is "Sorry this comes so late" and --**
MS. BURDETTE: Objection. That's not a proper characterization of the e-mail, I don't believe. Which one are you --
A. **It says, "Subject: Sorry this comes so late."**
MR. BROYLES: But it's actually from Thompson and Chadwick.
MS. BURDETTE: Right. It's from Thompson and Chadwick. You have to indicate --
THE WITNESS: From Kyle Chadwick, to Debbie Thompson. Look at the one at the very bottom.
MS. BURDETTE: Okay.
THE WITNESS: That's the earliest.
MS. BURDETTE: Okay. I just want to make

Page 89

sure --
THE WITNESS: That's the earliest. It says, "Sorry this comes so late."
MR. HOOVER: That's the redacted one.
**A. I'm pointing out that throughout this whole time period, from October 2005 all the way back to March, Mr. Chadwick was in a great stress because of the fact that he thought we were late in seeking the information that we were seeking. Therefore, he gave me and Ms. Thompson very narrow, very specific instructions as to what -- as to what we were seeking. He wanted to find credit card records only. And if we found other things in the process that was acceptable -- but he -- that -- he almost -- I could almost say that he wanted credit card records in exclusion of other things.**
**(Deposition Exhibit No. ^9 marked.)**
Q. I'm going to hand you what the court reporter has marked as Exhibit 9. Have you ever seen that document before?
**A. No.**
Q. I would like you to look at Exhibit 9 and then go down each of the numbers and tell me whether the facility shown by the number and the name of the record custodian were facilities and people that you had contact with in your search for documents. So number one,

Page 90

beginning with Fort Hood.
**A. And you'd like me to say do I recognize the person here?**
Q. First of all, did you contact Fort Hood?
**A. Yes.**
Q. And did you talk with Debra White?
**A. Yes.**
Q. Moving to Number 2. Did you contact Fort Sam Houston?
**A. Yes.**
Q. And did you talk with Debbie Thompson?
**A. Yes.**
Q. Number 3, Fort Bliss. Did you contact Fort Bliss and talk with Oscar Molinar?
**A. I spoke with Oscar Molinar. As I recall it, he had recently moved, so I don't know if he was at Fort Bliss at the time.**
Q. Now, it also says actually what should be Number 4, but there is no number there. It says the name of the records custodian is Bruce Christie. Do you see that?
**A. Yes.**
Q. Is that at Fort Sill?
**A. I believe so, yeah.**
Q. And you contacted Fort Sill and talked to

Page 91

Bruce Christie then?
**A. Yeah. I think -- yeah, um-hum. Yes, I did.**
Q. Now, Number 5 is Corpus Christi Naval Base, and the records custodian is Marie Trevino. Did you contact Corpus Christi and talk to Marie Trevino?
**A. I contacted Corpus Christi. I don't recall the name.**
Q. What did you learn about records at Corpus Christi? What were you told there?
**A. That they didn't have any records relating to United Medical is what I was told.**
Q. Did they tell you why they didn't have any records relating to United Medical?
**A. No.**
Q. Did you ask?
**A. I don't recall whether I asked.**
Q. Would it be in your normal practice to have asked why they didn't have any records?
**A. No. It would be in my normal practice to ask them to inquire further.**
Q. Do you believe you did that?
**A. Yes.**
Q. And did you ever hear back from them?
**A. I don't recall, but -- no, I don't recall whether I did.**

Page 92

Q. Now, how about Brooks Air Force Base? Did you contact them?
**A. Let's see. Brooks. Brooks is in Texas. I don't recall.**
Q. Is Brooks Air Force -- is that one of the facilities that you understood was closed?
**A. I don't recall about Brooks.**
Q. Did you --
**A. I confuse it with Brooke, which is a different -- an Army facility that's called Brooke, so it's hard for me to --**
Q. That's at Fort Sam Houston, right?
**A. Yeah. Thank you.**
Q. And Brooks Air Force Base, are there any facilities on page 1 of Exhibit 9 that you understood were closed?
**A. Not that I recall, no.**
Q. Are there any facilities on page 2 that you understood were closed?
**A. I don't recall whether -- you know, Altus rings a bell. I think Altus is closed. But even there, I'm not quite sure.**
Q. Now, did you contact Kelly Air Force Base?
**A. I think I did, um-hum.**
Q. Do you recall who you contacted there?

Page 93

A. **No.**
Q. Did you contact Randolph Air Force Base?
A. **Yes.**
Q. Do you recall who you contacted there?
A. **No.**
Q. Did you contact Laughlin Air Force Base?
A. **I don't recall.**
Q. Does Ted Conner ring a bell?
A. **I don't recall his name.**
Q. Does Ted Conner ring a bell?
A. **I don't recall that name.**
Q. Did you contact Sheppard Air Force Base, Number 10?
A. **I don't recall Sheppard specifically.**
Q. Do you recall if you contacted Altus?
A. **I don't recall. I -- my recollection is that Altus is closed, but I'm not sure about that.**
Q. Does the name, Jesse Schrunk, ring a bell?
A. **No.**
Q. Did you contact Tinker Air Force Base?
A. **I don't recall.**
Q. Does Technical Sergeant Jennifer Crosby ring a bell?
A. **No, it doesn't.**
Q. Turning to the next page, are there any

Page 94

facilities listed, 13 through 18, that you formed an opinion were closed?
A. **I don't recall which ones -- I really don't recall if any of these were.**
Q. The -- did you contact Reese Air Force Base, Number 13?
A. **I don't recall whether I contacted them or not.**
Q. Did you contact Dyess Air Force Base, Number 14?
A. **I don't recall.**
Q. Does -- looks like it should be Stephanie Hedrick. Does that name ring a bell?
A. **No.**
Q. Did you contact Holloman Air Force Base, Number 16?
A. **I don't recall.**
Q. Did you contact Cannon Air Force Base, Number 17?
A. **I believe I did contact them, yeah. I recall Cannon, yeah.**
Q. And do you recall who you talked to at Cannon?
A. **No. I think that's -- but it's one of the names that I got from Bruce Christie.**
Q. Did Bruce Christie give you a bunch of names?

Page 95

A. **Yes.**
Q. And did you make written record of the names he gave you?
A. **I definitely made record of some of them, yes.**
Q. Did Mr. Christie -- was he saying these are people you need to contact at different medical treatment facilities?
A. **He didn't say that he thought I needed to. He thought that those names would possibly be in a similar position that was similar to his.**
Q. And now, did you contact Number 18, AFMLO?
A. **I don't recall.**
Q. Does Eletta Bacy-Fouche ring a bell?
A. **No, it doesn't.**
Q. Now, Number 19, the Public Health Service of Ada, Oklahoma, did you contact them?
A. **It's closed.**
Q. And how did you form an opinion it was closed?
A. **I don't recall.**
Q. Did you make -- did you learn it was closed in an attempt to contact them?
A. **I don't recall.**
Q. Here is a document that was served on the Plaintiff by the Government in October of 2005, Defendant's Amended Responses to Plaintiff's

Page 96

November 2002 Interrogatories 4 through 7. Have you seen that document before?
A. **No, I don't recall seeing this.**
Q. Have you seen the Court's order of November 8th, 2005 before?
A. **No, I don't recall.**
Q. Now, how about the Court's order of November 18th, 2005?
A. **No, I don't recall seeing this because generally, court orders are -- generally, when they come into the office, they immediately go to the attorney who's handling the case, and they go into his or her mailbox when they come in through the mail room. They don't go to paralegals' boxes. And unless someone specifically decides to show me something that's come from the Court, whether it's an order or a pleading or a letter, they generally don't -- aren't given to paralegals on a regular basis.**
MR. BROYLES: Let's mark --
MS. BURDETTE: Frank, can I just ask, is this within the time frame you were working on that case? Were you off the case by that date?
MR. BROYLES: Let's mark it and then you can refer to --
MS. BURDETTE: Okay. I just wanted

Page 97

to clarify that.
**A. Well, to answer your question --**
MR. BROYLES: Just a second. That's not a question for you. Plus, the court reporter is busy. She only has two hands.
(Deposition Exhibit No. ^10 marked.)
Q. Okay. Now, Deposition Exhibit 10 is a court order dated November 18th, 2005, correct?
**A. Yes.**
Q. And your testimony is that you don't recall seeing that before?
**A. Correct.**
Q. Now, do you -- do you see a reference down there to a case called Pueblo of Laguna or something like that?
**A. Yes, I do.**
Q. Have you read that case?
**A. No.**
Q. In your role as a paralegal, do you routinely read cases?
**A. No.**
Q. Do you ever read them?
**A. From time to time.**
Q. Now, you'll notice on Number 2 there, it says that we're going to have a status conference and we're

Page 98

going to discuss what steps have been taken to make sure that no further document destruction is taking place?
**A. Yes.**
Q. Were you involved in talking with Mr. Chadwick about what steps had been taken to make sure that no further document destruction had taken place?
**A. At this time, I was not working on the case with regard to discovery matters. I continued to work on the case throughout 2005, 2006, even some into 2007, but I wasn't involved in discovery parts.**
Q. What kind of work were you doing on the case?
**A. I don't recall everything I did, but the most recent thing I did as late as 2007 was --**
MS. BURDETTE: I want to just caution you that if you are going to reveal any kind of work product or anything you did --
THE WITNESS: Are you talking to me?
MS. BURDETTE: Yeah. Go ahead.
MR. HOOVER: You were saying the most recent thing you've worked on.
**A. That involves a legal determination as to what's work product and what's not, and I'm not an attorney.**
MR. HOOVER: Let me just do a little sidebar here.

Page 99

(Discussion off the record)
MR. HOOVER: That's administrative stuff you're about to describe. If that's what you were going to talk about, you can say that.
**A. That then requests for litigation services that come in from the -- that -- actually, we get invoices in for -- copy services for digital imaging services, for court reporters, for all kinds of services. And I process it -- I've done ten of them in late 2006, early 2007.**
Q. The -- so with respect to after you quit working on the discovery aspects of this case, and this order comes out on November 18th where the Court wants to know what steps have been taken to make sure that no further documents are destroyed, is it your testimony then you never had any input after November 18th with respect to that particular question?
**A. That's correct.**
Q. Okay. Now, look at Exhibit 5. I think it's Exhibit 5.
MS. BURDETTE: Can you just identify that for the record?
MR. BROYLES: It's a transcript. It should be the bottom one.
THE WITNESS: Right here.

Page 100

Q. Is that Exhibit 5?
**A. Yeah.**
Q. Now, I'd direct your attention to page 4, numbered page 4 at the top right there, and you'll see where it says Mr. Chadwick, where he starts speaking there.
**A. Yes.**
Q. And he says, "We've had a paralegal who's been in charge of it," talking about discovery. And he says, "We have contacted, and on many occasions, visited all of the MTFs."
And I believe your testimony is you never represented to Mr. Chadwick that you had, on many occasions, visited all of the MTFs; is that correct?
Let me rephrase. Did you ever tell Mr. Chadwick that you had visited -- physically visited all of the MTFs?
**A. I'm having difficulty answering because I don't think that's what he says here.**
**He says, "We have contacted, and on many occasions, visited."**
**He says on many occasions, we have visited, but not that we visited all of the MTFs.**
Q. So your -- so your understanding of that sentence is that --

A. **What he's saying is correct. We visited many of these MTFs. We've been around, and we have contacted all of the MTFs. Of course, he's not saying all of the MTFs. He's saying the MTFs that -- I don't know what he means when he says "all of the MTFs".**

Q. That's a fair thing. Maybe I don't know.

A. **You know, because we know four of them were closed. Nobody knew to answer the phone.**

Q. What four were closed?

A. **You know, you called and nobody answered.**

Q. What four were closed?

A. **I don't recall.**

Q. How many physical visits did you make to the MTFs?

A. **Four.**

Q. Were they visits to four separate MTFs?

A. **Correct.**

Q. You didn't go to any single MTF twice?

A. **That's correct.**

Q. Now, on page 5, Mr. Chadwick says, at the top, "According to some people's memories, it seems that they didn't get the first clear sense of the case until '03. So there was a document destruction scheduled."

Did you have that discussion with Mr. Chadwick?



A. **I don't know what he's referring to.**

Q. You don't recall anything that you said that would have given him that impression?

A. **I don't understand what he's saying.**

Q. Go to page 7. And down on line 21, Mr. Chadwick says, in response to the Court's question, "What have you done since that happened to ensure that this doesn't happen any place else?"

And Mr. Chadwick says, "Well, what we've continued to do is, to make sure that documents aren't destroyed, is to go out and get all of them that we can, to get copies of them."

Now, at this point in time, on December 8th, you are no longer working on the case, correct?

A. **That's correct. I'm working on the case, but not with regard to that specific task.**

Q. Fair enough. And when did -- when was the last trip that you made to an MTF to get documents? Time frame or date, if you recall.

A. **Yeah. I want to -- I know it was definitely summer. It was really, really hot. I just don't recall whether it was late summer or middle summer.**

Q. And that would be of 2005?

A. **Yes.**

Q. Now, on page 8, line 5, he indicates that



the paralegal in my office has indicated that "if you have anything, you need to send to us." Did you tell all of the MTFs that?

A. **I don't know if he's referring to me.**

Q. Did you tell the MTFs that?

A. **I don't recall saying that. About that time, there was another paralegal assigned to the case who handled a lot of that.**

Q. Mr. Chadwick makes a statement on line 24, "That on a periodic basis, approximately once a year, things are destroyed."

Did you tell Mr. Chadwick that?

A. **No.**

Q. Now, the Court asked Mr. Chadwick on line 15 if he's actually seen the destruction policies.

And on line 19 and 20, he says, "No, they were described to me earlier."

Did you describe the destruction policies to Mr. Chadwick?

A. **I've never been the one who informed him about the destruction policies or whether it happens approximately once a year or whether it's a three year time frame. I'm not the one that informed him of that or stated that as a policy. I'm a paralegal. You know, I don't instruct anybody on these things, and I certainly**



**don't have, as a part of my job description, what the DOD does with their destruction policies.**

**It's possible that the subject came up and that somebody said that to me, and I may have repeated it. But not in the -- not in the context of informing Mr. Chadwick how to respond to this question.**

Q. Well, but if you advised Mr. Chadwick that things are destroyed once a year, that would have been within your customary duties as a paralegal?

A. **No, sir. No, sir. A paralegal never advises an attorney about the policies of anything.**

Q. How about tells? Let me rephrase the question. If you told Mr. Chadwick that approximately once a year things were destroyed, would that have been within your customary duties as a paralegal?

A. **Well, it -- I'm trying to answer your question, but...**

Q. Let me rephrase.

A. **What's my customary duty? I mean, it's a hypothetical situation. It's possible that it would be my customary duty to tell them what somebody told me.**

Q. Fair enough. And so then my question would be, did somebody tell you at any of the MTFs that they destroyed documents once per year?

A. **Once per year? I don't recall that specific**

**once per year, you know, duration, that that was a policy. The once a year part, I don't recall at all.**

Q. And so looking at page 9, the top line where he's referring to the retention period is three years, you could have told that to Mr. Chadwick if somebody would have told it to you?

**A. That's correct.**

Q. You wouldn't have made any independent investigation to determine that?

**A. I wouldn't make any independent investigation to determine it. And I wouldn't tell him that it was -- that it was true or that it was false or that it -- that I understood it to be true or false or that it -- that he should have relayed this information to the Court or anything like that.**

**I might simply quote someone that I spoke to in the field. And I -- and I -- I feel certain that we did have these kind of conversations about the retention status of these documents. So, you know, it's possible that, you know, that I quoted somebody that said that. I do believe it's possible.**

Q. And you would have expected Mr. Chadwick to understand that you were just basically telling him what somebody else had told him? You hadn't done an investigation. You weren't representing this. You



were just saying this is what somebody said?

**A. It's possible that happened, but I don't recall it specifically.**

Q. What I'm trying to find out is if you would have thought that Mr. Chadwick thought you had done any independent research. Would he have any reason to believe that kind of thing would have taken place at your level?

**A. Not at my level.**

Q. It's not something you normally do?

**A. No.**

Q. Now, speaking of what you normally do in terms of deciding what's relevant discovery documents and what's not relevant discovery documents, is it customary for you to rely on the attorney to describe to you the types of documents that are relevant?

**A. Yes, yes. We rely on the attorney for that.**

Q. And do you ever -- are you ever just given a discovery request or a complaint and told, "You determine what types of documents are relevant"?

**A. Never do that, no. Nobody ever asked me to do that.**

Q. And not only with this case, but in any case?

**A. In any case. And I handle -- at any one time, especially during this period of time, this was -- this**



**case took up about fifty percent of my time. And the other fifty percent of my time was taken up with handling another huge case that ultimately went to trial and went to trial in the Court of International Trade.**

**And I was responsible for preparing all of the exhibits and -- for that case, which I think we had about a hundred exhibits in that case. So I was very busy in the status of litigation really at the trial stage contemporaneous with all of this work. So this was not the only thing I was focusing on.**

**Plus, I had -- like I said, anytime invoices come in, they have to be processed expeditiously due to the fact that there are deadlines whereby invoices have to be paid and processed. And I'm responsible for receiving those invoices and making sure they get paid, so I've got a lot of stuff going on during this time.**

Q. To the extent that Mr. Chadwick assumed that you would be determining the types of documents that were relevant, would it be a fair statement to say that that would have been unreasonable on his part?

**A. Yes.**

MR. BROYLES: Pass the witness.

MS. BURDETTE: Can we take a short break?

MR. BROYLES: Sure.

(Recess taken)



MS. BURDETTE: I have no questions.

(Proceedings concluded at 2:58 p.m.)