# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>Defendant. | Docket No. 03-289C |

Pages: 1 through 51

Place: Dallas, Texas

Date: December 5, 2005

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

[redacted]

P R O C E E D I N G S

(10:00 a.m.)

THE COURT: Please be seated. We're hear this morning to have a status conference in United Medical Supply Company v United States, Case Number 03-289.

Mr. Broyles, good morning.

MR. BROYLES: Good morning, Your Honor.

THE COURT: And have you provided a card with your identifying information to the reporter?

MR. BROYLES: I have, Your Honor.

THE COURT: Very good.

Mr. Chadwick, good morning.

MR. CHADWICK: Good morning. Good morning, Your Honor.

THE COURT: And have you likewise provided a card to the reporter?

MR. CHADWICK: I have.

THE COURT: Very good.

Let's talk about why we're here. The various documents that started to flow in here starting back a few months ago, I found troubling and, in particular, found troubling because of the report of the destruction of records.

And in my view, they were troubling enough that I really didn't want to wait to see what type of motions

Plaintiff might ultimately file. It seemed to me that it was a better idea to discuss this as soon as we could and figure out what we need to do, if possible, to get this case sort of on the glide path to at least the completion of discovery.

Given sort of the nature of this, I really felt that a live conference rather than a telephonic one was going to be necessary. And given the fact that it's the destruction of records by the government agency that is the reason for this, and given the fact also that I was heading out in this direction anyhow, I thought that the fairness meant that this time, Mr. Chadwick, you have to travel as opposed to Mr. Broyles.

So what I want you to do, and you don't need to get up and bounce back and forth to the podium, because I see this as potentially a situation in which there'll be some interplay, and so I don't want you to get to the podium and you both have mikes right there at your locations.

I want to get a sense of where things are now, and both your perspectives on that, recognizing the likelihood that they're not necessarily the same. I want to talk about what we need to do to get whatever is still sort of not clear straightened out.

And in particular, make sure that we've taken whatever steps are necessary to ensure no further

destruction of records that might be relevant to this case. And then ultimately I want to talk about where we're heading here, not just in terms of discovery, but in terms of the entire case.

Let me start with you, Mr. Chadwick, in terms of just getting a general sense as to what has happened -- and I've read all these things again very recently -- what has happened and sort of bringing it up to date from the time of the status report till now.

MR. CHADWICK: I'm not sure I -- well, we've -- in my office, we've had a paralegal who's been in charge of it, I've been involved periodically. We have contacted, and on many occasions visited, all of the MTFs.

We've gotten written responses from at least people on the Army side higher up who have asked for data, asked the MTFs to produce all their data. And we've spoken on the phone with the Navy people at Corpus Christi, and there's an Air Force facility involved as well.

As far as we know, we have nothing from the MTFs that we've located that remains to be produced.

THE COURT: Why is it that records of these types of transactions don't appear to be available?

MR. CHADWICK: I don't know for sure. I know, number one, that this case, of course, started as a claim in the Bankruptcy Court, then came here and started again in

'03. According to some people's memories, it seems that they didn't get the first clear sense of the case until '03. So there was a document destruction scheduled. Of course, we're talking about roughly '97 to '01 is the contract period.

THE COURT: Generally speaking though, if you know that you have a controversy involving a particular contact, I would think that you wouldn't start destroying anything, whether you know what the specific issues are or not.

MR. CHADWICK: Right. Well, the -- possibly. But the initial advisory to these people in the field, in retrospect might not have been sufficiently clear.

Because, of course, these -- you know, people see claims regularly, so generally what they understood they were being told, as far as I can tell, is to save everything related to the United Medical contract, which, as far as we know, they diligently did.

What they didn't realize they were supposed to save were credit card records that, in their view, had nothing to do with the prime vendor contract. But that we know may have something to do with damages.

Some people did that. In fact, the largest Army facility, the Brooke Army Medical Center, had done that. Unfortunately, they are the ones who suffered the accidental

destruction that was approximately two years ago.

THE COURT: So they actually segregated the documents, and then later destroyed them?

MR. CHADWICK: They -- yes. In short, yes. Unintentionally, at least from the perspective of the person who had stored the documents. The -- what happened was, I'm told these documents were set aside.

I don't know how many -- three or four boxes, and they were being held in the materials branch, the ordering branch. I'm told that in order to make more space, the pallet of boxes was moved over to the property branch, which is a different bunch of folks.

And somehow, although the boxes were, I'm told, labeled, Save for United Medical Litigation, Do Not Destroy, it turns out, as far as we can tell, I mean, they appear to have been destroyed. We don't have a specific record of them being destroyed, but they appear to have been in a routine destruction.

How that might have happened is anyone's guess. Presumably they got covered with other boxes, or they got covered with packing materials, or something that caused them to be lumped in -- you know, this is just all presumption. The guess is that that was approximately two years go.

THE COURT: In other words, while the lawsuit was

pending?

MR. CHADWICK: Yes. Well, I haven't -- yes. I mean, approximately, yes.

THE COURT: Well, yes or no?

MR. CHADWICK: Well, I mean, two years ago was '03 and it's a guess --

THE COURT: Well, actually, it looks like it was filed in the earlier -- I have the record here, I could pull it up. It looks like it was filed in the earlier part of '03. When you say two years, do you really sort of mean about two years precisely, or --

MR. CHADWICK: No, but that's the -- you know, roughly two, you know, calendar years ago. Sometime in '03 essentially is the guess. I wouldn't try to dispute that it was during the pendency of this case. We just don't have a specific enough date to know. But clearly they had been marked, they were aware, the people were aware that there was litigation, so.

THE COURT: What have you done since that happened to ensure that this doesn't happen any place else?

MR. CHADWICK: Well, what we've continued to do is, to make sure that documents aren't destroyed, is to go out and get all of them that we can, to get copies of them. Unfortunately that's been next to nothing.

The reason that these documents at the Brooke

Army Medical Center were discovered to have been destroyed is that the responsible person was going over to get them for us because we had said, send them to us. And that's when the discovery was made.

The paralegal in my office has done the same kind of things, and if you have anything, you need to send it to us. So we're just not aware of anything that is out there that could be destroyed.

And we've had people from the supervisory chains, as I said, in the Army, with respect to the Army MTFs in particular, send out an e-mail, an electronic what they call data call, requesting this kind of information. And we've gotten no -- essentially no hits. So I mean, we just don't know of anything --

THE COURT: Have you actually seen the destruction policies so that you know what type of time frames we're talking about before they would ordinarily destroy something?

MR. CHADWICK: No, they were described to me earlier. I haven't seen the --

THE COURT: What was the --

MR. CHADWICK: -- I haven't seen the policy.

THE COURT: -- description you received?

MR. CHADWICK: That on a periodic basis, approximately once a year, things are destroyed. The normal

retention period is three years.

THE COURT: Three years?

MR. CHADWICK: Right.

THE COURT: All right. And so these things happened, in terms of the facts of the case, back, what, mid 90s. Is that a good --

MR. CHADWICK: Late 90s.

THE COURT: Okay. And so basically, are you suggesting to me that a lot of records may have been destroyed even before the lawsuit was filed? I mean, what -- let me back up.

There were records at one point, were there not, of these transactions?

MR. CHADWICK: Well, yes.

THE COURT: All right. So at some point they were making purchases -- the purchases that they made, besides this contract, there were trails of records that would indicate what those purchases were for, the amounts, what the items were, thing like that?

MR. CHADWICK: Yes. I have no reason to think that's not the case, yes.

THE COURT: All right. And so when we say that these documents that you specifically identified have been destroyed, in fact, at some point apparently maybe prior to that, these other documents for these other facilities were

also destroyed?

MR. CHADWICK: That's correct.

THE COURT: Okay. So that the -- and the bankruptcy suit here, didn't it -- let me back it up.

The first time that a claim was filed here, I assume was a CDA claim. Am I right about that?

MR. CHADWICK: CDA claim, frankly no benefit. I believe it was first --

THE COURT: Just a bankruptcy --

MR. CHADWICK: -- noticed --

THE COURT: -- claim?

MR. CHADWICK: -- as a bankruptcy claim, then it was realized that the CDA would need to be filed.

THE COURT: All right. Well, it looks like that at one point they did submit something under the Contracts Disputes Act, but not the -- maybe that wasn't the first thing --

MR. CHADWICK: Right.

THE COURT: -- that they did. The earliest that a claim was filed, basically indicating high, you all are buying things off contract that you should be buying from us, was when?

MR. CHADWICK: I haven't researched that. It's my understanding it was in '02, but I actually didn't --

THE COURT: All right. And so -- and by the

way, Mr. Broyles, in a second you're going to have your opportunity to sort of amend, modify, supplement facts here.

Does the Agency have any type of -- all right, so 2002 would have been the first time that it might be apparent to these agencies that transactions were going to be claimed to have sort of occurred that should have been done under the contract?

MR. CHADWICK: I think so. Again, I haven't reviewed recently the content of the CDA claim, but I think that's fair to say.

THE COURT: All right. But we don't even have destruction time periods here for the -- the contract's awarded in 1997. Right?

MR. CHADWICK: Yes.

THE COURT: All right. And so beginning then, the transactions conceivably are starting to occur that would have records indicating that this, that or the other thing had been purchased, not by this contract, by virtue of some sort of other mechanism.

MR. CHADWICK: Right.

THE COURT: All right. And then when we get to 2002 we have a claim filed. Right?

MR. CHADWICK: Right.

THE COURT: All right. But you're telling me, if I'm right, that they not only don't have the records from

1997, they don't have them from 1999, 2000, 2001. I mean, the contract here doesn't get terminated until, what, 2002?

MR. CHADWICK: No, it's spring of '01.

THE COURT: All right. So -- but they don't even have the records that go back to that time period, 2001, the year before the claim.

MR. CHADWICK: That's right. As far as we can determined.

THE COURT: All right. And so even though they have a claim pending, by 2002 they know that there is some dispute about whether or not the items were purchased in a fashion that would have violated the contract. Right?

MR. CHADWICK: Yes. And, again, I just want to, just to be clear, when I say there are no records, I mean there are records related to the performance of the contract, this other category of credit card records, as I understand it --

THE COURT: Well, but by 2002, they were put on notice that they have a claim that you're making purchases through other sources that you should have made through this contract.

MR. CHADWICK: Yes.

THE COURT: Correct?

MR. CHADWICK: Yes.

THE COURT: Okay. And they got a three year

destruction time period.

MR. CHADWICK: It's my understanding, yes.

THE COURT: so why is it that they don't have records for 2001 or 2000? Conceivably those were in existence still in 2002, and it sounds like at some point thereafter they had to be destroyed.

MR. CHADWICK: That's right. The reason is -- well, first of all, the function that awarded the contract, the activity operates out of Philadelphia, they saved everything they had in Philadelphia headquarters. There's voluminous boxes of what they have.

In terms of the --

THE COURT: But they, I take it, don't have the specifics of what actually is purchased off contract. In other words, somebody who would get out a credit card and go buy X item from some other place, or would cut a purchase order of some sort to make a quick purchase from someplace because they were running out of something. They don't keep that in Philadelphia. Correct?

MR. CHADWICK: Off contract, they would not have that. That's right. And this goes back -- again, much of this is, quick frankly, speculative. But --

THE COURT: What's not speculative, that the claim, in 2002 --

MR. CHADWICK: No.

THE COURT: -- put them on notice that, as at least of that point in time, allegations were being made that things should have been purchased under this contract that weren't.

MR. CHADWICK: That's right.

THE COURT: Correct?

MR. CHADWICK: Yes, well --

THE COURT: And wouldn't that be the time that they, if they were reading that, should have recognized that they would have records that would indicate what was not or not -- what was or was not purchased under the contract?

MR. CHADWICK: Yes, and it appears that the instruction that went out to the MTFs was simply not clear enough, for whatever reason.

THE COURT: Well, but that would also suggest timing, if you say there's a three year destruction record, that other things probably have been destroyed here.

MR. CHADWICK: Yes.

THE COURT: After the 2002 claim was filed.

MR. CHADWICK: Probably.

THE COURT: Okay. What you -- I mean, Mr. Chadwick, I've had you on a bunch of cases, all right. If it was dealing with somebody cold, okay, I would be making you file affidavits. In your case, you have a lot of credibility with me, but I've got to tell you that I don't

like the way this thing is progressing.

So cut to the chase here, I guess. What do you think we should be doing here?

MR. CHADWICK: Well, as you can imagine, I don't like it much either.

THE COURT: Actually, I kind of expect that.

MR. CHADWICK: On a going forward basis, I -- obviously we are in the position of having made errors. And obviously if the Court is of a mind to enter instructions to make sure this doesn't happen again, obviously we have very little reason -- basis to argue against that.

But on a going basis, as I said, we have now conducted what we believe to be our full scale search for these documents. We've not found any. Going forward with respect to the documents, I mean, we'll just --

THE COURT: Well, it's not --

MR. CHADWICK: -- there's not much we can do.

THE COURT: -- I sort of understand what you're telling me about that. I mean, there is an issue and I think -- and I want to hear from Mr. Broyles on this, as to whether we need a document preservation order that we'd put under these people's noses that we're not just talking about some general little instruction here, but we're talking about contempt of court if you make another mistake like this. So don't make one, you know, so that the --

right now --

THE COURT: As to any of them?

MR. CHADWICK: -- nothing I've seen. Nothing I've seen.

THE COURT: All right. So we're short in every single situation?

MR. CHADWICK: Yes, because if you don't know -- well, no, I take that back. There is Fort Sill, one Army base that our -- my experts, and presumably Mr. Broyles', have been -- have access to credit card records. So that's one that I'd left out, but that's relatively small, and we're examining those.

So that would be one example. If we were to project that out, I suppose that's possible. And we are -- my people, you know, they're working on it to see what can be gleaned from that. So I can't speak definitively. So that is one case where we do have information

THE COURT: I mean, part of my hesitancy to go down the path that you seem to be willing to offer is that I want to know sort of what the end of the story is, because I'm not going to go through this process, nor make you do so, once I know what practical impact it has on the case.

Because among other things, it ends up becoming a piece of satellite litigation that would potentially increase Mr. Broyles' expenses too, so it's not just sort of