# In The United States Court of Federal Claims

No. 03-289C

(Filed: June 27, 2007)

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., | * | Duty to preserve relevant evidence; Breach |
| | * | of duty; Spoliation sanctions; Inherent |
| | * | authority to impose sanctions; RCFC 37 – |
| Plaintiff, | * | discovery abuse; No requirement of bad faith |
| | * | in order to impose sanctions; Precedential |
| v. | * | value of Federal Circuit procedural rulings in |
| | * | patent cases; Balancing test; Reckless |
| THE UNITED STATES, | * | disregard of duty to preserve by government |
| | * | employees; Misrepresentations; Sanctions |
| Defendant. | * | imposed – limitations on examination and |
| | * | use of expert witnesses, as well as costs and |
| | * | attorney's fees. |

**OPINION and ORDER**

*Frank L. Broyles*, Goins, Underkofler, Crawford & Langdon, Dallas, Texas, for plaintiff.

*Kyle E. Chadwick*, United States Department of Justice, Washington, D.C., with whom was *Peter D. Keisler*, Assistant Attorney General, for defendant.

**ALLEGRA, Judge:**

"*One man's trash is another man's treasure.*"[1]

Aside perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence. Our adversarial process is designed to tolerate human failings – erring judges can be reversed, uncooperative counsel can be shepherded, and recalcitrant witnesses compelled to testify. But, when critical documents go missing, judges and litigants alike descend into a world of *ad hocery* and half measures – and our civil justice system suffers.

To guard against this, each party in litigation is solemnly bound to preserve potentially relevant evidence. In this government contract case, defendant violated that duty not once or

[1] Variously ascribed.

twice – but repeatedly, over many years, and in sundry ways, leading to the destruction of many admittedly relevant documents. Most disturbingly, some of these documents were destroyed even after the court conducted its first spoliation hearing. While defendant apologizes profusely for what it claims is the "negligence" of some of its employees and for making repeated misstatements to the court as to the steps that were being taken to prevent spoliation, it, nonetheless, asseverates that the court should not – indeed, ***cannot*** – impose spoliation sanctions because defendant did not proceed in bad faith. While defendant may be wrong in asserting that it acted in good faith, it most certainly is wrong in thinking that it can recklessly disregard its obligations to preserve evidence without legal consequence.

## I. Background

On June 1, 1997, United Medical Supply Co., Inc. (plaintiff) entered into a requirements contract with the United States to provide medical supplies to numerous military medical treatment facilities (MTFs) located in Texas and Oklahoma. That contract ended on May 31, 2001. In July of 2001, the Department of Justice received notice that plaintiff had filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Texas. Justice Department attorney E. Kathleen Shahan was assigned to investigate any potential claims plaintiff might have against the United States, including those under the aforementioned contract. Soon thereafter, Ms. Shahan contacted the Office of General Counsel of the Defense Supply Center-Philadelphia (DSCP) to obtain a copy of the contract files.

On October 5, 2001, Ms. Shahan received an adversary complaint from plaintiff, as well as a petition seeking to depose several former employees in order to perpetuate testimony for a contract claim that plaintiff intended to file. Shortly thereafter, defendant successfully opposed plaintiff's petition to perpetuate testimony. On November 27, 2001, plaintiff filed with the DSCP the first of a series of requests under the Freedom of Information Act, 5 U.S.C. § 552. On June 28, 2002, it filed a claim under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 609(a), for equitable adjustment of the contract price, in which it alleged, *inter alia*, that "the evidence is overwhelming that the supplies and equipment that contractually were required to be purchased from [United Medical] were actually purchased from other sources," thereby "breach[ing] the [United Medical] requirements contract and entitl[ing it] to the damages and contract adjustments set forth in this Claim." Later in this claim, plaintiff reemphasized that the "government's diversion of purchases away from the [United Medical] contract was the most egregious breach by the government," noting that two government documents "blame the problem on the use by the medical treatment facilities of government credit cards." On August 16, 2002, the bankruptcy court dismissed the adversary complaint, without prejudice, and on August 22, 2002, the contracting officer denied plaintiff's CDA claim.

On September 13, 2002, plaintiff filed a second adversary proceeding in the bankruptcy court, seeking recovery on its denied CDA claim. Plaintiff's counsel sent a copy of the summons and complaint to Ms. Shahan, who, on September 24, 2002, forwarded those documents to DSCP. In a cover letter, Ms. Shahan indicated that the parties should "start immediately to

identify all of the individuals that have discoverable information, to notify these individuals, and to instruct them to retain all documents, e-mails, etc. in their possession that relate to the contract at issue." On October 1, 2002, Anthony Amendolia, an attorney in the DSCP's Office of General Counsel, e-mailed alleged contact personnel at each MTF, stating:

> Because of current litigation proceedings, I have been asked to contact all customers and request that all records and correspondence . . . be saved with respect to United Medical. I will, at some point, make arrangements to have these documents sent out to be copied. Some of you may be asked to talk to the Department of Justice attorney concerning United Medical. Your cooperation is greatly appreciated.

In fact, his e-mail was not received by a number of the MTFs, apparently because there were errors either in his list of contacts or in their e-mail addresses. Despite not receiving responses from many facilities, Mr. Amendolia did not verify with any facilities whether his e-mail had been received or acted upon. On October 7, 2002, DSCP began receiving documents in response to its initial inquiries. At or about this time, Mr. Amendolia assured Ms. Shahan that he had contacted each of the affected MTFs and asked them to save relevant documents.

On October 25, 2002, plaintiff filed its first set of discovery requests. On November 6, 2002, Mr. Amendolia sent another e-mail, using the same defective list of MTF addresses, including in this message the text of his October 1 e-mail. In addition, he wrote:

> On October 1st, I sent the message below asking that everyone with any United Medical correspondence, save the information in case DSCP would need copies. I have been advised that, now, I should make arrangements to acquire copies of any United Medical correspondence that you may have on file.
>
> Please respond to this email whether you have any information or not. A simple answer, either way will suffice. "Yes I have info" and I will call you to talk to you about it or "No info available" and I will retain your email for our records. Even a simple yes or no answer will be fine.

Despite issuing these instructions and again hearing nothing from various MTFs, Mr. Amendolia did not verify that his e-mail had been received; and, in fact, it was not received by a number of the affected MTFs. Still using the same defective e-mail listing, on November 20, 2002, Mr. Amendolia sent a third e-mail notice, critically, for our purposes, requesting records relating to purchases made from vendors other than United Medical. Although, in this e-mail, he again asked every recipient to "respond even if you do not have any records available," as well as to update their point-of-contact information, he did not contact facilities that failed to respond. On November 22, 2002, defendant filed its response to plaintiff's discovery requests. In December of 2002, plaintiff's counsel wrote Ms. Shahan complaining that her responses did not include adequate information from the MTFs.

On December 11, 2002, the bankruptcy court transferred plaintiff's CDA claim to this court. About the same time, Ms. Shahan arranged for plaintiff to obtain contract documents from DSCP (counsel for both parties subsequently met at the DSCP facility during the week of January 13, 2003). On January 6, 2003, Ms. Shahan received notification from DSCP that two facilities – Raymond W. Bliss Army Health Center, San Antonio, Texas, and Brooke Army Medical Center, Fort Sam Houston – had documents responsive to plaintiff's request. From February 3 to 5, 2003, she traveled to these facilities and interviewed numerous individuals. At this time, a representative from the facilities identified 26 long and 17 short boxes of documents, containing shipping orders and packing slips related to plaintiff's contract, as well as credit card orders to outside vendors.

On February 10, 2003, this court received notice of the transfer complaint, and on March 24, 2003, plaintiff filed its amended complaint. As a result of the transfer, the responsibility for handling this case shifted within the Civil Division of the Justice Department, from the Commercial/Financial Branch to the National Courts Section of the Commercial Litigation Branch. Eventually, on September 10, 2003, Kyle Chadwick entered his appearance on behalf of the United States. Subsequently, the parties filed cross-motions for summary judgment. After denying, in part, those motions, *see United Medical Supply Co., Inc. v. United States*, 63 Fed. Cl. 430 (2005), the court, on January 31, 2005, issued a schedule for completing discovery in this case.

In early April of 2005, Mr. Chadwick met with Peter Brown, a paralegal in his section, to discuss collecting responsive documents from all the facilities involved in this matter. According to an affidavit filed by Mr. Chadwick, he instructed Mr. Brown "to gather and produce all available records of the medical treatment facilities relating to alleged diverted purchases of medical and surgical supplies; that [DSCP] had not, to [his] knowledge, collected documents from the MTFs in a systematic fashion and possessed the resources to provide only limited assistance; and that time was of the essence because discovery was scheduled to close in July 2005." Mr. Chadwick further avers that although he emphasized the need to locate credit card records, he did not instruct Mr. Brown to limit his search to such records.

On June 10, 2005, plaintiff filed a motion to compel, seeking to obtain responses to the interrogatories served while the case was pending in the bankruptcy court. Before defendant responded to this first motion, on June 14, 2005, plaintiff filed a second motion to compel, complaining that defendant had failed to produce documents from the individual MTFs. On July 18, 2005, Mr. Chadwick sent an e-mail to his section's paralegal supervisor and chief paralegal, with a copy to Mr. Brown, noting that soon "the workload for discovery will increase dramatically, as we will be expected to provide additional information and documents, and to round up witnesses, from [18] military treatment facilities across the Southwest U.S." Mr. Chadwick has asserted that in the summer of 2005, he repeatedly queried Mr. Brown, via e-mail, whether he had located all responsive documents, and that Mr. Brown responded affirmatively,

indicating that any documents not already produced had been destroyed.[2] According to Mr. Chadwick, when he asked Mr. Brown if he had contacted "all MTFs," Mr. Brown responded affirmatively, even though, as it turned out, the paralegal had contacted only eight of the eighteen facilities involved. Rulings on the motions to compel were forestalled when the parties agreed to work out the issues.

On December 5, 2005, this court held a joint status conference to discuss the status of document production. Mr. Chadwick indicated that some documents at the individual MTFs had been destroyed because "the instruction that went out to the MTFs was simply not clear enough." Reassuring the court, he represented that the government had conducted a "full scale search for these documents," and represented that all relevant documents still in existence had already been given to plaintiff. On April 26, 2006, the court ordered defendant to respond to plaintiff's outstanding interrogatories, and to file detailed affidavits with the court corresponding to each MTF, discussing how the documents in question had been handled. Specifically, each affiant – one for each of the affected MTFs – was ordered to indicate when the facility or its employees became aware of plaintiff's pending suit and how that notification occurred; what steps the facility or its employees took in response to preserve potentially relevant evidence; the nature and extent of any relevant records that the facility had possessed and whether the MTFs still possessed the documents or had destroyed them; and a detailed description of the facility's standard record retention/destruction policy.

On July 5, 2006, defendant filed these affidavits, the information from which is summarized in the attached Chart A, revealing document retention problems far more extensive than previously disclosed. First, these documents suggested that significant breakdowns in communications had occurred among the Department of Justice, DSCP, and the MTFs. A majority of the representatives for the MTFs indicated that they had first became aware of litigation after October 2005, with some facility representatives indicating that they were not aware of the litigation until May of 2006.[3] At some unknown point before receiving this notice,

---

[2] On September 21, 2005, Mr. Chadwick e-mailed Mr. Brown, asking, "Peter, can you brief me on where we stand?" Mr. Brown responded – "Where we stand is that I don't know of anywhere else that has any document or files from the time period in question. I've made several [calls] to hospitals such as Corpus and nobody knows of any. They've been destroyed." Defendant has not explained why, at this point, it did not immediately notify the court that relevant documents had been destroyed, even if under the MTFs' normal documentation retention procedures.

[3] Despite contrary statements in the affidavits, it is conceivable that, in some of these instances, the original e-mails sent by Mr. Amendolia were received by representatives at the MTF. However, even if that occurred, it appears that no steps were taken to communicate that information to successor representatives or to preserve relevant documents.

at least several of these MTFs had destroyed many relevant documents.[4] Moreover, the affidavits revealed that, in some instances, boxes of relevant documents were not marked for preservation even after the MTF received notification of the litigation and were destroyed – some of this destruction occurred after the December 5, 2005, hearing on spoliation and, in one instance, as late as May of 2006. In one instance boxes of documents that were palletized and marked for preservation were, nonetheless, destroyed. In another, a representative of one of the MTFs who had received timely notice of the litigation indicated that, in 2002 or 2003, she had been told – erroneously – by Ms. Shahan that certain documents were "useless," leading to their destruction. And these affidavits further revealed that, despite Mr. Chadwick's repeated representations that all remaining documents had been provided to plaintiff, documents were still being found at the various MTFs.

On July 21, 2006, plaintiff filed an expedited motion to compel compliance with the court's April 26, 2006, order, asserting that the affidavits revealed that defendant had failed to comply with that order. Plaintiff also sought sanctions based on the spoliation of evidence. In its response, defendant identified a "professional employee" of the Department of Justice, who, defendant averred, had been instructed to conduct a *de novo* search of documents relevant to this case, but had failed to do so – this individual was later confirmed to be Mr. Brown. Defendant also alleged that this employee had made false representations respecting his prior conduct, stating that he had personally conducted the search for documents when, according to defense counsel, he had not. In light of these serious allegations, on August 14, 2006, the court ordered defendant to file two additional affidavits: one by Mr. Chadwick and the other by Mr. Brown, detailing their conversations regarding Mr. Brown's search for documents. The court also ordered defendant to file copies of any general notices sent, either in paper or electronic form, by defendant to all affected MTFs requesting or relating to the preservation of relevant documents. On August 18, 2006, defendant responded to this order, with the affidavits filed revealing further conflicts between the accounts of Mr. Chadwick and Mr. Brown in terms of what had transpired.[5]

---

[4] The record suggests that, in some instances, records had been held only for short periods after they were generated based upon then existing record retention policies. Accordingly, some of these documents may have been destroyed even if the MTFs had received timely notices. In other instances, however, it appears that documents were retained for a lengthy period of time – in excess of that prescribed by document retention policies – and would have been preserved had notification been received and steps taken promptly in response thereto. Indeed, many of the records that were actually found should have been destroyed before notice was received, had the MTFs been following their supposed document retention policies.

[5] In his affidavit, Mr. Brown claimed that he had mistakenly believed that Mr. Chadwick wanted information only from the "eight or fewer MTFs" that possessed responsive documents. Mr. Brown further stated that he "was not aware that the representations I made were going to be conveyed to the Court." In his affidavit, Mr. Chadwick stated that he was "positive Mr. Brown understood I would convey to opposing counsel and the Court his findings as to the existence and location of relevant documents," noting that "[t]here could essentially have been no other

The court conducted another hearing on August 22, 2006, to discuss the ongoing discovery issues and potential spoliation sanctions. At this hearing, Mr. Chadwick readily acknowledged the various document retention problems and stated that defendant would transmit additional requests for documents to each MTF. Defendant also represented that it had located 229 additional boxes of documents, which it was in the process of converting to electronic format. On August 24, 2006, the court ordered the parties to file plans for completing fact discovery and for conducting discovery "regarding the potential for imposing spoliation sanctions in this case." In this order, the court ordered defendant to file a memorandum explaining the official document retention, preservation, and destruction policies in effect at each MTF from 1996 onwards, and to provide for the delivery of the 229 boxes of additional boxes in electronic format. On September 8, 2006, the court issued a document preservation order, requiring "defendant, its agencies, and employees [to] take reasonable steps to preserve every document, data or tangible thing . . . in its possession, custody or control, containing information that is relevant to, or may reasonably lead to the discovery of information relevant to, the subject matter involved in the pending litigation." *United Medical Supply Co., Inc. v. United States*, 73 Fed. Cl. 35, 37 (2006). The order required defendant to distribute the order to "all relevant agencies, departments, offices, divisions and individuals," and indicated that "[f]ailure to comply with this order may lead to the imposition of sanctions, including, if appropriate, punishment, by fine or imprisonment, for contempt of court, *see* [28 U.S.C. § 1651]." *Id*. at 39.

Plaintiff subsequently filed various motions and "notices" asserting that the document production deadlines had not been met. A telephonic status conference was held January 8, 2007, at which the court discussed the parties' compliance with its orders of August 24, 2006, and September 8, 2006. On January 9, 2007, the court issued an order establishing detailed deadlines for the production of all documents, and instructing the parties to file a joint status report including "[a] plan for the future conduct of this case, including the close of discovery, resolution of the spoliation issue, and ultimate consideration of the merits of this case." On January 17, 2007, defendant filed supplemental affidavits from each MTF, which confirmed that some of the MTFs had not received notice of the litigation until as late as August of 2006. Yet another status conference was held on March 21, 2007, to assess compliance with the court's orders, and to clarify the parties' respective positions with respect to the law surrounding spoliation sanctions. At that status conference, the court ordered supplemental memoranda on

---

purpose for the document search." In addition, Mr. Chadwick further stated that he had advised Mr. Brown "that the Court had raised questions during one or more status conferences regarding the thoroughness of our search." Mr. Chadwick further asserted that he believed that Mr. Brown knew that he was supposed to be contacting all of the MTFs, noting, *inter alia*, that a July 18, 2005, e-mail he sent to Mr. Brown and others specifically referred to the need "to provide additional information and documents, and to round up witnesses, from [18] military treatment facilities across the Southwest U.S." Finally, Mr. Chadwick indicated that when, in the process of obtaining the affidavits required by the court's June 13, 2006, order, he learned that certain MTFs had not been asked to turn over documents, he sent an e-mail to Mr. Brown asking him to comment on the situation, to which Mr. Brown assertedly replied, "[m]y bad."

spoliation, which the parties have now filed. The parties have requested – and this order provides – guidance as to what spoliation sanctions, if any, the court will impose in this case.

## II. DISCUSSION

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,*167 F.3d 776, 779 (2d Cir. 1999) (citing Black's Law Dictionary 1401 (6th ed. 1990)); *see also Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc*., 473 F.3d 450, 457 (2d Cir. 2007). It has long been the rule that spoliators should not benefit from their wrongdoing, as illustrated by "that favourite maxim of the law, *omnia presumuntur contra spoliatorem*," 1 Sir T. Willes Chitty, et al., *Smith's Leading Cases*, 404 (13th ed. 1929). Spoliation may result in a variety of sanctions, with "the oldest and most venerable remedy" being an "adverse inference," under which the finder of fact may infer that the destroyed evidence would have been favorable to the opposing side. Jonathan Judge, "Reconsidering Spoliation: Common-Sense Alternatives to the Spoliation Tort," 2001 Wis. L. Rev. 441, 444 (2001); *see also* Jamie S. Gorelick, Stephen Marzen & Lawrence Solum, Destruction of Evidence § 1.3 (1989) (hereinafter "Gorelick").

In the Federal system, spoliation sanctions spring from two main sources of authority. First, sanctions may be based on the court's inherent power to control the judicial process and litigation, a power that is necessary to redress conduct "which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (recognizing the inherent power of the courts to fashion appropriate sanctions for conduct that disrupts the judicial process)*; see also Shepherd v. American Broadcasting Cos*., 62 F.3d 1469, 1474-75 (D.C. Cir. 1995); *see generally Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65 (1980). Although established under Article I of the Constitution, this court, no less than any Article III tribunal, possesses this form of inherent authority. *See United Medical Supply Co.,* 73 Fed. Cl. at 36; *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 136 (2004).[6] Second, where the spoliation violates a specific court order or disrupts the court's discovery regime, sanctions also may be imposed under Fed. R. Civ. P. 37, which is essentially identical to its counterpart under this court's rules. *See* RCFC 37; *Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 167 (2006). In either instance, the policies underlying the sanctions are multifaceted: to punish the spoliator, so as to ensure that it does not

---

[6] The Supreme Court has held that Article I courts exercise the judicial power of the United States. *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 889 (1991); *Williams v. United States*, 289 U.S. 553, 564-65 (1933); *see also Chambers*, 501 U.S. at 43 (courts are vested with inherent powers "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" (quoting *Link v. Wabash R. Co.*, 270 U.S. 626, 630-31 (1962)).

benefit from its misdeeds; to deter future misconduct; to remedy, or at least minimize, the evidentiary or financial damages caused by the spoliation; and last, but not least, to preserve the integrity of the judicial process and its truth-seeking function. *See West*, 167 F.3d at 779; Gorelick, *supra*, at § 3.14; *see also Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-43 (1976). In keeping with these broad rationales, courts have held that, like any other litigant, the United States is subject to spoliation sanctions either under the court's inherent authority or the sanction provisions of Rule 37 – and defendant has not argued otherwise. *See, e.g.*, *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1183-84 (Fed. Cir. 1993) (citing additional cases); *see also Chilcutt v. United States*, 4 F.3d 1313, 1325-26 (5th Cir. 1993), *cert. denied, sub nom.*, *Means v. Wortham*, 513 U.S. 979 (1994); *United States v. National Medical Enters., Inc.*, 792 F.2d 906, 912 (9th Cir. 1986).[7]

**A.**

Defendant does not contest that it had a duty to preserve evidence arising at least as early as the filing of plaintiff's CDA claim, which plainly revealed the relevancy of certain documents, including credit card receipts involving transactions with third-party vendors. Nor does it contest that its employees repeatedly violated that duty, most recently in May of 2006. But, relying upon *Eaton Corp. v. Appliances Valves Corp.*, 790 F.2d 874, 878 (Fed. Cir. 1986), defendant asserts that, in order to impose sanctions, this court must find that its destruction of relevant records was done in bad faith, essentially with knowledge that the documents would harm its case. Curiously, defendant took a very different view of *Eaton* in *Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693, 703-04 (2002), in which it was seeking, rather than opposing, spoliation sanctions. In that case, defendant strenuously argued that *Eaton* did not impose a "bad faith requirement" generally within this circuit, noting that the latter decision sprung from a patent case in which the Federal Circuit had simply summarized the "bad faith" requirement applicable in the Seventh Circuit (in which laid the district court from which the appeal arose). In so ruling, defendant pointed out, the Federal Circuit had followed its normal practice of deciding procedural issues that do not implicate its exclusive jurisdiction under the law of the applicable

---

[7] Generally speaking, "when the United States comes into court as a party in a civil suit, it is subject to the Federal Rules of Civil Procedure as any other litigant." *Mattingly v. United States*, 939 F.2d 816, 818 (9th Cir. 1991). Further, section 5 of the original Equal Access to Justice Act, Pub. L. No. 96-481, § 205, 94 Stat. 2321, 2330 (1980), expressly repealed former subdivision (f) of Fed. R. Civ. P. 37, which had disallowed awards of expenses and attorney's fees against the United States for discovery abuses. In the accompanying report, Congress specified that the United States is to be treated like any other litigant in awarding discovery sanctions: "This change reflects the belief that the United States should be liable for fees the same as other parties when it abuses discovery." H.R. Rep. No. 1418, at 19 (1980); *see also id.* at 9 (noting that a modification made to 28 U.S.C. § 2412(b) "reflects the belief that, at a minimum, the United States should be held to the same standards in litigating as private parties").

regional circuit.[8] Such procedural rulings are not binding precedent in subsequent proceedings arising out of other circuits, including cases arising out of this court. *See*, *e.g.*, *Lariscey v. United States*, 861 F.2d 1267, 1271 (Fed. Cir. 1988) (Archer, J. concurring); *Asyst Tech., Inc v. Empak, Inc.*, 962 F. Supp. 1241, 1243 (N.D. Cal. 1997); *see also Exxon Corp. v. United States*, 931 F.2d 874, 877 n.4 (Fed. Cir. 1991).[9] As a result, the Federal Circuit's ruling in *Eaton* is not binding here – or to put it another way, defendant was right in *Columbia First Bank* and wrong here.

Defendant, however, notes that several cases in this court have held that bad faith is an indispensable element of the spoliation doctrine. *See*, *e.g.*, *Columbia First Bank, FSB*, 54 Fed. Cl. at 703; *Slattery v. United States*, 46 Fed. Cl. 402, 405 (2000); *Hardwick Bros. Co. II v. United States*, 36 Fed. Cl. 347, 416-17 (1996), *aff'd on other grounds*, 168 F.3d 1322 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1111 (1999). But, with all due respect, these cases fail to persuade. Even a cursory review of them reveals that they either proceed directly from the mistaken notion that *Eaton* is binding, *see Slattery*, 46 Fed. Cl. at 405; *Hardwick Bros. Co. II*, at 416-17; or rely on cases that have made the same mistake, *see*, *e.g.*, *Columbia First Bank*, 54 Fed. Cl. at 703. These decisions, moreover, do not conduct any significant analysis of the bad faith issue. In particular, they fail to reference, let alone actively consider, various cases decided both before and after *Eaton*, in which the Federal Circuit, reviewing district court decisions from circuits other than the Seventh Circuit, upheld the imposition of spoliation sanctions without any finding of bad faith.

Such was the specific holding, for example, in *Sensonics v. Aerosonic Corp*., 81 F.3d 1566 (Fed. Cir. 1996), involving a spoliation issue that arose out a district court decision from the Eleventh Circuit. In that case, the Federal Circuit stated –

---

[8] Research reveals that this rule originated in *Panduit Corp. v. All States Plastic Mfg. Co., Inc*., 744 F.2d 1564 (Fed. Cir. 1984), *overruled on other grounds*, *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985), in which the court said that "[s]ince our mandate is to eliminate conflicts and uncertainties in the area of patent law, we must not, in doing so, create unnecessary conflicts and confusion in procedural matters." 744 F.2d at 1575; *see also Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1106 (Fed. Cir. 2003) ("This court defers to the law of the regional circuits on matters of procedural law that do not implicate issues of patent law."); *Midwest Indus. Inc. v. Karavan Trailers, Inc*., 175 F.3d 1356, 1359 (Fed. Cir. 1999) (*en banc*, in relevant part), *cert. denied*, 528 U.S. 1019 (1999). A recent illustration of this rule in action may be seen in *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc*., 126 S. Ct. 980 (2006), in which the Supreme Court reversed a Federal Circuit decision that was obliged to follow Tenth Circuit precedent, even though the Federal Circuit's internal view of the same issue was different. *Id*. at 984.

[9] In fact, in *Eaton*, the Federal Circuit did not even apply Seventh Circuit precedent on this issue as it found that spoliation sanctions were not appropriate because the "evidence destroyed had been produced." 790 F.2d at 878.

> Sensonics states that Aerosonic's failure to retain production records during the litigation period requires that strong adverse inferences be drawn. We agree that this circumstance gives rise to a strong inference that the records would have been unfavorable to Aerosonic. *Lam v. Johns-Manville*, [718 F.2d 1056, 1065 (Fed. Cir. 1983)]. Indeed, as the court discussed in *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir. 1982), it is not necessary to establish bad faith in order to draw an adverse inference from "purposeful" action:
>
> > The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document . . . .
> >
> > The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.
>
> citing 2 *Wigmore on Evidence* § 291, at 228 (Chadbourn rev. 1979).

*Sensonics*, 81 F.3d at 1572-73. The court concluded that "Aerosonic had the clear duty of keeping and preserving records of the acts for which infringement had been charged, and it is appropriate that doubt be resolved against Aerosonic." *Id.* at 1573. Other cases in the Federal Circuit, again both pre- and post-dating *Eaton*, likewise hold that spoliation sanctions may be imposed without proof of bad faith. *See*, *e.g.*, *Beatrice Foods, Co. v. New England Printing and Lithographing Co.*, 899 F.2d 1171, 1175-76 (Fed. Cir. 1990); *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 655 (Fed. Cir.), *cert. denied*, 474 U.S. 902 (1985).

Of course, *Sensonics* and, as far as research reveals, every case in which the Federal Circuit has dealt with spoliation, share a key feature with *Eaton* – they are all patent cases, in which the court applied the law of the relevant regional circuit. As such, as startlingly as it might seem, the *mens rea* issue confronting this court appears to be an open question in this circuit. There is, in fact, a division of authority among the circuits on this issue. While the tendency is to view that split in terms of whether *vel non* a showing of bad faith is required, in fact, the diverging views cover a much broader spectrum. On one end of that spectrum, actually representing a distinct minority, are courts that require a showing of bad faith before any form of sanction is applied.[10] Other courts expect such a showing, but only for the imposition of certain

---

[10] *See*, *e.g.*, *S.C. Johnson & Sons*, 695 F.2d at 258-59; *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *see also Coates v. Johnson & Johnson*, 756 F.2d

more serious sanctions, such as the application of an adverse inference or the entry of a default judgment.[11] Further relaxing the *scienter* requirement, some courts do not require a showing of bad faith, but do require proof of purposeful, willful or intentional conduct, at least as to certain sanctions, so as not to impose sanctions based solely upon negligent conduct.[12] On the other side of the spectrum, we find courts that do not require a showing of purposeful conduct, at all, but instead require merely that there be a showing of fault, with the degree of fault, ranging from mere negligence to bad faith, impacting the severity of the sanction.[13] If this continuum were not

---

524, 551 (7th Cir. 1985). Many of these courts have adopted this requirement based on their belief that the inference presupposes consciousness of wrongdoing. *See* Gorelick, *supra* at § 2.3.

[11] *See*, *e.g.*, *103 Investors I, L.P. v. Square D Co*., 470 F.3d 985, 988-89 (10th Cir. 2006); *Harlan v. Lewis*, 982 F.2d 1255, 1260 (8th Cir.), *cert. denied*, *Hall v. Harlan*, 510 U.S. 828 (1993); *Berkovich v. Hicks*, 922 F.2d 1018, 1024 (2d Cir. 1991); *see also Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 806-07 (7th Cir. 1995) (not requiring bad faith as precondition to dismissing complaint as sanction for spoliation of evidence).

[12] *See*, *e.g.*, *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958-59 (9th Cir. 2006) (noting that a finding of "willfulness, fault or bad faith" is required for a dismissal sanction); *Nye v. CSC Transp., Inc.*, 437 F.3d 556, 569 (6th Cir. 2006) (must have willful destruction to demonstrate spoliation of evidence); *Trentadue v. United States*, 386 F.3d 1322, 1343 (10th Cir. 2004), *modified on rehearing, sub nom.*, *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840 (10th Cir. 2005) ("Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case."); *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) (inference cannot be drawn merely from negligent loss or destruction of evidence but requires a showing that willful conduct resulted in the loss or destruction); *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir. 1993) (finding of bad faith not required to fine attorney); *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983) (adverse inference from the destruction of evidence arises only where destruction was intentional).

[13] *See, e.g., Reilly v. Natwest Mkts. Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999), *cert. denied*, 528 U.S. 1119 (2000) ("Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing – a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case."); *Sacramona v. Bridgestone/ Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir. 1997) ("Certainly bad faith is a proper and important consideration in deciding whether and how to sanction conduct resulting in the destruction of evidence. But bad faith is not essential. If such evidence is mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of the evidence."); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156-57 (4th Cir. 1994) ("mere failure" to produce evidence may give rise to an adverse inference); *Unigard Sec. Ins. Co. v. Lakewood Eng'r & Mfg. Corp.*, 982 F.2d 363, 369 (9th Cir. 1992) (upholding exclusion of evidence as sanction for negligent destruction of evidence); *see also* Drew D. Dropkin, "Linking the Culpability and Circumstantial Evidence Requirements for

complicated enough, some circuits initially appear to have adopted universal rules, only to later shade their precedents with caveats.[14] Other times, the difference between decisions appear to be more a matter of semantics, perhaps driven by state law,[15] with some courts, for example, identifying as "bad faith" what others would call "recklessness" or even "gross negligence."[16]

Some of these cases suggest that the intent requirement might vary depending upon whether RCFC 37 or this court's inherent authority is invoked. As noted, RCFC 37, like its Federal Rules counterpart, provides textual authority for imposing sanctions when a litigant or an attorney fails to comply with discovery rules or orders. Pursuant to that rule, sanctions for spoliation may be imposed under RCFC 37(b), upon the failure of a party to comply with an order, or under RCFC 37(d), upon a complete failure to comply with a discovery request. *See*,

---

the Spoliation Inference," 51 Duke L.J. 1803, 1818-19 (2002).

[14] For example, in *Allen Pen Co. v. Springfield Photo Mount Co., Inc.*, 653 F.2d 17, 23-24 (1st Cir. 1981), the First Circuit refused to apply an adverse inference absent evidence that "the document destruction was in bad faith or flowed from the consciousness of a weak case." Yet, later, in *Nationwide-Check Corp.*, 692 F.2d at 219, that same court stated:

> The [district] court's reluctance to label [the spoliator's] conduct as "bad faith" is not dispositive: "bad faith" is not a talisman, as *Allen Pen* itself made clear when it stated that the adverse inference "ordinarily" depended on a showing of bad faith. Indeed, the "bad faith" label is more useful to summarize the conclusion that an adverse inference is permissible than it is actually to reach the conclusion.

The fact that single circuits appear more than one time across the spectrum described above is also illustrative of the shifting precedents on this doctrine.

[15] *See*, *e.g.*, *Flury v. Daimler Chrysler Corp*. 427 F.3d 939, 944 (11th Cir. 2005) ("Applicability of federal law notwithstanding, our opinion is also informed by . . . the factors enumerated in Georgia law."); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (concluding that although federal law of spoliation applies, the court will recognize principles from some of the state cases cited to them); *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999) (in diversity action, "[t]he rules that apply to the spoiling of evidence and the range of appropriate sanctions are defined by state law").

[16] *See*, *e.g.*, *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir.), *cert. denied, sub nom.*, *Beauclair v. Puente Gomez*, 534 U.S. 1066 (2001) (recklessness combined with other conduct meets the bad faith requirement); *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001) (same); *Marocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (describing "bad faith" as "conduct which is either intentional or in reckless disregard of a party's obligations"); *cf. Cache LaPoudre Feeds, LLC v. Land O Lakes, Inc.*, 2007 WL 684001, at * 24 (D. Colo. Mar. 2, 2007) ("Bad faith is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently.").

*e.g.*, *Barsoum v. NYC Housing Authority*, 202 F.R.D. 396, 399 (S.D.N.Y. 2001) (construing the comparable Federal rule). Under either scenario, this court may impose a variety of sanctions, including those specifically enumerated under RCFC 37(b)(2), among which are orders: (i) precluding the introduction of evidence or establishing facts; (ii) dismissing the action or parts thereof; or (iii) entering a default judgment. Notably, neither RCFC 37(b) nor RCFC 37(d) requires a showing of bad faith as a precondition to the imposition of sanctions. Instead, they require only that the sanctions imposed be "just." The omission of any *mens rea* requirement in this rule is not an oversight. Indeed, in 1970, Fed. R. Civ. P. 37(d) was modified to eliminate the requirement that the failure to comply with a discovery request be "willful," with specific indication in the drafters' notes that, under the modified rule, sanctions could be imposed for negligence. *See* Advisory Comm. Notes to 1970 Amendments; *see also Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1032 (5th Cir. 1990).[17] Under the revised rule, wilfullness instead factors only into the selection of the sanction. As such, it is apparent that "bad faith" need not be shown in order to impose even the most severe of the spoliation sanctions authorized by RCFC 37(b) and (d). And courts construing the Federal rule counterpart to this rule have so held. *See Residential Funding Corp. v. Degeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002); *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (reaching this same conclusion as to Fed. R. Civ. P. 37(c)); *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003) (same).

Several courts have held that Rule 37 sanctions are available even where evidence is destroyed before the issuance of a discovery request, with a few going so far as to apply the rule

---

[17] In this regard, the Committee notes provide:

> The resulting flexibility as to sanctions eliminates any need to retain the requirement that the failure to appear or respond be "wilful." The concept of "wilful failure" is at best subtle and difficult, and the cases do not supply a bright line. Many courts have imposed sanctions without referring to wilfullness. *E.g.*, *Milewski v. Schneider Transportation Co.*, 238 F.2d 397 (6th Cir. 1956); *Dictograph Products, Inc. v. Kentworth Corp.,* 7 F.R.D. 543 (W.D. Ky. 1947). In addition, in view of the possibility of light sanctions, even a negligent failure should come within Rule 37(d). If default is caused by counsel's ignorance of Federal practice, *cf. Dunn v. Pa. R.R.*, 96 F. Supp. 597 (N. D. Ohio 1951), or by his preoccupation with another aspect of the case, *cf. Maurer-Neuer, Inc. v. United Packinghouse Workers*, 26 F.R.D. 139 (D. Kans.1960), dismissal of the action and default judgment are not justified, but the imposition of expenses and fees may well be. "Wilfullness" continues to play a role, along with various other factors, in the choice of sanctions.

The position taken by the reports conformed to the Supreme Court's interpretation of the prior rule as enunciated in *Society Internationale Pour Inudstrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 208 (1958).

to conduct that occurred before the lawsuit was filed, provided the party was on notice of a claim.[18] But, the majority view – and the one most easily reconciled with the terms of the rule – is that Rule 37 is narrower in scope and does not apply before the discovery regime is triggered. *See Beil v. Lakewood Eng'g & Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994); *Dillon v. Nissan Motor Co.*, 986 F.2d at 268-69; *Unigard Sec. Ins. Co.*, 982 F.2d at 368; *see also* Iain D. Johnson, "Federal Courts' Authority to Impose Sanctions for Prelitigation or Pre-order Spoliation of Evidence," 156 F.R.D. 313, 318 (1994) ("it is questionable whether Rule 37 provides a federal court with authority to impose sanctions for spoliating evidence prior to a court order concerning discovery or a production request being served"). If that is true, the court must look to its inherent authority to impose, if at all, sanctions for evidence destruction that occurs between the time that the duty to preserve attaches and, at the least, the filing of a formal discovery request. But, this approach begs yet another question – what sort of intent requirement ought to apply in this non-rule context?

Guided by logic and considerable and growing precedent, the court concludes that an injured party need not demonstrate bad faith in order for the court to impose, under its inherent authority, spoliation sanctions. Several reasons lead to this conclusion. For one thing, it makes little sense to talk of a general duty to preserve evidence if, in fact, the breach of that duty carries no real legal ramifications. Requiring a showing of bad faith as a precondition to the imposition of spoliation sanctions means that evidence may be destroyed wilfully, or through gross negligence or even reckless disregard, without any true consequences. At least in Hohfeldian terms, in which a duty is the jural correlate of a right,[19] this approach is tantamount to suggesting that the "duty" to preserve evidence is not much of a duty at all.[20] Second, imposing sanctions only when a spoliator can be proven to have acted in bad faith defenestrates three of the four purposes underlying such sanctions – to protect the integrity of the fact-finding process, to restore the adversarial balance between the spoliator and the prejudiced party, and to deter future misconduct – and severely frustrates the last, to punish. These objectives are hardly served if the court, in effect, is constrained to say to the injured party – "sorry about that, but there is nothing I can do, except to let you present your case, such as it remains." *See also Turner*, 142 F.R.D. at 74-78 ("It makes little difference to the party victimized by the destruction of evidence whether

---

[18] These cases proceed from the view that "[e]ven though a party may have destroyed evidence prior to issuance of the discovery order and thus be unable to obey, sanctions are still appropriate under Rule 37(b) because this inability was self-inflicted." *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991); *see also In re Air Crash Disaster near Chicago, Illinois on May 25, 1979*, 90 F.R.D. 613, 620-21 (N.D. Ill. 1981).

[19] *See* Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16, 32 (1913) (describing this taxonomy).

[20] *See* Black's Law Dictionary 543 (8th ed. 2004) (a "duty" is "[a] legal obligation that is owed or due to another and that needs to be satisfied; an obligation for which somebody else has a corresponding right"); Oliver Wendell Holmes, The Common Law 219 (Dover Pubs., Inc. 1991) (1881) ("legal duties are logically antecedent to legal rights").

that act was done willfully or negligently"); *see also Residential Funding Corp.*, 306 F.3d at 108. Indeed, while some commentators have asserted otherwise,[21] the history of the spoliation doctrine suggests that it was not designed solely to punish those who consciously destroy inculpatory documents, but also to address the manifest unfairness inherent in the loss of relevant evidence.[22] Even if such sanctions were once rooted in an inference of consciousness of a weak case, that is neither the controlling rationale nor the prevailing rule nowadays. Finally, adopting a bad faith standard when the court is operating under its inherent authority creates an incongruity between the sanctions available for spoliation depending upon whether – or not – a discovery regime has been established that would trigger Rule 37. This incongruity could be viewed as encouraging the ***earlier*** destruction of evidence – a race to the shredder, so to speak.[23] At least in some courts,

---

[21] *See*, *e.g.*, John MacArthur Maguire and Robert C. Vincent, "Admissions Implied from Spoliation or Related Conduct," 45 Yale L.J. 226, 235 (1935).

[22] One of the earliest English spoliation decisions, *Rex v. Arundel*, 1 Hob. 109, 80 Eng. Rep. 258 (K.B. 1617), applied the inference when title to a manor was lost under "very vehemently suspicious circumstances." In one of the earliest American decisions to discuss the spoliation inference, *The Pizarro*, 15 U.S. (2 Wheat.) 227 (1817), the Supreme Court was faced with a prize case in which the ship's papers were allegedly thrown overboard before the ship's capture by Carthaginian pirates. Declining to draw the inference, Justice Story, writing on behalf of the Court, reasoned:

> [S]poliation of papers, is not itself a sufficient ground for condemnation in a prize court. It is, undoubtedly, a very awakening circumstance, calculated to excite the vigilance, and justify the suspicions of the court. But it is a circumstance open to explanation, for it may have arisen from accident, necessity or superior force; and if the party, in the first instance, fairly and frankly explains it to the satisfaction of the court, it deprives him of no right to which he is otherwise entitled. If, on the other hand, the spoliation be unexplained, or the explanations appear weak and futile; if the cause labor under heavy suspicions, or there be a vehement presumption of bad faith or gross prevarication, it is made the ground of denial of further proof, and condemnation ensues from defects in the evidence, which the party is not permitted to supply.

*Id*. at 240; *see also* Gorelick, *supra* at § 1.3; Maguire & Vincent, "Admissions Implied from Spoliation," 45 Yale L.J. at 238.

[23] Allowed to exist, this incongruity could create other undesirable incentives. If the availability of sanctions hinges on the formal invocation of the court's discovery regime, then a potential spoliator has an incentive to try to delay the invocation of that regime, perhaps by offering a settlement or convincing the court that steps have been taken to ensure that no spoliation occurs. On the other hand, a party concerned about the potential for spoliation has the incentive to accelerate the process, filing discovery requests immediately upon the filing of a lawsuit and seeking orders to compel or even a document preservation order at the first hint of a

this incongruity did not exist prior to the amendment of the Federal rules in 1970 – wilfullness was required under both regimes – and, indeed, some of the earliest cases requiring bad faith as a precondition for all spoliation sanctions can be viewed as reflecting the rules as they existed prior to 1970. But, the rules have changed, leading some courts to reconsider their enhanced proof requirements and more broadly militating in favor of a more flexible intent requirement, even in cases involving inherent authority. *See*, *e.g.*, *Webb v. District of Columbia*, 146 F.3d 964, 971 & 971 n.15 (D.C. Cir. 1998) (noting that the consideration for imposing a dismissal sanction under Rule 37(b) and under the court's inherent power are the same); *Barsoum*, 202 F.R.D. at 399 n.3.[24]

To be sure, there is another important consideration here – that courts ought to be cautious in exercising their inherent authority. This concern is dictated, in part, by the Fifth Amendment to the Constitution and its requirements of due process, and, as to the United States, by separation of powers concerns. In *Societe International*, due process considerations led Justice Harlan, writing on behalf of a unanimous Supreme Court, to observe that "there are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." 357 U.S. at 209 (citing *Hovey v. Elliott*, 167 U.S. 409, 413-14 (1897) and *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 349-51 (1909)); *see also Chambers*, 501 U.S. at 64-70 (Kennedy, J., dissenting). Likewise in *Roadway Express*, 447 U.S. at 764, Justice Powell observed that "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *See also Crowe v. Smith*, 151 F.3d 217, 226 (5th Cir. 1998), *cert. denied*, *sub nom.*, *In re Wright*, 526 U.S. 1158 (1999) ("The inherent power is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function."); Gorelick, *supra*, at § 3.18. Such concerns dictate that a court must allow the potential target of sanctions a full opportunity to explain itself and construct spoliation sanctions that are narrowly tailored to the abuses revealed. But, it is a

---

problem. The court, of course, could avoid such discovery disputes by issuing, *sua sponte*, an order early in the case requiring the parties to preserve evidence, but such an order, essentially restating a duty that all agree (in theory) exists, ought to be unnecessary.

[24] The gulf between Rule 37 and cases holding that sanctions may be applied only where the spoliator is conscious of a weak case has become more obvious with the recent adoption of new Fed. R. Civ. P. 37(f), which provides that "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." According to the reporter notes, "[g]ood faith in the routine operation of an information system may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information," adding that "[w]hen a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system is one aspect of what is often called a "litigation hold." Advisory Comm. Notes to the 2006 Amendment. That the Advisory Committee would need to adopt a limited "good faith" faith exception to the imposition of sanctions belies the notion such sanctions should be imposed only upon a more traditional finding of "bad faith."

huge logical leap to suggest that the only way to accomplish these purposes is to limit sanctions to cases in which there is a showing of bad faith.[25]

Based on this *tour d'horizon*, the court concludes that, under both RCFC 37 and its inherent authority, it must construct a sanction that is just and proportionate in light of the circumstances underlying the failure to preserve relevant evidence, as well as the punitive, prophylactic, remedial and institutional purposes to be served by such sanctions. When considering the most powerful of the available sanctions, particularly those that might lead to a determination other than on the merits, the court must use an additional measure of restraint, which ordinarily requires that the offending party's conduct evinces serious fault, willfulness or bad faith. The court must also consider what ill effect – if any – the challenged conduct has had on the course of the litigation and on the integrity of the fact-finding processes. Under this balancing approach, there are no bright lines, at least in terms of *mens rea*, with the focus instead being on effectively addressing, overall, the spoliation conduct, as well as the harm it engendered – "the judge should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms." *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir.), *cert. denied*, 498 U.S. 891 (1990); *see also Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994) (adopting a sliding scale of sanctions calibrated to the egregiousness of the conduct, the impact it will have on the opposing party and the intent of the party destroying the evidence); *Vazquez-Corales v. Sea-Land Serv., Inc.*, 172 F.R.D. 10, 13-14 (D.P.R. 1997) (collecting cases); *Turner*, 142 F.R.D. at 74-76 (taking a similar approach). Under this flexible standard, repeated acts of gross negligence, particularly if accompanied by inaccurate representations to the court that serve to mask and perpetuate the spoliation, can be met with the same or a more severe sanction than a single act of bad faith.

**B.**

And so we come to this case. At the outset, precision requires the court to identify the point at which the more specific sanction provisions of RCFC 37 were triggered. Even though plaintiff filed its first document production requests in 2002, in the court's view, RCFC 37 was not directly implicated until November 18, 2005, when the court ordered defendant to be prepared to specify the steps that would be taken to prevent further spoliation, or, at the latest, December 5, 2005, when, as described in greater detail below, the court warned defendant that

[25] Notably, courts generally have not required proof of bad faith in applying other forms of adverse inferences, *e.g.*, when a party fails to bring forward available evidence or witnesses. In the latter circumstance, the Supreme Court has simply operated on a presumption, instructing that "[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939); *see also New Dynamics Foundation v. United States*, 70 Fed. Cl. 782, 802 (2006); *Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 421 n.8 (2001).

any further document destruction would lead to sanctions.[26] Of course, it should not be overlooked that it was defendant's misrepresentations that prevented the court from earlier entering an order to compel the production of documents or to preserve documents. That said, it appears that any destruction that occurred prior to November 18, 2005, must be dealt with under this court's inherent authority. Any destruction that occurred thereafter, in the court's view, potentially triggered sanctions not only under this court's inherent authority, but also under RCFC 37(b), based upon defendant's failure to comply with this court's orders regarding discovery.[27]

Here, there is insufficient evidence to demonstrate that one or more government employees deliberately destroyed the records in question to prevent their discovery. Defendant's conduct is, nonetheless, quite disturbing, as, over a period of approximately five years, it repeatedly violated its obligation to maintain these records once it had knowledge of plaintiff's CDA claim. That claim specifically asserted that purchases had been inappropriately diverted from the requirements contract at issue through the use of government credit cards, thereby plainly revealing the relevancy of documents surrounding the latter purchases. Yet, some records were destroyed when defendant waited several or more months after the filing of adversary complaint in the bankruptcy proceeding to notify the MTFS that they should retain and produce documents. Things got appreciably worse in October 1, 2002, when, following the filing of the adversary complaint, Mr. Amendolia electronically mailed at least three notices to the MTFs regarding documents, the last specifically referencing credit card receipts, but never bothered to confirm that these messages were received, even when he did not receive the requested "yes" or "no" response from a number of MTFs. And, some of those notices, perhaps more than half, had not been received. As a result, many of the MTFs claim that they did not receive notice of the filing of the lawsuit until four to five ***years*** after the filing of the adversary complaint, with the last of these facilities indicating that they first received noticed in August of 2006. In the meantime, some of these facilities shredded records describing credit card purchases that may have been improperly diverted from the requirements contract in question. Significant destruction clearly occurred after plaintiff, on October 25, 2002, filed its first set of document

---

[26] Courts have held that, for purposes of Federal Rule 37(b)(2), a party fails to obey a court "order" whenever it takes conduct inconsistent with the court's expressed views regarding how discovery should proceed. *See, e.g.*, *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 n.7 (7th Cir. 1994); *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991). As such, the court need not issue a written order compelling discovery for RCFC 37 to be triggered. *See, e.g.*, *Avionic Co. v. General Dynamics Corp.,* 957 F.2d 555, 558 (8th Cir. 1992); *Bhan v. NME Hosps, Inc*., 929 F.2d 1404, 1415 (9th Cir.), *cert. denied*, 502 U.S. 994 (1991); *see also* Gorelick, *supra*, at § 3.4 (citing additional cases).

[27] According to the Federal Circuit, sanctions may not be imposed under RCFC 37(d) unless a party wholly fails to respond to a discovery request. *See, e.g.*, *Badalmenti v. Dunham's Inc.*, 896 F.2d 1359, 1362-63 (Fed. Cir.), *cert. denied sub nom.*, *Hyde Athletic Indus., Inc. v. Badalmenti*, 498 U.S. 851 (1990).

requests; indeed, by defendant's own stunning admission, some of it occurred after the court had conducted its first hearing regarding spoliation in this case.

But, unfortunately, the spoliation story thus far told is incomplete, for it additionally appears that, over a period of years, defendant misled plaintiff and this court. The court is obliged to elaborate.

In April of 2005, Mr. Chadwick met with Mr. Brown, asking the latter to gather and produce all available records, including, but not limited to, credit card records, from all the MTFs. On June 10 and 14, 2005, plaintiff filed motions to compel, complaining in the latter of these that defendant had failed to produce documents from the individual MTFs. On June 20, 2005, defendant responded to the first of these motions, asserting that "[a] renewed search of all of the MTFs, conducted by a senior Department of Justice paralegal at the direction of undersigned counsel in March and April 2005, disclosed some responsive documents at three MTFs." The response indicated that these documents would be produced to plaintiff on a compact disk, emphasizing further that "[t]he responsive documents being produced on CD are all that exist, to the best of our knowledge." In its June 23, 2005, opposition to plaintiff's second motion to compel, defendant reiterated that "[a]s we have also noted, only <u>three</u> of the 13 MTFs possess responsive documents, to the best of our knowledge after a diligent search." (Emphasis in original.) It characterized, as "irrelevant," plaintiff's complaint that it had not been allowed to travel to the individual MTFs "because <u>we are producing the responsive documents on CD at Government expense</u>." (Emphasis in original.) On June 30, 2005, this court conducted a status conference, at which it ordered the parties to make a good faith effort to resolve these discovery disputes. On or about July 14, 2005, the parties filed a status report indicating that they were prepared to proceed without a ruling on the motions to compel and that "[t]he Government, at its expense, will produce the 'CDs' . . . pertaining to credit card purchases at the following three MTFs: Fort Hood, Sam Houston and Fort Sill."

On October 17, 2005, the parties filed a joint status report, in which they reported that "[t]he Government states that it has located very few responsive documents in its search of the MTFs, but the Government has not provided Plaintiff with any description of the efforts it has made to locate such documents." Concerned, this court, on October 17, 2005, ordered defendant to file a further status report detailing its document product efforts. That report, which was filed on October 24, 2005, again stressed the comprehensiveness of Mr. Brown's search. However, it revealed, for the first time, that "several boxes that were thought to contain the records of credit card transactions for one or more Army MTFs at issue cannot be located, and are presumed to have been destroyed in the course of routine deaccession approximately two years ago." Expressing "regrets [for] this apparent accidental destruction of potentially probative documents," defendant, nonetheless, continued to maintain that, because of its extensive search efforts, "[w]e frankly have no reason to expect that any substantial number of such documents will be located." It added that the relatively few documents that had been produced to date "should not be the litmus test . . . of the adequacy of defendant's search." In response to this filing, the court, on November 18, 2005, ordered a further status conference, at which the parties

were to be prepared to discuss the entry of a document preservation order and "[t]he detailed steps that defendant has taken in order to avoid further relevant document destruction."

This status conference occurred on December 5, 2005. At the conference, Mr. Chadwick represented that Mr. Brown had "contacted, and on many occasions visited, all of the MTFs." Referring to Mr. Amendolia's e-mail notifications, Mr. Chadwick noted that "the initial advisory to these people in the field, in retrospect might not have been sufficiently clear," suggesting that the MTFs perhaps did not understand that they were supposed to save credit card records of transactions with other venders but had "diligently" saved everything related to the United Medical contract. When asked by the court, "[w]hat have you done . . . to ensure that this doesn't happen any place else?," Mr. Chadwick responded –

> Well, what we've continued to do is, to make sure that documents aren't destroyed, is to go out and get all of them that we can, to get copies of them. Unfortunately that's been next to nothing . . . .
>
> The paralegal in my office has done the same kind of things, and if you have anything, you need to send it to us. So we're just not aware of anything that is out there that could be destroyed.

Later, he reemphasized that "we have now conducted what we believe to be our full scale search for these documents. We've not found any." At the conclusion of the hearing, the court ordered the parties to explore settlement. At that point, the court should have issued a document preservation order, but because of the repeated assurances made by defendant's counsel, it did not; it warned, however, that any further document destruction would lead to a finding of contempt.[28]

---

[28] For example, in opposing plaintiff's motion for sanctions, defendant stated –

> The Government's efficacy in preserving, gathering, and producing responsive documents in this case has been subpar and disappointing. Nothing in this brief should be construed as arguing otherwise. Among other things, too much time elapsed between the initial e-mail communications between the [DSCP] and the [MTFs] in October 2002, and the point at which we began collecting documents; a very few MTFs inadvertently were not contacted in 2002 at all; and undersigned counsel for defendant delegated the document search in 2005 to an experienced professional employee of the Department of Justice who nonetheless failed to conduct a de novo search, as instructed, and who made representations upon which undersigned counsel, in turn, relied in making representations to the Court and plaintiff which we have learned were wrong. We are not attempting to excuse or explain away these regrettable circumstances.

Defendant's Opposition to Plaintiff's Discovery Motion (August 9, 2006) (emphasis in original).

After trying for several months, the parties ultimately could not reach a settlement. The court established a schedule for completing discovery, which required defendant to file affidavits for each MTF answering questions designed to assess how any spoliation may have occurred and the extent thereof. On July 5, 2006, defendant provided the requested affidavits, disclosing that the spoliation had been more extensive than previously indicated. Highlighting the contents of the affidavits, defendant noted, *inter alia*, that: (i) "[a]ffiants from many ordering locations . . . were unaware of, or cannot now recall receiving, the notifications from Mr. Amendolia in 2002;" (ii) some of the documents previously thought to have been destroyed had been discovered, while other documents had been destroyed, "as recently as 2006;" and (iii) some of the documents had been destroyed in 2003, after defendant's prior counsel, Ms. Shahan, had told an MTF official that they were not relevant.[29] This notice further admitted that "[t]hese facts indicate that defendant's search in 2005 was not as exhaustive, at least with respect to the Air Force facilities, as undersigned counsel had instructed, and had believed it was," adding that "[w]e emphatically regret this miscommunication and any resulting loss of evidence." In later filings with the court, the substance of which are recounted at the outset of this opinion, defendant confirmed these and other defects in its efforts to preserve responsive documents in this case.

This lengthy recital reveals that, over an extended period of time, during which it was regularly destroying documents, defendant mischaracterized the extent of its efforts to locate responsive documents and to prevent further spoliation. Because its efforts were incomplete and often ineffective, defendant failed to preserve documents that it could have preserved; because it made inaccurate representations to the court, defendant prevented this court from taking steps that might have avoided at least some of the damage that occurred. In the court's view, taking into account all the indicia of fault here, defendant's failure to take effective steps to preserve documents and to prevent further spoliation transcends any form of negligence. Rather, the court finds that defendant's overall course of conduct, including its misrepresentations, constituted, at the least, the reckless disregard of its duty to preserve relevant evidence.

Importantly, in coming to this conclusion, the court does not lay the majority of the fault at the feet of defendant's counsel, Mr. Chadwick, for it is readily apparent that he was ill-served not only by staff both at the Department of Justice and the Department of Defense, but by document retention and preservation policies that were – and may still be – antiquated and inadequate.[30] Moreover, to conclude that defendant acted recklessly, the court need not resolve

---

[29] As noted previously, more specific details from these affidavits are summarized in Chart A, which follows this order.

[30] One would think that document retention policies involving contract materials would consider, *inter alia*, the applicable statute of limitations on contract actions. Yet, there is some indication that early in this case, as to at least some of the facilities involved, that was not the case. Moreover, it cannot be doubted that the *ad hoc* fashion in which defendant attempted to notify the facilities retaining documents here contributed to the spoliation. Finally, it should be noted that courts have repeatedly rejected claims that a party should not be subject to spoliation sanctions because it destroyed documents pursuant to a document retention/destruction policy.

every unseemly factual issue presented. Ultimately, it matters not whether certain MTF representatives failed to receive notices from Mr. Amendolia, lost track of those notices, or simply failed to respond adequately to his requests. All the individuals involved in these activities were employees of the United States and, in various regards, committed malfeasance. Nor does it matter whether Mr. Chadwick misrepresented to this court the nature of his instructions to Mr. Brown, or Mr. Brown misrepresented to Mr. Chadwick the actions he took in response to those instructions (although the latter appears more likely). They are both employees of the United States and, via one or the other, the United States must be deemed purposely to have made false statements to this court. The United States cannot avoid the ramifications that flow from the conduct of its officials and employees, acting within their official capacities – it acts through those individuals and, at least in this circumstance, is vicariously responsible for their conduct. *See generally*, *Larson v. Domestic & Foreign Commerce Corp*., 337 U.S. 682, 700-01 (1949); *Portsmouth Harbor Land & Hotel Co. v. United States*, 267 U.S. 327, 330 (1922).

It is the duty of the United States, no less than any other party before this court, to ensure, through its agents, that documents relevant to a case are preserved. Indeed, while not entering into the calculus here, a good argument can be made that, as the enforcer of the laws, the United States should take this duty more seriously than any other litigant. Unfortunately, in the case *sub judice*, irrefutable evidence demonstrates that over an extended period of time, the United States, acting through at least some of its employees, recklessly disregarded that duty, thereby undoubtedly damaging plaintiff's ability to present its case in this matter and disrupting the orderly administration of this proceeding. Weighing the seriousness of the fault here, as well as its impact on plaintiff and the integrity of the judicial process, the court concludes that it must impose spoliation sanctions against the United States.

**C.**

Determining what sanctions to apply here is no easy task for a variety of reasons. For one thing, use of an adverse inference is complicated by the fact that the determinations of liability and damages here are intertwined – to the extent that defendant improperly diverted purchases to other vendors it breached the contract, and the amount of the damages is, at least in the first instance, related to the amount of such diversions. Courts have long struggled with determining how damages should be measured where the evidence revealing that amount is lost. In *Armory v. Delamirie*, 1 Str. 505, 93 Eng. Rep. 664 (K.B. 1722), the fabled "Chimney Sweep's Jewel Case," the plaintiff chimney sweep bailed a jewel with the defendant jeweler. When the jeweler failed to return the jewel, the court ruled that unless the defendant "produce the jewel, and shew it not to be of the finest water, [the jury] should presume the strongest against him, and make the value

---

*See*, *e.g.*, *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 750 (8th Cir. 2004); *In re Prudential In. Co. of Am. Sales Practices, Litig.*, 169 F.R.D. 598, 615 (D.N.J. 1997) ("w]hen senior management fails to establish and distribute a comprehensive document retention policy, it cannot shield itself from responsibility because of [its underlying employees] actions").

of the best jewels the measure of [the plaintiff's] damages." *See Conf. Tribes of Warm Springs Reservation of Oregon v. United States*, 248 F.3d 1365, 1372 (Fed. Cir. 2001); *Kronisch v. United States*, 150 F.3d 112, 126 n.11 (2d Cir. 1998). In 1895, however, the California Supreme Court rejected this "highest value" approach in *Fox v. Hale & Norcross Silver Mining Co.*, 108 Cal. 369 (1895), holding that the value of silver ore which was wrongfully mined, but for which records were lost, was to be ascertained by making the best possible estimate of its value, rather than assuming it was the most valuable silver ore possible. *Id.* at 413-17; *see also* Gorelick, *supra* at § 2.19. So, should the court assume, as to the MTFs that lack records, that defendant improperly diverted the greatest amount of purchases possible, or should it use the evidence it has to make the best possible estimate of the amount of those diversions? In the court's view, the answer is – neither.

Rather, balancing all the relevant considerations, the court believes that an appropriate sanction here should have two facets: First, defendant should be prohibited from cross-examining plaintiff's expert to the extent that the expert construes, to plaintiffs' favor, the gaps in the record created by defendant's spoliation and from adducing its own expert testimony construing the same gaps.[31] Limiting defendant's ability in this regard serves to prevent it from benefitting from the destruction of the records and from using its experts to wield the superior factual knowledge of the contents of the destroyed records likely possessed by its employees. Similar sanctions have been imposed in analogous circumstances.[32] Second, defendant should be obliged to reimburse plaintiff for any additional discovery-related costs, including attorney's fees, that were incurred after November 18, 2005, because of defendant's malfeasance and misrepresentations, as well as all the costs, including attorney's fees, that were incurred in

---

[31] Defendant will be permitted to provide factual testimony identifying precisely where the gaps in the records occur, as well as any other factual evidence that may be used to determine the accuracy of any assumptions employed by plaintiff's expert. Such evidence, however, may not relate to the contents of the lost documents nor supply any form of opinion testimony with respect thereto. Defendant will also be permitted to show that certain documents were destroyed prior to the time that it had notice of plaintiff's claim.

[32] *See, e.g.*, *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Dillon*, 986 F.2d at 269 (upholding this sanction as imposed under inherent authority, while noting that a similar sanction is expressly authorized by Federal Rule 37(b)); *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006) ("court can exclude witness testimony proferred by the party responsible for destroying the evidence and based on the destroyed evidence"); *Workman v. AB Electrolux Corp.*, 2005 WL 1896246 at *7 (D. Kan. 2005); *Northern Assur. Co. v. Ware*, 145 F.R.D. 281, 283 (D. Me. 1993); *Headley v. Chrysler Motor Corp.*, 141 F.R.D. 362, 365 (D. Mass. 1991) ; *see also Flury*, 427 F.3d at 945; *Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir. 1997) (recognizing exclusion of evidence as an appropriate sanctions for spoliation); *Roskam Bakery Co. v. Lanham Machinery Co., Inc.*, 71 F. Supp. 2d 736, 749-50 (W.D. Mich. 1999).

specifically pursuing this spoliation matter.[33] This second prong of the sanction serves both punitive and remedial purposes – it is intended to deter future spoliation and compensate plaintiff for the additional costs it has incurred. Again, ample authority supports the recovery of such costs and attorney's fees to the extent they relate either to discovery disputes that arose prior to the time the spoliation was revealed, and to the investigation and litigation of the document destruction itself.[34] In the court's view, this monetary award is particularly warranted because of defendant's repeated misrepresentations to plaintiff and the court. Further, there is no indication whatsoever that defendant's conduct was substantially justified or that any other circumstances here renders an award of costs and attorney's fees unjust. *See* RCFC 37(b)(2).

In the court's view, no lesser set of sanctions would cure the prejudice experienced by plaintiff here and effectively punish defendant for its reckless conduct. At the same time, no greater sanction (*e.g.*, default) is warranted given the lack of any proof suggesting that the destruction of the records was purposeful and designed to obscure the truth. *See Schmid*, 13 F.3d at 79 (court should choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim").[35]

## III. CONCLUSION

In 1940, the Fifth Circuit highlighted the negativity associated with the word "spoliation," describing it as a "word with evil connotations, . . [that] dictionaries make . . . synonymous with pillaging, plundering, and robbing." *Wichita Royalty Co. v. City Nat'l Bank of Wichita Falls*, 109 F.2d 299, 302 (5th Cir. 1940). Perhaps, it was these harsh overtones that caused some courts to erect extraordinarily strict proof requirements for spoliation. But, the modern trend has been to focus less on the obloquy associated with a finding of spoliation and more on the harm produced by the underlying acts, with the overarching goal of selecting sanctions that mirror the spoliator's culpability – the greater that culpability, the more serious the sanctions imposed. The latter is the approach the court has chosen to employ here.

---

[33] The court has selected November 18, 2005, as a demarcation line, to make clear that it is imposing these monetary sanctions under both RCFC 37(b) and its inherent authority.

[34] *See United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 26 (D.D.C. 2004); *Turner*, 142 F.R.D. at 78 (noting that such an award serves both punitive and remedial purposes); *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 132 F.R.D. 523, 524-25 (D. Ariz. 1990); *Capellupo v. FMC Corp.*, 126 F.R.D. 545, 552 (D. Minn. 1989); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 558-59 (N.D. Cal. 1997); *see also Chambers*, 501 U.S. at 44-45.

[35] While the parties have largely completed their discovery with respect to the spoliation issue, one deposition remains to be taken (that of Mr. Amendolia). The court reserves the right to modify its findings and sanctions should future discovery shed light on facts that warrant a different response.

Based on the foregoing, the court imposes the following sanctions upon defendant for its conduct in regards to the spoliation of relevant evidence in this matter:

1. In any trial in this matter, defendant shall be prohibited from cross-examining plaintiff's expert to the extent that he or she, seeking to overcome the spoliation that occurred herein, attempts to extrapolate the total amount of diversions that occurred with respect to the requirements contract in question. Defendant shall also be precluded from introducing its own expert testimony on the aforementioned topic. Defendant may examine plaintiff's witnesses and produce its own expert testimony to the extent that the testimony relates solely to documents that are available to plaintiff. Any specific questions regarding the scope of this preclusion provision shall be raised prior to, and decided no later than at, the pretrial conference that will be held in advance of any trial here; and

2. Defendant shall reimburse plaintiff for any additional discovery-related costs, including attorney's fees, that were incurred after November 18, 2005, because of defendant's malfeasance and misrepresentations, as well as all the costs, including attorney's fees, that were incurred in specifically pursuing this spoliation matter. On or before August 7, 2007, plaintiff shall submit a declaration and records in support of its attorney's fees and costs. On or before August 31, 2007, defendant shall file its response, if any, as to the ***reasonableness or accuracy only*** of plaintiff's claimed fees and costs.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

| Facility | Date Aware of Litigation | Action Taken on Notification of Litigation |
|---|---|---|
| AF Medical War Reserve Materiel | June 13, 2006 - Note: one employee was a listed recipient of Amendolia's November 6, 2002 e-mail. Because the organization did not possess e-mail capabilities until December 2002, that individual never received the e-mail. | Located and preserved prime vendor records dating from fiscal years (FY) 1998 - 2001, credit card receipts from FY1997 - FY2001, and blanket purchase agreement (BPA) orders from FY1998 - FY2001. |
| Altus AFB, OK, 97d Medical Group | May 10, 2006 | Located and preserved receipts dating from FY2000 - May 2001. |
| Brooks City-Base, TX (p/d/b/a Brooks AFB until 2002) | May 30, 2006 | Located and preserved 5 pallets of records dating from 1997 - 2006. On August 1, 2006, affiant identified 2.25 pallets of records dating from 1997 - 2001. It is unclear whether these pallets are included in the 5 located in May 2006. |
| Cannon AFB, NM, 27th Medical Group | May 16, 2006 | Located and preserved 5 boxes of documents, including credit card logs and receipts for FY1997 - FY2000, blanket purchase agreements from FY1998, and prime vendor receipts from FY2000. |
| Naval Hospital Corpus Christi, TX | May 10, 2006 | At time of notification all files had been destroyed. |
| Defense Manpower Data Center (DMDC) | Unknown | Located and preserved Rocky Mountain Bank credit card data dating from 1996 - 1998, First Bank/U.S. Bank credit card data dating from 1998 - 2001, and CitiBank credit card data dating from 1998 - 2001. |
| Dyess AFB | May 23, 2006 - Note: two employees were listed recipients of Amendolia's November 6, 2002 e-mail, but stated that they were unaware of the suit as of May 2006. | Located records dating back to January 2001. |
| Fort Bliss, TX, Beaumont Army Medical Center | November 2002 | Kathleen Shahan visited in March 2003. She did not ask to see credit card records, and BAMC had few contract records because UMS ceased doing business with BAMC in late 2000. Shahan said records they did have (including credit card records) were "useless" and did not advise them to keep any records. All records were destroyed pursuant to the regular document retention policy. |

| Facility | Date Aware of Litigation | Action Taken on Notification of Litigation |
|---|---|---|
| Fort Hood, TX, Darnall Army Medical Center | October 2005 - Note: one employee was a listed recipient of Amendolia's November 6, 2002, e-mail, but, in October 2005, stated that he never received the e-mail. | Located 13 binders and 2 blue folders of prime vendor records and 27 discs of credit card records dating from 1997 - 2001. These were given to Peter Brown. No documents were destroyed because of a failure to comply with the regular document retention policy, and because of a general records freeze in place since September 2004. |
| Fort Huachuca, AZ, Raymond W. Bliss Army Health Center | January 2005 - Note: predecessor received the "initial notification," but unknown to affiant when or how. | Located prime vendor documents dating from 2002 - 2005 and non-prime vendor documents dating from 2002 - 2004. After receiving notification of suit, they destroyed all documents from before June 2003 pursuant to regular document retention policy. |
| Fort Sam Houston, TX, Brooke Army Medical Center | October 1, 2002 | Located and preserved vendor files dating from 2000 - 2001 and credit card records dating from 1995 - 2001. When DOJ asked for these documents in October 2005, affiant was told by storage facility that files had been inadvertently destroyed without affiant's authorization or knowledge. However, on renewed search in June 2006, the files were located and marked for preservation. |
| Fort Sill, OK, Reynolds Army Community Hospital | October 1, 2002 | Located and preserved paper receipts from contract orders dating from January 1999 - May 2001, electronic copies of contract orders dating from April 2000 - February 2001, and electronic copies of credit card orders dating from October 2000 - February 2001. |
| Goodfellow AFB, TX, 17th Medical Group | May 11, 2006 | Located and preserved records dating from October 1, 1999 - June 15, 2006. |
| Holloman AFB, NM, 49th Medical Group | May 19, 2006 | Located and preserved 2 pallets of records dating from October 1, 1999 - June 15, 2006. |
| Kirtland AFB, NM, 377th Medical Group | August 4, 2006 | Located and preserved credit card documents dating from 1995 - 2001. |

| Facility | Date Aware of Litigation | Action Taken on Notification of Litigation |
|---|---|---|
| Laughlin AFB, TX | October 1, 2002 | Previous employee instructed affiant that all relevant documents, dated 1997 - 2001, had been located and preserved. However, when affiant obtained the files in 2006, they were NOT marked for preservation. Currently, Laughlin possesses credit card records dating from October 1999 - October 2001, and prime vendor records dating from October 2000 - October 2001. Affiant believes earlier dated files have been destroyed. Also, affiant stated that he destroyed some files in 2005 pursuant to the regular document retention policy and does not know what they were, as they were not marked for preservation. |
| Randolph AFB, TX, 12th Medical Logistics Flight | May 10, 2006 - Note: two employees were listed recipients of Amendolia's November 6, 2002, e-mail. One no longer works at Randolph; the other has no recollection of the e-mail. | Located and preserved credit card documents fo FY2000 and FY2001, and purchase invoices for FY2000 and FY2001. |
| Reese AFB, TX (closed in 1997) | May 23, 2006 | At time of notification all files had been destroyed. |
| Sheppard AFB, TX, 82d Medical Group | November 6, 2002 | Located and preserved prime vendor records dating from May 4, 2000 - May 24, 2001, and credit card records dating from May 26, 2000 - July 27, 2000. |
| Tinker AFB, OK | May 10, 2006 | Located and preserved 5 boxes of prime vendor receipts dating from December 1997 - March 2001, and 10 boxes of non-prime vendor receipts dating from 1998 - 2003. |
| Vance AFB, OK, 71st Medical Group | May 25, 2006 - Note: two employees were listed recipients of Amendolia's 2002 e-mails. One has no knowledge of the e-mail; the other has been discharged from the Air Force. | Located and preserved credit card documents dating from October 2000 - September 2002. |