IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED STATES MEDICAL SUPPLY COMPANY, INC., Plaintiff | : | CASE NO.: 03-CV-289 |
| vs. | : | |
| THE UNITED STATES, Defendant | : | |

\- - -

Philadelphia, Pennsylvania
Friday, September 21, 2007

\- - -

Deposition of ANTHONY AMENDOLIA, taken at the UNITED STATES DEFENSE SUPPLY CENTER PHILADELPHIA, 700 Robbins Avenue, on the above date, beginning at approximately 8:30 a.m., before Jessica Haddix, Registered Professional Reporter and Notary Public.

APPEARANCES:

FRANK BROYLES, ESQUIRE
KAREN-LEE POLLAK, ESQUIRE
GOINS, UNDERKOFLER, CRAWFORD
& LANGDON, L.L.P.
1201 Elm Street, Suite 4800
Dallas, TX 75270

Representing Plaintiff

KYLE CHADWICK, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
1100 L Street, N.W., Room 7062
Washington, DC 20530

Representing Defendant

MICHAEL McGLINCHEY, ESQUIRE
DEFENSE SUPPLY CENTER PHILADELPHIA
Office of Counsel
700 Robbins Avenue
Philadelphia, PA 19111

Representing Defendant

# I N D E X


| WITNESS | PAGE |
|---|---|
| ANTHONY AMENDOLIA | |
| EXAMINATION | |
| By Mr. Broyles | 4 |


_ _ _

# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Affidavit of Anthony Amendolia | 8 |
| 2 | E-mail Correspondence | 24 |
| 3 | Defendant's Response to Plaintiff's First Set of Discovery Requests to Defendant United States | 25 |
| 4 | Declaration of Peter Brown | 27 |
| 5 | E-mail Correspondence | 29 |
| 6 | Regional Tri-Service Medial Logistics Data Collection | 33 |
| 7 | Correspondence and attachments from Michael L. McGlinchey to Frank L. Broyles, dated may 23, 2007 | 34 |

INDEX (continued):


| | | |
|---|---|---|
| 8 | Medical/Surgical Prime Vendor, Lone Star Region | 38 |
| 9 | Medical/Surgical Prime Vendor, National Capital Region | 40 |
| 10 | E-mail Correspondence | 42 |
| 11 | Spread Sheet | 44 |
| 12 | Usage Items | 50 |
| 13 | E-mail Correspondence | 53 |
| 14 | Correspondence, dated August 6, 1997 | 55 |
| 15 | Correspondence, dated July 15, 1999 | 59 |
| 16 | E-Mail Correspondence, dated January 11, 2001 | 60 |
| 17 | E-mail Correspondence | 64 |
| 18 | E-mail Correspondence | 69 |
| 19 | E-mail Correspondence | 71 |
| 20 | Gen II Transition - Plan B-Feb 26th | 76 |
| 21 | E-mail Correspondence | 80 |


\- - -

ANTHONY AMENDOLIA, after having been first duly sworn, was examined and testified as follows:

BY MR. BROYLES:

Q. Mr. Amendolia, my name is Frank Broyles. I represent United Medical Supply Company in a breach of contract case against the government.

For the record, would you please state your full name?

A. My name is Anthony Amendolia.

Q. Mr. Amendolia, you understand that the United States is being represented by Mr. Kyle Chadwick, who is not here today due to some transportation issues, and that Mr. Mike McGlinchey, who is agency counsel, is present in the room?

A. Yes.

Q. And that Mr. Chadwick has instructed us that we're free to go ahead and start this deposition without him?

A. Yes.

MR. BROYLES: Mr. McGlinchey, would you just make a note on the record

of that?

MR. McGLINCHEY: I agree with everything you just said.

BY MR. BROYLES:

Q. Mr. Amendolia, do you recall that there has been an issue in this case regarding the preservation of documents?

A. I do.

Q. And have you seen Judge Allegra's sanctions order with respect to the preservation of documents and the destruction of documents?

A. Yes, but I don't know -- there was several e-mails or pieces of information that I received. I'm not quite sure who it was from.

Q. His particular sanctions order is precluding the government from cross-examining one of our experts.

Does that ring a bell to you?

A. No. One of our experts was --

Q. One of United Medical's experts, the government will not be permitted to cross-examine United Medical's experts on

Anthony Amendolia

methodology for estimating damages due to diversion.

Does that ring a bell?

A. No. No, it doesn't.

Q. Now, in the last few months have you seen any new policies that come out of DSCP regarding the preservation of evidence in the event of a lawsuit?

A. Past few months? I recall since years ago, when we first sent out that message, there have been some more information on that subject, yes. I received the information. I don't remember if it was the past few months or a little before that.

Q. Prior to this lawsuit by United Medical, had you been involved in any litigation before?

A. No, never.

Q. Have you had any training with respect to litigation procedures and discovery procedures prior to the filing of this lawsuit by United Medical?

A. I can't say that I remember having anything. I never had any training.

Anthony Amendolia

(Exhibit 1 was marked for identification.)

BY MR. BROYLES:

Q. Mr. Amendolia, do you recognize what the court reporter has marked as Exhibit 1?

A. Yeah.

Q. Is that your signature that appears on the second page of Exhibit 1?

A. Yes.

Q. Mr. Amendolia, one of the rules we have to have here for the sake of the court reporter is you have to let me finish my question before you answer, and I have to let you finish your answer before I ask another question because she can't take down both of us at the same time.

So, try to be conscious of that and let me fennish my question before you answer. Okay?

A. Okay.

Q. Thank you. Who is your current employer?

A. The Defense Supply Center of Philadelphia.

Anthony Amendolia

Q. And what is your position with Defense Supply Center of Philadelphia?
A. Currently or previous?
Q. Presently.
A. I am a supervisory customer account specialist.
Q. When did you assume that position?
A. February of this year.
Q. Prior to February of this year, what was your position with the SCP?
A. I worked in the medical directory, and our title was changed to Tailor Vendor Logistics Specialist or TVLS. Prior to that, before that name change, we were kind of known as case manager or, in other words, account manager.
Q. Now, have you seen one of the things that Judge Allegra indicates about you in his sanctions order is that you're an attorney.
Are you an attorney?
A. No.
Q. Do you recall seeing Judge Allegra's sanctions order saying you were an attorney?
A. No; that would have surprised me,

Anthony Amendolia

and I certainly would have straightened that out as soon as I saw it, so, no, I didn't.

Q. So we can safely say you haven't seen the sanctions order?

A. We can safely say that, yes.

Q. Because you would have jumped on that?

A. Of course. Yes, I would have.

Q. When you learned of this lawsuit, you were given some instructions to obtain documents from the different medical treatment facilities, correct?

A. Yes.

Q. And you were also given instructions to pass on to these medical treatment facilities that they were not to destroy documents, correct?

A. Yes.

Q. Who gave you those instructions?

A. I'm not sure if they came from Kathleen Hallam or someone else, but I think I remember them coming from Kathleen, from -- probably from someone else through Kathleen to me, as far as I can remember.

Anthony Amendolia

Q. How did you make a decision as to what documents might be relevant to this lawsuit?

A. I didn't categorize or request any particular documents to be saved. My idea -- the way I communicated with all of my customers for every request that I had was to -- because there were several, was to use e-mail.

So I just took my e-mail list of customers and either forwarded or sent a new e-mail just requesting that all the customers hold or not destroy any of the records related to the United Medical case, as far as I can remember.

Q. At the time that you did this, had you actually seen a copy of the lawsuit that United Medical had filed?

A. I remember having a copy of the lawsuit. I don't know if it was after or before the time frame that I sent out the message.

Q. Do you recall seeing actual discovery requests, interrogatories and

Anthony Amendolia

requests for production, that United Medical had served on the government?

A. If I saw them, I probably wouldn't know the importance of them at the time or really what I was looking at actually. So, I mean, I may have read them, may have understood the lawsuit issue.

I may have generally had an idea of what everything was, but I don't recall seeing it before or after. I don't remember when I saw it.

Q. Because basically what I am trying to get at, Mr. Amendolia, is that you were given the responsibility for going out to the medical treatment facilities and having them preserve relevant documents, but in fairness to you, you had no idea what documents were relevant or not relevant to the lawsuit.

Would that be a fair statement?

A. Yes. I mean, I just assumed that not to destroy any document concerning -- you know, anything they had concerning the United Medical contract.

No, I really didn't know which

Anthony Amendolia

documents would be safe to get rid of. So I just assumed save them all.

Q. But in terms of save them all, for example, the budgets of the different medical treatment facilities, did that even cross your mind that they needed to save their budgets?

A. No, that probably wouldn't have been something that I -- most of the time, the people that I dealt with, would not probably know their budget. So that probably wouldn't have crossed my mind. The budget is usually at a higher level than the people that I dealt with.

Q. So in terms of obtaining documents from the medical treatment facilities, you understood your responsibility was to deal with the people that you dealt with regularly, and if there were relevant documents outside their area, you weren't dealing with that, at least in your mind?

A. I guess if you mean -- I guess that's correct, and if you mean that I contacted the facility by my person -- the point of contact that I had, and I guess I

Anthony Amendolia

believed that was their responsibility to make sure that any document they knew that concerned United Medical would not be destroyed.

Now, that may be an assumption, but that's probably what I assumed when I contacted each facility.

Q. And when you contacted each facility though, you didn't provide that facility with a copy of the lawsuit or with a copy of our discovery request?

A. No, definitely not.

Q. And you didn't provide the facility with a summary of the lawsuit or a summary of our document requests?

A. Definitely not, right.

Q. At the time that you were, what, called the case manager for United Medical, correct?

A. Case manager, right. Yes.

Q. Were you the case manager for any other prime vendor contracts?

A. There was a time when the Texas area was my only region, but I did receive another

Anthony Amendolia

area of the country. I don't know if it was at the beginning, the middle, end of the contract, but I also had Chicago area at some point; region five that would have been considered.

Region six was the Lone Star area at the time, and then I also got region five.

Q. On Exhibit 1, if you'll go to -- do you see up at the top where it says Page 5 of 30?

A. Yes.

Q. And so this is an e-mail that you sent out on November 6 of 2002, and you write, "To All, On October 1st, I sent the message below asking that everyone with any United Medical correspondence, save the information in case DSCP would need copies."

Why did you just ask them to save correspondence and not other types of documents?

A. I may have used that word meaning to say any kind of document. Correspondence, I guess, in my mind was anything that they used

Anthony Amendolia

for the contract. So it may have been a bad word to use, I guess.

Q. Did you copy Ms. Hallam on that? There is a gillion e-mails.

A. I don't remember if I did. There could be a chance I did not. It doesn't look like I did.

Q. Now, you asked the people there that they say -- you say, "Please respond to this e-mail whether you have any information or not," and one of the concerns that Judge Allegra had that he talked about in his sanctions order was that you asked for a response, and if you didn't get any response, you never followed up to find out why you did not get a response.

Why did you not follow up if you did not get a response after you asked for one?

A. The customers, and you can see the long list of customers there, regularly I would send e-mails out to that customer group, and for whatever reason, it would not be unusual for me not to get responses from them

Anthony Amendolia

for certain things that I have asked.

And I guess what happened with this e-mail, and I have to say not knowing at the time all of the history of how important it was to actually get a response, and, you know, what we were actually looking for, I didn't know that I would have had to contact and follow up on each and every customer.

I took the big customers, I believe, and called them -- maybe that could have been a half a dozen -- called them to speak to them about any response received, but I did not take the time to call everybody, only thinking that maybe just not knowing that it was that important that I do that.

Q. Again, you had no training in litigation support?

A. Right.

Q. Now, turning the page to Page 6 of 30 there, and you write there in the middle paragraph, If anyone can produce a system generated listing of individual NON PV purchases from the same time period, it would be greatly appreciated.

Anthony Amendolia

Did you get any listing like you requested there do you recall?

A. To my recollection, I think there was maybe one person, maybe one or two. Bruce Christie from Fort Sill always seemed to be able to have something like this or the only other person that could have done that was Debbie Thompson at BAMC. I don't remember whether or not they were actually able to do that.

If I got one response, that would have probably been about as much as I could remember getting. I don't remember.

Q. Fair enough. Now, Mr. Bandy (ph.) indicated that you and he had several discussions about the government's use of credit cards to purchase medical supplies.

Do you recall any of those discussions?

A. I remember we would talk about the government use of credit cards because naturally back then our intent was to have our customers move their credit card purchases to prime vendor program.

Anthony Amendolia

Q. And what obstacles did you encounter in trying to get the customers, meaning the medical treatment facilities, to move their purchases of credit cards to the prime vendor program?

A. Just actually helping them find DAPA -- Distribution and Pricing Agreement, it's a pricing vehicle -- just getting to find exactly what they're buying on credit card to what we actually have on DAPA to match exactly.

So that was -- first of all, the biggest challenge was to find -- and if that -- or it may be something close to that. So that was our biggest challenge.

Q. One of the things -- you know Colonel Jim Reilly (ph.)?

A. Sure.

Q. Colonel Reilly indicated that one of the biggest problems was that doctors and nurses had credit cards, and they would buy -- just use their credit cards to buy, and they were outside the supervisory role of the department of logistics.

Did you deal with doctors and nurses on trying to get them to stop their use of credit card purchases?

A. No.

Q. Were you aware that was going on?

A. Well, I mean, I knew that there was some other offices that had credit cards because of, in that situation, if they would need something under emergency, they would certainly be able to buy something themselves. They didn't have to go through logistics people in every case.

Q. Were you aware they were using credit cards to buy -- these doctors and nurses, and what Colonel Reilly referred to as clinicians -- that clinicians were using credit cards to buy on other than emergency basis?

A. That possibility -- yes, that possibility was there only because we did not have 100 percent coverage in our contract for every item that a facility would use.

So it would not be unusual for them to buy certain items under the contract

Anthony Amendolia

in a nonemergency basis.

Q. Would you say it's a fair statement that there were significant purchases being made by clinicians using credit cards that should have been made through the department of logistics under the prime vendor program?

A. Significant. I think, in my opinion, a fair statement would be that there was purchases made by credit card that could have theoretically gone through the prime vendor program, and I wouldn't be able to determine whether or not those purchases were made because the item was not available through the prime vendor and they were buying it for that reason or whether they were buying it directly using their credit card, even though the item was available through the prime vendor.

I wouldn't be able to determine that, and it would be my opinion that the way the prime vendor program was set up, that it would be much easier, less expensive to buy through our program. So if that option was there, that they would take that option.

Anthony Amendolia

Q. You did an investigation, I understand, on the direct purchases at Fort Sill of -- or maybe it was Sheppard Air Force Base, but I think it was Fort Sill -- of McGaw IV solutions.

Do you recall that?

A. I probably did. I don't recall the details of it. I mean, I did several, I will call them studies, but really my job was -- the IV solution was probably a different subject; that had a different turn to it because that was -- IV solutions were actually under another separate contract with the VA that there was something special going on there that I may not remember all the details to that particular one.

Q. So you don't recall then that United Medical actually supplied McGaw IV solutions?

A. They would have, yes. They would have had to, but in that case, I don't believe we had DAPAs, our regular, our most used contract vehicle to get the pricing on our prime vendor contracts; that was a separate contract, I believe, with the VA, but we used

Anthony Amendolia

the pricing and ran that through the prime vendor program. That was a little bit different of a subject, but you can continue.

Q. So, is it your recollection then that there was actually non-DAPA items being run through the prime vendor program?

A. In the contract there were other pricing vehicles able to be used than DAPAs and the VA contract. Other long-term contracts could be used for pricing other than DAPAs, and that was one of them.

Q. One of the issues in the case is the closing of the warehouses by United Medical starting with the El Paso warehouse.

You were aware that United Medical did close those warehouses?

A. Yes.

Q. How did you become aware that they intended to close them or had closed them? What do you recall about that?

A. I don't remember if I was alerted by a customer first or maybe contacted by United Medical or our contracting people. I don't really remember first hearing about it, but I

Anthony Amendolia

did understand that that El Paso warehouse was closing.

Q. Did you know the El Paso warehouse was going to be closed before it was closed do you recall?

A. I believe so, yes.

Q. Mr. Bandy's recollection is that you and he had discussions regarding what they were going to do with all the stock that was in the El Paso warehouse when they closed the warehouse?

A. I am sure that would have been a topic of discussion. I don't really remember exactly talking about it, but I could imagine that we both would have talked about that.

(Exhibit 2 was marked for identification.)

BY MR. BROYLES:

Q. Mr. Amendolia, I have handed you what the court reporter has marked as Exhibit 2, and I really don't have any questions about Exhibit 2 other than to ask you if those appear to be e-mails that were either sent to or by you?

Anthony Amendolia

A. Sure, they look like they were sent by me, sure.

(Exhibit 3 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you what's been marked as Exhibit 3, which is a portion of the discovery requests and responses that the government provided in response to our discovery request.

Do you recall seeing that document before?

A. Something from Debra Thompson? No.

Q. Do you recall if you had any input into the answers that were provided in Exhibit 3?

A. Not Debra -- if Debra provided these, I didn't talk to her at any time about these answers.

Q. Maybe I have given you the wrong document.

A. I don't know.

Q. It's not necessarily Debra Thompson. It came from Kathleen Shahan.

Anthony Amendolia

Did you ever meet Ms. Shahan do you know?

A. I could have. I don't remember.

Q. She is a lawyer with the Department of Justice?

A. The name sounds familiar. I may have met her once.

Q. And then the answers, you know, to these interrogatories, you don't recall being asked to provide any information with respect to those answers?

A. There were times I did have to answer questions. Did I know that they were from an interrogatory? I mean, yeah, I probably did have to answer some type of questions to interrogatory. It's not fresh in my mind, but I'm looking at it and it's coming back.

Q. Did you review any documents or talk to anybody in preparation for your deposition today?

A. Not really. I mean, other than a short conversation of topics that may come up, but these were things that we talked about

before while I was being asked for information. So nothing -- just a few minutes.

(Exhibit 4 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you what's been marked as Exhibit 4, which is the Declaration of Peter Brown.

Do you know Mr. Brown?

A. I remember the name and probably had conversations with him or e-mail.

Q. Do you recall meeting him face to face?

A. I could have. I remember the name. I probably -- I don't know whether I did or not, to tell you the truth.

Q. I want to ask you some questions about paragraph two in that declaration.

A. Sure.

Q. Because he talks about you in paragraph two.

A. Okay.

Q. And this declaration is one of the

Anthony Amendolia

issues that Judge Allegra is focused on.

Peter Brown says that you gave him eight names and told him that no other medical treatment facilities had any documents relevant to the lawsuit.

First of all, do you recall telling Mr. Brown that none of the MTFs, other than the eight names you provided, had any documents relevant to the lawsuit?

A. It doesn't -- I mean, I don't exactly recall that, but it sounds about right. If I would not have received a response to my e-mail about documents. I may have taken it as a no, except for the maybe responses and calls I did make and the names I did offer.

Q. And to be fair, what I'm going to focus on is the use of the word "relevant," because our contention is that you were not aware of what documents were relevant to the lawsuit and what documents were not relevant to the lawsuit. You asked for specific things. We never saw you ask for things using the word relevant.

Anthony Amendolia

My first question is do you specifically recall using the word relevant with Peter Brown?

A. No, I don't specifically recall it. I probably back then, like I said, asked for any information or any documents or correspondence. I may have used those interchangeably and, you know, expected it to be anything that you had, whether it was e-mail, whatever you used in that contract. My intent was to ask for anything. "Relevant," I probably did not use.

Q. Do you know back then if there were written procedures at DSCP for what should take place in terms of getting documents and preservation of documents that you would have had to follow?

A. If there were, I was not aware of them or maybe I just didn't know enough to follow them, either one.

Q. Okay.

(Exhibit 5 was marked for identification.)

BY MR. BROYLES:

Anthony Amendolia

Q. The court reporter has handed you what she has marked as Exhibit 5, which is -- this is, again, some e-mails that you sent out, correct?

A. Yes.

Q. And I want to focus on the second paragraph of your e-mail where you say, "Ft. Hood has consistently reached $70,000 in sales per month," and you say, "But has potential to double that figure because they still buy a significant amount of Med/Surg items by credit card."

How did you come to the conclusion that they had potential to do 140,000 a month in sales?

A. Well, in 1996 the program was in its infancy, and I am sure that $70,000 in sales was a result of the limited number of items that we had on DAPA at the time because I think we -- our awards were just a year or two into that, and we did not have good coverage like we did later on, but.

So I don't know whether I received information from the facility there

Anthony Amendolia

saying that we buy so much more in credit cards that gave me the idea that they could double it.

(Mr. McGlinchey leaves the room.)

MR. BROYLES: We probably ought to pause for a moment. Mr. McGlinchey is out of the room. We'll take a little off-the-record break here.

(Messrs. Chadwick and McGlinchey enter the deposition.)

BY MR. BROYLES:

Q. We have been talking about Exhibit 5, and the last paragraph on Page 1 of Exhibit 5 refers to a 122 page computer printout.

Now, we have asked for a copy of that printout, and I understand that neither you nor Fort Hood has that printout.

Do you recall hunting to see if you had that printout?

A. Yes, I remember looking for it, but generally what I would do is -- back then we probably didn't have an electronic version of it, so I would have the hard copy printed out.

Anthony Amendolia

I would look up what I can on the printout, annotate what I found, and I would mail it back to the facility probably. I wouldn't keep a copy.

Q. Do you recall in your mind that printout?

A. Not exactly. I would kind of figure what it had on it and what the contents of the printout were.

Q. Do you recall if the credit card usage that was on that printout included credit card usage by the doctors and nurses or was it just credit card usage by the people in logistics?

A. There was no distinction on the report of who bought the items. It was just what items were purchased by credit card.

Q. So if it only included people in logistics that were using the credit card, you wouldn't know that?

In other words, you didn't see anything that showed you that somebody was a doctor or a nurse, it just had a name?

A. Right. I wouldn't know if that was

a complete listing or not.

(Exhibit 6 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you what has been marked as Exhibit 6.

Does that document look familiar to you?

A. No, not really.

Q. You recognize that as something purportedly dealing with Fort Hood, correct?

A. Yes.

Q. And looking at the purchases of medical supplies that are reflected there, do those look like the potential methods by which medical supplies are routinely purchased?

A. Are you asking through the different programs on here: Credit card, LID, ECAT, medical/surgical?

The document isn't familiar to me. I mean, it's probably some type of internal Fort Hood document. I don't remember going through doing any review or basing anything from this type of a document.

Anthony Amendolia

(Exhibit 7 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you what's been marked as Exhibit 7, which we understand to be dealing with the Generation II estimates.

Were you involved in preparing, helping to prepare the estimates that were used in the solicitation for the Generation II prime vendor program?

A. No, I don't recall being directly involved. I may have learned after the fact of how they were gathered or my impression of how they were gathered, but I think this was more of a function of the contracting side of the house at the time.

Q. You'll see some handwritten notations at the bottom of the spread sheet pages.

Do you see those?

A. Yep.

Q. Do you recognize that handwriting?

A. No. It's not my handwriting, but I

Anthony Amendolia

don't recognize who it might be.

Q. Now, I understand that you're currently attempting to determine what the Owens and Minor sales were under the -- in the Lone Star region under the prime vendor program; is that correct?

A. Currently?

Q. Yes.

A. Currently right now?

Q. Well, not this very minute, but this month.

A. I don't -- let me make sure I understand the question. You're asking if I am currently involved in trying to determine what the sales of Owens and Minor were back then?

Q. Yes.

A. I have been asked for the information. I haven't been able to locate it at this time yet.

Q. Where have you looked?

A. Well, I have looked through my e-mail, which I didn't think I would be too successful, and my desk area, where I have

Anthony Amendolia

made a move since. So I still have to try to figure out where my -- anything that I would have left would have -- it probably could only be in a couple areas, but I haven't gotten to everything yet.

Q. So you haven't gone and looked at the contract files with respect to the Lone Star region?

A. No, and basically I wouldn't go to the contract files. I would just look for anything that I had around at my old desk.

Q. Why would you not look in the contract files?

A. That's something that I wouldn't be familiar with, and I would probably ask a contract person to do that.

Q. Have you asked a contract person to do that?

A. No. Sales would not -- I mean, my opinion, sales would not be in the contract.

Q. Where would you expect the records of sales by Owens and Minor to be?

A. If someone kept a copy of the sales that they -- reports that they received over

time. I mean, there was a time naturally I kept that information. I just don't remember how far back I have it, if I saved what I saved, what I didn't save.

Q. Now, you say recently you have moved locations?

A. Uh-huh.

Q. In moving locations did any files get destroyed or thrown out?

A. No.

Q. In your old location, is anybody else sitting there or is that vacant?

A. There is someone sitting there.

Q. Did you move all of your files and take them with you?

A. All of my files pertaining to this case?

Q. All of your files that you had in your old location.

A. I took some files and left some back.

Q. And did you have any files dealing with the United Medical contract?

A. Yes.

Anthony Amendolia

Q. And did you leave those or take those?

A. I left them, and I think they were boxed and put away, to my knowledge.

(Exhibit 8 was marked for identification.)

BY MR. BROYLES:

Q. Now, who asked you to look for the Owens and Minor information?

A. I guess it was Mike.

Q. You're talking about Mr. McGlinchey?

A. Yes.

Q. I have handed you what's been marked as Exhibit 7 (sic), and it's a two-page document.

I direct your attention first to the second page, and we have been informed that that is your handwriting; is that correct?

A. It does look like my handwriting, yes.

Q. What is the second page of Exhibit 8?

A. It looks like an attempt to write

Anthony Amendolia

down sales, I don't know from what year. For some reason, I had to manually write this out. I don't remember why. I am waiting for it to dawn on me, but.

Q. Look at Page 1 of Exhibit 8.

Does that look familiar to you?

A. Yeah. I think it was from our system. We had system generated reports on what we thought were our sales for the month.

Q. Now, these would be vales under the Owens and Minor prime vendor contract, correct?

A. '96, I -- correct.

Q. Do you recall that the United Medical prime vendor contract became effective June 1 of 1997?

A. No. I forgot. Thanks for reminding me.

Q. That's the effective date of the --

A. Okay.

Q. -- United Medical contract.

So given that information, then it's clear to you that this would have been the Owens and Minor sales?

Anthony Amendolia

A. Yes.

Q. How soon after the end of a month would this information be available for a given month?

A. Probably a few days. We never got anything the next day, I don't think. It was probably a few days until everything hit.

Q. Certainly before the end of the following month?

A. Yes.

Q. So, for example, in April of '96, the information for April of '96 was available before the end of May of '96?

A. Yeah.

Q. This document came from documents produced to us by the government.

Do you have any reason to believe this is not an accurate document of the Owens and Minor sales for the time period reflected on this document?

A. No. This would have been as accurate as we would have had, and we would have relied on it to be that accurate.

(Exhibit 9 was marked for

Anthony Amendolia

identification.)

BY MR. BROYLES:

Q. I am handing you what the court reporter has marked as Exhibit 9, which is a similar type of spread sheet for the National Capital region.

Are you familiar with the National Capital region that existed back in the '96, '97 time frame?

A. Well, I wasn't the case manager for that region, but I knew it existed. I am not familiar with too many details at the time, but I am familiar with the region.

Q. Would this have been a report that would have been printed out for the various prime vendor regions? Was this something that was pretty standard?

A. I think -- yes, I think especially maybe upper management may have -- and me too -- would have looked to see if there were any large fluctuations from month to month in the sales, especially dips. If there was a dip in sales, then we would be interested to see why that dip would have occurred; that's

Anthony Amendolia

basically what we would have used the report for.

Q. Would you have had occasion to look at the reports from other regions where you weren't the case manager or just on the regions where you were the case manager?

A. I would only pull regions -- reports for my region. I would only look at other regions if I was asked a question or input of some type.

Q. When you say pull, this was available electronically?

A. Yes, I believe it was.

Q. And is it still available electronically?

A. I don't think the system exists anymore. I don't remember where we got it from. I can't remember the system, but I don't remember seeing it in this type of format exactly, you know, for a couple years now.

(Exhibit 10 was marked for identification.)

BY MR. BROYLES:

Anthony Amendolia

Q. The court reporter -- let me interrupt here a second.

Have you ever given your deposition before?

A. No.

Q. Okay. If you need a break or something, just speak up. This is not an interrogation.

A. I am okay. Thanks.

Q. If you want a drink, just let us know.

A. Thanks.

Q. Exhibit 10 is an e-mail that you sent, correct?

A. Yes.

Q. And it has to do with the addition of a training facility at Sheppard Air Force Base that wanted to be added to the contract?

A. Yes.

Q. It says, "They anticipate orders will be well over $10,000 per year."

Do you recall having a conversation as to that 10,000-dollar number?

A. For any new customer that

Anthony Amendolia

10,000-dollar number would come up in every case because in our contract it says that, you know, a customer has to have at least that much per year to be on the contract, although in some cases if it was convenient for the prime vendor, even if the dollar value wasn't $10,000, they could accept to be added -- the prime vendor could have allowed the new customer to be added if it was convenient even though it wasn't 10,000.

Q. When somebody said that they were going to have orders in excess of $10,000 per year, did you do any verification of that statement or just accept that at face value?

A. We would accept that at face value.

(Exhibit 11 was marked for identification.)

BY MR. BROYLES:

Q. I have handed you what -- this is a document that was provided to us by the government, and it's been indicated that you probably have more knowledge of this type of document than other people we have talked to.

Does this look familiar to you,

Anthony Amendolia

Exhibit 11?

A. It looks familiar. It's been a while. I'm trying to look at it -- oh, okay. Number of beds. Okay.

Yes, it looks familiar.

Q. Okay. I want to ask you about the column headings and what they mean, and in Column A it says -- right up at the top it has a date of 12/19/97.

Is that the date this particular document was prepared?

A. I would think so. I don't -- I mean, that's not something I prepared, but -- I don't think I prepared it -- but I will assume that that's the date it was prepared or the time frame. It might be the time frame the date is applicable.

Q. Then you go down two lines to Row 3 and it has a heading there Region?

A. Yes.

Q. What does the heading Region mean?

A. Well, the region stands for what part of the country the contracts fell under. So each contract was assigned a region.

Anthony Amendolia

Q. So, like, right under region it has Cascades.

Would that mean that it was the Cascades' region that was served by a single prime vendor?

A. Yes.

Q. And then you move to the right from Region and it says Facility.

Do you see that?

A. Yes.

Q. What does Facility mean?

A. That would be each single customer within that region that would be under the contract.

Q. Is that what we have typically -- when we call something a medical treatment facility, would that be synonymous with that?

A. Yes.

Q. Then, again, moving to the right, it has SVC and then BR.

What does that mean?

A. It think that would mean service or branch of the service. "A" meaning Army, "N" Navy, "AF" Air Force, "CG" Cost Guard.

Anthony Amendolia

Q. And then the number of beds? What does that mean on Column E?

A. That would be the number of beds at that particular facility that they would have inpatient -- they would be able to accommodate inpatient.

Q. And then --

A. Or outpatient too. Sorry.

Q. And then Column D is EFFDATE.

What does that mean?

A. I would think that would be the effective date or the beginning of the contract.

Q. So, for example, October 20th of 1995 would be the effective date of the Cascade region's prime vendor contract?

A. Yes.

Q. And then Column F it says First Year EST Sales.

What does that mean?

A. I would -- I guess that was the estimated sales that they thought would be there for the first year.

Q. Then what does Column G mean? The

Anthony Amendolia

heading in Column G?

A. And that was a tracker, I assume, to measure the sales as they are happening throughout the year compared to the estimate.

Q. Column H is a percent that appears to be Column G divided by Column F; is that correct?

A. Yes.

Q. And then Column I is number of months left in year one, and those are a bunch of nonapplicable.

Would that mean that your year one was completed?

A. I guess we could assume that. I don't know. I'm not sure why it says N/A.

Q. Then going over to Column M, it says Option Years, Estimated Sales.

Do you see Column M?

A. Yes.

Q. For example, under the Cascade's region, Madigan facility, the estimated first year sales were $2 million, estimated option year sales were $4 million.

Was that just pretty standard;

Anthony Amendolia

that the option year's estimated sales were twice the estimated first year sales?

A. I am not sure whether that was because it was new to ramp-up the first year or maybe there was not a full year for them to achieve the 4 million because -- there probably was a reason behind that to say that the sales are only half in the basic year than the option years.

Q. That's what they did in the United Medical contract.

Do you recall that?

A. Yes.

Q. And it appears, looking at Exhibit 11, that that seems to be pretty standard.

Column N is Total OPT Year Sales to Date.

Does that mean that this is the actual sales that have taken place in the first option year?

A. That's what it would appear to be, yes.

Q. Column P, Number of Months Left in Option Year. For the first option year it

Anthony Amendolia

actually had been completed. For example, in the Cascade regions, they show zero months left in the first option year.

So with respect to the Cascade regions, or actually the time this is printed, '97, we're actually in the third year of the Cascade region's contract, correct?

A. That's what it would look like, yes.

Q. Turning to Page 2 -- we don't need to talk about Page 2.

(Exhibit 12 was marked for identification.)

BY MR. BROYLES:

Q. Exhibit 12, the court reporter has handed you looks like a Power Point slide called Usage Items?

A. Yes.

Q. And there is --

A. Sorry.

Q. -- five bullet points there.

Do you agree with those five bullet points that describe usage items; that those statements are true?

A. Yes.

Anthony Amendolia

Q. And what is, in your mind, the importance of usage data?

A. Well, usage data is important so that the prime vendor will have a good idea of what to bring into stock to be able to service the customers when they place their orders. The better usage data, the better the service.

Q. Did you get involved in the Lone Star region with the MPS and obtaining usage data for United Medical?

A. Are we talking about initial usage data or usage data throughout the contract?

Q. Both.

A. My involvement was to educate the customer on the importance of it and the fact that it was due to the prime vendor. I would not, from my vantage point, actually make up any of the usage figures; that would not be my role, but I just would make sure that the customers were aware that it was a requirement and for them if they needed assistance in coming up with usage amounts, but just, I guess, generally to make sure that the customers knew that they were to provide usage

data.

Q. Was the usage data they were expected to provide historical usage data, projected usage data?

A. I believe their system had both, and they had the ability to select what they thought to be the truest number.

Q. Mr. Bandy -- you know Mr. Bandy, correct?

A. Yes.

Q. You have actually met Mr. Bandy on several occasions?

A. Yes.

Q. And he has indicated that the initial usage data was very inaccurate that they got from the medical treatment facilities.

Did you ever have any discussions with Mr. Bandy about that issue?

A. Yes, I believe that we did talk about the usage data.

Q. And what do you recall about the discussions concerning the -- his claim that the initial usage data was extremely

Anthony Amendolia

inaccurate?

A. Just that -- I mean, I remember thinking that the possibility was there that, I mean, for whatever means that our customers used to provide the usage data, that there probably were, you know, some spikes up or down, which made it difficult for them to provide the information, and it could be that some of them were inaccurate, but done to the best of their ability, if that helps.

Q. What does it mean, "Fill rate formula is demand accommodation"?

A. That I could only guess would be that the fill rate is a measure of how the prime vendor was accommodating the demand from the customers or how they were being measured on filling those demand orders.

(Exhibit 13 was marked for identification.)

BY MR. BROYLES:

Q. Exhibit 13 is a document that the government provided to us, and I want to direct your attention to the last line on Exhibit 13 where the statement is made, "Again

Anthony Amendolia

routine maintenance of this usage list is essential."

What is your understanding of routine maintenance of the usage list? How is routine maintenance of the usage list performed?

A. Well, I guess, especially back then, routine maintenance would have been a monthly review of the usage number that you submitted compared to what you have actually been ordering over the past month.

Q. Let me ask you this: Do you consider that routine maintenance of the usage list was essential?

A. Experience showed that when routine maintenance was performed and better communication was there, that fill rates were higher in my opinion.

Q. Did you get involved in the routine maintenance of usage data lists in the Lone Star region?

A. My involvement would have been -- again, I would not have been able to come up with any numbers or monthly usage figures for

Anthony Amendolia

a customer, that would be their job to do that, but my job would have been to intervene when -- just to remind the customer that they should, you know, look at their usage if maybe they were not performing that monthly review.

But also what we find is that having gone into a contract two or three or four months or by the time you're six months into a contract, the prime vendor does have their own monthly usage that they know the customer has ordered, and it's pretty reliable too.

Q. That's all based on historical sales?

A. Yes.

(Exhibit 14 was marked for identification.)

BY MR. BROYLES:

Q. I have handed you what the court reporter has marked as Exhibit 14, and it's been signed by a William E. Geesey.

Do you recognize or do you know William E. Geesey?

A. I remember William Geesey. I

Anthony Amendolia

believe he was at the Brooke Army Medical Center in, yep, Fort Sam Houston, BAMC.

Q. On Paragraph 4 on Page 1, he says, "Usage data provided to UMS was either inaccurate or not utilized."

Do you recall seeing this letter from -- do you recall seeing before Exhibit 14?

A. Yeah, I would have seen this I'm sure, and I believe I recall seeing it.

Q. He makes the basically accusation that from the user level, usage data was broken and is being manually fixed.

Did you get involved in determining, first, whether the usage data provided to United Medical was either inaccurate or not utilized?

A. Can you repeat?

Q. He makes the statement, "Usage data provided to UMS was either inaccurate or not utilized." This letter is dated August 1997, so just a few months after the effective date of the United Medical contract.

The question I am asking you is

Anthony Amendolia

whether you got involved in determining whether the usage data provided to United Medical from Brooke Army was -- whether that usage data was inaccurate or whether it was not utilized?

A. No, I wouldn't have been involved. For BAMC, they were a facility that, in my opinion, were very in tune to what they had to do and what they were required, and they would have worked this issue, maybe with some guidance, but not really asking for any specific help from us.

Q. He makes a statement on Page 2 in response to the question, "If fill rate is poor, do you know the cause?"

And he says, "Yes. The usage data supplied by DPSC to UMS was either inaccurate or UMS did not properly input the data."

Did you make any investigation to determine whether the usage data supplied by DPSC to UMS was inaccurate?

A. No, I didn't do any investigation.

Q. Now, when it says DPSC, there has

Anthony Amendolia

actually been a name change, correct?

A. Yes.

Q. So, as we're sitting here today, it's basically the same entity?

A. Yes.

Q. Was it the job of DPSC to provide usage data to UMS?

A. The job was for DSCP -- it was really -- the usage really was supposed to come from the customer, and we got involved when we thought we had to, maybe initially for initial estimates, but, again, they would have all been worked through customers.

We would never feel the responsibility of hanging a number on an item for a customer. We wouldn't do that.

Q. Did you see evidence that the usage that was initially given to United Medical was inaccurate?

A. I think it was the best we had at the time, and at the time we thought and we felt that it was perfectly accurate. I think it wasn't until later on that maybe we felt that there were some inconsistences with it.

Anthony Amendolia

(Exhibit 15 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has marked and handed you Exhibit 15.

Do you recognize Exhibit 15?

A. Yes.

Q. What is Exhibit 15?

A. Well, it looks like a trip report that I prepared as a result of a visit to William Beaumont Army Medical Center in Fort Bliss.

Q. You discuss how the killed items affected the fill rate.

How did the killed items affect the fill rate?

A. Let's see. Are we talking about the last paragraph?

Q. Yes. "In conclusion we found the killed items"?

A. Yes. Okay. What was the question?

Q. How did killed times affect the fill rate?

A. Well, in the calculation of our fill

Anthony Amendolia

rate, if an item was killed, it was a knock or a hit against the prime vendor and their ability to fill the order.

For example, if a customer ordered ten lines, and one of the lines was killed so they were only able to provide nine out of ten, that would have been a fill rate of 90 percent. So that one killed line would have been a hit against their fill rate.

(Exhibit 16 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you what's been marked Exhibit 16, which is an -- apparently you got involved in an issue regarding outstanding invoices.

Do you recall that?

A. Yes. There would be several instances of getting involved with invoices.

Q. Do you recall a period of time where there was what's been described as the failure of the mercator (ph.) translator?

A. I remember that happening, yes. I vaguely remember that happening.

Anthony Amendolia

Q. What do you recall about the failure of the mercator translator?

A. Just that there was a period of time where we had some issues with this translator, whether it was a server, I don't really remember what it was. I don't remember the time being very long, but I remember there being a time that there were issues with our mercator or whatever it was called, server, and just having to correct it. I don't remember it being a long period of time.

Q. Do you recall what the impact on the prime vendors were as a result of the failure of the mercator translator?

A. Well, I believe they weren't receiving payment at the time.

Q. Mr. Bandy's testimony is that nobody -- until this lawsuit was filed, he was totally unaware of this failure of the mercator translator issue.

Do you disagree with his testimony?

A. I'm not sure if he was told or not. I don't think I would have been the one to

Anthony Amendolia

tell him. I don't remember the details of why he wasn't told.

If it was something that I would have known -- but that would be something that we would share, you know, regularly with prime vendors, certainly if there is a problem. On either end, we would expect to share that information.

Q. Now, you indicated you wouldn't have been the one to tell him.

Who would you have expected to tell Mr. Bandy that there had been a failure in the payment process?

A. I would think the information would have come from the contracting side of the house, if they were aware sooner than I, because it did involve payment.

To me that is more like a contractual issue, but, like I say, at the time we worked in teams where we would -- I wouldn't have had any problem to call him either on this, but I really -- I am trying to remember the situation and what happened, and there wouldn't be any reason why we wouldn't

Anthony Amendolia

call him, that's for sure.

I don't remember how long of a period of time, if it was two weeks, three weeks, four weeks, six weeks; I don't think it was much longer than that. If we would have known something like that, if I would have known something like that beforehand, we would have definitely called to try to make sure that he was aware and that he knew what we were doing to correct the problem.

Q. But you have no recollection of you yourself discussing that with him?

A. No. No, I don't. You're right.

Q. Did anybody tell you back here at DSCP that the mercator failure right be responsible for putting United Medical out of business?

A. No, I don't remember that.

Q. You haven't seen the internal e-mails on that issue?

A. If I did see them, I don't remember. To me, the period of time when they weren't paid from that problem was kind of similar to their start-up invoicing issues, and as soon

Anthony Amendolia

as they got the contract, they were not able to send electronic invoices for a good month or so, and that took a while to get them paid from the very beginning. There was kind of a similar problem.

So, in my opinion, if they were able -- first month if they were able to do okay, then I would think that another month would probably be something similar and they would have been okay. I don't think it would have put them out of business. If I read that, I don't remember.

Q. If you would have read that, an internal e-mail that said that this could put United Medical out of business, you would have notified United Medical of the problem?

A. Yeah. I mean, there would be no reason why we would prevent them from having that.

(Exhibit 17 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you what's been marked as Exhibit 17.

Anthony Amendolia

Do you recognize Exhibit 17?

A. Well, it's an e-mail from me, yes. I would have to see what the story was about it.

Yes.

Q. So, reading Exhibit 17, has that refreshed your memory about what was going on on March 15, 2001 on this particular call number?

A. I remember -- yeah, I remember many details about this e-mail.

Q. What details do you remember?

A. Well, one of the customers, Holloman Air Force Base, placed an order. I think it was -- it was not a usual and typical order. It was an order that I believe they wanted to use for some type of WRM or War Reserve Material, because that would not be their usual purchases. They were a smaller Air Force base.

That order that they placed, I believe I remember having trouble getting them to process their receipt for the material that they received and the payment that was

Anthony Amendolia

supposed to go to United Medical. That wasn't a typical occurrence. That was an occurrence that was an unusual one that stood out. That's why we were giving it attention.

Q. You make the statement, "I still say United has the edge in proof."

What did you mean by that?

A. I think at the time it may have been that the different people at the Holloman Air Force base, because they rotate in and out, I may have been talking to the next person in line at Holloman who probably wasn't aware of the order, of the receipt, maybe had trouble finding records.

It was my understanding and my opinion that if United has their signed invoices that they have delivered the product, somehow Holloman was going to have to come up with the money to pay for it in this instance.

Q. You understand under the Lone Star United Medical contract that the option years were exercised three times?

A. Yes.

Q. And were you involved in determining

Anthony Amendolia

whether or not or helping to determine whether or not the government exercised those options?

A. I may have been asked some questions, I think, maybe theoretically, sent out some surveys to the customers to get feedback, but the exercising the options is a contracting function, and I don't really remember being too involved with -- other than maybe for some input generally about general type things, feedback from customers.

I would really not have too much of an impact on whether an option was exercised or not.

Q. You have used the phrase contracting side of the house.

What do you mean when you talk about contracting versus whatever side of the house you were on?

A. Well, even though at the time we were kind of multi-functional, in that no matter who you called, we can each get you an answer, perform a function. There was certainly a line drawn in the sand between people that were, like, customer or old supply

Anthony Amendolia

background people like myself or people who were in what we call the 1102 series or contracting series who were able to, first of all, be a contracting officer or have more of an impact and say on how a contract was maintained.

Q. So, in terms of where a contracting officer is trying to determine whether or not to exercise an option, you might be one source of input, but there might be a lot of other sources?

A. Yes.

Q. And then the contracting officer, as you understand it, would just have to make evaluation based on all the input he or she received?

A. Yes.

Q. Do you have special training in government contracting law or how did you get to be here?

A. Although not required, I have some training in taking contracting courses, took government law courses, but that was just because it was available. I figured it would

help. I figured I need to know that type of information, but not required at the time.

Q. What is your educational background?

A. Bachelor of Science in business administration from LaSalle University.

Q. Is that a pretty typical type degree for somebody in your position, business administration type?

A. I would say, but it could be that there is less, it could be that there is more, it could be other than business people.

Q. When did you get your Bachelor of Science degree from LaSalle?

A. 1981.

Q. Did you come to work for DSCP right after college?

A. Shortly after, yes.

(Exhibit 18 was marked for identification.)

BY MR. BROYLES:

Q. Do you recognize Exhibit 18?

A. Well, I recognize it being an e-mail string. Just give me a second to read it.

Q. I am really focusing on the

attachments to the e-mail more than the e-mail itself.

A. Okay.

Q. So the attachments to the e-mail, do you recognize those?

A. Yes. I mean, I have to say that apparently Greg or Linda had this type of a -- had this information in a database based on surveys, I would imagine, customer surveys that were sent out; I don't know how regular.

It may have been after Greg Wentzel left, but maybe this was not maintained, but I understand what everything is and I recognize it, yes.

Q. Is that something that you would have used in your businesses of working with the medical treatment facilities and the prime vendor?

A. It would be something that I would keep track of, especially if I have asked for customer surveys and feedback, and I would have had to capture that information, and definitely for the Lone Star region, put down whether a customer was satisfied or not

Anthony Amendolia

satisfied or whatever category they fit in.

Q. Now, whether a customer was satisfied or not satisfied, is it your understanding that the relationship between the customer and the prime vendor would have a significant impact on whether the customer was satisfied or not satisfied?

A. Most definitely. A poor fill rate would be overshadowed by great communication and customer service, and even though fill rate may be less than contractual, a customer could have said that they were satisfied. So, yes.

(Exhibit 19 was marked for identification.)

BY MR. BROYLES:

Q. You have been handed what has been marked as Exhibit 19. One of the issues that's come up in this case is what's been referred to as the multiple invoicing process of United Medical.

Are you familiar with that?

A. Right. Yes.

Q. And in the middle of Exhibit 19 is a

Anthony Amendolia

summary description of what DSCP determined was United Medical's invoicing process.

Do you recall being involved in making that determination or that investigation of how the invoicing was actually done?

A. I don't think that I would have been involved. It would have been more Donna Galligan's group or Donna Galligan to really get into the details of any type of multiple invoicing issue.

Q. Now, is Donna Galligan somebody you would consider is in the contracting side of the house?

A. No.

Q. What's her side of the house?

A. Her role was to get the bills paid. She was on the invoicing comptroller side of the house.

Q. Ms. Galligan has indicated to us that at least in 2003, DSCP had a little over $37,000 of funds that had been provided by the military treatment facilities to DSCP for payment to United Medical.

Anthony Amendolia

Do you know anything about that $37,000?

A. Not really. At any point in time there could have been money available from our treatment facilities to United Medical. I mean, what would happen is if the customer placed an order and the customer received their order, they would process a receipt, which would allow payment.

When their receipt hit our system -- everything was electronic, where once their receipt hit our system, that entry stayed -- actually, the invoice most likely would get there first because when United Medical, the day delivery went out the door, we would get an invoice saying this is what was ordered, here is your bill for what this customer ordered. When the customer processed the receipt, theoretically they should match, and that payment goes electronically.

Now, the only thing I would imagine why Donna Galligan would say that there would be money available from the customers for United Medical would be if that

Anthony Amendolia

receipt was processed and there was no electronic invoice to, you know, actually finalize that electronic payment process.

So there would be times when, for whatever reason, we would not receive an invoice into our system and we would have to ask them to resend the electronic, the 810 transaction, to get that payment going. So there would be communication regularly on the fact that we had money available or not.

Q. Do you have an understanding of why an invoice could be send by United Medical but not received by DSCP?

A. Well, I mean, I experienced a couple of different examples where they said they sent -- United Medical sent their electronic invoice and we had no -- it was almost like they did not send it, and there were times they sent it and on our end somehow, you know, we saw them, but it didn't get into our system.

So I can't say we never received any of them and I can't say every time we received them but couldn't do anything

Anthony Amendolia

with them we had to ask them to resend. So it varied as to why we would not receive their electronic invoice. It could have been a couple of different things.

Q. Did you experience times where United Medical sent the invoice that was received by DSCP and the customer had actually received the medical supplies, but for some reason the customer hadn't authorized payment to United Medical?

A. For the full amount of the invoice?

Q. Full or partial.

A. There were times where the invoice and the receipt did not match, and that would be where Donna Galligan's group, they would -- and I would get involved on a limited basis -- but if the invoice and that receipt did not match, we would pay the lowest amount.

So if the invoice was for a thousand dollars but the customer said they only received $800 worth of material, we would pay $800. Then United would come back to us and say, "What happened to the $200," and then that's when Donna Galligan's group would call

Anthony Amendolia

a customer, ask them for their receipt, and call United and ask them for their invoice, hard copy signed, and that's when the process of comparing what was actually received to what was actually invoiced.

Q. Do you recall any times where the customer just simply overlooked authorizing payment or for some reason -- did it authorize payment electronically? Was that the process?

A. No. The customer actually had to process a receipt for that payment to go electronically, but Donna Galligan's group would receive reports -- if after five days they had no receipt and they had an invoice, it was Donna Galligan's group's responsibility to contact the customers and get them to process that receipt.

Q. Did that happen fairly regularly do you know?

A. All the time, yes.

(Exhibit 20 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you

Anthony Amendolia

what she marked as Exhibit 20, which has got a footer on it of Gen II Transition, Plan B.

Do you know what that document is?

A. It looks like a transition schedule for when we changed prime vendors or awarded new contracts.

Q. On Page 2 a little below, half way down, first column, your name appears, and then Lone Star.

Do you see that?

A. Yes.

Q. And then you go over about three-quarters of the way, there is a column that says SLEF?

A. Right.

Q. What does that stand for?

A. That's our SLEF, which we called -- it was a Service Level Election Form.

Q. Which is what?

A. The prime vendor contracts allowed for a basic distribution fee. Naturally the contract that was awarded was only for distribution. The prices to the items were

Anthony Amendolia

actually outside of the contract in separate instruments.

The distribution fee, the fee that the prime vendor charged us or the customers to deliver those products, was a basic price, basic percentage in the contract; that SLEF, Service Level Election Form, would give the customer an opportunity to add service and increase the distribution fee or, I guess, in some cases take away service, which may decrease that distribution fee.

Q. On the Lone Star Fort Huachuca, it has December 8th of 2000 under SLEF.

Do you recall that SLEF?

A. Well, no. I mean, no, I don't remember the actual SLEF. I would have to take a look at it.

Q. Then there is -- the column to the left of the SLEF is something called Annual Sales.

Do you know what the Annual Sales, the particular year those represent?

A. No. I mean, it would be a guess. I think this was -- I don't remember if this was

Anthony Amendolia

prepared by someone here or by Steve Hasting, who was the systems guy or what we call DMLSS, Defense Medical Logistics something or other.

Q. Did you get involved in preparing estimates of sales for the solicitation in Generation I prime vendor program?

A. No.

Q. Do you know the process by which that was done?

A. I believe I understand the process, which my understanding of it was for the DSCP to go to each service rep, one for the Army, Air Force, Navy, and to ask them what an estimate from each of their facilities would be.

So we would go to the three service reps, they would go out to their customers or to their systems people, wherever they may have got the information from. I would imagine they went into budgetary type of information to pluck out a number for what was purchased as on a yearly basis, the prior year, and those service reps would then gather that information, list each customer

Anthony Amendolia

separately, based on what I'm assuming is budgetary information, and send it back to our contracting people, and they would put it the solicitation; that's my understanding of it.

(Exhibit 21 was marked for identification.)

BY MR. BROYLES:

Q. The court reporter has handed you an e-mail from Donna Galligan, dated June 4, 2001, that says -- she is writing to Megan, who was an employee of United Medical. It says, "As of today, I do not see any invoices coming in electronically from United."

Do you recall a period of time in 2001 where DSCP was not receiving electronic invoices from United?

A. No specific long-term issue about not receiving invoices. Like I said before, there were times when we may not have had them hit our system for a reason that we would have had to have determined.

Q. Did you ever have any discussions yourself with Bud Wellets (ph.) about the electronic invoicing process with United

Anthony Amendolia

Medical?

A. No. I would not be someone to talk to Bud. Bud was in our comptroller shop, and that would be more of something that Donna would handle with Bud.

Q. The bottom e-mail talks about two men named Steve Hasting and Jordan Henderson.

Do you know those two people?

A. I know Steve Hasting. I don't -- I didn't get too involved with anyone at DAASC, that's what we used to call -- I don't even remember what that stands for. I don't know Jordan, but I do know Steve, yes.

Q. Do you know where Steve Hasting is today?

A. No.

MR. BROYLES: Kyle, give me a couple minutes. I might be done.

MR. CHADWICK: Okay.

(Break held off the record.)

BY MR. BROYLES:

Q. Mr. Amendolia, were you the only case manager on the United Medical prime vendor contract?

Anthony Amendolia

A. Yes.

Q. So beginning in early to mid-1997 through April of 2001, you were the guy?

A. Yes.

Q. And how would you describe the case manager's responsibilities with respect to a prime vendor contract?

A. As a case manager, we were to implement -- help the customer and -- to help the customer and the prime vendor to implement the contract, and just be able to have any help that we can with the customers to make sure that contract continues as planned, as it's supposed to.

Q. Did you and Mr. Bandy have any discussions about the reasons that the actual purchases from United Medical were so much less than the estimates?

A. I'm sure that I probably talked to him about that subject, yes.

Q. And do you recall a discussion with Mr. Bandy where you indicated that DSCP did not have the ability to stop the use of credit cards by people who were purchasing with

Anthony Amendolia

credit cards?

A. That probably came up. I don't know what context it would have come up. Like I said, I think before I mentioned where there were some legitimate reasons why they would use credit cards, and there could have been some reasons where they may have had to buy an item that was on DAPA.

You know, would we be able to stop either way? We sent out reminders, if I can remember, from time to time reminding them that the contract was the requirements contract and that they were to buy all of their items through the contract that were on DAPA.

Q. And did these reminders go out to the individual credit card holders?

A. No. They probably went to logistics.

Q. Did you ever anticipate that 100 percent of all medical and surgical items would be purchased through the prime vendor program?

A. I never believed, nor I think we

Anthony Amendolia

believed as an organization that there would be 100 percent of the items being purchased through the program, but, you know, that was our goal.

I think when we reached 80 percent or somewhere in that area that we would feel pretty satisfied about that number, but it's not to say we would stop. To be honest, 100 percent was probably not reasonable.

Q. Do you know today what percent of the medical/surgical products are being purchased under the prime vendor program?

A. No. It would be a guess if I was to say what it was today because I have been removed from about February. 70 percent probably would be a good guess.

Q. When you changed jobs in February, what regions were you responsible for as a case manager immediately prior to your change of jobs?

A. Immediately before I moved to a new job, I believe there were only two case managers. So I had several regions, and my

role changed somewhat along with that.

So I probably -- I had Lone Star region -- well, Region 6, Region 5, Region 1, 2, 3, and 4. I think I had all one side of the country because there was only two of us before I left.

Q. And did you have an understanding at the time you left as to what percentage of the medical/surgical supplies were being provided under the prime vendor program?

A. No. I really didn't track that or that wasn't one of my metrics or anything that I looked at real closely. Like I said, I have seen numbers that would indicate that, you know, 70 percent was something that -- the Army used to keep track of that better than we did on how well their own Army customers were utilizing the prime vendor program.

Q. Are you aware that DSCP puts out an annual report?

A. Yes.

Q. Do you read that annual report?

A. I page through it.

MR. BROYLES: I pass the

witness.

MR. CHADWICK: I guess I have no questions.

(Witness was excused.)

(Deposition concluded at 10:30 a.m.)

I have read the foregoing transcript of my deposition given on September 21, 2007, and it is true, correct and complete, to the best of my knowledge, recollection and belief, except for the corrections noted hereon and/or list of corrections, if any, attached on a separate sheet herewith.

_____________________

Anthony Amendolia

Subscribed and sworn to before me this ____ day of ___________, 20__

_________________________

Notary Public

C E R T I F I C A T E

I HEREBY CERTIFY that the proceedings, evidence and objections are contained fully and accurately in the stenographic notes taken by me upon the deposition of ANTHONY AMENDOLIA, taken on September 21, 2007, and that this is a true and correct transcript of same.

_____________________________

Jessica Haddix, Registered
Professional Reporter and
Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)