# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>v.<br><br>THE UNITED STATES, Defendant | MAIN CASE NO: 03-CV-289<br>Consolidated case no: 07-cv-187<br>Judge Allegra |

## SECOND AMENDED COMPLAINT

TO THE HONORABLE COURT:

Plaintiff, United Medical Supply Company, Inc., files this its Second Amended Complaint against the United States (generally referenced as "the Government") arising out of the Government's breaches of contract.

United Medical seeks a judgment awarding it damages and/or equitable adjustments to the price for the Government's breaches of Contract Number SP0200-97-D-7133 and 7134 (referenced in this Complaint as "the Contract" or "Contract").

## JURISDICTION

1. This Court has jurisdiction of this case as a direct appeal of adverse decisions of a contracting officer pursuant Section 10(a)(1) of the Contract Disputes Act.

2. The Contract at issue was a one-year contract with four one-year renewal options in favor of the Government. It was first effective June 1, 1997. The Government exercised 3 of the renewal options, and the Contract terminated on or about May 31, 2001.

3. An initial certified, claim for equitable adjustment of the Contract Price based on diversion of purchases and orders, failure to timely pay invoices in accordance with contract terms, failure to honor stock commitments, breach of duty of good faith, and negligent estimation was filed with the Contracting Officer, Ms. Linda Flatley, on or about June 28, 2002.

4. The claim was denied on August 22, 2002.

5. A subsequent, uncertified claim for $100,000.00 for outstanding account receivable owed by the Government to United Medical was filed with contracting officer James Jennings on December 18, 2006.

6. The second claim was deemed denied by operation of law sixty days after it was filed.

7. United Medical has exhausted all required administrative remedies including two requests to the Contracting Officer for use of ADR. Until this lawsuit was filed, the Government denied Plaintiff's ADR requests.

8. United Medical has discharged its obligations under the Contract either by performance or by legal excuse. When the Government renewed the Contract three (3) times, it concluded that United Medical had performed its obligations under the Contract. (Exhibit A attached).

9. This case was originally filed with the United States Bankruptcy Court for the Northern District of Texas on or about September 5, 2002.

10. The Bankruptcy Court, on motion filed by the Government, transferred this case to this Court.

11. This Court granted summary judgment against United Medical on its claim for failure to honor stock commitments.

12. Subsequent to the filing of United Medical's First Amended Complaint, significant discovery has occurred with respect to United Medical's remaining claims.

13. Accordingly, this Second Amended Complaint is based on United Medical's claims filed with the contracting officer for breach by negligent estimation, breach by diversion, breach by failure to timely pay accounts payable to United Medical, breach by failure to pay certain accounts receivable at all, and breach of the Government's duty of good faith, including its implied duty to not hinder or delay performance by United Medical.

## STANDARD OF REVIEW

14. Trial before this court is *de novo* and there is no presumptive validity to the decision of the Contracting Officer who denied United Medical's claim. Contract Disputes Act, §§6(a) and 10(a)(3). *Assurance Co. v. U.S.*, 813 F.2d 1202 (Fed. Cir. 1987).

## PARTIES

15. Plaintiff United Medical Supply Company, Inc. is (and at all relevant times was) a "small business" corporation chartered under the laws of the State of Texas with its headquarters in Fort Worth, Texas.

16. Until 2001, United Medical enjoyed a reputation in the medical supply community as an industry leader in the medical supply business.

17. As recently as September 2000, United Medical was independently rated the best regional distributor of medical supplies in the United States and fourth best overall distributor out of the 567 distributors evaluated. Its 96.84 rating was higher than any national or other regional distributor. Only three local distributors had higher ratings.

18. United Medical is now operating as a reorganized debtor under a confirmed "Chapter 11 liquidating plan."

19. Defendant is the United States. It has appeared in this case through DOJ counsel and is typically referenced in this pleading as the Government. It also appeared in the general Chapter 11 case filed by United Medical, but did not file a proof of claim or otherwise make any claim against United Medical.

## CLAIMS

20. United Medical seeks an equitable adjustment and damages award based on the Government's breaches described herein. To some extent the claims are additive and to some extent they are duplicative. To the extent that the claims are duplicative, United Medical pleads such claims in the alternative and requests a judgment that awards United Medical the maximum dollar amount to which it may be entitled.

## CLAIM 1
## DIVERSION OF PURCHASES AND ORDERS

21. United Medical seeks judgment against the United States for lost profits resulting from DAPA item purchases by MTFs from third parties that should

have been made from United Medical under the requirements contract at issue ("the Contract").

**The Contract**

22. The Contract was a requirements contract covering certain types of medical supplies and hand held surgical instruments.

23. The Contract was part of the Defense Supply Center Philadelphia ("DSCP") Prime Vendor Program.

24. The Contract required various medical related facilities in Texas, New Mexico, Oklahoma and Fort Huachuca, Arizona to purchase a broad range of medical supplies and equipment from United Medical. The facilities are commonly called Medical Treatment Facilities ("MTFs"), although a few did not actually treat patients. The geographic region was named the Lone Star Region.

25. The two largest Lone Star MTFs in terms of dollars of medical products used were located at Fort Bliss in El Paso Texas (William Beaumont Hospital) and Fort Sam Houston in San Antonio Texas (Brooke Army Medical Center or "BAMC").

26. There were a number of DSCP prime vendor contracts other than the Contract. These were based on geographic location and types of medical products covered by the particular contract.

27. The Contract was the second prime vendor contract for the Lone Star Region and is part of what the Government commonly called its GEN I Prime Vendor Program.

28. The previous prime vendor contract for essentially the same area and types of products was between the Government and a distributor then known as Owens & Minor. The Government sometimes called this the GEN 0 Prime Vendor Program.

29. Under the Contract, the various medical facilities subject to the contract were required to order all of the medical products described in the Contract, with minor exception, from United Medical.

**The Types of Medical Products Subject to the Requirements Contract.**

30. The medical products the Government was required to order and purchase from United Medical were all of the MTFs' requirements for, "consumable and disposable medical/surgical products and hand-held surgical instruments" subject to Distribution and Pricing Agreements ("DAPAs").

31. The products covered by the Contract were typically called, "DAPA items."

32. DSCP did not consider DAPAs contracts.

33. At any given time there were over one-hundred thousand DAPA items in the DAPA catalogue, but only a small fraction of those items were actually used in any appreciable quantity by the MTFs.

**DAPAs.**

34. DAPAs were informal agreements between the Government and manufacturers and distributors that fixed the maximum amount that the Government could be charged for a given DAPA item.

35. These manufacturers and distributors were typically called, "DAPA Holders."

36. The DAPA catalogue was constantly changing for a variety of reasons. One type of DAPA item would be replaced with another. One DAPA Holder might be acquired or merged with another DAPA Holder. New products were routinely added or deleted from the DAPA database by the DAPA Holder.

37. In contrast to the representation made in the Solicitation, DAPA Holders were not required by the DAPA Agreement to do business with United Medical, and some refused to do so.

38. Another problem encountered with the DAPA concept was that product numbers would change, even though the product itself did not change.

39. Some DAPA Holders did not maintain product liability insurance, which prevented United Medical from selling their products under the Prime Vendor contract.

40. Notwithstanding problems with the DAPA concept and the misrepresentation by the Government about the binding nature of the Distribution and Pricing Agreements, United Medical obtained agreements to

distribute virtually all DAPA products that were actually used by the various Military Medical Treatment Facilities ("MTFs") in the Lone Star Region.

**Usage Data for DAPA items.**

41. United Medical was a distributor. It would purchase product from the various DAPA Holders for its inventory and then ship to the MTFs as the product was ordered.

42. The Prime Vendor Program was an inventory management program. The Government wanted the prime vendors such as United Medical to inventory those products the Government used, but not over inventory since over-inventory would increase costs and defeat the purpose of the Prime Vendor programs.

43. To accomplish this inventory management goal, the MTFs were required to provide United Medical with usage data for the "consumable and disposable medical/surgical products and hand-held surgical instruments" historically used by the MTF.

44. The obligation to provide usage data was a continuing obligation. The Government was required to provide the data before the effective date of the Contract and periodically thereafter.

45. United Medical was only required to stock items for which it had current usage data.

46. The parties agree that accurate usage data was essential to make the program work.

47. United Medical's had three types of delivery obligations: just-in-time ("JIT"), extended delivery ("EDO") and emergency. JIT was a 24 hour obligation, EDO was a ten-day obligation.

48. When an MTF had not provided United Medical with current usage data for a given DAPA item, it was expected that the item would be ordered by and EDO, not JIT.

49. The MTFs were never able to provide United Medical with accurate usage data and routinely placed JIT orders for products for which no current usage data was available.

50. In an attempt to build a reliable usage data database during the Contract term, United Medical relied on its historical sales to the Lone Star MTFs.

51. United Medical did not have any usage data for purchases made by an MTF from other sources during the contract period.

**Estimation of Diverted Purchases**

52. A diverted purchase is a purchase that the Government was contractually required to purchase from United Medical but which was made from some other party.

53. There were a variety of reasons that purchases were made from third parties that should have been made from United Medical. These include orders

placed as JIT order when they should have been placed as EDO orders because usage data was either not provided or stale. Primarily though, diversions occurred because individuals purchased DAPA items from third parties *via* alternative purchase methods either because of convenience or ignorance of the Contract's requirements.

54. It is not practical to attempt to identify each diversion transaction and that an estimate of the dollar amount of the diversions must be made.

**Estimation of Maximum Diverted Purchases**

55. In October 2002, United Medical served the following interrogatory number 7 on Defendant,

> 7. For each participating MTF, identify the MTF and state, for each contract year, the dollar amount of diverted purchases made by that MTF for that contract year during the term of the contract between the Government and United Medical. The term "diverted purchases" as used in this interrogatory means purchases made by the MTF from third parties which it contractually was required to first order from United Medical but did not.

56. Initially the Government responded that it was not aware of any diverted purchases.

57. The Government amended its answer on July 5, 2006 and estimated maximum diverted purchases of $44,242,718.66

58. In its amended response, the Government claimed that reductions from its estimated maximum dollar amount of diverted purchases should be made for purposes of awarding damages.

59. In calculating its $44 million estimate, the Government, claimed,

> We [the Government] cannot provide a definitive answer, because the purchasing records currently known to be available do not reflect quantities, or dollar values, of individual items purchased. Absent detailed records concerning individual items, it is impossible to determine, among other things, whether an item was subject to a DAPA, or available from Plaintiff, at the time of purchase….
>
> [but] we can derive various estimates of the dollar values of covered items purchased by each MTF from third parties, applying a range of assumptions.

60. The Government, however, did not make those various estimates notwithstanding its statement that it could make the estimates and a Court order directing it to make those estimates. It simply made a qualified estimate of maximum diverted purchased based on the assumptions it described.

61. The qualification added to its $44 million estimate was,

> The estimates below can (and should, for purposes of assigning damages) be reduced <u>pro</u> <u>rata</u> by inserting more reasonable assumptions concerning (i) the proportion of items with SIC code 5047 which were scheduled supplies under plaintiff's prime vendor contract and (ii) the missing 1998 data.

62. The Government's maximum estimate was based on flawed assumptions.

63. The Government's estimate was based on the incorrect assumption that all diversions were OIG recorded credit card purchase identified by standard industry code (SIC) of 5047.

64. The Government's assumption that all diversions were made by OIG recorded credit card purchases and coded 5047 is incorrect.

65. Documents produced by the Government evidence that not all diverted purchases were recorded in the OIG data and most purchases of diverted products were not SIC coded 5047.

66. The Government also omitted significant time-periods for at least two MTFs from its estimate.

**Appropriate Reductions from Estimated Maximum Diversions.**

67. United Medical agrees that certain reductions from estimated maximum diversions are required as part of the damages calculation.

68. A reasonable reduction should be made to account for purchased items that were not subject to the contract.

69. A reasonable reduction should be made to account for DAPA items purchased by the MTFs that would not have been filled by United Medical unless the Government was the cause of such orders not being fulfilled.

70. United Medical disagrees with the Government, however, that a reduction should be made based on whether the DAPA product purchased was or was not in United Medical's inventory on the date of purchase. United Medical's inventory was based on usage data, and the primary source of usage data was United Medical's historical sales to the Government. Usage data for diverted purchases was not provided to United Medical. Moreover, the OIG data does not distinguish between JIT orders and EDO orders. Even if a diverted order had been placed with United Medical, the fact that United

Medical might not have that item in stock when the order was received is not determinative of whether United Medical could or could not have filled the order.

**Damages for Diverted Orders**

71. United Medical suffered lost profits as a result of the diversion of orders and purchases by the Government.

72. United Medical requests an award of damages consisting of profits it lost due to diverted purchases by the Government, or, if the Court does not award United Medical its lost profits, an equitable adjustment to the Contract Price.

**CLAIM 2**
**NEGLIGENT ESTIMATION**

73. As part of its Solicitation, the Government was required to estimate the volume of orders that would be placed against the Contract.

74. The Government had an obligation to exercise ordinary care in making its estimate.

75. The duty to exercise ordinary care in making estimates, includes a duty to update estimates based on newly acquired information.

76. A breach of the duty to exercise ordinary care is a breach of contract.

77. The Government did not exercise ordinary care in making the estimate.

78. Indeed, documents and testimony obtained during discovery evidence such a cavalier attitude to support a finding that the Government's estimates were

made in bad faith and exaggerated for the purpose of obtaining reduced bids by prospective prime vendors.

79. The Government expected United Medical to rely on the Government's estimates, and United Medical did rely on the Government's estimates to the detriment of United Medical. Indeed, the Government admitted that if its estimates would have been significantly lower, United Medical would have substantially increased its bid percentage.

80. The Award, No. SP0200-97-D-7133 dated January 30, 1997, estimated the value of the Contract over a five-year period at $272,268,214.00 with a first-year value of $30,177,346.00. These estimates were directly based on the estimates the various MTFs and service branches provided to DSCP.

81. Various Solicitation documents made estimates of purchases similar in magnitude to the Contract Value stated in the award.

82. The Government repeatedly represented to United Medical that the estimates were based on historical purchases of the types of medical/surgical covered by the proposed contract.

83. The purchase estimates were based on a DSCP internal one-page document prepared by DSCP no later than November 6, 1995.

84. The estimates provided to United Medical were negligent for many reasons, among them being:

a. The November 1995 estimates were for purchases of all medical supplies, not just Government's estimates of orders it would place against the Contract;

b. By November 1995, the Government had sufficient experience under the GEN 0 Prime Vendor program with prime vendor Owens & Minor to know that the November 6, 1995 one-page estimate did not even come close to representing a reasonable volume of purchases under the Contract, but chose to ignore that data;

c. The Government made no meaningful attempt to confirm the accuracy of the estimates between November 6, 1995 and January 30, 1997;

d. DSCP's 1995 and 1996 internal reports summarizing purchase volumes of different types of medical supplies and sources of those purchases significantly differs from both the November 6, 1995 DSCP internal estimate and Solicitation estimates; and

e. By January 30, 1997, the Government had sufficient experience with other GEN 0 and GEN I prime vendor contracts to know that its estimating methodology was seriously flawed.

**Damages for Negligent Estimation**

85. The appropriate measure of damages under current case law is an award of unabsorbed overhead, either as a damage award or equitable adjustment to the Contract Price.

86. The unabsorbed overhead calculation must be based on the difference between the negligent estimate and a non-negligent estimate, not on actual purchases unless those happen to represent a non-negligent estimate.

87. United Medical suffered unabsorbed overhead damages as a result of the Government's breach of contract by negligent estimation.

88. For the Government's negligent estimation, United Medical seeks recovery as a damage award, or alternatively, an equitable adjustment to the Contract Price, an amount equal to its unabsorbed overhead, but only to the extent that such award is not duplicative of any award made for diversion.

**CLAIM 3**
**ACCOUNT CLAIM**

89. The Government ordered, received and accepted products provided by United Medical for which it has not paid and which are due and owing.

90. The Government's refusal to even acknowledge the validity of the claim has been made in bad faith.

91. DSCP recently admitted that it holds approximately $40,000 of funds received from the various MTFs for purchases made from United Medical.

92. DSCP would not provide the reasons that those funds have not been turned over to United Medical, but the documents obtained evidence that the purpose in withholding the funds was to obtain settlement leverage over United Medical.

93. The Government repeatedly, and falsely, insisted that it could not investigate United Medical's claim for outstanding account balances unless United Medical could identify the Government's call numbers with United Medical's invoice numbers, even though United Medical could (and did) provide a list of the Government's call numbers for which it showed a balance outstanding.

94. United Medical's account records maintained in the ordinary course of its business evidence that it is owed over $180,000.00 plus interest.

95. Because United Medical had to submit an uncertified claim on the account, the claim it actually submitted to the contracting officer, James Jennings, was limited to $100,000.00.

96. For the reasons discussed below in its breach of duty of good faith, particularly the segment dealing with the failure of the Mercator Translator, United Medical's records are more reliable than the Government's records, if any, that form the basis for any claim that it does not owe United Medical at least $100,000 plus CDA interest.

97. United Medical requests that the Court award it contract damages of $100,000.00 plus CDA interest on its outstanding account claim.

## CLAIM 4
## BREACH OF DUTY OF GOOD FAITH

98. Under the Contract, the Government owed United Medical a duty of good faith, including a duty not to hinder or delay Contract performance by United Medical.

99. The Government breached that duty in several respects as described below.

**The Mercator Translator Problem**

100. In early 1999 the Government elected to install an electronic component in its invoice payment system known as a Mercator Translator.

101. The Mercator Translator's function was to translate the language from a sending computer into the language of the receiving computer so that contractor invoices submitted electronically could be processed and paid.

102. That function previously had been performed, satisfactorily, by another brand of translator.

103. Almost from day one the translator did not work. The result was a tragic backlog of invoice payments to various contractors, including United Medical.

104. During early discovery in this case, United Medical discovered a series of internal "crisis" DSCP emails, including emails predicting the demise of United Medical as a result of the failure of the Mercator Translator. Ms. Sara Bird, in an internal July 1, 1999 DSCP email, wrote to John Boyle,

> Jack, We certainly appreciate the extraordinary efforts Bud Wellens and your office have made to shore up our failing electronic invoicing system. Perhaps after today, we will get the attention from the IT folks that we all have been demanding. As you personally may not be aware, United Medical is a small, minority owned distributor. We can't afford the adverse publicity nor the deterioration of service to our Texas customers if they are unable to pay their bills and are cut off from their suppliers. Their cash flow is very tight. If you can help get them the money they are owed, we'd be grateful…. We have

> established a reputation for reliability in paying our bills. Our low distribution fees are for the most part dependent on cash management. These problems have set us back with the industry. I suppose we can call it the first casualty of Y2K.

105. Notwithstanding the terrible problem being experienced by DSCP, it decided either affirmatively or simply by default not to notify United Medical of the problem. Rather, it kept telling United Medical that it must not be submitting its invoice payments in the proper electronic format.

106. Several of the DSCP internal emails describe an effort by some DSCP personnel to hand-pay United Medical, but a final election by DSCP not to do that because it had bigger fish to fry.

107. Until November 2007, the Government took the position that the Mercator Translator problem was short and temporary. That was not the case and the Government had no basis for that position.

108. Approximately one-year after the failure of the Mercator Translator became an issue, DSCP contacted Mr. Ralph Colavita to fix the problem, primarily because of his expertise with the Mercator Translator in another area of the Department of Logistics.

109. Mr. Colavita substantially solved the problem around the summer of 2000.

110. Throughout the period in which the Mercator Translator failure was an issue, the Government:

    a. Never notified United Medical of the problem;

b. Kept ordering products from United Medical at the rate of approximately $45,000 per day with knowledge that United Medical was in a financial crisis caused by the failure of the Government to honor its payment obligations and with knowledge that it was reasonably probable that the Government would not timely pay for the products it kept ordering;

c. Never notified the MTFs of the problem;

d. Never notified United Medical's secured lender, CIT Credit Finance, Inc., of the problem so that it might make lending concessions to United Medical;

e. Kept advising United Medical that the problem was with United Medical's invoicing system; and

f. Kept instructing United Medical to resend its invoices even though the Government knew that the invoices were being resent into the same defective system.

111. The Government admits that it should have notified United Medical of the problem, but cannot provide any reason for its failure to provide the notification.

**The Account Receivable Mess**

112. The Government's failure to pay United Medical's outstanding account receivable is not simply a typical dispute over whether funds are owed or not owed.

113. The Government has known since before this lawsuit was filed that various MTFs had forwarded funds to DSCP as payments due United Medical for products purchased by those MTFs.

114. The Government has known since before this lawsuit was filed that many of its payment related records had been destroyed by the failure of the Mercator Translator.

115. Notwithstanding the Government's knowledge about the problems it had caused and was causing, the Government elected to attempt to leverage the account receivable by putting United Medical in a duress situation.

116. A DSCP internal email of January 18, 2001 from Steven McManus to John Cuorato paints the picture. The issue is whether DSCP should pay United Medical $284,000 owed on account. The response was,

> I think in the end we will have to give him the money, but I would like to make sure we get our money's worth.

**The Usage Data Issue**

117. Successful inventory management under the Prime Vendor Program required complete and accurate Usage Data.

118. Plaintiff never received complete and accurate Usage Data from the ordering facilities, and advised the Government of this problem on numerous occasions.

119. The term "Usage Data" was defined under the Contract as "items with associated quantities, designated by the ordering facility as those that will [be] ordered under the Prime Vendor program."

120. Each ordering facility had two basic obligations to provide Usage Data.

121. First, it had to provide Usage Data to Plaintiff during the transition period between Contract award and the June 1, 1997 effective date. Specifically, the each facility was supposed to provide the Usage Data within ten days of Contract award.

122. Second, each ordering facility had to periodically provide Usage Data during the term of the Contract for items that it desired to order unless that item had been purchased in the same or greater quantities during the 45-day period immediately before the month in which the item was being ordered.

123. The Government breached its obligation to provide Usage Data during both the transition period and the Contract period.

124. The failure by the Government to provide usage data to United Medical was the subject of DSCP internal correspondence and debate.

125. On July 16, 1997, Glenn T. Chenoweth, then Chief, Programs and Contract Integrity Division with the DPSC, wrote an internal memorandum requesting a "fairness" Contract modification for United Medical. His primary justification for that was his acknowledgement that the Contract required the Government to provide Usage Data within ten days of Contract award and

that the Government wholly failed to do this. He goes on to state that the lack of Usage Data was going to impair Plaintiff's ability to perform.

126. On August 27, 1997 Michael Schmitt, DPSC Project Manager for the Lone Star Region responded to Mr. Chenoweth's request. Mr. Schmitt concluded that the Government had failed to provide Usage Data to Plaintiff in accordance with the Contract requirements, but that the Usage Data was so flawed that providing it might have created more problems than it solved. He also stated,

> [M]any of the contractual problems arising in the Lone Star region since December 2, 1994 were 95% caused by the Government's failure to act, provide information, or the MTF's failure to embrace the Prime Vendor concept. But, Mr. Schmitt opposed the Contract modification for Plaintiff proposed by Mr. Chenoweth because "there is nothing founded in any type of Government contracting law that requires "the interest of fair treatment of all parties concerned."

127. United Medical did not receive the Contract modification requested by Mr. Chenoweth.

128. On August 6, 1997 Brooke Army Medical Center, one of the ordering facilities in the Lone Star Region, concluded that bad Usage Data was severely impacting fill rates and that the Usage Data was "broken" and needed a manual fix.

129. Ms. Linda Flatley warned DPSC personnel that it was subject to a claim if complete and accurate Usage Data was not provided because the prime vendors did not bid expecting to have to work with piecemeal data.

130. Much of Plaintiff's efforts throughout the period beginning January 30, 1997 through March 2001 were spent trying to create reliable usage information for the ordering facilities in the Lone Star Region, efforts that increased the cost of performance and efforts that Plaintiff had planned on using to otherwise perform its Contract obligations.

**Request for Damages or Equitable Adjustment for the Government's Breach of Duty of Good Faith including Duty not to Hinder or Delay performance.**

131. For the breaches of duty of good faith including the duty not to hinder or delay contractor performance United Medical requests an award of damages, or in the alternative, an equitable adjustment to the Contract Price to the extent that such an award is not duplicative of any sums awarded under Claims 1, 2 and 3.

132. Plaintiff's request includes an award of lost profits and damages to reputation caused by the Government's breach of the implied duties described above.

**INCORPORATED AND ATTACHED APPENDICES**

133. Plaintiff attached to and incorporates in this Amended Complaint the following: Exhibit A – the Government's conclusions pertaining to United Medical's performance in connection with each of the three contract renewals; Exhibit B – excerpts from the Contract Documents; Exhibit C – The page on which the Government based its Solicitation Estimate and Contract Value; Exhibit D – Internal Government correspondence regarding the Mercator Translator problem previously filed as part of the summary judgment record;

and Exhibit E – Internal Government correspondence pertaining to United Medical's account receivable claim.

134. Plaintiff incorporates as an Appendix to this Complaint the Appendices to the Original Complaint filed in the United States Bankruptcy Court and transferred as part of the record by that Court to this Court.

135. Plaintiff also incorporates as an Appendix to this Second Amended Complaint those documents filed by Plaintiff as an Appendix to its First Amended Complaint.

**REQUEST FOR RELIEF**

Plaintiff requests that after trial on the merits, and after any required election of remedies, Plaintiff be awarded the maximum allowable judgment against the Government for Plaintiff's actual and special damages and/or an equitable adjustment to the Contract Price, including lost profits, unabsorbed overhead, $100,000 for outstanding and unpaid invoices and Contract interest due thereon, damage to reputation, plus interest on its claim as allowed by law, plus all other relief to which it justly may be entitled.

Plaintiff further requests that following entry of judgment and on separate application the Court grant an award of non-taxable costs as provided by the Equal Access to Justice Act.

Signed January 4, 2008.

Respectfully submitted,

s/Frank L Broyles
Frank L. Broyles
State Bar No. 03230500
GOINS, UNDERKOFLER, CRAWFORD
& LANGDON, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

On January 4, 2008 the above Second Amended Complaint and exhibits were served on the persons shown below by the method shown below.

/s Frank L. Broyiles

**PERSONS SERVED:**

**Kyle Chadwick via email.**