*IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>*v.*<br><br>THE UNITED STATES, Defendant | *CASE NO: 03-CV-289*<br><br>*Judge Allegra* |

**PLAINTIFF'S FIRST MOTION IN LIMINE**

TO THE HONORABLE UNITED STATES COURT OF FEDERAL CLAIMS:

On June 19, 2008 the Court ordered the parties to file their motions in limine by August 4, 2008. Plaintiff files its First Motion in Limine contemporaneously with its Second Motion in Limine. With respect to this First Motion in Limine, Plaintiff requests the Court exclude from trial scheduled to commence in these consolidated cases in November 2008 evidence of the following:

**LIST OF MATTERS SUBJECT TO PLAINTIFF'S FIRST MOTION IN LIMINE**

Plaintiff requests that the Court enter an order excluding evidence in support of the following matters:

1. The Solicitation Estimates were not negligently prepared.
2. Plaintiff did not rely on the Estimates.
3. The Court does not have jurisdiction over Plaintiff's negligent estimation claim.
4. The dollar amount of orders placed by the Government under the contract but not filled by Plaintiff cannot reasonably be estimated from the fill rate reports.

**ATTACHED DOCUMENTS IN SUPPORT OF PLAINTIFF'S MOTION**

| Exhibit # | Description | Bates "Limine Page __" |
|---|---|---|
| 1 | Excerpts from Affidavit of Linda Flatley filed by the Government in opposition to Plaintiff's Motion for Summary Judgment. | 1-4 |
| 2 | Excerpt from Solicitation Amendment 008 | 5-6 |
| 3 | Excerpt from Deposition Transcript of Mike David | 7-11 |
| 4 | Excerpt from Deposition Transcript of Colonel James Riley | 12-15 |
| 5 | Excerpt from Solicitation Amendment 012 | 16-17 |
| 6 | Government's Response to Request for Admission 9 | 18-21 |
| 7 | Excerpt from Deposition Transcript of William Bandy | 22-23 |
| 8 | Interrogatory Answer with Jennings verification | 24-27 |
| 9 | Deposition Excerpt of Mr. James Jennings, Contracting Officer | 28-31 |

## MATTER 1
## Exclusion of Evidence that the Solicitation Estimates were not negligently prepared

Plaintiff requests that the Court enter an order excluding evidence at trial in support of any contention the Solicitation Estimates were not negligently prepared.

**Realistic Estimates are Required by FAR §16.503(a)(1)**

FAR §16.503(a)(1) requires the Government to estimate the quantity of orders it will place under a requirements contracts. Typically that estimate is stated in terms of product units, but in this case it was an estimate of the dollar amount of orders that would be placed under the contract, exclusive of the contractor's distribution fee. Under FAR §16.503 the Government is required to "state a realistic estimated total quantity in the solicitation and resulting contract…which may be obtained from records

of previous requirements and consumption, or by other means, and should base the estimates on the most current information available."

**Defendant admits that the Solicitation estimates were estimates of purchases of all medical/surgical items and were not limited to estimates of items subject to the contract.**

Defendant, in response to Plaintiff's Motion for Summary Judgment, filed a supporting affidavit of Ms. Linda Flatley [Exhibit 1, ¶19] in which set testified,

> The estimate did not reflect the dollars spent for only DAPA items. Rather it reflected the dollars spent for all medical/surgical items, regardless of whether those exact items were covered by a DAPA. [Ex. 1, ¶19, Bates 3].

Ms. Flatley's statement quoted above was repeated in the Government's proposed findings of fact submitted in connection with its summary judgment response at numbered paragraph 14 and in its summary judgment response at p. 10.

**The Government never expected to purchase all of its medical/surgical items under the Contract**

The Solicitation repeatedly stated that it was expected that the <u>majority</u> of the type of products described in the Solicitation would be purchased under contract. *See,* for example, Solicitation Amendment 008, p.4, in which the Government stated, "Under this program, the prime vendors chosen by DPSC will furnish the participating ordering facilities with the majority of their normal day-to-day requirement for brand name specific and generic medical supplies." [Bates 6]. There was nothing in the Solicitation to indicate that the estimates were anything other than the estimates

required by FAR 16.503, that is, "a realistic to quantity" to be ordered under the contract.

During the course of discovery the Government identified the person who collected the Army estimates as a man named Mr. Mike David. Plaintiff took the deposition of Mr. David and he testified, *inter alia*, that the Government will never buy all of its medical/surgical items under the prime vendor program. [David depo. Tr., p. 29-30; Bates 10-11].

**Not a single MTF logistics officer testified that the estimates were reasonable.**

Plaintiff deposed several logistics personnel at the MTF level. Not one testified that the estimates were reasonable. Colonel James Riley, for example, who was previously head of medical logistics at the two largest MTFs (Brooke Army Medical Center in San Antonio and William Beaumont Army Hospital in El Paso), testified that in his opinion the estimates had no basis in reality, that they appeared to include many products that were not suitable for purchase through a prime vendor program, and that a reasonable estimate would have been six to eight million, not 18 million. [Ex. 4, Riley depo tr. 18-20; Bates 15]

## MATTER 2
## Exclusion of Evidence that Plaintiff did not rely on the estimates

Plaintiff requests that the Court enter an order excluding evidence at trial in support of any contention Plaintiff did not rely on the estimates.

The Government has repeatedly argued throughout this case that Plaintiff cannot recover under its negligent estimate theory because it cannot prove causation since, according to the Government, it did not rely on the estimates. At one point in time it suggested to the Court that it intended to file a summary judgment motion on this issue. That issue has been resolved by a formal admission by the Government and the opinion in *Hi-Shear Technology Corporation v. United States*, 356 F.3d 1372 (Fed. Cir. 2004).

**The Solicitation Instructs Bidders to Rely on the Published Estimates**

Solicitation Amendment 012, at page 4 specifically instructs the bidders to prepare their bids based on the estimates. [Bates 17]. This instruction was substantially identical to all other Solicitation Amendments in which the estimates were disclosed, including Amendments 008 and 014.

**Government Admits Reliance**

Plaintiff served a formal request on the Government as follows:

> 9. Admit that Plaintiff's bid, in terms of [percentage], would have been greater if the Government's estimates had been 1/3 or more [lower] than the estimates provided in the Solicitation.

The Government responded,

> Admitted – with the proviso that, in that case, Plaintiff probably would not have been awarded the Contract. [Bates 19].

**United Claims Reliance**

In its bid package United included, albeit unenforceably *per* the Court's summary judgment order, a provision requiring adjustment of its distribution fee if actual sales did not equal at least 90% of the estimate.

At his deposition Mr. William Bandy (president of United Medical at the time it submitted its bid) testified that he believes United Medical would have bid a substantially higher distribution fee if the estimates would have approximated actual sales. [2005 deposition of William Bandy, p. 20; Bates 23].

**Reliance is Presumed**

In *Hi-Shear Technology Corp. v. U.S.,* 53 Fed. Cl. 420, 432-433 (Fed. Cl. 2002; aff'd 356 F.3d 1372 (Fed. Cir. 2004)) the trial court stated,

> …the court rejects the government's argument that a contractor cannot rely on the estimates in a solicitation for a requirements contract because those estimates are not guarantees. In *Medart, Inc. v. Austin,* the contract at issue was a requirements contract and included a statement that the estimates therein were not guaranteed quantities. 967 F.2d at 580. Although the court noted that a variance between actual purchases and government estimates will not give rise to liability, the court also indicated that "presumably contractors rely on the proffered estimates in formulating their bids, so the government must act in good faith and use reasonable care in computing its estimated needs." *Id.* at 581. The *Medart* court found that 'where a contractor can show by preponderant evidence that the estimates were 'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made[,]' the government could be liable for appropriate damages resulting. [citations omitted]. Courts also have reiterated the presumption that contractors rely on government estimates in other case involving requirements contracts. See *Educators Assocs., Inc. v. United States*, 41 Fed.Cl. at 816; *Datalect Computer Servs., Ltd. v. United States*, 40 Fed.Cl. at 35; *Crown Laundry and Dry Cleaners, Inc. v. United States*, 29 Fed.Cl. at 519….

## MATTER 3
## Exclusion of Evidence that the Court does not have jurisdiction over Plaintiff's negligent estimation claim

Plaintiff requests that the Court enter an order excluding evidence at trial in support of any contention the Court does not have subject matter jurisdiction over Plaintiff's negligent estimation claim. Plaintiff recognizes that the parties cannot confer subject matter jurisdiction on the Court where there is none. This issue was previously addressed by the Court and it concluded, with agreement of the parties that negligent estimation was before the Court. Nothing has arisen that would indicate otherwise and it would be a waste of judicial resources and delay trial to rehash the jurisdiction issue.

## MATTER 4
## The dollar amount of Plaintiff's unfilled orders cannot be estimated from fill rate reports

Plaintiff requests that the Court enter an order excluding evidence at trial in support of any contention the dollar amount of orders submitted to Plaintiff but which Plaintiff did not fill cannot be estimated from the fill rate reports.

**An important distinction must be made between a diverted order and a diverted purchase**

The Government admits that the contract required the Government to order its contract requirements from United Medical before going to an outside source. [Ex Flatley Affidavit, para 20, Bates 3]. The Government has repeatedly asserted that the volume of orders submitted to United Medical is irrelevant to the lawsuit. Yet, at the

same time it attempts to justify its third party purchases by claiming that United Medical killed those orders. A comparison of orders killed or otherwise unfilled by United Medical with purchases of contract items from third parties is relevant. Moreover, to estimate damages resulting from a negligent estimation claim, total orders submitted by the Government is relevant.[1]

**The sworn, unchanged testimony, of contracting officer Jennings is that the dollar volume of orders submitted to United Medical but which United Medical did not fill can be reasonably estimated from the fill rate reports**

Mr. James Jennings, a contracting officer for the United Medical contract, signed verified interrogatories that a dollar estimate of unfilled orders could be obtained from the fill rate reports. [Exhibit 8, Interrogatory 5; Bates 25]. At the summary judgment hearing the idea was discussed that since fill rate reports reported orders by line and not by dollar, that there may not be a correlation. As a consequence, Plaintiff deposed Mr. Jennings to determine whether his interrogatory answer was correct. He testified that it was and that, due to the volume, unfilled lines reasonably equated to unfilled dollars. [Jennings Depo Tr. p. 105-109; Bates 30-31]. That testimony has never been changed. Moreover, the Government has not produced any evidence to suggest that Mr. Jennings testimony is anything but accurate on that issue.

[1] In *Hi-Shear Technology Corp. v. U.S.*, 53 Fed. Cl. 420, 444-445 (Fed. Cl. 2002; aff'd 356 F.3d 1372 (Fed. Cir. 2004)) the trial court used actual orders as a basis for estimating damages. Actual orders are relevant to Plaintiff's damages model in a similar manner.

For the reasons shown above, Plaintiff requests that the Court enter an order excluding admission of evidence on the matters shown.

Signed August 4, 2008.

Respectfully submitted,

s/ Frank L. Broyles

Frank L. Broyles
State Bar No. 03230500
Goins, Underkofler, Crawford
& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

Service of a copy of the foregoing including exhibits will be accomplished via the Court Clerk's ECF system.

s/ Frank Broyles

***IN THE UNITED STATES COURT OF FEDERAL CLAIMS***

| | |
|---|---|
| *UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff*<br><br>*v.*<br><br>*THE UNITED STATES,* Defendant | *CASE NO: 03-CV-289*<br><br>*Judge Allegra* |

**EXHIBITS TO PLAINTIFF'S FIRST MOTION IN LIMINE**

## AFFIDAVIT OF LINDA FLATLEY

I, LINDA FLATLEY, having been duly sworn, deposes and says as follows:

1. That I, LINDA FLATLEY am over 21 years of age, of sound mind, capable of making this Affidavit, and personally acquitted with the facts herein stated.

2. That the Defense Logistics Agency is a component of the Department of Defense.

3. That the Defense Supply Center, Philadelphia, ["DSCP"] formerly known as the Defense Personnel Support Center[1] is a field activity of DLA and is located in Philadelphia Pennsylvania. DSCP is composed of four commodity organizations generally responsible for acquiring, storing and distributing a wide variety of items to the military services, to some foreign governments, and to other federal, state and local entities.

4. That I have been employed at DSCP since 1977.

5. That I am currently the Chief, Medical Surgical Prime Vendor Section and have, most recently, held this position since April 2002.

6. That I was one of the contracting officers for SP0200-97-D-7133 from June 1, 1997 through April 30, 2001.

7. That I was involved in the negotiation of this contract and am familiar with the underlying solicitation and the negotiations that led to the award, for the period beginning September 1994 when I joined this acquisition team.

EXHIBIT Limine 1

18. That the estimated annual requirements listed in the solicitation were based upon figures provided by the participating medical facilities.

19. That the estimated dollar value for each hospital was obtained through the designed point of contacts for Army, Navy, and Air Force. The estimate did not reflect the dollars spent for only DAPA items. Rather it reflected the dollars spent for all medical/surgical items, regardless of whether those exact items were covered by a DAPA.

20. That under the contract, the customers were required to order all DAPA items that they used from the prime. However, the customers did not have to purchase all their medical/surgical requirements from DAPAs. For example, if a customer used brand A bandages and only brands B –Z were available on DAPAs, the customer was not required to change brands. In that case, the customer was permitted to purchase brand A bandages outside of the contract.

Linda Flatley
LINDA FLATLEY
Contracting Officer

Subscribed and Sworn to before me this 26th day of November 2003.

Virginia J. Nunes
NOTARY PUBLIC

Notarial Seal
Virginia J. Nunes, Notary Public
Philadelphia, Philadelphia County
My Commission Expires Mar. 15, 2004
Member, Pennsylvania Association of Notaries

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE | PAGE OF PAGES 1 | 96

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 0008 | 4 DEC 1995 | N/A | |

6. ISSUED BY CODE SP0200

DEFENSE PERSONNEL SUPPORT CENTER
DPSC-MSBAC
2800 SOUTH 20TH STREET
PHILADELPHIA, PA 19101
ATTN: Theresa Rucci, 215-737-2465

7. ADMINISTERED BY (If other than Item 6) CODE

SAME AS BLOCK 6

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

United Medical Supply Company, Inc.
5117 Northeast Parkway
Fort Worth, Tarrant County, Texas 76106

(✓) X 9A. AMENDMENT OF SOLICITATION NO. DLA120-93-R-0587

9B. DATED (SEE ITEM 11) 11 August 1993

10A. MODIFICATION OF CONTRACT/ORDER NO.

10B. DATED (SEE ITEM 13)

CODE | FACILITY CODE

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [X] is extended, [ ] is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor [ ] is not, [X] is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

SEE ATTACHED PAGES

EXHIBIT Limine 2

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| Joe W. Smith, Jr., Executive Vice President | | ROGER DIXON<br>CONTRACTING OFFICER | |
| 15B. CONTRACTOR/OFFEROR [signature]<br>(Signature of person authorized to sign) | 15C. DATE SIGNED<br>1/15/96 | 16B. UNITED STATES OF AMERICA<br>BY<br>(Signature of Contracting Officer) | 16C. DATE SIGNED |

GENERAL INFORMATION FOR OFFERORS

The Defense Personnel Support Center (DPSC), Directorate of Medical Materiel is establishing a "Prime Vendor" program for brand name specific and generic medical supplies. A "Prime Vendor" is a business concern that functions as a purchaser's primary source for specified classes of products. A prime vendor is responsible for the delivery of goods produced by various suppliers to the customer upon order.

DPSC Medical is selecting regional prime vendors for brand name specific and generic medical supplies broadly covering medical/surgical and pharmaceutical products. Presently, these items are purchased locally by the military medical facilities. Each prime vendor will be the primary supplier of one of the designated product groupings for member hospitals in a given geographic region. Under this program, the prime vendors chosen by DPSC will furnish the participating ordering facilities with the majority of their normal day-to-day requirements for brand name specific and generic medical supplies.

DPSC Medical will establish approximately 21 regions covering the United States, Europe, and Pacific. There will be two prime vendors per region - one for medical/surgical items and one for pharmaceuticals. Each Prime Vendor will be responsible for supplying all of the medical items that are listed on Distribution and Pricing Agreements (see below) ordered by the participating ordering facilities in the specific region. Duplicate items appearing on multiple DAPAs must be available through the Prime Vendor.

As part of the program, we are establishing "Distribution and Pricing Agreements" (DAPA's) with medical/surgical and pharmaceutical product manufacturers. Under a DAPA, the agreement holder consents to allow prime vendors selected by DPSC Medical to distribute its products to participating ordering facilities and agrees that the prime vendor will be charged no more that the prices set forth in the agreement. Orders will not be directly placed against the DAPA's; they are being used only to establish pricing and to obtain the right for our prime vendors to distribute an agreement holder's products. The DAPA's will be used to facilitate "charge-back" arrangements between the agreement holders and DPSC Medical's prime vendors. It is the responsibility of the prime vendor to use the DAPA holders as its source of supply. The specific sources of supply (DAPA Holder) for any item is determined by the ordering facility at the time an order is placed. It is the responsibility if the Prime Vendor to establish the necessary "charge-back" arrangements with the DAPA holders. DPSC may also issue Indefinite Delivery Type Contracts (IDTC's) for specific products to be distributed by the Prime Vendor. The Prime Vendor will be required to obtain these specific products from the listed sources. The price charged by the prime to the ordering activities will not exceed that cited in the IDTC plus the offeror's negotiated distribution fee.

At the time of award of each Prime Vendor contract, DPSC will provide the selected Prime Vendor a copy of all DAPA's and IDTC's either electronically or in a paper format.

NOTE: THIS SOLICITATION WILL RESULT IN THE SELECTION OF A MEDICAL/SURGICAL PRODUCTS PRIME VENDOR FOR THE LONE STAR REGION (TEXAS/OKLAHOMA/NEW MEXICO) - see Attachment III.

IN THE UNITED BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

In re: UNITED MEDICAL SUPPLY )( Case No. 01-41911-bjh-11
COMPANY, INC., )(
Debtor-in-Possession )(
)(
)( Chapter 11
)(
United Medical Supply )(
Company, Inc., )(
Plaintiff, )(
)(
v. )( Adversary: 02-4230
)(
United States of America, )(
Defendant. )(

* * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF
MICHAEL DAVID
SEPTEMBER 17, 2007

* * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION of MICHAEL DAVID, produced as a witness, and duly sworn, was taken in the above-styled and numbered cause on the 17th day of September, from 1:00 p.m. to 2:00 p.m., before Lori M. Bryant, CSR in and for the State of Texas, reported by Stenographic Machine, at Fort Sam, 2050 Worth Road, Suite 17, Ft. Sam Houston, Texas 78234.

2

APPEARANCES



EXHIBIT
Limine
3

Examination by Mr. Broyles.................... 4
Signature and Changes.............................. 36
Court Reporter's Certificate....................... 39

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Defendant's Response to Plaintiff's First Set of Discovery | 15 |
| 2 | Letter from Marie L. Boggs | 18 |
| 3 | Memo | 20 |
| 4 | Memo | 21 |
| 5 | Amendment of Colicitation Contract | 22 |
| 6 | Medical/Surgical Prime Vendor | 27 |
| 7 | Memo for Record | 30 |
| 8 | Schedule of Supplies/Services | 30 |

4

MICHAEL DAVID,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BROYLES:

Q. Please state your name.
A. My name is Michael David.
Q. Mr. Davis, where are you currently employed?

A. David, D-A-V-I-D.
Q. Yes, excuse me.
A. No problem. I'm employed with the medical command here at Fort Sam Houston.
Q. Are you military or civilian?
A. Civil service.
Q. What is your GS rating, Mr. David?
A. GS 12.
Q. What is your current position?
A. Supply management representative.
Q. Can you give me a general description of what you do as a supply management representative.
A. At the headquarters, I'm a staff officer here and we in logistics are responsible for writing policy and procedures for operating our hospitals on the logistics side. So my main responsibilities lies in the areas of setting policy and procedures for obtaining medical supplies, DSCP contracts, which is the prime vendors, EKAS

□

5

and other contracts to obtain the rest of the supplies we may need.
Q. How long have you been in the position you currently hold?
A. 19 years.
Q. So it seems like Kyle and I are the only people not retiring in this case. Do you have any plans to retire in the near future?
A. An interesting carrot, maybe two, three years from now.

A. Barely.
Q. And do you recall when you requested the estimates what you requested estimates of?
A. No, sir, I don't recall.
Q. Do you know today what percentage -- let me rephrase that. Do you know today the volume of Med/Surg supplies that are purchased by each of those four Army facilities listed on Exhibit 6?
A. I personally don't, but that data resides in my



office.
Q. Do you have an opinion of kind of the rough estimate of what the Med/Surg supply purchases would be at each of those four facilities today?
A. Just an opinion, yeah.
Q. And what would be your opinion of roughly what Fort Sam Houston would be purchasing in Med/Surg supplies today on an annual basis?
A. Probably exceeding 15 million.
Q. Would you have an opinion that it would be roughly something below 21 million?
A. 21 would be the high on mine.
Q. Would you have an opinion of what percentage of the purchases of Med/Surg supplies are being made under the prime vendor program?
A. State your question again so I'm sure I understand it.
Q. Would you have an opinion of what percentage of the Med/Surg supplies on a 12-month basis are currently

being purchased by Fort Sam Houston under the prime vendor program?

A. Yes.

Q. What percentage would that be?

A. I think they're getting close to 70 percent of all of their Med/Surg supplies are being obtained from the



prime vendor at this time.

Q. Do you anticipate that it would ever be 100 percent?

A. No, it never will be.

Q. Have you ever seen Exhibit 6 before today?

A. I don't recall, sir.

Q. How about Exhibit 7, have you ever seen Exhibit 7 before today?

A. I don't recall that either, sir.

Q. Did you have anything to do -- take a look at Exhibit 8. Do you have that in front of you?

A. Yes, sir.

Q. And recall having anything to do with preparation for the estimates of the Generation II prime vendor program?

A. No, sir, I never prepared the estimates. DSCP has all of our historical data.

Q. If you look at the bottom of Page 1 there in the last paragraph it says "as a minimum"?

A. Okay.

Q. And at that point in time they said it is estimated 45% of the total Med/Surg items used in this

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff | ) | CASE NO.: 03-CV-289 |
| vs. | ) | Judge Allegra |
| THE UNITED STATES Defendant | ) | |

**********************************

ORAL VIDEOTAPED DEPOSITION OF

JAMES D. RILEY, JR.

**********************************

ORAL DEPOSITION OF JAMES D. RILEY, JR., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 25th day of August, 2005, from 10:24 a.m. to 3:18 p.m. before LINDI S. ROBERTS, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the Brooke Army Medical Center, Nursing Tower, 6th Floor, San Antonio, Texas, pursuant to the Federal Rules of Civil Procedure.



Limine

EXHIBIT LIMINE 4 ~~Page 12~~

APPEARANCES:

FOR THE PLAINTIFF:
Mr. Frank L. Broyles
GOINS, UNDERKOFLER,
CRAWFORD & LANGDON, L.L.P.
Renaissance Tower
1201 Elm Street, Suite 4800
Dallas, Texas 75270

FOR THE DEFENDANT:
Mr. Kyle Chadwick
U.S. DEPARTMENT OF JUSTICE
Civil Division
1100 L. Street N.W.
Room 7062
Washington, D.C. 20530

ALSO PRESENT: Ms. Lillian Cadena, Videographer



INDEX


| | PAGE |
|---|---|
| JAMES D. RILEY, JR. | |
| Examination by Mr. Broyles .................... | 4 |
| Examination by Mr. Chadwick .................... | 97 |
| Examination by Mr. Broyles .................... | 133 |
| Signature Page ................................ | 168 |
| Court Reporter's Certificate .................. | 169 |


EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Medical/Surgical Prime Vendor Lone Star Region, 11/6/95 | 16 |
| 2 | E-mail from Margaret Rees, dated July 1, 1999 | 16 |
| 3 | Wilford Hall JIT Contract Price Analysis, August 22, 1997 | 40 |
| 4 | Package of E-mails from and to James Riley | 55 |



THE VIDEOGRAPHER: It's August 25th, 2005; 10:24 in the morning. We're on the record.

JAMES D. RILEY, JR.,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BROYLES:

Q. Please state your name.
A. James David Riley, Jr.
Q. And please state your rank.
A. I'm actually a Lieutenant Colonel on active duty; however, I'm on terminal leave. And I depart -- I'm actually in the final throws of retiring. So I guess I'm a Lieutenant Colonel until November.
Q. So I will address you as Col. Riley. Is that appropriate?
A. Okay.
Q. Okay. Col. Riley, have you ever had your deposition taken before?
A. Never.
Q. Do you understand that this is a lawsuit -- your deposition here today is a result of a lawsuit filed by United Medical Supply against the United States Government?
A. Yes.
Q. And it's been filed for breach of contract. Have you --



A. I did not know that. But, yes --
Q. Okay.
A. -- I --
Q. In preparing for your deposition, have you looked at any documents?
A. No.
Q. Have you talked to anybody other than Mr. Chadwick?
A. Yes.
Q. Who have you talked to?
A. I've had a conversation with Debbie Thompson, who is the Assistant Chief of Material.
Q. Here at BAMC?
A. Here at BAMC. No one else.
Q. The -- at one point in time when -- do you recall becoming involved with the United Medical contract?
A. Yes.
Q. Where were you located when you became involved with the United Medical contract?
A. I was the Chief of Logistics at Brooke Army Medical Center in El Paso, Texas.
Q. As Chief of Logistics, can you briefly describe your duties?
A. The Chief of Logistics at a medical center handles the vast majority of acquisitions; facility maintenance; transportation; security; housekeeping; property management;

Page 6

biomedical management; what JCAHO, the Joint Commission of Accreditation of Hospital Organizations, calls the Environment of Care Chapters of the Accreditation Manual; and other miscellaneous -- I mean, it's a very large job.
So basically, it's -- it's the acquisition, maintenance, care and disposal of U.S. government property and equipment, to include real property, the facility, and the equipment inside itself.
Q. When you were head of logistics in El Paso, who did you report to?
A. I report to the Deputy Chief of Staff for Administration. We call him the DCA.
Q. When you were in El Paso, approximately how many people reported to you?
A. Each req. report, section chiefs and managers, seven to eight, I think; indirect support, four or five hundred.
Q. Pretty large function there?
A. Yes.
Q. What is your position here at BAMC?
A. I am in -- I'm on terminal leave. I have -- I'm currently employed as a contractor with VWI to assist with BRAC. That's been the last three weeks.
Q. Prior to getting terminal leave, what was your position here at BAMC?
A. I was the Chief of Logistics at Brooke Army Medical

Page 7

Center.
Q. And Brooke Army is a larger facility than the El Paso facility?
A. Yes, sir.
Q. Approximately how many times bigger?
A. Can you phrase the question a little more specifically?
Q. How -- would you -- how would you describe it in terms of size comparison?
A. The physical size of the hospital is -- William Beaumont is about 800,000 square feet, up to about 900,000 square feet when you include all the outbuildings. The hospital here is 1.1 million square feet, up to about 1.04 with all the outbuildings. That's the facility size.
In terms of the material branch, which I -- which I think is the most pertinent to the case, I would say that, in general, it's probably about double the sales. But that's not just prime vendor. That's all sales.
Q. The -- in terms of bed capacity?
A. That's an area outside my expertise. The standard operating beds at William Beaumont roughly fluctuated between 80 and 110 while I was there; and the number of beds here fluctuate -- has fluctuated from I think a low of 90, before global war on terrorism began, to somewhere in the neighborhood of 220 now.

Page 8

Q. The -- how long were you at William Beaumont?
A. About five years.
Q. From when to when?
A. From -- I believe it was April of '95 to approximately June of 2000.
Q. The United Medical contract then was still in effect when you left William Beaumont?
A. I think so. I don't know.
Q. Did you leave William Beaumont to come to Brooke Army?
A. I did.
Q. When you came to Brooke Army, was Brooke Army still dealing with the United Medical contract?
A. I believe it was.
Q. The -- one of the issues in the case is what's kind of been called the failure of the translator. Do you know -- does that ring a bell to you at all?
A. No.
Q. I'd like you to take a look at -- this is a document that was produced to us by the government. And it's one of the documents that deals with this translator failure. And I'd like you to just read those couple of paragraphs there and see if that rings any bell at all with respect to a problem.
A. (Witness complies.)
(Off-the-record discussion)

Page 9

A. No, I'm not familiar with this e-mail. This appears to be an IM issue.
Q. When you say an IM issue --
A. Information management issue. It seems -- what I read in this is that this is a systems issue. And in the United States Army, systems are handled by a different agency other than logistics.
Q. One of the complaints that United Medical is making is that DSCP was aware that they had had a failure in their electronic payment system; and that nevertheless, all the MTFs kept ordering supplies from United Medical at a time when DSCP knew that they would not be paid for those supplies in a timely basis, if at all.
And so the question I'm -- the relevance to you is: Did anybody ever suggest to you that there was that issue and that you needed to maybe slow down your orders or make an alternative arrangement so that you weren't ordering from United Medical during this time period?
A. That seemed like a multi -- a question that had multiple pieces to it. So the first part I will say is that I don't -- I do not recall a single time where any one of the administrative contracting officers in Philadelphia asked us to halt -- stop using United Medical to process the requisitions. I do know that there was issues with payments.
Q. Did --

Page 18

it would have probably been the Material Chief and not the Chief of Logistics. Also, the date. I -- I arrived from Saudi Arabia just a few months before that date.
Q. With your Ping golf clubs?
A. With Ping golf clubs.
Q. Okay. And the $18,000,000 number there, is -- does that sound like a reasonable number for the sundry supplies that would have been provided to William Beaumont, potential annual volume?
A. No.
Q. And what is -- when you say it does not sound like a reasonable number, is it too low? Too high?
A. For the -- for the prime vendor?
Q. Well, for -- the contract said "Name brand specific medical supplies that are day-to-day type supplies," prime vendor or otherwise.
And so the government is claiming that this $18,000,000 number represents the annual volume -- historic volume that Fort Bliss purchased of that kind of supply. Would that be in the realm of reality?
A. No.
Q. Is it too low or too high?
A. The $18,000,000 is likely the amount of money in the entire medical stock fund -- Class 8 Stock Fund for Fort Bliss during that time.

Page 19

Q. What is a Class A Stock Fund?
A. Class 8.
Q. 8. Excuse me.
A. 8. Class 8 is the Army acronym for medical supplies -- all medical supplies and equipment.
Q. So it would include things like x-ray equipment, stuff like that?
A. No, it would not include any item of military equipment greater than $25,000 unit cost at that particular time. It could, however, include something that was less if it was ordered on a recurring basis, which is the purpose of the prime vendor. But if it was an occasional order it doesn't -- it would not be included.
The stock fund can include medical equipment which is nonexpendable. The prime vendor contract -- although I know Mr. Bandy did have items of equipment that he could buy, the prime vendor contract is for supplies which are expendable or durable. The word "expendable" means consumed in use.
Q. What would be a reasonable estimate of the expendables that Fort Bliss purchased on an annual basis back in the mid-'90 time frame?
A. You're asking for an estimate?
Q. Yes.
A. I would say probably in the neighborhood of six to

Page 20

eight million.
Q. Were you -- did you get involved in a budgeting process with -- for the hospital in --
A. Yes.
Q. Did that budgeting process then include expendables?
A. Yes.
Q. And when we talk about expendables, I think we're talking on the same wavelength. This is the stuff that a hospital uses up -- orders, uses up, and orders more?
A. Consumes in use.
Q. Okay.
A. Yes.
Q. Stuff that you felt was -- what was subject to the prime vendor contract.
A. Right. The definition includes -- the definition means "Losing its original identity." Okay? Once you use up a cup and you fold it up, throw it in the trash, it's no longer a cup. It's consumed in use.
Q. The -- and I understand that at Fort Bliss some of the products were purchased from the prime vendor and some of the products were purchased from other sources.
A. Yes.
Q. Some of the products were purchased with credit cards.
A. Yes.

Page 21

Q. And Mr. Bandy tells me you -- that there were roughly 180 to 190 people with credit cards out there in Fort Bliss that had purchasing authority; is that reasonable?
A. It was probably more. You're talking Fort Bliss?
Q. Right.
A. Okay.
Q. Well, the -- William Beaumont.
A. You're asking for an estimate?
Q. Yes.
A. Keeping in mind, the Chief of Logistics does not issue credit cards.
Q. Right.
A. Okay. It's my belief that during that time frame that William Beaumont probably had between 110 and 130 credit card holders.
Q. The -- did you have any sort of ability to see what was being purchased on those credit cards in the way of expendable medical supplies?
A. Limited -- limited ability.
Q. What was your limited ability?
A. If -- let me describe the credit card process real quick. The contracting office at William Beaumont Army Medical Center and other regional contracting officers issue the credit card directly to a user upon their request, and the product orders are approved by someone else in that same area,

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE

PAGE OF PAGES: 01 | 47

2. AMENDMENT/MODIFICATION NO.: 0012

3. EFFECTIVE DATE: 07 FEB 1996

4. REQUISITION/PURCHASE REQ. NO.: N/A

5. PROJECT NO. *(If applicable)*

6. ISSUED BY — CODE: SP0200

DEFENSE PERSONNEL SUPPORT CENTER
2800 SOUTH 20TH STREET
PHILADELPHIA, PA 19145-5099
CONTRACT SPECIALIST: N. MARTIN
PHONE: 215-737-8422

7. ADMINISTERED BY *(If other than Item 6)* — CODE: SP0200

SAME AS BLOCK 6

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

United Medical Supply Company, Inc.
5117 Northeast Parkway
Fort Worth, Texas 76106

CODE | FACILITY CODE

(✓) X — 9A. AMENDMENT OF SOLICITATION NO.: DLA120-93-R-0587

9B. DATED *(SEE ITEM 11)*: 11 AUGUST 1993

10A. MODIFICATION OF CONTRACT/ORDER NO.

10B. DATED *(SEE ITEM 13)*

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [X] is extended, [ ] is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning 01 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓)

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER *(Specify type of modification and authority)*

E. IMPORTANT: Contractor [ ] is not, [ ] is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

MED/SURG PRIME VENDOR - LONE STAR REGION

Subject solicitation is hereby amended as follows:

The closing date is hereby extended to 3:00 PM, local time, 28 February 1996. All responses must be received by the above cited time and date and are subject to the late submission, modifications, and withdrawal of proposals or quotation provision of the solicitation.

EXHIBIT LIMINE 5

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER *(Type or print)*

Joe W. Smith, Jr.
Executive Vice President

16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*

15B. CONTRACTOR/OFFEROR — [signature] *(Signature of person authorized to sign)*

15C. DATE SIGNED: 2/27/96

16B. UNITED STATES OF AMERICA BY ______ *(Signature of Contracting Officer)*

16C. DATE SIGNED

**Pages 6 through 12 are hereby deleted in their entirety and replaced with the following:**

## SECTION B

## SCHEDULE OF SUPPLIES

Based on a 12 month reporting period, the ordering facilities that will be listed in Attachment III spent an estimated $57,965,500 per year for those types of medical/surgical products covered by the proposed contract. Based on this figure, the following is the Government's best estimate of yearly sales that these ordering facilities will experience over the five year period.

| | Yearly Estimate | Approximate Yearly Maximum |
|---|---|---|
| First Year | $28,982,750.00 | $ 72,456,875.00 |
| Option Year 1 | $57,965,500.00 | $144,913,750.00 |
| Option Year 2 | $57,965,500.00 | $144,913,750.00 |
| Option Year 3 | $57,965,500.00 | $144,913,750.00 |
| Option Year 4 | $57,965,500.00 | $144,913,750.00 |

Annual Estimates are as follows:

| | Base Year | Option Years 1-4 |
|---|---|---|
| Considering Stockless Option (See Page 13) | $23,500,000 | $47,000,000 |
| JITO/EDO Option Only | $ 5,482,750 | $10,965,500 |

No guarantee is given that the above volume will be purchased. It should be noted that during the first year of the contract each facility will begin to reduce its existing inventory of medical/surgical products. Orders will be placed with the Prime Vendor as existing inventories are reduced to lower levels. This may affect the volume of ordering during the base ordering period.

Your proposed distribution fee should be based on the Yearly Estimate. If the Approximate Yearly Maximum is exceeded in any given year, the contract will be completed for that year but subsequent years will be resolicited.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 03-289C |
| | ) | (Judge Allegra) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSES TO PLAINTIFF'S APRIL 6, 2007 REQUESTS FOR ADMISSION AND INTERROGATORIES

Pursuant to Rules 33 and 36 of the Court's Rules ("RCFC"), defendant, the United States, responds as follows to the requests for admission and interrogatories that plaintiff served by facsimile on April 6, 2007.

EXHIBIT
LIMINE
6

were invariant with respect to plaintiff's sales. Plaintiff has not produced, and we otherwise lack, sufficient business records to identify particular expenses as fixed or variable. Absent evidence to the contrary, we presume all of plaintiff's expenses were variable.

6. Admit that Plaintiff's expenses it incurred during the Period June 1, 1997 through April 30, 2001 included general and administrative costs.

RESPONSE: Admitted, without making any admission with respect to the amount of those costs or their allocability to the prime vendor contract.

7. Admit that the Government failed to exercise due care in the preparation of the estimates provided to United Medical in the Solicitation . . . .

RESPONSE: Denied.

8. Admit that Plaintiff reasonably committed resources to the Contract throughout the Contract Period based on the estimates provided by the Government in the Solicitation . . . .

RESPONSE: Denied. William Bandy testified at pp. 24-28 of his May 25, 2005 deposition that, after the start-up period in 1997, plaintiff based its spending decisions upon the sales volumes actually experienced, rather upon than the solicitation estimates. Thus, plaintiff did not make use of the estimates "throughout the Contract Period."

9. Admit that Plaintiff's bid, in terms of [percentage], would have been greater if the Government's estimates [had] been 1/3 or more [lower] than the estimates provided in the Solicitation.

RESPONSE: Admitted – with the proviso that, in that case, plaintiff probably would not have been awarded the contract.

10. Admit that the Government did not provide usage data to Plaintiff during the Contract Period for purchases of DAPA items made with credit cards by the credit card holders identified in response to Interrogatory 5 below.

RESPONSE: After a reasonable inquiry, we admit that this is probably true for some number of credit card purchases of DAPA items, but we lack sufficient information concerning the usage data provided by the MTFs to admit (or deny) this unqualified, general statement.

5. For each credit card holder identified in the Initial OIG Data who did not report, directly or indirectly, to the head of logistics at the particular MTF, state if that person can be produced for deposition by the Government . . . .

RESPONSE: We need additional time to respond. As an initial matter, it has come to our attention that some of the card holders identified in the spreadsheets were not working at any MTF during the contract term. Their transactions appear in the search results because they worked in the same city, and in the same service, as one of the MTFs. (OIG could not query the data by individual MTF.) We will identify those card holders (who are not relevant to this case) in our supplemental response to this interrogatory, which we will provide as promptly as we can.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:
MICHAEL McGLINCHEY
Trial Attorney
Defense Supply Center
Philadelphia

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice
Attn: Classification, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

May 7, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC. | * | |
| PLAINTIFF, | * | NO. 03-CV-289 |
| VS. | * | (JUDGE ALLEGRA) |
| THE UNITED STATES | * | |
| DEFENDANT. | * | |

---

ORAL AND VIDEOTAPED DEPOSITION OF

WILLIAM P. BANDY

MAY 25, 2005

---

ANSWERS AND DEPOSITION of WILLIAM P. BANDY, a witness produced on behalf of the Defendant, taken in the above styled and numbered cause on the 25th day of May, 2005, from 12:58 p.m. to 5:00 p.m. before Kathy Bradford, a Certified Court Reporter in and for the State of Texas, taken at 7226 Rustic Valley Drive, City of Dallas, County of Dallas, State of Texas, in accordance with the Federal Rules.

EXHIBIT
LIMINE
7

Q. If the government's estimates in the solicitation had been more along the lines of the numbers that the government actually ended up purchasing, what do you think you would have done different? First of all, I guess, would you have even bid? And if you -- if you would have bid, would it be --

A. Certainly, the -- the -- assuming the numbers -- if -- if I had known the numbers would be as they turned out to be, I would have bid 12 percent -- cost plus 12 percent or more, but probably 12 percent, rough -- roughly double.

Q. Based on the different efficiency of --

A. Efficiencies, uh-huh. And if I may add one thing, because in using our trucks -- and -- and there's pretty good distances involved in -- like Fort Huachuca in Arizona that came on later. We simply needed that volume to make it worth -- worth making the trips.

Q. What about in the start-up phase? If the estimates had been lower, more in the range of what the sales ended up actually being, would you have done anything different with respect to, for instance, the warehouse space that you added?

A. I would not have added warehouse in El Paso

Civil Division
U.S. Department of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875
202 - 307-0249
202 - 307-0494 (telefax)
Kathie.Shahan@usdoj.gov
Attorney for the United States

**IN THE UNITED BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: UNITED MEDICAL SUPPLY COMPANY INC., Debtor-in-Possession | ) | Case No.01 - 41911-bjh-11<br>Chapter 11 |
| United Medical Supply Company, Inc., Plaintiff, | ) | |
| v. | ) | Adversary: 02 - 4230 |
| United States of America, Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS TO DEFENDANT UNITED STATES**

Defendant, the United States of America, responds to plaintiff's first set of discovery requests as follows:

**INTERROGATORY NO. 1**

This interrogatory requests information pertaining to the representations made by the Defendant in the Award SP0200-97-D-7133 and Modification Number 006 to the Award. For each Participating MTF, please provide the following information (The dollar amount provided



EXHIBIT
LIMINE
8

United Medical and the dollar amount of the Scheduled Medical Products and Supplies purchased from third parties.

ANSWER NO. 4

Individual MTF's do not capture their information in this manner. However, to the extent that information concerning the dollar amount of Scheduled Medical Products purchased from United Medical is available, it is contained in the Contracting Officer's Files for United Medical and will be made available as set forth in Response to Request No. 7. With respect to purchases from third parties, DSCP is attempting to determine what records are available and will supplement this response if relevant information or documents are located.

INTERROGATORY NO. 5

For each Participating MTF, identify the MTF and state the total dollar amount of products for each contract year that the particular MTF ordered from United Medical but which was not supplied by United Medical.

ANSWER NO. 5

The requested information can be extrapolated from the reports of fill rates by MTF and will be made available as set forth in Response to Request No. 4.

INTERROGATORY NO. 6

For each Participating MTF, identify the MTF and state the dollar amount of Products that particular MTF purchased from third parties, i.e., suppliers other than United Medical, during the term of the contract between United Medical and the United States.

Dated: November 25, 2002

Respectfully submitted,

ROBERT D. McCALLAM, JR.
Assistant Attorney General

RICHARD H. STEPHENS
United States Attorney

E. Kathleen Shahan

J. CHRISTOPHER KOHN
TRACY J. WHITAKER
E. KATHLEEN SHAHAN
D.C. Bar No. 267872
Civil Division
U.S. Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
(202)307-0249

ATTORNEYS FOR THE UNITED STATES

**VERIFICATION**

The undersigned certifies, under penalty of perjury, that, to the best of her knowledge and belief, the factual information in the foregoing responses is true.

Date: 11/21/02

James Jennings
James Jennings, Contracting Officer

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE NORTHERN
DISTRICT OF TEXAS, FORT WORTH DIVISION

IN RE: UNITED MEDICAL ) NO. 01-41911-BJH-11
SUPPLY COMPANY, INC., )
REORGANIZED DEBTOR )
- - - - - - - - - - - - -
UNITED MEDICAL SUPPLY ) Adversary: 02-4230
COMPANY, INC., )
Plaintiff, )
- vs- )
UNITED STATES OF )
AMERICA, )
Defendant. )

Oral deposition of JAMES JENNINGS, taken at the ESQUIRE DEPOSITION SERVICES, 1880 John F. Kennedy Boulevard, Philadelphia, Pennsylvania, on Tuesday, March 8, 2005, at 9:40 a.m., before Dolores M. Horne, Shorthand reporter and Notary Public, in and for the Commonwealth of Pennsylvania.

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103

EXHIBIT
LIMINE 9

6

JAMES JENNINGS, after having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

* * *

BY MR. BROYLES:

**Q. Tell me your name, sir.**

A. James Jennings.

**Q. J E N N I N G S; is that correct?**

A. Yes.

**Q. Mr. Jennings, have you ever been involved in a deposition, given a deposition, sat in a deposition before?**

A. No.

**Q. Have you ever testified in a courtroom?**

A. No.

**Q. Have you ever testified in an administrative hearing of any kind?**

A. Not that I know about.

**Q. So, this is your first experience. So it's kind of a --**

A. Yes.

7

**Q. A couple of things. In terms of just the protocol, we have to be careful not to speak over each other because the court reporter needs to have one of us stop talking before the other one starts talking. If you want to ask me to rephrase my question or you don't understand it, just feel free to say that. You're testifying under oath, but this is not a -- you know, if you want to take a break or whatever, just hold up your hand and say I want to take a break.**

A. Okay.

**Q. What have you done in preparation for your deposition today?**

A. I read some material from that contract.

**Q. You're talking about the contract with United Medical?**

A. Yes.

**Q. What material did you read?**

A. Parts from the contract file, some of the court stuff that's gone on before this. I don't know what they were called.

MS. HALLAM: Can I just make this simple. I gave him your appendix to look at and also the motion for summary judgement pleadings.

8

MR. BROYLES: Thank you.

BY MR. BROYLES:

**Q. The appendix that Ms. Hallam is referring to was three volumes, at least I had a three volume appendix. Did you get three volumes --**

A. I don't know that I got through three volumes.

**Q. How long did you spend reviewing the material?**

A. Off and on I've been looking through it for a week and a half.

**Q. Ten hours total maybe?**

A. I would think more than that.

**Q. Have you talked to anybody in preparation for this deposition?**

A. No.

**Q. Not Ms. Hallam or Mr. Chadwick?**

A. Ms. Hallam has talked to me. But I don't know what in particular you're looking for.

9

**Q. All I'm looking for are names, who you talked to.**

A. Okay, Ms. Hallam.

**Q. You didn't talk to Ms. Flatley or anybody like that in preparation for your deposition?**

A. Not in regards to this. She's my boss, so I've talked to her more than once.

**Q. So, she is your immediate supervisor?**

A. Yes.

**Q. You acted a little hesitant --**

A. We have a team leader between -- there's a team leader that's over me and then Linda is over her.

**Q. What is your team leader's name?**

A. Donna Kennedy.

**Q. The name rings a bell. Okay. What is your current title?**

A. Contracting officer --

**Q. How long --**

A. -- or contract specialist.

**Q. How long have you been a contract specialist?**

102

three pages was accurate and complete?
A. No.
(Document marked Exhibit 14 for identification.)
BY MR. BROYLES:
Q. I'm going to hand you what the court reporter has marked as Exhibit 14. Is that your signature that appears on the first page?
A. Yes.
Q. So on January 31, 1996 you were the contracting officer for the med/surg prime vendor Montana region?
A. Yes.
Q. Do you recall how the estimates were prepared in block 15C and 15G or were they the same as we what talked about before --
A. The same as we went through the point of contacts at the services.
Q. Do you recall the names of any of those points of contacts at the services?
A. No.
(Document marked Exhibit 15 for identification.)
BY MR. BROYLES:

103

Q. Is that your signature that appears on the first page of Exhibit 15?
A. Yes.
Q. On October 11 of 1996 were you the contracting officer for the New York, New England prime vendor region?
A. Yes.
Q. Were the estimates that are prepared in blocks 15C and 15G prepared in the same way as we've previously discussed?
A. Yes.
(Document marked Exhibit 16 for identification.)
BY MR. BROYLES:
Q. Is that your signature that appears on the first page of Exhibit 16?
A. Yes.
Q. And were you at that time then the contracting officer for the Florida, Georgia prime vendor region?
A. Yes.
(Document marked Exhibit 17 for identification.)
BY MR. BROYLES:

104

Q. Do you recognize what has been marked as Exhibit 17?
A. Yes.
Q. I'll ask you to turn to page 22 of that. Is that your signature that appears on page 22?
A. Yes.
Q. Now, at the time that you signed this document, what did you do to ensure that it was correct?
A. I don't recall.
Q. You see it says there that the undersigned certifies under penalty of perjury that to the best of her knowledge and belief the factual information in the foregoing responses is true. Why did you not change her to him?
A. I did not see that.
Q. Do you recall who presented you this document?
A. No.
(Document marked Exhibit 18 for identification.)
BY MR. BROYLES:

105

Q. Keep that document in front of you a minute. I'd ask you go to page four of Exhibit 17. Do you see where it says interrogatory No. 5?
A. Yes.
Q. Did you read the answer -- let me ask you this. Did you physically type the information in Exhibit 17?
A. No.
Q. Do you know who did?
A. No.
Q. Did you have any discussions with anybody about the information in Exhibit 17?
A. I'm sure I did.
Q. If you look at interrogatory No. 5 on page four, you answered the requested information can be extrapolated from the reports of fill rates by MTF and will be made available as set forth in response to request No. 5.
Can you tell me how the fill reports can be used to extrapolate the total dollar amount of products that were ordered from United Medical but which were not supplied by

**United Medical in a given year? And you can use Exhibit 18 to describe for me that process.**
A. Okay. Fill rate was 90 percent, and they got nine items, then ten were ordered.
**Q. Okay. Now, it says -- it talks about dollar amount there. Tell me how you come up -- extrapolate the dollar amount?**
A. If they received $9 and it was 90 percent then $10 were ordered.
**Q. The question is, it says state the total dollar amount of products for each contract year that the particular MTF ordered from United Medical but which was not supplied by United Medical. So, using your example, let's assume then for a given MTF that their fill rate for the year was 90 percent and that they actually ordered let's say $100,000 -- or they actually paid $100,000 for products they received from United Medical, tell me how we can calculate then the total dollar amount of products they attempted to order from United Medical for that year?**
A. If they got 90 percent, 90 percent of some number was your 100,000.



**Q. I happen to have a calculator. So, would it be a fair statement to say we can divide 100,000 by .9 and that equals roughly $111,000, correct?**
A. Yes.
**Q. Is that a fair calculation?**
A. Yes.
**Q. You're welcome to use the calculator. Does that sound right?**
A. It sounds right.
**Q. So, your answer then would be that you take the dollar amount that that MTF paid for products from United Medical and divide that by the fill rate in terms of a decimal?**
A. I have to have a piece of paper to figure this out. You want to know what to do to a dollar amount?
**Q. Let's assume that the particular MTF actually paid $100,000 for products that they got from United Medical in a given year, and we'll ignore the DSCP fee for the time being --**
A. Okay.
**Q. -- and that the fill rate for the year was 90 percent --**



A. Okay.
**Q. -- so in terms of a formula that we can use to calculate the total dollar amount of products that the MTF ordered in a given year, how would that formula get expressed in terms of dollars actually purchased, the fill rate and the order, the dollars ordered?**
A. So fill rate -- I'm sorry. The actual amount received divided by the fill rate.
**Q. Would give you the amount ordered?**
A. The amount ordered.
**Q. Now, and I don't want to be unfair here because the fill rates are actually based on line items, they're not based on dollar amount?**
A. Correct.
**Q. But would it be a fair statement to say we can use the line items because just average in and average out the line items and the dollar amounts will average out about the same?**
A. Say that again.
**Q. If the fill rate is 90 percent, that means, as I understand it, roughly nine out of**



**every ten items that were ordered were shipped and received?**
A. Correct.
**Q. But it could have been nine $1 items and $100 item could be the one that wasn't shipped?**
A. That's correct.
**Q. Or it could be vice versa?**
A. Correct.
**Q. So, would it be a fair statement then, and I gather by your answer to interrogatory No. 5, that it's going to average out where you can actually use line items and equate those to dollar amounts pretty much?**
A. Yes.
**Q. Do you know Troy Molnar?**
A. No.
**Q. Mike David?**
A. It's an Army person, yes.
**Q. I'm reading from interrogatory No. 3. How did you come up with those names or verify that those are the people who actually provided the information?**
A. They were the points of contact at