*IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

| | |
|---|---|
| *UNITED MEDICAL SUPPLY COMPANY, INC.*, Plaintiff<br><br>*v.*<br><br>*THE UNITED STATES*, Defendant | *CONSOLIDATED CASE NOS:*<br>***MAIN CASE: 03-CV-289***<br>*CONSOLIDATED CASE: 07-CV-187*<br><br>*Judge Allegra* |

## PLAINTIFF'S SECOND MOTION IN LIMINE

TO THE HONORABLE UNITED STATES COURT OF FEDERAL CLAIMS:

On June 19, 2008 the Court ordered the parties to file their motions in limine by August 4, 2008. Plaintiff files its Second Motion in Limine contemporaneously with its First Motion in Limine. With respect to this Second Motion in Limine, Plaintiff requests the Court exclude from trial scheduled to commence in these consolidated cases in November 2008 testimony of Defendant's expert Derk Rasmussen on the following matters and for the following reasons:

The issues presented by Plaintiff's Second Motion in Limine are whether Defendants expert, Mr. Derk Rasmussen, should be permitted to testify at all, and if so, to what extent.

Mr. Rasmussen's opinions heavily rely on three serious miscomprehensions about the contract and the law as follows:

1. Plaintiff cannot prove that it would have been awarded the contract if the estimates had been correct
2. Mr. Killman did not properly consider bid documents because they are necessary to estimate lost profits
3. The Government had the right to order contract items from third parties without first ordering from Plaintiff if Plaintiff did not have the items in stock.

## ARGUMENT

**The scope of Mr. Rasmussen's report [Attached Exhibit A; Bates Limine Page 32; Bates 33-59]**

Mr. Rasmussen was produced by the Government solely as a rebuttal expert witness. In his capacity as a rebuttal witness he was requested by the Government to answer three questions. First, are the opinions of Plaintiff's expert on diversion damages (Robert Imel) supported by the documents Mr. Imel reviewed. Second, are the opinions of Plaintiff's expert on negligent estimation damages (Pat Killman) supported by the documents he reviewed. Finally, Mr. Rasmussen was asked to provide an alternative calculation of damages that corrects for any errors made by Mr. Imel and Mr. Rasmussen.

Discovery revealed that Mr. Rasmussen had formed many more opinions than those provided in his report, but he did address the three questions and answered as follows: (1) no, (2) no, and (3) $3.6 million to $4.1 million.

**Rasmussen Contention: Plaintiff cannot prove that it would have been awarded the contract if the estimates had been correct**

Mr. Rasmussen suggests that United Medical must prove that it would have been awarded the contract if the estimates had been non-negligently made. [Rasmussen Report, p. 22; Bates 54]. He cites no authority for that proposition, and indeed there is none. Plaintiff's counsel has not found a single negligent estimates case that requires this type of proof. Mr. Rasmussen essentially is contending that the Government is free to estimate whatever it wants since rarely would a contractor be able to show it would have been awarded the contract if appropriate estimates would have been published. How, for example, could a contractor ever show what other bidders and potential bidders would have bid.

**Rasmussen Contention: Mr. Killman did not properly consider bid documents because they are necessary to estimate lost profits**

Mr. Rasmussen limits his consideration of available damages to lost profits. [Rasmussen Report, p. 10; Bates 42]. Then he specifically he faults Mr. Killman for failure to adequately consider bid documents because, according to Mr. Rasmussen,

> Without the bid documents reflecting the incremental fixed costs expected to occur, we are unable to determine the increase in profits that United Medical expected to achieve as a result of enter into the contact. As a result it is impossible to put them back into the position they would have been in under this approach…. [Rasmussen Report, p. 23; Bates 55].

Mr. Rasmussen's contention ignores the controlling case of *Hi-Shear Technology Corporation v. United States*, 356 F.3d 1372, 1383 (Fed. Cir. 2004). There the Federal

Circuit held that lost profits are not available as damages for negligent estimation. 356 F.3d at 1380. It further held that even true reliance costs are not available as damages for negligent estimation unless the Government terminates for convenience. 356 F.3d at 1383.

**Rasmussen Contention: The Government had the right to order contract items from third parties without first ordering from Plaintiff if Plaintiff did not have the items in stock.**

Mr. Rasmussen heavily based his opinions on his misunderstanding that the Government had a right to order contract items from third parties without first ordering from United Medical if United Medical did not have the contract item in stock. [Ex. F; Rasmussen deposition, p. 30-34; Bates 79-80]. This understanding was the foundation for his determination that United Medical could not prove that it could have supplied the diverted orders without inventory reports matching existing stock with the diverted order.

The contract required the Government to first order from United Medical before it went outside the contract -- absence of the item in inventory is not an excuse for first ordering from Plaintiff.

The affidavit of contracting officer Linda Flatley filed by the Government in response to Plaintiff's motion for summary judgment stated the contract required the Government to order all of the DAPA items from United Medical. [See, Exhibit 1, para

20 attached to Plaintiff's First Motion in Limine, Bates 3].[1] As the Court noted in its summary judgment opinion the contract provides,

> '(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.'

This issue is important to the lawsuit. The prime vendor program anticipated two types of contracts: a "JITO/EDO" contract and a "Stockless Contract." Some MTFs had the right to transfer from the JITO/EDO contract to the Stockless Contract. None of the MTFs in the Lone Star Region exercised that option; they all remained under the JITO/EDO contract. These facts are undisputed.

Under Solicitation Amendment 016, [attached Exhibit B; Bates 60-66], Plaintiff was required to fill EDOs (*i.e.,* extended delivery orders) within ten (10) days from date of order. In contrast, Plaintiff was required to fill JITOs (*i.e.,* just in time orders) within 24-hours. An issue completely overlooked by Mr. Rasmussen was the rationale for having these two types of orders. The Government was expected to use EDOs when it had not provided Plaintiff with usage data. Usage data was an essential prerequisite to maintaining an inventory of a given item. Plaintiff was not expected to stock items for

[1] "That under the contract, the customers were required to order all DAPA items that they used from the prime. However, the customers did not have to purchase all their medical/surgical requirements from DAPAs…."

which it did not have usage data and the Government was expected to order those items using the EDO method.

Mr. Bandy testified about the EDO process. Those extended delivery orders received by United Medical were forwarded by United Medical to the DAPA manufacturer and if United had to use overnight courier to meet the 10-day delivery obligation it did so at its own expense. [Ex. C; Bandy deposition, pp. 154-156, 166; Bates 68-71].

Mr. Rasmussen's incorrect legal conclusion is a serious flaw in his report. His argument is based on the fact that United Medical could not produce inventory reports showing that it had the diverted items in stock at the time they were ordered by the Government, but the overwhelming evidence is that the Government routinely used third parties to fill EDOs and EDO items were not required or expected to be in United Medical's inventory.

Mr. Rasmussen's opinions belittle the importance of usage data. In his report [Ex. A; p. 5, numbered paragraph 16; Bates 48] he states,

> The MTFs were required to provide the prime vendor with usage data, or the item and associated quantities that it intended to order from the prime vendor. [footnote omitted].

He then immediately thereafter states,

> There does not appear to have been any requirement that the MTFs provide usage data….

He explained the conflict as not artfully worded, but attempted to trivialize the problem by stating that the primary consequence of unprovided usage data was a fill rate adjustment. [Ex. F; Rasmussen Depo trans. P. 35; Bates 80].

It is undisputed that the success of the prime vendor program depended on the MTFs providing accurate usage data. For example, Mr. Mike David, one of the Government's top prime vendor managers, testified in his deposition at p. 32 [Ex D; Bates 73] as follows:

> Q. Do you have an opinion as to the significance of usage data being accurately provided to the prime vendors?
> A. Yes.
> Q. What is your opinion?
> A. That is the most crucial aspect of the program, because that's how we measure your performance.
> Q. When you say that's how we measure your performance, when you say "your," you're referring to a prime vendor?
> A. Yes, sir, because we want support for you. We give you our usage so you can stock the items, then we'll come to you for those items we told you we would. That's how we assure that you have those items that we're asking you for. So that's the single most important thing on getting good prime vendor support is giving you good accurate usage. Then it's the prime vendor's responsibility to stock to those levels that we told you we were going to use.

As a final note on this issue, Mr. Rasmussen correctly notes that the Government MTFs did, in fact, bypass ordering DAPA items from United Medical before they ordered from third parties. He quotes from the deposition of Ms. Debra Thompson at page 13 of his report [Ex. A; Bates 45] as follows:

> Okay, if [United Medical] stocked it, if they had it on hand, and it was a DAPA item, we would order it. But if it was a nonrecurring item, they did not have it on had…. So if it was nonrecurring, and they did not stock it, we had to seek other means to buy it.

Ms. Thompson was a responsible logistics employee at two of the major MTFs: BAMC in San Antonio and Fort Hood in Killen, Texas. Mr. Rasmussen omits a significant piece of her testimony. She was unaware that the contract provided for an extended delivery option.

This, in a nutshell, illustrates a portion of the problem. MTFs, especially the few largest ones, did not provide usage data on many items, United Medical, as a consequence, did not have these items in stock, so the MTFs simply went to other purchase methods.

Mr. Rasmussen's report is defective for a number of other reasons. For example, he ignored the multiple findings of multiple contracting officers that United Medical had met its obligations under the contract. [See Exhibit E, for example, Bates 74-77]. However, the above illustrate well the incorrect foundation on which all his opinions are based and his testimony should be excluded from trial.

Signed August 4, 2008.

Respectfully submitted,

s/ Frank L. Broyles

Frank L. Broyles
TX State Bar No. 03230500
Goins, Underkofler, Crawford

& Langdon, LLP
1201 Elm Street
4800 Renaissance Tower
Dallas, Texas 75270
(214) 969-5454
(214) 969-5902 Fax

Attorney for Plaintiff

CERTIFICATE OF SERVICE

Service of a copy of the foregoing including exhibits will be accomplished via the Court Clerk's ECF system.

s/ Frank Broyles

***IN THE UNITED STATES COURT OF FEDERAL CLAIMS***

| | |
|---|---|
| *UNITED MEDICAL SUPPLY COMPANY, INC.*, Plaintiff<br><br>*v.*<br><br>*THE UNITED STATES*, Defendant | *CONSOLIDATED CASE NOS:*<br>***MAIN CASE: 03-CV-289***<br>*CONSOLIDATED CASE: 07-CV-187*<br><br>*Judge Allegra* |

**EXHIBITS TO PLAINTIFF'S SECOND MOTION IN LIMINE**

Sage
FORENSIC ACCOUNTING

March 10, 2008

Kyle Chadwick, Esq.
Trial Attorney
Civil Division, U.S. Department of Justice
Washington, D.C. 20530

RE: United Medical Servs. Co., Inc. v. United States

Dear Mr. Chadwick:

The United States Department of Justice retained Derk Rasmussen of Sage Forensic Accounting, Inc. ("Sage") to perform the following analyses:

1. Review the expert report issued by Robert A. Imel on February 25, 2008, and assess whether the opinions proffered by Mr. Imel are reasonably supported by the information he considered.
2. Review the expert report issued by Patrick J. Killman on February 25, 2008, and assess whether the opinions proffered by Mr. Killman are reasonably supported by the information he considered.
3. To the extent that errors are contained within the expert reports of Mr. Imel and/or Mr. Killman provide an alternative calculation of damages that corrects for such errors.

This report outlines the results of my review and presents the opinions and conclusions reached therefrom. If additional information becomes available that I deem relevant to the scope of this engagement, I reserve the right to modify this report accordingly. This report is not be used for any other purpose than as explicitly stated herein.

## *DOCUMENTS*

In connection with my analysis, I reviewed the documents listed in Appendix A.

## *QUALIFICATIONS OF THE WITNESS AND BASIS OF COMPENSATION*

The compensation to be paid for my study and for testifying as to my findings is $280 per hour. Please note that my curriculum vitae, which includes my testifying experience and a list of authored publications, has been attached to this report as Appendix B.

EXHIBIT
LIMINE
A

UTAH OFFICE
136 E South Temple, Suite 2220
Salt Lake City, Utah 84111

Telephone 801.531.0400
Facsimile 801.328.0400

NEVADA OFFICE
3753 Howard Hughes Pkwy, Suite 200
Las Vegas, Nevada 89169

Telephone 702.433.2092
Facsimile 702.433.2792

IDAHO O
801 West Main St
Boise, Idaho

Telephone 208.639.5226
Facsimile 208.639.5227

Sage FORENSIC ACCOUNTING

## *BACKGROUND*

United Medical Servs. Co., Inc. ("United Medical" or "Plaintiff"), operated a medical products supply company headquartered in Fort Worth, Texas.

In 1993, the Defense Supply Center Philadelphia[1] ("DSCP") issued a solicitation[2] that intended to establish a prime vendor program that would supply military medical installations with medical supplies. United Medical responded to this solicitation, but was not awarded the contract. However, in late 1995, due to circumstances within the government, the DSCP decided to award a new contract, and issued a new solicitation[3]. United Medical responded to this solicitation as well, and on January 30, 1997 it was awarded two contracts, SPO200-97-D-7133 and SPO200-97-D-7134, to be the prime vendor of medical and surgical supplies for the Lone Star region.[4] One contract covered orders under the "just-in-time and extended delivery" or "JIT/EDO" option and the other contract covered the "stockless" option, both of which will be more fully explained below. Over the course of the contracts, the Lone Star Region included participating military treatment facilities ("MTF" or "MTFs") in Texas, Oklahoma, Arizona, and New Mexico.[5]

I am not an attorney and am therefore unqualified to offer a legal opinion on the terms of the contract. However, in order to adequately calculate damages associated with the alleged breach of contract, it is necessary for the expert to understand the terms of the contract. Therefore, for purposes of this report, it is my opinion that the salient economic facts surrounding the award contract, the solicitation, and the offer (which I understand were incorporated into the contract) are as follows:

1. The prime vendor was intended to be the MTF's primary source of specific classes of goods.[6]
2. As part of the broader prime vendor program, the DSCP reached distribution and pricing agreements ("DAPAs") with medical, surgical, and pharmaceutical manufacturers. The DAPAs set forth the prices that the manufacturers would charge to the prime vendors. The MTFs were to order products from the prime vendor which would in turn order the products from the manufacturers. The DAPAs established a "chargeback" arrangement wherein once the prime vendor produced evidence to the manufacturer that the products were purchased and sold to the MTFs, the prime vendor would receive a credit or rebate for the difference between the original purchase price of the product and the price indicated on the DAPA between the DSCP and the manufacturer. It was the prime vendors' responsibility to finalize the chargeback arrangements with the manufacturers. The selling price charged by the prime

[1] It was known at the time as the Defense Personnel Support Center, however for convenience I will refer to it in this report by its current name.
[2] Solicitation Number DLA120-93-R-0587.
[3] Issued as Amendment 8 to the original solicitation, the entire solicitation, including amendments 1 through 7, were deleted and replaced by Amendment 8. Refer to documented number UMS01818.
[4] Refer to documents numbered UMS01355-UMS01365.
[5] The actual MTF's that participated in the prime vendor program in the Lone Star region, and the timing of their participation are outlined in Appendix C.
[6] Refer to document numbered UMS01819.

vendor to the MTF was to be the price on the DAPAs plus the distribution fee contained within the contract.[7] See Figure 1.

3. There were approximately 122,000 items under DAPA agreements, and the number was expected to rise to approximately 500,000. As part of the contract, the prime vendor committed to have all DAPA items available to be ordered through the electronic ordering system.[8] The prime vendor was only to accept orders for and provide items that were part of the prime vendor program, or in other words those items that were part of the DAPAs.[9]
4. There were essentially two options for the MTF's to participate in the prime vendor program. They could participate using a "stockless option" or the MTF could participate using a just-in-time/extended delivery (JITO/EDO) option. The stockless option required the prime vendor to keep track of inventory and provide needed supplies to the MTF on a daily basis, excluding weekends and Federal holidays. The JITO/EDO option required the MTF to keep track of its own inventory and provide orders to the prime vendor. The orders were to be filled within 24 hours for just-in-time orders and within 7 days for extended delivery orders.[10]
5. The solicitation indicated three types of JITO/EDO orders:
    a. Just-in-time orders: required to be delivered within 24 hours.
    b. Extended delivery orders: required to be delivered within seven days.
    c. Emergency orders: required to be delivered within six or twelve hours depending on the customers' location.[11]
6. United Medical's offer in response to the solicitation proposed a distribution fee of 7.4 percent for those MTF's that elected a "stockless" option and a distribution fee of 6.4 percent for those MTF's that elected a JITO/EDO delivery option. The distribution fee percentage would be added to the prices contained within the DAPAs.[12]
7. The ordering and payment arrangements were to be completely electronic. The MTF would place an electronic order with the prime vendor, which in addition to products and quantities would contain a call number. A copy of the order was also transmitted electronically to the DSCP.[13] Within two hours of its receipt of JIT and emergency orders, the prime vendor was required to reply with an order confirmation. A similar requirement, but with a time period of 24 hours was required for EDO orders.[14]
8. Concurrent with delivery of the goods, the prime vendor was required to produce a packing slip that showed the "delivery order number, date of the order, itemized list of supplies included in the shipment by product number ordered, quantity ordered, quantity shipped, and delivered unit price".[15]
9. In order to facilitate correct tracking of orders, the prime vendor was required to package each order separately for delivery to the MTF.[16] Known as "fill or kill", any items that could not be

[7] Ibid.
[8] Refer to document numbered UMS01697.
[9] Refer to document numbered UMS01689.
[10] Refer to documents numbered UMS01823-UMS01828.
[11] Refer to document numbered UMS01831.
[12] Refer to document numbered UMS01821.
[13] Refer to documents numbered UMS01833-UMS01837.
[14] Refer to document numbered UMS01837.
[15] Refer to document numbered UMS01841.
[16] Refer to document numbered UMS01831.

shipped in the first shipment were considered to be unavailable, and the order for the undelivered products was killed, either to be reordered under a different call number or ordered from an alternative source.[17] Furthermore, no drop shipments were allowed under the contract unless authorized by the MTF.[18]

10. The prime vendor was required to submit only one electronic invoice per delivery order. Upon notification from the MTF, the DSCP was required to electronically submit payment to the prime vendor within 15 days of the placement of the order, or 15 days of receipt of the goods, whichever was later.[19] See Figure 1.
11. The solicitation estimated that orders for the types of products covered by the contract would be $28,982,750 during the first year of the contract and $57,965,500 annually during each subsequent year. However, the solicitation indicated that "[n]o guarantee is given that the above volume will be purchased".[20] Further, the contract reiterated that "[t]he quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as 'estimated' or 'maximum' in the Schedule, that fact shall not constitute the basis of an equitable price adjustment."[21] The contract also indicates that the MTFs will be reducing their inventory and because of that fact sales for the first year were expected to be lower than in subsequent years.[22]
12. The prime vendor was required to maintain, at a minimum, a 95 percent monthly fill-rate for each MTF. The fill rate was calculated by MTF each month whereby the fill rate was equal to 100 percent less a controllable factor plus a non-controllable factor. The controllable factor was calculated as the total lines ordered and not shipped plus one half of total lines partially shipped; the sum was then divided by the total number of lines ordered. The non-controllable factor was calculated as the number of manufacturers' backordered lines divided by the total number of lines ordered.[23]
13. The prime vendor was required to provide monthly, quarterly and annual reports regarding its performance under the prime vendor program. Notably, as part of its reporting requirements, it was required to provide a monthly fill rate calculation report.[24]
14. Certain circumstances allowed the government to purchase from a supplier other than the prime vendor. These circumstances included the following situations:
    a. "When the government requires supplies or services covered by this contract in an amount of less that $50.00, the government is not obligated to purchase, nor is [United Medical] obligated to furnish, those supplies or services under the contract."[25]
    b. "If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if [United Medical]

[17] Refer to document numbered UMS01829.
[18] Refer to document number UMS01828.
[19] Refer to document numbered UMS01835.
[20] Refer to document numbered UMS01688.
[21] Refer to document numbered UMS01861.
[22] Refer to document number UMS01688.
[23] Refer to documents numbered UMS01829-UMS01830.
[24] Refer to document numbered UMS01838.
[25] Refer to document numbered UMS01860.

will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source."[26]

15. The contract was provided for a one year base period, and four one-year options.[27] Ultimately, the DSCP exercised three of its four options and the contract ran from June 1997 through April 2001.[28]
16. The MTF's were required to provide the prime vendor with usage data, or the item and associated quantities that it intended to order from the prime vendor.[29] There does not appear to have been any requirement that the MTF's provide usage data, however, items ordered from a facility that did not provide usage data would be excluded from the fill or kill calculation.[30] Although the implementation plan which United Medical was required to follow was dependant upon usage data, it appears that United Medical was exempt from this requirement if the government did not provide usage data within ten days of the contract award.[31]

For perhaps many different reasons, the volume of orders that were actually placed by the MTF's to United Medical was a fraction of the volume that was estimated in the solicitation. For the entire period of the contract, the MTFs purchased approximately $30 million in goods from United Medical, as opposed to the approximately $260 million estimated by the original solicitation.

In March 2001, United Medical filed for bankruptcy under Chapter 11 of the bankruptcy code. Coincidentally or not, "by mutual agreement of the parties" the relationship between United Medical and the DSCP was terminated at the end of April 2001.[32]

In a claim filed under the Contract Disputes Act of 1978, United Medical has claimed breach of contract and indicated that the MTFs diverted purchases primarily through the use of government issued credit cards. United Medical also claims that the DSCP routinely failed to pay within the time requirements of the contract. United Medical furthers alleges that the alleged diversions of purchases and the alleged failure to pay on a timely basis were the cause of its bankruptcy.[33] In more recent documentation proffered in this case and particularly an expert report issued by Mr. Patrick Killman, United Medical has alleged that the United States was negligent in its preparation of the estimates included in the solicitation.

## SCOPE OF WORK

United Medical designated Robert A. Imel as one of its expert witnesses. As outlined in his report, Mr. Imel will presumably offer testimony regarding alleged lost profit damages incurred as a result of the

[26] Ibid.
[27] Refer to document numbered UMS01820.
[28] Refer to documents numbered UMS01412, UMS01425, UMS06318, UMS06343, UMS06338; Amendment 26 to contract SP0200-97-D-7133.
[29] Refer to document numbered UMS01830.
[30] Refer to document numbered UMS01831.
[31] Refer to document numbered UMS01842.
[32] Refer to Amendment 26 to contract SP0200-97-D-7133.
[33] Refer to Claim dated June 28, 2002.

Sage FORENSIC ACCOUNTING

alleged diversion of Medical/Surgical purchases. Mr. Imel's opinions have been outlined in an expert report dated February 25, 2007.

United Medical designated Patrick J. Killman as one of its expert witnesses. As outlined in his report, Mr. Killman will presumably offer testimony regarding alleged damages incurred as a result of the alleged negligent estimates contained in the solicitation for the contract. Mr. Killman's opinions have been outlined in an expert report dated February 25, 2007.
Based on the issuance of these reports, and pursuant to Sage's engagement with the Department of Justice, Sage has performed the following analyses:

1. Reviewed the expert report issued by Robert A. Imel on February 25, 2008.
2. Assessed whether the opinions proffered by Mr. Imel are reasonably supported by the information he considered.
3. Reviewed the expert report issued by Patrick J. Killman on February 25, 2008.
4. Assessed whether the opinions proffered by Mr. Killman are reasonably supported by the information he considered.
5. Assessed causation and calculated the amount of damages, if any, to United Medical Servs. Co., Inc. as a result of the alleged actions of the Defendant.

The results of Sage's analyses with regard to the above-mentioned assignments are outlined in the sections that follow.

## THEORETICAL FRAMEWORK FOR DAMAGE CALCULATIONS

Prior to proceeding with a review of expert reports, one needs to understand the theoretical framework for damage calculations, as well as the criteria under which the report should be evaluated.

## ECONOMIC DAMAGE THEORY

There are many different texts and court cases that outline the various parts that must be considered when conducting an analysis of economic damages; however, no single source attempts to put all the pieces together in a format that can be applied to all cases involving economic damages. In fact, a review of damages calculation across numerous cases shows significant variations of economic damage calculations that are seemingly inconsistent with damage theory.

Based upon my years of experience in calculating economic damages, I have extrapolated the process of calculating economic damages and codified them as follows:

1. Identify and describe the incident allegedly responsible for economic damages ("incident").
2. Identify the date on which the incident took place ("incident date").
3. Identify and describe the party or parties that were responsible for the incident ("responsible party") and the party or parties that suffered because of the incident ("damaged party").
4. Identify, describe, and quantify the time period, subsequent to the incident, during which damages are alleged to have occurred ("damage period").

5. Identify, describe, and quantify the individual types or elements of economic damages suffered by the damaged party during the damage period ("damage elements").
6. Evaluate each of the damage elements to confirm the following:
   a. That the damage element can be traced back to the incident ("causal link" or "causation"). The stronger the causal link, the more likely it is that the incident caused or contributed to the damage element. If there are any <u>other</u> known or knowable factors that could have contributed to the damage element, those factors must be considered and incorporated into the determination of the damage element, either as mitigation or as a factor that weakens or casts doubt upon the causal link.
   b. That the damaged party reasonably mitigated or acted to reduce the size of the damage element ("reasonable mitigation").
   c. That each damage element is mutually exclusive of other damage elements alleged to have been caused by the incident ("mutual exclusivity").

**<u>Incident</u>**

As outlined in the background section above, the incident in this case as alleged by Plaintiffs has two parts: the diversion of purchases and the failure to make timely payments.

**<u>Incident Date</u>**

In this case, each time products that were required to be purchased from United Medical were purchased elsewhere constitutes a separate incident. Similarly, each incident wherein the DSCP failed to pay as required by the terms of the contract constitutes a separate incident. Generally, these incidents occurred during the course of the contract from June 1997 through April 2001.

**<u>Responsible Party and Damaged Party</u>**

As outlined in the background section above, the United States is the alleged Responsible Party, and United Medical is the alleged Damaged Party.

**<u>Damage Period</u>**

The damage period tracks the period in which the contract was in force, from June 1997 through April 2001.

**<u>Damage Elements</u>**

The Claim outlines various damage elements, however for purposes of this report, I only address those that are covered in the expert reports of Mr. Imel and Mr. Killman. As noted in those reports, the relevant damage elements for this report are as follows:

1. Mr. Imel's report allegedly calculates the lost profit damages associated with an alleged breach of contract by the United States for diverting purchases required to be made from United Medical to third-party vendors.
2. Mr. Killman's report allegedly calculates the damages associated with an alleged negligence on the part of the government in preparing the estimates that were included in the solicitation of the contract.

Sage FORENSIC ACCOUNTING

**THE IMPORTANCE OF UNDERSTANDING AND INTEGRATING CAUSATION WITH THE ECONOMIC DAMAGES ANALYSIS**

While every economic damages expert must have a thorough understanding of the theory behind damage calculations, it is also imperative that they understand how to apply said theory to the unique fact patterns of different cases. As outlined above, when evaluating each of the damage elements, the expert must ensure that each damage element can be traced back to the incident ("causal link" or "causation"). This is where the concept of causation is integrated into the analysis of economic damages.

Based on various authoritative sources and on my many years of experience in performing economic damage analyses, one of the foremost deficiencies in damage evaluations is the assessment of causation.

**Deductive Reasoning versus Inductive Reasoning**

There are two methods by which to derive and quantify damage elements: deductive reasoning and inductive reasoning.

The use of deductive reasoning is exemplified in the situation where the expert starts by evaluating the incident (the cause) and then observing the damage elements that flow from it (the effect). Deductive reasoning is logically valid in that the cause always leads to the effect.

In order for a damage element to be ascertained through deductive reasoning, the expert must by necessity establish a causal link, in effect proving that without the cause there would be no effect. If a damage element is proven through deductive reasoning, there will always be a causal link between the incident and the damage element.

The use of inductive reasoning is exemplified in the situation where the expert starts by alleging damage elements (the effect) and then seeks to trace or tie them back to a particular incident (the cause). Inductive reasoning is not logically valid in that the observed effect may not be related to the hypothesized cause.

For a damage element to be ascertained through inductive reasoning, there is no predicate requirement that the expert establish causation before quantifying damage elements. Therefore, any damage elements ascertained through inductive reasoning are inherently suspect because they have no intuitive connection to the alleged cause.

Establishing damage elements through deductive reasoning is the most directly associative method of establishing a causal link. While it is still possible to establish damage elements through inductive reasoning, the expert must exercise due care and extensive vigilance when associating the alleged damage elements with the incident (the hypothesized cause). When using inductive reasoning, it is imperative that the expert specifically address the strength of the alleged causal link.

**Duties of the Expert**

In "Causation: Hidden Dangers in Damages (New)", a chapter published in the 2005 Cumulative Supplement to the Third Edition of Litigation Services Handbook: The Role of the Financial Expert, the authors address the duties of the financial expert as those duties relate to causation. In part, this article states:

> Financial experts who testify about damages without understanding causation place themselves on quicksand. Ignorance of causation rules can lead an expert to exclude significant allowable damages or include damages not legally available. Experts for defendants, wanting smaller damages, can overlook or, alternatively, overwork powerful tools to limit potential damages. Either way, consequences for both expert and client can prove disastrous.
>
> Though dangerous causation issues lurk in every lawsuit, financial experts – and the counsel who engage them – too often gloss over these critical facets of a case. Plaintiffs' experts simply assume causation exists. They assume the defendant did a wrongful act and financially harmed the plaintiff, and they focus their analysis solely on the amount of damages stemming from the defendant's conduct. Initially, this approach seems to make sense. After all, financial experts rarely have the qualifications to assess causation. Causation and damages, however, are more symbiotic than many experts realize. The financial expert who understands the basics of causation will be better equipped to establish and defend sophisticated financial damage calculations.[34]

This excerpt reinforces the fact that an expert has a duty to understand and prove that a causal link exists between the incident and each of the damage elements. Furthermore, an expert is specifically precluded from relying upon an assumption that causation exists.

In The Expert Witness Handbook, additional guidance speaks to the reasoning process by which experts must arrive at opinions:

> The expert *interprets* scientific and technological facts and *renders* scientific and technological opinions based on the facts. Opinion must be based on a reasonable interpretation of the facts and scientific probability. Do not give opinions unless you can identify facts to support them.
>
> The facts on which an expert's opinion is based should come from:
>
> 1. Evaluation of the facts including those facts in dispute. Whatever you learned in your investigation, testing and/or analysis.
> 2. Personal knowledge of the particular field. What you have learned through education, training and experience.
> 3. Assumed facts supported by evidence.[35]

As noted in this excerpt, any assumptions the expert makes must be rooted in facts.

The American Institute of Certified Public Accountant's Practice Aid 06-4, "Calculating Lost Profits", is also instructive. Chapter 8, which deals with causation, states in part:

---

[34] Weil, Roman L., Michael J. Wagner, and Peter B. Frank. Litigation Services Handbook: The Role of the Financial Expert, Third Edition 2005 Cumulative Supplement. 2005. pp. 1A.1 – 1A.2.

[35] Poynter, Dan. The Expert Witness Handbook: Tips and Techniques for the Litigation Consultant, Second Edition, 1997. pp. 57-58.

Sage FORENSIC ACCOUNTING

> The plaintiff must prove that their loss is related to the breach or wrongful act. The fact that the defendant breached a contract or performed a wrongful act does not alone support damages.[36]
>
> The practitioner should also be aware of the distinction between the legal requirement of causation and the proof of the amount of damages. In order to recover damages for lost profits, it is necessary to show that the damages were proximately caused by the wrongful conduct of the defendant.[37]

To date, we have seen no causation evidence by Mr. Imel, Mr. Killman or Plaintiffs' counsel that reasonably correlates the damages calculations which Mr. Imel and Mr. Killman supplied to the alleged wrongful actions of Defendants.

**DAMAGE CALCULATION MODELS**

There are three variations on the economic damages sustained by an operating entity: a temporary decline in profits, a permanent decline in profits, and a permanent decline in profits followed by the destruction of the business. Each of these models is evaluated below.

**Temporary Decline in Profits**

In this model, the injurious event causes the damaged party to earn smaller profits than they would otherwise have earned but-for the injurious event. In this situation, the damaged party partially recovers from the effects of the injurious event prior to the trial date and is expected to fully recover at some point subsequent to the trial date. Since this scenario has part of the loss occurring before the trial date and part of the loss occurring subsequent to the trial date, the differential between but-for and actual that exists prior to the trial date is future valued forward to the trial date, while the differential between but-for and actual that is expected subsequent to the trial date is present valued back to the trial date.

**Permanent Decline in Profits**

In this situation, the damaged party never fully recovers from the effects of the injurious event but is expected to continue operating into perpetuity. Since this scenario has part of the loss occurring before the trial date and part of the loss occurring subsequent to the trial date, the differential that exists prior to the trial date is future valued forward to the trial date while the permanent differential expected to exist subsequent to the trial date is reduced to a value representative of the permanent diminution in the value of the damaged party. In general, this should be done by calculating the differential between post-trial projected but-for profits and post-trial projected actual profits, and then discounting or present valuing that differential back to the trial date using a net discount rate, which in turn should be calculated based on the difference between the risk of achieving the projected but-for profits and the risk of achieving the projected actual profits. Since the calculation of post-trial economic damages seeks to value the permanent decline in business value, the expert must pay particular attention to factors such as the discount rates applicable to projected but-for and actual future profits and the appropriateness of business valuation discounts and premiums.

---

[36] American Institute of Certified Public Accountant's Practice Aid 06-4, "Calculating Lost Profits", p. 19 at para. 41. See Exhibit 5.

[37] Ibid, at para. 43.

**Permanent Decline in Profits and Destruction of Business**

In this situation, the damaged party never fully recovers but rather goes out of business prior to the trial date. Since this scenario has part of the loss occurring before the trial date and part of the loss occurring subsequent to the trial date, the differential that exists prior to the trial date is future valued forward to the trial date while the differential that exists subsequent to the trial date (which is essentially but-for profits since actual profits are effectively zero) should be converted into a value for the destroyed business as of the trial date. In general, this should be done by calculating the post-trial projected but-for profits and then discounting or present valuing that stream of income back to the trial date using a discount rate that reflects the risks inherent in achieving the projected but-for profits. Since the calculation of post-trial economic damages seeks to value the destroyed business, the expert must pay particular attention to factors such as the discount rates applicable to projected but-for future profits and the appropriateness of business valuation discounts and premiums.

The information presented in the above sections is used as the framework upon which the expert reports of Mr. Imel and Mr. Killman are evaluated. The follow section and its subsections provide the evaluation.

## *EVALUATION OF EXPERT REPORT OF MR. IMEL*

I have reviewed the expert report of Mr. Imel. Based on that review, I have the following issues and concerns.

1. Mr. Imel fails to adequately address causation.
2. Mr. Imel failed to consider all the data which was available to him.
3. Mr. Imel relies on SIC codes to determine damages when he had additional information available to him that might have altered his conclusions.
4. Mr. Imel goes through apparently meaningless gyrations to end up in approximately the same place he started.
5. Mr. Imel's calculations fail to consider United Medical's actual fill-or-kill rates.
6. Mr. Imel's report contains various minor errors, which cumulatively effect the outcome of his report by over $1.66 million.

I discuss each of the issues in the sections that follow.

### MR. IMEL FAILS TO ADEQUATELY ADDRESS CAUSATION

As addressed previously in this report, an expert must show that the damages calculated reasonably relate to the alleged wrongful acts of the defendant. In other words, the alleged wrongful acts must have caused the damages calculated. In this case, rather than attempting to establish necessary elements of causation, Mr. Imel simply assumes that causation exists.

Indeed, as the Court in this case has previously stated:

> At best, the evidence provided by plaintiff is not just circumstantial, but itself speculative, and essentially represents a backhanded attempt to impose liability on defendant based on the difference between the estimates and the amounts actually purchased under the contract. That this court will not do. Indeed,

Sage FORENSIC ACCOUNTING

> plaintiff has not provided evidence of a single specific transaction in which the product purchased from a third party was explicitly covered by a DAPA under which plaintiff had obtained an agreement with the supplier.[38]

It is evident that Mr. Imel has still not developed his damage analysis to the extent the Court indicated, as his report does not indicate a single transaction where in a purchase was diverted. I would only add to the Court's opinion that in my opinion, in order to prove causation, United Medical should also be required to show that not only was the item purchased from a third party, but also that United Medical had the item available and the ability to supply that item as well.

Thus, the primary causation issue, as it relates to Mr. Imel's report, is whether or not the purchases he examines are for items that were required to be purchased from United Medical. In order to show that purchases were wrongfully diverted from United Medical, Plaintiff must show more than merely a receipt showing that a medical or surgical product was purchased from a vendor other than United Medical. In order for a purchase from a third party to rise to the level of a diverted purchase <u>all</u> of the following elements must be shown:

1. There was a valid DAPA agreement in place for the product in question.
2. United Medical had the ability (i.e., financial capacity, delivery capacity, management capacity, etc.) to supply the product within the time frame of the order.
3. There was no valid reason, i.e. a purchase amount of less than $50, to purchase the product from another source.
4. Despite the above items, the MTF purchased the product from a third party vendor.

There is substantial evidence that suggests that there are causation issues in this regard that must be overcome if United Medical is to show that it is entitled to the damages Mr. Imel calculates.

For example, there is evidence that some of the MTFs complied with the prime vendor program and first attempted to order the material through United Medical prior to purchasing outside the contract. Susheep Oden testified to this point as follows:

> Q. Did you have any discussions – well, the discussion you had regarding United Medical as the prime vendor, who did you have those with?
> A. Well, at that particular time, I didn't know. I only knew that what system or what PR, what purchase request, go through the prime vendor, and if that a prime vendor request, we not supposed to process. And anything that we receive from the section that is responsible for processing on a prime vendor, this means that we authorized to do the local purchase. And normally, that kind of indicated either are the backlog items or the item is no longer handled by the prime vendor program.[39]

She further testified:

> Q. And did you have an understanding that DBPA purchase requests had also been run though the prime vendor check to make sure that they couldn't obtain that item through the prime vendor?

---

[38] Summary Judgment Opinion filed December 23, 2004.
[39] Deposition of Susheep Oden, p. 12.

A. That was my understanding.[40]

Marie Boggs testified as follows:

> Q. What was your understanding of what credit card purchases were being used for?
> A. More for emergency situations or for products that the vendor could not supply.[41]

Debra Thompson also testified on this as follows:

> Okay, if [United Medical] stocked it, if they had it on hand, and it was a DAPA item, we would order it. But if it was a nonrecurring item, they did not have it on hand…So if it was a nonrecurring, and they did not stock it, we had to seek other means to buy it.[42]

She further testified:

> It was either fill or kill, that I'm familiar with the contract. That's it. If they didn't have it, we bought it elsewhere.[43]

There is also evidence that suggests that many of the items that the MTFs were ordering were not available in the prime vendor program. Helen Connor testified as follows:

> It was generally known from complaints from our customers that they were not able to buy all of the items they needed under the med/surg prime vendor contract, and they complained that they still had to rely upon their local purchase contracting offices, which might issue a manual purchase order or they might still have to rely upon credit cards…[44]

She further stated:

> I don't know what the estimated sales were, but I know that all customers complained that the breadth of offerings under the DAPA, that was available in DAPA, what they wanted to buy wasn't available under the program.
> So they had to go outside the program or the prime vendor was not stocking in sufficient quantities and, therefore, they could not purchase from the prime vendor and had to go elsewhere to get those items.[45]

James Jennings also testified to problems with the prime vendor system and item availability:

> Q. …Did any prime vendor express any concern to you that projected sales as expressed in the award were a lot higher than what actually was being made?
> A. Not directly to me.
> Q. So I gather you've heard about that indirectly?
> A. Yes.
> Q. Tell me about that. What have you heard?

---

[40] Ibid, p. 14.
[41] Deposition of Marie Boggs, p. 48.
[42] Deposition of Debra Thompson, p. 14.
[43] Ibid, p. 72.
[44] Deposition of Helen Connor, p. 8.
[45] Ibid, pp. 9-10.

A. That the sales weren't meeting what they were projected to be?
Q. Did you get involved in why that was the case?
A. No.
Q. Do you have an understanding of why that was the case?
A. That the facilities weren't getting what they were ordering and would have to get them someplace else.[46]

Mr. Imel's report does not rise to the level of detail necessary to show that there is a link between the damages he calculates and the alleged wrongful actions of the Defendant; he has not presented a single example of a purchase where all of the above mentioned issues were present. Rather he simply assumes that purchases from specific SIC codes constitute a diverted purchase. While the sheer volume of purchases suggests that a diversion of some required purchases may have occurred, it is my understanding that the Plaintiff bears the burden of proof to show that the purchases did actually constitute a diversion.

Key failures with Mr. Imel's assumptions include the following:

1. No analysis of United Medical's inventory has been done to show that DAPA items were readily available on a consistent basis.
2. No analysis of the products which were purchased under the SIC codes Mr. Imel uses was done to show that the items purchased were included on the DAPA's.
3. No analysis of the United Medical's capacity (i.e., financial, delivery, management, etc.) to fill the alleged diverted purchases was done.
4. No analysis was done to determine what percentage of purchases was made outside of the requirements contract for valid reasons.

Admittedly, the volume of documentation produced in this case requires an expert to make various assumptions regarding whether or not the MTF purchases were potentially diverted. However, the assumptions made, as noted previously, must be rooted in the facts of the case, and should be made only after examining all of the available data. As will be noted in the following section of this report, it appears as though Mr. Imel has failed to include relevant portions of data which was available to him in reaching his conclusions.

**MR. IMEL FAILED TO CONSIDER ALL THE DATA WHICH WAS AVAILABLE TO HIM**

Despite the fact that Plaintiff has repeatedly complained about the destruction of documents in this case, and that the lack of documentation is prejudicial to its case, its own expert ignores a portion of the available documents. It is readily apparent from a review of Mr. Imel's report that he has failed to even consider all of the documentation that has been available to him.

Approximately 200 discs have been produced in this case, many of which contain images of scanned documents produced from the MTFs. Among these documents were images of credit cards statements, including credit card statements for periods not covered by the electronic data obtained from the OIG's office.

---

[46] Deposition of James Jennings, p. 47.

As shown on Schedule 1, we have summarized the data produced for the contract period. Months of the contract period are listed across the top, and each MTF is listed on the left, in a matrix fashion. The boxes in the matrix that are black are not included in the contract; the boxes that are highlighted green and contain the notation "OIG" are periods for which OIG data exists; the boxes that are highlighted yellow and contain the notation "CCS" are periods for which credit card statement data exists; the boxes that are blank indicate the periods for which we have no data. Based on this analysis, data exists for a total of 639 of 951, or 67.2 percent of all MTF months. However, the OIG data only covers 553 of 951, or 58.1 percent of all MTF months. Rather than examine the actual data on the credit card statements, Mr. Imel simply extrapolated the OIG data for 86 MTF months, or nearly 10 percent of the data available to him.

In my opinion, Mr. Imel's extrapolations render his calculations unreliable, because he could have examined and extracted data from the existing credit card statements, rather than simply extrapolating from the OIG data.

The scanned images also contained supporting documentation, including invoices for the purchases made. Using the invoices, Mr. Imel could have examined purchases in the SIC codes he selected and then compared the items purchased to the DAPA catalogs that were also produced to determine if in fact these purchases were of items that were available on the DAPA.

While it would have been very time consuming and expensive to perform a complete examination of this type, even a sampling process would produced better data upon which to rely than to simply make the blanket assumption that all (or 50 percent of) purchases from a specific SIC code were for DAPA products.

For example, a sampling type examination may have revealed that 75 percent of purchases for a specific SIC code were for goods that were included on the DAPA. This could have led to an assumption that 75 percent of purchases from that SIC code should be included as diverted purchases. However, since Mr. Imel failed to perform such an analysis, we are left without that knowledge and any percentage that is assumed is purely speculation. Instead, Mr. Imel wants the Court to simply adopt his assumption when there is no basis in the evidence to suggest any particular percentage of those products actually represent diverted sales.

**MR. IMEL RELIES ON SIC CODES TO DETERMINE DAMAGES WHEN HE HAD ADDITIONAL INFORMATION AVAILABLE TO HIM THAT MIGHT HAVE ALTERED HIS CONCLUSIONS**

Mr. Imel's relies on purchases in four SIC codes in determining his estimate of diverted purchases. While these SIC codes generally include medical/surgical supplies of the sort that the MTF should have purchased from United Medical, they also likely include various items that were not part of the DAPA. An SIC code is incredibly broad, and likely includes millions of potential products that could be sold. On the other hand, MTF's were only required to purchase items from United Medical that were included in the DAPA catalogs.

Sage FORENSIC ACCOUNTING

In a test of this theory, I located a credit card statement with transactions that showed an SIC code of 5047, this particular credit card statement was for Rick L Lofrese, Sr., at Kirtland AFB, New Mexico.[47] I then located the corresponding purchase orders/receiving report for those transactions to determine what items were purchased in that particular transaction.[48] I then search the DAPA catalog produced for that particular month to determine whether that item was located on the DAPA catalog. In doing so, I could not find any of these items that were on the DAPA.

I readily admit that I did not do this for all items, and that my search was not exhaustive. The point is that not all items from this SIC were DAPA items, and therefore were not required to be purchased from United Medical. Based on this analysis, Mr. Imel has potentially included hundreds of valid, non-diverted purchases in his estimate of diverted purchases.

My understanding of the origin of the SIC code data that has been reported in the OIG's database and in the credit card statements is that the SIC code data comes from the vendor. In other words, the vendor can identify whatever SIC code he or she wishes when reporting the sale of products. There is also a significant amount of unreliability in using these numbers based on the sole fact that this number can and does change from transaction to transaction. This is perhaps no more evident in transactions involving United Medical itself. We have identified 10 distinct SIC codes used in transactions between MTFs and United Medical in our analysis of the credit card statements and OIG data.

Based on my analysis of the DAPA catalogs in combination with the credit card statements and OIG data received, DAPA contract holders have reported 56 different SIC codes in the transactions. I also note that DAPA manufacturers report 66 different SIC codes. On the other hand, I have identified 1898 vendors who have used the 5047 SIC in a transaction, but only 208 who both use the 5047 SIC code and who are DAPA holder as well. If we include DAPA manufacturers, the number goes up to 359.

In my opinion, a potentially better method of estimating the purchases that were diverted would be to determine the number of purchases that MTF's made from actual DAPA holders and/or manufacturers. The DAPA catalog cd's produced in this case list the DAPA items, along with the DAPA contract holder and the DAPA product manufacturer for each item. By matching up DAPA holders and/or manufacturers, a better comparison might be made.

I readily admit that the same uncertainty issues regarding the items purchased remains when doing an analysis of vendors rather than an analysis of SIC codes, but at least when approaching it from this frame of reference there is a link back to the items that were actually required to be purchased from United Medical under the terms of the contract.

[47] Refer to document numbered KAFB-CC-00002635 to KAFB-CC-00002649.

[48] Refer to documents numbered KAFB-CC-00002726, KAFB-CC-00002743, KAFB-CC-00002762, KAFB-CC-00002824,2830, KAFB-CC-00002784, KAFB-CC-00002939, KAFB-CC-00003066, KAFB-CC-00003082.

Sage FORENSIC ACCOUNTING

**MR. IMEL GOES THROUGH APPARENTLY MEANINGLESS GYRATIONS TO END UP IN APPROXIMATELY THE SAME PLACE HE STARTED**

I am aware of the Court's order in this case which limits the ability of the United States and its expert from cross examination and criticism of United Medical's expert in the area of how the expert extrapolates and fills in the gaps in the record. As per the Court's order:

> First, defendant should be prohibited from cross-examining plaintiff's expert to the extent that the expert construes, to plaintiffs' favor, the gaps in the record created by defendant's spoliation and from adducing its own expert testimony construing the same gaps.
> [FN] Defendant will be permitted to provide factual testimony identifying precisely where the gaps in the records occur, as well as any other factual evidence that may be used to determine the accuracy of any assumptions employed by plaintiff's expert. Such evidence, however, may not relate to the contents of the lost documents nor supply any form of opinion testimony with respect thereto. Defendant will also be permitted to show that certain documents were destroyed prior to the time that it had notice of plaintiff's claim.

Based on my review of Mr. Imel's report and my understanding that the data related to credit card records that was alleged destroyed, it appears to me that the areas covered by the Court's order would consist of the methodology in which he extrapolates and fills in the gaps related to missing credit card data for the various MTF's. Mr. Imel does this by using growth rates from year to year in worldwide medical/surgical sales for year over year periods, and by taking monthly averages and applying those to missing months for periods missing within a year. I am not criticizing Mr. Imel for this type of extrapolation, in part because of the Court's order, but in part because the methodology seems reasonable in the current circumstance. Nevertheless, I can see where it might be questioned whether my comments in this particular section could be construed as a violation of the Court's order.

I completely understand and realize that the Court has the ultimate say on this issue, and that my opinions on this subject are not those of an attorney. However, in my opinion, my criticisms in this section do not fall within the Court's order because the criticisms herein address the methodology Mr. Imel employs after he obtains an estimate of the credit card purchase data for the periods which he lacked data. The criticisms herein address an issue in which Mr. Imel grosses up estimated sales using evidence that does not appear to fit the circumstances, and do not address the methodology in which Mr. Imel has filled in the gaps of the credit card data.

In coming up with his estimate of diverted purchases, Mr. Imel starts with credit card purchases. Then based on a document from Fort Hood, he grosses this number up by 34.4 percent to arrive at an estimate of total medical/surgical purchases. From there, he backs out a percentage of these sales based on prime vendor purchases as a percentage of worldwide medical/surgical purchases.

I have attempted to understand the rationale for grossing the number up and then backing off a percentage, but as yet, I have been unable to discover a valid reason for performing these steps. I understand in part, the idea of determining the overall medical/surgical purchases by grossing up credit card sales, but the whole process appears to me to be simply a methodology for increasing the number of estimated diverted purchases.

Sage FORENSIC ACCOUNTING

My first major issue is the use of a six-month period out of 46 total months, for one of the 22 MTF's to extrapolate for the entire group. We have no way of knowing how the numbers contained on the document Mr. Imel references were compiled, nor can we reference the data underlying this document to check for veracity. Mr. Imel has simply assumed that this percentage applies to all of the MTF's and all of the time periods involved. The document itself shows significant variability between time periods. While Mr. Imel uses an average of 34.4 percent which occurs during the entire six month period, when the same percentage is applied on a quarterly basis, the respective percentages are 30.3 percent in the last quarter of 1999 and 37.9 percent in the first quarter of 2000. In my opinion, the application of this percentage is a mistake.

The use of worldwide medical/surgical purchases is likewise nonsensical. Worldwide medical/surgical purchases likely have little to no resemblance to the actual experience at each of the MTFs, so applying this number makes no sense. Furthermore, the numbers are likely tainted by the inclusion of data from the Lone Star region in determining the percentage. While this tainting likely benefits the United States instead of United Medical, it still skews the results.

The net effect of the steps Mr. Imel performs is to raise the estimate of diverted purchases from roughly $51.4 million to $102.3 million. But there is no reliable evidence upon which this data is based. The weight of the evidence shows that credit cards were the method by which purchases were allegedly diverted.

Mr. Bandy testified that in his conversations with Michael Schmitt "He said primarily credit card purchases of those items"[49] were the reason that actual quantities didn't reach estimated quantities. Mr. Bandy further cites a conversation with Mr. Amendolia in which he indicates that Mr. Amendolia told him "that the MTFs were using credit cards instead of complying with contractual obligation to purchase from us on DAPA".[50]

United Medical's claim also refers to an article by Mr. Schmitt which indicates that the failure of the prime vendor program is attributed to two factors, the first being the use of government credit cards, and the second being the implementation of the program at MTFs.[51]

I have yet to see any credible evidence that indicates that purchases were diverted by means other than credit cards. Even though there are problems with the credit card data, at least with the credit card purchases, there is somewhat of an indication that purchases for DAPA items were taking place. In the case of the other categories of purchases contained on Mr. Imel's document (primarily Local Purchase, DBPA, and Other) he has not pointed to any credible evidence that indicates that these items were for purchases of items that should have been purchased from United Medical.

[49] Deposition of William P. Bandy, May 25, 2005, p. 50.
[50] Deposition of William Bandy, August 4, 2006, p. 39.
[51] Claim dated June 28, 2002, p. 23.

It appears that the only source of reliable information that Mr. Imel has for diverted purchases is the credit card data. In my opinion, he should have simply used these numbers, and then applied his revenue and cost percentages to them.

**MR. IMEL'S CALCULATIONS FAIL TO CONSIDER UNITED MEDICAL'S ACTUAL FILL-OR-KILL RATES**

Mr. Imel's calculations come up with an estimate of diverted sales. Mr. Imel then applies estimated revenue and variable cost percentages to the estimates of diverted sales in order to estimate United Medical's lost profits. However, Mr. Imel's calculation fail to consider the United Medical's ability to actually provide the products associated with the estimated diverted sales.

As noted previously, it is my opinion that Mr. Imel should have performed an analysis of United Medical's inventory records in order to determine if they had goods on hand when orders were placed. Mr. Imel did not do this analysis, but this is not all Mr. Imel failed to consider.

United Medical's actual performance on the contract indicates that it was not able to supply all the goods ordered. The contract had a fill or kill policy, meaning that if United Medical could not fill the order, it would be killed. Although I am unaware of United Medical's fill percentage for the life of the contract there is certainly evidence that it wasn't 100 percent.[52] Given that United Medical did not even have the ability to fill all of the orders it received, it is unreasonable to assume, as Mr. Imel does, that United Medical would have been able to fill all of the orders for alleged diverted purchases had it actually received said orders. Some adjustment should have been made for United Medical's actual fill rates.

**MR. IMEL'S REPORT CONTAINS VARIOUS MINOR ERRORS, WHICH CUMULATIVELY EFFECT THE OUTCOME OF HIS REPORT BY OVER $1.66 MILLION**

In the process of reviewing Mr. Imel's report, I have attempted to recreate all of his schedules so that I could understand the formulas and methodologies behind the lost profits he calculates. In performing this recreation, I have discovered a number of errors. While the errors individually do not have a large impact on the lost profits calculation, cumulatively, they result in a change of over $1.66 million.

In order to recreate Mr. Imel's Exhibits, we pulled the files from CD's received from OIG. Files were then grouped according to location, combined into one spreadsheet, and then sorted based on the criteria Mr. Imel indicates in his Exhibit. The amounts generated by our calculations were then compared to Mr. Imel's Exhibit C. Through this process we were able to match all of the numbers in Mr. Imel's Exhibit for the following locations:

1. Altus AFB
2. Cannon AFB
3. Dyess AFB
4. Ft Sill

[52] See for example documents Bates numbered UMS00196-UMS00201, UMS00206, UMS00211-UMS00212, among others.

Sage FORENSIC ACCOUNTING

5. Kelly AFB
6. Goodfellow AFB
7. Sheppard AFB
8. Tinker AFB
9. Vance AFB

However, we found multiple discrepancies for the following locations:

1. Brooks AFB
2. Corpus Christi
3. Ft Bliss
4. Ft Hood
5. Ft Huachuca
6. Ft Sam Houston
7. Holloman AFB
8. Randolph AFB
9. Laughlin AFB

At this point of my analysis I have not yet been able to identify each problem, but through trial and error I was able to generate a list of some of the errors Mr. Imel made. The list of discrepancies below is not all inclusive, but gives a general idea of the inconsistency, and unsupported rationale by Mr. Imel in creating Exhibit C, as follows:

1. It appears that Mr. Imel has misclassified the date range applicable to each location. I found that Mr. Imel included additional dates that did not fit in the data range, therefore the amounts in certain locations have been over overstated. For example, Brooks AFB shows $175,583 under "12 months 1998." According to Mr. Imel, the appropriate data range should be 1/98 to 12/98. Through the recreation I found that Imel actually included 1997 transactions. Therefore, not only is 1998 misstated so is 1997 for SIC code 5047. This type of misclassification problem was found in multiple locations.
2. It appears that Mr. Imel has excluded certain of the OIG files in putting together his calculation. The OIG files provided by the government contained multiple files for each location. Therefore in order to recreate Imel's schedules we had to combine certain files together by location. We assumed that each file should be combined if it contained the location name in the title of the file or if the 'CHCity' code in the file matched. We found this process to be unsuccessful because Imel excluded certain files; he did not provide explanation or reason to this in his report. For example, it appears that the following files should have been included in the Fort Bliss recreation: 'EL PASO FT BLISS 21 44', 'FORT BLISS 21 49', 'ELPASO 2 21', 'FTBLISS 10 21', 'EL PASO 21 45', 'FT BLISS 21 63', 'WSMR2 21', and 'FORTBLISS 5 21'. However, I found that Mr. Imel excluded half of these files and only used the following files: 'EL PASO FT BLISS 21 44', 'FORT BLISS 21 49', 'ELPASO 2 21', 'FTBLISS 10 21'.
3. As described earlier, Mr. Imel included certain transactions which overstated his amounts; however, it appears he has also excluded transactions without explanation. For example, in the Fort Bliss spreadsheet, SIC code 5047, "12 months 2000," Imel reported was $745,767.

Sage FORENSIC ACCOUNTING

Through recreation I discovered that Mr. Imel did not include the file entitled 'FORT BLISS 21 49'. By not including this file, Mr. Imel was inconsistent between that particular calculation and the other SIC codes in the 2000 category which do actually use 'FORT BLISS 21 49'.

4. It appears that Mr. Imel has double counted credit card transactions in Fort Hood. According to the Ft Hood spreadsheet, Mr. Imel includes "Missing Credit Card Data per Bates Stamp DAMC 00690." He uses this data to adjust "12 months 1999" and "12 months 2000". Mr. Imel inappropriately overstates 1999, because the $1,308,301 included under SIC Code 5047 includes data for the entire year. Mr. Imel stated that the data range for 1999 should be from January 1999 to June 1999, but in actuality it contains transactions from January 1999 through December 1999. These transactions can be found in the files entitled 'FT HOOD PT 1999 2000 21' and 'FTHOOD 11 21'.

In addition to the problems and discrepancies I discovered in recreating Mr. Imel's Exhibit C, I have also found the following errors in the remainder of his damage calculation model.

1. In Mr. Imel's Exhibit E, on the line for Tinker AFB, during the 7 months during 1997, the spreadsheet shows the total for all of the SIC code purchases when referring back to Mr. Imel's schedule in Exhibit C for Tinker AFB. The number in this spreadsheet shows as $183,771 but when referring back to the Tinker AFB schedule, the number should be $81,967.
2. Despite Mr. Imel's reference to the Solicitation in his report that indicates that the MTF's were not required to use the prime vendor for orders below $50[53], Mr. Imel includes these orders in determining lost profits.
3. Mr. Imel has included transactions for periods not covered by the contract. Specifically, he has included data from the entire month of April. As shown on Amendment 26 to the contract[54], the various MTFs were phased off the contract on various dates through April, beginning as early as April 5, 2001, and were not required to purchase from United Medical for the entire month.
4. Mr. Imel has included transactions on credit cards that were placed with United Medical in calculating the amount of lost profits. Since United Medical received the benefit of these purchases, they should be excluded in determining diverted purchases.
5. As noted previously, Mr. Imel has failed to use data from the credit card images that were provided. In my opinion, Mr. Imel errs by extrapolating for those periods rather than using the actual data available to him.

In order to determine the magnitude of these errors, I have recreated Mr. Imel's schedules, correcting the errors noted above. This recreation is shown on Schedules 2a to 2w. The cells that I changed are highlighted in green. After correcting for these errors, Mr. Imel's calculation of lost profits changes to $3,968,059, or $1,661,651 less than his original calculation.

[53] Expert Report on Loss Profits due to Diversion of Medical/Surgical Supplies by Robert A. Imel, p. 5.
[54] Refer to Amendment 26 to contract SP0200-97-D-7133.

Sage FORENSIC ACCOUNTING

## *EVALUATION OF EXPERT REPORT OF MR. KILLMAN*

I have reviewed the expert report of Mr. Killman. Based on that review, I have the following issues and concerns.

1. Mr. Killman fails to adequately address causation.
2. Mr. Killman's analysis does not appear to be based on actual bid documents United Medical used to prepare its bid.
3. Mr. Killman has essentially projected no incremental increase in fixed costs, which by its very nature appears to exclude a calculation of the type Mr. Killman opines to.
4. Mr. Killman's report is duplicative of Mr. Imel's calculation of damages.

I discuss each of the issues in the sections that follow.

### MR. KILLMAN FAILS TO ADEQUATELY ADDRESS CAUSATION

Mr. Killman addresses negligent estimates, however, he has failed to address a key issue in this regard, which is whether or not United Medical would have even obtained the contract if it had been given the reasonable estimates Mr. Killman suggests. In his deposition, Mr. Bandy testified that:

> Q. If the governments estimates in the solicitation had been more along the lines of the numbers that the government actually ended up purchasing, what do you think you would have done different? First of all, I guess, would you have even bid? And if you – if you would have bid, would it be –
> A. Certainly, the – the – assuming the numbers – if – if I had known the numbers would be as they turned out to be, I would have bid 12 percent – cost plus 12 percent or more, but probably 12 percent, rough, roughly double.[55]

It is highly questionable whether United Medical would have obtained the contract if the estimates had been in the range Mr. Killman suggests.

### MR. KILLMAN'S ANALYSIS DOES NOT APPEAR TO BE BASED ON ACTUAL BID DOCUMENTS UNITED MEDICAL USED TO PREPARE ITS BID

In preparing his estimate of fixed costs, it appears that Mr. Killman used actual costs from United Medical's financial statements in determining an estimate of fixed costs. While I am not an attorney and cannot offer a legal opinion on the subject, it appears from my reading of the case law and further based on conversations with counsel that the case law requires that calculations such as the one Mr. Killman performed should be based on the actual bid documents that United Medical used in preparing its bid.

This makes intuitive sense because United Medical should be able to cover its actual historical fixed costs with its existing book of business. It also would not have incurred additional variable costs related to the sales it allegedly missed out on. Therefore, in order to put United Medical back into the same position it would have been absent the alleged diverted sales, it would be entitled to recover any incremental fixed costs (or extra expenses) it incurred as a result of investing in the equipment, personnel, etc., necessary to administer the contract, as well as the lost gross margin it lost due to sales

[55] Deposition of William P. Bandy, May 25, 2005, p. 20.

Sage FORENSIC ACCOUNTING

it did not obtain. Since Mr. Imel's report addresses lost gross margin, Mr. Killman's report should show the incremental fixed costs (or extra expenses) United Medical incurred as a result of the contract.

In his deposition, Mr. Bandy testified to the additional overhead that would be required to administer the contract, as follows:

> For instance, based on the – based on William Beaumont Hospital in El Paso, I knew I would have to open a warehouse at least 30,000 square feet in El Paso. I immediately increased warehouse size in San Antonio an additional 16,000 feet.
> We had a major expense – initially would be computer – 100 to $125,000 to upgrade certain elements to take care of it....[56]
> I hired a few additional warehouse people, not too many addition – that was part of my rationale in the bidding process, that it would – the increase in personnel would be incremental....[57]
> Yes, we leased a few more trucks, yes, which, of course, meant a few more drivers...[58]

Other than the items referred to in Mr. Bandy's deposition, I am unaware of any additional overhead that would have been necessary to administer the contract. The problem centers on the fact that we have no bid documents or records that would indicate what United Medical expected in terms of these additional fixed costs. It is my opinion that in order for Mr. Killman's approach to be valid, it would need to be based on actual bid documents.

The only bid documents of which I am aware are attached to Mr. Bandy's August 4, 2006 deposition as Exhibit 1. These documents estimate gross profit and cash flows from the contract and contain a copy of a sticky note that roughly outlines Mr. Bandy's description of the types of fixed costs he would have needed to incur to administer the contract. However, the documents do not show the amounts for incremental fixed costs, nor does it appear that Mr. Killman relied on these incremental fixed costs in putting together his estimates.

Furthermore, Mr. Bandy testified that to his knowledge no one prepared a break-even analysis in connection with preparing the bid.[59] A break even analysis is designed to show the amount of sales it takes to cover fixed expenses. Since this type of analysis was not done, it is difficult to know what the incremental fixed expenses would have been for the contract.

Without the bid documents reflecting the incremental fixed costs expected to occur, we are unable to determine the increase in profits that United Medical expected to achieve as a result of entering into the contract. As a result it is impossible to put them back into the position they would have been in under this approach. Without using the incremental fixed costs associated with the contract, Mr. Killman's approach is inappropriate and invalid.

---

[56] Deposition of William P. Bandy, May 25, 2005, p. 15.
[57] Ibid, p.16.
[58] Ibid, p.18.
[59] Deposition of William P. Bandy, August 4, 2006, p.130.

**MR. KILLMAN HAS ESSENTIALLY PROJECTED NO INCREMENTAL INCREASE IN FIXED COSTS, WHICH BY ITS VERY NATURE APPEARS TO EXCLUDE A CALCULATION OF THE TYPE MR. KILLMAN OPINES TO**

As mentioned in the previous section, United Medical should be able to cover its actual historical fixed costs with its existing book of business. It also would not have incurred additional variable costs related to the sales it allegedly missed out on. Therefore, in order to put it back into the same position it would have been absent the alleged diverted sales, it would be entitled to recover any incremental fixed costs it incurred as a result of investing in the equipment, personnel, etc., necessary to administer the contract.

Based on this theory of damages, in order for United Medical to recover damages, it must have incurred additional or incremental fixed costs. However, this is not the approach Mr. Killman takes. Rather, Mr. Killman's appears to base his calculation of fixed costs on historical amounts from the fiscal year prior to the inception of the contract. He then assumes that fixed expenses are to remain flat during the entire period of the contract. Accordingly, he projected no increase in fixed costs.

In order to recover incremental fixed costs, there have to be incremental fixed costs. Mr. Killman assumes no increase in fixed costs, and accordingly, his calculation by its very nature should preclude the type of calculation which he performs.

**MR. KILLMAN'S REPORT IS DUPLICATIVE OF MR. IMEL'S CALCULATION OF DAMAGES**

Mr. Killman opines that a reasonable estimate of the purchases the United States should have included in its solicitation was between $38.8 million and $99.3 million. His estimate of damages for negligent estimates is based on an opined reasonable estimate of $62.1 million.

In contrast, Mr. Imel estimates that the MTFs should have purchased approximately $100 million in goods from United Medical, but only purchased approximately $30 million, concluding that United Medical was deprived of approximately $70 million in due to diverted purchases.

In my opinion, Mr. Killman's calculation is duplicative to Mr. Imel's calculation because it does not consider the additional sales that United Medical allegedly would have gotten had the United States complied with the contract.

As noted in the case law,

> The general rule in common law breach of contract cases is to award damages sufficient to place the non-breaching party in as good a position as it would have been had the breaching party fully performed.[60]

In this case, United Medical would be in as good a position as it would have been had the United States fully performed if it had obtained the alleged diverted sales. Obtaining the alleged diverted

[60] 06-1 BCA P 33135, ASBCA No. 54630, ASBCA No. 54435, 2005 WL 3100997 (A.S.B.C.A), Appeals of – S.P.L. Spare Parts Logistics, Inc. Under contract No. DAAE07-92-D-A006.

Sage FORENSIC ACCOUNTING

purchases would have likely put the United Medical's actual sales to the MTF's solidly in the middle, if not the upper end, of the range Mr. Killman presents as a reasonable estimate which should have been used in the solicitation. In other words, it would have obtained sales in the range which Mr. Killman believes are reasonable, and therefore it would have been in as good a position as it would have been.

In my opinion, if the Court awards United Medical lost profits, it must consider the amount of diverted sales used to calculate such lost profits to determine any damages attributable to allegedly negligent estimates.

***TO THE EXTENT THAT ERRORS ARE CONTAINED WITHIN THE EXPERT REPORTS OF MR. IMEL AND/OR MR. KILLMAN PROVIDE AN ALTERNATIVE CALCULATION OF DAMAGES THAT CORRECTS FOR SUCH ERRORS***

As noted above, it is my opinion that serious causation questions remain that prohibits the ability of any expert to reliably determine the damages in this particular case. Because of such questions, any expert is required to make assumptions regarding these issues in order to approximate the damages sustained by the Plaintiff in this particular case.

However, given those facts, I believe that there are serious errors in the assumptions used by Mr. Imel and Mr. Killman to estimate the damages attributable to the United States as a result of the alleged breaches of contract. Although I believe it is the Plaintiff's burden to support assumptions and establish causation, I have performed my own calculations of damages using various assumptions that will be outlined below. However, I want to emphasize that I do not consider these calculations to be reliable given the unsubstantiated causation assumptions necessary to calculate damages in this case. I have provided these calculations to demonstrate the proper method for the calculation of damages in this case.

All of my damage calculations rely on an SQL database which was created using data obtained in an excel spreadsheet format from the United State's Office of Inspector General and data obtained from data entry of credit card records scanned at the various MTF's.

The database contains transaction data from credit cards, the primary method by which United Medical has alleged that sales were diverted. The transactional data contained in the database consists of MTF data, vendor data, dates, and amounts. The database consists of over 370,000 individual transactions amounting to over $181 million of purchases from over 17,700 vendors for the relevant MTFs during the contract period.

The key drawback to the database is that it does not contain data regarding the supplies that were actually purchased from each vendor. Rather the database consists primarily of the data that might be obtained from a common credit card statement, because that is in fact where the information was obtained.

As mentioned previously, some documentation exists that could be used to determine what supplies were actually purchased using the credit cards. Many of the scanned documents from the MTF's

contain supporting documentation such as purchase orders, packing slips, and invoices that back up the transactional data contained in the credit card statements.

Given the time and expense that would be necessary to expend in order to go through all of this documentation, a decision was made to not put forth this effort. Rather, it was determined that the most efficient course of action would be to examine the credit card statements, and make various assumptions regarding whether the supplies purchased from the credit cards constituted a diversion from the contract based on an analysis of the vendors.

Another drawback to the database is that even though I have obtained data regarding credit card purchases made from each MTF, there are still gaps in the evidence, or in other words there are time periods for which no data exists in the database. Because of this drawback assumptions are necessary regarding the amount of diverted purchases during these time periods.

I have prepared three scenarios wherein I have calculated lost profits for United Medical based on assumptions about the vendors.

Each of the scenarios assumes the following facts, all of which fall in the favor of the Plaintiff:

1. There was a valid DAPA agreement in place for the products in the transactions in question.
2. United Medical had the ability (i.e., financial, delivery, management, etc.) to supply these products within the time frame of the order.
3. There was no valid reason, i.e. the item was not in stock, or a purchase amount under $50, to purchase the product from another source.

Because of the causation issues surrounding these assumptions, it is my opinion that the range in my scenarios represents the maximum amount that might be due to United Medical for lost profits. It is further my opinion that additional causation evidence would need to be presented in order for United Medical to recover damages of these amounts.

**SCENARIO 1 – DAPA HOLDERS**

In addition to the assumptions outlined above, Scenario 1 calculates damages due to the alleged breaches of contract under the assumption that transactions between MTFs and DAPA holders represent diverted purchases. I have also performed the calculation using the same assumptions as Mr. Imel in extrapolating for periods where there were gaps in the data. I also applied Mr. Imel's methodology in terms of calculating margins and saved variable costs to the assumed diverted purchases.

Scenario 1 is shown on Schedules 3a to 3u. Applying this methodology and assumptions results in a calculation of lost profits of $3,264,706.

**SCENARIO 2 – DAPA MANUFACTURERS**

Scenario 2 calculates damages due to the alleged breaches of contract under the assumption that transactions between MTFs and DAPA manufacturers represent diverted purchases. As I did in

Sage FORENSIC ACCOUNTING

Scenario 1, I have also performed the calculation using the same assumptions as Mr. Imel in extrapolating for periods where there were gaps in the data. I also applied Mr. Imel's methodology in terms of calculating margins and saved variable costs to the assumed diverted purchases.

Scenario 2 is shown on Schedules 4a to 4u. Applying this methodology and assumptions results in a calculation of lost profits of $3,888,720.

**SCENARIO 3 – DAPA HOLDERS AND MANUFACTURERS**

Scenario 3 calculates damages due to the alleged breaches of contract under the assumption that transactions between MTFs and DAPA holders and manufacturers represent diverted purchases. Since DAPA holders and DAPA manufacturers are not mutually exclusive, i.e. a particular vendor could be both a DAPA holder and a DAPA manufacturer, this scenario is a separate scenario rather than simply an additive scenario of Scenarios 1 and 2. As I did previously, I have also performed the calculation using the same assumptions as Mr. Imel in extrapolating for periods where there were gaps in the data. I also applied Mr. Imel's methodology in terms of calculating margins and saved variable costs to the assumed diverted purchases.

Scenario 3 is shown on Schedules 5a to 5u. Applying this methodology and assumptions results in a calculation of lost profits of $4, 089,106.

***CONCLUSION***

It is my opinion that Mr. Imel has not adequately considered causation, and that his report makes serious errors that render his opinions unreliable and potentially misleading. It is also my opinion that Mr. Killman has not adequately considered causation, and that his report makes serious errors that render his opinions unreliable and potentially misleading. Assuming that Plaintiff could show causation, it is my opinion that the maximum of damages that might be available to it would be between $3.3 and $4.1 million.

***RESERVATION OF RIGHT TO SUPPLEMENT, REVISE, AND/OR AMEND REPORT***

I reserve the right to update or supplement my report in the event that additional information becomes available.

I trust that the foregoing comments are clear. However, should you have any questions, please contact me at (801) 531-0400.

Sincerely,
Sage Forensic Accounting, Inc.

By: Derk G Rasmussen, CPA, ABV, ASA, CFE
derk@sagefa.com

*IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

| | |
|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., Plaintiff<br><br>*v.*<br><br>THE UNITED STATES, Defendant | *CONSOLIDATED CASE NOS:*<br>***MAIN CASE: 03-CV-289***<br>*CONSOLIDATED CASE: 07-CV-187*<br><br>*Judge Allegra* |

**EXHIBITS TO PLAINTIFF'S SECOND MOTION IN LIMINE**

Exhibits
B-F

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | | |
|---|---|---|---|
| 1. CONTRACT ID CODE | | PAGE OF PAGES 01 \| 07 | |
| 2. AMENDMENT/MODIFICATION NO. 0016 | 3. EFFECTIVE DATE NOV 15 1996 | 4. REQUISITION/PURCHASE REQ. NO. N/A | 5. PROJECT NO. *(If applicable)* |
| 6. ISSUED BY CODE SP0200 | | 7. ADMINISTERED BY *(If other than Item 6)* CODE SP0200 | |

6. DEFENSE PERSONNEL SUPPORT CENTER
2800 SOUTH 20TH STREET
PHILADELPHIA, PA 19145-5099
CONTRACT SPECIALIST: N. MARTIN
PHONE: 215-737-8422

7. SAME AS BLOCK 6

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

CODE | FACILITY CODE

| (✓) | |
|---|---|
| X | 9A. AMENDMENT OF SOLICITATION NO. DLA120-93-R-0587 |
| | 9B. DATED *(SEE ITEM 11)* 11 AUGUST 1993 |
| | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| | 10B. DATED *(SEE ITEM 13)* |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [X] is extended, [ ] is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning 01 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER *(Specify type of modification and authority)* |

**E. IMPORTANT:** Contractor [ ] is not, [ ] is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

MEDICAL/SURGICAL PRIME VENDOR - LONE STAR REGION

Subject solicitation is hereby amended as follows:
See Attached Pages 02 through 07.

EXHIBIT
B

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | | | |
|---|---|---|---|
| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
| 15B. CONTRACTOR/OFFEROR<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY *(Signature of Contracting Officer)* | 16C. DATE SIGNED |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105-02

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

LF

DSCP-UMS-2399

Offerors are being given an opportunity at this time to submit any further revisions to their proposal. Any revisions should be submitted with this amendment.

The offeror agrees that its offer, as it may have been amended, may be accepted within the same number of calendar days after the revised closing date as were specified for acceptance of its initial offer.

If you fail to respond to this amendment by the time and date specified, your proposal may be evaluated as originally submitted.

The hour and date for receipt of offers/modifications is extended to 3:00 PM, local time, NOV 2 3 1993.

Facsimile responses are only authorized at the following numbers: 215-737-9300, 9301, 9302 or 9303.

**Amendment 0008 is hereby revised as follows:**

Page 8 - Paragraph G - Delete USAF Hospital Kirtland - Alberquerque, NM.

Page 13 - under Routine, Number 2, the definition of Extended Delivery Orders (EDO) is changed to read: "Orders which the ordering facility wants delivered within 10 calendar days of order placement. These items must be from DAPAs or IDTCs. The intent of EDOs is to provide a method for non-usage data items to be ordered."

Page 13 - the paragraph starting with "The majority", the 3rd and 4th sentences are changed to read: "All Extended Delivery Order items appearing on one order must be delivered at the same time and within 10 calendar days of order placement. If all ordered/confirmed items are available in fewer than 10 calendar days, they may be shipped in a single shipment at that time."

Page 16 - Paragraph F, the 1st sentence is changed to read: "Deliver all orders for non-emergency supplies within 24 hours (JITO) or 10 calendar days (EDO) of receipt of the order.

All other references relating to 7 day delivery for EDOs in the SOW are replaced with "10 calendar days".

Page 22 - Paragraph K (5) - Delete Updates of these files will be provided directly to DPSC (ATTN: DPSC-MEI, DMLSS Team) on a quarterly basis and replace with the following: In addition, every time changes are made to your catalog numbers or new DAPAs are issued, your firm has until four days after DPSC posts to the Bulletin Board to update the file with your order number, and provide it to the Government at the following address (only one copy is required):

Mr. Tom Stevens
Computer Consulting Co
129 Chester Rd
Devon, PA 19333-1644

Page 22 - Paragraph L, - Delete the 2nd sentence and replace with the following: Updates of these files will be provided directly to Mr. Tom Stevens as shown in Paragraph K(5), above.

Page 22 - Paragraph M, - Change to read as follows: "The Prime Vendor shall provide an electronic "order confirmation", (ANSI X12 855 is mandatory when the PVI is used) which confirms orders at the line item level, to the ordering facility, within two hours for JITOs and emergency orders, and within 24 hours or 1 day (if longer), counting only business days, for EDOs, following transmission of the order from the ordering facility." (For Example: An order placed at 5 P.M. Friday has until the following Monday at 5 P.M. to be confirmed.) All other SOW references to EDOs order confirmation shall be adjusted accordingly. the remaining sentences in Paragraph "M" remain in effect as originally written.

Page 23 - Delete Paragraph B in its entirety (including the chart) and replace with the following: The Prime Vendor must provide the following required standard usage and fill data requirements:

1. The Prime Vendor must provide order and fill data on a monthly basis by no later than the 20th of the month following the month for which data is being provided.

2. The order and fill data must be provided to DPSC Medical via electronic data transmission (e.g., via FTP over the Internet or via DPSC-Medical modem pool) rather than via diskette or hardcopy. The Contracting Officer must be notified as to which form of data transmission will be used by your firm within 30 days of award notification (so that mailboxes, passwords, etc. can be set-up).

3. The order data must be at the line-item level for all filled, unfilled and partially filled lines, rather than at a summary-level. Orders against open credit accounts should also be reflected.

4. The order data must be provided in an up-caret (^) delimited format without dashes (-) in the order and format outlined below. All fields not marked as being variable (letter "v" with a suggested length) must be of the length specified. All of the fields below must be completed except for the following cases:

a. If an NDC cannot be supplied, then the item's Universal Product Number (UPN) should be supplied. If neither the NDC nor UPN can be supplied, then the manufacturer part number must be supplied. One of these three fields must be completed.

b. Special Order Designator only needs to be completed if one of the special order cases listed applies. If none of the cases apply, the field should be left blank.

c. Format:

| Description | Length |
|---|---|
| Prime Vendor Contract Number | 13 |
| Delivery Order Number (i.e., "Call Number") | 4 |
| Order Date (DDMMMYYYY) | 9 |
| Delivery Date (DDMMMYYYY) | 9 |
| Department of Defense Activity Address Code (DoDAAC) | 6 |
| Prime Vendor-Assigned Account/Customer Number | v20 |
| National Drug Code (NDC) | 11 |
| Universal Product Number (UPN)* | v18 |
| Manufacturer Part Number | v17 |
| DAPA or IDTC Number | 13 |
| Unit Sold | 2 |
| Quantity Ordered in Unit Sold | 8 |
| Quantity Delivered in Unit Sold (Negative Value if Inventory Adjustment) | 8 |
| Manufacturer Backorder (Y/N)** | 1 |
| Total Price (Charged Customer)*** (Negative Value if Inventory Adjustment) | 9**** |
| Special Order Designator (D=Drop Shipment, S=Stockless, R=Surge) | 1 |
| Delivery Requirement (in business days) (less than one business day = 0) | 3 |
| Advance Customer Usage Data Provided on Item (Y/N) (Med/Surg Only) | 1 |

5. The Prime Vendor must also provide fill data for the contract overall, by customer (i.e., DoDDAC), and Prime Vendor-assigned account/customer number in an ASCII text format.

| Description | Length |
|---|---|
| Prime Vendor Contract Number | 13 |
| Beginning of Reporting Period (DDMMMYYYY) | 9 |
| End of Reporting Period (DDMMMYYYY) | 9 |
| DoDAAC (none if for contract overall) | 6 |
| Calculated Fill Rate (in accordance with Contracted Fill-Rate Formula) | 5***** |
| Prime Vendor-Assigned Account/Customer Number (none if for contract overall) | v20 |

*UPN includes UCC/EAN (of which the Universal Product Code [UPC] is a subset) or HIBC number.

**Indicates manufacturer is unable to supply the quantities ordered by the Prime Vendor.

***Total Price of the line including Prime Vendor Distribution Fee and DPSC-Medical Cost Recovery Factor.

****Six characters before the decimal point, explicit decimal point, and two characters after the decimal (e.g., 123456.78).

*****One character before the decimal point (i.e., 0 or 1), explicit decimal point, and three characters after the decimal point (e.g., 0.950).

Page 26 - Add the following note to Paragraph E: NOTE: In order for your firm to get paid, our facility must send an electronic receipt document covering the total dollar value of the material received (the quantity times the delivered unit price, but covering the total for all items in the shipment). This delivered unit price includes the DAPA price, the DPSC surcharge, and your distribution fee. Every ordering facility must total the shipment value to process the receipt document dollar amount. It will expedite receipt posting and probably improve the accuracy of the shipment total calculation, if your firm provides a total shipment delivered dollar amount on your packing slip. It does not matter how this is accomplished but inclusion of this figure on the packing slip will benefit you, the customer, and the DPSC payment office.

Pages 26 and 27 - Revise Paragraph I as follows: First sentence, second paragraph, delete 17 positions and replace with 18 positions. Add the following to the end of the second paragraph: The Prime Vendor must implement the UPN within 90 days of award if the Prime Vendor has received a prior award and no later than 120 days for a Prime Vendor receiving its first award.

Page 27 - Revise Paragraph B - Transition Period/Commencement Schedule as follows: Delete the 4th sentence in its entirety and replace with the following: Ordering facilities may maintain an inventory of stock-on-hand that will be reduced during the transition period through normal attrition.

Page 71 - Delete Question G in its entirety and replace with the following: G. Can your firm currently provide an electronic order confirmation (ANSI X12 [855]) to the ordering facility within two hours following transmission of the JITO from the ordering facility (in every case)?

Page 72 - After Question P, Add Question Q as follows: Q. Can your firm currently provide an electronic order confirmation (ANSI X12 [855]) to the ordering facility within 24 hours or 1 day (if longer) following transmission of the EDO from the ordering facility (in every case)?

Page 85 - Delete Paragraph E and replace with the following: E. Its EOE/EDI system can distinguish between IDTC/DAPA and non-IDTC/non-DAPA items prior to order placement. Firm can prevent its EDI System from processing non-IDTC/non-DAPA items.

Page 85 - Delete Paragraph F and replace with the following: F. It can provide an electronic order confirmation within two hours following transmission of the JITO from the ordering facilities in all cases.

**Amendment 0012 is hereby revised as follows:**

Page 12 - Delete the paragraph that starts Page 69 and with the following: Page 69: Section L, Past Performance: Requirements A, B, D, E and G should be addressed separately for JITO/EDO Orders and Stockless Option Orders.

Page 14 - The Paragraph that starts Page 19, add the following to the end of the paragraph: All new Distribution and Pricing Agreements (DAPAs) become effective on the 1st of the month (ex. new DAPA available to you on December 9th becomes effective January 1st). DAPA price changes (increases/decreases) become effective on the 1st of the month. Your electronic catalog and electronic order entry (EOE) system must show these revised prices on the 1st of the month.

Page 15 - Paragraph I - Add to the end of the paragraph: Only the Prime Vendor's EOE system/catalog and the Government supplied software may reside on the Government PC. (The Prime Vendor's personal ordering system, non-Government, may not reside on the Government-supplied PC.)

Page 22 - Under Factor 3 - ELECTRONIC ORDER ENTRY (EOE) SYSTEMS AND ELECTRONIC DATA INTERCHANGE (EDI) CAPABILITY - Delete the entire paragraph starting with Add the following to Question G.

Page 23 - After Question P, add Question Q as follows: Q. Can your firm currently provide an electronic order confirmation (ANSI X12 [855]) to the ordering facility within 24 hours or 1 day (if longer) following transmission of the EDO from the ordering facility (in every case)?

Page 26 - After Letter F add Letter G as follows: G. It provides a reasonable delivery service for emergency shipments.

Page 26 - After Letter G add Letter H as follows: H. It provides a reasonable cost for emergency shipments in excess of two.

Page 27 - Delete Paragraph O in its entirety and replace with the following: O. Its order confirmation will show rejection of non-IDTC/non-DAPA items.

Page 27 - After Paragraph O add Paragraph P as follows: P. The Prime Vendor's minimum PC hardware and software configuration is reasonable.

Page 27 - After Paragraph P add Paragraph Q as follows: Q. It can provide an electronic order confirmation within 24 hours or 1 day (if longer) following transmission of the EDO from the ordering facilities in all cases.

Page 27 - Under Factor 4 - Customer Support, Delete Paragraph G and replace with the following: G. The firm has submitted a plan that adequately addresses the requirement to service, support and visit ordering facilities that are not physically located close to the firm's sales representatives or distribution centers, or are not doing a large dollar volume of sales.

Page 47 - Add the following ordering/receiving point:

Vance AFB, OK
DEA# B94426676

<u>Ordering Point</u>
71st Medical Group
527 Gott Road
Building 810
Vance AFB, OK 73705-5105

<u>Receiving Point</u>
71st Medical Group
527 Gott Road
Building 810
Vance AFB, OK 73705-5105

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC. Plaintiff, | )( | |
| VS. | )( | CASE NO: 03-CV-289 |
| THE UNITED STATES, Defendant. | )( | Judge Allegra |

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM P. BANDY

AUGUST 4, 2006

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM P. BANDY, produced as a witness duly sworn by me at the instance of the Plaintiff, was taken in the above styled and numbered cause on the 4th day of August, 2006, from 1:09 p.m. to 8:17 p..m., before Susan M. Owen, Certified Shorthand Reporter No. 2013 in and for the State of Texas, at the home of William P. Bandy, 7226 Rustic Valley Drive, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

EXHIBIT
tabbies
C

timely?

A. No.

Q. You tried just as hard with respect to EDOs as for just-in-time?

A. We turned over -- Our orders went -- particularly for MTFs went that day to the manufacturer, because there was a pretty short window on EDOs --

Q. Uh-huh.

A. -- delivery.

Q. You kept track of your fill rates on EDOs?

A. Oh, yes. That was part of -- and, again, it was not material, but the Salgados were at that time doing some of that for us from the systems.

Q. Do you recall at anytime during the contract performance your being disappointed in your fill rates for EDOs?

A. Well, I'm sure there would be a time. If one specific order wasn't delivered timely, I was disappointed.

Q. Can you think of a time period during performance when you were -- you became concerned about your fill rates for EDOs?

A. No. The only time that I was concerned about our performance to MTFs, as well as all of our customers, was the point where we were being put on credit hold, and obviously that's not the normal course of business.

Q. Uh-huh. At that point then did you look into fill rate issues when you were put on credit hold?
A. It -- We didn't need to look at them. We knew they were pretty bad. When you're on credit hold, it's implicit that you order the merchandise from the manufacturer and he doesn't ship it to you. And if you don't have the money to pay that manufacturer, you don't get the merchandise.
Q. Uh-huh. And you were put on credit hold when?
A. Oh, by many manufacturers during the latter part of 2000.
Q. Uh-huh.
A. And at times during -- not as much, but at times during 1999 when -- See, it's not so much what's owed the end of a contract as what's owed during the contract, because it's all a cash flow situation, and we're buying on a daily basis and shipping on a daily basis.
Q. Other than being put on a credit hold, what factors can you think of that would lead to United Medical not being able to fill an EDO order timely?
A. Well, if the EDO -- if it's Ethicon or if it's a major manufacturer, we could say if we needed to -- and we would even pay for it, you have to do it to meet the 10-day-window -- do it on -- on Federal Express. If you had a Fed Ex, you'd do that. We'll eat that. If it were a DAPA

holder that had an office like I've got in there in the corner of his den and he was out playing golf that day when they ordered an EDO and they wanted that DAPA order and three days later they got him on the phone and he -- then he ordered from the manufacturer, we couldn't control that kind of performance. But that's the only time. If it was a -- what we call a legitimate manufacturer and -- we'd handle an EDO just like anything else.

Q. If an MTF placed an EDO -- I mean, an extended delivery order, and the MTF sent you all the information correctly --

A. Uh-huh.

Q. -- would there be anything outside of that that would be the MTF's fault that you would not be able to fill an order timely?

A. If the manufacturer just simply didn't perform.

Q. That's not the MTF's fault.

A. No, no, not the MTF. If the MTF sent us an order timely and every item was properly identified and the manufacturer had it, it was up to us to get it here. Now, would there be a time -- and I'm sure in the time period with the multiplicity of orders, even though there weren't that many EDOs, if somebody looked hard enough, they could find out we didn't meet the 10-day window.

Q. Uh-huh. You testified that in preparing your bid

Q. And so when she says, "Under the EDO portion, all items appearing on one order must be delivered at the same time and within 20 calendar days of order placement," that means -- that doesn't mean the entire order, it means all the ones that you're delivering under the order?

A. No. In an EDO it was different, because that order went to a manufacturer, and that meant everything had to be delivered. That was my understanding. They couldn't be -- there couldn't be one box back-ordered, or killed.

Q. For just-in-time you could fill partially, but for EDO you were not supposed to?

A. On a line item basis. It's my recollection that that's --

Q. Uh-huh. Okay. Stack them here, I guess.

(Exhibit No. 28 marked)

This will be Bandy 28. Is that a United Medical Supply cover sheet?

A. Yes.

Q. Does this refresh your recollection at all with respect to who June Lyon is or was?

A. Obviously she must have been one of our employees in our accounts receivable.

Q. Uh-huh.

A. Worked for Megan.

Q. What -- If you look at the second page, what is

IN THE UNITED BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: UNITED MEDICAL SUPPLY COMPANY, INC., Debtor-in-Possession | )( | Case No. 01-41911-bjh-11 |
| | )( | Chapter 11 |
| United Medical Supply Company, Inc., Plaintiff, | )( | |
| v. | )( | Adversary: 02-4230 |
| United States of America, Defendant. | )( | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF
MICHAEL DAVID
SEPTEMBER 17, 2007

* * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION of MICHAEL DAVID, produced as a witness, and duly sworn, was taken in the above-styled and numbered cause on the 17th day of September, from 1:00 p.m. to 2:00 p.m., before Lori M. Bryant, CSR in and for the State of Texas, reported by Stenographic Machine, at Fort Sam, 2050 Worth Road, Suite 17, Ft. Sam Houston, Texas 78234.

EXHIBIT D

APPEARANCES

Q. Do you have an opinion as to the significance of usage data being accurately provided to the prime vendors?
A. Yes.
Q. What is your opinion?
A. That is the most crucial aspect of the program, because that's how we measure your performance.
Q. When you say that's how we measure your performance, when you say "your," you're referring to a prime vendor?
A. Yes, sir, because we want support for you. We give you our usage so you can stock the items, then we'll come to you for those items we told you we would. That's how we assure that you have those items that we're asking you for. So that's the single most important thing on getting good prime vendor support is giving you good accurate usage. Then it's the prime vendor's responsibility to stock to those levels that we told you we were going to use.
Q. Do you recall back in the 1997 time frame that there were issues regarding getting accurate usage data to the United Medical as the Lone Star prime vendor?
A. Not you in particular, but it has always been a factor getting good usage. And there are several reasons, one of them simply being manufacturers frequently change. Like they'll have a box of 10 and make it a box of 12, or

## FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER

Based on the following findings, it is the determination of the Contracting Officer, in accordance with FAR 17.207, to exercise option year three, for a period of one year, for the Medical/Surgical Prime Vendor Program – Lone Star Region, Contracts SP0200-97-D-7133 (JITO/EDO) and SP0200-97-D-7134 (Stockless) dated January 30, 1997 (with an effective date of June 1, 1997). The second option period will be effective June 1, 2000 and will expire on May 31, 2001.

### FINDINGS

1. Request for Proposal (RFP) DLA120-93-R-0587 was synopsized and issued under Full and Open Competition procedures. Three offers were received. Contracts SP0200-97-D-7133 and SP0200-97-D-7134 were awarded to United Medical Supply on January 30, 1997, using a Best Value acquisition methodology with technical quality being more important than price. These contracts covered the distribution of medical/surgical products to nineteen facilities in the Lone Star Region. The contracts were awarded for one year plus four one-year option periods. The estimated annual sales volume of the facilities in the region is $28,357,750.00 for the base year and $56,715,500.00 for each option year. Each year, the percentage of sales for JITO/EDO is expected to decrease and the Stockless percentage is expected to increase. The distribution fees for the base plus option years are as follows:

| | DISTRIBUTION FEE | ESTIMATED TOTAL |
|---|---|---|
| **Base Year** | | |
| JITO/EDO | 6.4% | $1,778,598 |
| Stockless | 7.4% | 41,969 |
| | | **$1,820,567** |
| **Option Year 1** | | |
| JITO/EDO | 6.4% | $3,194,217 |
| Stockless | 7.4% | 503,634 |
| | | **$3,697,851** |
| **Option Year 2** | | |
| JITO/EDO | 6.4% | $2,504,556 |
| Stockless | 7.4% | 1,301,054 |
| | | **$3,805,610** |
| **Option Year 3** | | |
| JITO/EDO | 6.4% | $1,851,194 |
| Stockless | 7.4% | 2,056,504 |
| | | **$3,907,698** |

EXHIBIT
E

**FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER (continued)**

| | | |
|---|---|---|
| **Option Year 4** | | |
| JITO/EDO | 6.4% | $1,488,215 |
| Stockless | 7.4% | 2,476,199 |
| | | **$3,964,414** |

2. Twenty-three Medical/Surgical Prime Vendor contracts have been awarded as of this date. Twenty-one of the twenty-three awards were made under full and open competition (Two were Small Business Set-Asides). Listed below are all the current Medical/Surgical Prime Vendor contract distribution fees:

| REGION | PRIME VENDOR | DISTRIBUTION FEES Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|
| Cascades | BBMC | 6.5% | 6.0% | 5.5% | 5.5% | 5.5% |
| IL/KY/MO | BBMC | 5.9% | 5.8% | 5.7% | 5.6% | 5.5% |
| FL/GA | Owens & Minor | 6.0% | 5.5% | 5.5% | 5.5% | 5.5% |
| Panhandle | Owens & Minor | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| OH/IL | BBMC | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% |
| Carolinas | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Rocky Mountains | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Midwest | Midwest Medical | 5.9% | 5.8% | 5.7% | 5.6% | 5.5% |
| Hawaii | Pacific Criticare | 14.2% | 13.2% | 11.2% | 10.2% | 10.2% |
| Europe | BBMC | 6.7% | 5.86% | 5.86% | 5.86% | 5.86% |
| | Surge | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| AL/TN/ARK | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Montana | Kreisers, Inc. | 5.9% | 5.5% | 5.5% | 5.5% | 5.0% |
| Alaska | BBMC | 13.0% | 13.0% | 13.0% | 13.0% | 13.0% |
| Dakotas | Kreisers, Inc. | 5.9% | 5.5% | 5.5% | 5.5% | 5.0% |
| Utah/Idaho | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Tidewater | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| San Francisco | Owens & Minor | 5.9% | 5.75% | 5.2% | 5.0% | 5.0% |
| Pacific | BBMC | 8.91% | 6.9% | 6.9% | 6.9% | 6.9% |
| | Surge | 8.91% | 6.9% | 6.9% | 6.9% | 6.9% |
| NY/NE | Owens & Minor | 8.0% | 7.5% | 5.5% | 5.5% | 5.5% |
| National Capitol | Owens & Minor | 6.0% | 5.75% | 5.3% | 5.25% | 5.25% |
| | Stockless | 13.0% | 12.75% | 12.5% | 12.0% | 11.0% |
| Wilford Hall | Owens & Minor | 7.0% | 7.0% | 6.25% | 5.0% | 5.0% |
| Lone Star | United Medical Supply | 6.4% | 6.4% | 6.4% | 6.4% | 6.4% |
| | Stockless | 7.4% | 7.4% | 7.4% | 7.4% | 7.4% |
| San Diego | Allegiance Healthcare | 5.1% | 5.1% | 4.9% | 4.7% | 4.5% |

**FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER (continued)**

An informal analysis of distribution fees reveals that the Lone Star Region distribution fee for option year three compares favorably to the distribution fees for the other CONUS Medical/Surgical Prime Vendor contracts. In addition, the distribution fee is same as the Base Year and Option Years One & Two. Therefore, it is determined that the 6.4% distribution fee for option year three of contract SP0200-97-D-7133 (JITO/EDO) is fair and reasonable. The 7.4% distribution fee for contract SP0200-97-D-7134 (Stockless) compares favorably with the National Capitol Region (the only other Stockless contract) and is therefore considered fair and reasonable.

3. On April 12, 2000, United Medical was sent a Preliminary Notice to Exercise Option Year Three. The notice advised United Medical Supply that the Government is considering invoking the option in accordance with Option Clause 52.217-9P10, Option for Requirements Contract Term Extension. United Medical Supply was also informed that the preliminary notice does not commit the Government to an extension.

4. Consideration was also given to other factors, which impact overall cost such as the need for continuity of operations, investment in training and equipment, and the potential costs of disrupting operations. Each prime vendor has its own proprietary electronic ordering system. As customers become more familiar with a particular firm's ordering system, efficiency increases and other associated supply management costs decrease. Failure to exercise the option at this time would have a tremendous impact on the overall mission of the ordering facilities.

5. In accordance with FAR 17.207 (c) the following conditions have been met:

a. The requirement covered by the option fulfills an existing Government need.
b. The exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors considered.
c. The option was included in the original synopsis and was evaluated with the initial proposals.

**DETERMINATION**

Based on the above findings, it is the intent of the undersigned to exercise the third option year under the contract. The option year three distribution fee (6.4% for JITO/EDO and 7.4% for Stockless) is the same as the distribution fee for the base year, option year one and option year two. Based on the estimated requirements of $56,715,500.00, the total estimated value of option year three is $60,623,198.00. This figure represents $56,715,500.00 for the estimated requirements plus $3,907,698 ($1,851,194.00 for JITO/EDO plus $2,056,504 for Stockless) for distribution fees. Execution of the option is the most advantageous way of fulfilling the Government's need, price and other factors considered.

United Medical Supply has demonstrated a full understanding of the Government requirements and has performed all the required tasks and functions cited in the aforementioned contract.

**FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER (continued)**

The firm is a commercially recognized large volume distributor of medical/surgical products. It has been determined that United Medical Supply, from a critical review of its commercial operations, can handle the financial and logistical obligations of this contract without difficulty. In accordance with the provisions of FAR 9.105-2, I hereby determine that United Medical Supply is considered to be responsible within the meaning of FAR 9.103 and 9.104.

Donna M Kennedy
DONNA M. KENNEDY 5/22/00
Contracting Officer

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., | ) | Videotaped deposition of: |
| Plaintiff, | ) | DERK RASMUSSEN |
| vs. | ) | |
| THE UNITED STATES, | ) | Case No. 03-CV-289 |
| Defendant. | ) | Judge Allegra |

April 16, 2008 * 9:00 a.m.

Location: Sage Forensic Accounting
136 East South Temple, Suite 2220
Salt Lake City, Utah

Reporter: Ashley Davis, RPR
Notary Public in and for the State of Utah

Videographer: Ryan Reverman



COPY

Limine Ex F

would have impaired their ability to perform their obligations under the contract?
A. Detailed inventory records.
Q. The -- is it your opinion that if United Medical did not have an item in stock at the time it was ordered, the government was free to -- to go somewhere else to purchase that item?
A. Well, that's a legal conclusion; but from an economic point of view, I understand that that's a possibility, yeah. They could go somewhere else. And I know that the government believed that they could. That's how they acted.
Q. If they sent an order to United Medical and United Medical was not able to fill that order, then it's your opinion the government just went somewhere else?
A. It's my opinion, based on testimony from people who were ordering for the government, that that's what they did.
Q. And under what circumstances did the government go directly to third-party venders without first -- do you need me to take a break for you to get some water there?
A. No, not right now.
Q. Okay. Under what circumstances -- I kind



of lost my train of thought there.
Where the government went first to third parties without ever ordering first from United Medical, do you have any opinion as to why they did that?
A. I wasn't able to form an opinion because you don't have the records -- United Medical doesn't have the detailed inventory records to assess that problem.
Q. No. I -- the question I'm asking is whether you formed an opinion that -- okay. Let's -- okay. I think I do understand your answer.
So you're saying where the government went to third-party venders without first going to United Medical -- you're saying United Medical didn't have inventory records to show whether they could have filled that or not?
A. That's correct.
Q. And if the government would have sent the order to United Medical, what would have prevented United Medical from then ordering from a supplier and receiving it and then shipping it to the government?
A. Well, I guess it comes down to your interpretation of the contract. It's my understanding that they were supposed to have these



items on hand and that you couldn't do any sort of drop shipment or -- I guess it also depends on the timing, how quickly they could get the order in and get it off to the MTFs and still comply with the contract.
Q. So it is possible that -- in your opinion, then, that circumstances could have existed where the government ordered from United Medical, United Medical then ordered from the supplier and then reshipped to the MTF?
A. Is it possible? It may be possible. Is it outside of what I think the intent of the contract was from an economic perspective? Yeah, I think it is outside the intent.
I think the intent of the contract from an economic perspective is that those items would have been on hand. And I know from the perspective of the government, the people who were ordering -- the deposition testimony I've reviewed, they've indicated that they called up and United Medical didn't have it on hand, that they were free to go order it from whoever they needed to order from to get it right away.
Q. And that would have been a just-in-time-type order?



A. Well, they didn't specify the type of order when they gave the deposition testimony, but they talked about orders in general.
Q. Do you perceive a distinction between a just-in-time order and an extended-delivery order with respect to United's obligation to have that stuff in their inventory?
A. I'd have to go back and review the contract. There may be a distinction, but I don't have a recollection right now.
Q. Would that be a significant distinction to you?
A. Well, it's potentially a distinction that could be addressed if United Medical had the inventory records to address it. It's -- it's part of the process that I think you would -- you would logically go through to assess damages in this case, but you're limited from doing it because you don't have the available records.
Q. Well, when you say we don't have the available records, United Medical had significant inventory records that were provided to you, did they not?
A. I guess I would -- they provided inventory records. Whether or not they were significant, I

would beg to differ; but they had inventory records. But they weren't the type of records that would demonstrate the availability of particular products at any particular point in time.
Q. If -- assume that the government had not provided usage data to United Medical and then they submitted an extended delivery order to United Medical. Is it your understanding that under the terms of the contract United Medical should have had that in inventory?
A. Should have had the items in inventory?
Q. Yes.
A. I'd have to go back and review the contract. I don't have a specific recollection of that provision.
Q. Do you know what Mr. Imel's opinion is with respect to that issue?
A. I don't recall him addressing that issue in his report. If he has an opinion of it that's not mentioned in his report, I wouldn't know about it.
Q. Now, you state in paragraph 16 on page 5 -- it says, "The MTFs were required to provide the prime vendor with usage data or the item in associated quantities that it intended to order from the prime vendor."



How is that consistent with the second sentence of item 16? Those appear to be contradictory statements to me.
A. Well, based on my review of the contract, those -- the issues regarding usage data -- that they were required to provide usage data, and they were -- the issue on providing the usage data would be whether or not they were excluded from the fill-or-kill calculation. That was the penalty within the contract, based on my review of it, for not providing the usage data.
Q. Well, and what I'm -- what I'm getting at there on item 16, you start out item 16 with, "The MTFs were required to provide the prime vendor with usage data," and then you begin the second sentence with, "There does not appear to have been any requirement that the MTFs provide usage data."
And I'm asking you to explain what appears to be an inconsistency there.
A. Well, they had a requirement, but what I'm trying to say is -- and it's probably not as artful as it ought to be -- what I'm trying to say here is they had a requirement to provide usage data; but if they didn't provide it, then the consequence was they were -- the MT -- or the -- United Medical was



excluded from the fill-or-kill calculation.
Q. On -- again, referring to page 5, it -- the last paragraph right above the section that begins, "Scope of work," it starts out, "In a claim..." Do you see that?
A. Yes.
Q. And in the last sentence, it says, "In more recent documentation proffered in this case..." What recent documentation are you referring to besides Mr. Killman's report?
A. I'd have to go back and look at the timing of documents that we received and when, but it's primarily Mr. Killman's report.
Q. When did you first understand that there was an issue of negligent estimates in this case, roughly?
A. When we received Mr. Killman's report.
Q. So prior to then, you were not aware that negligent estimates were an issue in this case?
A. We may have been. It may have been discussed, but we hadn't seen anything proffered by the plaintiffs dealing with that particular issue.
Q. The -- on page 6 of Exhibit 1, you state you were asked to assess whether the opinions proffered by Mr. Imel are reasonably supported by the



information he considered.
A. Are you talking about item 4?
Q. I -- no. Oh. Did I say "Killman"? I meant Imel -- "Assessed whether the opinions proffered by Mr. Imel are reasonably supported by the information he considered."
A. So you're talking about item 2 on page 6?
Q. Right. I thought that's what I said.
A. No. You just -- you didn't tell me -- tell me which item you were referring to.
Q. Okay. Item 2 on page 6.
A. And what was your question again?
Q. That's -- that was one of the things you were asked to do.
A. Yes.
Q. And did you personally make a determination whether you had before you all the information that Mr. Imel considered in providing his opinion?
A. Well, to the extent he disclosed it in his report, yes.
Q. So did you personally make a determination that you -- you had before you all the information he considered, if that information was provided in his report?