*IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

| | |
|---|---|
| *UNITED MEDICAL SUPPLY COMPANY, INC.*, Plaintiff<br><br>*v.*<br><br>*THE UNITED STATES*, Defendant | *CONSOLIDATED CASE NOS:*<br>***MAIN CASE: 03-CV-289***<br>*CONSOLIDATED CASE: 07-CV-187*<br><br>*Judge Allegra* |

**EXHIBITS TO PLAINTIFF'S SECOND MOTION IN LIMINE**

Exhibits
B-F

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGES |
|---|---|
| | 01 \| 07 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| 0016 | NOV 15 1996 | N/A | |

**6. ISSUED BY** CODE SP0200

DEFENSE PERSONNEL SUPPORT CENTER
2800 SOUTH 20TH STREET
PHILADELPHIA, PA 19145-5099
CONTRACT SPECIALIST: N. MARTIN
PHONE: 215-737-8422

**7. ADMINISTERED BY** *(If other than Item 6)* CODE SP0200

SAME AS BLOCK 6

**8. NAME AND ADDRESS OF CONTRACTOR** *(No., street, county, State and ZIP Code)*

CODE | FACILITY CODE

| (✓) | |
|---|---|
| X | 9A. AMENDMENT OF SOLICITATION NO. DLA120-93-R-0587 |
| | 9B. DATED *(SEE ITEM 11)* 11 AUGUST 1993 |
| | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| | 10B. DATED *(SEE ITEM 13)* |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [X] is extended, [ ] is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning 01 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

**12. ACCOUNTING AND APPROPRIATION DATA** *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER *(Specify type of modification and authority)* |

**E. IMPORTANT:** Contractor [ ] is not, [ ] is required to sign this document and return ______ copies to the issuing office.

**14. DESCRIPTION OF AMENDMENT/MODIFICATION** *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

MEDICAL/SURGICAL PRIME VENDOR - LONE STAR REGION

Subject solicitation is hereby amended as follows:
See Attached Pages 02 through 07.

EXHIBIT
tabbles
B

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY *(Signature of Contracting Officer)* | 16C. DATE SIGNED |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105-02

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

LF

DSCP-UMS-2399

Offerors are being given an opportunity at this time to submit any further revisions to their proposal. Any revisions should be submitted with this amendment.

The offeror agrees that its offer, as it may have been amended, may be accepted within the same number of calendar days after the revised closing date as were specified for acceptance of its initial offer.

If you fail to respond to this amendment by the time and date specified, your proposal may be evaluated as originally submitted.

The hour and date for receipt of offers/modifications is extended to 3:00 PM, local time, NOV 2 3 1995.

Facsimile responses are only authorized at the following numbers: 215-737-9300, 9301, 9302 or 9303.

<u>Amendment 0008 is hereby revised as follows:</u>

Page 8 - Paragraph G - Delete USAF Hospital Kirtland - Alberquerque, NM.

Page 13 - under Routine, Number 2, the definition of Extended Delivery Orders (EDO) is changed to read: "Orders which the ordering facility wants delivered within 10 calendar days of order placement. These items must be from DAPAs or IDTCs. The intent of EDOs is to provide a method for non-usage data items to be ordered."

Page 13 - the paragraph starting with "The majority", the 3rd and 4th sentences are changed to read: "All <u>Extended Delivery Order</u> items appearing on one order must be delivered at the same time and within 10 calendar days of order placement. If all ordered/confirmed items are available in fewer than 10 calendar days, they may be shipped in a single shipment at that time."

Page 16 - Paragraph F, the 1st sentence is changed to read: "Deliver all orders for non-emergency supplies within 24 hours (JITO) or 10 calendar days (EDO) of receipt of the order.

All other references relating to 7 day delivery for EDOs in the SOW are replaced with "10 calendar days".

Page 22 - Paragraph K (5) - Delete Updates of these files will be provided directly to DPSC (ATTN: DPSC-MEI, DMLSS Team) on a quarterly basis and replace with the following: In addition, every time changes are made to your catalog numbers or new DAPAs are issued, your firm has until four days after DPSC posts to the Bulletin Board to update the file with your order number, and provide it to the Government at the following address (only one copy is required):

Mr. Tom Stevens
Computer Consulting Co
129 Chester Rd
Devon, PA 19333-1644

Page 22 - Paragraph L, - Delete the 2nd sentence and replace with the following: Updates of these files will be provided directly to Mr. Tom Stevens as shown in Paragraph K(5), above.

Page 22 - Paragraph M, - Change to read as follows: "The Prime Vendor shall provide an electronic "order confirmation", (ANSI X12 855 is mandatory when the PVI is used) which confirms orders at the line item level, to the ordering facility, within two hours for JITOs and emergency orders, and within 24 hours or 1 day (if longer), counting only business days, for EDOs, following transmission of the order from the ordering facility." (For Example: An order placed at 5 P.M. Friday has until the following Monday at 5 P.M. to be confirmed.) All other SOW references to EDOs order confirmation shall be adjusted accordingly. the remaining sentences in Paragraph "M" remain in effect as originally written.

Page 23 - Delete Paragraph B in its entirety (including the chart) and replace with the following: The Prime Vendor must provide the following required standard usage and fill data requirements:

1. The Prime Vendor must provide order and fill data on a monthly basis by no later than the 20th of the month following the month for which data is being provided.

2. The order and fill data must be provided to DPSC Medical via electronic data transmission (e.g., via FTP over the Internet or via DPSC-Medical modem pool) rather than via diskette or hardcopy. The Contracting Officer must be notified as to which form of data transmission will be used by your firm within 30 days of award notification (so that mailboxes, passwords, etc. can be set-up).

3. The order data must be at the line-item level for all filled, unfilled and partially filled lines, rather than at a summary-level. Orders against open credit accounts should also be reflected.

4. The order data must be provided in an up-caret (^) delimited format without dashes (-) in the order and format outlined below. All fields not marked as being variable (letter "v" with a suggested length) must be of the length specified. All of the fields below must be completed except for the following cases:

a. If an NDC cannot be supplied, then the item's Universal Product Number (UPN) should be supplied. If neither the NDC nor UPN can be supplied, then the manufacturer part number must be supplied. One of these three fields must be completed.

b. Special Order Designator only needs to be completed if one of the special order cases listed applies. If none of the cases apply, the field should be left blank.

c. Format:

DSCP-UMS-2401

| Description | Length |
|---|---|
| Prime Vendor Contract Number | 13 |
| Delivery Order Number (i.e., "Call Number") | 4 |
| Order Date (DDMMMYYYY) | 9 |
| Delivery Date (DDMMMYYYY) | 9 |
| Department of Defense Activity Address Code (DoDAAC) | 6 |
| Prime Vendor-Assigned Account/Customer Number | v20 |
| National Drug Code (NDC) | 11 |
| Universal Product Number (UPN)* | v18 |
| Manufacturer Part Number | v17 |
| DAPA or IDTC Number | 13 |
| Unit Sold | 2 |
| Quantity Ordered in Unit Sold | 8 |
| Quantity Delivered in Unit Sold (Negative Value if Inventory Adjustment) | 8 |
| Manufacturer Backorder (Y/N)** | 1 |
| Total Price (Charged Customer)*** (Negative Value if Inventory Adjustment) | 9**** |
| Special Order Designator (D=Drop Shipment, S=Stockless, R=Surge) | 1 |
| Delivery Requirement (in business days) (less than one business day = 0) | 3 |
| Advance Customer Usage Data Provided on Item (Y/N) (Med/Surg Only) | 1 |

5. The Prime Vendor must also provide fill data for the contract overall, by customer (i.e., DoDDAC), and Prime Vendor-assigned account/customer number in an ASCII text format.

| Description | Length |
|---|---|
| Prime Vendor Contract Number | 13 |
| Beginning of Reporting Period (DDMMMYYYY) | 9 |
| End of Reporting Period (DDMMMYYYY) | 9 |
| DoDAAC (none if for contract overall) | 6 |
| Calculated Fill Rate (in accordance with Contracted Fill-Rate Formula) | 5***** |
| Prime Vendor-Assigned Account/Customer Number (none if for contract overall) | v20 |

---

*UPN includes UCC/EAN (of which the Universal Product Code [UPC] is a subset) or HIBC number.

**Indicates manufacturer is unable to supply the quantities ordered by the Prime Vendor.

***Total Price of the line including Prime Vendor Distribution Fee and DPSC-Medical Cost Recovery Factor.

****Six characters before the decimal point, explicit decimal point, and two characters after the decimal (e.g., 123456.78).

*****One character before the decimal point (i.e., 0 or 1), explicit decimal point, and three characters after the decimal point (e.g., 0.950).

Page 26 - Add the following note to Paragraph E: NOTE: In order for your firm to get paid, our facility must send an electronic receipt document covering the total dollar value of the material received (the quantity times the delivered unit price, but covering the total for all items in the shipment). This delivered unit price includes the DAPA price, the DPSC surcharge, and your distribution fee. Every ordering facility must total the shipment value to process the receipt document dollar amount. It will expedite receipt posting and probably improve the accuracy of the shipment total calculation, if your firm provides a total shipment delivered dollar amount on your packing slip. It does not matter how this is accomplished but inclusion of this figure on the packing slip will benefit you, the customer, and the DPSC payment office.

Pages 26 and 27 - Revise Paragraph I as follows: First sentence, second paragraph, delete 17 positions and replace with 18 positions. Add the following to the end of the second paragraph: The Prime Vendor must implement the UPN within 90 days of award if the Prime Vendor has received a prior award and no later than 120 days for a Prime Vendor receiving its first award.

Page 27 - Revise Paragraph B - Transition Period/Commencement Schedule as follows: Delete the 4th sentence in its entirety and replace with the following: Ordering facilities may maintain an inventory of stock-on-hand that will be reduced during the transition period through normal attrition.

Page 71 - Delete Question G in its entirety and replace with the following: G. Can your firm currently provide an electronic order confirmation (ANSI X12 [855]) to the ordering facility within two hours following transmission of the JITO from the ordering facility (in every case)?

Page 72 - After Question P, Add Question Q as follows: Q. Can your firm currently provide an electronic order confirmation (ANSI X12 [855]) to the ordering facility within 24 hours or 1 day (if longer) following transmission of the EDO from the ordering facility (in every case)?

Page 85 - Delete Paragraph E and replace with the following: E. Its EOE/EDI system can distinguish between IDTC/DAPA and non-IDTC/non-DAPA items prior to order placement. Firm can prevent its EDI System from processing non-IDTC/non-DAPA items.

Page 85 - Delete Paragraph F and replace with the following: F. It can provide an electronic order confirmation within two hours following transmission of the JITO from the ordering facilities in all cases.

**Amendment 0012 is hereby revised as follows:**

Page 12 - Delete the paragraph that starts Page 69 and with the following: Page 69: Section L, Past Performance: Requirements A, B, D, E and G should be addressed separately for JITO/EDO Orders and Stockless Option Orders.

Page 14 - The Paragraph that starts Page 19, add the following to the end of the paragraph: All new Distribution and Pricing Agreements (DAPAs) become effective on the 1st of the month (ex. new DAPA available to you on December 9th becomes effective January 1st). DAPA price changes (increases/decreases) become effective on the 1st of the month. Your electronic catalog and electronic order entry (EOE) system must show these revised prices on the 1st of the month.

Page 15 - Paragraph I - Add to the end of the paragraph: Only the Prime Vendor's EOE system/catalog and the Government supplied software may reside on the Government PC. (The Prime Vendor's personal ordering system, non-Government, may not reside on the Government-supplied PC.)

Page 22 - Under Factor 3 - ELECTRONIC ORDER ENTRY (EOE) SYSTEMS AND ELECTRONIC DATA INTERCHANGE (EDI) CAPABILITY - Delete the entire paragraph starting with Add the following to Question G.

Page 23 - After Question P, add Question Q as follows: Q. Can your firm currently provide an electronic order confirmation (ANSI X12 [855]) to the ordering facility within 24 hours or 1 day (if longer) following transmission of the EDO from the ordering facility (in every case)?

Page 26 - After Letter F add Letter G as follows: G. It provides a reasonable delivery service for emergency shipments.

Page 26 - After Letter G add Letter H as follows: H. It provides a reasonable cost for emergency shipments in excess of two.

Page 27 - Delete Paragraph O in its entirety and replace with the following: O. Its order confirmation will show rejection of non-IDTC/non-DAPA items.

Page 27 - After Paragraph O add Paragraph P as follows: P. The Prime Vendor's minimum PC hardware and software configuration is reasonable.

Page 27 - After Paragraph P add Paragraph Q as follows: Q. It can provide an electronic order confirmation within 24 hours or 1 day (if longer) following transmission of the EDO from the ordering facilities in all cases.

Page 27 - Under Factor 4 - Customer Support, Delete Paragraph G and replace with the following: G. The firm has submitted a plan that adequately addresses the requirement to service, support and visit ordering facilities that are not physically located close to the firm's sales representatives or distribution centers, or are not doing a large dollar volume of sales.

Page 47 - Add the following ordering/receiving point:

Vance AFB, OK
DEA# B94426676

| Ordering Point | Receiving Point |
|---|---|
| 71st Medical Group<br>527 Gott Road<br>Building 810<br>Vance AFB, OK 73705-5105 | 71st Medical Group<br>527 Gott Road<br>Building 810<br>Vance AFB, OK 73705-5105 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC. Plaintiff, | )( | |
| VS. | )( | CASE NO: 03-CV-289 |
| THE UNITED STATES, Defendant. | )( | Judge Allegra |

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM P. BANDY

AUGUST 4, 2006

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM P. BANDY, produced as a witness duly sworn by me at the instance of the Plaintiff, was taken in the above styled and numbered cause on the 4th day of August, 2006, from 1:09 p.m. to 8:17 p..m., before Susan M. Owen, Certified Shorthand Reporter No. 2013 in and for the State of Texas, at the home of William P. Bandy, 7226 Rustic Valley Drive, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

EXHIBIT C

timely?

A. No.

Q. You tried just as hard with respect to EDOs as for just-in-time?

A. We turned over -- Our orders went -- particularly for MTFs went that day to the manufacturer, because there was a pretty short window on EDOs --

Q. Uh-huh.

A. -- delivery.

Q. You kept track of your fill rates on EDOs?

A. Oh, yes. That was part of -- and, again, it was not material, but the Salgados were at that time doing some of that for us from the systems.

Q. Do you recall at anytime during the contract performance your being disappointed in your fill rates for EDOs?

A. Well, I'm sure there would be a time. If one specific order wasn't delivered timely, I was disappointed.

Q. Can you think of a time period during performance when you were -- you became concerned about your fill rates for EDOs?

A. No. The only time that I was concerned about our performance to MTFs, as well as all of our customers, was the point where we were being put on credit hold, and obviously that's not the normal course of business.

Q. Uh-huh. At that point then did you look into fill rate issues when you were put on credit hold?
A. It -- We didn't need to look at them. We knew they were pretty bad. When you're on credit hold, it's implicit that you order the merchandise from the manufacturer and he doesn't ship it to you. And if you don't have the money to pay that manufacturer, you don't get the merchandise.
Q. Uh-huh. And you were put on credit hold when?
A. Oh, by many manufacturers during the latter part of 2000.
Q. Uh-huh.
A. And at times during -- not as much, but at times during 1999 when -- See, it's not so much what's owed the end of a contract as what's owed during the contract, because it's all a cash flow situation, and we're buying on a daily basis and shipping on a daily basis.
Q. Other than being put on a credit hold, what factors can you think of that would lead to United Medical not being able to fill an EDO order timely?
A. Well, if the EDO -- if it's Ethicon or if it's a major manufacturer, we could say if we needed to -- and we would even pay for it, you have to do it to meet the 10-day-window -- do it on -- on Federal Express. If you had a Fed Ex, you'd do that. We'll eat that. If it were a DAPA

holder that had an office like I've got in there in the corner of his den and he was out playing golf that day when they ordered an EDO and they wanted that DAPA order and three days later they got him on the phone and he -- then he ordered from the manufacturer, we couldn't control that kind of performance. But that's the only time. If it was a -- what we call a legitimate manufacturer and -- we'd handle an EDO just like anything else.

Q. If an MTF placed an EDO -- I mean, an extended delivery order, and the MTF sent you all the information correctly --

A. Uh-huh.

Q. -- would there be anything outside of that that would be the MTF's fault that you would not be able to fill an order timely?

A. If the manufacturer just simply didn't perform.

Q. That's not the MTF's fault.

A. No, no, not the MTF. If the MTF sent us an order timely and every item was properly identified and the manufacturer had it, it was up to us to get it here. Now, would there be a time -- and I'm sure in the time period with the multiplicity of orders, even though there weren't that many EDOs, if somebody looked hard enough, they could find out we didn't meet the 10-day window.

Q. Uh-huh. You testified that in preparing your bid

Q. And so when she says, "Under the EDO portion, all items appearing on one order must be delivered at the same time and within 20 calendar days of order placement," that means -- that doesn't mean the entire order, it means all the ones that you're delivering under the order?

A. No. In an EDO it was different, because that order went to a manufacturer, and that meant everything had to be delivered. That was my understanding. They couldn't be -- there couldn't be one box back-ordered, or killed.

Q. For just-in-time you could fill partially, but for EDO you were not supposed to?

A. On a line item basis. It's my recollection that that's --

Q. Uh-huh. Okay. Stack them here, I guess.

(Exhibit No. 28 marked)

This will be Bandy 28. Is that a United Medical Supply cover sheet?

A. Yes.

Q. Does this refresh your recollection at all with respect to who June Lyon is or was?

A. Obviously she must have been one of our employees in our accounts receivable.

Q. Uh-huh.

A. Worked for Megan.

Q. What -- If you look at the second page, what is



Limine

IN THE UNITED BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: UNITED MEDICAL SUPPLY COMPANY, INC., Debtor-in-Possession | )( | Case No. 01-41911-bjh-11 |
| | )( | Chapter 11 |
| United Medical Supply Company, Inc., Plaintiff, | )( | |
| v. | )( | Adversary: 02-4230 |
| United States of America, Defendant. | )( | |

* * * * * * * * * * * * * * * * * * * * * * * * * * 

ORAL DEPOSITION OF
MICHAEL DAVID
SEPTEMBER 17, 2007

* * * * * * * * * * * * * * * * * * * * * * * * * * 

ORAL DEPOSITION of MICHAEL DAVID, produced as a witness, and duly sworn, was taken in the above-styled and numbered cause on the 17th day of September, from 1:00 p.m. to 2:00 p.m., before Lori M. Bryant, CSR in and for the State of Texas, reported by Stenographic Machine, at Fort Sam, 2050 Worth Road, Suite 17, Ft. Sam Houston, Texas 78234.

EXHIBIT D

APPEARANCES

Q. Do you have an opinion as to the significance of usage data being accurately provided to the prime vendors?
A. Yes.
Q. What is your opinion?
A. That is the most crucial aspect of the program, because that's how we measure your performance.
Q. When you say that's how we measure your performance, when you say "your," you're referring to a prime vendor?
A. Yes, sir, because we want support for you. We give you our usage so you can stock the items, then we'll come to you for those items we told you we would. That's how we assure that you have those items that we're asking you for. So that's the single most important thing on getting good prime vendor support is giving you good accurate usage. Then it's the prime vendor's responsibility to stock to those levels that we told you we were going to use.
Q. Do you recall back in the 1997 time frame that there were issues regarding getting accurate usage data to the United Medical as the Lone Star prime vendor?
A. Not you in particular, but it has always been a factor getting good usage. And there are several reasons, one of them simply being manufacturers frequently change. Like they'll have a box of 10 and make it a box of 12, or

## FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER

Based on the following findings, it is the determination of the Contracting Officer, in accordance with FAR 17.207, to exercise option year three, for a period of one year, for the Medical/Surgical Prime Vendor Program – Lone Star Region, Contracts SP0200-97-D-7133 (JITO/EDO) and SP0200-97-D-7134 (Stockless) dated January 30, 1997 (with an effective date of June 1, 1997). The second option period will be effective June 1, 2000 and will expire on May 31, 2001.

## FINDINGS

1. Request for Proposal (RFP) DLA120-93-R-0587 was synopsized and issued under Full and Open Competition procedures. Three offers were received. Contracts SP0200-97-D-7133 and SP0200-97-D-7134 were awarded to United Medical Supply on January 30, 1997, using a Best Value acquisition methodology with technical quality being more important than price. These contracts covered the distribution of medical/surgical products to nineteen facilities in the Lone Star Region. The contracts were awarded for one year plus four one-year option periods. The estimated annual sales volume of the facilities in the region is $28,357,750.00 for the base year and $56,715,500.00 for each option year. Each year, the percentage of sales for JITO/EDO is expected to decrease and the Stockless percentage is expected to increase. The distribution fees for the base plus option years are as follows:

| | DISTRIBUTION FEE | ESTIMATED TOTAL |
|---|---|---|
| **Base Year** | | |
| JITO/EDO | 6.4% | $1,778,598 |
| Stockless | 7.4% | 41,969 |
| | | **$1,820,567** |
| **Option Year 1** | | |
| JITO/EDO | 6.4% | $3,194,217 |
| Stockless | 7.4% | 503,634 |
| | | **$3,697,851** |
| **Option Year 2** | | |
| JITO/EDO | 6.4% | $2,504,556 |
| Stockless | 7.4% | 1,301,054 |
| | | **$3,805,610** |
| **Option Year 3** | | |
| JITO/EDO | 6.4% | $1,851,194 |
| Stockless | 7.4% | 2,056,504 |
| | | **$3,907,698** |

EXHIBIT
E

## FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER (continued)

| Option Year 4 | | |
|---|---|---|
| JITO/EDO | 6.4% | $1,488,215 |
| Stockless | 7.4% | 2,476,199 |
| | | **$3,964,414** |

2. Twenty-three Medical/Surgical Prime Vendor contracts have been awarded as of this date. Twenty-one of the twenty-three awards were made under full and open competition (Two were Small Business Set-Asides). Listed below are all the current Medical/Surgical Prime Vendor contract distribution fees:

| REGION | PRIME VENDOR | DISTRIBUTION FEES | | | | |
|---|---|---|---|---|---|---|
| | | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
| Cascades | BBMC | 6.5% | 6.0% | 5.5% | 5.5% | 5.5% |
| IL/KY/MO | BBMC | 5.9% | 5.8% | 5.7% | 5.6% | 5.5% |
| FL/GA | Owens & Minor | 6.0% | 5.5% | 5.5% | 5.5% | 5.5% |
| Panhandle | Owens & Minor | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| OH/IL | BBMC | 5.5% | 5.5% | 5.5% | 5.5% | 5.5% |
| Carolinas | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Rocky Mountains | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Midwest | Midwest Medical | 5.9% | 5.8% | 5.7% | 5.6% | 5.5% |
| Hawaii | Pacific Criticare | 14.2% | 13.2% | 11.2% | 10.2% | 10.2% |
| Europe | BBMC | 6.7% | 5.86% | 5.86% | 5.86% | 5.86% |
| | Surge | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| AL/TN/ARK | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Montana | Kreisers, Inc. | 5.9% | 5.5% | 5.5% | 5.5% | 5.0% |
| Alaska | BBMC | 13.0% | 13.0% | 13.0% | 13.0% | 13.0% |
| Dakotas | Kreisers, Inc. | 5.9% | 5.5% | 5.5% | 5.5% | 5.0% |
| Utah/Idaho | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Tidewater | BBMC | 6.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| San Francisco | Owens & Minor | 5.9% | 5.75% | 5.2% | 5.0% | 5.0% |
| Pacific | BBMC | 8.91% | 6.9% | 6.9% | 6.9% | 6.9% |
| | Surge | 8.91% | 6.9% | 6.9% | 6.9% | 6.9% |
| NY/NE | Owens & Minor | 8.0% | 7.5% | 5.5% | 5.5% | 5.5% |
| National Capitol | Owens & Minor | 6.0% | 5.75% | 5.3% | 5.25% | 5.25% |
| | Stockless | 13.0% | 12.75% | 12.5% | 12.0% | 11.0% |
| Wilford Hall | Owens & Minor | 7.0% | 7.0% | 6.25% | 5.0% | 5.0% |
| Lone Star | United Medical Supply | 6.4% | 6.4% | 6.4% | 6.4% | 6.4% |
| | Stockless | 7.4% | 7.4% | 7.4% | 7.4% | 7.4% |
| San Diego | Allegiance Healthcare | 5.1% | 5.1% | 4.9% | 4.7% | 4.5% |

**FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER (continued)**

An informal analysis of distribution fees reveals that the Lone Star Region distribution fee for option year three compares favorably to the distribution fees for the other CONUS Medical/Surgical Prime Vendor contracts. In addition, the distribution fee is same as the Base Year and Option Years One & Two. Therefore, it is determined that the 6.4% distribution fee for option year three of contract SP0200-97-D-7133 (JITO/EDO) is fair and reasonable. The 7.4% distribution fee for contract SP0200-97-D-7134 (Stockless) compares favorably with the National Capitol Region (the only other Stockless contract) and is therefore considered fair and reasonable.

3. On April 12, 2000, United Medical was sent a Preliminary Notice to Exercise Option Year Three. The notice advised United Medical Supply that the Government is considering invoking the option in accordance with Option Clause 52.217-9P10, Option for Requirements Contract Term Extension. United Medical Supply was also informed that the preliminary notice does not commit the Government to an extension.

4. Consideration was also given to other factors, which impact overall cost such as the need for continuity of operations, investment in training and equipment, and the potential costs of disrupting operations. Each prime vendor has its own proprietary electronic ordering system. As customers become more familiar with a particular firm's ordering system, efficiency increases and other associated supply management costs decrease. Failure to exercise the option at this time would have a tremendous impact on the overall mission of the ordering facilities.

5. In accordance with FAR 17.207 (c) the following conditions have been met:

a. The requirement covered by the option fulfills an existing Government need.
b. The exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors considered.
c. The option was included in the original synopsis and was evaluated with the initial proposals.

**DETERMINATION**

Based on the above findings, it is the intent of the undersigned to exercise the third option year under the contract. The option year three distribution fee (6.4% for JITO/EDO and 7.4% for Stockless) is the same as the distribution fee for the base year, option year one and option year two. Based on the estimated requirements of $56,715,500.00, the total estimated value of option year three is $60,623,198.00. This figure represents $56,715,500.00 for the estimated requirements plus $3,907,698 ($1,851,194.00 for JITO/EDO plus $2,056,504 for Stockless) for distribution fees. Execution of the option is the most advantageous way of fulfilling the Government's need, price and other factors considered.

United Medical Supply has demonstrated a full understanding of the Government requirements and has performed all the required tasks and functions cited in the aforementioned contract.

## FINDINGS AND DETERMINATION OF THE CONTRACTING OFFICER (continued)

The firm is a commercially recognized large volume distributor of medical/surgical products. It has been determined that United Medical Supply, from a critical review of its commercial operations, can handle the financial and logistical obligations of this contract without difficulty. In accordance with the provisions of FAR 9.105-2, I hereby determine that United Medical Supply is considered to be responsible within the meaning of FAR 9.103 and 9.104.

Donna M Kennedy
DONNA M. KENNEDY 5/22/00
Contracting Officer

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED MEDICAL SUPPLY COMPANY, INC., | ) | Videotaped deposition of: |
| Plaintiff, | ) | DERK RASMUSSEN |
| vs. | ) | |
| THE UNITED STATES, | ) | Case No. 03-CV-289 |
| Defendant. | ) | Judge Allegra |

April 16, 2008 * 9:00 a.m.

Location: Sage Forensic Accounting
136 East South Temple, Suite 2220
Salt Lake City, Utah

Reporter: Ashley Davis, RPR
Notary Public in and for the State of Utah

Videographer: Ryan Reverman

would have impaired their ability to perform their obligations under the contract?

A. Detailed inventory records.

Q. The -- is it your opinion that if United Medical did not have an item in stock at the time it was ordered, the government was free to -- to go somewhere else to purchase that item?

A. Well, that's a legal conclusion; but from an economic point of view, I understand that that's a possibility, yeah. They could go somewhere else. And I know that the government believed that they could. That's how they acted.

Q. If they sent an order to United Medical and United Medical was not able to fill that order, then it's your opinion the government just went somewhere else?

A. It's my opinion, based on testimony from people who were ordering for the government, that that's what they did.

Q. And under what circumstances did the government go directly to third-party venders without first -- do you need me to take a break for you to get some water there?

A. No, not right now.

Q. Okay. Under what circumstances -- I kind



of lost my train of thought there.

Where the government went first to third parties without ever ordering first from United Medical, do you have any opinion as to why they did that?

A. I wasn't able to form an opinion because you don't have the records -- United Medical doesn't have the detailed inventory records to assess that problem.

Q. No. I -- the question I'm asking is whether you formed an opinion that -- okay. Let's -- okay. I think I do understand your answer.

So you're saying where the government went to third-party venders without first going to United Medical -- you're saying United Medical didn't have inventory records to show whether they could have filled that or not?

A. That's correct.

Q. And if the government would have sent the order to United Medical, what would have prevented United Medical from then ordering from a supplier and receiving it and then shipping it to the government?

A. Well, I guess it comes down to your interpretation of the contract. It's my understanding that they were supposed to have these



items on hand and that you couldn't do any sort of drop shipment or -- I guess it also depends on the timing, how quickly they could get the order in and get it off to the MTFs and still comply with the contract.

Q. So it is possible that -- in your opinion, then, that circumstances could have existed where the government ordered from United Medical, United Medical then ordered from the supplier and then reshipped to the MTF?

A. Is it possible? It may be possible. Is it outside of what I think the intent of the contract was from an economic perspective? Yeah, I think it is outside the intent.

I think the intent of the contract from an economic perspective is that those items would have been on hand. And I know from the perspective of the government, the people who were ordering -- the deposition testimony I've reviewed, they've indicated that they called up and United Medical didn't have it on hand, that they were free to go order it from whoever they needed to order from to get it right away.

Q. And that would have been a just-in-time-type order?



A. Well, they didn't specify the type of order when they gave the deposition testimony, but they talked about orders in general.

Q. Do you perceive a distinction between a just-in-time order and an extended-delivery order with respect to United's obligation to have that stuff in their inventory?

A. I'd have to go back and review the contract. There may be a distinction, but I don't have a recollection right now.

Q. Would that be a significant distinction to you?

A. Well, it's potentially a distinction that could be addressed if United Medical had the inventory records to address it. It's -- it's part of the process that I think you would -- you would logically go through to assess damages in this case, but you're limited from doing it because you don't have the available records.

Q. Well, when you say we don't have the available records, United Medical had significant inventory records that were provided to you, did they not?

A. I guess I would -- they provided inventory records. Whether or not they were significant, I

**Page 34**

would beg to differ; but they had inventory records. But they weren't the type of records that would demonstrate the availability of particular products at any particular point in time.

Q. If -- assume that the government had not provided usage data to United Medical and then they submitted an extended delivery order to United Medical. Is it your understanding that under the terms of the contract United Medical should have had that in inventory?

A. Should have had the items in inventory?

Q. Yes.

A. I'd have to go back and review the contract. I don't have a specific recollection of that provision.

Q. Do you know what Mr. Imel's opinion is with respect to that issue?

A. I don't recall him addressing that issue in his report. If he has an opinion of it that's not mentioned in his report, I wouldn't know about it.

Q. Now, you state in paragraph 16 on page 5 -- it says, "The MTFs were required to provide the prime vendor with usage data or the item in associated quantities that it intended to order from the prime vendor."

**Page 35**

How is that consistent with the second sentence of item 16? Those appear to be contradictory statements to me.

A. Well, based on my review of the contract, those -- the issues regarding usage data -- that they were required to provide usage data, and they were -- the issue on providing the usage data would be whether or not they were excluded from the fill-or-kill calculation. That was the penalty within the contract, based on my review of it, for not providing the usage data.

Q. Well, and what I'm -- what I'm getting at there on item 16, you start out item 16 with, "The MTFs were required to provide the prime vendor with usage data," and then you begin the second sentence with, "There does not appear to have been any requirement that the MTFs provide usage data."

And I'm asking you to explain what appears to be an inconsistency there.

A. Well, they had a requirement, but what I'm trying to say is -- and it's probably not as artful as it ought to be -- what I'm trying to say here is they had a requirement to provide usage data; but if they didn't provide it, then the consequence was they were -- the MT -- or the -- United Medical was

**Page 36**

excluded from the fill-or-kill calculation.

Q. On -- again, referring to page 5, it -- the last paragraph right above the section that begins, "Scope of work," it starts out, "In a claim..." Do you see that?

A. Yes.

Q. And in the last sentence, it says, "In more recent documentation proffered in this case..." What recent documentation are you referring to besides Mr. Killman's report?

A. I'd have to go back and look at the timing of documents that we received and when, but it's primarily Mr. Killman's report.

Q. When did you first understand that there was an issue of negligent estimates in this case, roughly?

A. When we received Mr. Killman's report.

Q. So prior to then, you were not aware that negligent estimates were an issue in this case?

A. We may have been. It may have been discussed, but we hadn't seen anything proffered by the plaintiffs dealing with that particular issue.

Q. The -- on page 6 of Exhibit 1, you state you were asked to assess whether the opinions proffered by Mr. Imel are reasonably supported by the

**Page 37**

information he considered.

A. Are you talking about item 4?

Q. I -- no. Oh. Did I say "Killman"? I meant Imel -- "Assessed whether the opinions proffered by Mr. Imel are reasonably supported by the information he considered."

A. So you're talking about item 2 on page 6?

Q. Right. I thought that's what I said.

A. No. You just -- you didn't tell me -- tell me which item you were referring to.

Q. Okay. Item 2 on page 6.

A. And what was your question again?

Q. That's -- that was one of the things you were asked to do.

A. Yes.

Q. And did you personally make a determination whether you had before you all the information that Mr. Imel considered in providing his opinion?

A. Well, to the extent he disclosed it in his report, yes.

Q. So did you personally make a determination that you -- you had before you all the information he considered, if that information was provided in his report?



GWENDOLYN PARKER & ASSOCIATES
214-747-8007